IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, 813 West Northern Lights Blvd., Anchorage, AK 99503,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Department of Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management;<br><br>Defendants. | Case No.: |

## **COMPLAINT**

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") brings this civil action against the above-listed Defendants. Plaintiff alleges as follows:

### **INTRODUCTION**

1.      This case challenges under the Administrative Procedure Act and applicable law the unilateral termination by the Department of the Interior ("DOI") and its Bureau of Land Management ("BLM") (collectively "DOI") of oil and gas leases entered into by BLM and Plaintiff Alaska Industrial Development and Export Authority ("AIDEA"). An Act of Congress directs DOI to facilitate the development of oil and gas resources on the Coastal Plan of Alaska within the Arctic

National Wildlife Refuge ("ANWR" and the "Leasing Program" or "Coastal Plain Program") by awarding leases for the production of such resources and taking additional steps to further the Leasing Program.   P.L. 115-97 § 20001 ("Tax Act").  The Act requires that DOI issues a lease or leases covering at least 400,000 acres for exploration by December, 2021.  DOI (including BLM) is no longer in compliance with that statute.  In January, 2021, DOI issued leases under the Leasing Program to Plaintiff AIDEA (as well as to other parties who subsequently agreed to the voluntary termination of their leases).  On September 6, 2023, without providing Plaintiff AIDEA with the opportunity to defend the validity of it leases as required by due process, and before DOI even completed its ongoing environmental review of the Leasing Program or received public comment in that review, DOI unilaterally terminated AIDEA's leases (the only leases in the Leasing Program still in effect) on the alleged basis that DOI itself violated the law in issuing these Congressionally-mandated leases (the "Lease Cancellation Decision").

       2.      DOI's termination of AIDEA's seven lease agreements is unlawful.  First, AIDEA's leases were and are entirely legal, indeed they are Congressionally-mandated.  Second, DOI's recent determination its Lease Cancellation Decision that DOI had erred in previous environmental analysis in its 2019 Final Environmental Impact Statement ("FEIS") and its 2020 Record of Decision ("ROD") concerns operational rules for the Coastal Plain Program, such as the number of surface acres that can be occupied by oil production and support facilities, or how best to protect subsistence hunting and fishing.  Those operational rules do not implicate the validity of the Congressionally-mandated leases that DOI issued to AIDEA.  DOI failed to provide AIDEA the opportunity to keep its leases and abide by any corrective operational rules that DOI might impose.  Third, DOI did not err in the 2019 FEIS and 2020 ROD as DOI now claims it did.  Fourth, DOI's decision to terminate the leases was inadequately reasoned, unsupported by facts, and a pretext for

2

DOI's real goal of never allowing drilling in the Coastal Plan to occur. It frustrates Congress's directive in the Tax Act to hold an initial sale and issue leases for oil and gas production and development by 2021, making the lease cancellation decision arbitrary and capricious. Fifth, DOI's unilateral decision to cancel the leases violates AIDEA's constitutional and statutory due process rights, because DOI failed to provide AIDEA with an administrative process in which it could defend the validity of its leases, before DOI terminated them. Sixth, because the leased lands are known to contain valuable deposits of oil, a fact recognized by the U.S. Geological Survey, DOI's procedural rules required that DOI obtain a court order authorizing termination of the leases, and DOI failed to obtain any such court order.

## PARTIES

3.      Plaintiff AIDEA is a public corporation of the State of Alaska. AIDEA was created in 1967 for an important purpose: to "promote, develop and advance the general prosperity and economic welfare of the people of [Alaska], to relieve problems of unemployment, and to create additional employment…." Alaska Statutes § 44.88.070. Through its development project finance programs, AIDEA leverages valuable public resources to support significant private-sector investment, catalyzing enterprise growth to protect the long-term economic health of the State and its citizens. From its inception, AIDEA has worked with Alaska Native Corporations, tribal organizations and indigenous village communities to increase job opportunities and encourage the economic growth of the State, particularly in rural and remote areas, including the North Slope region of Alaska. AIDEA is specifically authorized by the Alaska Legislature to promote and provide financing for Arctic infrastructure development and to enter into lease agreements with government entities necessary to fulfill these purposes. Alaska Statutes § 44.88.070.

4.      Defendant United States Department of the Interior ("DOI") is an agency within the executive branch of the United States government.

5.    Defendant Deb Haaland is the Secretary of the Interior ("Secretary"). She is sued in her official capacity.

6.    Defendant Bureau of Land Management ("BLM") is an agency within DOI. Accordingly, references to DOI are to both BLM and the Department of Interior.

7.    Defendant Tracy Stone-Manning is the Director of BLM. She is sued in her official capacity.

## JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  *See* 28 U.S.C. §§ 1331, 1367(a), 2201; 5 U.S.C. §§ 701-706.

9.    Venue is proper in this District because Defendants are United States agencies or officers sued in their official capacities and a substantial part of the events or omissions giving rise to the Complaint occurred within this District. *See* 28 U.S.C. § 1391(e)(1).

10.    DOI's decision to issue the Lease Cancellation Decision was made at DOI headquarters in Washington, DC.  DOI issued the Lease Cancellation Decision and its associated press release from Washington headquarters.

11.    DOI Secretary Haaland personally announced the Lease Cancellation Decision at a press event held on or about September 6, 2023 and DOI Deputy Secretary Beaudreau signed the decision.   Both worked from DOI's Washington, DC headquarters.

## LAW AND FACTS

### A.  Congress Directs DOI to Establish and Oil and Gas Program in ANWR.

4

12. In 2017, after decades of debate over oil and gas development within ANWR, Congress expressly opened the Coastal Plain of ANWR up for oil and gas development. Section 20001(b)(2)(A) of Pub. Law No. 115-97, known as the "Tax Act," provides: "The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."

13. Through the Tax Act, Congress mandated that the Secretary of the Interior take various steps to promote the exploration and development of oil and gas resources within the Coastal Plain, including directing the sale of leases in the Coastal Plain.

14. Section 20001(c) of the Tax Act directs the Secretary to conduct at least two 400,000-acre Coastal Plain lease sales by December 22, 2024, with the first sale to be completed by December 22, 2021 and the second by December 22, 2024. PL 115-97, § 20001(c).

15. Section 20001(c) also provides that "[t]he Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." PL 115-97, § 20001(c)(2).

16. Section 20001(c) also states that "in administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities…. during the term of the leases under the oil and gas program under this section." PL 115-97, § 20001(c)(3).

17. Finally, the Tax Act borrows the statute and rules governing the nearby National Petroleum Reserve Alaska ("NPRA"), making the NPRA's regulatory structure applicable to the Tax Act, except where inconsistent with a provision of the Tax Act: "Except as otherwise provided in this section, the Secretary shall manage the oil and gas program on the Coastal Plain in a manner

5

similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." PL 115-97, § 20001(b)(3).

**B. DOI Issues Leases to AIDEA in January, 2021 for the Portions of the Coastal Plain Most Economically Valuable for Oil Production.**

18.     After enactment of Tax Act § 20001, DOI began work to implement it. In September 2019, after taking public comment on a draft Environmental Impact Statement ("EIS") DOI issued the 2019 FEIS.   In August, 2020, DOI published its 2020 ROD finalizing the structure of the Coastal Plain oil and gas program.  The 2020 ROD also contains a thorough analysis and review of the Leasing Program's environmental impacts, addresses possible alternative forms of action that DOI could have taken to implement the program, and evaluates the proposed Leasing Program's compliance with other statutory requirements such as assessing the impacts that the Leasing Program may have on subsistence uses of the Coastal Plain under Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. Law No. 96-487.

19.     On December 7, 2020, DOI published in the Federal Register a Notice of Coastal Plain Oil and Gas Lease Sale.  85 Fed. Reg. 78865.  The notice called for the submission of competitive bids for the available leases.  During the open period, AIDEA submitted bids for the eleven tracts of land DOI had opened to the leasing process.  DOI reviewed the bids and announced on January 6, 2021 that AIDEA was the high bidder and awarded the opportunity to enter into lease agreements on nine of the tracts.

20.     On January 13, 2021, AIDEA entered into oil and gas lease agreements with DOI (specifically BLM) for seven tracts of Coastal Plain land, covering 365,775 acres, more than one fifth of the 1.5 million acres in the Coastal Plain a/k/a the "1002 Area."

21.     The 365,775 acres leased by AIDEA included substantial oil deposits that were both technically and economically recoverable, and thus valuable.  Oil is technically recoverable if

technology exists to recover it. Oil is economically recoverable if the revenues that can be earned by selling it exceeds the costs of obtaining and transporting it.

22. In Fact Sheet 0028-01, originally issued in 1998 and updated in 2001, the United States Geological Survey ("USGS") found that the Coastal Plain was 95% certain to have at least 4.3 billion barrels of technically recoverable oil.[1] In the same document USGS found that "nearly 80 percent of the oil" would likely be "in the western part of" the ANWR Coastal Plain, "which is closest to the existing infrastructure" serving Prudhoe Bay and adjacent oil production facilities.[2] USGS based this conclusion in part on the geology of the western portion of the ANWR Coastal Plan. It specifically identified this location as the Undeformed Area to the northwest of the March Creek anticline, where the formation rocks are generally horizontal. USCS also noted the presence just to the west and northwest of the Coastal Plain of locations where recoverable oil has actually been located within State onshore and offshore leases.[3]

23. USGS further found that oil in the ANWR Coastal Plain was economically and technically recoverable, to a 95% degree of certainty, so long as the market price for oil exceeded just $19 per barrel.[4] USGS determined that 3.6 billion barrels of oil were economically recoverable from the Coastal Plain if oil prices reached $40 per barrel.[5]

---

[1]    Fact Sheet, p. 4, available at https://.pubs.usgs.gov/fs/fs-0028-01/fs-0028-01.pdf

[2]    USGS Fact Sheet FS-0028-01, p. 4.

[3]    *Id.,* pp. 1-6 and Figure 2.

[4]    *Id*., p. 6, Figure 6.

[5]    *Id*.

24.     In September, 2023, when DOI cancelled the leases, the market price for oil was in the mid-to-high $80s or low $90s per barrel.[6]  In January, 2021, when DOI issued AIDEA's leases, the market price was in the mid $40s to low $50s per barrel.[7]

25.     AIDEA was aware of USGS's findings when it bid on selected portions of the ANWR Coastal Plain in January, 2021.  The 365,755 acres leased by AIDEA (more than one fifth of the entire Coastal Plain) covered much of western end of the Coastal Plain, and all or almost all of the portion of the Coastal Plain along ANWR's western and northwestern boundaries, which are the areas nearest to the proven wells on adjacent State land (both onshore and offshore).  Until the Tax Act, drilling within ANWR was prohibited, which is why drilling has not been performed.

26.     Including both the winning bid and payments for rent pursuant to the lease agreement, AIDEA in or about January, 2021 paid over $13 million to DOI to acquire the Coastal Plains lease agreements, which granted the exclusive rights to develop oil and gas production on those lands.  AIDEA then paid approximately $3 million more in rent to DOI.

27.     AIDEA participated in the Coastal Plains Program and incurred such significant expenses in order to further its mission of increasing job opportunities and encouraging economic growth throughout Alaska by accessing and developing the State's natural resources.  Work performed on the leased lands for exploration and development advancing the Coastal Plains oil and gas project would result in numerous benefits to AIDEA and the State of Alaska; such benefits include the creation of new employment opportunities for work both directly and indirectly necessary to develop and initiate oil and gas production; direct revenue from the management and sale of such resources that will be paid to local and State governments, Alaska Native corporations,

---

[6]     https://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm (viewed October 10, 2023).

[7]     https://www.eia.gov/dnav/pet/hist/RWTCD.htm  (viewed October 10, 2023).

and Native Villages; and the direct revenue and profits AIDEA will receive from the development of the leased tracts which can then be reinvested into future economic development projects in Alaska.

28.     Cancellation of the lease agreements eliminates AIDEA's property rights in exploring and developing these leases and prevents all of the expected benefits that would have come from developing an oil and gas program on these lands, seriously harming AIDEA.   If there is another lease sale, cancellation puts AIDEA at risk of being outbid by another bidder for the most economically valuable land, the western portion of the Coastal Plain, when AIDEA had already taken the risk of submitting winning bids for that area.

## C. **DOI Suspends AIDEA's Leases, Initiates Supplemental NEPA Proceedings, and Leads AIDEA to Believe it can Defend the Validity of its Leases by Filing Comments in Those Supplemental NEPA Proceedings.**

29.     On January 20, 2021, on the first day of his term, President Biden issued Executive Order 13990, directing DOI to "place a temporary moratorium on all activities of the Federal Government relating to the implementation" of the Coastal Plain Program.

30.     On June 1, 2021, Secretary of the Interior Haaland, issued Order No. 3401 ("SO 3401") in furtherance of the presidential directive articulated in EO 13990. In SO 3401, Haaland directed her Department to "conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies." While that analysis was pending, Haaland directed "a temporary halt on all Department activities related to the Program in the Arctic Refuge."   DOI implemented that halt by, among other things, refusing to process applications by AIDEA and its contractors, for permission to conduct preliminary archeological and seismic surveys.

31.     Also on June 1, 2021, Laura Daniel-Davis, DOI's Principal Deputy Assistant Secretary, sent AIDEA a letter entitled "Decision" which cited SO 3401 and explained that "it is necessary to suspend [AIDEA's] leases and complete further environmental analysis under NEPA," i.e. the National Environmental Policy Act, 42 U.S.C. § 4321, et seq.  Daniel-Davis explained that "the BLM will undertake this additional *NEPA* analysis to determine whether the leases should be reaffirmed, voided, or subject to additional mitigation measures," and that when this additional NEPA analysis is "complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the Leases."  (Emphasis added).  NEPA requires the agency to seek comment on a draft EIS, including a draft SEIS, before releasing a final EIS and ROD.  40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c).   Thus, by informing AIDEA that DOI would use a NEPA process to evaluate the lawfulness of the leases that DOI had already issued to AIDEA, DOI effectively assured AIDEA that it would have an opportunity to submit comments defending its leases.

32.     On August 4, 2021, following SO 3401, DOI began that NEPA process by publishing in the Federal Register a "Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program" ("Scoping Notice").  The Scoping Notice stated that DOI would first take public comments to refine the list of issues to be analyzed in a draft Supplemental Environmental Impact Statement ("SEIS") DOI would develop. 86 Fed.Reg. 41989.  The Scoping Notice specified that "[t]he purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues, including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis."  *Id*.  In other words, the Notice solicited

10

public comment only as to the *scope* of the issues to be addressed in the proceeding, not the merits of the identified and to be identified issues. Confirming that the public could comment on the merits of the issues later, the Scoping Notice explained that DOI would develop a Draft SEIS "which will be made available for public comment for at least 45 days," before DOI made final decisions. 86 Fed.Reg. at 41990.

33.    The Scoping Notice did not invite or require AIDEA to immediately submit comments on whether AIDEA's leases should be invalidated for illegality, or otherwise. In fact, the Scoping Notice did not mention the possibility that AIDEA's leases might be invalidated for purported illegality. Responding to the Scoping Notice as DOI invited, AIDEA submitted timely comments, which it called "scoping comments," addressing the scope of issues to be addressed.

34.    Subsequently, on August 19, 2022, DOI through Ms. Daniel-Davis distributed another letter, entitled "Addendum to Suspension of Operations and Production," which purported to identify another potential "legal defect" in the Coastal Plain EIS. Once more, Ms. Daniel-Davis assured AIDEA that BLM would use "additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures," meaning that AIDEA would have the benefit of NEPA-required public input opportunities to comment on a draft SEIS.

**D**. **The Lease Moratorium Litigation.**

35.    On November 4, 2021, Plaintiff AIDEA filed suit against Defendants in *Alaska Industrial Development and Export Authority v. Biden,* Case No. 3:21-cv-00245SLG (USDC Alaska), seeking judicial review of Defendants' suspension of AIDEA leases and its halt of activities to implement the Coastal Plain program (the "Moratorium Litigation").

36.    Throughout the course of the Moratorium Litigation, DOI characterized its halting of the Coastal Plain Program and its suspension of AIDEA's leases as being temporary actions.

DOI described itself as having undertaken "the preparation of a supplemental NEPA analysis, and… a temporary halt on Department activities related to the Program pending completion of that supplemental analysis." DOI contended "there is a disconnect between the injuries Plaintiffs claim to suffer – temporary inability to obtain economic benefits and information through surveys – and an order directing Defendants to cease the temporary suspension of efforts to implement the Program." Case No. 3:21-cv-00245-SLG, Docket Entry 63 at 18.

37.    DOI's representations as to the temporary nature of the suspension of the lease and Program implementation activities played a central role in the Court's decision to enter judgment in favor of Defendants in the Moratorium Litigation:

> As an initial matter underlying the Moratorium's legality, the Court highlights what are perhaps the Moratorium's most critical elements: its temporary duration and limited scope. Plaintiffs and the State characterize the Moratorium as "indefinitely" suspending the ROD prepared in conjunction with the Program. This characterization is inaccurate. EO 13990 expressly directs only a "*temporary* moratorium," and Secretarial Order 3401 orders a "*temporary* halt on all Department activities related to the Program." The SOP Letter also connotes temporality: "*While this SOP is in place,* no lease operations may transpire on the leases, the terms of the leases are *tolled,* and the lease rentals are *suspended.*"[8]

38.    The Court emphasized that DOIS's decisional documents "contain no statement or suggestion that the Program, including the ROD, is terminated or that AIDEA's leases are cancelled. Agency Defendants have instead evidenced an intent to continue implementing the Program. The supplemental NEPA review is the current stage of that implementation."[9] Having so framed the case as being about a temporary lease suspension only, the Court granted summary judgment to DOI and the other Defendants on August 7, 2023.

---

[8]    Case No. 3:21-cv-00245-SLG, Docket Entry 72 at 16-18 (USDC Alaska, Aug. 7, 2023). (emphasis added).

[9]    *Id.* at 17. The Court emphasized that DOI had not cancelled AIDEA's leases and that "the validity of" any such future lease cancellation "is not before the Court. *Id.* at n. 66.

**E.    DOI Abruptly Shifts From Lease Suspension to Lease Cancellation**.

39.    On September 6, 2023, just 30 days after the Court's August 7, 2023 decision discussed above upholding lease suspension, DOI through its Deputy Secretary Beaudreau issued a lengthy letter, the Lease Cancellation Decision, stating that DOI "has determined that the leases were improperly issued due to pre-leasing legal defects… and... the Department has determined that cancellation is appropriate."

40.    Deputy Secretary Beaudreau asserted that DOI had failed in its 2019 EIS and its 2020 ROD to "analyze any alternative… that involved fewer than 2,000 acres of surface development" and had "failed to provide a quantitative estimate of downstream GHG [Greenhouse Gas] emissions resulting from reduced foreign consumption or adequately explain why it could not."    Further, in a wholly conclusory fashion, Beaudreau stated that the ANILCA § 810 analysis of subsistence hunting impact was deficient.    Based on these purported errors by DOI in proceedings relating to the issuance of AIDEA's leases, Beaudreau declared AIDEA's leases to be terminated.

41.    Although DOI's suspension decision and other documents issued by DOI from June, 2021 through August, 2022, reviewed above, had assured AIDEA that the issue of possible termination of AIDEA's leases would be addressed in a NEPA analysis, and DOI in the Scoping Notice commencing the NEPA process had assured AIDEA and the public that DOI would provide an opportunity to comment on a Draft SEIS before DOI took final action, DOI terminated AIDEA's leases without actually providing AIDEA with that public comment opportunity.    On September 6, 2023, DOI released both the Lease Cancellation Decision and the Draft SEIS, thus depriving AIDEA of the chance to file comments defending the legality of its leases, before DOI acted to terminate the leases.

13

42.     During a call with reporters on September 6, 2023, Secretary Haaland explained that she had authorized the lease termination and she stated that "with today's action no one will have rights to drill oil in one of the most sensitive landscapes on Earth."[10]

43.     Despite the sudden cancellation of AIDEA's leases, Secretary Haaland's subordinates told the media on about September 6, 2023 that they "intend to comply with the law" as to the Tax Act's mandate to hold another lease sale by December 2024.[11] Further, in the Lease Cancellation Decision, DOI stated that it is considering taking acreage that had been included in AIDEA's leases and offering it to bidders in a lease sale in 2024.[12]  This subjects AIDEA to the risk that other bidders will obtain the acreage for which AIDEA bid, paid, and was subsequently awarded.  Other bidders might outbid AIDEA for the most economically valuable western portion of the Coastal Plain.  Further, Defendants are subjecting AIDEA to the risk that they will not offer to any bidder the acreage that AIDEA bid upon and was awarded in the January, 2021 lease sale.

44.     In the Lease Cancellation Decision, DOI informed AIDEA that the decision to cancel AIDEA's leases was "the final decision of the Department [of the Interior] and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Department Regulations at 43 C.F.R. Part 4."  Thus, there are no administrative remedies that AIDEA must exhaust before bringing this lawsuit.

45.     DOI has not sought to hold a replacement lease sale to make up for the termination of the leases issued in the January, 2021 sale.

## COUNT I

---

[10] A media report by National Public Radio containing this quotation is available at: https://www.npr.org/2023/09/06/1197945859/anwr-alaska-drilling-oil-gas-leases-environment-energy-climate-change#:~:text=The%20administration%20is%20required%20to,lease%20sale%20by%20December%202024

[11] *See id.*

[12] Lease Cancellation Decision, p. 6.

14

## THE CANCELLATION OF AIDEA'S LEASES WAS UNJUSTIFIED
## AND VIOLATES SECTION 20001(C) OF THE TAX ACT

46.     The preceding paragraphs are incorporated by reference.

47.     In Section 20001(c)(1)(B)(ii) of the Tax Act, Congress mandated that DOI hold an initial lease sale under the Coastal Plain Program no later than December 22, 2021.

48.     DOI's decision to cancel the leases it previously issued to AIDEA directly contradicts and frustrates the Tax Act's Congressional mandate. Because DOI has now terminated or cancelled every Coastal Plain lease issued in the initial sale, DOI has not effectively complied with Congress's mandate to hold an initial lease sale.

49.     DOI in its Lease Cancellation Decision justifies the cancellation of AIDEA's leases based on alleged errors by DOI in its NEPA analysis in the 2019 FEIS and 2020 ROD, its ANILCA § 810 subsistence analysis, and its alleged mis-interpretation of the Tax Act's 2000-acre surface occupancy provision, P.L. 115-97, § 20001(c)(3). These justifications are flawed. With respect to NEPA and ANILCA § 810, DOI's asserted justification fails at the threshold, because both statutes exist to inform discretionary agency decision-making. But the issuance of leases was Congressionally-mandated by the Tax Act, rather than discretionary. *Dept. of Transportation v. Public Citizen*, 541 U.S. 752, 766-68 (2004); *see also,* 42 U.S.C. § 4336e(10)(B)(vii). With respect to all these issues identified by DOI in its Lease Cancellation Decision, DOI did not err in its prior decision-making, as is discussed further in Count II below.

50.     Even more fundamentally, there is a complete disconnect between the errors DOI asserts it made and the grossly excessive and unjustified remedy of lease termination. DOI's alleged error in the 2019 FEIS and 2020 ROD involve the details of how operations under the leases will proceed in the future. This includes how many acres of surface can be occupied by production and support facilities, and steps to be taken in the future to avoid impact on subsistence hunting and

15

fishing.  Whether the leases themselves are legal presents an entirely different question from how lease implementation operational steps should proceed going forward.  Even if the Tax Act *arguendo* leaves room for interpretation by DOI as to some implementation details, the Tax Act imposes a non-discretionary duty on DOI to issue leases by December, 2021 allowing exploration for oil in at least 400,000 acres within the Costal Plain.  Pub. Law No.  115-97, § 20001(c).

51.     The leases are unquestionably legal because Congress directed DOI to issue them. Even if DOI erred in some manner at to the issues it identified in the Lease Cancellation Decision, DOI's proper course of action was to correct any unlawful program terms and apply the corrected terms to future activities under the leases.  For example, if DOI erred in the 2020 ROD in interpreting the 2,000-acre surface disturbance provision (it did not), DOI should have applied the corrected acreage limitation to operations under AIDEA's leases, such as through imposing permit conditions when AIDEA files applications for permits to construct surface facilities.  By instead invalidating Congressionally-mandated leases, DOI committed one wrong to right another asserted wrong, and put itself out of compliance with the December, 2021 due date set in the Tax Act for selling leases.  As of the present (October 2023), there are no such leases.  DOI also failed to offer AIDEA the opportunity to keep its leases and abide by any changes in Coastal Plain Program rules necessary to correct any errors DOI perceived it had made.

52.     When DOI determines to terminate an oil and gas lease for alleged illegality in the inception, such action is "subject to judicial review."  *Boesche v. Udall*, 373 U.S. 472, 486 (1963) (cited by DOI in the Lease Cancellation Decision).  DOI's excessive and unnecessary action to terminate AIDEA's Congressionally-mandated leases on account of DOI's own alleged errors in its analysis concerning various issues ancillary to the non-discretionary issuance of the leases was

"arbitrary, capricious, an abuse of discretion, or not in accordance with law," and so must be set aside.  5 U.S.C. § 706(2).

**COUNT II**

**THE LEASE TERMINATION WAS CONTRARY TO THE LAW
AND ARBITRARY AND CAPRICIOUS**

53.     The previous paragraphs are incorporated by reference.

54.     For additional reasons, the law and facts do not support DOI's unilateral decision to terminate the leases for alleged illegality at the inception.

**(A).  AIDEA's Leases were not Illegal.**

55.     The alleged legal defects DOI relies upon in cancelling AIDEA's leases do not support DOI's conclusion that the leases were illegal, and the explanation in the Lease Cancellation Decision does not support the decision to terminate leases.  As a consequence, the Lease Cancellation Decision was contrary to law and arbitrary and capricious.  Any "inherent authority" the Secretary of the Interior has to manage federal lands only conveys authority to administratively cancel oil and gas leases if those leases were invalid at their inception.  *Boesche,* 373 U.S. at 476.[13] "[T]he existence of a legal defect is a necessary precondition to the Secretary exercising her authority to administratively cancel the lease."  *Solenex, LLC v. Haaland*, 626 F.Supp.3d 110, 119 (D.D.C. 2022).  AIDEA's leases with DOI were valid at their inception and not illegal.

56.     The issue of how to interpret the Tax Act's clause allowing "up to" 2,000 acres of production and support facilities (Tax Act § 20001(c)(3)) did not justify cancellation of AIDEA leases for purported illegality at the inception of the leases.  DOI in the 2020 ROD correctly

---

[13]     As discussed in Count IV below, any such inherent authority to administratively terminate oil and gas leases for illegality in the inception is subject to additional constraints that may be imposed by statute or agency regulation and such additional constraints are present here.

interpreted the 2,000-acre clause. The clause allows the leaseholder(s) to construct production and support facilities covering "up to" 2,000 acres, leaving the leaseholders discretion to utilize less acreage. Thus, the statutory discretion to disturb less than 2,000 surface acres in the phrase "up to" lies with AIDEA or other Lessees, not DOI. The "up to" language of the clause cannot be read as allowing DOI the discretion to defeat the Congressionally-mandated oil and gas program through DOI capping the leaseholder(s) at some arbitrary figure substantially less than 2,000 acres. Moreover, no provision in the leases addresses interpretation of the 2,000-acre clause.

57. The issue of the downstream effect of greenhouse gasses also does not justify termination of AIDEA leases. Among other flaws in DOI's new conclusions, the cases cited by DOI in its unilateral Lease Cancellation Decision, *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020), concern leasing on the Outer Continental Shelf, a location where DOI has substantial discretionary control over whether to allow oil and gas projects proceed. *See* 43 U.S.C. § 1344(a)(1).[14] By contrast, the Tax Act mandates DOI administer an oil and gas program and issue leases, and does not employ any such balancing language. Tax Act § 20001(b)(2)(A). Where DOI has discretion to block an activity by declining to issue leases for particular projects, as under the statute governing the Outer Continental Shelf oil and gas drilling program, there might arguably be a reason to require it to conduct a NEPA analysis concerning greenhouse gas effects that could be avoided by declining to issue leases. But the Tax Act mandates that DOI issue the Coastal Plain Program oil and gas leases. Accordingly, there was no opportunity for DOI to avoid the alleged greenhouse gas effects through declining to issue leases. Based on

---

[14] Under that Outer Continental Shelf statute, DOI "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resources values of the outer Continental Shelf and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1)

this, any alleged shortcoming in the NEPA analysis regarding that issue is not an agency error. *Public Citizen*, 541 U.S. at 76-78; *see* 42 U.S.C. § 4336e(10)(B)(vii).

58.    The other alleged deficiencies in the 2020 ROD and 2020 EIS, including alleged deficiencies in analysis of the claimed impacts on subsistence hunting and fishing, are also not grounds for termination of the AIDEA leases for illegality.  DOI's discussion of these subjects in the Lease Cancellation Decision is conclusory, unsupported, and arbitrary and capricious.  BLM also considered ANILCA section § 810's required analysis of impacts to subsistence hunting and fishing in both Appendix E of the FEIS and again in its ROD.  2020 ROD, pp.  24.  Moreover, DOI in the 2020 ROD cautioned that further NEPA and ANILCA § 810 analysis would need to be conducted before actual oil and gas ground-disturbing operations would be approved, when the leaseholder submitted follow-up applications for permission to engage in exploration and drilling activities.  *Id.*, pp. 2, 27.  This is another reason that issuing the leases did not violate NEPA or ANILCA § 810.

59.    Further, the lease cancellation decision also was a change of agency position, as compared to DOI's position in 2020, when DOI found it proper and lawful to issue the leases to AIDEA.  Although agencies can change positions from their prior stances, such changes must include reasoned explanations for the change must be supported by the record before the agency. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  These requirements were not met here.

60.    Finally, as discussed in Count I above, none of DOI's purported errors in the 2019 FEIS, 2020 ROD, and related documents justify the grossly excessive remedy of unilaterally terminating the Congressionally-mandated leases.  This is particularly true when the lesser remedy

19

of correcting any alleged deficiencies in program rules was available to DOI, and would not have made DOI out of compliance with the statutory mandate to offer leases by December, 2021.

**(B). DOI's Stated Reasons for Lease Termination Were Pretextual.**

61.     The stated grounds for both the earlier lease suspension and the subsequent lease termination were pretextual. DOI's decisions to suspend and then cancel AIDEA's Coastal Plains leases arose from President Biden's directives in Executive Order 13990, issued on his first day in office. In campaigning for office, then-Candidate Biden stated unequivocally on the record that he would never allow oil and gas drilling in ANWR. Asked "[h]ow do you feel about drilling in the Arctic National Wildlife Refuge," he responded on the record: "[t]otally opposed to it. Completely, totally opposed to it … No more drilling on federal lands period."[15] Later, in a press conference on September 6, 2023, announcing the lease cancellation, DOI Secretary Haaland stated that she would not allow drilling in ANWR. She did not state that she was temporarily halting drilling so that issues could be studied before more leases were issued. Instead, she said (future tense) that drilling will not occur: "no one will have rights to drill for oil in [ANWR]." Development of the facts will likely reveal additional pronouncements by President Biden, Secretary Haaland, and other senior officials showing that, although DOI might go through the motions of issuing documents and holding proceedings purporting to implement the Tax Act's Coastal Plains Program, the President and Secretary will never allow drilling in ANWR to actually occur. DOI's assertions of pre-lease legal defects (both at the time of lease suspension and at the time of lease cancellation) were a pretext to paper over a predetermined political decision to defeat AIDEA leases and to never allow drilling. Additionally, given the very short period of time between the August 7, 2023 ruling in the

---

[15]   https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge  (Feb. 9, 2020).

Moratorium Litigation upholding lease suspension and the lengthy September 6, 2023 Lease Cancellation Decision, development of the facts will likely reveal that DOI had already determined to issues the Lease Cancellation Decision while it was representing in the Moratorium Litigation that it was only temporarily suspending AIDEA's leases while it evaluated whether it lawfully issued those leases.

62.     Agency action must be taken with reasoned explanation and genuine justifications. Although judicial review is sometimes limited to an agency's stated reasons for the action, courts have authority to scrutinize those justifications to evaluate whether the stated reasons are pretextual or mere distractions, and to remand with vacatur agency decision where pretext is established. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Here, President Biden's and Secretary Haaland's pronouncements that they will never allow oil and gas drilling in ANWR contradict rather than compliment their subordinates' statements in the Lease Cancellation Decision and accompanying draft SEIS that the Leasing Program may resume after more environmental analysis is completed and certain alleged errors fixed. That contradiction distinguishes this case from the more typical case in which an agency's stated reason for an action align with agency leadership's political preferences. Because the reasons stated for lease termination in the Lease Cancellation Decision were pretextual, the court should vacate that decision and remand it to DOI. 5 U.S.C. § 706(2); *Dep' of Com.*, 139 S.Ct at 2576..

                                                    ***

63.     DOI's cancellation of AIDEA's valid lease agreements is not authorized by law and was an abuse of discretion and was arbitrary and capricious decision-making. The court should set aside the lease cancellation. 5 U.S.C. § 706(2).

21

## COUNT III

## DOI FAILED TO PROVIDE AIDEA WITH DUE PROCESS

64.     The preceding paragraphs are incorporated by reference.

65.     DOI asserts in its Lease Cancellation Decision that it has authority to administratively terminate oil and gas leases for illegality at their inception.  If so, the Supreme Court has indicated that this authority comes with an essential safeguard, specifically, DOI must provide the leaseholder with "full rights of participation" in the administrative proceeding by which DOI decides whether or not there was illegality in the inception of the lease.  *See Boesche*, 373 U.S. at 486 (pointing to this safeguard provided by DOI in that case as supporting the Court's ruling). Additionally, the due process clause of the Constitution ensures that adequate procedural protections are followed prior to the deprivation of a protected right, such as a leasehold interest. U.S. Const. Art. V.  In the context of agency adjudicatory and licensing decisions, due process "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976) (quotation omitted).  The "laws under which… agencies operate prescribe the fundamentals of fair play.  They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion." *Fed. Commc'ns Comm'n v. Pottsville Broad. Co.,* 309 U.S. 134, 143 (1940).  Under these principles, a party who is adversely affected by an administrative decision must be afforded proper notice of the action that is contemplated; he must be afforded a meaningful opportunity to participate in the decision-making proceeding, and the action ultimately rendered must express a reasoned conclusion.  The agency must also actually provide any procedural participation opportunities required by statute or rule or that an agency announces it will provide.

66.     DOI's cancellation of AIDEA's leases occurred without DOI first providing AIDEA with an administrative summons, invitation to comment, or other administrative process affording

AIDEA an opportunity to defend its leases, including to defend them against allegations that DOI's purported improprieties in issuing the leases should result in the termination of the leases for illegality. Thus, DOI both failed to comply with the procedural safeguards recognized in *Boesche,* and deprived AIDEA of due process of law.

67. Moreover, DOI led AIDEA to believe AIDEA would have an opportunity to defend the legality of its leases by submitting comments on a Draft SEIS that DOI was preparing. DOI then surprised AIDEA by unilaterally terminating AIDEA leases on the same day DOI sought comment on the Draft SEIS. As discussed above, in June and August, 2021 DOI informed AIDEA of its decision to prepare a SEIS to evaluate whether or not to terminate AIDEA's leases for alleged illegalities involving DOI's prior NEPA analysis. A procedural requirement for the use of a SEIS in decision-making is the publication of a draft SEIS, an invitation to the public to comment on the draft SEIS, and agency consideration of that comment before reaching a final decision. 40 CFR 1502.9, 1503.1, and 1503.4; *see* 42 U.S.C. § 4336a(c). As discussed above, DOI confirmed in its Scoping Notice in August, 2021 that it would provide that public comment opportunity on the draft SEIS. Thus, DOI was obligated to actually provide that process to AIDEA. Instead, DOI abruptly terminated the leases for illegality, just as the public comment opportunity on the draft SEIS began, and before AIDEA could submit argument and evidence in defense of its leases.

68. A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions [made] … without observance of procedure required by law…" 5 U.S.C. § 706(2). Because DOI failed to comply with the procedural safeguards recognized in *Boesche* and failed to provide AIDEA with due process before terminating its leases, the Lease Cancellation Decision must be set aside.

## COUNT IV

### DOI'S CANCELLATION OF AIDEA'S LEASES VIOLATED DOI'S
### REGULATIONS GOVERNING THE LEASE TERMINATION PROCESS

69.     The previous paragraphs are incorporated by reference.

70.     Congress may "withdraw[ ]" the inherent authority of DOI to administratively cancel oil and gas leases for alleged illegality at the inception, *Boesche*, 373 U.S. at 476. Accordingly, Congress and DOI may take lesser steps to restrict or constrain the use of that authority, as has occurred here.  The regulations implementing the Naval Petroleum Reserves Production Act of 1976 ("NPRA") that Congress applied to the ANWR Coastal Plain in the Tax Act include 43 C.F.R. § 3136.3, which governs the cancellation of leases.  *See* Tax Act, Pub. Law 115-97, § 20001(b)(3).  That adopted NPRA regulation provides: "Producing leases *or* leases known to contain valuable deposits of oil or gas may be canceled *only* by court order." § 3136.3(b) (emphasis added).  Although AIDEA's leases were not yet producing leases, they were "leases known to contain valuable deposits of oil or gas," as discussed above and below, and could only be terminated by court order and could not be terminated administratively by DOI.

71.     Under DOI and judicial precedent, AIDEA is not required to show that it or anyone else has successfully drilled for oil on the leased land in order for the leased lands to qualify as lands known to contain valuable deposits of leasable resource.  It is enough that the facts engender a belief on the part of a reasonable person that valuable oil is present:

> The meaning of the statutory phrase "known to contain valuable deposits [of a leasable substance]" can be understood from decisions of the Supreme Court defining the phrase "known to be valuable [for a leasable substance]."   Actual discovery of … deposits … on the land sought is not required in order that the land may be regarded as "known to contain valuable deposits" ….   Competent evidence may consist of proof of the existence of the mineral on adjacent lands as well as proof of geological and other surrounding and external conditions, and all that is required is that the evidence show that the known conditions were plainly such as reasonably to engender the belief that the lands contain the mineral in such quantity

24

and of such quality as to render its extraction profitable and justify expenditures to
that end.

*Delta Chemical Co.*, 76 IBLA 111, 1983 WL 35057 (Dept. Interior Bd. of Land Appeals, 1983)

(citing *U.S. v. Southern Pacific Co.*, 251 U.S. 1, 13-14 (1919), *Diamond Coal Co. v. U.S.*, 233 U.S.

236, 239-40 (1914), and *U.S. v. U.S. Borax Co.*, 58 I.D. 426, 433 (1943)).

72.     As discussed above, USGS found that: (a) the vast majority of oil within the ANWR

Coastal Plain is in the western portion of the Plain, which is the non-deformed area, (b) this oil

exists in sufficient quantities and situation to be both technically and economically recoverable at

current market prices, (c) oil has been actually been found in wells drilled on State lands just to the

west and north of the western end of the Coastal Plain, and (d) the western end of the Coastal Plain

is the portion closes to the existing oil and gas infrastructure centered around Prudhoe Bay.

AIDEA's leases from DOI covered much of the western portion of the ANWR Coastal Plain,

including all or almost all of the land inside ANWR adjacent to the oil discoveries just outside

ANWR. In light of these facts, AIDEA reasonably spent substantial sums to lease the favorable

locations at the western end of the Coastal Plain.  These and other facts establish a belief on the part

of reasonable person that the lands in the western Coastal Plain that AIDEA leased likely contain

valuable oil, which satisfies the standards set forth in *Delta Chemical Co., U.S. v. Southern Pacific

Co.*, and *U.S. v. U.S. Borax Co., supra*, to qualify as land known to contain valuable deposits of a

leasable resource.

73.     Because AIDEA's leases were for land known to contain valuable deposits of oil,

they can only be terminated by court order. 43 CFR § 3.136.3(b); *see* Pub. Law 115-97, §

20001(b)(3).  DOI's administrative termination of AIDEA's lease without a court order was

contrary to law, made without observance of proper procedure, and must be set aside.  5 U.S.C. §

706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue:

1.      A declaratory judgment invalidating DOI's cancellation of AIDEA's leases;

2.      An order directing Defendants to proceed with leasing, exploration, and development of the ANWR Coastal Plain as prescribed in the Tax Act, § 20001; and

3.      All other relief within the Court's jurisdiction to grant which this Court deems just, equitable, and according to law; including but not limited to attorneys' fees and costs.

DATED this 18th day of October, 2023.


BIRCH HORTON BITTNER & CHEROT

Attorneys for Plaintiff ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY

Of Counsel:

David Karl Gross, ABA #9611065**
Zoe A. Eisberg, ABA #1911094**
Brian V. Gerd, DC Bar #9001929*
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, AK 99501
907-276-1550 (phone)
907-276-3680 (fax)
dgross@bhb.com
zeisberg@bhb.com
bgerd@bhb.com

By:

*/s/ James H. Lister*
James H. Lister, DC Bar 447878
Birch Horton Bittner & Cherot
Suite 350, 1150 Connecticut Ave.
Washington, DC. 20036
202-862-8368 (phone)
202-659-1027(fax)
jlister@bhb.com


*   *Admission to District Court Pending*
** *Pro Hac Vice Pending*

26