IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Department of Interior; BUREAU OF LAND MANAGEMENT; and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management;<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No.: 3:24-cv-00051-SLG |

**PLAINTIFF'S OPENING BRIEF ON
COUNTS I, II(A), III, IV, AND V**

Attorneys for Plaintiff ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT
AUTHORITY

David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, AK 99501
907-276-1550 (phone)
907-276-3680 (fax)
dgross@bhb.com
zeisberg@bhb.com

James H. Lister, ABA # 1611111
Brian V. Gerd, ABA # 1810097
Birch Horton Bittner & Cherot
Suite 350, 1150 Connecticut Ave.
Washington, DC. 20036
202-659-5800 (phone)
202-659-1027(fax)
jlister@bhb.com
bgerd@bhb.com

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                          Page i

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 1 of 55

**TABLE OF CONTENTS**

A. Introduction and Summary of Argument ............................................................1

B. Standard of Review ................................................................................................5

C. Statutory Background, Procedural History, and Facts ........................................6

    1. DOI Issues the 2019 EIS and the 2020 ROD, and Issues Leases to AIDEA .....7

    2. A New Administration Suspends AIDEA's Leases and Begins Steps to Potentially Cancel AIDEA's Leases. This Court Affirms the Suspension. ........8

    3. DOI's September 6, 2023 Lease Cancellation Decision .................................10

D. Argument ............................................................................................................13

    1. DOI Deprived AIDEA of a Property Interest Without First Providing Due Process of Law as Required by the Fifth Amendment to the Constitution ......13

    2. DOI Also Failed to Provide Statutory Due Process Required by the APA .....16

    3. DOI Lacks Authority to Cancel Leases that Congress Directed DOI to Issue, Particularly When Lesser Remedies like Mitigation Were Available to DOI ................................................................................................................18

        a. Issuance of AIDEA's oil and gas leases was not subject to NEPA review ...............................................................................................18

        b. Lease cancellation was a disproportional response to the alleged errors ...............................................................................................24

    4. APA § 558(c)(2) Required DOI to Provide a Cure Opportunity Before Terminating AIDEA Leases ............................................................................27

    5. 43 CFR 3163.3(b) Applies in ANWR and Requires DOI to Obtain a Court Order if it Believes Cause Exists to Cancel AIDEA's Leases ........................29

        a. NPR-A Rule 3163.3(b) has no counterpart in the Mineral Leasing Act provisions construed in the *Boesche* decision mistakenly relied upon by DOI ..........................................................................30

        b. The NPR-A lease cancellation rule extends to ANWR ......................33

        c. DOI appropriately credited evidence that economically recoverable oil and thus valuable oil exists in Coastal Plain areas mostly leased by AIDEA ........................................................................35

    6. The Prior Administration's Analysis in the 2019 FEIS and 2020 ROD is not "Error in the Inception" so as to Justify Lease Cancellation ....................41

AIDEA v. Haaland, et al.                        Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief              Page ii

a. Greenhouse gasses ...................................................................43

b. Statutory construction of 2,000-surface-acre provision.....................44

c. DOI fully satisfied ANILCA's § 810 subsistence analysis
   requirements................................................................47

E.   Conclusion .........................................................................................49

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page iii

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 3 of 55

# TABLE OF AUTHORITIES

## Cases

*Air North America v. Department of Transportation*, 937 F.2d 1427 (9th Cir. 1991) .............18

*Alaska Industrial Development and Export Authority v. Biden*, 2023 WL 5021555 (D. Alaska, Aug. 7, 2023) ...............................................................1, 10, 11, 23, 34, 41, 44

*Alaska Wilderness League v. Jewell*, 788 F.3d 1212 (9th Cir. 2015)............................2, 20, 21

*Amoco Production Company v. Fry*, 118 F.3d 812 (D.C. Cir. 1997) .....................................13

*Anchugstegui v. Department of Agriculture*, 257 F.3d 1124 (9th Cir. 2001) ..........................17

*Belmont Municipal Light Department v. Federal Energy Regulatory Commission*, 38 F.4[th] 173 (D.C. Cir. 2022) ................................................................................24

*Boesche v. Udall*, 373 U.S. 472 (1963)...........................................14, 30, 31, 32, 33

*Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156 (1962)........................................................6

*Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) ...................11, 22

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ........5

*Clarke v. Commodity Future Trading Commission*, 74 F.4[th] 627 (5th Cir. 2023)...................17

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) ......................................14

*Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988)................................................................13

*Conserve Southwest Utah v. U.S. Department of Interior*, 2023 WL 7922785 (D.D.C. 2023) ........................................................................................................27

*Cook Inletkeeper v. Raimondo*, 541 F.Supp.3d 987 (D. Alaska 2021)...................................24

*Delta Chemical Company*, 76 IBLA 111, 1983 WL 35057 (DOI Board of Land Appeals, 1983) ........................................................................................................39

*Department of Fish and Game v. Federal Subsistence Board*, 2023 WL 7282538 (D. Alaska, Nov. 3, 2023) ................................................................................5

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)..................2, 19, 21, 23

*Diamond Coal Company v. U.S.*, 233 U.S. 236 (1914) ..........................................................39

*Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125 (9th Cir. 2010)......................17

*Finnbin, LLC v. Consumer Product Safety Commission*, 45 F.4[th] 127 (D.C. Cir. 2022) ........24

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                   Page iv

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 4 of 55

*Friends of Alaska National Wildlife Refuges v. Bernhardt*, 381 F.Supp.3d 1127 (D. Alaska 2019) ............................................................................................5

*Friends of Earth v. Haaland*, 2023 WL 3144203 (D.C. Cir. 2023).....................2, 22

*Hodgins v. U.S. Department of Agriculture*, 238 F.3d 421 (6th Cir 2000)............18

*Humane Society of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ...............................6

*Monsanto Company v. Geertson Seed Farms*, 561 U.S. 139 (2010) ......................24

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Auto Insurance Company*, 463 U.S. 29 (1983) ...............................................6, 41

*Natural Resources Defense Council v. Zinke*, 2018 WL 6424687 (D. Alaska 2018)...........32

*San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014) ..............6

*Skidmore v. Swift Company*, 323 U.S. 134 (1944)...................................................47

*Solonex v. Haaland*, 626 F.Supp.3d 110 (D.D.C. 2022)......................................6, 43

*U.S. v. Mead Corporation*, 533 U.S. 218 (2001) ...................................................47

*U.S. v. Southern Pacific Company*, 251 U.S. 1 (1919) ....................................39, 40

**Statutes**

5 U.S.C. § 551............................................................................................16, 17

5 U.S.C. § 558.........................................................................................*passim*

5 U.S.C. § 706........................................................................5, 13, 14, 40, 46

30 U.S.C. § 188...............................................................................................30

42 U.S.C. § 4332.............................................................................................19

42 U.S.C. § 4336e.......................................................................................2, 19

42 U.S.C. § 6506a (formerly 6508) .............................................................33

Alaska National Interest Lands Conservation Act, P.L. 96-487.....................7, 42, 47, 48, 49

Clean Water Act, 33 U.S.C. § 1251 et seq.....................................................21

Fiscal Responsibility Act, P.L. 118-5 .........................................................2, 19

Inflation Reduction Act, P.L. 117-169...........................................................22

Naval Petroleum Reserves Protection Act of 1976, 42 U.S.C. § 6501 et seq.........................34

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq.................21, 22, 23

Tax Act, P.L. 115-97 § 20001............................................................................ *passim*


**Regulations**

40 CFR 1501.1 ......................................................................................................19

40 CFR 1508.1 ..................................................................................................2, 19

43 CFR 3100.0-3 ................................................................................................32

43 CFR 3108.3 ....................................................................................................33

43 CFR 3135.2 .............................................................................................4, 33, 34

43 CFR 3136.3 ....................................................................................... *passim*


**Federal Register**

46 Fed. Reg. 55494 (Nov. 9, 1981)................................................................32, 33

89 Fed. Reg. 35442 (May 1, 2024) .....................................................................19


**Legislative History**

H. Rept. No. 1980 (79th Congress, 2nd Session)...................................................18

Sen. Doc. No. 248 (79th Congress, 2nd Session) .................................................18


**Other Authorities**

*U.S. Department of the Interior – Applicability of the Congressional Review Act to*
  *Cancellation of Oil Leases in the Arctic National Wildlife Refuge*, File B-33578
  (Feb. 27, 2024)..............................................................................................16

AIDEA v. Haaland, et al.                                      Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                      Page vi

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 6 of 55

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") respectfully submits this opening brief in this judicial review case pursuant to Local Rule 16.3 and the Court's scheduling order (DE 49). As scheduled in that Order, this brief addresses each of AIDEA's pleaded claims, with the exception of Count II(b), the "pretext" claim, which will be briefed later.

### A. Introduction and Summary of Argument

On September 6, 2023, thirty days after Defendants Department of Interior et al. ("DOI") obtained this Court's affirmation of DOI's June, 2021 decision to temporarily suspend the oil and gas leases covering the western portions of the coastal plain of the Arctic National Wildlife Refuge ("ANWR"), which DOI had previously issued to AIDEA in January 2021, DOI went further and cancelled AIDEA's leases. AR 5353. In affirming DOI's "temporary" suspension and the related moratorium on ANWR oil and gas program activities, this Court in its August 2023 order emphasized that DOI had not, at that point, cancelled or otherwise "undone" the issuance of the leases. The Court noted the interface of this matter with the Tax Act, P.L. 115-97 § 20001(c), which mandated lease issuance:

> [T]he operative statutes governing the Program—primarily the Tax Act—do not prescribe any discrete steps that Agency Defendants have yet failed to take. *The Tax Act requires DOI to hold "the initial lease sale under the oil and gas program...not later than 4 years after the date of enactment of this Act."* Agency Defendants conducted the Program's first lease sale on January 6, 2021. Congress enacted the Tax Act on December 22, 2017, so Agency Defendants handily met this deadline. *Agency Defendants have not cancelled, rescinded, nullified, or otherwise undone the first lease sale.*[1]

---

[1] *Alaska Industrial Development and Export Authority v. Biden*, No. 3:21-cv-00245-SLG, 2023 WL 5021555, \*27 (Aug. 7, 2023) (emphasis added, "*AIDEA*").

AIDEA v. Haaland, et al.                                      Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 1 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 7 of 55

One month after receiving that opinion, DOI crossed the Court's line in the sand, cancelling AIDEA's leases. Of course, this undid the statutorily-mandated issuance of the leases.

However, in cancelling AIDEA's leases, DOI failed to recognize that a purported violation of the National Environmental Policy Act ("NEPA") cannot in any circumstance be the basis for rescinding a program step that is statutorily-mandated and thus non-discretionary, even if such a NEPA violation might be a basis for pausing the discretionary aspects of implementation of the same program. *See Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 764, 769-773 (2004) (non-discretionary agency action requiring the agency to admit Mexican trucks into the United Sates could not be challenged under NEPA because the agency lacked authority to refuse admission, even though plaintiffs might have invoked NEPA to instead challenge how the agency addressed environmental "mitigation" once the Mexican trucks were in the country, a matter over which the agency had discretion); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (a statutory directive stating an agency <u>shall</u> approve oil spill response plans meeting statutory criteria eliminates any agency discretion and therefore, such approvals are not subject to NEPA review); *Friends of Earth v. Haaland*, 2023 WL 3144203, *2 (D.C. Cir. 2023) (non-discretionary issuance of oil and gas leases is not subject to NEPA, so lease issuance cannot be cancelled on account of purported NEPA violations).

Congress amended NEPA in 2023 to expressly codify and affirm the Supreme Court's holding in *Public Citizen* that NEPA is not applicable to non-discretionary actions.[2]

---

[2]    Pub. L. 118-5 § 321(b); 42 U.S.C. § 4336e(10)(B)(vii); 40 CFR § 1508.1(q)(1)(ii).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 2 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 8 of 55

Additionally, lease cancellation was a wholly disproportional remedy for the concerns DOI identified, which dealt with mitigation of the impact of this statutorily-mandated oil and gas project, and so would have been far more logically dealt with by DOI using its authority to impose additional mitigation measures.

Moreover, before cancelling the leases, DOI did not open an agency adjudicative docket, did not issue an administrative summons to AIDEA, and did not inform AIDEA of when and where it might respond to the charges its leases were illegal from the inception. Thus, DOI failed to comply with basic constitutional due process requirements owed to holders of property interests such as AIDEA's leases. This was unlawful and inexcusable.

In addition, DOI has persuaded the Government Accounting Office ("GAO") to rule that AIDEA's leases fit within the broad definition of "licenses" under the Administrative Procedure Act ("APA").[3] But this means that, as a consequence, DOI's cancellation of the leases also contravened the statutory due process protections that the APA affords license holders. 5 U.S.C. § 558(c). Before canceling an APA license, the agency must provide the licensee an opportunity to contest the claimed deficiencies. § 558(c)(2). DOI did not do so. The agency must also first provide the licensee the opportunity to cure any deficiencies. DOI again did not do so, but it easily could have provided AIDEA with the opportunity to comply with additional environmental mitigations measures taken by DOI to correct for any errors by DOI in its earlier environmental and statutory analyses. *Id*.[4]

---

[3]   See n. 33 below in Point D.2.

[4]   DOI admits key aspects of the constitutional and statutory due process allegations in its Answer. Answer to Amended Complaint (DE. 20), ¶ 66 ("Defendants admit the allegations

AIDEA v. Haaland, et al.                                              Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                    Page 3 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 9 of 55

As this brief demonstrates, DOI procedurally and substantively erred in cancelling AIDEA's leases, because the issuance of leases was non-discretionary, and lease cancellation was thus the undoing of a non-discretionary agency action. This is so even though other aspects of program implementation were discretionary and regardless of whether the environmental and subsistence analysis in the 2020 ROD and 2019 EIS, and the interpretation of the Tax Act's 2,000-acre clause in that ROD, was lawful or deficient. AIDEA will briefly describe why DOI did not err in its 2020 ROD and 2019 FEIS, but emphasizes that the errors DOI maintains it made in those documents cannot support lease cancellation, even though they might justify ordering AIDEA as lessee to abide by additional measures to protect the environment and subsistence hunting and fishing.

In addition, although the National Petroleum Reserve Alaska's ("NPR-A") leasing procedures that the Tax Act adopts to manage ANWR in § 20001(b)(3) may empower DOI to administratively suspend leases, leases like AIDEA's which are known to contain valuable oil "may only be cancelled by court order." *Compare* 43 CFR 3135.2(a) (lease suspension) *with* 43 CFR 3136.3(b) (lease cancellation). DOI found that the parts of ANWR mostly leased by AIDEA are highly likely to contain valuable oil and gas, satisfying the caselaw standard under which certainty is not required for lands to be

---

of the first sentence of paragraph 66 that AIDEA was not offered an opportunity to comment on the Lease Cancellation Decision prior to its issuance."); ¶ 51 ("Defendants admit that…DOI did not offer AIDEA the opportunity to keep its leases subject to changes in the coastal plain program" addressing DOI's concerns).

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 4 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 10 of 55

considered as "known to contain valuable deposits" of oil. This important finding precluded DOI's unilateral non-judicial lease cancellation.

**B. <u>Standard of Review.</u>**

Courts review final agency actions pursuant to § 706 of the APA, which requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2). An agency acted arbitrarily or capriciously if it relied on impermissible factors in its decision making, failed to consider important aspects in its review, or its explanation is counter to the evidence. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F.Supp.3d 1127, 1134 (D. Alaska 2019). Whether an agency action is in accordance with law is a question of statutory interpretation. *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 2023 WL 7282538, *5 (D. Alaska Nov. 3, 2023). Where Congress's intent is clear, the agency must give effect to that intent; if Congress was unclear, courts assess whether the agency's interpretation was reasonable. *Id.* (citing to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Courts may give some deference to agency interpretations that were subject to notice-and-comment processes, but DOI did not supply a notice-and-comment period before this lease cancellation, either to AIDEA or the general public. *Id.*

The standard of review operates with a twist in this case because it is defendants who claim agency error – DOI claims DOI under the prior Administration erred in issuing

AIDEA v. Haaland, et al.
Plaintiff's Opening Summary Judgment Brief

Case No. 3:24-cv-00051-SLG
Page 5 of 49

leases to AIDEA, which "requires the Secretary to show a violation" of law justifying cancellation of the oil and gas lease. *Solonex v. Haaland*, 626 F.Supp.3d 110, 119 (DDC 2022). The due process issue also impacts the standard of review. Likely because DOI gave AIDEA no opportunity to defend its leases from cancellation, and thus deprived itself of the benefit of AIDEA's briefing, DOI either did not address several substantial issues discussed below, or addressed them in a cursory fashion that did not grapple with the arguments that AIDEA makes. *See, e.g.* Points D.4 and D.5 below. If an agency has not reached a substantial issue, that failure is often itself an error requiring reversal. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 636 (9th Cir. 2014); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reviewing court can only affirm based on a rationale stated in the agency decision, not one supplied by agency counsel. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

## C. <u>Statutory Background, Procedural History, and Facts.</u>

Section 20001 of the Tax Act consists of a series of "shall" directives to DOI. DOI "shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain" of ANWR. § 20001(b)(2)(A). DOI "shall conduct" at least two 400,000-acre Coastal Plain lease sales by December 22, 2024, with the first sale to be completed by December 22, 2021 and the second by December 22, 2024. § 20001(c)(1). DOI "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production,

AIDEA v. Haaland, et al.                                        Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                      Page 6 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 12 of 55

or transportation necessary to carry out this section." § 20001(c)(2). DOI "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities…." § 20001(c)(3).

1. DOI Issues the 2019 EIS and the 2020 ROD, and Issues Leases to AIDEA.

DOI worked to implement the 2017 Tax Act, issuing in September 2019 the final Environmental Impact Statement ("FEIS") after accepting public comments on a draft version[5] and in August 2020, publishing its 2020 ROD finalizing the structure of the Coastal Plain oil and gas program.[6] Both the 2019 FEIS and 2020 ROD reviewed the program's environmental impacts. They address alternatives DOI could have taken to implement the Congressionally mandated program and evaluate the proposed program's compliance with other statutes, such as by assessing impacts that the Leasing Program may have on subsistence hunting and fishing uses of the Coastal Plain under Section 810 of the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. Law No. 96-487.[7] On December 7, 2020, DOI invited bids for Coastal Plain leases.[8] AIDEA submitted bids for the eleven tracts.[9] DOI announced that AIDEA was the high bidder on multiple tracts and

---

[5]  AR 1-3135.

[6]  AR 3138-3225.

[7]  AR 0031-0032, 0686-0714 and 3167-3170.

[8]  85 Fed. Reg. 78865; AR 3227.

[9]  Lease Sale Bid Recap and Results Map, AR 3314.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 7 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 13 of 55

on January 13, 2021, AIDEA and DOI executed lease agreements for seven tracts covering 365,775 acres, for extendable 10-year terms.[10]

2. <u>A New Administration Suspends AIDEA's Leases and Begins Steps to Potentially Cancel AIDEA's Leases. This Court Affirms the Suspension.</u>

Seven days after execution of the leases, and as foreshadowed by a campaign promise, the Biden Administration took office and immediately "paused" the ANWR oil and gas program.[11] It issued Executive Order 13990 on it first day in office, which ordered DOI to issue a temporary moratorium on all activities implementing the Coastal Plain oil and gas program.[12] All Coastal Plain lessees except AIDEA surrendered their leases.

The specific steps taken by DOI in 2021 are now important from a due process standpoint relative to the September 2023 lease cancellation. In the summer of 2021, DOI sent AIDEA a letter suspending, but not cancelling, the leases.[13] The letter informed AIDEA that DOI would conduct supplemental analysis under NEPA to re-evaluate the conclusions reached in the 2019 FEIS and 2020 ROD and to evaluate the lawfulness of AIDEA's leases.[14] Specifically, DOI identified two concerns: (1) whether DOI properly

---

[10]   AIDEA's Oil & Gas Leases and Notice of Lease Issuance Decision, AR 3317-3346.

[11]   Asked in February 2020 about drilling in ANWR, Candidate Biden stated he was completely opposed to it: "no more drilling on federal lands period. Period, period, period." Video available: https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge. The parties have stipulated to the admissibility of this video clip.

[12]   86 Fed. Reg. 7039; AR 3351.

[13]   June 1, 2021, Notice of Decision, AR 3364-3365.

[14]   AR 3365, "The BLM will **undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures**. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 8 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 14 of 55

interpreted the 2,000-acre-surface-footprint provision in the Tax Act in the 2020 ROD, and (2) whether DOI adequately analyzed reasonable alternatives in its NEPA review of the impact of Congressionally-mandated oil and gas program. AR 3364. In August 2022, DOI sent AIDEA a second letter identifying a third concern, whether DOI had adequately analyzed the "downstream greenhouse gas impact" of oil and gas development in ANWR.[15]

During the suspension of AIDEA's leases and while conducting its supplemental review, DOI never issued an administrative summons, administrative complaint, or other notice that provided AIDEA with an opportunity to respond and defend its leases. Neither the original lease suspension notice nor the addendum sought a response from AIDEA to these alleged defects. DOI did not notify AIDEA of where, how, and when AIDEA could defend the legality of the leases. AR 3365. However, DOI's suspension letter strongly implied that AIDEA would have the opportunity to defend the validity of its leases by submitting comments in the supplemental NEPA process DOI stated it would use to evaluate the legality of AIDEA's leases. *Id.* Furthermore, DOI published a Scoping Notice initiating that supplemental NEPA process which stated that DOI would issue a Draft SEIS and accept comments on that document for at least 45 days, before making final decisions.[16] This cemented the conclusion, resulting from DOI's statements, that AIDEA

---

ROD. **When complete**, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases." (Emphasis added).

[15]    Addendum to Suspension of Operations and Production, August 19, 2022, AR 3404.

[16]    86 FR 41989-90 (Aug. 4, 2021), AR 3368 ("The purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues,

AIDEA v. Haaland, et al.                                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                         Page 9 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 15 of 55

could defend the legality of its leases through submitting comments when DOI issued the Draft SEIS promised in the Scoping Notice. DOI's addendum to its lease suspension decision a year later in August 2022 furthered this impression, stating "BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided or subject to additional mitigation measures." AR 3405.

Meanwhile, AIDEA sued DOI in the District of Alaska challenging the lease suspension and DOI's temporary "moratorium." DOI defended the suspension and moratorium on the grounds that it had not cancelled AIDEA's leases, but rather had merely "paused" the oil and gas program for a "temporary" period in order to re-evaluate the program's environmental impacts.[17] In an August 7, 2023 order, this Court upheld the lease suspension, agreeing with DOI that the "pause" and lease suspension was only "temporary," while DOI conducted supplemental environmental analysis. *Id.*

3. DOI's September 6, 2023 Lease Cancellation Decision.

---

including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis. … Potential new alternatives to be considered in the Supplemental EIS include, but are not limited to, those that would: Designate certain areas of the Coastal Plain as open or closed to leasing; permit less than 2,000 acres of surface development throughout the Coastal Plain; prohibit surface infrastructure in sensitive areas; and otherwise avoid or mitigate impacts from oil and gas activities.… ***At that time the Draft Supplemental EIS will be made available for public comment for at least 45 days***. After the close of the Draft Supplemental EIS comment period, BLM will develop a Final Supplemental EIS incorporating comments received on the Draft.") (emphasis added).

[17]     *See, e.g., AIDEA,* 2023 WL 5021555, at *7.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 10 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 16 of 55

In its August 7, 2023 Order in the lease suspension / moratorium case, the Court cautioned that it was **not** deciding whether DOI could later cancel AIDEA's leases:

> [T]he issues of whether Agency Defendants have the authority to cancel any leases and under what circumstances are not before this Court. The purpose of the Moratorium—the agency action that is properly challenged and currently before the Court—is to provide time for Agency Defendants to ensure that the Program is implemented in accordance with applicable laws.[18]

The Court in affirming lease suspension stressed that, while DOI was "required" by the Tax Act to hold lease sales by December 2021, DOI in suspending the leases and imposing a temporary moratorium on program implementation had "not cancelled, rescinded, nullified, or otherwise **undone** the first lease sale."[19]

But in cancelling the leases a month later, on September 6, 2023, DOI <u>did</u> undo that lease sale. In its lease cancellation decision, DOI reversed its prior position and concluded that AIDEA's leases were "unlawful in the inception."[20] For this conclusion, DOI cited (1) its re-interpretation of the 2,000-acre-surface-footprint provision of the Tax Act;[21] (2) its conclusion the 2019 FEIS and 2020 ROD did not adequately analyze the impact of oil and gas activities on subsistence hunting;[22] and (3) a decision by the Ninth Circuit holding that in issuing oil and gas leases for the Outer Continental Shelf ("OCS") under a different

---

[18]   *Id.* at *25 (footnote omitted).

[19]   *Id.* at *27 (emphasis added, footnotes omitted).

[20]   AR 5353-5359. DOI did allow AIDEA a refund of its lease payments. AR 5359.

[21]   AR 5356.

[22]   AR 5357.

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                       Page 11 of 49

statutory structure, DOI should have conducted a more in-depth analysis of the "downstream" impact on greenhouse gas emissions resulting from leasing in the OCS.[23]

DOI did not explain why these three concerns "were sufficiently serious and fundamental" to require the extreme step of cancelling the leases rather than imposing additional mitigation measures.[24] *See* AR 3405 (in suspending the leases, BLM had noted it might "subject" them "to additional mitigation measures"). Nor did DOI explain why it could not rectify these alleged deficiencies by requiring AIDEA as lessee to abide by DOI's new interpretation of the 2,000-acre surface footprint provision and additional measures DOI finds necessary to address subsistence hunting and fishing and greenhouse gas emissions. *See* AR 5355-5358. Finally, DOI failed to address the obvious conclusion that, by directing DOI to implement a program for the development and production of oil and gas in ANWR, Congress necessarily authorized and accepted the consequential increase in greenhouse gas emissions resulting from that program.

On the same day DOI issued the Lease Cancellation Decision, DOI published and opened a public comment period for its draft SEIS that set forth DOI's new analysis of the 2,000-acre-surface footprint issue, its plan on how to minimize impacts on subsistence hunting and fishing, and what to do regarding greenhouse gas emissions.[25] While DOI sought public comment on these three issues and other matters for purposes of developing

---

[23] AR 5357 (*citing Ctr. For Biological Diversity v. Bernhardt,* 982 F.3d 723 (9th Cir. 2020)). *See* discussion of this precedent in Point D.3.a below.

[24] AR 5358.

[25] 88 Fed. Reg. 62104, AR 5363-5564.

AIDEA v. Haaland, et al.                                              Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                            Page 12 of 49

a final SEIS and new ROD, DOI did not seek comment on these three issues or any other issues for purposes of deciding whether to cancel AIDEA's leases.

The Lease Cancellation Decision concluded by specifying that lease cancellation was the "final" decision of the Department and not subject to appeal within DOI.[26]

As the holder of the leases DOI cancelled, AIDEA has standing to bring this suit.[27]

### D. ARGUMENT

1. <u>DOI Deprived AIDEA of a Property Interest Without First Providing Due Process of Law as Required by the Fifth Amendment to the Constitution.</u>

AIDEA's oil and gas leases were property interests entitled to the protection of the due process clause in the Fifth Amendment to the Constitution, which prohibits the United States from depriving a person (AIDEA) of a property interest without due process of law. *See, e.g, Conner v. Burford,* 848 F.2d 1441, 1458 and n. 50 (9th Cir. 1988) (clarifying remedy in oil and gas leasing case "to avoid the unnecessarily harsh result of completely divesting the lessee of their property rights")*; Amoco Prod. Co. v. Fry,* 118 F.3d 812, 819 (D.C. Cir. 1997) (lessee's right to recover overpayment has due process protections, including right to "[n]otice and a meaningful opportunity to challenge the agency's decision"). Indeed, in the primary case DOI cites as establishing its authority to

---

[26]   AR 5359, ("My decision constitutes the final decision of the Department and…is not subject to appeal under Departmental regulations at 43 CFR Part 4.").

[27]   The leases granted DOI exclusive rights to drill and extract oil and gas reserves on over 365,000 acres of the Coastal Plain, rights AIDEA paid over $12 million to obtain. AR 3317-3346. Thus, AIDA suffered injury-in-fact from DOI's cancellation decision, which was unequivocally the cause of the harm resulting from the termination AIDEA's leasehold rights, and this Court can redress that harm by issuing an order vacating DOI's unlawful cancellation, which would reinstate the leases. 5 U.S.C. § 706.

AIDEA v. Haaland, et al.                              Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                    Page 13 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 19 of 55

administratively terminate oil and gas leases due to illegality in their inception, the

Supreme Court expressly relied on DOI first providing due process to the lessee. *See*

*Boesche v. Udall*, 373 U.S. 472, 485-86 (1963).[28]

"The essential requirements of due process…are notice **and an opportunity to**

**respond**." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (emphasis

added). Regardless of whether DOI provided sufficient notice to AIDEA of the possibility

of lease cancellation, DOI did not provide the equally essential opportunity to respond. As

detailed in Point C above, DOI did not issue an administrative summons, did not issue a

letter requiring or inviting AIDEA to respond by some date certain, and simply failed to

provide AIDEA with an opportunity to defend its property interests conveyed through these

lease agreements.[29] "Defendants admit … that AIDEA was not offered an opportunity to

comment on the Lease Cancellation Decision." Answer to Amend. Cmplt, ¶ 66 (DE 20).

The record is devoid of any opportunity for AIDEA to defend its leases before DOI issued

its cancellation decision. Because DOI did not provide AIDEA with an opportunity to

---

[28]  Cautioning that it did not intend to "open the door to administrative abuses," 373 U.S. at 485-86, the *Boesche* Court emphasized the due process DOI accorded the lessee. DOI's regulations "provide for adversary proceedings on appeals taken within the Department where other private parties will be affected by the decision.…Appeal is of right, the appellant is required to notify his opponent, and the latter has full rights of participation." *Id* (internal citations omitted). "Pending the outcome of [his] litigation, the [DOI] Land Office Manager…withheld cancellation of [his] lease." *Id*. at 474, n.3. DOI provided AIDEA with no such agency process—or indeed with any process at all.

[29]  In *Boesche*, DOI conducted "adversary proceedings" before an agency tribunal, 373 U.S. at 374, 386. Whether or not such proceedings are constitutionally required here, an opportunity to respond to the charges is always required. *Loudermill*, 470 U.S. at 546.

AIDEA v. Haaland, et al.                                      Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 14 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 20 of 55

respond and defend its leases, the Lease Cancellation Decision must be set aside for failure to observe procedures required by law, i.e. the Due Process Clause. 5 U.S.C. § 706(2).

Although not necessary to find that DOI failed to provide the constitutionally required opportunity to respond, that conclusion is buttressed by the steps DOI took that led AIDEA to believe it would have the opportunity to defend the legality of its leases by filing comments on the Draft SEIS and participating in DOI's promised NEPA analysis. As discussed above, in its letters suspending AIDEA's leases, DOI stated it would use a supplemental NEPA process to evaluate the legality of AIDEA's leases ("The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures."). AR 3365. In the Scoping Notice, DOI then started that NEPA process by informing AIDEA and the public that DOI would issue a draft SEIS and provide a comment opportunity on it before making final decisions.[30] This led AIDEA to believe it would have the opportunity to defend the legality of its leases in comments.[31] Had DOI followed through on its promised NEPA process and refrained from deciding the lease cancellation issue until after it considered AIDEA's comments on the Draft SEIS, DOI might have provided due process. Had DOI informed AIDEA of when, how, and where it could respond to the charges that AIDEA's leases were

---

[30]   86 Fed. Reg. 41989, 41990 (Aug. 4, 2021), AR 3369; *see* n. 16 above.

[31]   The Scoping Notice was akin to a notice of a pre-hearing conference in litigation. It invited comments on the "scope" of the issues to be considered, not the merits of the issues. AIDEA filed timely comments on the scope of the issues, but rightly did not consider those scoping comments to be the forum for fully defending the lawfulness of its leases on the merits. AR 3368 (scoping notice, quoted in n. 16 above).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 15 of 49

illegal in the inception, DOI's sudden withdrawal of the opportunity to comment on the Draft SEIS before cancelling the leases might have been less damaging. In the end, however, DOI never provided the required opportunity to defend, and so did not provide due process.

2. DOI Also Failed to Provide Statutory Due Process Required by the APA.

In addition to constitutional due process protections, the APA in 5 U.S.C. § 558 provides statutory due process protections to license holders. In the lease suspension / moratorium litigation, in successfully opposing the argument that the moratorium was a rule subject to APA rulemaking requirements, DOI took the position that AIDEA's leases were also "licenses" as defined in the APA, which necessarily means that DOI tacitly conceded that § 558 and its statutory due process protections also applied to AIDEA's leases.[32] Moreover, DOI persuaded the GAO to rule that the leases were APA licenses:

> [The] APA defines license as 'the whole or a part of an agency permit, certificate, approval, registration, charter, member ship, statutory exemption or other form of permission.' 5 U.S.C. § 551(8). Because the leases are permission to explore for oil and gas in the Arctic National Wildlife Refuge, the leases are licenses for purposes of APA.[33]

While the leases were not "licenses" as defined in the context of substantive oil and gas and real property law,[34] what matters for purposes of application of the APA license

---

[32]   DOI brief, DE 63, p. 29, n. 10, Case No 3:21-cv-00245-SLG ("The APA definition of 'licensing' further supports this distinction …. The leases fall squarely within these definitions, and are neither issued nor suspended through rule making.")

[33]   File B-33578 at 3-4 (GAO, Feb. 27, 2024) (https://www.gao.gov/products/b-335781).

[34]   Substantive oil and gas law and real property law use the term "license" more narrowly to refer to instruments granting a mere permissive revocable permission to use real property. AIDEA's leases were non-revocable grants for renewable terms of years, were entitled "leases," and were issued under a statute, the Tax Act, which used the term "lease."

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                    Page 16 of 49

holder due process protections in 5 U.S.C. § 558(c) is whether the leases meet the much broader definition of "license" in the APA. 5 U.S.C. § 551(8) ("license" includes "the whole or a part of an agency permit, certificate, approval, registration, charter … or other form of permission"). The GAO's ruling that AIDEA's leases fall within the broad definition of "license" in the APA, which DOI obtained, should be followed by the Court.

APA § 558(c) provides two key statutory due process requirements for license holders: (1) notice of the charges that may result in adverse agency action, and (2) the opportunity of the license holder to defend against those charges and to cure any defaults:

> (c) … Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, *before the institution of agency proceedings* therefor, *the licensee has been given*—
>
> **(1)** notice by the agency in writing of the facts or conduct which may warrant the action; *and*
>
> **(2)** *opportunity* to *demonstrate* or achieve *compliance* with all lawful requirements.…

5 U.S.C. § 558(c) (emphasis added). DOI failed to provide AIDEA the opportunity to "demonstrate" the leases complied with legal requirements.[35] If AIDEA was given that

---

Thus, within the context of and substantive oil and gas law and real estate law, AIDEA's leases were in fact leases rather than "licenses." But DOI has conceded the leases were "licenses" under the APA's broad definition of "license," which is what matters here.

[35] There is no specified notice form for the agency to comply with § 558(c)(2). In a case involving a licensee default, notice was lawful because it "set forth the reasons for the Forest Service's inquiry *and* explicitly identified what documents [the licensee] needed to provide in order to confirm ownership of the cattle and entitlement to the grazing permit." *Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1135 (9th Cir. 2010) (emphasis added); *see Anchugstegui v. Dept. of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001) (notice issued too late in process); *Clarke v. Commodity Future Trading Comm.*, 74 F.4th

AIDEA v. Haaland, et al.
Plaintiff's Opening Summary Judgment Brief

Case No. 3:24-cv-00051-SLG
Page 17 of 49

opportunity, it could have raised the argument that Congress ordered DOI to issue the oil

and gas leases, thus removing lease issuance from the realm of NEPA review and potential

invalidity due to NEPA errors. AIDEA could also have contended that lease termination

was excessive as DOI had authority to order additional mitigation measures. The Lease

Cancellation Decisions should be set aside because of DOI's non-compliance with

§ 558(c).[36]

3. <u>DOI Lacked Authority to Cancel Leases that Congress Directed DOI to Issue, Particularly When Lesser Remedies like Mitigation Were Available to DOI.</u>

DOI's decision to cancel AIDEA's lease agreements also contains at least two

substantive errors. First, the Congressionally mandated leases DOI issued are not subject

to NEPA review, at least as to their issuance in order to comply with the Tax Act, and DOI

therefore lacks authority to cancel those lease agreements because of alleged NEPA errors.

Second, cancelation was a grossly excessive remedy, beyond what is necessary for DOI to

correct any harm from its alleged errors, when DOI had available to it the power to order

issue environmental mitigation corresponding to DOI's errors. The remedy was

---

627, 635, 642 (5th Cir. 2023) (letter merely providing licensee with "opportunity to respond" insufficient – opportunity "to demonstrate or achieve compliance" is essential).

[36] The "public health, interest, and safety" exception to § 558(c) requirements is "directed to unusual, emergency, situations," and so has no application here. *Air North America v. Department of Transportation,* 937 F.2d 1427, 1437, n. 8 (9th Cir.1991); *Hodgins v. U.S.D.A,* 238 F.3d 421, n. 5 (6th Cir. 2000, table). The APA's legislative history confirms this point. Sen. Doc. No. 248, p. 35 (79th Congress, 2nd Session) (exception applies in cases "of urgency"); H. Rept. No. 1980, p. 275 (79th Congress, 2nd Session) (exception applies "where clear and immediate necessity for the due execution of the laws overrides the equities …."). AIDEA had to apply for and obtain follow-up permits to do any physical work, so there was no such urgency to cancellation, particularly after lease suspension.

AIDEA v. Haaland, et al.                                                      Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                            Page 18 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 24 of 55

particularly excessive as its burden fell upon an innocent party, AIDEA, which was not responsible for the agency errors that prompted the remedy.

   a. *Issuance of AIDEA's oil and gas leases was not subject to NEPA review.*

The U.S. Supreme Court's landmark ruling in *Department of Transportation v. Public Citizen*, 541 U.S. at 764, 769-73, addressed when agencies must conduct NEPA analyses. The Supreme Court concluded that, in order to trigger NEPA, the environmental consequences in question must result causally from the agency's decision making, and so the Court rejected arguments that NEPA is triggered even when the agency has no authority or discretion to decline to take agency action being considered:

> NEPA requires a 'reasonably close causal relationship' between the environmental effect and the alleged cause…in particular, 'courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.'

> Also, inherent in NEPA and its implementing regulations is a "'rule of reason,'" which ensures that agencies determine whether and to what extent to prepare an EIS…***It would not, therefore, satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform***.

*Public Citizen*, 541 U.S. at 767-69 (emphasis added, internal citations omitted). Thus, actions subject to NEPA review do not include "nondiscretionary obligation[s]" where DOI has no ability to refuse or to modify an action that Congress has instructed it to take. *Public Citizen* has since been codified by NEPA amendments in 2023 through Pub. Law 118-5 §321(b), which clarified that the definition of "major federal action" excludes "[a]ctivities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." 42 U.S.C. § 4336e; 40 CFR 1508.1(q)(1)(ii) (89 Fed. Reg. 35442, issued May

AIDEA v. Haaland, et al.                                  Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 19 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 25 of 55

1, 2024, will renumber these rules). The duty to prepare an EIS extends only to "major federal action." 42 U.S.C. § 4332(2)(C); 40 CFR § 1501.1(a). Were the law otherwise, agencies could wittingly or unwittingly fail to heed congressional directives, resulting in serious separations of powers concerns.

This has occurred here. The Tax Act called for both discretionary and nondiscretionary actions by DOI. The directive requiring DOI to establish an oil and gas program on ANWR's coastal plain provided the agency some discretion in formulating the structure of the program and in the continued management over actions implementing the program. Tax Act, § 20001(b). But beyond that broader directive, Congress imposed narrower, specific "nondiscretionary obligations" on DOI, including the requirement that the agency hold a lease sale and issue leases for oil and gas development on ANWR's Coastal Plain no later than January 6, 2021. Tax Act, § 20001(c). DOI had no discretion in choosing if it should hold a sale for oil and gas leases. Thus, DOI's actions implementing the Tax Act's requirement to hold a sale and its issuance of the resulting oil and gas lease agreements to AIDEA are precisely the kind of "nondiscretionary obligation" excluded from NEPA review. As such, DOI cannot support its subsequent cancellation of the lease agreements by claiming that the alleged DOI errors in the NEPA analysis are grounds for lease cancellation.

The Tax Act's statutory scheme, directing DOI to take both discretionary and non-discretionary actions in establishing a Coastal Plain oil and gas program, is similar to the framework the Ninth Circuit analyzed in *Alaska Wilderness League,* 788 F.3d at 1215.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 20 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 26 of 55

Anti-drilling plaintiffs sued DOI over its approval of oil spill response plans tied to off-shore leases in the Beaufort and Chukchi Sea. Off-shore drilling is governed by OCSLA, which requires lessees to submit oil spill response plans in accordance with the Clean Water Act. The OCSLA project approval process involves a series of discretionary agency decisions subject to NEPA, but, like the Tax Act, OCSLA also imposes non-discretionary obligations on DOI. For example, under OCSLA and the Clean Water Act, DOI "must 'promptly review' submitted [oil spill response] plans…and '*shall*…approve any plan that meets' the statutory requirements." *Alaska Wilderness League*, 788 F. 3d at 1216 (emphasis added, internal citations omitted). Plaintiffs claimed approving these oil spill response plans without an EIS violated NEPA.

The Ninth Circuit rejected this argument, citing *Public Citizen* as precedent that NEPA does not apply to DOI's nondiscretionary review and approval of response plans:

> …Plaintiffs' argument [is] that no authority prevents [DOI] from requiring Shell to make changes to the [response plans] in order to minimize adverse environmental effects. On the contrary, [DOI's] authority is just so constrained. The governing statute mandates that the agency "shall ... approve any plan that meets the requirements" of the statutory section. This language is similar to the statutory mandate at issue in *Public Citizen,* where the governing statute required that the [agency] "*shall* register a person to provide transportation ... as a motor carrier if [it] finds that the person is willing and able to comply with" that statute's requirements. …
>
> The statute here similarly restricts [DOI's] discretion. [DOI] is required to approve an OSRP that meets the statute's requirements, which the agency reasonably interprets to be the checklist of six requirements…. Applying NEPA to this process, then, would merely require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform, which would clearly violate NEPA's rule of reason.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                 Page 21 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 27 of 55

*Alaska Wilderness League*, 788 F.3d at 1225–26. The Tax Act operated in the same way, providing DOI with discretion to establish various details regarding the Coastal Plain oil and gas program, but granting no such discretion as to issuance of leases by the statutory deadline: "the Secretary <u>shall</u> conduct not fewer than 2 lease sales", "the Secretary shall offer for lease…not fewer than 400,000 acres area-wide in each lease sale", and "the Secretary shall offer…the initial lease sale…not later than 4 years after the date of enactment of this Act." Tax Act §20001(c). Faced with a similar statutory directive in the Inflation Reduction Act (Pub. L. 117-169) that DOI issue oil and gas leases in the Gulf of Mexico, the D.C. Circuit held that lease issuance under that statute was not subject to NEPA and so leases could not be invalidated for alleged NEPA failures. *Friends of the Earth v. Haaland,* No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

The Ninth Circuit's decision in *Center for Biological Diversity v. Bernhardt* is the counterpoint, but it is easily distinguishable. It involved a discretionary rather than non-discretionary agency decision. Environmental plaintiffs alleged that DOI erred in approving a site-specific oil and gas project proposed by Hilcorp Alaska, LLC on the Outer Continental Shelf pursuant to OCSLA, because DOI's NEPA analysis for the project failed to consider the consequences of increased emissions of greenhouse gases arising from increased foreign oil consumption due to the project. *Bernhardt*, 982 F.3d at 736. The Ninth Circuit agreed, finding it was necessary for DOI to have considered levels of greenhouse gas consumption and emissions when considering a "no-action alternative" in its NEPA review. *Id.* at 737-740. But therein lies the key distinction. OCSLA extended a <u>permissive</u>

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                       Page 22 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 28 of 55

grant of authority to DOI, such that the agency "is **_authorized_** to grant…any oil and gas lease on submerged lands of the outer Continental Shelf," but was not required to grant the lease. 43 U.S.C. § 1337(a) (emphasis added).[37] In exercising that permissive authority, DOI had sufficient discretion to deny Hilcorp's application for the lease and select the "no action alternative" following NEPA analysis. Thus, unlike the present case, DOI was required under *Public Citizen* to conduct NEPA analysis regarding whether to issue the requested lease at all. By contrast, the Tax Act provided DOI with no discretion to decline to issue leases, Tax Act § 20001(c). Indeed, this Court has already held that DOI was "required" to issue the leases. *AIDEA*, 2023 WL 5021555, *27.

DOI's undoing of the statutorily-mandated lease issuance through lease cancellation was all the more unreasonable because DOI had available to it the tailored remedy of instead imposing on AIDEA additional environmental mitigation requirements corresponding to DOI's perceived errors in its earlier environmental and statutory analyses, as discussed further in Point D.3.b below. Here, the Tax Act commanded DOI to issue leases covering 400,000 subsurface acres by December 2021, and to issue the rights-of-way and permits necessary to make oil and gas production in ANWR a reality. Tax Act, § 20001(c)(1) and (2). In September 2023, DOI cancelled those leases, for purported illegality in the inception, leaving no leases in effect. DOI's conduct is particularly remarkable because it occurred 2.5 years after expiration of the statutory deadline,

---

[37]     In contrast to the Tax Act, OCSLA is written as a series of "may" directives empowering DOI with discretion in its management of the program, for example 43 U.S.C. § 1337(p) states that DOI "<u>may</u> grant a lease, easement, or right-of-way…."

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 23 of 49

Case 3:24-cv-00051-SLG     Document 50     Filed 05/03/24     Page 29 of 55

retroactively frustrating Congress's intent. DOI has declined to promise to re-conduct the now-defunct first lease sale. *See* DOI Answer to Amended Complaint ¶ 45 (DE 20); *cf. Finnbin, LLC v. Consumer Product Safety Comm'n*, 45 F.4th 127, 134 (D.C. Cir. 2022) ("We strongly disfavor any interpretation that make statutory commands unfulfillable.").[38]

>   *b. Lease cancellation was a disproportional response to the alleged errors.*

Even if *arguendo* issuance of AIDEA's leases was subject to evaluation under NEPA, any DOI errors did not justify the extreme remedy of lease cancellation where ordering mitigation was an available proportional remedy. Remedies for agency error must be tailored to logically correspond with the agency error, and not be excessive or disproportional to the scale of the error. In *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165–66 (2010), the Supreme Court observed: "[i]f a less drastic remedy (such as partial or complete vacatur of [the agency's] deregulation decision) was sufficient to redress respondents' injury," a more drastic remedy was not warranted. Along these lines, remedies for error as to part of an agency action should respect severability principles. *Cook Inletkeeper v. Raimondo*, 541 F.Supp.3d 987, 992 (D. Alaska 2021) (vacating only those portions of a permit that were "within the scope of" errors in environmental analysis). "[S]uccessful challenges to one aspect of a rule yield partial vacatur unless there is 'substantial doubt' that the agency would left the balance of the rule intact." *Finnbin, LLC*

---

[38]  In announcing the lease cancellation, Secretary Haaland remarked that "no one will have rights to drill for oil in [ANWR]," which raises doubts that these leases will ever be reissued to comply with the Tax Act. DOI Answer to Amend. Cmplt, ¶ 61 (quote). The parties have stipulated this remark may be considered by the Court. DE 48, n. 1.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 24 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 30 of 55

45 F.4th at 136; *see also, Belmont Municipal Light Dept. v. F.E.R.C.*, 38 F.4th 173, 188

(D.C. Cir. 2022) (severing offending provisions from an agency adjudicatory order). These

principles logically also apply when an agency self-corrects for its own errors, particularly

if the burden of the remedy falls on an innocent party.[39]

There is a lack of nexus between the alleged NEPA and statutory interpretation

errors DOI believes it committed in the 2020 ROD and 2019 FEIS, the issuance of the

leases in January, 2021, and the lease terms. The lease agreements convey to AIDEA the

exclusive right (as against others) to drill, extract, and remove oil and gas from specific

tracts of lands located in ANWR, but development of those lands remains subject to DOI

regulation and further DOI permitting requirements. AR 3320. In the 2020 ROD, DOI

established that any action by AIDEA under the leases involving exploration, development,

production, transportation, or otherwise disturbing the surface of the leased lands requires

additional DOI approval and site-specific NEPA reviews. AR 3148. DOI's self-perceived

errors are not even reflected in any lease terms (and if they were reflected in lease terms,

the proportional remedy would be to sever and invalidate those terms with AIDEA's

consent). The lease terms required AIDEA to abide by all existing laws and order and even

reasonable subsequent orders. AR 3320.

Further, AIDEA's leases did not contractually guarantee access to develop 2,000

surface acres, are silent on and do not prohibit imposition of mitigation measures regarding

---

[39] DOI equated its role reconsidering its own prior decision to that of a court reviewing
an agency decision, citing judicial review decisions regarding remedies. AR 5355.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 25 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 31 of 55

greenhouse gases, and do not prohibit mitigation measures regarding subsistence hunting and fishing. The additional permitting required before ground-disturbing activities can occur was designed to allow DOI to evaluate and address potential environmental harm before any harm occurs.

One proportional remedy for the 2020 ROD's purported misreading of the Tax Act's 2,000-acre surface footprint clause could be for DOI to impose upon AIDEA as the existing lessee the duty to comply with DOI's new interpretation. Implementing that change would mean revising the 2020 ROD, i.e., revising that document to correct DOI's previous statutory interpretation. But no provision would need to be excised from AIDEA's leases, which require compliance with the 2020 ROD and DOI orders, but do not themselves address the 2,000-acre surface footprint issue.

Similarly, a proportional remedy for the 2020 ROD's purportedly inadequate analysis of the impacts of oil and gas drilling on subsistence hunting is for DOI to refresh its analysis of that issue, and once more order AIDEA as the lessee to comply with whatever new mitigation measures DOI concludes are necessary, subject to the Tax Act's mandate that DOI allow and facilitate oil and gas drilling. As with the surface-acre question, revisions to the 2020 ROD would be sufficient to accomplish this remedy. No change to the terms of AIDEA's leases would be necessary to address DOI's error.

Finally, a proportional remedy for the greenhouse gas emissions issue was evaluating, selecting, and imposing reasonable mitigation measures pertaining to such emissions. This would be available through a revision of the 2020 ROD, which imposes

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 26 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 32 of 55

many mitigation measures. By directing that DOI issue oil and gas leases and administer an oil and gas program, Congress necessarily chose to accept some level of greenhouse gas emissions.

In summary, the Tax Act, DOI's regulations, the 2020 ROD, and the Lease Terms all establish DOI's authority to impose additional mitigation measures, all of which would have preserved AIDEA"s right to judicial review. But, in its Answer, DOI admits that it did not give AIDEA a chance to keep its leases and implement such mitigation measures to address any errors by DOI.[40] Further, because DOI had suspended AIDEA's leases, and this Court had just upheld that suspension decision, there was no risk of AIDEA moving forward with ground-disturbing activities before DOI could develop logical tailored remedies.[41] In short, DOI had no basis to terminate AIDEA's leases when far more proportional remedies were available.

4. APA § 558(c)(2) Required DOI to Provide a Cure Opportunity Before Terminating AIDEA Leases.

DOI not only failed to take narrowly-tailored action to remedy its errors, it also failed to provide AIDEA with the opportunity to cure that 5 U.S.C. § 558(c)(2) requires

---

[40]    Answer to Amended Complaint, ¶ 51 ("DOI did not offer AIDEA the opportunity to keep its leases subject to changes in the coastal plain program.").

[41]    *See Conserve Southwest Utah v. U.S. Dep't of Interior,* 2023 WL 7922785, **8-9, No. 21-1506- ABJ (DDC 2023) (declining to vacate DOI's grant of a right-of-way to build a road, despite DOI confessing error in its National Historic Preservation Act analysis and agreeing to vacatur – vacatur not justified because project proponent could only begin construction after completion of a remand addressing the NHPA issue).

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                  Page 27 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 33 of 55

agencies to afford license holders before license cancellation can lawfully occur.[42] Rather than provide this opportunity to cure, DOI jumped straight to lease cancellation.

In addition to requiring that the agency provide the licensee with the opportunity to contest claims that non-compliance with law exists, § 558(c)(2) requires that, before initiating proceedings to terminate a license, the licensing agency also provide the licensee with the opportunity to "*achieve*…compliance…" i.e. to cure any non-compliances that might presently exist. (Emphasis added). Section 558(c)(2) thus specifically applies to the subject of cancellation of APA licenses the more general legal doctrines reviewed in Point D.3.b above that remedies for agency error must be proportional and tailored to address the error committed. Cancellation of an APA license for a curable concern is, as a matter of law, an unavailable remedy under § 558(c)(2). Here, to the extent DOI arguably erred at all in its various analyses in the 2020 ROD and 2019 FEIS that accompanied lease issuance, cure was achievable through DOI ordering and AIDEA complying with mitigation measures, such as including its new more conservative interpretation of the 2,000-acre clause, adding additional subsistence hunting and fishing protections, and adding additional greenhouse gas mitigation.

The § 558(c)(2) obligation requiring a licensing agency to allow the licensee an opportunity to cure is most often invoked when the licensee has done something wrong that is curable, e.g. being late in paying license fees, or failing to comply with some terms

---

[42]  *See* Point D.2 above for discussion of DOI's successful effort to persuade GAO that AIDEA's leases were also licenses within the APA's broad definition of "license."

AIDEA v. Haaland, et al.                                        Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                            Page 28 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 34 of 55

of the license. But that obligation of the licensor (the agency) to provide a cure opportunity logically and textually applies even when the licensor is the actor whose mistakes might result in the licensee losing its license.[43] The text of § 558(c)(2) is not narrowly limited to licensee defaults. The language is broadly written guaranteeing an opportunity to achieve compliance with "all lawful requirements" regarding the license. And here, DOI's allegedly inadequate analyses in the 2019 FEIS and 2020 ROD put AIDEA's leases in jeopardy. In this situation, the innocent licensee must be allowed a chance to cure any defects by cooperating with the licensing agency's efforts to fix the licensing agency's own errors. Instead, DOI admits it did not provide AIDEA with the opportunity to accept "program changes" and keep its licenses. Answer to Amended Complaint, ¶ 51. DOI did not provide the cure opportunity the APA requires be afforded to holders of APA licenses.

5. <u>43 CFR § 3136.3(b) Applies in ANWR and Requires DOI to Obtain a Court Order if it Believes Cause Exists to Cancel AIDEA's Leases.</u>

DOI further erred by failing to follow an NPR-A regulation applied by the Tax Act to ANWR. This regulation expressly provides that a lease of lands that either have a "producing" well "or" are "known to contain valuable deposits of oil" may "only be cancelled by court order." 43 CFR § 3136.3(b); *see* Tax Act § 20001(b)(3) (DOI shall administer the ANWR oil and gas program in a manner "similar to" the NPR-A program, citing these NPR-A regulations). In the 2019 FEIS and 2023 Draft SEIS, DOI made factual determinations regarding the high likelihood of economically recoverable oil being present

---

[43] As discussed in Point D.2 above, the exceptions in § 558(c) for willful bad acts by the licensee and exigent circumstances impacting public health and safety do not apply.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                           Page 29 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 35 of 55

that meet the caselaw standard for identifying lands "known to contain valuable deposits of oil." *See* AR 122-24; AR 4114-15; AR 5586-97 (detailed further below).

    a. *NPR-A Rule 3136.3(b) has no counterpart in the Mineral Leasing Act provisions construed in the* Boesche *decision mistakenly relied upon by DOI.*

Rather than suing AIDEA to seek a ruling by a neutral judge that AIDEA's leases were invalid, the procedure set by the regulation, DOI made that determination unilaterally and administratively. AR 5353. DOI acted in misplaced reliance on the Supreme Court's *Boesche* decision, which construed a different leasing regulatory structure with no counterpart to Rule 3136.3(b). AR 5355. In *Boesche*, the Court construed a provision of the Mineral Leasing Act ("MLA"), 30 U.S.C. § 188. 373 U.S. at 475. That statute (1) allowed DOI to seek judicial cancellation of leases for default by the lessee, (2) allowed DOI to administratively cancel a lease for default by the lessee if the lease was not known to contain valuable deposits of oil, but (3) said nothing either way about whether DOI could administratively cancel leases for other reasons, such as error in issuing leases:

> Except as otherwise herein provided, any lease issued under the provisions of * * * (this Act) may be forfeited and canceled by an appropriate proceeding in the United States district court for the district in which the property, or some part thereof, is located whenever the lessee fails to comply with any of the provisions of * * * (the Act), of the lease, or of the general regulations promulgated under * * * (the Act) and in force at the date of the lease * * *.

> 'Any lease issued after August 21, 1935, under the provisions of * * * (s 17 of the Act, 30 U.S.C. s 226) shall be subject to cancellation by the Secretary of the Interior after thirty days' notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the land covered by any such lease is known to contain valuable deposits of oil or gas.'

30 U.S.C. § 188 (historical, as quoted in *Boesche*, 373 U.S. at 475).

AIDEA v. Haaland, et al.                                 Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                     Page 30 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 36 of 55

The lessee in *Boesche* contended that this MLA provision implicitly prohibited DOI from administratively cancelling leases for pre-issuance errors by DOI. 373 U.S. at 475-76. The lessee asked the Supreme Court to find that the statutory grant of administrative cancellation authority for certain defaults by the lessee was exclusive, implying a lack of DOI authority to administratively cancel leases in other contexts. *Id.* The Supreme Court rejected the lessee's argument, holding that, in the absence of a statute limiting DOI's authority, DOI's powers to administer public lands included an inherent power to administratively cancel leases in order to correct its own errors. *Id.* at 476. However, the Court was careful to note that this inherent power held by DOI could be "withdrawn" by Congress. *Id.* The MLA lacked such a provision withdrawing DOI's authority. *Id.*

But just as Congress may withdraw DOI's inherent powers, so too may DOI choose to limit its inherent powers by adopting a regulation requiring it to obtain a court order to cancel a lease in some or all circumstances. If DOI makes that choice, errors by DOI are still correctable, but through a proceeding before a neutral court. In adopting Rule 3136.3(b) in 1981 for the NPR-A, DOI did just that. The decades old regulation contains one exception allowing DOI to administratively cancel a lease if the lessee commits an uncured default and is not yet producing oil or gas, but otherwise DOI must obtain a court order to cancel a lease if the lease either includes a "producing" well or is for lands "known to contain valuable deposits" of oil:

(a). Any nonproducing lease may be canceled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in § 3130.0-3 of this title, of the regulations issued thereunder or of the lease, if such failure to comply continues for 30-days after a notice thereof has been

AIDEA v. Haaland, et al.                                     Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                    Page 31 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 37 of 55

delivered by registered or certified mail to the lease owner's record post office address.

(b). Producing leases or **leases known to contain valuable deposits of oil or gas may be canceled _only_ by court order**.

43 CFR § 3136.3 (emphasis added). Comparing subsection (a) to subsection (b) of this rule, one sees that DOI tackled the subject of cancellation of leases for lessee default in sub-section (a) and wrote sub-section (b) more broadly, without limiting subsection (b) to the subject of default by the lessee. Where it applies, this NPR-A rule prohibits administrative lease cancellation by requiring a court order, which resolves an issue on which the MLA provisions construed in *Boesche* were silent.

DOI's differing approaches in implementing the NPR-A and the MLA reinforce the conclusion that Rule 3136.3(b) means that leases under NPR-A (and ANWR) known to contain valuable oil may "only" be cancelled by court order. In adopting this and other NPR-A Rules, DOI determined that the MLA and DOI's MLA regulations "are not applicable to" the NPR-A. 46 Fed. Reg. 55494, 55497 (Nov. 9, 1981). Indeed, the MLA and NPR-A regulations are mutually exclusive, and cannot both apply to the same project.

The District of Alaska agreed with this conclusion that the MLA does not apply to the NPR-A. *Natural Resources Defense Council v. Zinke*, 2018 WL 6424687, *2 (D. Alaska 2018).[44] The text of DOI's NPR-A lease cancellation rule differs sharply from DOI's MLA lease cancellation rule. The NPR-A rule requires a court order to cancel leases of lands known to contain valuable oil, with a limited exception for certain lessee default

---

[44] *See also*, 43 CFR § 3100.0-3(a)(2)(v) and (vi) (MLA does not apply to units north of 68 degrees latitude and east of the western boundary of the NPRA, such as ANWR).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 32 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 38 of 55

scenarios, 43 CFR § 3136.3, while the MLA regulations codify *Boesche* by expressly declaring that a lease may be cancelled for errors in issuance, without requiring a court determination. 43 CFR § 3108.3(c). In adopting the NPR-A regulations, the Reagan Administration's DOI further explained its determination to construe its agency powers narrowly. 46 Fed. Reg. 55494, 55496. At the time, DOI declined to adopt a rule giving itself the authority to administratively suspend NPR-A leases, reasoning that the statute governing the NPR-A did not yet include a provision authorizing the administrative suspension of NPR-A leases. *Id.* This philosophy of limiting agency power made it unsurprising that DOI in Rule 3136.3 provided lessees with the protection of the courts when DOI seeks to cancel a lease of lands containing valuable oil.

DOI did not add administrative lease suspension to the NPR-A rules until 20 years later, after the NPR-A statute was amended to authorize administrative suspension.[45] And to this day the NPR-A rules require a judicial order to cancel leases, with the sole exception being when a lessee defaults under a non-producing lease. 43 CFR § 3136.3(a) and (b). In this matter, there was no default and DOI administratively canceled oil and gas leases known to contain valuable oil and gas deposits, contrary to governing regulations.

*b. The NPR-A lease cancellation rule extends to ANWR.*

While Tax Act § 20001(b)(3) requires DOI to administer ANWR leases in a manner "similar to" how DOI administers NPR-A leases, DOI may contend that cancellation of a lease <u>by DOI</u> for errors in issuing the lease is similar enough to cancellation of a lease for

---

[45]   42 U.S.C. § 6508 (1997 amendments, now § 6506a(k)(2)); 43 CFR § 3135.2 (2002).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                            Page 33 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 39 of 55

such reasons <u>by a court</u> that DOI could utilize agency proceedings to cancel ANWR leases, even if Rule 3136.3(b) requires judicial procedures to cancel NPR-A leases.

This Court should reject any such "wiggle room" argument by DOI, for multiple reasons. First, the Tax Act's "similar to" provision cites the NPR-A rules, including Rule 3136.3, reflecting Congress's expectation that DOI would follow the NPR-A rules in administering the ANWR Coastal Plain program, unless there was some legal basis not to do so in a particular instance.[46] Indeed, in the 2020 ROD, DOI interpreted the "similar to" clause in the Tax Act as calling for DOI to follow its NPR-A regulations, unless some special characteristic applicable to the ANWR Coastal Plain required different treatment. AR 3151 ("The words 'similar to' in this context mean consistent except where the statutory goals and mandates or differences in circumstances between the NPR-A and the Coastal Plain support a departure"). There is no special characteristic of ANWR, as distinct from the NPR-A, that would call for a different treatment between the two units on the purely legal issue of whether DOI or a court decides whether grounds exist to cancel a lease. This is particularly true now that this Court has relied on NPR-A provisions and the Tax Act's clause borrowing those provisions for ANWR to hold that DOI had authority to administratively suspend AIDEA's ANWR leases, allowing DOI to freeze action pending a judicial determination on lease cancellation.[47] *Compare* 43 CFR § 3135.2(a) ("BLM may

---

[46]    "Except as otherwise provided in this section, the Secretary shall manage the oil and gas program in the [ANWR] Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Protection Act of 1976 (42 U.S.C 6501 et seq.) (including regulations)." Tax Act § 20001(b)(3) (parentheses in original).

[47]    *AIDEA v. Biden*, 2023 WL 5021555, *10, appeal pending.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 34 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 40 of 55

require a suspension of operations … for your [NPR-A] lease ….") *with* 43 CFR § 3136.3(b) (NPR-A leases known to contain valuable oil "may be cancelled only by court order").

Second, it would be incongruous to hold that NPR-A lease suspension provisions extend to ANWR, as this Court has done, but that the protections for lessees in the NPR-A lease cancellation rule do not. Suspension and cancellation are often related agency actions.

Third, any power on the part of DOI to administratively cancel leases by unilaterally finding that a prior Administration with a different philosophy erred in issuing the leases would be a highly significant power. A program operating under the threat of use of such a power would be dissimilar to a program free from that threat, because the balance of power would shift significantly, particularly for a program where a partisan divide exists and development work will have to span multiple Administrations.

    *c. DOI appropriately credited evidence that economically recoverable oil and thus valuable oil exists in Coastal Plain areas mostly leased by AIDEA.*

What remains then is to determine whether the 365,000 areas of the western ANWR Coastal Plain leased by AIDEA are "known to contain valuable deposits of oil," 43 CFR § 3136.3(b). Simply put, they are. In both the 2019 FEIS and the September 2023 Draft SEIS, DOI cited and credited findings by the U.S. Geological Survey ("USGS") in 2005 that economically recoverable (and thus "valuable") oil exists in ANWR, with 80% of that oil in the western sub-area, particularly the portion of the western sub-area with "undeformed" rocks north and west of the Marsh Creek anticline. AR 4114-15; AR 0123-24. AIDEA paid $12 million to lease the substantial majority of those most promising lands north and west

AIDEA v. Haaland, et al.                                     Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 35 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 41 of 55

of the anticline. *Compare* AR 3316 (map of AIDEA's leases); AR 5587 (USGS map showing undeformed area, deformed area, and the Marsh Creek anticline); AR 5592 (USGS map showing western sub-area and eastern sub-area); AR 5496 (map of "Topset Play," which USGS and DOI noted was the most promising geological feature of ANWR for oil extraction, AR 5604).

In addition to analyzing the geology of the rocks and finding the undeformed rocks north and west of the Marsh Creek anticline to be particularly promising for oil, USGS pursued other lines of analysis and found it significant that multiple wells had struck oil just to the west and north of the western sub-area of the Coastal Plain. AR 5577, 5581 (map of these wells and analysis of their significance).[48] In summarizing all available information, DOI in the 2019 FEIS and 2023 Draft SEIS found that "427,900 acres of the program area are projected to have a high potential for petroleum resources, 658,400 acres are projected to have moderate potential, and 477,200 acres are projected to have low potential." AR 0122; AR 4113. Because the USGS reports relied upon by DOI and the 2019 FEIS were published, AIDEA submitted bids to lease those locations within ANWR that DOI found most likely to contain oil, and therefore AIDEA's leases totaling 365,000 acres largely overlap with the 427,900 acres DOI found have a "high potential" for oil.[49]

---

[48]  These findings were in the original 1998 USGS study which the 2005 USGS study relied upon for technical geological analysis and updated as to economics. AR 5586.

[49]  The High Hydrocarbon Potential area identified by DOI in the 2019 FEIS (AR 0538-0541 – note hatchmarks) and the 2023 Draft SEIS (AR 4639-4641) falls north and west of the Marsh Creek anticline and is largely the same area that USGS identified in its study as containing the most recoverable oil, the undeformed rocks area. (AR 5577). AIDEA's leases also largely fall within this area (AR 3316).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 36 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 42 of 55

Rule 3136.3(b) requires that there be economically recoverable oil to trigger the procedural protections for lessees, because the rule turns on whether "valuable deposits of oil" are present. USGS defined economically recoverable oil as technically recoverable oil that can be sold for a profit after accounting for all costs, including building a transportation network in this remote arctic area, costs of extraction and transport, and a return on capital invested. AR 5588. Therefore, economically recoverable oil is oil that, from a business perspective, is worth drilling for and so is valuable. Thus, a key part of USGS's work was its determination, credited by DOI in both the 2019 FEIS and the 2023 Draft SEIS, that there would be economically recoverable oil in the western sub-area of ANWR, most of which AIDEA leased, even if the market price for oil was as low as $21 a barrel. AR 4115; AR 0123-24; AR 5597; AR 5598-99. USGS had an extraordinarily high 95% degree of confidence in this conclusion, AR 5598, i.e. "a 19 out of 20" chance, AR 5586.

Applying that degree of confidence, USGS estimated that there were at least 750 million barrels of economically recoverable oil in the western sub-area at a $21 market price, AR 5597, and that this figure would rise to 3.26 billion barrels if the market price was $55 a barrel. AR 5597-99. In the Draft SEIS that accompanied the Lease Cancellation Decision, DOI cited the USGS study for the proposition that "[n]inety percent of the technical recoverable resources were estimated to be economically recoverable at $55/barrel, approximately $85/barrel in 2023 dollars." AR 4115. At that time, September

AIDEA v. Haaland, et al.                                  Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                Page 37 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 43 of 55

2023, the market price was in the $80s.[50] This was several times higher than the minimum price ($21 a barrel) at which USGS could say with a 95% degree of confidence that there was economically recoverable oil in the western sub-area. In other words, the question is not whether there is economically recoverable oil in the Coastal Plain, but whether the Coastal Plain contains economically recoverable oil deposits worth (1) hundreds of millions or (2) billions of dollars. This is contingent not on the quantity of oil available (which is massive) but on the market price for such oil once extracted.

DOI may contend that the 95% degree of confidence expressed by USGS falls short of 100% certainty and that Rule 3136.3(b) applies only if there is 100% certainty valuable oil is present. However, the rule does not require 100% certainty, nor is 100% certainty ever possible when evaluating a prospective analysis. Certainty could only exist when a well is drilled that strikes oil that the developer extracts and brings to market, i.e. a "producing" well. Rule 3136.3(b) is written to afford the lessee the protection of a judicial trial if there is either a "producing" well "or" the leased lands "are known to contain valuable deposits of oil…." Thus, the rule contemplates both retrospective and prospective applicability, and a probability less than 100% certainty is sufficient.

More pertinently, because the term of art "known to contain valuable deposits" has been employed in federal oil and gas law for more than a century, caselaw applying it exists. In 1983, just two years after DOI adopted Rule 3136.3, DOI's Board of Land

---

[50] https://www.eia.gov/dnav/pet/pet_pri_spt_s1_d.htm (viewed October 10, 2023); *see* AIDEA Amnd. Cmplt., ¶ 24 (alleging market price, ECF 11); DOI Answer to Amnd. Cmplt, ¶ 24 (admitting allegation, ECF 20); AR 4115 (market price in December, 2022).

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                          Page 38 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 44 of 55

Appeals reaffirmed the force of older Supreme Court cases that adopted a lessee-friendly construction of "known to contain valuable deposits" in which definitive proof of the presence of oil or another mineral is not required and indirect evidence is sufficient if it "engenders" a "belief" that a mineral is present and economically worthwhile to extract:

> The meaning of the statutory phrase "known to contain valuable deposits [of a leasable substance]" can be understood from decisions of the Supreme Court defining the phrase "known to be valuable [for a leasable substance]." Actual discovery of … deposits … on the land sought is not required in order that the land may be regarded as "known to contain valuable deposits" …. Competent evidence may consist of proof of the existence of the mineral on adjacent lands as well as proof of geological and other surrounding and external conditions, and all that is required is that the evidence show that the known conditions were plainly such as reasonably to engender the belief that the lands contain the mineral in such quantity and of such quality as to render its extraction profitable and justify expenditures to that end.

*Delta Chemical Co.*, 76 IBLA 111, 1983 WL 35057 (DOI Board of Land Appeals, 1983) (citing *U.S. v. Southern Pacific Co.*, 251 U.S. 1, 13-14 (1919), *Diamond Coal Co. v. U.S.*, 233 U.S. 236, 239-40 (1914), and *U.S. v. U.S. Borax Co.*, 58 I.D. 426, 433 (1943)).

As reviewed above, USGS analyzed geological evidence regarding the undeformed rocks north and west of the Marsh Creek anticline and found that multiple successful wells had been drilled just to the west and north of that part of the Coastal Plain. AIDEA leased most of the area that USGS found was most likely to contain oil. USGS concluded to a 95% degree of confidence that economically recoverable oil was present so long as the market price was at least $21 a barrel, and that price is now in the $80s. The facts "reasonably engender" a "belief" on the part of a prudent person that "lands contain the mineral in such quantity and of such quality as to render its extraction profitable and justify expenditures to that end." *Delta Chemical Co.*, 1983 WL 35057 ("The presence of

AIDEA v. Haaland, et al.                              Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                        Page 39 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 45 of 55

comparable operations in the same geographic area suggest that sodium may be extracted at a profit from brines at Cadiz Lake"); *Southern Pacific Co.*, 251 U.S. at 13-14 (the "certainty" that is only achievable by drilling wells "is a mistaken test" – test is whether an "ordinarily prudent person" would have enough information to justify investment).

DOI may also attempt to rely on a brief uncited statement in the 2020 ROD where it asserts that it is unknown whether oil will be found the Coastal Plain. AR 3145. That isolated statement, unsupported by any evidence or further analysis, did not reject DOI's detailed discussion and reliance on the USGS findings in the Petroleum Resources assessment in the 2019 FEIS (repeated in the 2023 Draft SEIS). AR 0124, AR 4414. Those DOI documents and the 1998 and 2005 USGS studies that they cited must be read together. The commonality among all these DOI documents (USGS is part of DOI) is that one cannot be certain that oil is present in economically recoverable and thus valuable quantities, because the 95% confidence level reached by USGS is not the same as 100% certainty. But USGS's findings, made to a 95% degree of confidence, meet and exceed the reasonable belief standard set by the caselaw cited above. Thus, Rule 3136.3(b) applies and DOI must sue AIDEA in a neutral judicial forum if DOI believes there are grounds to cancel AIDEA's leases. 5 U.S.C. § 706(2); Tax Act § 20001(b)(3). It did not do so.

Finally, it is notable that DOI did not analyze Rule 3136.3 in its Lease Cancellation Decision, AR 5353. This omission is itself likely reversible error, because the Rule presents a threshold issue concerning whether DOI had jurisdiction to administratively cancel the leases. *See* Point B above citing to *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*'s holding that

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                              Page 40 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 46 of 55

an agency's failure to consider an important issue in its analysis is arbitrary and capricious. 463 U.S. at 43 (1983). DOI failed to provide AIDEA with the opportunity to contest the claims that the leases should be cancelled, and so failed to provide due process required by the Constitution and by 5 U.S.C. § 558. Having so deprived itself of the benefit of legal briefing from AIDEA, DOI has only itself to blame for its failure to analyze and account for Rule 3136.3(b). This Court's August 7, 2023 decision citing the NPR-A lease suspension provisions in upholding DOI's decision to suspend AIDEA's leases should also have prompted DOI to examine the related NPR-A lease cancellation rule, before cancelling the leases one month later. *AIDEA*, 2023 WL 5021555, *10. In any event, the threshold issue of whether the Court or DOI should decide the lease cancellation issue is appropriate for this Court to decide. DOI's discussion in the record of the likely presence of economically recoverable oil, recounted above, support the conclusion that Rule 3136.3(b) applies, so the issue of lease cancellations belongs in a judicial forum, with DOI as plaintiff and AIDEA as defendant, and not before DOI.[51]

6. The prior Administration's analysis in the 2019 FEIS and 2020 ROD is not "error in the inception" so as to justify lease cancellation.

Up until now, this brief has focused on the lack of a nexus between (a) the errors DOI claims it made under the prior Administration in connection with the ANWR oil and gas program, and (b) the extreme remedy of cancelling leases Congress ordered DOI to issue when DOI could have taken more narrowly tailored actions imposing stiffer program

---

[51] For this reason, any further proceedings regarding lease cancellation should be before a court, and any such unresolved issues should not be remanded to DOI.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                        Page 41 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 47 of 55

terms and conditions responsive and proportional to the alleged errors. That point applies regardless of whether or not DOI erred in its prior analysis. To briefly recap:

Foreign Oil Consumption and Greenhouse Gas Emissions – While this Court held in the lease suspension / moratorium case that agencies must consider foreign oil and gas consumption in NEPA analyses, and thus DOI should consider those effects in the ROD establishing the overall structure of the Coastal Plain oil and gas program, the *issuance* of leases was a non-discretionary action mandated by the Tax Act, and therefore not subject to NEPA. Failure to conduct an adequate NEPA analysis might justify lease suspension for further analysis to guide DOI's implementation of discretionary aspects of the program, but such a defect could not justify undoing lease issuance through lease cancellation.

The Tax Act's 2,000 Surface Acre Provision – AIDEA's lease agreements contain no provisions or contractual guarantees regarding the amount of surface acres that may be covered, therefore no nexus connects the alleged error in the ROD to the issued leases. DOI can address the 2,000-surface-acre provision through its supplemental ROD and direct AIDEA to comply with new lawful requirements, if any, moving forward. To date, AIDEA has not put a shovel in the soil and has not disturbed a single surface acre.

ANILCA § 810 Subsistence Analysis – Like the 2,000-surface-acre provision, the alleged errors in subsistence analysis are tied to the 2019 FEIS and 2020 ROD, not the leases themselves. Cancellation of the leases is not warranted as the leases require AIDEA to receive DOI approval prior to engaging in projects on the leased lands. Such review

AIDEA v. Haaland, et al.                                        Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                     Page 42 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 48 of 55

includes consideration of subsistence impacts and DOI can require compliance with the supplemental ROD's subsistence requirements.

These considerations alone warrant overturning the lease cancellation decision. However, it is also worth observing that DOI's analysis in the 2019 FEIS and 2020 ROD was in fact reasonable and lawful, and not "error." AIDEA will now each address each claim of error. Notably, as discussed in Point B above, it is defendants who challenge the lawfulness of agency actions, specifically actions by DOI in the prior Administration implementing the Tax Act's ANWR oil and gas program. *See Solonex*, 626 F.Supp.3d at 119. Thus, deferential review doctrines do not necessarily operate in favor of the defense.

a. *Greenhouse gasses*.

The question of whether DOI erred in its analysis of greenhouse gasses <u>with respect to issuing the leases</u> and the question of the proper remedy for any error largely merge. As explained in detail in Point D.3 of this brief above, the issuance of the leases was non-discretionary and so not subject to NEPA, meaning the leases could not be cancelled on account of alleged NEPA errors, including the greenhouse gas analysis. The question of environmental mitigation is one over which DOI has some discretion and so is subject to NEPA. DOI has authority to impose terms and conditions that, if lawful, must be obeyed by AIDEA as leaseholder in its development of the project under those leases.

b. *Statutory construction of 2,000-surface-acre provision.*

The fact that DOI now interprets the 2,000-surface-acre provision of the statute differently than it did in the 2019 FEIS and 2020 ROD is not evidence that the prior interpretation was legal error. The parties briefed this issue in the lease suspension case,

AIDEA v. Haaland, et al.                        Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief            Page 43 of 49

but the Court did not decide it, stating it "expresses no opinion in this order as to this legal issue." *AIDEA*, 2023 WL 5021555, at *24, n. 259.

The 2,000-acre provision is short and establishes a mandatory directive requiring DOI to authorize surface development on the Coastal Plain:

> In administering this section, the Secretary **shall authorize up to 2,000 surface acres** of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

Tax Act, §20001(c)(3) (emphasis added). Under all interpretations of this language, the 2,000-acre maximum is clearly established. The competing interpretations of the "up to" language differ in who decides whether to use less than all of the 2,000 acres authorized by Congress: (1) the developers, or (2) DOI. Lurking just below the surface is a text-related policy issue – if DOI makes that decision, what textual safeguard prevents DOI from choosing to allow so little acreage as to make the leasing program non-viable?

The first interpretation, adopted by DOI under the Trump Administration, is that the statute directs that DOI "shall" authorize enough surface acres to allow oil and gas development, while still protecting the environment by imposing a 2,000-acre cap.[52] In other words, "up to 2,000 acres" is a direction from Congress to DOI to allow developers

---

[52] DOI explained its interpretation at AR 3153 in the 2020 ROD, stating:

> …Consistent with Congress's objective to achieve revenue from the Coastal Plain oil and gas program, the 'shall authorize' language in (c)(3) functions as a directive to the BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities.

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                        Page 44 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 50 of 55

to have up to 2,000 surface acres, similar to a corporate board resolution stating a manager may spend "up to" a stated amount on a project. The developers might use less than the authorized 2,000 surface acres, just like the manager might not spend his entire budget.

The second interpretation, favored by the present DOI, is that this provision grants discretion to DOI to choose any number of acres it will permit to be covered by production or support facilities, up to a maximum of 2,000 acres.[53] The lessees operating on the Coastal Plain would thus be constrained to limit their surface construction to the lesser of: (a) 2,000 acres, and (b) whatever number of surface acres DOI authorizes be covered, whether that be 2,000 acres, 1,000 acres,100 acres, 1 acre, or 0.01 acres.

The first interpretation is the correct reading of the statute; it is a natural and linguistically appropriate reading that more closely aligns with the purpose and statutory scheme of § 20001 of the Tax Act. It is linguistically natural to read the statute as granting the developers a budget of 2,000 surface acres, not all of which they have to use. Congress drafted § 20001 as a series of "shall" commands ordering DOI to implement and establish an oil and gas program on ANWR. *See* Point C of this brief. The surface acre provision, paragraph (c)(3), follows other "shall" mandates requiring DOI to hold at least two lease sales, to make available the lands with the highest potential for discovery of hydrocarbons, to hold those sales by specific dates, and to issue any necessary rights-of-way or easements. These directives created clear, enforceable obligations on DOI in its future management of

---

[53]    Under DOI's new interpretation: "The phrase 'up to' plainly indicates that BLM may authorize less than 2,000 acres for production and support facilities, and BLM's conclusion otherwise was incorrect as a matter of law, as well as unreasonable." AR 5356.

AIDEA v. Haaland, et al.                                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                           Page 45 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 51 of 55

the oil and gas program. The "shall" directives including § 20001(c)(3) are implementing steps ensuring the development of the program and should be construed to achieve that purpose. The first interpretation, adopted by DOI in the 2020 ROD, guarantees that lessees can access a significant, but capped number of acres. This makes the program viable, and so achieves the purpose evident in reading all the "shall" directives in § 20001 together.

The second interpretation undercuts the clarity provided by Congress and risks frustrating the purposes of the statute altogether because under that interpretation, there is no textual minimum on the number of acres DOI is required to authorize. Under the second interpretation, DOI could elect to authorize an unviable amount of surface development, even as low as 0.1 acres, rendering the "shall authorize" surface acre provision in § 20001(c)(3) toothless, as if it were a mere "may authorize" grant of non-mandatory permissive authority. That would leave a hamstrung oil and gas developer with no option other than the unattractive one of asserting that the acres allowed by DOI are so low as to be arbitrary and capricious. 5 U.S.C. § 706(2). Congress is unlikely to have relied on the deferential arbitrary and capricious standard of review as the lone watchman to save the program. DOI's 2020 interpretation presents a textually accurate and more realistic reading of the statute than DOI's 2023 interpretation.

It is also possible that this Court concludes that <u>both</u> the prior and current interpretations are permissible, which would lead to the continued application of DOI's new interpretation of the statute moving forward. Such a conclusion, however, would not justify cancellation of AIDEA's leases, because it would mean that DOI's 2020

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                  Page 46 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 52 of 55

interpretation was permissible, and thus not error in the inception. Deference doctrines recognize there may be more than one permissible and lawful interpretation of a statute.[54]

Finally, one must not forget that DOI's 2020 interpretation of the 2,000-acre surface provision is stated in the 2020 ROD, not the leases DOI issued to AIDEA. Thus, even if the Court were to conclude that DOI's 2020 interpretation of the 2,000-acre surface clause was error, that error would not implicate the lawfulness of the leases. The error would instead require a correction of the 2020 ROD, and a change in the acreage cap set in the 2020 ROD, which would need to be complied with by AIDEA as lessee.

### c. DOI fully satisfied ANILCA's § 810 subsistence analysis requirements.

In its Lease Cancellation Decision, DOI included reference to ANILCA § 810's subsistence analysis requirements as an issue where additional analysis <u>may</u> address "<u>potential</u> legal defect[s]" amongst the grounds justifying its decision to cancel AIDEA's lease agreements. AR 5357-58. Because DOI never alleged specific errors relating to ANILCA § 810, it is not clear to what extent, if any, the agency based its final cancellation decision on an alleged violation of ANILCA § 810.[55] Review of DOI's preliminary § 810 analysis in the supplemental EIS, however, suggests that any alleged errors in the ANILCA analysis are duplicative of the claims discussed above regarding Tax Act § 20001(c)(3)

---

[54]   *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, (1944). *See U.S. v. Mead Corp.*, 533 U.S. 218, 234, (2001) ("Chevron did nothing to eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form…").

[55]   That the agency issued an addendum specifically identifying a third error regarding foreign consumption of greenhouse gasses but did <u>not</u> issue a similar addendum identifying flaws in the § 810 analysis suggests that DOI did not justify cancellation on these grounds.

AIDEA v. Haaland, et al.                                          Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                Page 47 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 53 of 55

(i.e., claims that DOI failed to consider alternatives in its ANILCA § 810 analysis that authorized less than 2,000 acres of surface development.)[56] But, as is discussed above, DOI's prior interpretation of that part of the Tax Act was not erroneous.

DOI conducted a thorough § 810 analysis as required by ANILCA, 2019 FEIS (AR 682-707), and summarized its findings in the 2020 ROD (AR 3167-3170):

> Alternative B involves the minimal amount of public lands necessary to accomplish the purposes of the oil and gas leasing program required by Section 20001 of PL 115-97…An alternative that allowed less than 2,000 acres to be covered by production and support facilities would be inconsistent with the mandate contained in PL 115-97…

> The BLM cannot administratively modify this explicit statutory directive. Alternative B includes numerous lease stipulations and ROPs that apply across the Coastal Plain for protection of specific habitats and site-specific resources and uses, while allowing reasonable opportunity for necessary infrastructure to support oil and gas exploration and development.

AR 3169. DOI concluded that the potential restrictions on subsistence use were necessary, involved the minimal amount of public lands possible, and included reasonable steps in the ROD to minimize adverse impacts on subsistence uses. AR 3168-70. Additionally, it is important to note that the scope of the § 810 analysis is preliminary for the project as a whole. The ROD's § 810 analysis does not provide carte blanche for development; DOI will further evaluate the subsistence impacts of the development of particular acreage as leaseholders request land use authorizations:

> In addition to the lease stipulations and ROP's the BLM will consider alternatives to avoid adverse effects and incompatible development to subsistence resources and uses and subsistence access before any on-the-

---

[56]   The preliminary § 810 evaluation in DOI's draft SEIS reaches similar conclusions regarding "Alternative B's" impact. The difference is that the SEIS considers alternatives authorizing fewer than 2,000 acres for development. AR 4792-4815.

AIDEA v. Haaland, et al.                                               Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief                                      Page 48 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 54 of 55

ground activities are approved. This will be done through subsequent NEPA analysis, which will be conducted before any construction or operation permits or approvals are issued. Compliance with ANILCA Section 810(A) will be undertaken at these subsequence stages through project-specific ANILCA Section 810 evaluations.

AR 3170. The 2020 ROD properly considered potential subsistence impacts that may arise from authorizing 2,000 acres of surface area development as required by the statute, while establishing that DOI will conduct additional § 810 subsistence analyses prior to actual development on the land, and impose additional subsistence protection measures as needed.

### E. <u>Conclusion</u>

For the reasons set forth above, the Court should vacate DOI's unlawful Lease Cancellation Decision.

Respectfully submitted this 3rd day of May, 2024.

BIRCH HORTON BITTNER & CHEROT

Attorneys for Plaintiff ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY

By:

/s/  David K. Gross
David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, AK  99501
907-276-1550 (phone)
907-276-3680 (fax)
dgross@bhb.com
zeisberg@bhb.com

/s/  James H. Lister
James H. Lister, ABA # 1611111
Brian V. Gerd, ABA # 1810097
Birch Horton Bittner & Cherot
Suite 350, 1150 Connecticut Ave.
Washington, DC.  20036
202-659-5800 (phone)
202-659-1027(fax)
jlister@bhb.com
bgerd@bhb.com

AIDEA v. Haaland, et al.                                    Case No. 3:24-cv-00051-SLG
Plaintiff's Opening Summary Judgment Brief          Page 49 of 49

Case 3:24-cv-00051-SLG   Document 50   Filed 05/03/24   Page 55 of 55