TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
202-532-5994 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, *et al.*, <br><br> Defendants, <br> and <br><br> GWICH'IN STEERING COMMITTEE, *et al.*, <br><br> Intervenor-Defendants. | Case No. 3:24-cv-00051-SLG |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.     Legal Background ..................................................................................... 2

           A.    Alaska National Interest Lands Conservation Act ........................... 2

           B.    Tax Cuts and Jobs Act of 2017 ........................................................ 3

           C.    National Environmental Policy Act .................................................. 4

    II.    Factual and Procedural Background ......................................................... 5

           A.    The Program's Establishment and First Lease Sale .......................... 5

           B.    Suspension of the Program and Lease Activity ................................. 6

           C.    The Lease Cancellation Decision ...................................................... 8

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT .............................................................................................................. 11

    I.     All of Plaintiff's Claims Can Be Resolved on Summary Judgment .......... 12

    II.    DOI Properly Invoked the Secretary's Discretion to Cancel Leases ......... 13

           A.    The Identified Legal Deficiencies Justify Cancellation ................... 14

           B.    DOI Was Not Required to Take an Approach Other than
                   Cancellation ...................................................................................... 21

    III.   AIDEA's Political Pretext Claim Fails ..................................................... 24

    IV.   Cancellation Did Not Deprive AIDEA of Due Process ............................. 28

           A.    Constitutional Due Process ............................................................... 28

           B.    Statutory Due Process ....................................................................... 33

    V.     Petroleum Reserve Regulations Do Not Preclude Lease Cancellation ....... 36

    VI.   Remedy ................................................................................................... 41

CONCLUSION ........................................................................................................... 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*350 Montana v. Haaland,*
  50 F.4th 1254 (9th Cir. 2022) ...................................................................... 9, 19

*Air N. Am. v. Dep' t of Transp.,*
  937 F.2d 1427 (9th Cir. 1991) ........................................................................ 34

*Alaska Indus. Dev. & Exp. Auth. v. Biden,*
  685 F. Supp. 3d 813 (D. Alaska 2023) ...................................................... passim

*Alaska Wilderness League v. Jewell,*
  788 F.3d 1212 (9th Cir. 2015) ........................................................................ 18

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm' n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 41

*Am. Petroleum Inst. v. Env't Def. Ctr.,*
  143 S. Ct. 2582 (2023) ...................................................................................... 5

*Amoco Prod. Co. v. Fry,*
  118 F.3d 812 (D.C. Cir. 1997) .................................................................. 28, 29

*Anchustegui v. Dep't of Agric.,*
  257 F.3d 1124 (9th Cir. 2001) ........................................................................ 35

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................ 13

*Belmont Municipal Light Department v. FERC,*
  38 F.4th 173 (D.C. Cir. 2022) .................................................................. 22, 23

*Belville Min. Co. v. United States,*
  999 F.2d 989 (6th Cir. 1993) .................................................................... 26, 27

*Biden v. Texas,*
  597 U.S. 785 (2022) ........................................................................................ 25

*Boesche v. Udall,*
  373 U.S. 472 (1963) .................................................................................. passim

*Bradley v. Vill. of Univ. Park, Illinois,*
  59 F.4th 887 (7th Cir. 2023) .......................................................................... 29

*Cal. Cmtys. Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) .......................................................................... 41

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
ii

*Cal. Sportfishing Prot. All. v. Lake Wildwood Ass'n*,
   No. CV S 06 1026 WBS EFB, 2006 WL 2734370 (E.D. Cal. Sept. 25, 2006)............ 34

*Cameron v. United States*,
   252 U.S. 450 (1920)................................................................................................. 14

*Center for Biological Diversity v. Bernhardt*,
   982 F.3d 723 (9th Cir. 2020) ............................................................... 7, 9, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)................................................................................................. 13

*Clarke v. Commodity Futures Trading Comm'n*,
   74 F.4th 627 (5th Cir. 2023) ................................................................................. 35

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)................................................................................................. 30

*Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................................... 29

*Consumer Elecs. Ass'n v. FCC*,
   347 F.3d 291 (D.C. Cir. 2003)................................................................................ 14

*Cook Inletkeeper v. Raimondo*,
   541 F. Supp. 3d 987 (D. Alaska 2021) .................................................................. 22

*Dakota Res. Council v. U.S. Dep't of the Interior*,
   No. 22-CV-1853 (CRC), 2024 WL 1239698 (D.D.C. Mar. 22, 2024) ................. 19

*Dallas Safari Club v. Bernhardt*,
   518 F. Supp. 3d 535 (D.D.C. 2021) ....................................................................... 25

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019)................................................................. 13, 25, 26

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004)................................................................................................. 18

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ................................................................................... 5

*Estado de Sinaloa, A.C. v. United States*,
   32 F.4th 1130 (Fed. Cir. 2022) .............................................................................. 25

*Ewing v. Mytinger & Casselberry, Inc.*,
   339 U.S. 594 (1950)................................................................................................. 31

*Fence Creek Cattle Co. v. U.S. Forest Serv.*,
   602 F.3d 1125 (9th Cir. 2010) ............................................................................... 35

*Finnbin, LLC v. Consumer Product Safety Commission*,
  45 F.4th 127 (D.C. Cir. 2022)...........................................................................22

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*,
  426 U.S. 776 (1976)...........................................................................................17

*Friends of Animals v. Haaland*,
  997 F.3d 1010 (9th Cir. 2021) ...........................................................................11

*Friends of the Earth v. Haaland*,
  583 F. Supp. 3d 113 (D.D.C. 2022)..............................................................9, 19

*Friends of the Earth v. Haaland*,
  No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) .....................17, 18

*Gallagher & Ascher Co. v. Simon*,
  687 F.2d 1067 (7th Cir. 1982) ...........................................................................34

*Gwich'in Steering Comm. v. Bernhardt*,
  No. 3:20-CV-204-SLG *et al.* (D. Alaska Jan. 5, 2021) .................................2, 3, 5, 6, 17

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
  67 F. Supp. 3d 1262 (D. Colo. 2014)..................................................................23

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981)...........................................................................................30

*Hoopa Valley Tribe v. U.S. Bureau of Reclamation*,
  648 F. Supp. 3d 1196 (E.D. Cal. 2022) .............................................................30

*In re Big Thorne Project*,
  857 F.3d 968 (9th Cir. 2017) .............................................................................11

*Ivy Sports Medicine, LLC v. Burwell*,
  767 F.3d 81 (D.C. Cir. 2014).............................................................................26

*Jamul Action Comm. v. Chaudhuri*,
  837 F.3d 958 (9th Cir. 2016) .......................................................................16, 18

*Lum v. Kauai City Council*,
  358 F. App'x 860 (9th Cir. 2009) ......................................................................30

*Lum v. Kauai Cnty. Council*,
  No. CIV 06-00068 SOM/BMK, 2007 WL 1482403 (D. Haw. May 18, 2007) ...........30

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)......................................................................................29, 30

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)...........................................................................................22

*Municipality of Anchorage v. United States*,
    980 F.2d 1320 (9th Cir. 1992) ........................................................... 16

*N.Y. Pathological & X-Ray Lab'ys, Inc. v. Immigr. & Naturalization Serv.*,
    523 F.2d 79 (2d Cir. 1975) ............................................................... 34

*Nat. Res. Def. Council, Inc. v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987) ............................................................ 5

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ...................................................................... 18

*PDK Lab'ys Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ........................................................... 41

*Pit River Tribe v. U.S. Forest Serv.*,
    469 F.3d 768 (9th Cir. 2006) ........................................................... 12

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010) .......................................................... 11

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................... 5

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ........................................................... 17

*Shanks v. Dressel*,
    540 F.3d 1082 (9th Cir. 2008) ...................................................... 28, 29

*Shiny Rock Min. Corp. v. United States*,
    825 F.2d 216 (9th Cir. 1987) ........................................................... 29

*Sierra Club v. EPA*,
    995 F.2d 1478 (9th Cir. 1993) .......................................................... 32

*Silver State Land, LLC v. Schneider*,
    843 F.3d 982 (D.C. Cir. 2016) ........................................................... 14

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    2023 WL 7410730 (D. Alaska Nov. 9, 2023) ...................................... 19, 27

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    555 F. Supp. 3d 739 (D. Alaska 2021) ................................. 8, 9, 19, 20, 23

*Stand Up for California! v. U.S. Dep't of the Interior*,
    959 F.3d 1154 (9th Cir. 2020) .......................................................... 17

*Texaco, Inc. v. Hickel*,
    437 F.2d 636 (D.C. Cir. 1970) ................................................................ 15

*Texas Oil & Gas Corp. v. Andrus*,
    498 F. Supp. 668 (D.D.C. 1980) ............................................................. 15

*Texas Oil & Gas Corp. v. Watt*,
    683 F.2d 427 (D.C. Cir. 1982) ................................................................ 15

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) .................................................................. 11

*United States v. Wood, Wire & Metal Lathers Int'l Union, Loc. Union No. 46*,
    471 F.2d 408 (2d Cir. 1973) ................................................................... 30

*Ursack Inc. v. Sierra Interagency Black Bear Group*,
    639 F.3d 949 (9th Cir. 2011) ........................................................... 35, 36

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 .......................................................................................... 11, 35

*Wade v. Goldschmidt*,
    673 F.2d 182 (7th Cir. 1982) ................................................................. 32

*Winkler v. Andrus*,
    614 F.2d 707 (10th Cir. 1980) ............................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 4

**Statutes**

16 U.S.C. § § 3141-3151 ............................................................................ 3

30 U.S.C. § 226 ......................................................................................... 38

42 U.S.C. § 4332(C) .................................................................................. 4

42 U.S.C. § 6501 ....................................................................................... 36

43 U.S.C. § 2 ............................................................................................. 14

5 U.S.C. § 558(c) ........................................................................... 33, 34, 36

5 U.S.C. § 558(c)(2) ................................................................................. 34

5 U.S.C. § § 701-06 ................................................................................. 10

Pub. L. No. 117-169 ............................................................... 17, 18

Pub. L. No. 115-97 ................................................................... 3

Pub. L. No. 96-487 .................................................................... 2

**Rules**

Fed. R. Civ. P. 56(c) ............................................................... 13

**Regulations**

43 C.F.R. § 3136.3 (2024) ........................................................ 37

**Other Authorities**

Executive Order 13990 .......................................................... 6, 27

*AIDEA v. U.S. Dep't of the Interior*                    Case No. 3:24-cv-00051-SLG
Defs.' Mem. on Mots. for Summ. J.                        vii

Case 3:24-cv-00051-SLG    Document 52    Filed 06/07/24    Page 8 of 51

## <u>INTRODUCTION</u>

The Alaska Industrial Development and Export Authority ("AIDEA") here challenges a decision by the U.S. Department of the Interior ("DOI") to cancel seven leases acquired by AIDEA in the first-ever lease sale under the Coastal Plain Oil and Gas Leasing Program for the Arctic National Wildlife Refuge (the "Program"). AIDEA moves for summary judgment on all but one of its claims, and Defendants hereby oppose that motion and cross-move for summary judgment on all claims.

DOI cancelled AIDEA's leases because of serious legal deficiencies in the Program's creation. DOI is addressing these deficiencies through additional analysis under the National Environmental Policy Act ("NEPA"), in order to bring the Program into legal compliance and provide a proper basis for conducting a December 2024 lease sale. This Court found sufficient a similar rationale in upholding DOI's initial decision to suspend lease implementation. That rationale, augmented by further information developed during the additional NEPA analysis, is equally compelling to justify lease cancellation.

AIDEA primarily argues that Congress mandated its leases be issued, making NEPA compliance irrelevant. But Congress did not exempt the Program from NEPA or mandate that AIDEA's particular leases be issued, and, even if it had, it certainly did not mandate the specific terms and conditions of those leases. DOI possesses broad discretion in determining how to implement the Program, subject to applicable law including NEPA. Upon rejection of AIDEA's foundational and false premise, its

Case 3:24-cv-00051-SLG　　Document 52　　Filed 06/07/24　　Page 9 of 51

additional arguments all fail. AIDEA's leases were appropriately cancelled because they could only properly come into existence under a lawful Program, and subsequent review has shown the Program suffered from significant pre-leasing legal defects. The Court should deny AIDEA's motion and enter judgment in favor of Defendants.

## BACKGROUND

The Court (and parties) are familiar with evolution of the Program and AIDEA's leases. *See*, *e.g.*, *Gwich'in Steering Comm. v. Bernhardt*, Nos. 3:20-CV-00204-SLG, 3:20-cv-00205-SLG, 3:20-cv-00223-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021); *Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813 (D. Alaska 2023) ("*AIDEA*"). This background discussion will provide a brief recap and focus on the challenged lease cancellation decision.

### I. Legal Background

#### A. Alaska National Interest Lands Conservation Act

The Alaska National Interest Lands Conservation Act ("ANILCA") sought, in broad terms, to balance natural resource conservation and development in Alaska. *See* Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371, 2371-2551 (1980). Among conservation unit designations for tens of millions of acres, ANILCA established the Arctic National Wildlife Refuge at the northeastern corner of Alaska's North Slope, expanding the prior Arctic National Wildlife Range to include more than 19 million acres, of which approximately 8 million acres were designated as wilderness. The purposes of the Refuge include "conserv[ing] fish and wildlife

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
2

populations and habitats in their natural diversity[,]" "provid[ing] . . . the opportunity for continued subsistence uses [of fish and wildlife] by local residents[,]" and "ensur[ing] . . . water quality and necessary water quantity within the refuge." ANILCA § 302, 94 Stat. at 2385, 2390. ANILCA Title X, 16 U.S.C. §§ 3141-3151, prohibited oil and gas leasing and development in the Refuge, but excluded a 1.56 million acre area bordering the Arctic Ocean known as the Coastal Plain from wilderness designation and provided that, following an agency report, Congress might take future action to authorize oil and gas leasing in the Coastal Plain. *See Gwich'in Steering Comm.*, 2021 WL 46703, at *2. The Secretary of the Interior submitted the report to Congress in 1987, recommending enactment of legislation "to conduct an orderly oil and gas leasing program" for the Coastal Plain. *Id.* Roughly four decades later, President Trump signed into law the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 20001, 131 Stat. 2054, 2236-37 (2017) ("Tax Act"). *Id.*

B.    Tax Cuts and Jobs Act of 2017

The Tax Act provides that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Tax Act § 20001(b)(2)(A). The Act makes "provid[ing] for an oil and gas program on the Coastal Plain" one of the statutory purposes for the Refuge, in addition to the conservation and subsistence purposes established in ANILCA. *Id.* § (b)(2)(B)(v).

The Act further addresses certain aspects of the Program, directing that "the

Secretary shall conduct not fewer than 2 lease sales area-wide under the oil and gas program under this section by not later than 10 years after" the Tax Act's enactment on December 22, 2017. *Id*. § (c)(1)(A). The Secretary "shall offer" "not fewer than 400,000 acres area-wide in each lease sale" to include "those areas that have the highest potential for the discovery of hydrocarbons." *Id*. § (c)(1)(B)(i). The Secretary "shall offer" the initial lease sale not later than December 22, 2021, and the second lease sale not later than December 22, 2024. *Id*. § (c)(1)(B)(ii). Further, the Secretary "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." *Id*. § (c)(2). Finally, the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases[.]" *Id*. § (c)(3). The Court has interpreted the Tax Act to create "a statutory mandate to conduct lease sales by dates certain" while otherwise reflecting a "broad grant of authority [to DOI] . . . to implement and operate the Program, provided it does so in accordance with all applicable federal laws." *AIDEA*, 685 F. Supp. 3d at 833.

C.    National Environmental Policy Act

NEPA seeks to ensure that federal agencies consider the environmental impacts of proposed major federal actions. 42 U.S.C. § 4332(C); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 16 (2008). Such review both informs agency decision-makers of the significant environmental effects of proposed major federal actions and ensures

that relevant information is made available so the public may "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Id*. at 351 (footnote omitted). NEPA thus imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). However, where an agency's effort to address these procedural requirements has sufficiently serious flaws, then vacatur is "the presumptive remedy for agency action that violates the NEPA[.]" *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023).

## II. Factual and Procedural Background

### A. The Program's Establishment and First Lease Sale

Following passage of the Tax Act, DOI outlined the Program and reviewed its environmental impacts under NEPA, publishing an environmental impact statement ("EIS") in September 2019. *AIDEA*, 685 F. Supp. 3d at 825. After issuing a Record of Decision ("ROD") in August 2020, DOI initiated efforts in late 2020 to conduct the first lease sale under the new Program. *See Gwich'in Steering Comm*., 2021 WL 46703 at *3 (describing November 17, 2020, call for nominations and December 7, 2020, notice of lease sale to be conducted on January 6, 2021). Four lawsuits were filed with this Court

challenging the ROD and EIS establishing the Program, and Plaintiffs in *Gwich'in Steering Committee* and two other cases unsuccessfully sought preliminary injunctive relief to prohibit the issuance of leases under the Program. *Id*. at *4. The lease sale proceeded on January 6, 2021, where AIDEA posted minimum bids and ultimately "secured leases for seven tracts of land." *AIDEA*, 685 F. Supp. 3d at 825.[1] AIDEA's leases were issued by the State Director of the Bureau of Land Management for Alaska on January 13, 2021.

B.    Suspension of the Program and Lease Activity

On January 20, 2021, President Biden issued Executive Order 13990, which, in part, "directed DOI to conduct a supplemental environmental review of the Program and, during the pendency of such review, temporarily halt all activities related to the Coastal Plain oil and gas leases." *Id*. at 826; AR 3351.

Thereafter, on June 1, 2021, Interior Secretary Haaland issued Secretary's Order 3401, "which instructed DOI and BLM officials to conduct the supplemental environmental review and instituted a 'temporary halt on all Department activities related to the Program in the Arctic Refuge' while that supplemental review was being

---

[1]    AIDEA was the high bidder on two additional lease tracts but subsequently abandoned those bids. *Compare* AR 3314 *with* AR 3347. Two other bidders – Knik Arm Services, LLC, and Regenerate Alaska, Inc. – also each obtained a lease for one tract of land. *AIDEA*, 685 F. Supp. 3d at 825-26. However, they each sought and obtained an agreement whereby the Bureau of Land Management ("BLM") cancelled and rescinded their leases and refunded their bonus bid and first year's rental payments. *See* AR 3782-92.

conducted." *AIDEA*, 685 F. Supp. 3d at 826 (quoting AR 3362). Specifically, the Secretary explained that her review:

> identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the [ROD] to properly interpret Section 20001 of [the Tax Act].

*Id.*

The same day, DOI issued a Decision to AIDEA entitled "Suspension of Operation and Production." AR 3364. That Decision elaborated on the legal deficiencies identified in the Secretary's Order, noting that "the recent Ninth Circuit opinion involving the Liberty Project in Alaska, *Center for Biological Diversity v. Bernhardt*, [982 F.3d 723 (9th Cir. 2020)], has implications for the analysis of foreign greenhouse gas ["GHG"] emissions in many of its programs and projects, including those already in litigation, like the [Program]." AR 3365. The Decision thus suspended AIDEA's leases during the "further environmental analysis," advised the analysis would "determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures," and provided that during the suspension "no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended." *Id.*

A subsequent Decision dated August 19, 2022, elaborated on the implications of the referenced *Center for Biological Diversity* precedent (hereinafter, "*Liberty*") and noted this Court's determination "that BLM's exclusion of foreign GHG emissions in its alternatives analysis in the Willow Project EIS was arbitrary and capricious." AR 3404;

*see also Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 762-67 (D. Alaska 2021) ("*Sovereign Iñupiat I*"). "Recognizing that the BLM also excluded foreign GHG emissions from its analysis of alternatives in the Coastal Plain EIS for the same basic reasons cited in the Willow Project EIS, [DOI] . . . has now identified this exclusion as an additional specific legal defect" supporting lease suspension. AR 3404. The Decision noted that BLM would be conducting a supplemental EIS to analyze the Program, stating:

> The BLM is conducting the additional NEPA analysis to determine whether the leases should be affirmed, voided or subject to additional mitigation measures. *Once sufficient information is developed, the BLM will issue a new decision* concerning this suspension of operations and production (SOP) of the above-referenced [Coastal Plain] leases.

AR 3405 (emphasis added). AIDEA, along with co-plaintiffs North Slope Borough, Arctic Slope Regional Corporation, Kaktovik Iñupiat Corporation, and intervenor-plaintiff State of Alaska brought suit challenging the suspension of activity under the Program and the leases. This Court ruled in DOI's favor and dismissed those challenges. *See AIDEA*, 685 F. Supp. 3d 813.[2]

C.    The Lease Cancellation Decision

DOI issued a Draft Supplemental EIS on September 6, 2023. *See* AR 3930 (explaining that the new "Leasing SEIS" is intended "to address deficiencies in the previous NEPA analysis" of the Program's 2019 EIS and 2020 ROD). On the same day, DOI issued a Decision entitled "Lease Cancellation" reflecting the agency's

---

[2]    AIDEA and its co-plaintiffs have appealed from the Court's decision, with their opening brief presently due on September 16, 2024.

determination that AIDEA's leases "were improperly issued due to pre-leasing defects" and concluding "that cancellation is appropriate."  AR 5353.

The Cancellation Decision first recognized the Secretary's "inherent authority, under her general managerial power over public lands, to cancel or suspend oil and gas leases issued in violation of a statute or regulation."  AR 5355 (citing *Boesche v. Udall*, 373 U.S. 472 (1963)).  The Decision addressed multiple legal defects "in the record supporting the leases[.]"  AR 5356.  The first two included BLM's failure to properly interpret the Tax Act's 2,000-acre provision, causing the 2019 EIS to improperly constrain BLM's discretion because every action alternative "involved exactly 2,000 acres of surface development" despite the Tax Act's language allowing alternatives that might authorize lesser disturbance "up to 2,000 surface acres."  *Id*. (quoting Tax Act § 20001(c)(3)).  Additionally, the Decision analyzed the 2019 EIS's failure to adequately quantify downstream GHG emissions as clarified by subsequently evolved case law in *Liberty*, 982 F.3d 723; *Sovereign Iñupiat I*, 555 F. Supp. 3d 739; *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022); and *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022).  AR 5357-58.  As a result, DOI "determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing the underlying issues in a completely new analysis rather than trying to rectify past errors through remedial NEPA analysis."  AR 5358.

DOI further addressed the Decision's timing, explaining that "[w]hile the original suspension order indicated that the Department might complete the NEPA process before deciding whether to cancel the leases, we also noted in the addendum to the original lease suspension that '[o]nce sufficient information is developed, BLM will issue a new decision concerning this suspension of operations.'" *Id.* (quoting AR 3405). "As set forth above [in the Cancellation Decision], that information has been revealed at the draft Supplemental [EIS] stage." AR 5358. The Decision further explains "there are practical considerations that support cancelling the invalidly-issued leases now" because doing so "will enable the Department to consider whether some or all of the areas at issue in these leases may be offered in the second lease sale contemplated by the Tax Act[,]" that there is "value [in] finality for all interested parties vis-à-vis the subject leases[,]" and that "disruptive consequences . . . from cancellation are minimal." AR 5358-59.

AIDEA brought this challenge to the Cancellation Decision by filing a complaint on October 18, 2023.

## STANDARD OF REVIEW

Courts review agency decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. In such review a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." *Id.* § 706(2). Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the

court is not to substitute its judgment for that of the agency. *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (the APA "does not allow the court to overturn an agency decision because it disagrees with the decision") (citations omitted). An agency must "articulate a satisfactory explanation for its action," and a court may find an agency decision arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732-33 (9th Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). The judgments of land management agencies, like DOI, "often require trade-offs among worthy objectives . . . Congress left such judgments to a politically responsive agency with relevant expertise." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017) (citation omitted).

## ARGUMENT

AIDEA's claims are all deficient as a matter of law. The first claim of the Amended Complaint contends that DOI need not comply with NEPA in establishing the Program or issuing leases thereunder. But this Court has properly rejected that contention under established law. And AIDEA's claim that DOI acted arbitrarily and

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
11

capriciously in cancelling its leases should be rejected because the Secretary has inherent authority to cancel leases suffering pre-leasing defects as they rely on the unlawfully established Program.  The political pretext claim too fails in light of DOI's reasonable and well-supported rationale for lease cancellation.  AIDEA's constitutional and due process claims fail because AIDEA's unlawfully issued leases did not create a protected property interest and AIDEA was unable, and thus not improperly deprived of any opportunity, to cure the Program's legal deficiencies.  Finally, regulations addressing lease cancellation for lessee noncompliance do not constrain the Secretary's inherent authority to cancel unlawfully issued leases.  The Court should rule in Defendants' favor and dismiss this case.

## I.     All of Plaintiff's Claims Can Be Resolved on Summary Judgment

The scheduling order (ECF No. 49) contemplates resolution of this case on cross motions for summary judgment, consistent with this Court's observation that a motion for summary judgment "is an appropriate mechanism to seek review of an agency action." *AIDEA*, 685 F. Supp. 3d at 829 n.56 (citations omitted); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (indicating a court may direct entry of summary judgment to any party based on review of the administrative record).

Under this standard, Defendants hereby move for judgment on the entirety of Plaintiff's Amended Complaint.  Plaintiff's initial motion filed May 3 seeks summary judgment on "each of AIDEA's pleaded claims, with the exception of Count II(b), the 'pretext' claim, which will be briefed later."  Pl.'s Opening Summ. J. Br. 7, ECF No. 50

*AIDEA v. U.S. Dep't of the Interior*
Defs.' Mem. on Mots. for Summ. J.

Case No. 3:24-cv-00051-SLG
12

("Pl.'s Opening Br.").[3]  But, as with all other claims, the "pretext claim" can and should

be resolved on summary judgment based on the Court's review of the administrative

record.  This is the presumptive course for all APA claims, including claims involving

allegations of pretext, as the mere possibility of "unstated reasons" or "political

considerations" would not justify expanding review beyond the record absent "a 'strong

showing of bad faith or improper behavior'".  *See Dep't of Com. v. New York*, 139 S. Ct.

2551, 2573-74 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 420 (1971)).  And because none of these exceptions have been satisfied, "there is no

genuine issue as to any *material* fact" such as would prevent entry of summary judgment

here.  *See* Fed. R. Civ. P. 56(c) (emphasis added); *see also Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact[,]" where

materiality is determined by reference to the applicable substantive law).

## II.     DOI Properly Invoked the Secretary's Discretion to Cancel Leases

The lynchpin of AIDEA's case is the flawed assertion that the Secretary lacks

inherent authority to cancel leases that were "statutorily mandated and thus non-

discretionary[.]"  Pl.'s Opening Br. 8, 24; *see also* Am. Compl. ¶ 49 (Count I), ¶ 57

(Count II(A)), ECF No. 11.  This assertion contradicts the plain statutory text of the Tax

---

3       Throughout this brief, the citations to Plaintiff's filings refer to the ECF-stamped
page numbers from the docket.

Act, this Court's prior interpretation of the Tax Act, relevant case law, and common sense. At the removal of this illusory lynchpin, AIDEA's case falls apart.

A. The Identified Legal Deficiencies Justify Cancellation

The Cancellation Decision proceeds from the general proposition that "[t]he Secretary has inherent authority, under her general managerial power over public lands, to cancel or suspend oil and gas leases issued in violation of a statute or regulation." AR 5355 (citing *Boesche v. Udall*, 373 U.S. 472 (1963)). The Secretary is empowered to "perform all executive duties . . . in anywise respecting" the "public lands of the United States[.]" 43 U.S.C. § 2. This provision "vest[s] the Secretary with general managerial powers over the public lands." *Boesche*, 373 U.S. at 476 & n.6; *see also Cameron v. United States*, 252 U.S. 450, 459-60 (1920). Because "statutes written in broad, sweeping language should be given broad, sweeping application," *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003), it is reasonable to conclude that this general authority enabled the Secretary to "correct [the] errors" of her predecessor that have become apparent through additional review and recently evolved case law. *Boesche*, 373 U.S. at 478. This authority has been recognized in numerous factual contexts by various courts. *See Silver State Land, LLC v. Schneider*, 843 F.3d 982, 990 (D.C. Cir. 2016) (*Boesche* "confirmed the Secretary's authority to cancel a 'lease administratively for invalidity at its inception,' even after the lease had been issued" (citation omitted)); *Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980) (recognizing the Secretary's "broad authority to cancel oil and gas leases for violations of the Mineral Leasing Act

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
14

["MLA"] and regulations thereunder, as well as for administrative errors committed before the lease was issued"); *cf. Texas Oil & Gas Corp. v. Andrus*, 498 F. Supp. 668, 675 (D.D.C. 1980) (citing *Boesche* to support cancellation of oil and gas lease improperly issued inside military base), *rev'd sub. nom on other grounds*, *Texas Oil & Gas Corp. v. Watt*, 683 F.2d 427 (D.C. Cir. 1982); *Texaco, Inc. v. Hickel*, 437 F.2d 636, 641 (D.C. Cir. 1970) (recognizing the Secretary's authority "to cancel a lease administratively for invalidity in its inception" where "a determination required by law had not been made") (internal quotation marks and citations omitted).

AIDEA claims that DOI's exercise of this inherent cancellation authority was an "excessive and unnecessary action to terminate AIDEA's Congressionally-mandated leases on account of DOI's own alleged errors in its analysis concerning various issues ancillary to the non-discretionary issuances of the leases[.]" Am. Compl. ¶ 52; *see also* Pl.'s Opening Br. 29 (addressing "DOI's undoing of the statutorily mandated *lease issuance*") (emphasis added). The Tax Act's plain text rebuts AIDEA's position. The Tax Act says nothing about lease issuance, and certainly does not do so in a way that would override NEPA. Rather, it provides that "the Secretary shall *conduct* not fewer than 2 lease sales," Tax Act § 20001(c)(1)(A) (emphasis added), and "shall *offer*" not fewer than 400,000 acres with the highest potential for discovery of hydrocarbons in the initial lease sale to be held not later than December 22, 2021, and the second lease sale to be held not later than December 22, 2024, *id*. § (c)(1)(B) (emphasis added).

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
15

This Court has properly interpreted the statutory text in rejecting previous efforts by the AIDEA plaintiffs and State of Alaska to constrain DOI's authority to establish and administer the Program. Specifically, in *AIDEA*, the Court ruled:

> DOI's discretion is constrained by the Tax Act's mandate to implement the Program and conduct the two lease sales within the required timeframe and the APA's requirement to act within a reasonable time. As intimated above, Congress could have included additional deadlines requiring Agency Defendants to issue any subsequent approvals by a date certain, but it chose not to do so. Rather, the Tax Act accords to DOI the discretion to implement the Program in a manner consistent with the Tax Act and consistent with ANILCA's purposes, which include environmental conservation along with the newly added purpose of the oil and gas program, and also consistent with other applicable federal laws, *including NEPA*.

*AIDEA*, 685 F. Supp. 3d at 835 (emphasis added). Again, Congress directed that DOI "conduct" lease sales and "offer" certain lands for lease but was silent on other aspects of the Program, including the issuance, terms and conditions, and administration of leases.

In reaching its earlier conclusion, the Court necessarily considered the relevant law addressing the manner in which Congress can exempt compliance with NEPA. Since AIDEA fails to address that law, a summary is appropriate. Congress can expressly exempt the need to conduct NEPA analysis of a particular action. *See Municipality of Anchorage v. United States*, 980 F.2d 1320, 1327 (9th Cir. 1992). Or Congress can implicitly exempt NEPA compliance in "two circumstances" – "First, an agency need not adhere to NEPA where doing so 'would create an irreconcilable and fundamental conflict' with the substantive statute at issue. Second, in limited instances, a substantive statute 'displaces' NEPA's procedural requirements." *Jamul Action Comm. v.*

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
16

Case 3:24-cv-00051-SLG    Document 52    Filed 06/07/24    Page 24 of 51

*Chaudhuri*, 837 F.3d 958, 963 (9th Cir. 2016) (quoting *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 648 (9th Cir. 2014)); *see also Flint Ridge Dev. Co. v.*

*Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 788 (1976). None of these exemptions

to NEPA compliance exist here, because the Tax Act "does not foreclose all

consideration of applicable federal laws by the Secretary" nor does it "create any

comparable process for ensuring environmental protection." *Stand Up for California! v.*

*U.S. Dep't of the Interior*, 959 F.3d 1154, 1164-65 (9th Cir. 2020).

      AIDEA's cited authority only punctuates these distinctions. In particular, AIDEA

contends that the Tax Act commands issuance of Coastal Plain leases in the same manner

that the Inflation Reduction Act ("IRA") commanded issuance of Lease Sale 257 offshore

leases. *See* Pl.'s Opening Br. 8, 28 (citing *Friends of the Earth v. Haaland*, No. 22-5036,

2023 WL 3144203 (D.C. Cir. Apr. 28, 2023)). But unique language addresses Lease Sale

257 – which had occurred before the IRA was passed – directing "the Secretary . . . to

'accept the highest valid bid for each tract or bidding unit of Lease Sale 257 . . . and . . .

provide the appropriate lease form to the winning bidder' within 30 days of the [IRA's]

enactment." *Id*. at *1 (quoting IRA, Pub. L. 117-169, § 50264(b)(1), 136 Stat. 1818,

2059-60 (2022)). And "[a]fter then receiving an executed lease form and payment from

the highest bidder, the Secretary must 'promptly issue to the high bidder a fully executed

lease.'" *Friends of the Earth v. Haaland*, 2023 WL 3144203, at *1 (quoting IRA §

50264(b)(2)). The D.C. Circuit concluded this language "place[d] a nondiscretionary

obligation on the Department to issue the leases . . . mak[ing] clear that the issuance of

the leases is no longer subject to NEPA." *Id.* at *2. There is no comparable language in the Tax Act. Indeed, even the IRA establishes this approach solely for Lease Sale 257. Elsewhere, the IRA only directs DOI to "conduct" Lease Sales 258, 259, and 261 "in accordance with" the agency's specified ROD. *Compare* IRA § 50264(b) ("Lease Sale 257 Reinstatement") *with id.* §§ 50264(c)-(e) ("Requirement" for Lease Sales 258, 259, and 261).[4] The differences show that Congress did not set any timeline in the Tax Act that could excuse noncompliance with NEPA. *See*, *e.g.*, *Jamul Action Comm.*, 837 F.3d at 964 (finding that a statute imposing a 90-day compliance timeline rendered NEPA inapplicable). Meanwhile, the statutory language in AIDEA's other cited authority bears, if possible, even less resemblance to the Tax Act. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004); *Alaska Wilderness League v. Jewell*, 788 F.3d 1212 (9th Cir. 2015).[5]

---

[4]     A challenge to Lease Sale 258 involving Alaska's Cook Inlet is pending before the Court. *See Cook Inletkeeper v. U.S. Dep't of the Interior*, Case No. 3:22-cv-00279-SLG (D. Alaska). DOI's interpretation of the IRA here is consistent with its position in *Cook Inletkeeper*. *See*, *id.*, Pls.' Reply Br. 6, ECF No. 46 (explaining that Defendants do not join in the State of Alaska's argument that the IRA exempts Lease Sale 258 from NEPA).

[5]     Moreover, the cited cases are procedurally distinguishable. They reflect judicial deference to the agency's "reasonable" interpretation of whether an "ambiguous governing statute" allowed for NEPA analysis. *See Alaska Wilderness League*, 788 F.3d at 1220-21; *Pub. Citizen*, 541 U.S. at 766; *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007) (finding reasonable "the implementing agency's expert interpretation" that Endangered Species Act ("ESA") consultation requirements only apply to actions where there is federal involvement or control). AIDEA seeks the converse – a judicial determination that the agency unlawfully chose to comply with NEPA in establishing the Program and conducting the first lease sale.

All of this supports DOI's conclusion that it was necessary to comply with NEPA in creating the Program, conducting its first lease sale, and issuing AIDEA's leases. And DOI's conclusion that the relevant decisions suffered fundamental NEPA deficiencies is plainly apparent, and certainly not arbitrary and capricious. The Cancellation Decision first explains that the 2019 EIS failed to consider any alternative with less than 2,000 acres of surface development, in contravention to the plain language of the Tax Act. AR 5356-57. The Decision further emphasizes this Court's ruling in *Sovereign Iñupiat I*, where this Court vacated the master development plan for the Willow Project after finding deficiencies in DOI's analysis of greenhouse gas emissions under NEPA. *See Sovereign Iñupiat I*, 555 F. Supp. 3d at 804. And the Cancellation Decision discussed that ruling within the context of a recently evolved line of authority making clear the requirement that a NEPA analysis of certain agency actions relating to potential oil and gas development must provide a quantitative estimate of downstream GHG emissions and associated environmental impacts, or sufficiently explain why quantification is not possible. AR 5357-58 (citing *Liberty*, 982 F.3d 723; *Sovereign Iñupiat I*, 555 F. Supp. 3d 739; *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022); and *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022)).[6] The Cancellation Decision

---

[6] Subsequent decisions recognize the importance of this analysis, and affirm BLM's adaptation to the *Liberty* line of authority through new methodologies allowing it to "rectif[y]" prior "deficienc[ies] . . . by including foreign GHG emissions in its alternatives analysis[.]" *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, F. 3d Supp.___, No. 3:23-CV-00058-SLG, 2023 WL 7410730, at *12 (D. Alaska Nov. 9, 2023) ("*Sovereign Iñupiat II*"); *see also Dakota Res. Council v. U.S. Dep't of the Interior*, No. 22-CV-1853 (CRC), 2024 WL 1239698, at *9-12 (D.D.C. Mar. 22, 2024).

explains that the Coastal Plain 2019 EIS "used the same model (MarketSim) as did [the Bureau of Ocean Energy Management] and BLM in the cases cited above, which excluded consideration of the impacts of foreign consumption on downstream GHG emissions." AR 5358; *see also Sovereign Iñupiat I*, 555 F. Supp. 3d at 763-65 (rejecting DOI's attempts to defend the initial GHG emissions NEPA analysis for the Willow Project, concluding that "BLM's greenhouse gas emissions analysis suffers from the same flaws the Ninth Circuit identified in *Liberty*").

AIDEA fails to address the weight of this authority, seeking only to distinguish *Liberty*. *See* Pl.'s Opening Br. 28-29. These arguments raise irrelevant factual differences and fail to address recognition of *Liberty*'s holding in subsequent case law.[7] Moreover, AIDEA ignores the relevant portions of this Court's earlier analysis finding that it was reasonable for DOI to revisit the Coastal Plain EIS and ROD in order to conform to controlling case law. *AIDEA*, 685 F. Supp. 3d at 850-52.

---

[7]    In support of its mistaken view that DOI faced a nondiscretionary obligation to issue leases, AIDEA states "[i]ndeed, this Court has already held that DOI was 'required' to issue the leases." Pl.'s Opening Br. 29 (quoting *AIDEA*, No. 3:21-cv-00245-SLG, 2023 WL 5021555, at *27 (D. Alaska Aug. 7, 2023) (filed prior to *AIDEA* being published in the Federal Supplement, Third Series). The word "required" does not appear on the cited page, which rejects the argument that DOI has unreasonably delayed implementing any aspect of the Program. *Id*. Contrary to AIDEA's inaccurate citation, the analysis in this section of the Court's decision does not say DOI had a nondiscretionary obligation to issue leases but reiterates that DOI must "adhere[ ] to the applicable procedures established by Congress in NEPA," 685 F. Supp. 3d at 856, and refers only to the lease sale timing provisions in concluding that "the operative statutes governing the Program – primarily the Tax Act – do not prescribe any discrete steps that Agency Defendants have yet failed to take." *Id*. at 858.

In sum, the Cancellation Decision reflects DOI's reasonable determination, in light of a subsequently evolved line of authority including decisions by this Court, that the 2019 EIS and 2020 ROD creating the Program suffered serious legal deficiencies. DOI thus properly chose, upon recognition of the Program's legal insufficiency, to cancel leases that were shown to have been improperly issued.

B.     DOI Was Not Required to Take an Approach Other than Cancellation

Plaintiff further argues that DOI was precluded as a matter of law from imposing "the extreme remedy of lease cancellation where ordering mitigation was an available proportional remedy." Pl.'s Opening Br. 30; *see also* Am. Compl. ¶ 50. But Plaintiff fails to meet its burden, which would require it to show that DOI was legally obligated to address the Program's NEPA insufficiency solely through mitigation. The law imposes no such requirement, and DOI considered and reasonably explained why it concluded that mitigation alone would not appropriately address the Program's serious pre-leasing legal defects. *See* AR 5355 n.4, 5358.

The scant authority that AIDEA cites for its "proportional remedy" argument is unpersuasive. *See* Pl.'s Opening Br. 30-31. Most significantly, Plaintiff has failed to identify a single case holding that the Secretary's inherent authority to cancel or suspend improperly issued oil and gas leases is subject to the same principles governing remedy in an Article III court. Because the cited cases articulate principles relating only to Article III courts, they are irrelevant here.

Beyond that, each of the cases is readily distinguishable for additional reasons. Beginning with *Monsanto v. Geertson Seed Farms*, the Supreme Court found a district court had failed to make judicial findings necessary to justify a nationwide injunction. 561 U.S. 139, 165-66 (2010). Here, by contrast, DOI amply articulated a rational connection between the facts found and the choice made, resulting in a decision appropriately tailored to only the leases in question. *Cook Inletkeeper v. Raimondo* also provides no support for Plaintiff's arguments, because that case did not focus on NEPA violations undergirding the entire project approval, as is the case here. 541 F. Supp. 3d 987, 992 (D. Alaska 2021). *Cook Inletkeeper* instead involved ESA violations relating to "only a discrete set of tug operations" within a broader set of activities that "as a whole will have negligible impact." *Id*. And while AIDEA clips text from *Finnbin, LLC v. Consumer Product Safety Commission*, 45 F.4th 127, 136-37 (D.C. Cir. 2022), for the proposition that courts should observe severability principles when deciding how much of a rule can be vacated and how much should be left intact, the instant case does not involve a multipart rulemaking – it involves seven leases that the Secretary reasonably determined had been improperly issued. Finally, AIDEA cites *Belmont Municipal Light Department v. FERC*, 38 F.4th 173 (D.C. Cir. 2022), for the proposition that courts can apply severability principles upon judicial review of agency adjudications, by severing the offending parts of a decision and leaving the rest intact. Pl.'s Opening Br. 31. Obvious procedural dissimilarities aside, *Belmont* does not support Plaintiff's argument because that court recognized that severability can apply only in the absence of evidence

demonstrating "substantial doubt" whether the agency would have issued the narrower order. *Id*. at 187-90. Here, DOI considered and rejected any suggestion of a "more narrowly tailored remedy," making it not only substantially doubtful but certain that DOI did not intend to address the Program's fundamental defects by imposing additional mitigation measures on the leases.

Moreover, even if principles governing judicial review somehow also governed the Secretary's exercise of authority under *Boesche*, AIDEA's argument still fails because this Court rejected a narrower approach in reviewing BLM's initial approval of the analogous Willow Project. There, the Court found that failing "to adequately analyze a reasonable range of alternatives" and making "much the same error in its [GHG] emissions analysis as BOEM did in *Liberty*" constituted "serious" errors warranting vacatur of all Project approval decisions. *Sovereign Iñupiat I*, 555 F. Supp. 3d at 804. The Court observed that "[v]acatur is the normal remedy under the APA" and reached this conclusion notwithstanding the fact that many aspects of BLM's analysis were unchallenged or upheld by the Court. *Id*.; *see also High Country Conservation Advocs. v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014) (finding that "interrelated agency decisions" containing "significant NEPA violations" are "more like a Gordian knot that needs cutting than a simple tangle that the government can untie with a little extra time" properly addressed on "a clean slate" following vacatur). So too here, DOI "determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing

the underlying issues in a completely new analysis rather than trying to rectify past errors through remedial NEPA analysis." AR 5358. DOI reserves its right to take a different approach with any future leases, but here it considered and decided against some hypothetically narrower remedy that AIDEA now says it would have preferred.[8] The Cancellation Decision remedy analysis satisfies the APA.

AIDEA's argument that mitigation was legally required is incorrect. DOI considered the possibility of mitigation but reasonably found that the Program's foundational legal flaws warranted lease cancellation.

## III. AIDEA's Political Pretext Claim Fails

AIDEA contends that DOI's "stated grounds for both the earlier lease suspension and the subsequent lease termination were pretextual." Am. Compl. ¶ 61. Specifically, AIDEA points to a response to a question that "then-Candidate Biden" made before taking office, and statements that Secretary Haaland made in a press conference, both allegedly showing that neither official will ever allow any drilling for oil in the Refuge, or "on federal lands period." *Id*. AIDEA believes this "pretext" claim should "be briefed later." Pl.'s Opening Br. 7. But AIDEA's characterizations are demonstrably false and fail to discredit DOI's stated rationale for the Lease Cancellation Decision. Defendants therefore move for summary judgment on this claim because Plaintiff's allegations fail to demonstrate a genuine dispute of material fact.

---

[8]     AIDEA did not propose or advocate for specific mitigation measures of the type it alludes to in its briefing. And its briefing does not explain how the effects of downstream GHG emissions arising from oil eventually produced under Coastal Plain leases could be mitigated through stipulations on lease development.

AIDEA cannot establish a basis for a pretext claim in this case. It acknowledges that "judicial review is sometimes limited to an agency's stated reasons for the action" but suggests that a court can "scrutinize those justifications to evaluate whether the stated reasons are pretextual or mere distractions[.]" Am. Compl. ¶ 62 (citing *Dep't of Com.*, 139 S. Ct. at 2575-76). But AIDEA fails to acknowledge that confining review to the agency's stated reasons for decision is presumptively proper, and that *Department of Commerce* deviated from this approach only because "the sole stated reason" for the challenged decision "seems to have been contrived" against a backdrop of other "unstated reasons[.]" *Dep't of Com.*, 139 S. Ct. at 2575. In doing so, the Supreme Court observed it was addressing "unusual circumstances" requiring consideration of the possible existence of "something better than the explanation offered for the action taken in this case." *Id*. at 2576.

Courts subsequently applying *Department of Commerce* have recognized that it allows inquiry into pretext only in exceptional circumstances, and prohibits it absent such circumstances. The Supreme Court has since reaffirmed that review will extend beyond the stated reasons for an agency decision only upon a "strong showing of bad faith or improper behavior." *Biden v. Texas*, 597 U.S. 785, 811-12 (2022) ("The circumstances in this case do not come close to those in *Department of Commerce*."). Mere "speculation about alleged improper political influence is not a ground for invaliding agency action[.]" *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130, 1142 (Fed. Cir. 2022); *see also Dallas Safari Club v.*

*Bernhardt*, 518 F. Supp. 3d 535, 544 (D.D.C. 2021) ("none of the reasons contained in the DOI Memo are so lacking in credibility or so contradicted by other evidence as to suspect them to be contrived").

Nothing here fits within the narrow holding of *Department of Commerce*. As explained above at pages 16-20, the Lease Cancellation Decision reasonably explains the demonstrated serious legal deficiencies in the NEPA analysis establishing the Program. *See also* AR 5355-58. Without a lawfully established Program, there could not be lawfully issued leases. Neither "unstated reasons" nor "political considerations" in the backdrop to a decision support AIDEA's inquiry, because "[s]uch decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *Dep't of Com.*, 139 S. Ct. at 2573. And this Court has found that DOI's reasons to revisit the Program "are tethered to a concern about legality and judicial review and not to some unrelated concern, such as a political motivation or desire to address climate change." *AIDEA*, 685 F. Supp. 3d at 854. These concerns, "once addressed, should facilitate Agency Defendants' efforts to implement the Program in accordance with the law." *Id*. Agencies should be allowed to revisit their prior decisions to identify and correct errors. *See Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). The mere existence of political factors appearing to be "the catalyst for reconsideration" does not undercut an agency's "legitimate concern that [its prior] determinations had serious procedural and substantive deficiencies." *Belville Min. Co. v. United States*, 999 F.2d

*AIDEA v. U.S. Dep't of the Interior*                    Case No. 3:24-cv-00051-SLG
Defs.' Mem. on Mots. for Summ. J.                    26

Case 3:24-cv-00051-SLG    Document 52    Filed 06/07/24    Page 34 of 51

989, 998 (6th Cir. 1993). And DOI is not "adopt[ing] one legally supportable position rather than another" solely to effectuate policy, but is instead "attempt[ing] to correct legally erroneous . . . determinations that, left uncorrected, would be vulnerable to court challenge because of the wholly inadequate process by which these determinations were reached." *Id*. at 999.[9]

DOI presented compelling reasons justifying its decisions to initially suspend, and then cancel, unlawfully issued leases. Given the sufficiency of this rationale, AIDEA's references to tangential policy statements fails to demonstrate a genuine dispute of material fact. The Court should grant summary judgment to Defendants on the pretext claim in Count II(B) of the Amended Complaint.

---

[9]     AIDEA's two pieces of "evidence" to show political pretext fall far short of the *Department of Commerce* standard. One of those is a response to a question by then-candidate Biden at a campaign event in early 2020, *see* Am. Compl. ¶ 61 (citing https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge (Feb. 9, 2020)). That statement was clearly superseded by Executive Order 13990 issued on January 20, 2021, which reflects the Administration's actual policy direction with respect to the Program. The second, AIDEA's interpretation of the Secretary's statement that upon lease cancellation "no one will have rights to drill" in the Refuge is merely an accurate reflection of the consequences of cancellation of the leases, which had granted certain rights to develop oil and gas resources. *See id*. DOI has not implemented a blanket prohibition on all drilling on federal lands, but has approved oil and gas development with suitable protections. *Id*.; *see Sovereign Iñupiat II*, 2023 WL 7410730; *see also* https://www.blm.gov/programs-energy-and-minerals-oil-and-gas-oil-and-gas-statistics (compiling information relating to BLM oil and gas leasing FY21-FY23); https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/permitting/applications-permits-drill (approved and pending BLM applications for permits to drill FY20-FY24).

## IV.    Cancellation Did Not Deprive AIDEA of Due Process

AIDEA brings several claims contending that lease cancellation violated its due process rights.  But these arguments rely on inapplicable abstract principles and ignore the relevant context and substance of the Cancellation Decision.  Properly framed, AIDEA's due process arguments are easily rejected.

### A.    Constitutional Due Process

AIDEA contends that its leases "were property interests entitled to the protection of the due process clause in the Fifth Amendment to the Constitution" including notice and an opportunity to be heard vis-à-vis lease cancellation.  Pl.'s Opening Br. 19; *see also* Am. Compl. ¶¶ 64-68.  That is incorrect as a matter of law.  The leases subsequently shown to have suffered significant pre-leasing legal defects did not create constitutionally protected property interests.  And AIDEA was not deprived of notice or an opportunity to address the identified legal deficiencies that formed the basis for lease cancellation.

AIDEA seems to raise a procedural due process claim, which initially raises two questions – was the claimant deprived "of a protected property interest," and, if so, "what process was due?"  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (citation omitted); *see also Shanks v. Dressel*, 540 F.3d 1082, 1090-91 (9th Cir. 2008).  The second inquiry further considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Shanks*, 540 F.3d at 1090.

AIDEA fails to carry its initial burden of showing that its unlawfully issued leases gave rise to a protected property interest. *See* Pl.'s Opening Br. 19-20. Its first cited case, *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), refers only in dicta to the possibility that oil and gas leases are a protected property interest, but avoids any due process analysis "[b]ecause the lessees' property interests were not adjudicated in this litigation[.]" *Id.* at 1461 n.52. And AIDEA's other citation does not address the property interest in a lease itself, but rather in withheld overpayments where the lessee had "an entitlement to the return of the overpayments once the statutory prerequisites were satisfied." *Amoco Prod. Co.*, 118 F.3d at 819.[10] AIDEA's leases were cancelled "based on the seriousness of the pre-leasing legal errors given the special legal and factual circumstances of the original leasing decisions, and on the minimal disruptive consequences from cancellation." AR 5359. This falls within "the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors." *Boesche*, 373 U.S. at 479. If a lease turns out to have been issued in violation of underlying law, "[n]o property right was created, therefore no due process right was violated." *Shiny Rock Min. Corp. v. United States*, 825 F.2d 216, 219 (9th Cir. 1987). This analysis is often applied in other contexts to conclude that a protected due process interest was never created. *See Bradley v. Vill. of Univ. Park, Illinois*, 59 F.4th 887, 902 (7th Cir. 2023) (plaintiff's

---

[10]    AIDEA does not face similar circumstances because its lease bid and first year rental payments have been fully refunded to ensure that "the consequences from cancellation are minimal." AR 5359.

"employment contract was void ab initio, so it could not serve as the source of a federal due process right"); *Lum v. Kauai Cnty. Council*, No. CIV 06-00068 SOM/BMK, 2007 WL 1482403, at *8 (D. Haw. May 18, 2007) ("void contracts create no property interests"), *aff'd,* 358 F. App'x 860 (9th Cir. 2009).[11]   For similar reasons, AIDEA fails to demonstrate that it ever acquired a constitutionally protected property interest in leases that were unlawfully issued.

Even if AIDEA temporarily possessed a protected property interest, it was afforded an opportunity to be heard on the underlying legal defects resulting in lease cancellation.  The "essential requirements of due process . . . are notice and an opportunity to respond" which may include an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken[.]"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  "Central to the evaluation of any administrative process is the nature of the relevant inquiry."  *Mathews*, 424 U.S. at 343.  At bottom, sufficient process requires making known "the facts upon which judgment is based" because "arbitrary action as well as error can be corrected by the reviewing court." *United States v. Wood, Wire & Metal Lathers Int'l Union, Loc. Union No. 46*, 471 F.2d 408, 416 (2d Cir. 1973); *see also Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 303 (1981) ("'It is sufficient, where only property rights are concerned,

---

[11]      Whether AIDEA's leases are characterized as void or voidable raises a distinction without a difference.  Even treating the leases as voidable rendered them a legal nullity upon the exercise of Secretarial discretion to cancel the leases.  *See Hoopa Valley Tribe v. U.S. Bureau of Reclamation*, 648 F. Supp. 3d 1196, 1203 (E.D. Cal. 2022).

that there is at some stage an opportunity for a hearing and a judicial determination.'")

(quoting *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599 (1950)).

AIDEA was provided notice of the identified lease defects.  On June 1, 2021, DOI

issued Secretary's Order 3401 and the initial Lease Suspension Decision.  *See* AR 3362,

3364-65.  Subsequently, the August 19, 2022, "addendum" Decision identified "an

additional specific legal error."  AR 3404.  That Decision stated that BLM would conduct

its additional NEPA analysis "to determine whether the leases should be affirmed, voided

or subject to additional mitigation measures.  *Once sufficient information is developed,*

*the BLM will issue a new decision* concerning this suspension of operations and

production (SOP) of the above-referenced [Coastal Plain] leases."  AR 3405 (emphasis

added); *see also AIDEA*, 685 F. Supp. 3d at 826.

AIDEA, and other commentors, availed themselves of the opportunity to be heard

on a range of topics relating to lease validity and the nature of any corrective action.  On

October 4, 2021, AIDEA submitted scoping comments, AR 3793-800, contending that

DOI's earlier NEPA analysis was sufficient, that a Supplemental EIS was not necessary,

and that DOI had failed to substantiate the "identified legal deficiencies" in Secretary's

Order 3401 and the initial Suspension Decision, AR 3796-97.  DOI's scoping report

reflects this input, as well as input from numerous other commentors on the sufficiency

of the 2019 EIS and identified legal deficiencies.  *See* AR 3811-12 (table summarizing

number of substantive comments by issue category); AR 3813-14 (summarizing NEPA

comments).  And AIDEA has made well known its primary argument here, that the Tax

Act mandated not only issuance but development of leases despite any underlying NEPA deficiencies. *See AIDEA*, 685 F. Supp. 3d at 835, 850-52 (discussing interplay between Tax Act and NEPA).

The context of the relevant administrative process and nature of DOI's inquiry is uniquely relevant. DOI's core inquiry was the adequacy of the 2019 EIS NEPA analysis and associated legal sufficiency of the 2020 ROD establishing the Program. DOI's concerns first formed the basis for lease suspension, and ultimately, lease cancellation. While AIDEA (and other stakeholders) expressed various opinions on these questions, "NEPA requires only action by the [federal] government, no private party can comply with NEPA." *Sierra Club v. EPA*, 995 F.2d 1478, 1485 (9th Cir. 1993), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *see also Wade v. Goldschmidt*, 673 F.2d 182, 185-86 (7th Cir. 1982). DOI's ultimate conclusions about the legal insufficiency of the 2019 EIS are rational, as recognized by the Court. And, most importantly, the insufficiency of the 2019 EIS is not something that AIDEA (or any entity other than DOI) can rectify through "more process" in the hopes of protecting an asserted property interest.

In erroneously arguing it was deprived of any opportunity to address the possibility of lease cancellation, AIDEA suggests its claim should be "buttressed by the steps DOI took that led AIDEA to believe it would have the opportunity to defend the legality of its leases" through a completed NEPA process. Pl.'s Opening Br. 21. The argument contradicts the record. The initial suspension decision did suggest that BLM

*AIDEA v. U.S. Dep't of the Interior*                                    Case No. 3:24-cv-00051-SLG
Defs.' Mem. on Mots. for Summ. J.                                                              32

Case 3:24-cv-00051-SLG    Document 52    Filed 06/07/24    Page 40 of 51

would revisit the "suspension of operations and production" on the leases when the "additional NEPA analysis" was "complete." AR 3365. But this direction was modified in the August 2022 addendum explaining that BLM "will issue a new decision concerning this suspension of operations and production" when "sufficient information is developed[.]" AR 3405. The Cancellation Decision acknowledges these circumstances and explains that sufficient information had become available at the Draft SEIS stage to justify lease cancellation. AR 5358. And again, AIDEA's position could not have been differently or more effectively communicated through additional process, because the Lease Cancellation Decision turned on DOI's interpretation of a purely legal issue that was solely within the purview of DOI to analyze.

B.      Statutory Due Process

AIDEA also argues that its "statutory due process" rights were violated because its leases were "licenses" that were cancelled in violation of the APA. Pl.'s Opening Br. 22, 33-35 (opportunity to cure); *see also* Am. Compl. ¶¶ 74-79. But, as with AIDEA's constitutional claim, subsequent review and developed case law demonstrated that any license obtained became null and void and there was nothing about the underlying legal deficiencies that AIDEA could cure through further proceedings. DOI appropriately exercised discretion rendering the leases void in light of the significance of the NEPA deficiencies underlying DOI's creation of the Program.

AIDEA argues, based on 5 U.S.C. § 558(c), that a "license holder" is entitled to "(1) notice of the charges that may result in adverse agency action; and (2) the

opportunity of the license holder to defend against those charges and cure any defaults[.]" Pl.'s Opening Br. 23. However, even if an oil and gas lease constitutes a "license" under the APA, AIDEA fails to explain how it remained a "license holder" when DOI has determined that its leases were unlawfully issued. AIDEA's leases were cancelled as a result of "the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors" that exists regardless of "cancellations based on post-lease events" that might arise under the APA (or MLA). *Boesche*, 373 U.S. at 478.[12]

Moreover, AIDEA demonstrates no violation of § 558(c). DOI provided AIDEA with notice of possible adverse action regarding its leases. *See* AR 3365, 3405. And AIDEA was not deprived of an "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(2). "[T]he purpose of section 558(c) is to provide individuals with an opportunity to correct their transgressions before the termination or suspension of their licenses." *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1438 (9th Cir. 1991); *see also Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1074 (7th Cir. 1982) (characterizing the statutory provision as providing a licensee facing revocation a "second chance . . . or an opportunity to put its house in lawful order")

---

[12]     AIDEA fails to address an additional threshold issue, because the first sentence instructs that subsection (c) applies "[w]hen application is made for a license required by law[.]" 5 U.S.C. § 558(c). A "license required by law" is typically one issued pursuant to regulations to perform prescribed activities. *See N.Y. Pathological & X-Ray Lab'ys, Inc. v. Immigr. & Naturalization Serv.*, 523 F.2d 79, 82 (2d Cir. 1975). In contrast, "general permits" subject to agency discretion do not fall within § 558(c). *See Cal. Sportfishing Prot. All. v. Lake Wildwood Ass'n*, No. CV S-06-1026-WBS-EFB, 2006 WL 2734370, at *3 (E.D. Cal. Sept. 25, 2006).

(internal quotation marks and citations omitted). AIDEA claims it could have done so here by rehashing its arguments that Refuge leases were congressionally mandated and exempt from "invalidity due to NEPA errors" or that DOI should have ordered mitigation as an alternative to lease termination. Pl.'s Opening Br. 23-24; *see also id*. 35 (claiming AIDEA could have "cured any defects by cooperating with the licensing agency's efforts to fix the licensing agency's own errors"). DOI squarely considered and rejected those positions. *See* AR 5355-59.

AIDEA's cited cases are not to the contrary. Those cases involved adverse agency proceedings based on factual inquiry into permit violations or allegations of noncompliance. *See Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001); *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 642 (5th Cir. 2023) (both finding that agency had improperly determined how to address noncompliance before allowing the licensee an opportunity to respond); *see also Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1135-36 (9th Cir. 2010) (rejecting challenge because grazing permittee received "notice and fair opportunity . . . to answer [the agency's] concerns"). AIDEA's cases do not address a "license" that was improperly issued due to underlying legal errors. Rather than AIDEA's cited cases, this case is more like *Ursack Inc. v. Sierra Interagency Black Bear Group*, 639 F.3d 949 (9th Cir. 2011), because AIDEA "is not asking for notice and a chance 'to demonstrate or achieve compliance with all lawful requirements.' Instead, [AIDEA] wants to argue with [DOI]" about the

sufficiency of DOI's "decision to adopt the relevant lawful requirements" undergirding lease issuance. *Id*. at 962-63 (quoting 5 U.S.C. § 558(c)).

AIDEA's leases became void based on DOI's determination that adoption of the Program suffered significant legal errors. AIDEA could not "cure" this outcome because the pivotal determination was solely DOI's to make. Therefore, AIDEA's claim that it was deprived of statutory due process under § 558(c) must fail.

## V. Petroleum Reserve Regulations Do Not Preclude Lease Cancellation

AIDEA's final argument contends that regulations addressing oil and gas development in the National Petroleum Reserve – Alaska ("NPR-A") require a court order to cancel leases, precluding DOI's issuance of the Lease Cancellation Decision. *See* Pl.'s Opening Br. 35; *see also* Am. Compl. ¶¶ 70-73. Even if these regulations were to apply to cancellation of leases in the Refuge, they do not apply to or diminish the Secretary's inherent authority to cancel improperly issued leases. And AIDEA fails to explain how implementation of the regulatory provision would work here, or how any invocation of that process would affect the outcome or otherwise change the analysis of the serious legal deficiencies underlying creation of the Program.

At the outset, the NPR-A regulations only apply to the Refuge in the narrow context prescribed by the Tax Act, which states that "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the *administration of lease sales* under the Naval Petroleum Reserves Production Act of 1976 [42 U.S.C. 6501 et seq. (including regulations)]." Tax Act § 20001(b)(3) (emphasis added). The regulations

contain distinct provisions addressing lease sales. *See* 43 C.F.R. Subparts 3131, 3132 (2024). The Court need not reach this issue to reject AIDEA's argument under the NPR-A regulations, but the statutory text does not support AIDEA's view that additional NPR-A regulations, including those that address lease cancellation, must apply to the Program.[13]

Further, the NPR-A regulations exist to address lessee noncompliance, which is not at issue here. Section 3136.3 addresses "[c]ancellation of leases" and contains two subsections. *See* 43 C.F.R. § 3136.3 (2024). AIDEA fixates on the second addressing "[p]roducing leases or leases known to contain valuable deposits of oil or gas[.]" *Id*. at (b). But this must be read in conjunction with the first subsection, which clarifies that nonproducing leases may be cancelled "by the authorized officer" for lessee failure to comply with requirements under statute, regulation, or terms of the lease. *Id*. at (a). Properly interpreted, Section 3136.3 speaks only to a situation where DOI seeks to address lessee noncompliance through cancellation, which for nonproducing leases it may do administratively but for producing leases it must do by initiating judicial enforcement proceedings. Operations under AIDEA's leases never commenced and the regulations addressing lessee noncompliance are therefore inapplicable.

---

[13]     Additionally, the Court need not make some detailed (or extra-record) factual inquiry into the meaning or application of the regulatory phrase "known to contain valuable deposits of oil or gas" in order to reject AIDEA's argument under the NPR-A regulations.

The existence of the NPR-A regulations does not alter *Boesche*'s recognition of inherent Secretarial authority to cancel leases. AIDEA contends that *Boesche* considered materially different provisions of the MLA, but these arguments are unavailing. *See* Pl.'s Opening Br. 36-39. The statutory provision at issue in *Boesche* stated:

> Except as otherwise herein provided, any lease issued under the provisions of * * * (this Act) may be forfeited and canceled by an appropriate proceeding in the United States district court for the district in which the property, or some part thereof, is located whenever the lessee fails to comply with any of the provisions of * * * (the Act), of the lease, or of the general regulations promulgated under * * * (the Act) and in force at the date of the lease * * *.
>
> Any lease issued after August 21, 1935, under the provisions of * * * (s 17 of the Act, 30 U.S.C. s 226) shall be subject to cancellation by the Secretary of the Interior after thirty days' notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the land covered by any such lease is known to contain valuable deposits of oil or gas.

*Boesche*, 373 U.S. at 475 (quoting 30 U.S.C. § 188); *see also* Pl.'s Opening Br. 36 (quoting same). Boesche argued that this section provided "the exclusive source of the Secretary's power to forfeit a lease once it has been issued," and, that "the section, by its second paragraph, limits administrative cancellation to instances where a lessee has failed to comply with the terms of the lease and then only so long as the land is not known to contain oil or gas[.]" *Boesche*, 373 U.S. at 475. The Secretary responded by arguing that the statute and regulations "apply only to events . . . occurring after a lease has been issued" and that "the Secretary's authority to cancel on the basis of pre-lease events is found not in [§] 31 but in his general powers of management[.]" *Id.* at 476.

The Supreme Court decisively rejected Boesche's arguments, and any derivations therefrom now raised by AIDEA, in clarifying the Secretary's inherent authority to take certain action outside the statutory or regulatory scheme. First, it found the Secretary possessed "general powers of management over the public lands" including "authority to cancel this lease administratively for invalidity at its inception, unless such authority was withdrawn by the [MLA]." *Id*. Next, notwithstanding the statutory language, the Court found the Act "reaches only cancellations based on post-lease events and leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors." *Id*. at 478-79. In addressing the specific language limiting cancellation to judicial proceedings, the Court found that such provision "clearly assumes the existence of a valid lease." *Id*. at 479 (emphasis added). Where a lease was unlawfully issued, the limiting language does not apply because such a lease "has not been issued at the time the breach of the Act or regulations occurs, for [there] is at that time no lease to cancel." *Id*.

AIDEA fails to explain why this same analysis does not apply here. There is no functional difference between Boesche's interpretation of limitations on Secretarial authority imposed by the MLA and AIDEA's interpretation of limitations on the same authority under the NPR-A regulations. AIDEA necessarily makes (or implies) Boesche's arguments that the statute (or regulations) create "the exclusive source of the Secretary's power to forfeit a lease" and that "administrative cancellation" can only occur in strict compliance with prescribed circumstances, which preclude administrative

cancellation of leases "known to contain oil or gas[.]" *Boesche*, 373 U.S. at 475. The Supreme Court left no room for this interpretation, finding that a lease rendered invalid "on the basis of pre-lease factors" was a legal nullity that "has not been issued" in a way requiring application "of the Act or regulations." *Id*. at 479. Moreover, DOI considered the possibility of "address[ing] procedural errors by completing an additional process *post hoc*" and reasonably decided against doing so here "given the gravity of the errors and minimal consequences of cancellation." AR 5355 n.4.

Instead, AIDEA tries to distinguish *Boesche* by claiming the NPR-A regulations reflect DOI's choice "to limit its inherent powers by adopting a regulation requiring it to obtain a court order to cancel a lease[.]" Pl.'s Opening Br. 37. But it fails to explain how or why the regulation applies to the exercise of such inherent authority. And insofar as AIDEA's view is based on some sense of fairness or intuition, it is illogical. Certainly, DOI never intends to issue leases suffering legal defects such as in *Boesche* or under the Program, and recognition of the agency's inherent ability to correct its own mistakes "do[es] not warrant initial submission to the judicial process" and "serves to protect the public interest in the administration of the public domain." *Boesche*, 373 U.S. at 484.

Finally, AIDEA fails to explain how DOI would institute proceedings to obtain a court order cancelling leases based on DOI's own commission of legal error. And regardless of how such a procedure might unfold, it would not alter the straightforward analysis of the legal defects underlying creation of the Program. In any event, this Court will consider and rule upon the sufficiency of DOI's reasoning. Whether it does so in

this proceeding or one instituted by DOI is ultimately of little practical effect. *See PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). AIDEA has not shown prejudice through DOI's approach to cancelling leases based on information developed through supplemental NEPA analysis that was required to address serious errors in creating the Program.

## VI. Remedy

AIDEA fails to engage with the question of remedy, stating only that based on its arguments the Court "should vacate DOI's unlawful Lease Cancellation Decision." Pl.'s Opening Br. 55. Even if AIDEA were to prevail on the merits, however, it would not be entitled to vacatur. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citations omitted). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Id.* (internal quotation marks and citation omitted). Whether an agency action should be vacated depends on several factors, including "how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). The circumstances here might not only require consideration of the Court's ruling on the merits, but also additional factors outside the record, including the outcome of a 2024 lease sale and whether reinstatement of leases might trigger resumption of the stayed cases challenging the 2019 EIS and 2020 ROD. AIDEA has not addressed these

Case 3:24-cv-00051-SLG    Document 52    Filed 06/07/24    Page 49 of 51

issues, and further proceedings would be appropriate should there be any occasion for the Court to consider remedy.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's motion, grant Defendants' cross-motion, enter judgment for Defendants, and dismiss this case with prejudice.

Respectfully submitted this 7th day of June 2024.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
202-532-5994 || 202-305-0275 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

Of Counsel:

MIKE GIERYIC
Attorney Advisor
Office of the Regional Solicitor, Alaska Region
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-1420
mike.gieryic@sol.doi.gov

*AIDEA v. U.S. Dep't of the Interior*
DEFS.' MEM. ON MOTS. FOR SUMM. J.

Case No. 3:24-cv-00051-SLG
42

## CERTIFICATE OF COMPLIANCE

Consistent with Local Civil Rule 7.4(a), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) as modified by applicable order of the Court, ECF No. 49, which provides that Defendants shall have 80 pages (or 22,000) words to divide between this memorandum and the memorandum presently scheduled for filing on August 16, 2024. At that time counsel will confirm that the two memoranda fall within the specified type-volume limitation.

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke