Erik Grafe
EARTHJUSTICE
301 K Street, Suite 508
Anchorage, AK 99501
T: 907.792.7102
E: egrafe@earthjustice.org

Garett R. Rose (*pro hac vice forthcoming*)
Jared E. Knicley (*pro hac vice forthcoming*)
NATURAL RESOURCES DEFENSE
COUNCIL
1152 15th St. NW
Washington DC 20005
T: 202.289.6868
E: grose@nrdc.org
E: jknicley@nrdc.org

*Attorneys for Proposed Amicus Curiae Natural Resources Defense Council, Center for Biological Diversity, and Friends of the Earth.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR *et al.*,<br><br>*Defendants*,<br><br>and<br><br>GWICH'IN STEERING COMMITTEE *et al.*,<br><br>*Intervenor-Defendants*. | Case No. 3:24-cv-00051-SLG |

**[PROPOSED] *AMICUS CURIAE* BRIEF OF NATURAL RESOURCES DEFENSE COUNCIL *ET AL.* IN SUPPORT OF FEDERAL DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

I.  The Secretary has broad authority to cancel leases for pre-issuance flaws as part of her power to manage public lands. .............................................. 1

II. The Secretary's cancellation authority extends to NEPA violations. ..................... 5

III. The 2017 Tax Act did not withdraw the Secretary's authority to cancel leases for pre-issuance flaws. .................................................................. 7

    A.  The Tax Act did not explicitly withdraw cancellation authority for unlawfully issued leases. ....................................................... 7

    B.  The Tax Act did not implicitly withdraw cancellation authority for unlawfully issued leases through incorporation of 43 C.F.R. § 3136.3. ............................................................................ 8

IV. The Secretary reasonably exercised her cancellation authority here. .................... 13

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................................... 16

# TABLE OF AUTHORITIES

## CASES

*350 Mont. v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ...................................................................... 6

*AIDEA v. Biden*,
  685 F. Supp. 3d 813 (D. Alaska 2023) ......................................................... 8

*Bob Marshall All. v. Lujan*,
  804 F. Supp. 1292 (D. Mont. 1992) .............................................................. 7

*Boesche v. Udall*,
  373 U.S. 472 (1963) ....................................................................... 1, 2, 3, 4, 9

*Cameron v. United States*,
  252 U.S. 450 (1920) .................................................................................. 3, 4

*Clayton W. Williams, Jr. Exxon Corporation*,
  103 IBLA 192 (1988) ..................................................................................... 6

*D.M. Yates*,
  74 IBLA 159 (1983) ........................................................................................ 3

*Elaine Wolf*,
  113 IBLA 364 (1990) ...................................................................................... 6

*Entergy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009) ........................................................................................ 2

*Est. of Glenn F. Coy Res. Serv. Co., Inc.*,
  52 IBLA 182 (1981) ........................................................................................ 3

*Fortune Oil Co.*,
  69 IBLA 13 (1982) .......................................................................................... 3

*Gilmore v. Lujan*,
  947 F.2d 1409 (9th Cir. 1991) ..................................................................... 13

*Grynberg v. Kempthorne*,
  No. 06-CV-01878, 2008 WL 2445564 (D. Colo. June 16, 2008) ............................. 2, 5

*Gwich'in Steering Comm. v. Bernhardt,*
No. 3:20-CV-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) ................... 7, 15

*Hannifin v. Morton,*
444 F.2d 200 (10th Cir. 1971) ........................................................................... 2

*High Plains Petroleum Corp.,*
125 IBLA 24 (1992) ..................................................................................... 3, 6

*Hoefler v. Babbitt,*
139 F.3d 726 (9th Cir. 1998) ............................................................................ 3

*Mont. Wilderness Ass'n v. Fry,*
408 F. Supp. 2d 1032 (D. Mont. 2006) ............................................................. 5

*Mont. Wildlife Fed'n v. Bernhardt,*
No. 18-CV-00069, 2020 WL 2615631 (D. Mont. May 22, 2020) ............................ 7

*Morrow v. Clayton,*
326 F.2d 36 (10th Cir. 1963) ........................................................................... 2

*N. Cheyenne Tribe v. Lujan,*
804 F. Supp. 1281 (D. Mont. 1991) .................................................................. 5

*Nevitt v. United States,*
828 F.2d 1405 (9th Cir. 1987) ......................................................................... 13

*S. Utah Wilderness All.,*
194 IBLA 333 (2019) .................................................................................... 5, 6

*Silver State Land LLC v. Schneider,*
843 F.3d 982 (D.C. Cir. 2016) ....................................................................... 1, 4

*Solenex LLC v. Bernhardt,*
962 F.3d 520 (D.C. Cir. 2020) ...................................................................... 2-3, 14

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior,*
No. 06-CV-342, 2007 WL 2220525 (D. Utah July 30, 2007) ................................. 5

*Sun Expl. & Prod. Co.,*
95 IBLA 140 (1987) ....................................................................................... 3

*AIDEA v. U.S Dep't of the Interior et al.,*
Case No. 3:24-cv-00051-SLG

iii

*Twin Metals Minn. LLC v. United States*,
  No. 22-CV-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ..................................... 2

*Union Oil Co. of Cal. v. Udall*,
  289 F.2d 790 (D.C. Cir. 1961) ......................................................................... 4

*W. Watersheds Project v. Zinke*,
  441 F. Supp. 3d 1042 (D. Idaho 2020) .......................................................... 7

*West v. Standard Oil Co.*,
  278 U.S. 200 (1929) ....................................................................................... 4

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
  457 F. Supp. 3d 880 (D. Mont. 2020) ............................................................ 7

*Winkler v. Andrus*,
  614 F.2d 707 (10th Cir. 1980) ....................................................................... 2

## STATUTES

30 U.S.C. § 184(h)(1) ......................................................................................... 13

30 U.S.C. § 184(h)(2) ......................................................................................... 13

30 U.S.C. §§ 188(a)-(b) ...................................................................................... 13

42 U.S.C. §§ 6501-08 ......................................................................................... 9

42 U.S.C. § 6506a(k)(2) ..................................................................................... 11

Pub. L. No. 96-514 (Dec. 12, 1980) .................................................................. 11

Pub. L. No. 105-83 (Nov. 14, 1997) ................................................................. 11

Pub. L. No. 115-97 (2017) ............................................................................ 8, 9, 12

## REGULATIONS

43 C.F.R. § 3102.1-2 .......................................................................................... 10

43 C.F.R. §§ 3108.3(a)-(b) ................................................................................ 13

*AIDEA v. U.S Dep't of the Interior et al.*,                                    iv
Case No. 3:24-cv-00051-SLG

43 C.F.R. § 3108.3(c) ................................................................................. 13

43 C.F.R. § 3108.4 ........................................................................... 10, 11, 13

43 C.F.R. § 3130.5 ..................................................................................... 10

43 C.F.R. § 3136.3 ........................................................... 8, 9, 10, 11, 12, 13

## FEDERAL REGISTER NOTICES

46 Fed. Reg. 55,494 (Nov. 9, 1981) ........................................................ 10, 11

## EXECUTIVE AND SECRETERIAL ORDERS

Executive Order No. 13990, 86 Fed. Reg. 7,037 (Jan. 20, 2021) ..................................... 14

Secretarial Order No. 3401 (June 1, 2021) ........................................................ 14

The Secretary of the Interior ("Secretary") has authority to cancel leases administratively based on pre-issuance legal flaws. This cancellation power flows from the Department of the Interior's ("Interior") plenary authority conferred by Congress to manage federally owned lands. It has long been exercised by the Secretary for a variety of pre-issuance flaws and judicially recognized. Both federal courts and the Interior Board of Land Appeals ("IBLA") have affirmed the Secretary's cancellation authority in this context. Alaska Industrial Development and Export Authority's ("AIDEA") arguments that the Tax Cuts and Jobs Act of 2017 ("Tax Act") and the Bureau of Land Management's ("BLM") cancellation regulation for oil producing leases withdrew the Secretary's authority to cancel unlawfully issued leases are without merit. The Secretary rationally exercised her cancellation authority early in the leasing process, when doing so caused little disruption or harm to the leaseholder.

## I. The Secretary has broad authority to cancel leases for pre-issuance flaws as part of her power to manage public lands.

The Secretary retains broad authority to cancel issued leases based on pre-issuance errors. *See Boesche v. Udall*, 373 U.S. 472, 478-79 (1963) (holding that the Mineral Leasing Act ("MLA") "leaves unaffected the Secretary's traditional administrative authority to cancel on the basis of pre-lease factors"). Courts across the country have recognized and reaffirmed this authority. *See Silver State Land LLC v. Schneider*, 843 F.3d 982, 990 (D.C. Cir. 2016) (recognizing that the Supreme Court has "confirmed the Secretary's authority to cancel a 'lease administratively for invalidity at its inception,'

even after the lease had been issued" (quoting *Boesche*, 373 U.S. at 476)); *Winkler v. Andrus*, 614 F.2d 707, 711 (10th Cir. 1980) ("The Secretary has broad authority to cancel oil and gas leases for violations of the MLA and regulations thereunder, as well as for administrative errors committed before the lease was issued."); *Hannifin v. Morton*, 444 F.2d 200, 202 (10th Cir. 1971) (applying *Boesche* to recognize the Secretary's "broad authority" beyond that specifically granted in the Sulphur Production Act); *Morrow v. Clayton*, 326 F.2d 36, 46 (10th Cir. 1963) (applying *Boesche* to support the Secretary of Agriculture's authority to cancel fraudulently obtained allotment transfers); *Grynberg v. Kempthorne*, No. 06-CV-01878, 2008 WL 2445564, at *4 (D. Colo. June 16, 2008) (recognizing that the Supreme Court has "confirmed that the Secretary's 'general powers of management over the public lands' gives him 'authority to cancel [a] lease administratively for invalidity at its inception'" (quoting *Boesche*, 373 U.S. at 476)).

That the Secretary has consistently used the cancellation authority further "show[s] that the [Secretary's] current practice is a reasonable and hence legitimate exercise" of her power. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009). For example, Interior has cancelled copper mining leases because of pre-issuance flaws, including faulty analysis under the National Environmental Policy Act ("NEPA"). *See Twin Metals Minn. LLC v. United States*, No. 22-CV-2506, 2023 WL 5748624, at *2 (D.D.C. Sept. 6, 2023). It has cancelled oil leases, including where Interior failed to conduct proper pre-lease analysis required by NEPA. *See Solenex LLC v. Bernhardt*,

962 F.3d 520, 522 (D.C. Cir. 2020); *see also High Plains Petroleum Corp.*, 125 IBLA 24, 26-27 (1992) (cancellation of oil lease issued in contravention of a resource management plan); *Sun Expl. & Prod. Co.*, 95 IBLA 140, 140-41 (1987) (oil lease cancelled when bidder had failed to accompany bid with payment required by regulation); *D.M. Yates*, 74 IBLA 159, 160 (1983) (cancellation of oil lease issued in area closed to leasing); *Fortune Oil Co.*, 69 IBLA 13, 15 (1982) (oil lease cancelled when it covered a portion of already leased land); *Est. of Glenn F. Coy Res. Serv. Co., Inc.*, 52 IBLA 182, 185-86 (1981) (cancellation of oil lease for bidder's failure to make disclosures required by regulation).

The Secretary's broad cancellation power springs from the authority Congress has granted her to administer public lands. *See Boesche*, 373 U.S. at 478-79; *see also id.* at 476 n.6 (citing statutes that confer this authority); *Cameron v. United States*, 252 U.S. 450, 459-60 (1920) (discussing the Secretary's general powers over public lands); *cf. Hoefler v. Babbitt*, 139 F.3d 726, 728 (9th Cir. 1998) (describing the caselaw establishing the Secretary's general management power as a "wall of authority"). The Secretary retains this Congressionally delegated power to cancel leases for pre-issuance flaws unless Congress explicitly divests her of it. *Boesche*, 373 U.S. at 478-79.

Underscoring its importance in stewarding the public estate, courts have described that the Secretary's cancellation authority ends only when the United States fully divests

itself of jurisdiction over the parcel of public land in question. As the Supreme Court explained in *West v. Standard Oil Co.*:

> On May 8, 1925, Secretary Work vacated Secretary Fall's order. . . . If at the time of Secretary Work's order the Department still had jurisdiction of the land, he possessed the power to review the action of his predecessor and to deal with the matter as freely as he could have done if the dismissal of the proceedings had been his own act or that of a subordinate official. For, so long as the Department retains jurisdiction of the land, administrative orders concerning it are subject to revision.

278 U.S. 200, 210 (1929). Cases involving passage of title over public lands confirm this point. *Silver State Land*, 843 F.3d at 990 is instructive. Based on the Secretary's "authority over the administration of public lands," and with nothing in any relevant statute limiting that authority, *Silver State Land* held that the Secretary had "authority to cancel an invalid land sale . . . at least until the issuance of the land patent." *Id.*; *cf. Union Oil Co. of Cal. v. Udall*, 289 F.2d 790, 792 (D.C. Cir. 1961) (confirming, in the context of a land patent dispute, that the Secretary retains authority to inquire "into the validity of claimed rights to public land" until legal title to the land has passed, and citing *Cameron*).

So too here. "[A] mineral lease does not give the lessee anything approaching the full ownership of a fee patentee," *Boesche,* 373 U.S. at 478, and the Secretary's authority to remedy pre-issuance flaws through cancellation is an important aspect of her ongoing obligation to manage the public estate.

## II. The Secretary's cancellation authority extends to NEPA violations.

Many courts have recognized pre-issuance NEPA violations as a basis to cancel leases. In *Southern Utah Wilderness Alliance v. U.S. Department of the Interior*, for example, after remanding leases it had determined were issued in violation of NEPA, the court explained that "BLM may cancel or modify the leases." No. 06-CV-342, 2007 WL 2220525, at *1 & n.3 (D. Utah July 30, 2007). Other cases similarly underscore the Secretary's independent authority to cancel leases that violated NEPA. *See N. Cheyenne Tribe v. Lujan*, 804 F. Supp. 1281, 1286 n.4 (D. Mont. 1991) (noting, in the context of a coal lease sale that violated NEPA, that "[t]he Secretary has had ample time to cancel the leases on his own"); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1037-39 (D. Mont. 2006) (noting that rescinding oil and gas leases would "put[] the Court in the role of the [environmental impact statement] decision maker"); *accord S. Utah Wilderness All.* (*SUWA*), 194 IBLA 333, 339 (2019) ("Thus, judicial precedent is consistent with the Department's longstanding position that oil and gas leases issued by BLM without proper NEPA compliance are . . . voidable.").

This is in accord with longstanding IBLA precedent that allows cancellation of leases for pre-issuance flaws. *See Grynberg*, 2008 WL 2445564, at *3-5 (recommending affirming administrative cancellation where BLM failed to secure the Forest Service's consent prior to leasing, in violation of the Mineral Leasing Act for Acquired Lands); *SUWA*, 194 IBLA at 336 (noting that IBLA "has repeatedly acknowledged the broad authority of the Secretary in such instances to cancel any lease issued contrary to law");

*AIDEA v. U.S. Dep't of the Interior et al.*,                                          5
Case No. 3:24-cv-00051-SLG

*Elaine Wolf*, 113 IBLA 364, 364-66 (1990) (affirming lease cancellation where the lease had not been signed by the appellant as required by regulation); *High Plains Petroleum Corp.,* 125 IBLA at 26 ("It is well settled that the Secretary has the authority to cancel any oil and gas lease issued contrary to law or regulation because of the inadvertence of his subordinates.").  Thus, leases can be cancelled administratively where Interior failed to comply with NEPA prior to their issuance.  In *SUWA*, for example, the IBLA affirmed that competitive oil and gas leases could be cancelled administratively where BLM determined that its "pre-lease sale NEPA analysis . . . did not meet the [greenhouse gas] analysis bar" set by a prior federal decision. 194 IBLA at 334-37 (citations omitted).  In *Clayton W. Williams, Jr. Exxon Corporation*, the IBLA similarly concluded that leases issued in violation of NEPA could be cancelled administratively, though it found that cancellation there was not supported because, among other things, BLM made no attempt "to document exactly what the deficiencies were" in the original NEPA analyses.[1] 103 IBLA 192, 209-10 (1988).

The IBLA's longstanding conclusions are also analytically consistent with how courts have approached remedies for NEPA violations.  Vacatur is the "presumptive remedy" for unlawful agency actions, including violations of NEPA.  *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022).  This Court has recognized that voiding a lease can be the proper remedy for pre-issuance statutory violations, including NEPA

---

[1] Here, conversely, BLM clearly documented the deficiencies in the original NEPA analysis.  *See infra* p. 14.

*AIDEA v. U.S. Dep't of the Interior et al.*,                                                6
Case No. 3:24-cv-00051-SLG

violations. *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-CV-00204-SLG, 2021 WL 46703, at *9 n.91 (D. Alaska Jan. 5, 2021). And other courts have applied this remedy. *See, e.g.*, *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 896-97 (D. Mont. 2020) (vacating leases on the basis of NEPA violations); *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1086-90 (D. Idaho 2020) (vacating leasing on the basis of NEPA and Federal Land Policy and Management Act ("FLPMA") violations); *Mont. Wildlife Fed'n v. Bernhardt*, No. 18-CV-00069, 2020 WL 2615631, at *11-12 (D. Mont. May 22, 2020) (vacating leases on the basis of FLPMA violations); *Bob Marshall All. v. Lujan*, 804 F. Supp. 1292, 1295-98 (D. Mont. 1992) (cancelling leases on the basis of NEPA and Endangered Species Act violations). Interior's general authority to cancel unlawful leases and courts' undisputed authority to set aside unlawful leases are two sides of the same coin.

## III. The 2017 Tax Act did not withdraw the Secretary's authority to cancel leases for pre-issuance flaws.

Because the Secretary's authority to cancel leases for pre-issuance flaws stems from Congress's delegation of general management of public lands, Congress can abridge the authority. It has not done so here.

### A. The Tax Act did not explicitly withdraw cancellation authority for unlawfully issued leases.

Nothing in the Tax Act addresses, let alone purports to constrain, the Secretary's authority to cancel leases based on pre-issuance flaws. The Tax Act mandates that the Secretary establish a leasing program in the Coastal Plain and "offer for lease" a certain

amount of acreage in two lease sales by certain dates. Tax Act, Pub. L. No. 115-97, § 20001(b), (c), 131 Stat. 2054, 2235-37 (2017). As this Court has previously concluded, Congress's use of broad language in the Tax Act leaves much of the leasing program's implementation to Interior's discretion. *AIDEA v. Biden*, 685 F. Supp. 3d 813, 833 (D. Alaska 2023). The Tax Act "accords to [Interior] the discretion to implement the Program in a manner consistent with the Tax Act and consistent with [the Alaska National Interest Lands Conservation Act's] purposes, which include environmental conservation along with the newly added purpose of the oil and gas program, and also consistent with other applicable federal laws, including NEPA." *Id.* at 835. AIDEA's argument that the Tax Act withdraws the Secretary's authority to cancel leases, AIDEA Br., Doc. 50 at 24-26, finds no support in the statute.

### B. The Tax Act did not implicitly withdraw cancellation authority for unlawfully issued leases through incorporation of 43 C.F.R. § 3136.3.

Focusing on the Tax Act's directive for Interior to manage the Coastal Plain oil and gas leasing program in a manner "similar to" how it manages lease sales in the National Petroleum Reserve-Alaska ("NPR-A"), *see* Tax Act § 20001(b)(3), AIDEA argues that 43 C.F.R. § 3136.3 applied to its Arctic National Wildlife Refuge ("Refuge") leases and divested Interior of its authority to cancel leases based on pre-issuance legal flaws. *See* Doc. 50 at 35. Its argument is unpersuasive: the Tax Act does not mandate application of section 3136.3 to the Refuge and, even were it to apply, it would not divest Interior of its authority to cancel AIDEA's leases.

*AIDEA v. U.S. Dep't of the Interior et al.*,                                      8
Case No. 3:24-cv-00051-SLG

Congress left the Secretary some discretion as to how to administer the leasing program. As relevant here, the Tax Act requires that the Secretary shall manage the Coastal Plain oil and gas leasing program "in a manner *similar to* the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. §§ 6501-08) (including regulations)." Tax Act § 20001(b)(3) (emphasis added). The phrase "similar to" is a meaningful limit on Interior's discretion when designing a program. But "similar to" does not mean "identical to." Congress's use of "similar to" instead indicates its intent to allow the Secretary some discretion when determining which NPR-A regulations apply to the Coastal Plain. The Tax Act does not compel the Secretary to apply section 3136.3 to AIDEA's leases, and that should end the matter here.

Even if section 3136.3(b) did apply, it still would not divest the Secretary of her authority to cancel leases for pre-issuance flaws. This is so for several reasons. First, the regulation does not explicitly address BLM's authority to cancel leases based on pre-issuance unlawfulness, much less explicitly revoke that authority. The regulation therefore should not be construed to divest the Secretary of this well-established authority. *Cf. Boesche*, 373 U.S. at 475-76 (authority exists unless affirmatively withdrawn by Congress).

Instead, consistent with the way the courts have long recognized the Secretary's authority to cancel leases based on pre-issuance flaws, *supra* pp. 1-2, 5, the more sensible reading is that section 3136.3 applies only to cancellation based on lessee non-

compliance. *See* Interior Br., Doc. 52 at 45. In that reading, the provision's subsections simply make it more onerous to cancel leases for alleged lessee non-compliance when lessees have invested in exploring for, developing, and producing oil on their lease. While subsection (a) allows administrative cancellation of pre-production leases, subsection (b) requires Interior to go to court to cancel a lease in which the lessee has already invested more heavily.

Further proof that section 3136.3 addresses lessee non-compliance—not cancellation due to Interior's own pre-lease errors—is the impracticality of applying subsection (b) in the current context. *See* Doc. 52 at 48. Interior has no legal claim against AIDEA for its own failure to comply with NEPA before issuing the leases, so it is not clear how Interior could obtain a court order cancelling AIDEA's leases. The regulation only makes sense as applied to lessee non-compliance, over which Interior could sue the leaseholder.

Additionally, the NPR-A regulations contain a separate provision that withdraws some of Interior's authority to address cancellation for flaws that predate a leaseholder's acquisition of a lease. Section 3130.5 imports the "bona fide purchaser" rule governing other Interior-managed lands into management of the NPR-A. 46 Fed. Reg. 55,494, 55,498 (Nov. 9, 1981) (section 3130.5, incorporating section 3102.1-2, since recodified as section 3108.4). This rule prohibits cancellation of a lease if it would "adversely affect[] the title or interest of a bona fide purchaser even though such lease or interest,

*AIDEA v. U.S. Dep't of the Interior et al.*,
Case No. 3:24-cv-00051-SLG

10

when held by a predecessor in title, may have been subject to cancellation." 43 C.F.R. § 3108.4. This illustrates that when BLM restricts its general cancellation authority through regulation, it does so explicitly.

The evidence AIDEA cites to support its interpretation of section 3136.3—language in a 1981 preamble addressing suspension of NPR-A leases—does not further its cause. AIDEA points to BLM's statement declining to adopt a regulation regarding lease suspension because Congress had not specifically authorized suspension in the 1980 Naval Petroleum Reserves Production Act ("NPRPA") amendments. Doc. 50 at 39 (citing 46 Fed. Reg. at 55,496 (second column)). But this statement does not show that BLM wanted to "construe its agency powers narrowly"—particularly not its power to cancel. Indeed, BLM adopted lease cancellation regulations in the same preamble, notwithstanding the NPRPA amendments' similar silence on cancellation. *See* Pub. L. No. 96-514 (Dec. 12, 1980), 94 Stat. 2964-65 (no reference to cancellation or termination).[2] One column over from the language AIDEA cites, BLM explained that "the final rulemaking continues to have provisions for . . . cancellation of leases" because "there is an administrative need . . . for [the] authorit[y]." 46 Fed. Reg. at 55,496 (third column). BLM thus rightly construed the NPRPA's silence as to cancellation as leaving the Secretary's preexisting authority unaffected.

---

[2] Congress has since amended the NPRPA to authorize suspension. *See* 42 U.S.C. § 6506a(k)(2); Pub. L. No. 105-83, Title I, § 128 (Nov. 14, 1997), 111 Stat. 1568.

As to when the provision, even if it were to apply to pre-issuance flaws, kicks in, AIDEA argues that its leases are covered by section 3136.3 because they "are known to contain valuable deposits." Doc. 50 at 41-46. But the record does not support that. It is true that much of AIDEA's leases were in areas that Interior identified as having "high potential" for oil, *id.* at 42, as part of its Tax Act obligation to offer for lease "those areas with the highest potential for the discovery of hydrocarbons," Tax Act § 20001(c)(1)(B)(II). But AIDEA again overreads the Tax Act's plain language. A "potential for discovery" is, on its face, not the same as "known . . . valuable deposits." AIDEA's leases are in an area that has never before been leased (much less developed) for oil and that has not undergone any oil exploration for decades. *See* AR4113-14. Thus "[g]iven the limited amount of information regarding petroleum resources in the program area, the locations, size, number, and characteristics of any economically viable accumulations of oil are *unknown*." *See* AR4116 (emphasis added). The outcome of the original lease sale further underscores the uncertainty about the economic viability of oil and gas operations in the Coastal Plain: AIDEA bid the *minimum* amount for its leases, AR3232, AR3314, and it was the *only* bidder on the leases it obtained, AR3314. By AIDEA's metric, most leases on which a company might bid in the hopes of finding oil would, from the moment if its issuance, qualify as a lease known to contain valuable deposits and thus be immune from administrative cancellation for any flaw, no matter how severe.

Again, there is no evidence that BLM intended to divest itself of its cancellation authority so broadly when it issued section 3136.3. Cutting off its cancellation authority at such an early stage in the leasing process also would be out of line with how Congress has curtailed Interior's pre-lease cancellation authority in other statutory regimes. When it has done so, it has only done so in circumstances where leases have moved on to some subsequent stage in which cancellation might be particularly disruptive. *See, e.g.*, 30 U.S.C. §§ 188(a)-(b) (outlining cancellation procedures for post-lease violations under the MLA); 43 C.F.R. §§ 3108.3(a)-(b) (same); 30 U.S.C. § 184(h)(1) (outlining cancellation authority based on violations of the MLA's lease ownership provisions); 43 C.F.R. § 3108.3(c) (same); 30 U.S.C. § 184(h)(2) (barring cancellation of leases held by bona fide purchasers); 43 C.F.R. § 3108.4 (same).

## IV. The Secretary reasonably exercised her cancellation authority here.

The Secretary's cancellation of AIDEA's leases followed a reasonable procedure and was well-supported. *See Gilmore v. Lujan*, 947 F.2d 1409, 1411 (9th Cir. 1991) ("Determinations by the BLM and the IBLA must be upheld unless arbitrary, capricious, an abuse of discretion, or not in accordance with law." (quoting *Nevitt v. United States*, 828 F.2d 1405, 1406 (9th Cir. 1987)). The government acted quickly: it informed AIDEA soon after it received its leases that they likely had been issued unlawfully and that the Secretary was reexamining them. Interior issued leases to AIDEA on January 13, 2021. AR3317-18. Five business days later, on January 20, 2021, the President issued Executive Order 13990 directing the Secretary to place a moratorium on all activity

relating to the implementation of Coastal Plain oil and gas leasing program, pursuant to which AIDEA obtained its leases. AR3351; Exec. Order No. 13990, 86 Fed. Reg. 7,037 (Jan. 20, 2021). The order clearly articulated that the moratorium and program reconsideration were based on pre-issuance legal deficiencies, including flaws in the NEPA analysis. Exec. Order No. 13990, Sec. 4.

Following Executive Order 13990, the Secretary took a transparent approach to informing AIDEA of her reconsideration. She further described the pre-issuance flaws and extent of the moratorium when she suspended the leases in June 2021. AR3362-63; Secretarial Order No. 3401 (June 1, 2021). And she fully described the pre-issuance flaws when she cancelled the leases last year. AR5454-60. Beginning only five business days from issuance, AIDEA was fully on notice that Interior was reexamining the lawfulness of their issuance, the reasons for such reexamination, and that the reexamination might lead to restrictions or cancellation of the leases. There is no record evidence that AIDEA conducted any activities in reliance on its leases in those five business days between lease issuance and Executive Order 13990. And any investments in reliance on the lawfulness of the program and leases after the executive order were not reasonable. While the power to cancel for pre-issuance flaws does not diminish with delay, *Solenex*, 962 F.3d at 527, the President's and the Secretary's quick and transparent action demonstrated an approach that sought to avoid harm to the lessees, a strong indicator of reasoned agency action.

Finally, Interior has fully reimbursed AIDEA for its financial investment in the leases. AR5452. AIDEA's leases conferred only limited rights, subject to Interior's authority to limit and suspend activities and terminate the leases outright for pre- and post-issuance flaws. *See*, *e.g.*, *Gwich'in Steering Comm.,* 2021 WL 46703, at *8 (rejecting plaintiffs' (*amici* here) argument that a lease sale causes irreparable harm and crediting Interior's description of the limits of lessees' rights to explore for oil absent additional permits). Indeed, beyond citing its (since reimbursed) bonus bid payment, AIDEA does not describe how it was harmed by Interior's cancellation of its leases. *See* Doc. 50 at 19 n.27. This context, too, underscores the reasonableness of Interior's cancellation.

Respectfully submitted this 14th day of June, 2024.

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*s/ Garett Rose*
Garett R. Rose (D.C. Bar No. 1023909) (*pro hac vice forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL

*s/ Jared Knicley*
Jared E. Knicley (D.C. Bar No. 1027257) (*pro hac vice forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Proposed Amicus Curiae Natural Resources Defense Council, Center for Biological Diversity, and Friends of the Earth*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) and Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,769 words, excluding items exempted by Local Civil Rule 7.4(a)(4).

Respectfully submitted this 14th day of June, 2024.

*s/ Erik Grafe*
Erik Grafe
EARTHJUSTICE