IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ALASKA INDUSTRIAL
DEVELOPMENT AND EXPORT
AUTHORITY,

    Plaintiff,

  vs.

U.S. DEPARTMENT OF THE
INTERIOR, DEB HAALAND, in her
capacity as Secretary of the Department
of the Interior, BUREAU OF LAND
MANAGEMENT, and TRACY
STONE-MANNING, in her official
capacity as Director of the Bureau of
Land Management;

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 3:24-cv-00051-SLG

**PLAINTIFF AIDEA'S REPLY BRIEF ON
COUNTS I, II(A), III, IV, AND V**

Attorneys for Plaintiff

David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, AK 99501
907-276-1550 (phone)
907-276-3680 (fax)
dgross@bhb.com
zeisberg@bhb.com

James H. Lister, ABA # 1611111
Brian V. Gerd, ABA # 1810097
Birch Horton Bittner & Cherot
Suite 350, 1150 Connecticut Ave.
Washington, DC. 20036
202-659-5800 (phone)
202-659-1027(fax)
jlister@bhb.com
bgerd@bhb.com

1703914

# TABLE OF CONTENTS

I.   Lease Cancellation Deprived AIDEA of Due Process of Law................................... 2

   A.   Constitutional Due Process.................................................................... 2

   B.   Defendants All But Concede That DOI Did Not Provide AIDEA With
        Sufficient Pre-Deprivation Notice and Opportunity to be Heard ..................... 6

   C.   There is No Futility Exception to the Obligation to Provide Due Process........ 10

   D.   Statutory Due Process....................................................................... 12

        1.   Void Versus Voidable .............................................................. 12

        2.   APA Procedures for Applications for "Licenses Required by Law.".......... 13

        3.   Defendants' Reading that § 558(c)(2) Applies Only When it is the
             Licensee Which Has Failed to Comply With Law....................................... 14

   E.   DOI Violated AIDEA's Statutory Rights By Administratively Cancelling
        Leases Known to Contain Valuable Deposits of Oil or Gas ............................ 16

II.  The Issuance of Leases Was a Non-Discretionary Action Not Subject to NEPA
     Review, so Alleged NEPA Errors Did Not Justify Canceling AIDEA's Leases ...... 21

   A.   Seeking to Sidestep the Holding in *Public Citizen*, Defendants
        Unpersuasively Contend That Tax Act § 20001(c) Required DOI to
        Market But Not Issue Leases........................................................... 21

   B.   Precedent From This Court and the Ninth Circuit Address the Proper
        Remedy When a NEPA Issue Concerns a Statutorily-Mandated Project ........ 29

   C.   Defendants' Other Efforts to Distinguish *Public Citizen* Lack Merit .............. 33

   D.   NPRA Rules Do Not Override Tax Act Requirements ..................................... 34

   E.   DOI's Claim That the Prior Administration Committed NEPA Errors
        Does Not Withstand Scrutiny and, if There Were Errors, DOI's Selected
        Remedy Did Not Correspond to the Errors and Was Disproportionate .......... 36

        1.   Greenhouse Gasses................................................................. 37

        2.   2,000 Surface Acres .............................................................. 40

        3.   DOI Did Not Err in its ANILCA § 810 Subsistence Analysis.................... 45

Case 3:24-cv-00051-SLG   Document 65   Filed 08/02/24   Page 2 of 59

    4.   DOI Failed to Provide Opportunity to Cure Under 5 U.S.C. 558(c)(2)....... 46

III.  Remedy: The Court Should Set Aside the Lease Cancellation Decision.................. 48

IV.  Conclusion ................................................................................................. 50

1703914

# TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland,*
    50 F.4th 1254 (9th Cir. 2022) ........................................................... 39

*AIDEA v. Biden,*
    685 F. Supp. 3d 813 (D. Alaska 2023) ............................................. 8, 17, 40

*Alaska Oil & Gas Ass'n v. Jewell,*
    2013 WL 11897792 (D. Alaska May 15, 2013) ............................................. 49

*Alaska Wilderness League v. Jewell,*
    788 F.3d 1212 (9th Cir. 2015) ........................................... 22, 33, 34, 39

*All. for the Wild Rockies v U.S. Forest Service,*
    907 F.3d 1105 (9th Cir. 2018) ........................................................... 48

*Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ........................................................... 48

*American Airlines v. Dept. of Transp.,*
    202 F.3d 788 (5th Cir. 2000) ........................................................... 16

*Boesche v. Udall,*
    373 U.S. 472 (1963). ................................................... 19, 20, 36, 46

*Bond v. United States,*
    572 U. S. 844 (2014) ........................................................... 29

*Bradley v. Vill. Of Univ. Park, Illinois,*
    59 F.4th 887 (7th Cir. 2023) ........................................................... 3

*Cal. Sportfishing Prot. Alliance v. Lake Wildwood Ass'n,*
    No. S-06-1026 WBS EFB 2006 WL 2734370 (E.D. Cal. Sept. 25, 2006) ...................... 14

*California Communities Against Toxics v. U.S. E.P.A.,*
    688 F.3d 989 (9th Cir. 2012) ........................................................... 48

*Camacho v. Ford Motor Co.,*
    993 F.3d 308 (5th Cir. 2021) ........................................................... 24

*Center for Biological Diversity v. Bernhardt,*
    982 F.3d 723 (9th Cir. 2020) ........................................... 37, 38, 46

1703914

*Ciechon v. City of Chicago,*
    686 F.2d 511 (7th Cir.1982) ........................................................................ 11

*Colorado Envtl. Coalition v. Salazar,*
    875 F. Supp. 2d 1233 (D. Colo. 2012) ........................................................... 5

*Comm'r v. Brown,*
    380 U.S. 563 (1965) .................................................................................... 24

*Cook Inletkeepers v. U.S. Dept. of the Interior,*
    2024 WL 3439462 (D. Alaska July 16, 2024) .............................. 25, 29, 30, 31

*Dept. of Transportation v. Public Citizen,*
    541 U.S. 752 (2004) ............................................................................. passim

*Diamond Ring Ranch v. Morton,*
    531 F.2d 1397 (10th Cir. 1976) ................................................................... 42

*Forelaws on Board v. Johnson,*
    743 F.2d 677 (9th Cir. 1984) .................................................................. 31, 32

*Friends of the Earth v. Haaland,*
    583 F. Supp. 3d 113 (D.D.C. 2022) ............................................................. 26

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,*
    452 U.S. 264 (1981) ...................................................................................... 6

*Loper Bright Enterprises v. Raimondo,*
    2024 WL 3208360 (2024) ....................................................................... 24, 41

*Lum v. Kauai County Council,*
    No. 06-00068 SOM/BMK, 2007 WL 1482403 (D. Hawai'i May 18, 2007) .................... 4

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .............................................................................. 6, 10, 11

*Migrant Clinicians Network v. U.S. Env't Prot. Agency,*
    88 F.4th 830 (9th Cir. 2023) ........................................................................ 49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................................... 42

*Mullane v. Central Hannover Bank & Trust Co.,*
    339 U.S. 306 (1950) ...................................................................................... 9

1703914

*Nat. Res. Defense Council v. McCarthy,*
  993 F.3d 1243 (10th Cir. 2021) ................................................................ 27, 28

*Nat. Tel. Coop. Assoc. v. FCC,*
  563 F.3d 536 (D.C. Cir. 2009) .................................................................. 42

*National Wildlife Federation v. Secretary, U.S. Dept. of Transp.,*
  960 F.3d 872 (6th Cir. 2020) ............................................................ 22, 33, 36

*Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency,*
  960 F.3d 1120 (9th Cir. 2020) .................................................................. 49

*Natural Resource Defense Council v. Zinke,*
  No. 3:18-cv-00031-SLG, 2018 WL 6424687 (D. Alaska Dec. 6, 2018) (not reported) . 20

*New York Pathological X-Ray Laboratories, Inc. v. INS,*
  523 F.2d 79 (2nd Cir. 1975) .................................................................. 14

*Pollinator Stewardship Council v. U.S. E.P.A.,*
  806 F.3d 520 (9th Cir. 2015) .................................................................. 49

*Ryan v. Illinois Dept. of Children and Family Services,*
  185 F.3d 751 (7th Cir.1999) .................................................................. 11

*Sac and Fox Nation of Missouri v. Norton,*
  240 F.3d 1250 (10th Cir. 2001) ............................................................ 23, 27

*Secretary of the Interior v. California,*
  464 U.S. 312 (1984) .......................................................................... 25

*Shiny Rock Min. Corp. v. U.S.,*
  825 F.2d 216 (9th Cir. 1987) .................................................................. 2, 3

*Sierra Club v. Babbitt,*
  65 F.3d 1502 (9th Cir. 1995) ............................................................... 23, 34

*Sierra Club v. Watt,*
  608 F.Supp. 305 (E.D.Cal. 1985) ............................................................... 4

*Sollberger v. CIR,*
  691 F.3d 1119 (9th Cir. 2012) ................................................................ 24

*Solonex, LLC v. Haaland,*
  626 F. Supp. 3d 110 (DDC 2022) .............................................................. 5, 36

1703914

*Southern Utah Wilderness All. v. Kempthorne,*
    525 F.3d 966 (10th Cir.  2008) ................................................................ 5

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.,*
    555 F. Supp. 3d 739 (D. Alaska 2021) ............................................ 24, 38, 39

*U.S. v. Sischo,*
    262 U.S. 165 (1923) ................................................................................ 26

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,*
    484 U.S. 365 (1988) ................................................................................ 27

*United States v. Union Oil of California,*
    549 F.2d 1271 (9th Cir. 1977) .................................................................. 4

*United States v. Wood, Wire & Metal Lathers Int'l Union, Loc. Union No. 46,*
    471 F.2d 408 (2nd Cir. 1973) ................................................................... 6

*Walters v. National Ass'n of Radiation Survivors,*
    473 U.S. 305 (1985) ................................................................................ 11

*Whitman v. Am. Trucking Association,*
    531 U.S. 457 (2001) ................................................................................ 36

**Federal Regulations**

*40 CFR 1503.1* ..................................................................................... 8, 10

*40 CFR 1508.1* ......................................................................................... 22

*43 CFR 3100.0-3* ...................................................................................... 20

*43 CFR 3108.3* ......................................................................................... 19

*43 CFR 3130.0-3* ...................................................................................... 18

*43 CFR 3131* ............................................................................................ 17

*43 CFR 3131.4* ......................................................................................... 17

*43 CFR 3132* ............................................................................................ 17

*43 CFR 3132.5* ..................................................................................... 34, 35

*43 CFR 3136* ............................................................................................ 16

*43 CFR 3136.3* .................................................................................. 17, 18, 20

1703914

*43 CFR 8341.2* ............................................................................................. 28

*46 Fed.Reg. 37725 (July 22, 1981)* ................................................................ 35

*46 Fed.Reg. 37726 (July 22, 1981)* ................................................................ 35

*46 Fed.Reg. 55494 (Nov. 9, 1981)* ................................................................ 20

*46 Fed.Reg. 55497 (Nov. 9, 1981)* ............................................................. 20, 35

*86 Fed.Reg. 41989 (Aug. 4, 2021)* .................................................................. 7

*86 Fed.Reg. 41990 (Aug. 4, 2021)* .................................................................. 7

**Federal Statutes**

*28 U.S.C. § 1345* .......................................................................................... 21

*28 U.S.C. § 2201* .......................................................................................... 21

*30 U.S.C. § 1260* .......................................................................................... 40

*30 U.S.C. § 188* ........................................................................................... 20

*30 U.S.C. § 201* ........................................................................................... 40

*42 U.S.C. § 4332* .......................................................................................... 32

*42 U.S.C. § 4336e* ........................................................................................ 22

*42 U.S.C. § 6501* .......................................................................................... 16

*43 CFR 3135.2* ............................................................................................. 17

*43 U.S.C. § 1337* .......................................................................................... 38

*5 U.S.C. § 551* ......................................................................................... 12, 14

*5 U.S.C. § 555* ............................................................................................. 16

*5 U.S.C. § 558* ......................................................................................... 12, 13

*5 U.S.C. § 706* ..................................................................................... 10, 16, 48

*Inflation Reduction Act of 2022, PL 117-169, § 50264(b)* .................... 26, 29, 30

*Tax Act of 2017, PL 115-97 § 20001* ...................................................... passim*

1703914

**Other Authorities**

*Sutherlands Statutory Construction, § 55:2* .................................................................... 26, 29

*Sutherlands Statutory Construction, § 55:4* .................................................................... 29

**Public Land Order**

*Public Land Order 3502* .................................................................................................... 2

**Agency Appeals**

*Arco Alaska, Inc.,*
  *78 IBLA 115, 1983 WL 35015 (DOI Board of Land Appeals, 1983)* ............................ 36

*Exxon Corp.,*
  *73 IBLA 176, 1983 WL 34627 (DOI Board of Land Appeal, 1983)* ............................. 36

*Southern Utah Wilderness All.,*
  *194 IBLA 333 (2019)* ...................................................................................................... 4

*Weston B. Andrews,*
  *116 IBLA 41 (1990)* ........................................................................................................ 5

1703914

Plaintiff Alaska Industrial Development and Export Authority ("AIDEA") respectfully submits this reply brief in support of its Motion for Summary Judgment on Counts I, II(A), III, IV, and V of its Complaint.[1] Contrary to Defendants' rhetoric and that of *amici,* Defendants' cancellation of AIDEA's issued oil and gas leases was inconsistent with fundamental and well-established principals of both common-law and statutory due process, and was inconsistent with the Department of the Interior's ("DOI's") own regulations. Worse, Defendants' procedural errors facilitated serious substantive errors by unlawfully utilizing supplemental NEPA processes to frustrate clear Congressional intent as expressed in the 2017 Tax Act. The ANWR leasing program was mandatory and non-discretionary. The purported legal errors Defendants rely upon to support the cancellation simply do not exist. But if they did, they would not support the cancellation of AIDEA's leases. Congress left DOI with discretion to order mitigation, and, if DOI made NEPA errors, that may result in lawful changes to the program with which AIDEA must abide. But Congress did not leave DOI with the discretion to decline to issue leases, or to undo statutorily mandated lease sales by cancelling leases it previously issued to comply with the statute. The Court's recent decision in *AIDEA v. Biden* declining to cancel the leases issued in the Congressionally-mandated Lease Sale 258 despite the presence of NEPA errors bears this out.

---

[1] The case scheduling order (ECF 49, amended ECF 64) provides for Count II(B), the "pretext claim," to be briefed in a second round of briefing starting next week and that "Plaintiff does not waive its Count II(B) arguments" by not including them in this first round of briefing. This reply brief completes the briefing of all issues except the pretext claim.

AIDEA V. HAALAND, ET AL.                                     CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 1 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 10 of 59

# I.     Lease Cancellation Deprived AIDEA of Due Process of Law

## A.     Constitutional Due Process

Threshold errors of procedure committed by the agency led to great errors of substance. Defendants' insistence that AIDEA is not entitled to due process is a clear error of law. DOI argues that because AIDEA's leases purportedly suffered from pre-leasing defects, they were void at the time of issuance and that AIDEA never had a constitutionally-protected property interest.[2] These assertions are incorrect and mischaracterize the precedent DOI relies upon. The issued leases that DOI suggests could have been subjected to further NEPA analysis are voidable, *not* void ab initio. A protected property interest in voidable leases exists from the moment of issuance. An agency's subsequent reconsideration does not extinguish that interest. Consequently, AIDEA had a protected property interest in its leases. Defendants' contrary position should be rejected.

DOI relies on the Ninth Circuit's decision in *Shiny Rock Min. Corp. v. U.S.*[3] to support its assertion that leases issued in violation of underlying law do not convey a property right. In *Shiny Rock*¸ the Shiny Rock mining company applied for a mineral patent for the Mandalay claim, part of which was located on lands withdrawn from appropriation pursuant to Public Land Order 3502.[4] Accordingly, Shiny Rock's application was partially rejected and the portion of the Mandalay claim covering withdrawn lands declared null and void *ab initio*. No patent, lease, or other instrument ever issued to Shiny Rock granting it

---

[2]     DOI Response Br. at 20, 28-30 (ECF 52) (page number citations to pleadings refer to the original page numbers in the brief, not those electronically generated by ECF).

[3]     825 F.2d 216 (9th Cir. 1987).

[4]     *Id.* at 217.

any rights to the withdrawn portion of the claim. DOI's Board of Land Appeals ("IBLA")

rejected Shiny Rock's appeal:

> The Department has repeatedly held that the availability of land for appropriation or lease must at least initially be determined by recourse to the public records of the BLM…if the BLM records have been noted to reflect the devotion of land to a particular use that is exclusive of another conflicting use, no incompatible rights in the land can attach by reason of any subsequent application until the record has been changed to reflect the availability of the land for the desired use.[5]

The Ninth Circuit affirmed this application of the notation rule, noting that:

> [s]ince there is no dispute that the withdrawal at issue was noted on BLM records and was still in effect when Shiny Rock attempted to locate the Mandalay claim, that portion **of the claim** located within the withdrawal is void *ab initio.* No property right was created, therefore no due process right was violated.[6]

DOI mischaracterizes *Shiny Rock*'s holding, writing that "[i]f a lease turns out to have been

issued in violation of underlying law, '[n]o property right was created, therefore no due

process right was violated.'"[7] But unlike here, DOI never issued a lease or otherwise

conveyed a right or property interest in the lands to Shiny Rock prior to rejecting its

application. The Ninth Circuit simply recognized that a miner could not establish a right to

a claim within lands that had been withdrawn. As no property interest was ever established,

due process protections for property interests did not apply.

The other cases cited by DOI are likewise easily distinguishable. *Bradley v. Vill. Of*

*Univ. Park, Illinois,* involved a municipal employee's contract issued in violation of local

---

[5]      *Id.* at 218 (internal citation omitted).

[6]      *Id.* at 219 (emphasis added). DOI denied Shiny Rock's "claim," rather than voiding a patent, lease or other instrument that it had previously executed and issued.

[7]      DOI Response Br. at 37 (citing *Shiny Rock,* 825 F.2d at 219).

law.[8] The case was decided entirely on state-law grounds. It has no bearing on the procedural due process protections to which an oil and gas lessee is entitled before issued leases may be cancelled. *Lum v. Kauai County Council,* which is an unpublished opinion, likewise arises in the employment context and, again, has no bearing on AIDEA's due process rights and the property interests conveyed through leases.[9]

Instead, this case is more like *Sierra Club v. Watt,* where the Eastern District of California noted the truism that "mineral interest owners hold property rights which, if threatened, would trigger Fifth Amendment due process protection cannot reasonably be disputed."[10] Indeed, IBLA has ruled that allegations of NEPA violations do not automatically render leases null and void, even when DOI itself professes error in the prior NEPA review. IBLA explained this in *Southern Utah Wilderness All.*:

> ***Even given BLM's admission that the NEPA analysis is deficient, the leases are not void ab initio***. The Board has held that ***an oil and gas lease issued by BLM in violation of NEPA is voidable rather than void***. … [Lease] cancellation is required when BLM's error involves mistakenly leasing land that is simply not available for leasing, such as lands statutorily or administratively withdrawn from leasing. But when the land is otherwise available for mineral leasing, and the lease 'has been issued in violation of established procedures,' the 'lease is considered voidable rather than void …' ***The rationale for deeming the lease voidable is that the lease becomes effective at the time of execution by the BLM authorized officer, even if a procedural flaw has occurred in the leasing process....***[11]

---

[8]     59 F.4th 887, 903 (7th Cir. 2023).

[9]     No. 06-00068 SOM/BMK, 2007 WL 1482403 (D. Hawai'i May 18, 2007) (unreported).

[10]    608 F. Supp. 305, 325 (E.D. Cal. 1985) (citing *United States v. Union Oil of California,* 549 F.2d 1271 (9th Cir. 1977) and collecting additional cases).

[11]    *Southern Utah Wilderness All.,* 194 IBLA 333, 337 (2019).

AIDEA V. HAALAND, ET AL.                                      CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 4 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 13 of 59

As IBLA has noted: "upon signature of a lease by both parties, it becomes a binding instrument and cannot be vitiated by unilateral action, all else being regular."[12]

The conclusion that leases create property interests at the time of execution is well-supported by judicial precedent. For example, in *Colorado Envtl. Coalition v. Salazar,* the Colorado district court found that DOI had violated NEPA in a Range Management Plan and EIS created in conjunction with issuing oil and gas leases. Even so, the court refused to cancel the oil and gas leases, noting that the parties interested in the leases were not before the court, and so lacked an opportunity to participate in defense of their leases.[13] Similarly, in *Solonex*, the District Court for Washington D.C. overturned DOI's cancellation of an oil and gas lease for alleged invalidity in the inception due to NEPA errors, holding that leases alleged to be terminable due to error in the inception are "voidable" rather than "void."[14] The court noted this meant that, as a "precondition" to cancelling the leases, DOI had to establish that its confessed errors actually occurred, and that any such errors could be overridden by lessee defenses.[15]

AIDEA unquestionably had a property interest in its executed leases. This interest, as a matter of law, entitles AIDEA to due process, including both notice and an opportunity to be heard by DOI.

---

[12]    *Weston B. Andrews,* 116 IBLA 41, 43 (1990).

[13]    875 F. Supp. 2d 1233, 1259 (D. Colo. 2012).

[14]    *Solonex, LLC v. Haaland,* 626 F. Supp. 3d 110, 119, 124-26 (D.D.C. 2022).

[15]    *Id*., at 119, 124-26; *see also Southern Utah Wilderness All. v. Kempthorne*, 525 F.3d 966, 970-71 (10th Cir.  2008) (where lessees were untimely in moving to intervene in judicial review litigation in which environmentalists challenged their leases, they were still entitled to participate in follow-up agency proceedings on remand).

### B. Defendants All But Concede That DOI Did Not Provide AIDEA With Sufficient Pre-Deprivation Notice and Opportunity to be Heard

DOI is simply mistaken about what due process requires and relies upon inapposite cases to support its position. It states that, "[a]t bottom, sufficient process requires making known the 'facts upon which judgment is based' because 'arbitrary action as well as error can be corrected by the reviewing court.'"[16] DOI relies for that proposition on *United States v. Wood, Wire & Metal Lathers Int'l Union, Loc. Union No. 46* ("Local 46"),[17] *Local 46* is a 1973 case from the Second Circuit decided prior to the United States Supreme Court's landmark decision in *Mathews v. Eldridge.*[18] To the extent that *Local 46* can be construed to imply that AIDEA is entitled to anything less than pre-deprivation notice and an opportunity to be heard, it is not good law and should be disregarded.[19]

Regardless, AIDEA was afforded no opportunity by DOI to contest cancellation of its leases either before or after the cancellation occurred. Defendants admit that BLM told AIDEA when it suspended the leases that it would conduct "additional NEPA analysis 'to determine whether the leases should be affirmed, voided, or subject to additional mitigation reassures.'" But DOI issued its final cancellation decision the same day it released the draft Supplemental Environmental Impact Statement ("Draft SEIS"). DOI acted before

---

[16]    DOI Response Br. at 32.

[17]    471 F.2d 408 (2d Cir. 1973).

[18]    424 U.S. 319 (1976).

[19]    Another case cited by DOI, *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,* found that a pre-deprivation hearing was not required prior to issuance of an emergency agency order required to ensure mining safety where the relevant regulations afforded the aggrieved party the right to a swift post-deprivation administrative hearing. 452 U.S. 264, 302-303 (1981).   Here, no emergency action was required and no post-deprivation process offered, so *Hodel* is inapplicable.

completing the promised supplemental NEPA review and before opening the public comment period required by NEPA.[20] DOI never provided an administrative summons or letter telling AIDEA where and when it might contest the charges that its leases should be cancelled. DOI admits "AIDEA was not offered an opportunity to comment on the Lease Cancellation Decision."[21] DOI did not provide AIDEA an opportunity to comment, defend, or present evidence in opposition to a proposed cancellation.

Defendants attempt to hang their hat on the draft SEIS's scoping notice as fulfilling due process. They assert that AIDEA had the opportunity to comment and in fact responded through its submission of scoping comments at the initiation of the supplemental NEPA proceedings. But scoping comments are the administrative analog of the input that a court receives from the parties in litigation to establish a scheduling order. Scoping comments are not an invitation or opportunity to present arguments on the merits of a proposed action. Even more critically, DOI's invitation for scoping comments included an additional promise that DOI would provide further public comment opportunity of at least 45-days to respond to the merits of the to-be-written Draft SEIS, before DOI finalized the SEIS and completed its supplemental review.[22] NEPA requires that comment opportunity, yet DOI cancelled AIDEA's leases based on the content of a preliminary Draft SEIS, on the same day DOI issued that Draft SEIS, and thus without providing AIDEA an opportunity to

---

[20]    AIDEA Opening Br. at 9-10 and n. 16 (citing AR 3365 and 3404-05 and 86 Fed.Reg. 41989, 41990 (Aug. 4, 2021)); *compare* DOI Response Br. at 39-41.

[21]    DOI Answer to Amended Complaint, ¶ 20 (ECF 20).

[22]    AIDEA Opening Brief at 9 and n. 16 (citing 86 Fed.Reg. 41989-90 (Aug 4., 2021)).

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V                 PAGE 7 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 16 of 59

comment on the merits.[23] By doing so, DOI allows itself the benefit of further NEPA process while denying AIDEA the procedural protections that NEPA requires.

DOI also notes that AIDEA submitted briefing to this Court in the lease suspension case, suggesting that litigation is a substitute form of due process for lease cancellation.[24] But the Court properly declined to rule on the legality of hypothetical future actions, such as lease cancellation. DOI cannot credibly argue that litigation pre-dating its decision to cancel AIDEA's leases offered a forum and opportunity for AIDEA to present evidence and arguments challenging a potential future cancellation of its leases. Even if the purported justifications for cancellation are the same as those provided for suspension (a fact AIDEA could not possibly know prior to DOI issuing its cancellation decision) there is a clear and obvious legal difference between a "temporary suspension" and a permanent cancellation. This Court reiterated this distinction throughout its ruling in the lease suspension case.[25]

To the extent any of Defendants' caselaw citations suggest post-deprivation input opportunities can satisfy an agency's due process obligation, they are inapplicable here. DOI's Lease Cancellation Decision specifically precluded any post-deprivation process, declaring the lease cancellation "final" and "not subject to appeal." AR 5359. Defendant-Intervenors' observations that AIDEA submitted comments on the Draft SEIS and brief

---

[23]     *Id.* at 8-9, 15-16; *see also*, 40 CFR 1503.1.

[24]     DOI Response Br. at 32 (citing *AIDEA*, 685 F. Supp. 3d at 855).

[25]     Additionally, judicial review is sometimes deferential and is focused on the agency's reasoning, and thus is no substitute for the opportunity to make one's case to the agency in the first instance on the issue at hand, which here is lease cancellation.

remarks at a public meeting on the Draft SEIS, both of which occurred after DOI issued its "final" lease cancellation decision, are thus irrelevant.[26]

Defendant-Intervenors also observe that AIDEA sent an unsolicited letter on June 11, 2021 (AR 3366) protesting DOI's June 1, 2021 decision suspending, but not cancelling, AIDEA's leases (AR 3364). Intervenors (but not DOI) contend that AIDEA's sending that letter satisfied DOI's obligation to provide a meaningful opportunity to be heard before cancelling AIDEA's leases.[27] Intervenors' contention fails on multiple levels. First, it is the agency that must provide the respondent with an opportunity to defend, so respondent may await notice from the agency on where and when to provide its defenses.[28] The respondent does not forfeit that right merely by writing a letter to the agency. Second, AIDEA's letter addressed the lease suspension which had just occurred, not the lease cancellation. Third, it is reasonable for a respondent to rely upon an agency's representations about what an administrative process will entail. As discussed above, DOI's August 4, 2021 Federal Register notice inviting scoping comments included a commitment to later provide the public with a 45-day comment opportunity on the contents of the Draft SEIS. It never rescinded that promise.

---

[26]    AIDEA's post-cancellation input thus focused on other matters. AR 5365-66. See *Venetie Response Br.* at 26 (ECF 59); *Gwich'in Response Br.* at 28 (ECF 53).

[27]    *Venetie Response Br.* at 26; *Gwich'in Response Br.* at 27.

[28]    *See Mullane v. Central Hannover Bank & Trust Co*., 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process … is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.") (citations omitted).

DOI's August, 2022 supplemental lease suspension letter reaffirmed rather than backtracked from the message in DOI's June, 2021 original suspension letter that DOI would use a NEPA process to evaluate the legality of AIDEA's leases.[29] Moreover, the law required DOI to provide a public comment opportunity on a Draft SEIS before acting on it. 40 C.F.R. 1503.1(a). AIDEA was not required to anticipate that DOI might take action based on a Draft SEIS before providing that required and promised comment opportunity.

### C.     There is No Futility Exception to the Obligation to Provide Due Process

DOI's assertion that additional agency process would not have been productive because it had already made up its mind on the "legal issues" underlying the lease cancellation decision is irrelevant.[30] Futility is not part of a procedural due process analysis, and DOI fails to identify any precedent supporting its argument. Defendants appear to conflate DOI's obligation to provide AIDEA with procedural due process protections with its obligation under the APA to engage in reasoned decision-making. These concepts are distinct. The obligation to provide procedural due process demands notice and an opportunity to be heard "at a meaningful time and in a meaningful manner."[31] The obligation to refrain from arbitrary and capricious decision-making concerns the substantive quality of the agency's decision-making. These are separate agency obligations and fulfilling one does not fulfill the other.[32]

---

[29]     AR 3365 (original suspension letter); AR 3404-05 (supplemental suspension letter).

[30]     DOI Response Br. at 41.

[31]     *Mathews,* 424 U.S. 319.

[32]     The agency's duty to comply with "procedure required by law" is reflected in one branch of the APA review statute, 5 U.S.C. § 706(2)(D). The agency's substantive duty to refrain from arbitrary and capricious decision-making is in another, § 706(2)(A).

AIDEA V. HAALAND, ET AL.                                              CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 10 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 19 of 59

More critically, DOI's statement that failure to provide AIDEA with this process does not matter because its mind was already made up evidences a more fundamental due process violation.[33] Procedural due process rules "are shaped by the risk of error inherent in the [] process as applied to the generality of cases, not the rare exceptions."[34] Even if DOI anticipated that AIDEA's position would not change its mind, it was still required to provide AIDEA with an opportunity to put its best foot forward and attempt to obviate the need for this judicial review action. And DOI was required to provide AIDEA with that opportunity in good faith, without a predetermined decision that cancellation would occur. "Due process requires that a hearing 'must be a real one, not a sham or a pretense.'"[35] As the Seventh Circuit explained in *Ryan v. Illinois Dep't of Children and Family Services,* due process requires that a party "be given the chance to tell [its] side of the story, and that the agency be willing to listen. Otherwise, the 'opportunity to respond' required by [applicable law] is no opportunity at all."[36] DOI's failure to provide procedural due process is not excused by its unjustified presumption that AIDEA could have provided no further input of value had DOI provided that process before cancelling AIDEA's leases.

---

[33]    DOI Response Br. at 41 ("AIDEA's position could not have been differently or more effectively communicated through additional process, because the Lease Cancellation Decision turned on DOI's interpretation of a purely legal issue that was solely within the purview of DOI to analyze").

[34]    *Mathews*, 424 U.S. at 344; *see also Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (reiterating that the "fundamental fairness of a particular procedure does not turn on the result obtained in any individual case").

[35]    *Ciechon v. City of Chicago,* 686 F.2d 511, 517 (7th Cir. 1982) (collecting cases).

[36]    185 F.3d 751, 762 (7th Cir. 1999).

AIDEA V. HAALAND, ET AL.                                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 11 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 20 of 59

### D. Statutory Due Process

Even if DOI's obligations to AIDEA under constitutional principles of due process were ambiguous, its statutory obligations were not. The APA creates statutory due process rights under the licensee protections section, 5 U.S.C. § 558(c). In other pleadings before this Court and in representations to other executive agencies, DOI claims that AIDEA's leases were also licenses within the APA broad definition of "license."[37] Therefore, DOI was obligated to provide the process required by § 558. Section 558 separately enumerates the two key elements of due process: the agency's duty to provide notice and the agency's separate duty to provide an opportunity to defend the license, § 558(c)(1) and (2). It also requires that this process be provided at the outset, "before the institution of agency proceedings" for license cancellation, not at some later stage, *id*. As with constitutional due process, Defendants' convoluted arguments seeking to excuse DOI's failure to comply with its statutory due process obligations lack merit and are largely duplicative of its unsuccessful arguments made in the constitutional due process context:

#### 1. Void Versus Voidable

Defendants contend that the leases/APA licenses were void from the moment they were issued and thus not subject to APA license protections.[38] This argument was fully rebutted above in the discussion of constitutional due process protection for a property interest. If there were NEPA errors, the leases were voidable, not void. AIDEA as licensee

---

[37]    AIDEA Opening Brief at 16-17 (citing 5 U.S.C. § 551 and recapping DOI filings in the lease suspension case and the GAO ruling that AIDEA's leases were APA licenses).

[38]    DOI Response Br. at 34.

AIDEA V. HAALAND, ET AL.                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 12 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 21 of 59

was entitled to statutory due process rights up through DOI's issuance of its Lease Cancellation Decision.

## 2. APA Procedures for Applications for "Licenses Required by Law."

Defendants' next argument is difficult to understand. Some statutory background is needed. The first sentence of 5 U.S.C. § 558(c), not applicable here, governs proceedings on license applications, when "application is made for a license required by law …." The second sentence, the one relevant here, governs agency proceedings to suspend or cancel a license the agency has already granted. This is the sentence that specifies the statutory due process protections that DOI disregarded. The third sentence concerns renewal of expiring licenses. DOI twists the first sentence of § 558(c), both misinterpreting its language and over-stating its significance.[39] DOI reads "license required by law" as shorthand for licenses the agency is under a non-discretionary duty to grant, concluding that § 558(c)(1)'s requirements only apply to non-discretionary licenses. DOI then asks the Court to extend and impute this purported "license required by law" qualifier into the second sentence of § 558(c), which concerns the separate topic of suspension and cancellation of licenses. Applying its logic, DOI asserts AIDEA's leases are thus not entitled to statutory due process protections because DOI believes AIDEA's leases are mere discretionary licenses, rather than "a license required by law."

The "required by law" provision of the first sentence of § 558(c) merely means that, if a citizen is "required by law" to obtain a license before undertaking a regulated activity,

---

[39]     DOI Response Br. at 34, n. 12.

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 13 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 22 of 59

the agency shall apply the stated procedures in considering his license application.[40] That provision does not distinguish license applications based on whether they are submitted under non-discretionary or discretionary licensing statutes. Nor does the APA's definition of "license" in § 551 draw such distinctions. Moreover, the purported "required by law" qualifier in the first sentence on license applications is not included in the second sentence, which concerns the different topic of suspension and cancellation of licenses. Such a requirement is not imputed into the second sentence by inference.[41] Finally, as discussed in depth below, AIDEA's leases were not discretionary licenses, but instead were required authorizations Congress ordered DOI to issue under Tax Act § 20001 (DOI "shall" conduct lease sales).

### 3. Defendants' Reading that § 558(c)(2) Applies Only When it is the Licensee Which Has Failed to Comply With Law

References in caselaw and the APA's legislative history to the importance of treating the licensee fairly if the licensee commits violations should not be read as implying

---

[40] The only published case DOI cites supports AIDEA's reading. *New York Pathological X-Ray Laboratories, Inc. v. INS*, 523 F.2d 79, 82 (2d Cir. 1975) (holding that an unlicensed facility is "[n]ot permitted to conduct the medical examination," so a license to conduct that activity "is 'required by law,' as that phrase is used in 5 U.S.C. § 558(c)."). The one unpublished case DOI cites does not concern license cancellation or suspension, and concerns a "general permit" not granted to anyone in particular, and so is off-point. *Cal. Sportfishing Prot. Alliance v. Lake Wildwood Ass'n*, No. S-06-1026 WBS EFB 2006 WL 2734370, *3 (E.D. Cal. Sept. 25, 2006) (not reported).

[41] Even if DOI were correctly reading the first sentence regarding license applications, which it is not, the APA's framers had ample reason in the second sentence to afford more due process protections after a license has been granted, and the licensee is engaging in the licensed activity, than at the license application stage, when the activity has not yet started.

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 14 OF 50
1703914

Case 3:24-cv-00051-SLG          Document 65          Filed 08/02/24          Page 23 of 59

the APA drafters lacked concern for fairness when the licensing agency committed the transgressions.[42]

Nevertheless, Defendants narrowly read § 558(c)(2), which provides that, before beginning proceedings to suspend or cancel a license, the agency must give the licensee the "opportunity to demonstrate or achieve compliance with all lawful requirements." Defendants read "all lawful requirements" as referring only to those legal requirements the law imposes on the licensee. In doing so, Defendants exclude consideration of legal requirements the law imposes on the licensing agency. Thus, Defendants contend that an agency may confess that it unlawfully issued a license and cancelled the license without affording the licensee the opportunity to show that the agency complied with the law or that a "remedy" to achieve compliance exists short of outright cancellation.

The Court should reject this argument. "<u>All</u> lawful requirements" covers the gamut of laws, and is not textually limited to laws imposed on the licensee. Defendants' argument for implying a substantial unstated qualifier into "all lawful requirements" makes no sense. Defendants propose to read the licensee protection provisions of the APA as according an innocent licensee, who may lose its license as a result of alleged violations by the licensing agency, less protection than a licensee who may lose his license as a result of his own alleged violations. Defendants propose an unduly strained reading of a statute enacted to require government agencies to engage "in fair play" with its citizens.[43] The agency must

---

[42]     Gwich'in Response Br. at 29, n. 150 (citing S. Doc. 79-248 at 34-35 (1946)).

[43]     *See* Point B.5.d below for a review of APA legislative history.

afford the licensee an opportunity to "demonstrate" that there was "compliance with all lawful requirements" in the issuance of the license.[44]

In short, Defendants must comply with the APA's requirement to provide statutory due process to a licensee.[45] Moreover, even if § 558(c)(2) did not apply, DOI would still have to comply with the APA's informal adjudication provisions, requiring the agency to provide an opportunity to defend, as well as notice.[46]

### E. DOI Violated AIDEA's Statutory Rights By Administratively Cancelling Leases Known to Contain Valuable Deposits of Oil or Gas

Defendants contend that the NPRA lease cancellation regulation in 43 CFR Subpart 3136 is not borrowed for ANWR by Tax Act § 20001(b)(3), which provides:

> MANAGEMENT.—Except as otherwise provided in this section, [DOI] shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations).

---

[44] 5 U.S.C. § 558(c)(2). This provision gives the licensee a second distinct right, the right to <u>achieve</u> compliance with all lawful requirements," i.e., conduct a cure. The cure right will sometimes offer little relief where the alleged errors are by the licensing agency, as there are some types of agency errors that are not amenable to being fixed with the licensee's help. But there are other types of agency errors a licensee can help rectify. *See* Point B.5.d below. The pertinent point here is that the licensee should always be allowed a chance to "demonstrate … compliance," i.e., to contend that the licensing agency issued its license in compliance with law. *Id.* The statute cannot be read to eliminate that right.

[45] *See also* AIDEA Opening Br. at 24, n. 36 (rebutting Intervenors' effort to invoke § 558(c)'s health and safety exception, which cases establish is for exigent circumstances).

[46] This obligation arises in informal adjudications from the APA requirements that an agency must develop and supply a record facilitating judicial review, which requires an opportunity for input by the affected parties prior to agency decision, and that the agency conduct proceedings with due regard for the convenience and needs of the parties. *See* 5 U.S.C. §§ 555(b), 706; *American Airlines v. Dept. of Transp.,* 202 F.3d 788, 797 (5th Cir. 2000); *Indep. U.S. Tanker Owners Committee v. Lewis*, 690 F.2d 908, 923 (D.C. Cir. 1982). *See AIDEA*, 685 F.Supp.3d at 855 (lease suspension was a form of informal adjudication).

AIDEA V. HAALAND, ET AL.                                              CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 16 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 25 of 59

Defendants assert that 43 CFR § 3136.3, the NPRA regulation governing Lease Cancellation, does not apply, because it does not specifically pertain to lease sales. However, this Court has already ruled that the § 20001(b)(3)'s incorporation of the NPRA regulations is broader than Defendants argue. In affirming lease suspension, the Court ruled that the NPRA lease suspension rule in 43 CFR Subpart 3135 is borrowed for ANWR.[47] Logically, as Tax Act § 20001(b)(3) incorporated the lease suspension rule, the parallel ANWR lease cancellation rule in Subpart 3136 must also be incorporated.

In any event, Defendants are misreading the quoted statute. If, as Defendants argue, "administration of lease sales" was intended to narrowly limit its incorporation of the NPRA and its regulations, Congress easily could have said so. Only one NPRA rule is titled "Lease Sales," 43 CFR 3131.4. If that was all Congress wished to borrow for ANWR, it would have incorporated that rule specifically, rather than borrowing NPRA "regulations."

Perhaps realizing this, Defendants advocate for a slightly less narrow partial borrowing of NPRA regulations that would incorporate 43 CFR Subparts 3131 and 3132, but not adjoining subparts of the NPRA regulations governing lease administration. In seeking to cherry-pick subparts, Defendants overlook that the Tax Act's borrowing provision begins by directing DOI to "manage the oil and gas program on the Coastal Plain" i.e., the entire program, in a manner similar to the NPRA program.

DOI rests its hope on a narrow reading of the later part of this sentence in the Tax Act, which directs that this managing be done "in a manner similar to the administration

---

[47]    AIDEA Opening Brief at 50-51 (citing *AIDEA*, 685 F. Supp. 3d at 834; 43 CFR 3135.2(a)).

of lease sales" under the NPRA statute and regulations. However, reading "administration of leases sales" to cover the administration of the leases sold in lease sales, as AIDEA proposes, does no violence to any part of this sentence. That reading accords with the start of this sentence, which identifies the subject matter being addressed by the sentence as the management of the Coastal Plain program as a whole, not some subset or narrow phase of the program. Conversely, reading "administration of lease sales" to narrowly cover only time-of-sale activities (i.e., auction preparations, the auction and the immediate aftermath of the auction), would conflict with the subject matter identified at the start of this sentence (i.e. management of the entire Coastal Plain program as a whole). DOI's reading would also leave a regulatory gap as to what happens after a narrow lease sale phase.

Defendants next engage in a strained contortion of the plain language of 43 CFR § 3136.3. They assert that DOI's prohibition on cancelling leases known to contain valuable deposits of oil and gas only applies if there has been "lessee noncompliance" with some law or lease term.[48] This argument is unsupported by the text of § 3136.3, which reads, in full:

> § 3136.3 Cancellation of leases.
>
> (a) Any nonproducing lease may be canceled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in § 3130.0-3 of this title, of the regulations issued thereunder or of the lease, if such failure to comply continues for 30-days after a notice thereof has been delivered by registered or certified mail to the lease owner's record post office address.

---

[48] *See, e.g.,* DOI Response Br. at 45.

(b) Producing leases or leases known to contain valuable deposits of oil or gas may be canceled only by court order.

The two parts of this rule are distinct from each other. Part (a) addresses nonproducing leases which are not known to contain valuable deposits of oil. Those leases may be administratively cancelled where the lessee fails to comply with certain provisions of law. Part (b), in contrast, provides a different procedure for leases known to contain valuable mineral deposits. Part (b) makes no reference to lessee noncompliance; part (a)'s reference of lessee noncompliance cannot be read to extend to part (b). DOI also could have specifically addressed errors made by DOI in issuing leases in the text, as DOI did in its Mineral Leasing Act ("MLA") rules.[49] Instead, DOI in part (b) chose to provide heightened protections to lessees with leases producing or known to contain valuable oil and gas deposits by requiring court proceedings in order to cancel any such leases. That regulation does not distinguish lessee non-compliance from other grounds for lease cancellation. DOI agrees the rule requires a court proceeding to cancel such a valuable lease if the lessee may be non-compliant.[50] Its reading that it can itself cancel the same lease for its own non-compliance should be rejected.

Defendants stress the *Boesche* case as essentially overruling the NPRA regulation. AIDEA's opening brief fully addressed the differences between (1) the NPRA and ANWR statutory and regulatory regimes and (2) the MLA, which the Supreme Court interpreted

---

[49]    AIDEA Opening Br. at 32 (citing MLA lease cancellation rule, 43 CFR 3108.3).

[50]    DOI Response Br. at 37.

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 19 OF 50
1703914

Case 3:24-cv-00051-SLG   Document 65   Filed 08/02/24   Page 28 of 59

in *Boesche*.[51] Both DOI and this Court have held the MLA does not apply to the NPRA, and as AIDEA explained, this extends to ANWR as well.[52] Moreover, even if *Boesche* were extended to this case, Defendants fail to grapple with a critical feature of the NPRA lease cancellation rule, its use of the word "only." Leases "known to contain valuable deposits of oil or gas may be canceled ***only*** by court order."[53] The MLA provision construed in *Boesche* lacked such a restrictive term.[54] The NPRA rule does shuts down other cancellation options.

DOI also asserts that the Court need not make "some detailed (or extra-record) factual inquiry into the meaning or application of the regulatory phrase 'known to contain valuable deposits of oil or gas' in order to reject AIDEA's argument under the NPRA regulations."[55] DOI is partially correct—the Court need not conduct an extra-record inquiry, because AIDEA's supporting evidence is the DOI's own studies within the administrative record.[56] No additional extra-record evidence is necessary to conclude the leased lands were "known to contain oil or gas."[57]

---

[51]     AIDEA Opening Br. at 30-32 (discussing *Boesche*, 373 U.S. at 475-76).

[52]     *Id.* (citing 43 CFR 3100.0-3(a)(2)(v), (vi); 46 Fed.Reg. 55494, 55497 (Nov. 9, 1981), and *Natural Resource Defense Council v. Zinke*, No. 3:18-cv-00031-SLG, 2018 WL 6424687, *2 (D. Alaska Dec. 6, 2018) (not reported), and Tax Act § 20001(b)(3)).

[53]     43 CFR 3136.3(b) (emphasis added).

[54]     AIDEA Opening Br. at 30 (quoting 30 U.S.C. § 188 as reprinted in *Boesche*).

[55]     DOI Response Br. at 37.

[56]     AIDEA Opening Br. at 35-41 (supplying AR citations).

[57]     Amici argue it is not "known" that AIDEA's leases contain oil and gas deposits. *Amicus Brief* at 12 (ECF 54-1). But Federal Defendants do not raise such an argument, the auctioned acres were those selected to comply with the Tax Act's mandate that DOI lease the lands with the highest potential to contain hydrocarbons. More importantly, as was

AIDEA V. HAALAND, ET AL.                                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 20 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 29 of 59

Finally, DOI suggests there is no judicial forum which would entertain a lawsuit by it against AIDEA for a court order cancelling the leases. However, DOI could have filed a simple federal plaintiff lawsuit against AIDEA in district court for declaratory relief. 28 U.S.C. §§ 1345, 2201. DOI manufactures logistical concerns where none exist.

## II. The Issuance of Leases Was a Non-Discretionary Action Not Subject to NEPA Review, so Alleged NEPA Errors Did Not Justify Canceling AIDEA's Leases

In addition to the procedural requirements discussed above, for DOI to have lawfully cancelled AIDEA's leases three things must be true. First, the Court must conclude that the <u>issuance</u> of the leases was a discretionary agency action. Second, the Court must conclude DOI made an error in its original NEPA analysis and the error was pertinent to the discrete action of issuing the leases. Third, the Court must find that the "remedy" selected by DOI to respond to its own purported errors was reasonably proportional, and not an arbitrary and capricious remedy. A review of Defendants' arguments demonstrates that none of these three requirements have been met, rendering cancelation of the leases unlawful.

### A. Seeking to Sidestep the Holding in *Public Citizen*, Defendants Unpersuasively Contend That Tax Act § 20001(c) Required DOI to Market But Not Issue Leases

Defendants spend most of their briefing arguing that the issuance of the leases was a discretionary agency action subject to NEPA review under *Dept. of Transportation v. Public Citizen,* 541 U.S. 752 (2004) ("Public Citizen"). Defendants are mistaken. The *Public Citizen* case held that when a statute requires an agency to take an action, the statute

_____

thoroughly analyzed in AIDEA's opening brief, "known" does not require 100% certainty in order for these regulatory protections to apply. AIDEA Opening Br. at 38-40.

establishes a mandatory duty that is not subject to NEPA's procedural analysis requirements.[58] When Congress directs that an action be taken, an agency must comply with the statutory directive even if its own analysis may suggest a different action. Defendants attempt to rebrand the lease sales into something else. But this effort to relabel what is clearly a non-discretionary and mandatory agency action fails.

First, an agency's ability to control certain details in implementing a statutory directive does not mean that the agency has sufficient discretion for NEPA to apply. For example, in *Alaska Wilderness League v. Jewell*,[59] the Ninth Circuit held that DOI's ability to consider whether or not a proposed oil response plan effectively reduced the impact of oil spills did not change the DOI's non-discretionary duty to approve the oil response plan. NEPA did not apply and could not frustrate DOI's obligation to facilitate Congress's intent.

The Sixth Circuit agreed with this holding in *Alaska Wilderness League* in *National Wildlife Federation v. Secretary, U.S. Dept. of Transp*.[60] It observed that the agency's responsibility to "exercise[] some degree of judgment when it considers the statutory criteria" does not make the approval of the oil spill plan a discretionary decision subject to NEPA review. The decisions in both these cases make clear that just because an agency has some wiggle room in how to evaluate an oil response plan or oil spill plan, the agency may not engage in "free-form" environmental decision-making. Other courts are in

---

[58]     *See Public Citizen,* 541 U.S. 752, 767-769 (2004); 42 U.S.C. § 4336e(10)(B)(vii); 40 CFR 1508.1(w)(2)(vii).

[59]     788 F.3d 1212, 1219, 1225-26 (9th Cir. 2015).

[60]     960 F.3d 872, 874, 879-80 (6th Cir. 2020).

AIDEA V. HAALAND, ET AL.                                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V                    PAGE 22 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 31 of 59

accord.[61] NEPA grants agencies flexibility in implementing development programs, but not to head in a direction different from what a statute orders.

Under *Public Citizen,* the Tax Act's lease sales are mandatory and non-discretionary. Congress directed DOI to (1) "conduct" a "lease sale" totaling at least 400,000 ANWR acres by December, 2021; (2) ensure the land that is leased is within "those areas with the highest potential for the production of hydrocarbons;" and (3) issue the rights-of-way and surface development authorizations needed for the development of the oil and gas resources of the ANWR Coastal Plain.[62] The word "shall" used in each of these statutory mandates makes clear that DOI has <u>no</u> discretion to prevent the leases from being sold and the oil and gas resources from being developed.

Despite this clear directive, we are now 32 months past the statutory deadline for completing the first lease sale and no ANWR leases exist. DOI cancelled the only remaining leases issued under the statute, citing purported NEPA errors. As there are no leases, it is impossible to carry out the required surface development or implement an ongoing oil and gas program. DOI has thus done what *Public Citizen* forbids — invoke NEPA in a way that impedes statutory requirements.

To try and obscure this conclusion, DOI seeks to reframe the case. It starts by erroneously stating that AIDEA argued the oil and gas program as a whole is exempt from NEPA. AIDEA makes no such claim. Indeed, such an argument would be futile given this

---

[61]    *See Sac and Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1262-63 (10th Cir. 2001); *see also, Sierra Club v. Babbitt,* 65 F.3d 1502, 1512 (9th Cir. 1995) (the caselaw is "forceful" in "excusing nondiscretionary agency action … from the operation of NEPA").

[62]    Tax Act § 20001(c)(1), (c)(2), and (c)(3).

AIDEA V. HAALAND, ET AL.                                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V           PAGE 23 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 32 of 59

Court's ruling in the lease suspension case. Rather than a general NEPA exemption, what is at stake is narrow. Does the specific action of issuing leases fall within DOI's non-discretionary statutory duty under Tax Act to "conduct … lease sales," making NEPA inapplicable under *Public Citizen*? The answer is a clear yes.

DOI reads § 20001(c) to advocate for an ambitiously narrow construction of the phrase "lease sale." It contends that § 20001(c) mandates the holding of a lease auction, but not the issuance of leases to the auction winners.[63] This position is meritless.[64]

The Tax Act § 20001 does not provide a statutory definition for "sale," so the term should "be construed in accord with its ordinary or natural meaning."[65] The Ninth Circuit defined the "ordinary meaning" of "sale" as "'***a transfer of property*** for a fixed price in money or its equivalent' and 'a contract to pass rights of property for money, which the buyer pays or promises to pay to the seller.'"[66] The Fifth Circuit adopted a similar definition, when it held that a 'sale' is "[t]he action or an act of selling or making over to another for a price" or "the exchange of a commodity for money or other valuable consideration."[67] Black's Law Dictionary similarly defines "sale" as "the transfer of

---

[63]    DOI Response Br. at 15; Venetie Response Br. at 15 ("While the Tax Act consists of a series of 'shall' directives to Interior, critically missing from this list is a directive that Interior shall issue leases.").

[64]    As the Supreme Court recently held, agency statutory construction is reviewed *de novo*. *Loper Bright Enterprises v. Raimondo*, 2024 WL 3208360, *12. *14, and n. 4 (2024).

[65]    *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 756 (D. Alaska 2021) (referred to henceforth as *Sovereign Inupiat*).

[66]    *Sollberger v. CIR*, 691 F.3d 1119, 1123 (9th Cir. 2012) (emphasis added, quoting *Comm'r v. Brown,* 380 U.S. 563, 571 (1965)).

[67]    *Camacho v. Ford Motor Co.*, 993 F.3d 308, 312 (5th Cir. 2021).

AIDEA V. HAALAND, ET AL.                                      CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 24 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 33 of 59

property or title for a price" or "the agreement by which such a transfer takes place."[68] The ordinary meaning of the word "sale" requires more than just the solicitation of offers, it includes the "transfer of property" that completes the sale. Here, that transfer requires the issuance of the leases. A "sale" without that transfer of interest is not a sale. It is an offer.

The Supreme Court has also expressed its understanding of the meaning of the term "lease sale" in the oil and gas context. In an early case under the Outer Continental Shelf Lands Act ("OCSLA"), the Supreme Court reviewed the four stages of a leasing program. It identified the second stage as the "lease sales" stage, which consists of "the solicitation of bids *and the issuance of* offshore *leases*."[69] Thus, the Supreme Court viewed the term "lease sale" as including lease issuance, following the plain meaning of "sale."[70] The statute construed in that case did not mandate the completion of lease sales, and thus NEPA did fully apply to the decision of whether to issue leases.

Defendants claim that if Congress intended to create a non-discretionary obligation mandating lease issuance, it would have used more specific language. For instance, it could have ordered DOI to "accept the highest valid bids" and "promptly issue to the high bidder a fully executed lease," as Congress did in the Inflation Reduction Act ("IRA") for Lease

---

[68] Black's Law Dictionary (12th ed. 2024). The dictionary also notes an alternate meaning focusing on the formation of a binding contract for a sale, without reference to the final conveyance that closes the sale, but no meaning for "sale" is given under which a "sale" could be completed, yet the seller neither closes the sale nor is obligated to close.

[69] *Secretary of the Interior v. California*, 464 U.S. 312, 338 (1984) (emphasis added). There is no reason to distinguish onshore leases from offshore leases as to this issue.

[70] *Id.*; *see Cook Inletkeeper v. U.S. Dep't of the Interior,* 2024 WL 3439462, *1 (D. Alaska July 16, 2024) (reviewing this Supreme Court opinion, citing it for pertinent point of what activities go on in a "lease sale," and noting changes to statute over time).

Sale 257 in the Gulf of Mexico. This assertion overlooks Congress' option to enact laws without superfluous language.[71] Nothing requires Congress to draft a law covering each component of the directed action because doing so would encourage an interminable process where the true intent of the legislation "[is] likely to be defeated."[72]

Defendants' assertion also overlooks the material differences between Lease Sale 257 and the Tax Act. Lease Sale 257 was the subject of a final notice of sale and an auction was initiated, with interested parties submitting bids for the leases, prior to a Court order vacating the auction results.[73] Rather than ordering a replacement sale, Congress chose to reinstate the judicially-vacated auction results. In great detail, Congress ordered DOI to take the steps necessary to follow through on the auction results and complete the sale by issuing those leases.[74] Had Congress instead directed DOI to conduct a "lease sale," the directive could easily have been interpreted to require DOI to re-do the whole auction process. It made sense for the IRA provision to focus precisely on lease issuance, since the lease auction had already occurred. By contrast, the 2017 Tax Act preceded the first ANWR lease auction in January, 2021 by several years. So, it naturally addressed "lease sales," i.e.

---

[71]    *See U.S. v. Sischo*, 262 U.S. 165, 169 (1923) (sometimes Congress acts cautiously by "making explicit what is implied").

[72]    Sutherlands Statutory Construction, § 55:2.

[73]    *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022), *vacated and remanded*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

[74]    Inflation Reduction Act of 2022, PL 117-169, § 50264(b), Aug. 16, 2022 ("IRA"). In contrast, Congress in the IRA also issued a mandate requiring DOI conduct three other oil and gas lease sales for lands on the Outer Continental Shelf (Lease Sale 258, 259, and 261). These leases had not undergone an initial sale and for them Congress issued a broader directive requiring the agency "conduct [a] lease sale." *See* IRA § 50264(a) – Definitions, and subsections (c)-(e), which required DOI to conduct sales.

the entire sale process. Defendants ignore this chronology. The variance in level of detail between the IRA and the Tax Act does not support an inference that Congress in the Tax Act ordered DOI to market leases, but allowed DOI to decline to issue them.

An interpreting that issuance of leases was a component of the mandated "lease sales," rather than a separate and discretionary post-sale step, further flows from a straightforward reading of closely-related Tax Act provisions. Section 20001(c)(2) and (c)(3) direct that DOI "shall" grant necessary right-of-way and "shall authorize" surface development. Auctions or other lease marketing comes first, then leases are issued, and finally rights-of-way and surface development authorizations are issued to the leaseholder. It is significant that those first and third steps are non-discretionary "shall" duties, even under Defendants' strained reading. Under these circumstances, it is not credible to suggest that Congress gave DOI an "out" by allowing DOI the discretion at the intermediate second step to halt or even end the statutory program. Indeed, doing so would replace Congress's overall decision that DOI "shall" administer an oil and gas program in ANWR, Tax Act § 20001(b)(3), with a mere non-binding authorization allowing DOI to decide itself whether to have such a program.[75]

The Tenth Circuit only three years ago rejected an argument that closely parallels Defendants' efforts to sidestep *Public Citizen*.[76] There a BLM rule imposed a "shall" duty

---

[75]     *See Sac and Fox Nation of Missouri,* 240 F.3d at 1262 (consulting related provisions in a sparse statute "clarified …the remainder of the statutory scheme" and revealed that an arguably "ambiguous" statutory duty was non-discretionary, and so agency action implementing that duty was not subject to NEPA review) (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 371 (1988)).

[76]     *See Nat. Res. Defense Council v. McCarthy*, 993 F.3d 1243 (10th Cir. 2021).

on BLM land managers to close off-road vehicle trails if adverse conditions occurred, "until" such conditions dissipated. The rule did not explicitly direct BLM land managers to reopen the closed trails after conditions improved. The rule provided:

> [W]here the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects ... the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.[77]

Opponents of trail re-opening contended that, because the rule contained no explicit directive compelling trail re-opening, the agency action of re-opening a previously closed trail was a discretionary agency action subject to NEPA review. The Tenth Circuit disagreed, refusing to read the provision so narrowly. The Court reasoned that the mandatory closure, which must last "until" adverse conditions dissipate, necessarily created a duty to re-open the trail when the adverse conditions dissipated. This meant that NEPA did not apply to the trail reopening action.[78]

Like in that case, even if DOI's duty to issue leases is not a component of DOI's explicit obligation to "conduct … lease sales," the duty follows from the Tax Act's directive that DOI administer an oil and gas leasing program for ANWR. This is based on the Tax Act's directives including the "shall" duties to "conduct…lease sales" and issue rights-of-way and surface development authorizations to that the leaseholder may develop the project. Tax Act § 20001(c)(2) and (c)(3). As the Supreme Court has remarked, the "notion that some things 'go without saying' applies to legislation just as it does to

---

[77]    43 CFR 8341.2(a) (quoted in *Nat. Res. Defense Council*, 993 F.3d at 1252).

[78]    *Id.*, 993 F.3d at 1255.

everyday life."[79] Without the issuance of leases, the slate of "shall" duties in the Tax Act are meaningless. A "statute which confers powers or duties in general terms includes by implication all powers and duties incidental and necessary to make the legislation effective. In other words, that which is clearly implied is as much a part of a law as that which is expressed."[80] "[I]mplication and inference" is necessary to construe statutes "because legislation cannot practically or conveniently, or perhaps even possibly, specify all of the detailed operational effects it should have in all of the various circumstances to which it may apply."[81] Here, if the duty to issue leases is not an explicit component of the duty to complete a lease "sale," it is necessary to make the various "shall" duties in § 20001 "effective," and so is implied.

### B. Precedent From This Court and the Ninth Circuit Address the Proper Remedy When a NEPA Issue Concerns a Statutorily-Mandated Project

DOI's remedy-related arguments are further undermined by this Court's July 16, 2024 opinion, which declined to cancel a lease to address NEPA errors in Lease Sale 258.[82] That offshore lease sale was for parts of Cook Inlet.

Lease Sale 258 has both obvious statutory similarities and differences to the ANWR lease sale. For both lease sales, statutes directed that the "lease sale" be "conducted" by a particular date.[83] But the two statutes differed substantially regarding the discretion left to

---

[79]     *Bond* v. *United States*, 572 U. S. 844, 857 (2014).

[80]     Sutherlands Statutory Construction, § 55:4.

[81]     *Id*., § 55:2.

[82]     *Cook Inletkeeper v. DOI,* 2024 WL 3439462 (D. Alaska).

[83]     *See* IRA § 50264(c) (governing Lease Sale 258); Tax Act § 20001(c)(1) (ANWR).

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 29 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 38 of 59

DOI, and thus differ regarding the application of *Public Citizen* and the scope of the issues to which NEPA applies. The Tax Act requires that DOI "shall" lease at least 400,000 acres and that those acres be the ones with the highest potential for hydrocarbon production. In comparison, the IRA provision regarding Lease Sale 258 did not establish a minimum number of aces to be leased or tell DOI which types of acres to lease.[84]

Opponents of Lease Sale 258 argued that DOI failed to adequately consider alternatives which would have leased substantially fewer acres or leased acres in a way that better protected the endangered Cook Inlet beluga whale populations.[85] The Court held that by statute, DOI had to conduct Lease Sale 258. It therefore rejected the project opponent's arguments for the "no action" alternative of declining to issue leases.[86] However, it found DOI had the discretion to choose the number of acres to be leased in Lease Sale 258, and which types of acres to lease. The Court therefore held that DOI violated NEPA by failing to adequately consider alternatives in which it would have leased fewer and/or different acres, and perhaps better protected the environment and beluga whales.[87]

Because the Court found that NEPA errors could not affect the Congressional mandate to conduct the lease sale and issue the leases, it confined the scope of the NEPA remedy to the scope of the NEPA problem. It suspended rather than cancelled the Lease Sale 258 leases:

---

[84]    IRA § 50264(c).

[85]    *Cook Inletkeeper*, 2024 WL 3439462, *6-7, 9-11.

[86]    *Id.* *9.

[87]    *Id.* *6-7, *9-11.

AIDEA V. HAALAND, ET AL.                                                CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 30 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 39 of 59

> In this case, the Court finds that vacatur [of the leases or the decision to issue them] would be contrary to the directive of Congress, as set forth in the IRA's mandate that BOEM hold Lease Sale 258 prior to December 2022, and therefore that the equities weigh against vacatur. As such, the Court REMANDS WITHOUT VACATUR Lease Sale 258's Final EIS and the ROD for Federal Defendants to provide a supplemental EIS addressing the deficiencies identified above, and a modified ROD as warranted. The Court SUSPENDS Hilcorp's lease pending a supplemental EIS from [DOI].[88]

This remedy preserved the leases, respecting the Congressional directive requiring issuance while allowing DOI to consider additional steps to protect the environment. This result is remarkably similar to how things stood with respect to AIDEA's leases in the interim between (1) August 7, 2023, when this Court affirmed DOI's suspension of the leases during further NEPA review, and (2) September 6, 2023, when DOI cancelled AIDEA's already-suspended leases, despite the Tax Act's mandates. In requesting vacatur of the lease cancellation decision, which would leave AIDEA's leases intact but suspended, AIDEA seeks relief strongly supported by this Court's decision in Lease Sale 258.[89]

In *Forelaws on Board v. Johnson*,[90] the Ninth Circuit reached the same result. There, a statute called "the Regional Act" directed the Bonneville Power Authority ("BPA") to enter into long-term contracts with customers for the provision of low-cost hydro power in advance of a statutory deadline. The BPA initially met that deadline, but the deadline passed by the time the Court heard the case.[91] Despite finding NEPA errors, the Court

---

[88]     *Id*. *17 (footnotes omitted, ALL CAPs in original).

[89]     Overturning lease cancellation will prevent DOI from auctioning off to someone else the acreage that AIDEA leased.

[90]     743 F.2d 677, 686 (9th Cir. 1984).

[91]     *Id.* at 685.

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V        PAGE 31 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 40 of 59

declined to invalidate the contracts, to avoid "tension" with the Congressional direction and deadline. Instead the Court ordered a remand so that the agency could revise the environmental mitigation terms associated with the contracts, with the aid of improved NEPA analysis: "Faced with reconciling NEPA and the Regional Act, we conclude that an injunction of the operation of the contracts themselves is inappropriate."[92] The Court observed that the terms of the BPA contracts did not prevent the agency as regulator from imposing conditions designed to better protect the environment.[93]

AIDEA's leases, by design, contained similarly protective provisions. AIDEA was required to seek DOI's blessing for ground-disturbing work, and the 2020 ROD required AIDEA to comply with mitigation measures that DOI could change.[94] *Forelaws on Board* confirms that NEPA remedies can address the discretionary portions of an agency's role, but must not undermine achievement of the agency's non-discretionary duties.[95] As in that case, invalidating, enjoining, or otherwise frustrating AIDEA's leases is fundamentally in tension with Congress's intent as manifested in the Tax Act.

---

[92] *Id.* at 686

[93] *Id.*

[94] *See* AIDEA Opening Br. at 25-27 (citing AR 3148 and 3320).

[95] *Forelaws on Board* also noted the disruption that would occur from enjoining existing long-term BPA contracts in the third year of their term, but the primary factor in the Ninth Circuit's analysis was the "tension" between the agency's duty to have contracts in place and how enjoining the contracts would prevent that duty from being fulfilled. 743 F.2d at 686. The Court also remarked that NEPA itself only requires compliance with NEPA "to the fullest extent possible," not absolutely. *Id.* (citing 42 U.S.C. § 4332(1)).

## C. Defendants' Other Efforts to Distinguish *Public Citizen* Lack Merit

Similarly, DOI claims the OCSLA provision at issue in *Alaska Wilderness League,*[96] a case discussed extensively by AIDEA in its opening brief, bears little "resemblance" to the Tax Act. But the Tax Act is even more strident than OCSLA in imposing a non-discretionary duty on DOI.[97] As the <u>dissenting</u> opinion in *Alaska Wilderness League* stressed, DOI's "shall" duty under OCSLA to approve a qualifying oil response plan was soft and qualified. Under OCSLA, DOI could only approve a response plan if DOI made the "broad and amorphous" judgment that the proposed plan mitigated "to the maximum extent practicable" the adverse environmental impact of a "worse case discharge" of oil.[98] The dissent urged the majority to find that this environmentally-orientated condition required substantial decision-making analysis by DOI beyond ministerial action. Such analysis, according to the dissent, took the agency decision-making out of the realm of *Public Citizen* and required NEPA analysis. But the Ninth Circuit majority declined, and held the approval action was still non-discretionary, and not subject to NEPA review, despite DOI's important decision-making role.[99]

DOI also contends that because Congress did not mandate the <u>particular</u> terms of the leases, this fact serves as further evidence that lease issuance was a discretionary step

---

[96]     788 F.3d at 1219, 1225-26.

[97]     DOI Response Br. at 18.

[98]     788 F.3d at 1230 (McKay, J., dissenting).

[99]     *Id*. at 1225-26. The Sixth Circuit has since followed the Ninth Circuit's construction of OCSLA in *Alaska Wilderness League* regarding oil spill response plan approvals, and further clarified that it reached that result through *de novo* statutory construction, so the holding was not dependent on deference to DOI's interpretation of OCSLA. *National Wildlife Federation*, 960 F.3d at 880.

subject to NEPA. Defendants' contention fails to meaningfully account for *Alaska Wilderness League*. OCSLA did not guarantee the applicant the right to approval of any particular oil spill response plan. The statute directed DOI, before approving a proposed plan, to determine that the plan mitigated oil spill impacts to the "maximum extent practicable." That meant that an applicant's plan might not be approved as presented. Nevertheless, the Ninth Circuit held the duty to approve qualifying response plans was non-discretionary and so not subject to NEPA.[100]

### D. NPRA Rules Do Not Override Tax Act Requirements

Finally, the Gwich'in intervenors raise an argument not joined or addressed by DOI. They note that a rule for processing bids found in one of the NPRA regulations states that DOI may reject bids at an auction.[101] They infer that this means DOI is not obligated to complete the required lease sales by issuing a lease. Thus, they conclude that lease issuance for ANWR was a discretionary agency action, and therefore fully subject to NEPA, even though they acknowledge that a lease "sale" must take place. While the Tax Act directs DOI to administer the ANWR program in a manner "similar" to the NPRA program, the Gwich'in overlook that the NPRA statute and NPRA rules are borrowed for the ANWR program only where consistent with the Tax Act's ANWR provisions. Specifically, by statute NPRA provisions do not extend to ANWR where the Tax Act "otherwise provide[s]."[102] Thus, even if the NPRA bid evaluation rule operates as the Gwich'in

---

[100]    *Id.*; *see also*, *Sierra Club,* 65 F.3d at 1512 (similar agency control over details).

[101]    43 CFR 3132.5(b).

[102]    Tax Act § 20001(b)(3).

AIDEA V. HAALAND, ET AL.                                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 34 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 43 of 59

advocate,[103] it could not displace the Tax Act § 20001(c)'s statutory directive to conduct an ANWR lease sale by December, 2021, including issuing the conveyance completing the lease sale.

Additionally, the NPRA bid evaluation rule, which DOI never invoked in this case, does not have the substantial program-altering quality the Gwich'in attribute to it. The rule addresses the interval of time immediately after the receipt of bids in an NPRA lease auction. Sub-section (h) concludes the rule by providing that, after the lessee executes a lease, the United States "shall…execute the lease" within 15 days. That is mandatory.[104] Before that point, subsection (b) allows DOI to "reject any and all bids received" in an NPRA auction. Thus, if something goes awry in the auction, whether it be collusive bidding or some other problem, DOI has a way to fix the problem. But the rule is not written in a way that remotely suggests it converts mandatory lease sales required by statute into discretionary lease sales DOI can veto.[105] Indeed, the only two published decisions applying the rule deal with problems with the monetary aspects of bids. Both cases reversed DOI auction managers for rejecting bids deemed to be too low to be accepted, finding DOI

---

[103]     This is a point that AIDEA strongly contests.

[104]     43 CFR 3132.5(h).

[105]     The drafters of the NPRA rules explained that they wrote the full set of rules in 1981 in order to carry out DOI's duty to complete the first NPRA lease sale within 20 months of enactment of a 1981 statute. *Proposed Rule*, 46 Fed.Reg. 37725, 37726 (July 22, 1981). Nothing in that preamble or the preamble to the corresponding *Final Rule,* 46 Fed.Reg. 55497 (Nov. 9, 1981) suggested that, in drafting the bid rejection rule, DOI intended to allow itself leeway to decline to issue leases, despite the deadline to conduct lease sales.

invoked the rule without providing substantial supporting evidence.[106] Such an under-the-hood rule regarding bidding details at an auction does not erode or override DOI's non-discretionary duty under Tax Act § 20001(c) to complete lease sales by December, 2021.[107] Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[108]

### E. DOI's Claim That the Prior Administration Committed NEPA Errors Does Not Withstand Scrutiny and, if There Were Errors, DOI's Selected Remedy Did Not Correspond to the Errors and Was Disproportionate

Even if this Court were to extend caselaw governing lease cancellation under the Mineral Leasing Act ("MLA") to ANWR lands not subject to the MLA, "the Secretary only has the power to administratively cancel *improperly issued* leases…The existence of a legal defect is a necessary precondition to" DOI administratively canceling leases.[109]

More fundamentally, Defendants utterly fail to explain how DOI could lawfully decline to issue oil and gas leases, despite the mandatory language in Tax Act § 20001(b)(3) and (c) and the *Public Citizen* doctrine regarding non-discretionary duties and NEPA. This is true even if DOI might have concluded in a "better" NEPA analysis that issuing leases would cause unacceptable adverse downstream greenhouse gas impacts or other adverse

---

[106]     *Arco Alaska, Inc.,* 78 IBLA 115, 1983 WL 35015 (DOI Board of Land Appeals, 1983); *Exxon Corp.*, 73 IBLA 176, 1983 WL 34627 (DOI Board of Land Appeal, 1983).

[107]     As bears repeating, the agency's responsibility "to exercise [] some degree of judgment" does not make an agency action executing a mandatory statutory directive a discretionary action subject to NEPA. *National Wildlife Fed.,* 960 F.3d at 874, 879-80.

[108]     *Whitman v. Am. Trucking Association,* 531 U.S. 457, 468 (2001).

[109]     *Solonex v. Haaland*, 626 F. Supp. 3d 110, 119 (D.D.C. 2023) (emphasis added, discussing *Boesche v. Udall*, 373 U.S., 472, 476 (1963)). *See* AIDEA Opening Br. at 32 and n. 44 (this Court and DOI have held that the MLA, which was construed in *Boesche*, does not apply to the NPRA. The MLA also does not apply to ANWR).

AIDEA V. HAALAND, ET AL.                                            CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 36 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 45 of 59

environmental or subsistence hunting and fishing impacts. While ordering mitigation was within DOI's bailiwick, Congress itself made the decision that DOI "shall conduct no fewer than two lease sales" in ANWR and "shall" administer an oil and gas program and issue rights-of-way and surface development authorization.[110] Under *Public Citizen*, there is no reason to analyze the environmental impact of an action the agency "could not refuse to perform," and no basis for an agency to use its own purported NEPA failure to escape its duty to execute statutory mandates.[111]

### 1. Greenhouse Gasses

Defendants fail to rebut the significant statutory distinction between the Tax Act's mandatory leasing provisions governing ANWR and OCSLA's discretionary leasing provisions that were the subject of *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) ("*Liberty,*" as DOI refers to the case).[112]

As AIDEA discussed in its opening brief, DOI's lease cancellation decision erroneously relied upon *Liberty* for the proposition that it was NEPA error for the FEIS to not consider downstream greenhouse gas emissions. AR 5357. In *Liberty*, DOI exercised its discretionary authority under OCSLA to approve an oil and gas project on the

---

[110]    Tax Act § 20001(b) and (c).

[111]    541 U.S. at 769.

[112]    *See* AIDEA Opening Br. at 22-23. Downstream greenhouse gas impacts are the worldwide increase in emissions that may indirectly result from a given oil and gas project generating carbon fuels that, when introduced to the market, increase supply and thus lower worldwide prices, resulting in increased consumption and increased emissions.

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 46 of 59

continental shelf.[113] Thus, NEPA applied to DOI's decision of whether to issue leases for any particular project. Failure to consider downstream greenhouse gas impacts was a NEPA error warranting reversal of that decision.[114] By contrast, DOI here was under a statutory obligation requiring it to establish the Program promoting oil and gas development and to conduct at least two lease sales to establish the Coastal Plain Program. In relying on *Liberty*, Defendants fail to recognize this distinction.

Defendants stress that in creating the Coastal Plain EIS and ROD, DOI used a model similar to that which was used in *Liberty*. Because of this, they assert that downstream greenhouse gas impacts were not included in the NEPA analysis.[115] But even if that is so, the dispositive statutory distinction remains, unrebutted by Defendants arguments: (1) *Liberty* was a discretionary leasing case, and thus lease issuance was subject to NEPA, (2) this case is a non-discretionary leasing case, and so lease issuance was not subject to NEPA.

DOI also cites to this Court's ruling regarding NEPA consideration of downstream greenhouse gasses in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, concerning the Willow project.[116] But again, *Sovereign Inupiat*, involved permissive rather than mandatory oil and gas leasing. *Sovereign Inupiat* concerned challenges to DOI's

---

[113] 43 U.S.C. § 1337(a) (the agency "is ***authorized*** to grant…any oil and gas lease on submerged lands of the outer Continental Shelf.") (emphasis added). A grant of authority to take an action does not command the agency to take the action, it instead leaves the agency with discretion as to how to act.

[114] *Liberty* 982 F.3d at 736-740.

[115] DOI Response Br. at 20.

[116] 555 F. Supp. 3d 739, 762 (D. Alaska 2021).

approval of the Willow Master Development Plan, a development plan submitted by ConocoPhillips seeking authorization for development of the leases DOI previously issued to it in the NPRA. No <u>statute</u> required that DOI authorize the leases or approve the Master Plan. This Court rejected an argument that a <u>contract</u> (oil and gas leases signed by DOI) rendered approval of a Master Plan a mandatory non-discretionary agency action not subject to NEPA.[117] The Court ruled that the agency remained bound by NEPA and retained statutory authority and responsibility over the environmental consequences arising from the Willow Project. That holding illustrates the basic principle that an agency cannot contract away or limit its statutory duty to comply with NEPA. But this Court's ruling in *Sovereign Inupiat* did not alter the principal that another statute can command an agency to take an action, and thus remove that action from the NEPA analysis.[118]

DOI and Gwich'in-Intervenors also cite to *350 Montana v. Haaland* as a third authority holding that the failure to consider downstream greenhouse gas emissions violates NEPA.[119] But again, the agency action in question was discretionary: whether or not to grant a leaseholder's request to modify their federal coal lease to allow for expanded coal mining.[120] The mine was leased subject to the MLA. The statutory language of the

---

[117]    555 F. Supp. 3d at 766.

[118]    *See* Point II.A above, citing *Alaska Wilderness League,* 788 F.3d at 1225-26 and other cases applying *Public Citizen*. And unlike *Sovereign Inupiat*, where this Court determined DOI to be the "legally relevant cause" of environmental effects because it chose to issue the leases, Congress is the "legally relevant cause" of any changes to downstream greenhouse gas emissions, because the Tax Act required DOI to take the actions in question.

[119]    50 F.4th 1254 (9th Cir. 2022).

[120]    *Id.* at 1260.

AIDEA V. HAALAND, ET AL.                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 39 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 48 of 59

MLA provides that DOI "is authorized" (not directed) to issue leases for coal mining.[121] This "authorization" meant that DOI had discretion to issue leases, but was not required to do so. Thus, NEPA applied and DOI needed to consider greenhouse gasses.

Downstream greenhouse gas effects are an obvious and known result of Congress's § 20001 command to develop an oil and gas project. Congress accepted those effects.[122] If DOI concludes in its supplemental ROD that there are reasonable steps to mitigate greenhouse gas effects which are not inconsistent with the directive that the Coastal Plain be developed for oil and gas, DOI can order such mitigation measures, subject to AIDEA's ability to seek judicial review.[123]

### 2. 2,000 Surface Acres

DOI further justified lease cancellation based upon alleged NEPA violations resulting from a purported misreading of the 2,000-surface acre clause in the Tax Act. In its opening brief, AIDEA addressed why DOI's original reading of that clause was correct. Tellingly, in its response brief, DOI did not defend its revised interpretation.[124] The Gwich'in Intervenors' response defends DOI's new interpretation and allegations of error, but focuses too narrowly upon the meaning of the term "up to" at the expense of the

---

[121]    30 U.S.C. §§ 201(a), 1260(a).

[122]    This Court's consideration of downstream greenhouse gas emissions in the lease suspension case is not dispositive of the issue. 685 F. Supp. 3d at 851. Suspension of the leases to allow DOI time to develop mitigation measures through supplemental NEPA analysis could arguably be reconciled with the Tax Act's commands. By contrast, outright cancellation of the leases constituted the undoing of a statutorily mandated action and cannot be reconciled with the Tax Act. *See* AIDEA Opening Br. at 1-2, 11.

[123]    *See* AIDEA Opening Br. at 26-27.

[124]    DOI Response Br. at 19.

construction of the statute as a whole.[125] Recently, the Supreme Court has held that agencies' statutory construction is reviewed *de novo*.[126] Thus, there is no longer any thumb on the judicial review scales preferring DOI's new interpretation over its prior interpretation. And even if the Court finds DOI was free to change its views and adopt its new interpretation, that does not mean the prior interpretation was unlawful when DOI reached it in 2020, as it would have to be in order to be "error in the inception." Agencies often change their statutory interpretation after elections put new Administrations in power, but this does not retroactively invalidate prior agency actions.

Equally important, the lease agreements do not address the 2,000-surface acre clause and do not resolve how many acres of surface development are allowed. AR 3320. That issue is addressed in the 2020 ROD, which DOI can revise if warranted. Thus, any alleged error due to this statutory interpretation issue does not implicate the lawfulness of the leases. DOI fails to recognize that even if the agency had been required to undertake a more exhaustive NEPA review, cancellation of the leases shared no nexus to the alleged harm. Cancellation does not correspond with the alleged error. It is disproportional and arbitrary.

DOI responds that proportionality and reasonableness limitations on remedy only apply to remedies issued by Article III courts, as opposed to by agencies.[127] But these

---

[125]    Gwich'in Response Br. at 20-23.

[126]    *Loper Bright Enterprises* 2024 WL 3208360 at *12 ("agency interpretations of statutes—like agency interpretations of the Constitution—are not entitled to deference.")

[127]    DOI Response Br. at. 21.

AIDEA V. HAALAND, ET AL.                                        CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V        PAGE 41 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 50 of 59

limitations <u>do</u> apply to agencies which determine remedies.[128] Indeed, in the Lease Cancellation Decision, DOI cited to Article III court caselaw on remedies when justifying cancellation, making it surprising that the agency's litigation counsel now contends that agencies are free to select any remedy they wish. AR 5355. Moreover, review of arbitrary and capriciousness concerns both the merits of the agency's legal justifications and an assessment of the action itself.[129] The agency must provide "a rational connection between the facts found and the choices made."[130] Cancelling the leases was not rational when the leases themselves made no guarantees to surface development and more tailored and proportionate remedies were available through amendments in the supplemental ROD.

Defendants assert that DOI "considered and reasonably explained why…mitigation alone would not appropriately address the Program's serious pre-leasing legal defects," citing to two portions of the decision: AR 5355, n.4 and 5358.[131] But DOI's purported explanation is nowhere to be found. Note 4 of the Lease Cancellation Decision states:

> The BLM has occasionally sought to address procedural errors by completing an additional process *post hoc* (e.g., additional NEPA analysis to address a NEPA error), and then determining whether the leases should be cancelled. … Nothing obligates BLM to take such an approach and, for the reasons set forth below, further process is inappropriate in this case given the gravity of the errors and the minimal consequences of cancellation.[132]

---

[128]    *See Diamond Ring Ranch v. Morton*, 531 F.2d 1397, 1407 (10th Cir. 1976) (setting aside grazing permit suspension by Forest Service as an excessive remedy.

[129]    *Nat. Tel. Coop. Assoc. v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (arbitrary and capricious standard requires that agency action be "reasonable and reasonably explained").

[130]    *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

[131]    DOI Response Br. at 21.

[132]    AR 5355 n. 4 (citations omitted).

AIDEA V. HAALAND, ET AL.                                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V                 PAGE 42 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 51 of 59

This footnote does not adequately explain the basis for the lease cancellation. In the footnote, DOI cites authorities confirming that DOI can address NEPA issues without vacating the challenged agency action, but does not persuasively explain why that available process was "inappropriate" in these circumstances. Significantly, DOI's failure to provide due process to AIDEA prevented DOI from hearing AIDEA's input on this and other questions concerning DOI's choice of remedy.[133] Nor does this footnote or other portions of DOI's decision explain why more proportionate remedies that cure the alleged errors could not be used. Further, lease cancellation has far more than "minimal consequences" for AIDEA. DOI has proposed to auction off the acres that AIDEA had leased, putting AIDEA at risk of losing those acres to someone else. AR 5358.

DOI ultimately reiterates that it "determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing the underlying issues in a completely new analysis…" It concludes that "cancelling these leases before consummation of the NEPA process to support a 2024 sale as required by the Tax Act will enable the Department to "consider" selling "some or all of the areas at issue in these leases" in the second lease sale." AR 5358. Far from offering a "reasonable explanation" as to why it concluded that mitigation alone would not appropriately address the Program's "serious pre-leasing legal defects," the portions of the administrative record upon which DOI relies answer that question with the

---

[133] The lack of due process rebuts Defendants' arguments that AIDEA should have made to DOI each of its points regarding proportional remedies and mitigation.

proverbial "because I said so." DOI failed to provide a rational explanation as to why cancellation rather than more proportional cures was necessary or proper.

Finally, the Gwich'in advance a separate argument that the supposed NEPA violations stemming from the 2,000-surface-acre issue tainted AIDEA's leases. Specifically, they suggest that had DOI "properly" interpreted the 2,000-surface-acre provision, it would have considered a wider array of lands for lease under different terms and conditions that allow for less surface development.[134] This speculative argument confuses the issues. First, as discussed above, Tax Act § 20001(c) took away DOI's discretion as to the number and type of acres to be leased. The Tax Act required DOI to lease no fewer than 400,000 acres of land on the Coastal Plain, and that those acres be lands with the highest potential for the discovery of hydrocarbons. Second, the Gwich'in mixes apples (leased acres) and oranges (surface development acres). The inclusion of any given acre in the very large number of acres leased for oil and gas purposes does not mean that AIDEA is free to develop that same acreage at the surface. The small number of surface acres that AIDEA could ultimately develop are not selected by the lease or identified in the leases. Applications to develop particular surface areas come later in the process. When such applications are filed, the Gwich'in will remain free to advocate that particular surface areas be exempted from development. Further, subject to judicial review, DOI can modify

---

[134]     Gwich'in Response Br. at 22.

AIDEA V. HAALAND, ET AL.                                           CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V                PAGE 44 OF 50
1703914

Case 3:24-cv-00051-SLG     Document 65     Filed 08/02/24     Page 53 of 59

the 2020 ROD to put additional acres off limit from surface development, without changing the leases. The lease terms do not guaranty the right to develop particular surface areas.[135]

### 3. DOI Did Not Err in its ANILCA § 810 Subsistence Analysis

It is unclear whether DOI includes ANILCA § 810's subsistence analysis requirements as a justification for lease cancellation.[136] DOI did not address alleged subsistence errors in its brief. The Gwich'in Intervenors take the position that BLM's subsistence analysis was <u>not</u> a justification for the cancellation decision.[137] The Venetie Intervenors assert that DOI properly acknowledged that the Final EIS and ROD contained flawed analyses that do not adequately review potential effects on subsistence hunting.[138] But any alleged subsistence errors cannot be used to support lease cancellation if, as seems to be the case, DOI did not actually rely upon those errors as a justification for cancellation. Further, the alleged defects in subsistence analysis appear to arise from the same arguments that DOI failed to consider alternatives authorizing fewer than 2,000 surface acres.[139]

Even if the Court determines DOI erred in its subsistence analysis, lease cancellation again was not a remedy reasonably necessary to address any potential harm. AIDEA's lease agreements did not insulate AIDEA from further subsistence analysis and oversight. The §810 subsistence analysis was a preliminary analysis for the Program as a whole. The 2020

---

[135]    Given directional drilling, there is flexibility in deciding which acres out of the over 350,000 acres leased to AIDEA should be the small number with surface development.

[136]    AIDEA Opening Br. at 47.

[137]    Gwich'in Response Br. at 18, n. 99.

[138]    Venetie Response Br. at 30.

[139]    AIDEA Opening Br. at 47-49.

AIDEA V. HAALAND, ET AL.                                          CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V          PAGE 45 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 54 of 59

ROD acknowledged that prior to approving any on-the-ground activities additional project-specific subsistence evaluations will be conducted. AR 3169-70. DOI can remedy any prior errors in its subsistence analysis through its forthcoming supplemental ROD, which would govern AIDEA's leases. There was no reason to frustrate the statutory duty to complete lease sales by December, 2021 by unilaterally cancelling all remaining leases in 2023.

### 4. DOI Failed to Provide Opportunity to Cure Under 5 U.S.C. 558(c)(2)

As discussed, 5 U.S.C. § 558(c)(2) required DOI to provide statutory due process, i.e. to provide AIDEA as licensee with an opportunity to demonstrate there was no illegality in the issuance of the leases justifying lease cancellation.

In its opening brief, AIDEA also detailed another feature of § 558(c)(2): the requirement that the licensing agency afford the licensee the "opportunity" to "achieve compliance with all lawful requirements." In other words, a right to cure non-compliance that could otherwise justify license cancellation.[140] In their oppositions, Defendants make the superficially attractive but over-stated argument that only an agency can cure its own NEPA violations. There are indeed scenarios in which there is nothing the licensee could do to assist the agency in a cure of errors. One example is where DOI issues a lease / license to the wrong claimant when another has a superior right, as in *Boesche.* Another might be where DOI issues a lease / license on a discretionary basis without adequate NEPA analysis, as in *Liberty, supra*. But there are also scenarios where the licensee can assist the licensor agency in "achiev[ing] compliance," including where the agency is required by

---

[140]      AIDEA Opening Br. at 28 (quoting 5 U.S.C. § 558(c)(2)).

AIDEA V. HAALAND, ET AL.                                           CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V           PAGE 46 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 55 of 59

statute to take an action, but has some level of discretionary control over mitigation, which is the situation here. The licensee is the party that will be engaging in the on-the-ground work that will trigger the environmental consequences to be mitigated, and can alter its plans to address issues and comply with additional mitigation measures.

DOI admits that it made no such effort to work with AIDEA to cure the NEPA or other violations that DOI claims to have committed.[141] Because DOI was obligated to complete lease sales, which means issuing leases, this is a situation where NEPA analysis pertains to mitigation. Therefore, a licensee can assist in achieving a cure. For example, AIDEA could comply with any lawful new restrictions on the maximum number of surface acres to be developed, or how to limit impact on subsistence hunting.

Section 558(c)(2) requires there be an opportunity "to achieve" compliance with "all lawful requirements." The text of the statute is not limited to curing breaches and violations that are committed by the licensee.[142] The APA was enacted "as a solemn undertaking of official fairness" by the United States, in order to uphold "fair play," and to "lighten[] the burden of those on whom the laws may impinge."[143] Defendants misread the spirit as well as the text of the APA in their efforts to neuter their cure obligation when the licensing agency's error put an innocent licensee's license in jeopardy.

---

[141]    Answer to Amended Complaint, ¶ 51. *See* AIDEA Opening Br. at 27-29.

[142]    Cases construing § 558 in a situation involving a breach by the licensee naturally emphasize the licensee's opportunity to cure his own transgressions. These opinions did not consider the situation in which the licensing agency has committed curable error.

[143]    Senate Document No. 248, 79th Congress, 2nd Session (1946) ("Forward" page).

## III. Remedy: The Court Should Set Aside the Lease Cancellation Decision

Some Defendants urge the Court to consider leaving the lease cancellation in effect by way of a remand without vacatur, even if the Court finds DOI erred in cancelling the leases.[144] However, vacatur of the specific agency action taken in error is the presumptive and "normal" remedy.[145] The APA expressly provides that the "reviewing court *shall*…hold unlawful *and set aside* agency actions" that are contrary to law, made without proper procedures, or arbitrary and capricious. 5 U.S.C. § 706(2) (emphasis added).[146]

In light of this presumption, remand without vacatur is reserved for unusual circumstances. Remand without vacatur is appropriate when: (1) the agency's errors are not serious, such as a failure to adequately explain a decision that may well have been substantively correct, and (2) vacatur of the agency action at issue would impose undue disruption on the parties.[147] Courts routinely deny requests for remand without vacatur where the agency's error is serious (as is usually the case if the plaintiff prevails), where

---

[144] DOI asks for separate briefing on remedy, but cites in its brief the applicable law regarding remand without vacatur. DOI Response Br. at 41. As the party seeking to overcome the APA's presumption of vacatur, DOI has had every opportunity to initiate and brief that question. Additional briefing is not warranted. *See* Local Rule 16.3.

[145] *All. for the Wild Rockies v U.S. Forest Service,* 907 F.3d 1105, 1121 (9th Cir. 2018).

[146] By the same token, other agency actions bearing some relationship to an erroneous agency action may not themselves be erroneous and so should not be vacated. *See* AIDEA Opening Br. at 25-26.

[147] *See California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)) (both cited by DOI in its Response Brief at 41).

the plaintiff would be harmed, or where vacatur would not have substantial on-the-ground effects that would be difficult to reverse if the original agency order was later reinstated.[148]

Here, DOI's errors were serious rather than minor and transitory. DOI retroactively frustrated the statutory direction that DOI issue leases by December, 2021 by unilaterally cancelling the leases after that date. DOI flagrantly disregarded AIDEA's constitutional and statutory due process rights. AIDEA is aware of no cases where a remand without vacatur was granted in response to a due process violation directly related to the challenged action. Such a toothless remedy would incentivize agencies to shoot first and solicit the necessary input from affected parties later, only if someone complains. Cancellation harmed AIDEA, terminating its exclusive rights to produce oil and gas on 365,000 acres.[149]

Moreover, because the Court has already affirmed suspension of AIDEA's leases, a simple vacatur will not cause disruption, but rather, will avoid it. Setting aside the lease cancellation will restore the stable status quo. It will preclude DOI from doing what it has threatened in its Lease Cancellation Decision: auctioning off to a third party in the upcoming December, 2024 auction the acres leased to AIDEA.[150] In the meantime, while DOI finishes its supplemental NEPA work, AIDEA can proceed with the planning necessary for this project, but not with the on-the-ground development work for its

---

[148]    *See Alaska Oil & Gas Ass'n v. Jewell,* 2013 WL 11897792, at *7 (D. Alaska May 15, 2013) ("When a court determines that an agency's action failed to follow Congress's clear mandate or where a regulation is promulgated in violation of the APA and the violation is not harmless, the appropriate remedy is to vacate that action."); *see, e.g., Migrant Clinicians Network v. U.S. Env't Prot. Agency,* 88 F.4th 830, 848 (9th Cir. 2023); *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 960 F.3d 1120, 1145 (9th Cir. 2020).

[149]    AIDEA Opening Br. at 13, n. 27, 23-24 and 49.

[150]    AR 5358; Tax Act § 20001(c)(1) (requiring second lease sale by December, 2024).

AIDEA V. HAALAND, ET AL.                                    CASE NO. 3:24-CV-00051-SLG
PLAINTIFF AIDEA'S REPLY BRIEF ON COUNTS I, II(A), III, IV, AND V              PAGE 49 OF 50
1703914

Case 3:24-cv-00051-SLG    Document 65    Filed 08/02/24    Page 58 of 59

suspended leases.[151] By contrast, remand without vacatur invites chaos by opening the door to DOI auctioning off the acres covered by AIDEA's still-cancelled leases. Applying the presumptive APA remedy and setting aside the lease cancellation avoids the risk of two lessees having claim to the same acres and is the right remedy here.

## IV.  Conclusion

For these reasons above, and in AIDEA's opening brief, the Court should grant summary judgment in AIDEA's favor and vacate DOI's Lease Cancellation Decision.

DATED this 2nd day of August, 2024.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By:   /s/ *David K. Gross*
James Lister, ABA #1611111
Brian V. Gerd, ABA #1810097
David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 2nd day of August, 2024, a true and correct copy of the foregoing was served on all parties to this case via the Court's CM/ECF electronic delivery system:

BIRCH HORTON BITTNER & CHEROT

By:   /s/ *David K. Gross*

---

[151]  *See* AIDEA Opening Br. at 27 and n. 41.