

**U.S. Department of the Interior**
**Bureau of Land Management**

# Coastal Plain Oil and Gas Leasing Program

## Environmental Impact Statement

# *FINAL*

## Volume I: Executive Summary, Chapters 1-3, References, and Glossary

### September 2019

Prepared by:

US Department of the Interior
Bureau of Land Management

In cooperation with:

US Fish and Wildlife Service
US Environmental Protection Agency
Native Village of Kaktovik
Native Village of Venetie Tribal Government
Venetie Village Council
Arctic Village Council
North Slope Borough
State of Alaska

Estimated Lead Agency Total
Costs Associated with Developing
and Producing this EIS: $3,970,000

AR00001

be subject to controlled surface use (CSU). Alternative D1 would have no areas subject to TLs but would have approximately 204,700 acres subject to only standard terms and conditions.

Under Alternative D2, 800,000 acres would be offered for lease. Of those acres, 505,800 acres would be subject to NSO, 105,200 acres would be subject to controlled surface use (CSU), 189,000 acres would be subject to TLs, and no areas subject to standard terms and conditions. The BLM reduced the amount of land available for leasing under Alternative D2, based on public comments received on the Draft EIS. This revision prioritizes high potential areas available for lease, while providing additional consideration for caribou calving and post-calving habitat (areas along the coast of Camden Bay and east of the mouth of the Niguanak River), expansion of existing buffers, and expansion of lands adjacent to springs and aufeis[1] habitats. Alternative D2 reflects the total minimum acreage that PL 115-97 requires to be offered in two mandated lease sales.

The complete list of lease stipulations and ROPs under each alternative is presented in **Table 2-3** in **Chapter 2**.

## HYPOTHETICAL DEVELOPMENT SCENARIO

The BLM developed a hypothetical development scenario for oil and gas exploration, development, production, and abandonment in the PL 115-97 Coastal Plain. This hypothetical development scenario projects the reasonably foreseeable oil and gas exploration, development, production, and abandonment/reclamation over the expected life of the program. Of the approximately 1,563,500 acres of federal land in the Coastal Plain, an estimated 427,900 acres are projected to have high potential for petroleum resources, 658,400 acres have medium potential, and 477,200 acres have low potential. The hypothetical baseline scenario assumes all potentially productive areas can be open under standard lease terms and conditions, except those areas outside the BLM's oil and gas leasing authority. This unconstrained scenario represents the maximum level of development that could occur in the program area with no management restrictions except those mandated by law. **Appendix B** contains a more detailed description of these activities and the resources that would be required under each phase.

The BLM used the unconstrained hypothetical development scenario for each alternative, based on differing terms and conditions relating to environmental protection. It did this so that it could analyze a range of impacts on resources. Section 20001(c)(3) of PL 115-97 states that the Secretary shall authorize up to 2,000 surface acres of federal land on the Coastal Plain to be covered by production and support facilities during the term of the leases (see **Section 1.9.1**). **Table ES-2**, below, shows the hypothetical projected facilities and the associated surface disturbance estimates by alternative that would occur after applying discretionary management decisions.

The program area contains an estimated mean of 7.687 billion barrels of technically recoverable oil and 7.04 trillion cubic feet (TCF) of technically recoverable natural gas (Attanasi 2005). Due to high costs associated with operating in the Arctic, it is extremely unlikely that all technically recoverable resources would be produced. The US Energy Information Administration estimated that a total mean of approximately 3.4 billion barrels of oil (BBO) would be produced in the Arctic Refuge by 2050 (Van Wagner 2018). Estimated natural gas production from the Coastal Plain ranges from 0 to 7 TCF of gas produced (Attanasi 2005). See **Appendix B** for more information on development potential, assumptions behind potential estimates, and estimates for the baseline future hypothetical development scenario for petroleum.

---

[1] German for "ice on top"; it is a sheet-like mass of layered ice that forms from successive flows of groundwater during freezing temperatures.

The BLM is undertaking this Leasing EIS to implement the leasing program consistent with PL 115-97. The Leasing EIS will serve to inform the BLM's implementation of PL 115-97, Section 20001(c)(1), which is the requirement to hold multiple lease sales. It may also inform post-lease activities, including seismic and drilling exploration, development, and transportation of oil and gas in and from the Coastal Plain. Specifically, the Leasing EIS considers and analyzes the environmental impact of various leasing alternatives, including the areas to offer for sale, and the indirect impacts that could result, in consideration of the hypothetical development scenario. All action alternatives were designed to meet Section 20001 of PL 115-97 and to account for all purposes of the Arctic Refuge. The alternatives analyze various terms and conditions (i.e., lease stipulations and ROPs) to be applied to leases and associated oil and gas activities, to properly balance oil and gas development with protection of surface resources.

This Leasing EIS evaluates which lands to offer to lease and what terms and conditions to apply to those leases; it does not in itself authorize on-the-ground exploration or development. Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the site-specific proposal. For example, before drilling on any lease, an operator would be required to submit an application for permit to drill, which would require appropriate NEPA analysis (as well as compliance with other applicable laws) before any drilling could be authorized. Potential applicants would be subject to the terms of the lease; however, the BLM Authorized Officer may require additional site-specific terms and conditions before authorizing any oil and gas activity based on the project level NEPA analysis.

## 1.3 DECISIONS TO BE MADE

The BLM's decisions will include which tracts of land will be offered for lease and the terms and conditions to be applied to such leases and subsequent authorizations for oil and gas activities. The decisions evaluated in this Leasing EIS and its ROD would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources in the Coastal Plain.

The USFWS continues to manage all federal lands in the Arctic Refuge Coastal Plain, including both potential leased and unleased areas; however, the BLM manages all aspects of the oil and gas program, including the issuance and administration of oil and gas leases, and permitting of all oil and gas activities. Although the BLM intends to consult with the USFWS, as noted in **Table 2-3** (footnote 1) when making oil and gas program decisions, Section 20001(a)(2) and (b)(2)(A) of PL 115-97 assigns the BLM the sole responsibility for making such decisions.

## 1.4 PROGRAM AREA

The USFWS is the predominant land manager in the program area. Other lands in the Coastal Plain include Alaska Native lands conveyed pursuant to ANCSA and Native allotments (see **Table 1-1**).

### Table 1-1
### Land Administration Included in PL 115-97 Coastal Plain

| Subject to the BLM's Oil and Gas Leasing Authority | Acres | Outside the BLM's Oil and Gas Leasing Authority | Acres |
|---|---|---|---|
| USFWS-managed lands, including submerged lands | 1,562,600 | Native-conveyed | 24,400 |
| Native allotment | 900 | Native-selected | 4,400 |
| **Total** | **1,563,500** | **Total** | **28,800** |

Source: BLM GIS 2018
Note: Acreages are rounded to nearest 100.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 3 of 201
AR0026

facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

The BLM interprets this provision as limiting to 2,000 the total number of surface acres of *all* federal land across the Coastal Plain, regardless of whether such land is leased, which may be covered by production and support facilities *at any given time*. Under this interpretation, production and support facilities not authorized by an oil and gas lease (e.g., off-lease pipelines or roads authorized by a right-of-way grant), would be counted toward the 2,000-acre limit as would on-lease production and support facilities, and reclaimed acreage of Federal land formerly containing production and support facilities would no longer count towards the 2,000-acre limit. The limit does not apply to production and support facilities located on non-federal lands, including Native allotments and land owned by ANCSA corporations.

The BLM interprets this limitation to generally refer to acres of land directly occupied by non-ephemeral facilities (i.e., those that occupy the land for more than one winter season) that are primarily used for the purpose of development, production, and transportation of oil and gas in and from the Coastal Plain. In applying that standard, 1) "facility" is given its ordinary dictionary definition, which is something that is built, installed, or established to serve a particular purpose; here, the development, production, and transportation of oil and gas in and from the Coastal Plain; 2) the limitation does not apply to surface disturbance indirectly related to or resulting from those facilities; and 3) the limitation applies only to those portions of oil and gas facilities that touch the land; thus, the BLM interprets the types of "production and support" facilities that will count toward the 2,000-acre limit as including any type of gravel or other fill constructed facility which touches the land, to include:

- Gravel pads used for production or processing facilities (including wells), pump or compressor stations, and lodging facilities for workers
- Gravel airstrips or roads
- Any other area covered by gravel berms or piers for support of pipelines

Examples of types of facilities that would not count toward the 2,000-acre limit include the portion of facilities that do not touch the land (e.g., elevated pipelines), and facilities constructed with snow or ice (e.g., snow trails and ice roads/pads). In addition, the BLM interprets "production and support facilities" to include gravel mines used to supply mineral materials for construction and maintenance of oil and gas facilities within the Coastal Plain; specifically, the unreclaimed portions of land that have undergone excavation of mineral materials or contain stockpiles of mined mineral materials. For purposes of impact analysis, the BLM employs this interpretation as an assumption in each of the action alternatives analyzed in the EIS.

See **Section S.1.2** of **Appendix S** for a detailed explanation of the basis for the foregoing interpretation. See also **Table S-1** of **Appendix S**, which includes the BLM's response to public comments received on the interpretation included in the Draft EIS.

## 1.10 ANILCA SECTION 810 EVALUATION

Section 810 of ANILCA focuses on issues related to the effects of proposed activities on subsistence use. An ANILCA Section 810 notice and public hearing process is required if a proposed action may significantly restrict subsistence uses and needs. A final evaluation and finding of effects on subsistence uses and needs from actions that could be undertaken under the four alternatives considered in this EIS is provided in **Appendix E**. The preliminary evaluation, published with the Draft EIS, found that the cumulative case presented in the EIS met the "may significantly restrict" threshold for the community of Kaktovik; therefore,

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 4 of 201
AR0031

it made a positive finding pursuant to ANILCA Section 810. As a result, a public subsistence hearing was held in the potentially affected community of Kaktovik on February 5, 2019 in conjunction with the Draft EIS public meeting. The final evaluation made the same findings as the preliminary evaluation, concluding that the cumulative case presented in the EIS met the "may significantly restrict" threshold for the community of Kaktovik.

## 1.11 TRANSLATION

Using BLM funds provided through the Bureau of Indian Affairs, the Arctic Village Council translated and distributed key sections of the Draft EIS into the Gwich'in language. The key sections were the **Executive Summary**, **Chapter 2**: Alternatives, **Chapter 3**: Cultural Resources, Subsistence Uses and Resources, and **Appendix E**: ANILCA Section 810 Preliminary Evaluation. In addition, translators were available in Arctic Village, Venetie, Kaktovik, and Utqiagvik for public testimony during the scoping and Draft EIS public meetings.

This Final EIS may be translated into a language other than English to facilitate public participation in the decision process. The English-language version has been prepared by the BLM and is the official version of the document for all purposes. Any translated version of this document has been prepared for the convenience of non-English-speaking members of the public. In the event of any discrepancy, the English-language version controls.

## 2.3   ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS

### 2.3.1   Renewable Energy Alternative

An alternative that considers development of alternative or renewable energy was considered but eliminated from detailed analysis. Such an alternative does not meet the purpose and need for an oil and gas program on the Coastal Plain and is not consistent with PL 115-97.

### 2.3.2   Deferred Leasing

An alternative that considers deferring leasing was considered but eliminated from detailed analysis because PL 115-97 requires the BLM to hold a minimum of two lease sales, that offer not fewer than 400,000 acres each by 2024, the first of which must be held by December 2021. Further, such an alternative would have essentially the same impacts as the action alternatives already analyzed.

### 2.3.3   No Waivers, Modifications, and Exceptions

An alternative that would disallow waivers, modifications, or exceptions to any lease stipulation or required operating procedure was considered but eliminated from detailed analysis because it was not reasonable or practicable. There are several lease stipulations and required operating procedures that do not allow waivers, modifications, or exceptions; however, it is not reasonable to eliminate the potential for such flexibility for all lease stipulations and required operating procedures, particularly if in accordance with 43 CFR 3101.1-4 the factors leading to the adoption of the lease stipulation or required operating procedure have changed sufficiently to make the protection it provides no longer justified or if the proposed operation would not cause unacceptable impacts. Also, in some cases it is not practicable to comply with all lease stipulations and required operating procedures. For example, in specific areas it may be impossible to avoid certain setbacks in the construction of linear features such as pipelines.

### 2.3.4   Less Than 2,000 Acres of Surface Facilities

An alternative that allowed less than 2,000 acres of surface facilities would be inconsistent with PL 115-97 as Congress explicitly established the protective facility acreage limit. Section 20001(c)(3) of PL 115-97 states "the Secretary shall authorize up to 2,000 surface acres … to be covered by production and support facilities." BLM cannot administratively modify this explicit statutory limitation.

### 2.3.5   Preclude Future Development or Only Allow Contiguous Development

An alternative that precludes development is not consistent with PL 115-97, which requires the BLM to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain and to hold at least two lease sales of not fewer than 400,000 acres each. Oil and gas leases gives lessees the right to develop the oil and gas underlying the leases. Precluding development would not allow reasonable access to any leases purchased. Similarly, allowing only contiguous development may also preclude reasonable access to leases purchased if they are not next to each other.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 6 of 201
AR0076

part of Township 6 North, Range 36 East) are along intermittent tributaries up to 5 miles west of the Niguanak River.

As indicated above, for all action alternatives ROP 35 stipulates developing and implementing an abandonment and reclamation plan to restore previous conditions. Under Alternative D, ROP 35 includes the following additional reclamation plan requirements that would minimize the risk of slope failure:

- Implementing measures to control erosion, landslides, and water runoff
- Reshaping the area disturbed, applying the topsoil, and revegetating disturbed areas, where reasonably practicable

*Transboundary Impacts*

Impacts on the geologic and mineral resources described in this section are site specific and, as such, no transboundary impacts would occur under any of the alternatives.

**Cumulative Impacts**

The geographic area relevant for assessing cumulative impacts for geology and minerals is the program area. No other past, present, and reasonably foreseeable future actions that could affect geology or mineral resources have occurred or are expected to occur in the program area. The effects of climate change described under *Affected Environment* above, could influence the rate or degree of potential geologic hazards. Alternative A would have no contribution to cumulative impacts on geology and minerals.

### 3.2.6   Petroleum Resources

#### Affected Environment

*Regulatory Information*

Section 20001 of PL 115-97 directs the BLM to undertake an oil and gas leasing program in the Coastal Plain (also known as the 1002 Area) of the Arctic Refuge. Under the ANILCA, the Coastal Plain was not designated wilderness, and Congress reserved the area for potential future oil and gas development. The USFWS Revised CCP (2015a) recommended the area for wilderness designation and the area has been managed for wilderness characteristics. PL 115-97 opened all federal lands in the Coastal Plain to leasing, however, Alaska Native selected lands within the program area boundary remain segregated from mineral leasing due to their selected status. PL 115-97limited surface development from oil and gas production and support facilities to a maximum of 2,000 acres.

*Oil and Gas Resources*

The Coastal Plain encompasses approximately 1,563,500 acres. Currently no acreage is open to petroleum leasing. It is estimated that approximately 427,900 acres of the program area are projected to have high potential for petroleum resources, 658,400 acres are projected to have moderate potential, and 477,200 acres are projected to have low potential. Estimates are based on best available information, but due to the limited amount of exploration that has occurred in the area, petroleum development potential and acreages should be considered rough estimates. The one exploration well drilled in the Coastal Plain is held as confidential information, so exact formation compositions and oil and gas percentages are not well established across the entire region. Existing oil and gas wells are shown in **Map 3-5** in **Appendix A**. See the hypothetical development scenario (**Appendix B**) for more information on development potential, assumptions behind potential estimates, and estimates for the baseline future development scenario for petroleum.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 7 of 201
AR0122

Approximately 80 percent of petroleum resources are estimated to be in the undeformed western portion of the program area (USGS 1998b). As shown in **Table 3-10**, the identified potential plays in the undeformed area are the Topset play, Thompson play, Turbidite play, Wedge, Kemik, and Undeformed Franklinian. Potential plays in the deformed area are the Thin-Skinned Thrust Belt, Ellesmerian Thrust Belt, Deformed Franklinian, and Niguanak/Aurora (Attanasi 2005).

All oil and gas volumes represent the mean estimated technically recoverable volumes unless otherwise noted. The Topset is expected to be the primary play in the Coastal Plain, with an estimated technically recoverable 4.325 BBO and 1.193 TCF of gas. The Turbidite play is the second most productive, with an estimated technically recoverable 1.279 BBO and 1.120 TCF of gas. In the deformed area, the Thin-Skinned Thrust Belt is the primary play, with an estimated technically recoverable 1.038 BBO and 1.608 TCF of gas (Attanasi 2005). In total, the undeformed area is estimated to contain a technically recoverable total of 6.420 BBO and 3.424 TCF of gas, and the deformed area is estimated to contain a technically recoverable total of 1.267 BBO and 3.617 TCF of gas. Natural gas liquids would also be produced as part of the oil and gas production process. Additional exploration would take place to refine knowledge of the geology and petroleum resources of the area should one of the action alternatives be implemented.

**Table 3-10**
**Estimated Mean Undiscovered Petroleum Resources in the Coastal Plain**

| Area | Play Name | Oil (BBO) | Gas (TCF) | Natural Gas Liquids (Billion Barrels of Liquid) |
|------|-----------|-----------|-----------|--------------------------------------------------|
| **Undeformed** | Topset | 4.325 | 1.193 | 0.010 |
| | Turbidite | 1.279 | 1.120 | 0.065 |
| | Wedge | 0.438 | 0.226 | 0.005 |
| | Thompson | 0.246 | 0.470 | 0.039 |
| | Kemik | 0.047 | 0.116 | 0.010 |
| | Undeformed Franklinian | 0.085 | 0.30 | 0.029 |
| | *Undeformed subtotal* | *6.420* | *3.424* | *0.159* |
| **Deformed** | Thin-Skinned Thrust Belt | 1.038 | 1.608 | 0.017 |
| | Ellesmerian Thrust Belt | 0.000 | 0.876 | 0.018 |
| | Deformed Franklinian | 0.046 | 0.86 | 0.046 |
| | Niguanak/Aurora | 0.183 | 0.273 | 0.016 |
| | *Deformed subtotal* | *1.267* | *3.617* | *0.096* |
| **Total** | - | **7.687** | **7.041** | **0.225** |

Source: Attanasi 2005
Note: Totals are technically recoverable amounts; oil associated gas and natural gas liquid estimates were combined with non-oil associated gas and natural gas liquid estimates.

*Trends*

Due to the prior prohibition on leasing, there has been no development of oil and gas resources in the Coastal Plain to date. Section 1002 of ANILCA identified the Coastal Plain for studying the potential oil and gas leasing and development, and there has been interest from some ANCSA corporations in developing the Coastal Plain ever since 1980, when the 1002 Area was identified (Doyon Limited 2018; Rexford 2017). The area has had limited exploration; as further exploration occurs, a greater understanding of the size and characteristics of petroleum resources would be gained.

Ninety percent of technically recoverable resources were estimated to be economically recoverable at $55/barrel (2005 dollars, approximately $70/barrel in 2018 dollars; Attanasi 2005). The threshold price to initiate exploration was estimated to be from $20 to $21/barrel (2005 dollars). (The economics may have changed significantly since that study was published.) As of August 2018, the price of West Coast crude was approximately $75/barrel and the price of West Texas Intermediate crude was approximately $65/barrel. The

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 8 of 201
AR0123

US Energy Information Agency forecasts the price of crude oil to steadily rise to over $85/barrel over the next 10 years (EIA 2018).

### Direct and Indirect Impacts

Issuance of oil and gas leases under the directives of Section 20001(c)(1) of PL 115-97 would have no direct impacts on the environment because by itself a lease does not authorize any on the ground oil and gas activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to further environmental review and reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease. The impacts of such future exploration and development activities that may occur because of the issuance of leases are considered potential indirect impacts of leasing. Such post-lease activities could include seismic and drilling exploration, development, and transportation of oil and gas in and from the Coastal Plain; therefore, the analysis considers potential impacts on petroleum resources from on-the-ground post-lease activities.

### Alternative A

Under Alternative A (No Action Alternative), no federal minerals in the Coastal Plain would be offered for future oil and gas lease sales. Alternative A would not establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain in the Arctic Refuge. Current management actions would be maintained, and resource trends would continue, as described in the Arctic Refuge CCP (USFWS 2015a). No future extraction or use of petroleum resources would occur and as a result no potential direct or indirect impacts on petroleum resources from future oil and gas exploration, development, and production would occur.

### Impacts Common to All Action Alternatives

Potential future impacts on petroleum resources under all action alternatives can reasonably be expected to result in the irreversible commitment of petroleum hydrocarbon resources of the PL 115-97 through future oil and gas exploration, development, and production; however, the stated purpose of this EIS is to facilitate petroleum leasing, development, and production.

Potential impacts on petroleum resources would vary based on the amount of acreage available for leasing and restrictions on future access to available acreage. Under all action alternatives, surface development is expected to reach the 2,000-acre maximum. The approach for allocating the 2,000 acres of allowable production and support facilities would be generally described in the detailed statement of sale accompanying the notice of sale for the first lease sale. Mean estimates for the program area suggest it contains approximately 7.687 billion barrels of technically recoverable oil and 7.04 TCF of technically recoverable natural gas (Attanasi 2005). Due to high costs associated with operating in the Arctic it is extremely unlikely that all technically recoverable resources would be produced. The US Energy Information Administration estimated that a total of approximately 3.4 BBO would be produced in the Arctic Refuge by 2050 (Van Wagner 2018). Oil would be transported to market by a connection to the TAPS.

Given the uncertainty involved in defining undiscovered resources in the program area, attempting to define variances in production by alternative is too speculative to provide value in the analysis. NSO restrictions could require that well pads be located outside optimal locations for the most efficient oil recovery under some alternatives; however, horizontal drilling technology would allow operators to recover oil and gas from NSO areas. Under some alternatives, additional pads could be required to access all areas, potentially decreasing the overall volume of oil and gas that would be economically recoverable.

*Coastal Plain Oil and Gas Leasing Program*
*Final Environmental Impact Statement*

in Beaufort Sea nearshore environments until they are sexually mature (approximately age 8). Upon reaching maturity, they return to their natal water bodies in tributaries of the Mackenzie River in Canada (Moulton et al. 2010). Impacts on Arctic cisco (and other highly migratory species) in Alaskan waters can have population level impacts on the species in Canadian waters.

### Cumulative Impacts

Past and present actions in the program area have been limited and thus have had limited effects on aquatic species and habitats. Past, present, and reasonably foreseeable actions that may contribute to cumulative impacts are infrastructure development, area-wide geophysical exploration, future oil and gas activities in the Prudhoe Bay area, and climate change. Impacts from these actions would generally affect fish and aquatic species through habitat alterations and disturbance, as described below, and would have a cumulative effect.

Infrastructure developed for the community of Kaktovik may have indirectly affected or may be affecting aquatic habitats and species by contributing dust and gravel spray to streams, altering habitat by withdrawing water, and disturbing or displacing fish due to noise. Impacts from area-wide geophysical exploration, including seismic activities, may change hydrology and water quality, potentially affecting fish habitat, if surface damage results in thermokarst and water channel formation.

It is likely that past, present, and reasonably foreseeable future oil and gas activities in the Prudhoe Bay area may increase the quality and quantity of infrastructure. This would make oil and gas development in the program area more profitable or likely to occur. and would add to the cumulative effect of habitat alteration and disturbance to aquatic species. This would come about by increasing the potential for impacts on fish and aquatic species.

The effects of climate change, described under *Affected Environment* above, could influence the rate or degree of the potential cumulative impacts. These would include alterations to fish and aquatic species habitats due to changes in surface water quantity and quality. These impacts would worsen and add to impacts from other past, present, and reasonably foreseeable actions by further reducing habitat suitability for fish and aquatic species.

Cumulative impacts on some fish species would come from the combination of certain activities, such as habitat alterations lead to movement of fish and further effects from habitat compression. For example, fish species such as Dolly Varden which do not show site-fidelity in their spawning or overwintering behavior may experience long-term deleterious stock related genetic impacts resulting from migrations from non-affected areas into affected areas (Brown et al. 2019).

All action alternatives would incrementally contribute to potential cumulative impacts on fish and aquatic resources from post-leasing oil and gas activities. Alternative B would have the greatest incremental contribution to potential cumulative impacts. This is because the entire program area could be offered for lease sale and there would be the fewest acres with NSO stipulations. Alternative D2 would contribute the leastto potential cumulative impacts because the amount of land available for leasing would be reduced to a maximum of 800,000 acres.

### 3.3.3 Birds

### Affected Environment

According to the USFWS (USFWS 2015a, Appendix F), 157 bird species have been recorded in the Arctic Refuge on the northern foothills of the Brooks Range, in the ACP (an area inclusive of the program area), and in adjacent marine waters (**Table J-13** in **Appendix J**). Sixty-eight of those species (46 percent) are confirmed

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 10 of 201
AR0182

breeders or permanent residents, or both; 11 are possible breeders, 40 species use the ARCP during staging or migration (29 of which are breeders or possible breeders), and 65 species occur as casual, accidental, or rare visitors.

With some exceptions described below, birds in the program area are migratory and are only present May to September (Young et al. 1995; Kuletz et al. 2015; Kuletz and Labunski 2017). Winter residents include small numbers of ravens and ptarmigan, dippers near open running water, and occasional gyrfalcons. The migration routes and wintering areas of ARCP birds encompass much of the North American and South American continents and central and southern Pacific islands; some species may winter in southern Africa, Australasia, east and southeast Asia, and coastal Antarctica.

Shorebirds and passerines[22] are the most abundant guilds of nesting birds on the ARCP (Bart et al. 2012). Waterfowl, loons, grebes, and cranes also use the ARCP in large numbers (Bart et al. 2013). Jaegers occur in relatively high densities in ARCP. Raptors, other larids (gulls, terns), and seabirds are less abundant but important components of the bird community.

Of the species considered likely to occur on the ARCP, 39 are classified as common, fairly common, or abundant in one or more seasons, and all are breeders or possible breeders on the ARCP. Most of the 53 species considered casual and accidental visitors were seen outside the normal range of the species, as were many of the species listed as uncommon or rare; however, 40 of the 65 species listed as uncommon or rare are breeders or possible breeders in the ARCP, and many of these are species of conservation concern (Pearce et al. 2018; **Table J-13** in **Appendix J**).

Additional waterbirds, larids, and seabirds occur along the marine vessel route to Dutch Harbor, Alaska, including Steller's and spectacled eiders, which are discussed under *Special Status Species*, below (see **Table J-15** in **Appendix J**). Many bird species are present where there is open water in these marine habitats during all seasons of the year; however, concentration areas are particularly important during the fall open water season (Kuletz and Labunski 2017). A number of species, including eiders and brants, rely almost exclusively on marine habitats and coasts of the Bering Sea during migration, molting, or wintering.

The ARCP represents a substantial portion of the Beaufort Sea coastline in Alaska. Accordingly, it also supports a large number of birds during the important pre-breeding, nesting, rearing, and migration staging periods. For these reasons, the ARCP and adjacent marine waters are recognized as important bird areas by the American Bird Conservancy, Audubon, and Birdlife International. Prior studies (summarized in USFWS 2015a; Pearce et al. 2018; and USFWS and BLM 2018) have demonstrated that at least several hundred thousand breeding and nonbreeding birds use the ARCP and program area during spring migration, summer breeding, and fall staging and migration.

A few bird species have been relatively well studied on the ARCP, such as golden eagles and fall-staging snow geese, but even for these species recent data are lacking (summarized in USFWS 2015a). Although there are historical survey data for the ARCP, as described in USFWS and BLM (2018), detailed distribution and abundance data for the program area are lacking for many species, and contemporary data are lacking for most bird species. In addition, much of the contemporary data were collected for only 1 or 2 years, cover only a small portion of the program area, or were collected at low survey intensity. The program area contains far fewer water bodies, compared with sites farther west, such as Prudhoe Bay and the NPR-A. Because of this,

---

[22] Perching birds.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 11 of 201
AR0183

many waterbirds and shorebirds are patchily distributed, which increases the difficulty in estimating numbers. Information about the various bird species and species groups found in the program area is summarized below.

*Special Status Species*

The Migratory Bird Treaty Act and the corresponding Migratory Bird Convention Act and Canada Wildlife Act in Canada protect all migratory birds (see **Tables J-13, J-14** and **J-15** in **Appendix J** [Birds on the Arctic Refuge Coastal Plain Listed as Canadian Wildlife Species At Risk). Of the 156 species known to occur in the program area, 12 are recognized as BLM sensitive species (BLM 2019), 11 are USFWS birds of conservation concern (USFWS 2008a), and 45 are recognized as at-risk species by the ADFG (**Table J-15** in **Appendix J**). ADFG at-risk species are those with a small population size or range, a declining population, or a population facing documented threats. ADFG at-risk rankings also incorporate the conservation concern listings prepared by other agencies and specialist groups focused on the conservation of Alaska birds (ADFG 2015). Listings by the US Shorebird Conservation Plan Partnership, Partners in Flight, the International Union for Conservation of Nature Red List of Threatened Species (IUCN 2018), and Audubon Alaska (Warnock 2017a and 2017b) are also included in **Table J-15**.

Steller's eiders, the smallest of the four eider species, are tundra-nesting sea ducks. Their primary present-day breeding range is in eastern Siberia, where they nest in wet tundra near freshwater ponds with and without emergents[23] (Fredrickson 2001; Safine 2013, 2015; Graff 2016). The Alaska-breeding Steller's eider, belonging to a larger Pacific population, was listed under the ESA as a threatened species in 1997 (62 FR 31748–31757). Critical habitat was designated for Steller's eiders in western Alaska (including Kuskokwim Shoals, Sea Islands, Nelson Lagoon, and Izembek Lagoon, all of which are next to the marine transportation route), but no critical habitat was designated on the North Slope. Although the nesting distribution on the North Slope once extended eastward to Demarcation Bay, most Steller's eiders nest in the Utqiaġvik area (Quakenbush et al. 2002). Steller's eiders are considered to occur only as rare visitors in the program area (**Table J-13** in **Appendix J**) and are not expected to nest that far east on the ACP. As with other eiders, they spend the entire non-breeding season in coastal marine waters. In the winter, most of the world's Steller's eiders are located along the Alaska Peninsula and Aleutian Island chain.

The spectacled eider is a medium-sized eider, breeding on tundra in arctic and western Alaska and eastern Siberia and spending the rest of the year at sea, after young can fly (Petersen et al. 2000). The spectacled eider was listed as threatened in 1993, after a severe decline of the species on the Yukon-Kuskokwim Delta (58 FR 27474–27480). Critical habitat was designated in 2001 in Ledyard Bay in the Chukchi Sea and in other areas of western Alaska next to the marine transportation route (66 FR 9146–9185). No critical habitat occurs in the program area. The spectacled eider breeds primarily on the Arctic coast from Point Lay and Utqiaġvik to the Sagavanirktok River (USFWS 1996). The program area is in the breeding range, but in the lowest density class for pre-nesting spectacled eiders as measured by ACP aerial surveys. Between 2012 and 2015 surveys of waterbird habitats in the ARCP recorded low densities (0 to 0.07 birds per 0.39 square miles) of pre-nesting spectacled eiders (**Map 3-20**, Nest Sites, Observations, and Density of Pre-Nesting Spectacled Eider, in **Appendix A**). The spectacled eider is an uncommon breeder in the program area (USFWS 2015a). Nests have been documented on the Canning River delta (USFWS unpublished data), but contemporary systematic ground surveys have not been conducted. Low numbers of spectacled eiders are expected to occur in the program area during the pre-nesting and nesting periods, where suitable habitat is available.

---

[23]A water plant whose leaves and flowers appear above the surface

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 12 of 201
AR0184

*Waterbirds*

As treated in this EIS, waterbirds on the ARCP are waterfowl (ducks, geese, and swans), loons, grebes, and cranes. Thirty-seven species of waterbirds have been observed on the ARCP, 19 of which are confirmed breeders and 4 are possible breeders; 19 species occur as migrants, 14 of which are also breeders, and 9 are visitors (**Table J-13** in **Appendix J**). The group of 24 species considered breeders and possible breeders on the ARCP are 14 species of ducks, 3 geese, 3 loons, 2 swans, 1 grebe, and 1 crane. Five of these 24 species are on at least one of four agency conservations lists, 2 are listed as threatened under the ESA (Steller's and spectacled eiders), another 2 are listed as sensitive species by the BLM (red-throated and yellow-billed loons; BLM 2019), both of which are also USFWS birds of conservation concern (USFWS 2008a); the ADFG lists these and a fifth species (black scoter) as at-risk species (ADFG 2015) (**Table J-13** in **Appendix J**).

Waterbirds, especially ducks and geese, are an important subsistence resource for residents in Kaktovik (summarized in USFWS 2015a). The North American Waterfowl Management Plan (USFWS 2012) and updates (USFWS 2018a) outline the population status and abundance objectives of agency wildlife managers for waterfowl (ducks, geese, and swans).

Thirteen waterbird species are fairly common to abundant seasonally in the program area: greater white-fronted goose, snow goose, brant, cackling goose, tundra swan, northern pintail, king eider, common eider, white-winged scoter, long-tailed duck, red-breasted merganser, red-throated loon, and Pacific loon (Pearce et al. 2018). All occur as breeders or possible breeders.

Using aerial-survey breeding waterbird data collected across the ACP from 1992-2016 for 20 species, Amundson et al. (2019) found that density on the ARCP was greater than average for jaeger (pomarine, parasitic, and long-tailed combined), tundra swan, red-throated loon, and cackling geese, and lower than average for greater white-fronted geese, pacific loon, Steller's eider, white-winged scoter, yellow-billed loon, and Sabine's gull. There was no difference in density between areas surveyed in NPR-A and the ARCP for snow geese, black brant, northern pintail, scaup, spectacled eider, king eider, long-tailed duck, red-breasted merganser, glaucous gull, and Arctic tern. Most of the 9 species of waterbirds that are casual or accidental visitors and several of the 15 uncommon and rare species are outside their historical ranges; however, 9 of 15 uncommon or rare species breed on the ARCP, and several of these are species of conservation concern (**Table J-13** in **Appendix J**).

Breeding waterbirds generally arrive on the coastal plain of the North Slope in late May and June and begin nesting from late May through June (Johnson and Herter 1989). Most waterbird species nest at highest densities in wet and moist tundra habitats, often on water body shorelines, islands, and peninsulas, but some species primarily nest in drier habitats (for example, see *Common Eider* below). The distribution of high-value waterbird nesting habitats in the ARCP is roughly represented by the areas included in annual USFWS waterfowl breeding population surveys (Larned et al. 2011; see **Map 3-20**).

In July and August, most waterbirds occupy lakes and ponds to rear their young, although geese and cranes graze in tundra wetlands. In the late summer, large numbers of post-breeding and molting (temporarily flightless) sea ducks, primarily long-tailed ducks, and other waterfowl and loons use coastal lagoons behind the barrier islands. In aerial surveys conducted in late June/early July 1999–2011, surf scoters were the most abundant species in the ARCP barrier island/lagoon system (mean 2,857 birds, range 544 to 8,855 birds), followed by long-tailed ducks (mean 1,445 birds, range 220 to 3,199) and white-winged scoters (mean 1,340, range 31 to 4,192) (Dau and Bollinger 2012, USFWS unpublished data).

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 13 of 201
AR0185

Common eiders, glaucous gulls, and red-breasted mergansers were abundant and loons and swans were common in the lagoon systems in late June/early July. By late July/early August, long-tailed ducks become the dominant species in the lagoons, where they spend the molting period flightless. In surveys conducted in the ARCP lagoons in 2002 and 2003, 12,000 and 27,965 long-tailed ducks were counted, making up 92 and 95 percent of birds observed (Lysne et al. 2004).

The peak in numbers of long-tailed ducks in the lagoons are in late July or early August. This is followed by a decline into mid-September, by which time the flightless molt has ended (Garner and Reynolds 1986; Johnson and Gazey 1992). Other species present in much lower numbers (fewer than 450 birds) during the late July/early August surveys were common and king eiders, surf scoters, scaup, northern pintails, and all three species of loons. Sea ducks and other waterbirds continue to forage in the lagoons in the fall as they stage for the southward migration. Migratory waterbirds may be present in the marine environment through October and into November, leaving with advancing sea ice (Kuletz et al. 2015).

Various migration routes and wintering areas are used by different species of waterbirds. Most geese and dabbling ducks migrate through the Pacific and Central Flyways after leaving the ARCP to wintering areas across the continental US. Tundra swans cross the continent to winter on the Atlantic coast, largely in Chesapeake Bay. Primary migration routes of brant, eiders, and loons from the ARCP are coastal across northern Alaska and along the coasts of the Chukchi and Bering seas. Eiders winter primarily in the Bering Sea, with some species also occurring in coastal areas of southern Alaska. Brant, Pacific loons, and yellow-billed loons from the ARCP winter primarily along the Pacific coast of North America, while red-throated loons from the ARCP winter in East Asia (McCloskey at al. 2018).

<u>Common Eider and King Eider</u>

Common and king eiders are an important subsistence resource for North Slope residents. The USFWS conducted 12 years of aerial surveys during the nesting period of common eiders (1999–2009, 2011) and estimated the number, distribution, and population trend of common eiders in coastal habitats on the North Slope, including Arctic Refuge lands (Dau and Bollinger 2012, summarized in USFWS 2015a) (**Map 3-21** top panel, Common Eider Locations in Late June/Early July, in **Appendix A**). During that period, USFWS estimated between 75 and 445 breeding pairs annually, suggesting that common eiders have increased in abundance on their barrier island breeding grounds in the Arctic Refuge since 1976, although the reasons are uncertain (USFWS 2015a). In a 2015 ground-based survey conducted across most Arctic Refuge barrier islands, over 800 common eider nests were found (USFWS, unpublished data).

Common eiders from the Beaufort Sea winter primarily in the Bering Sea, apparently using the closest available ice-free habitats (Petersen and Flint 2002). Common eiders use the lagoon system into late July/early August prior to migration (**Map 3-21** bottom panel, Common Eider Locations in Late July/early August). Migration routes of common eiders in the Beaufort Sea are generally within 30 miles of shore, and routes are affected by the occurrence of open water leads in spring. Common eiders undertake spectacular spring migrations of several hundred thousand birds between the Beaufort Sea and coastal areas in western Alaska, along the coast of the Chukchi Sea.

From systematic observations of the spring and fall migrations past Point Barrow, common eider numbers declined by 53 percent between 1976 and 1996 (Suydam et al. 2000) but subsequently increased from 72,606 in 1996 to 114,996 in 2002 and 110,561 in 2003 (Quakenbush et al. 2009). Westward fall migration of eiders is protracted by comparison with spring, and common eiders move out of the Beaufort Sea between July and October, after molting. They use a corridor paralleling the northern coast of the Yukon Territory and Alaska,

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 14 of 201
AR0186

past Point Barrow and southwest across the Chukchi Sea to wintering areas in the Bering Sea south to the Aleutian Islands.

King eiders are abundant in the Beaufort Sea area, including the program area (Johnson and Herter 1989). They nest primarily in tundra wetlands, and low densities (0.3–0.8 nests/0.39 square mile) have been documented in the Arctic Refuge (Johnson and Herter 1989) (**Map 3-22**, King Eider, in **Appendix A**). Barry (1974) estimated that about a million king eiders migrated into and through the Beaufort Sea area in the early 1970s; however, estimated numbers from systematic observations at Point Barrow in spring and fall declined for unknown reasons by more than 50 percent between 1976 and 1996, to about 350,835 birds (Suydam et al. 2000). At Point Barrow in 2002 and 2003, 304,966 and 591,961 king eiders, respectively, were estimated, suggesting that numbers increased from 1996 to 2003 (Quakenbush et al. 2009).

Most of these birds nest on high arctic islands of Canada. Spring migrating king eiders come close to land only as they pass specific points, including Point Barrow and sites primarily in the Northwest Territories of Canada; offshore lead systems in pack ice are the primary determinant of routing and timing. Similar to common eiders, spring migrations of king eiders past Point Barrow in May can be spectacular, with king eiders typically first and closely followed by common eiders.

King eiders undertake a molt migration between July and September leaving the breeding grounds and the Beaufort Sea for staging areas in the Chukchi Sea and then to molting and wintering areas in the Bering Sea (Phillips et al. 2006). As in spring, much of this migration occurs offshore and is most conspicuous at Point Barrow and Cape Bathurst in the eastern Beaufort Sea, and less conspicuous along much of the intervening coast (Johnson and Richardson 1982). King eiders are not abundant during fall surveys of coastal lagoons in the Arctic Refuge (Lysne et al. 2004).

### Waterbird Use of Coastal Lagoons

Many waterbirds in the post-breeding period use the coastal lagoons between the barrier islands and the program area's coast (see **Appendix A**, **Map 3-21**, Common Eider, **Map 3-22**, King Eider, **Map 3-23**, Surf Scoter, **Map 3-24**, Long Tailed Duck, and **Map 3-25**, Yellow-Billed Loon).

In aerial surveys of nearshore waters and barrier islands conducted 1999–2009 and 2011 during late June and early July (early incubation for common eiders and the early post-breeding period for most other species surveyed), 17 waterbird species were recorded regularly (Dau and Bollinger 2009, 2012). The most abundant species recorded was surf scoter (average of 2,173 individuals), followed by long-tailed duck (average of 819 individuals), common eider (average of 593 individuals), and glaucous gull (average of 553 individuals). In aerial surveys conducted later in the season (late July and early August 2002 and 2003), thousands more long-tailed ducks were observed, with over 28,000 birds recorded in one year (Lysne et al. 2004). These numbers likely far exceed the number breeding in the Arctic Refuge, indicating that long-tailed ducks from a larger geographic area move to coastal lagoons in the Arctic Refuge to molt in late summer and fall (Lysne et al. 2004; USFWS 2015a).

During those same aerial surveys conducted in fall 2002 and 2003, up to 20 percent of yellow-billed loons, 28 percent of red-throated loons, 29 percent of long-tailed ducks, 33 percent of scaup, and 41 percent of Pacific loons counted across the entire North Slope survey area were in the lagoons and nearshore areas along the Arctic Refuge coast (Lysne et al. 2004).

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 15 of 201
AR0187

Snow Geese

The entire western Arctic population of snow geese assembles for fall migration on the coastal plain of Alaska and Canada during late August and early September (Garner and Reynolds 1986; USFWS 2015a). In surveys conducted between 1973 and 2004, as many as 325,760 snow geese were recorded on the ARCP (**Map 3-26**, Frequency of Occurrence of Snow Goose Flocks with >500 Birds observed During Aerial Surveys, 1982– 2004, in **Appendix A**). They come primarily from the large nesting colony on Banks Island (Canada) and from much smaller nesting colonies on the North Slope and in western Canada to graze in upland and coastal tundra habitats (Hupp et al. 2002).

The ARCP east to the Canada border is part of a larger assembly area that extends east another 310.7 miles to the Bathurst Peninsula in Canada (Pearce et al. 2018). The breeding population on Banks Island more than doubled, from 200,000 in the early 1990s to 500,000 in 2013 (Pacific Flyway Council 2013). The population breeding across the entire coastal plain of the North Slope also increased dramatically in that time (Burgess et al. 2017; Hupp et al. 2017).

The numbers of birds on the ARCP during the 1973 to 2004 USFWS surveys were highly variable, with the proportion of the population staging in Alaska ranging from 0 to 49 percent. In some years, no staging snow geese were recorded as far west as the ARCP; numbers in Alaska may depend on weather conditions (wind and the timing of onset of snow cover) and may be affected by changes in food availability caused by foraging (Kendall 2006). In the last surveys of staging snow geese on the ARCP conducted in 2004, 189,636 individuals were recorded (USFWS 2015a). If trends in staging reflect population trends in breeding areas, the number of geese staging in the program area was likely much higher in recent years. Snow geese depend on this staging period to build energy reserves for their southward migration (Brackney and Hupp 1993). Following staging on the coastal plains of northeastern Alaska and northwestern Canada, snow geese migration takes birds south through Alberta and Manitoba and to wintering areas primarily in central California.

*Shorebirds*

Thirty-three shorebird species have been recorded on the ARCP, 19 of which are confirmed breeders and 3 possible breeders. Fourteen species are migrants, 12 of which also breed or possibly breed on the ARCP, and 9 are rare or casual visitors (**Table J-13** in **Appendix J**). The group of 22 breeders and possible breeders includes 17 sandpipers, 3 plovers, and 2 phalaropes.

As a group, shorebirds are of increasing conservation concern, as many species have been undergoing population declines over the past several decades (US Shorebird Conservation Plan Partnership 2016; Alaska Shorebird Group 2019). Of the 23 shorebird species not considered rare or casual visitors, 11 are listed as species of conservation concern by at least one of four agencies; 5 are BLM sensitive species (BLM 2019), these and one additional shorebird are USFWS birds of conservation concern (USFWS 2008a), and the ADFG lists these additional shorebirds as at-risk species (ADFG 2015) (**Table J-13** in **Appendix J**). Fourteen of 22 species (64 percent) that breed or possibly breed on the ARCP are considered shorebirds of conservation concern (US Conservation Plan Partnership 2016), including 7 species of moderate concern, 6 species of high concern, and 1 species of greatest concern (**Table J-13**).

Eight shorebird species are fairly common to abundant in the program area as both breeders and migrants: American golden-plover, semipalmated plover, ruddy turnstone, pectoral sandpiper, semipalmated sandpiper, long-billed dowitcher, red-necked phalarope, and red phalarope (Pearce et al. 2018). Upland sandpipers are listed in **Table J-13** in **Appendix J** as "fairly common (inland)" and are typically found more in the foothills, which are primarily outside the program area. The 9 rare or casual visitors and several of the rare or

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 16 of 201 <br> AR0188

uncommon breeders/migrants are outside the normal ranges of those species; however, 13 of 16 species considered rare or uncommon are confirmed or likely breeders on the ARCP, as follows: black-bellied plover, whimbrel, bar-tailed godwit, stilt sandpiper, sanderling, dunlin, Baird's sandpiper, white-rumped sandpiper, buff-breasted sandpiper, western sandpiper, Wilson's snipe, spotted sandpiper, and wanderling tattler. Most species of shorebirds are of conservation concern due to ongoing population declines (Bart and Johnston 2012); not considering relative abundance in the ARCP, these include 2 species of greatest concern (bar-tailed godwit and red knot) and 8 species of high concern (American golden-plover, whimbrel, Hudsonian godwit, dunlin, buff-breasted sandpiper, pectoral sandpiper, semipalmated sandpiper, and lesser yellowlegs).

Shorebirds arrive on the North Slope in mid-May through June. Most begin nesting in June, though a small number begin laying eggs in late May and into early July (Saalfeld and Lanctot 2015). In surveys of breeding shorebirds in June 2002 and 2004, Brown et al. (2007) recorded 14 shorebird species and estimated that 230,000 shorebirds (95 percent confidence interval (CI) of 104,000 to 363,000) occupied the program area during the breeding season. For the five most abundant shorebird species on the ARCP (pectoral sandpiper, semipalmated sandpiper, red-necked phalarope, red phalarope, and American golden-plover), numbers breeding in the program area were estimated to comprise between 1.4 percent (semipalmated sandpiper) and 13.2 percent (pectoral sandpiper) of global populations.

Shorebirds use a wide range of tundra habitats for nesting. Most species nest in wet and moist habitats, but some prefer drier uplands and riverine habitats. Wetland and riparian habitats, particularly deltas and coastal areas, have higher shorebird density and diversity, and shorebird density appears to be highest in wetland areas in the Canning River delta region (Brown et al. 2007).

Shorebirds generally are more abundant near the coast than farther inland, with American golden-plover and long-billed dowitcher less restricted by such elevational differences (Saalfeld et al. 2013). Species richness was highest to the west, in the NPR-A (Johnson et al. 2007, Saalfeld et al. 2013). however, several species were more common in the east (Johnson et al. 2007), reflecting differences in distribution among individual species across the coastal plain of the North Slope.

After hatching, most shorebirds use open tundra and shorelines to rear their young; as the young become flight capable, they begin to forage on the coast. In late July through September, shorebirds stage on river deltas across northern Alaska, including in the ARCP, for the fall migration to wintering areas in the Americas and Asia. Shorebird abundance on river deltas varies among sites and years (Taylor et al. 2010; Brown et al. 2012) and individuals move among multiple sites during the year (Taylor et al. 2011). Up to 4,000 shorebirds were counted on daily surveys at the Jago and Okpilak River deltas in 2011 (Churchwell 2015). Most of the deltas on the North Slope are used by large numbers of foraging shorebirds, with the Jago River and Hulahula River deltas being among the most heavily used areas in the ARCP (summarized in USFWS 2015a and Pearce et al. 2018). These deltas are among an interconnected network of post-breeding sites, all of which are important to multiple species of shorebirds (Taylor et al. 2011). Most of the shorebirds foraging in the river deltas in late summer and fall are juveniles hatched earlier in the summer. After staging, shorebirds continue migrating to coastal wintering areas in Central and South America (e.g., semipalmated sandpipers) and Asia (e.g., dunlin), using various flyways and migration routes, with both eastward and westward movements along the Alaska coast (Taylor et al. 2011; Brown et al. 2017).

*Larids*

Larids that occur on the ARCP are gulls, jaegers, and terns. Sixteen larid species have been recorded, 7 of which are confirmed breeders or migrants: The 7 breeding species are pomarine jaeger, parasitic jaeger, long-tailed jaeger, Sabine's gull, mew gull, glaucous gull, and arctic tern (**Table J-13** in **Appendix J**). Three larids

occur only as rare migrants (ivory gull, Ross's gull, and herring gull) and 6 species occur as rare, casual, or accidental visitors.

None of the larids that occur on the ARCP are BLM sensitive species (BLM 2019), one is a USFWS bird of conservation concern (arctic tern; USFWS 2008a), and none are ADFG at-risk species (ADFG 2015) (**Table J-14** in **Appendix J**). At-sea surveys have recorded glaucous gulls, black-legged kittiwakes, Ross's gulls, and Sabine's gulls in waters next to the ARCP (Kuletz et al. 2015). At least 17 larid species occur along the marine vessel route to Dutch Harbor, including 4 listed as USFWS species of conservation concern (red-legged kittiwake, Aleutian tern, Caspian tern, and arctic tern; **Table J-15** in **Appendix J**).

Larids arrive on the North Slope roughly at the same time as shorebirds, in mid-May through June (Johnson and Herter 1989). They breed across the ARCP in a range of habitats, including open tundra (primarily jaegers), shores and islands on tundra lakes, and on the barrier islands (primarily gulls and terns). During the breeding season, the smaller gulls and terns generally feed on aquatic invertebrates and small fish, whereas jaegers largely prey on small mammals, birds, and eggs.

The single larger gull species (glaucous gull) is omnivorous and can prey on small birds and eggs. Local residents report that glaucous gull populations on the ARCP have been increasing, and there is some evidence of increases in gull populations in the Arctic generally (NRC 2003). These increases could be due to global changes in their populations or increased human development in the area (Weiser and Powell 2010). There are numerous accounts of glaucous gulls foraging in North Slope landfills. Distribution maps from aerial surveys indicate that gulls tend to concentrate in the vicinity of human development on the coastal plain of the North Slope, including Kaktovik on the Arctic Refuge (summarized in USFWS 2015a).

### Raptors

As treated in this EIS, raptors on the ARCP include eagles, hawks, falcons, and owls. Thirteen raptor species have been recorded on the ARCP, 6 of which are confirmed breeders and 2 are possible breeders (**Table J-13** in **Appendix J**). Five species occur as casual visitors, including the bald eagle. Only 3 raptor species are considered abundant: golden eagle, snowy owl, and short-eared owl, and the other 5 breeding or possibly breeding species are uncommon or rare (northern harrier, rough-legged hawk, merlin, gyrfalcon, and peregrine falcon).

None of these are BLM sensitive species or USFWS birds of conservation concern (BLM 2019; USFWS 2008a), and 6 of the ARCP raptors are listed by the ADFG as at-risk species (ADFG 2015) (**Table J-13** in **Appendix J**). Several raptors on the ARCP are cliff-nesting, occurring primarily in mountainous terrain or on steep river bluffs: golden eagle, rough-legged hawk, gyrfalcon, and peregrine falcon. Ground-nesting species are northern harriers, snowy owls, and short-eared owls. Bald and golden eagles are protected under the Bald and Golden Eagle Protection Act. The arctic peregrine falcon subspecies, which breeds on the ARCP, was previously listed as endangered under the ESA, but it has been delisted (USFWS and NMFS 2014).

In the Arctic Refuge, nesting of raptors begins from late March to early May (Young et al. 1995). Some snowy owls winter on Arctic breeding grounds, but most arrive on the North Slope during April and May, with most egg laying in mid-May (summarized in Holt et al. 2015). The remaining raptors arrive and begin nesting in May and early June (Johnson and Herter 1989).

Golden eagles nest almost exclusively in cliff habitats and, in the program area, they nest primarily in the Brooks Range foothills, as cliff habitat appropriate for eagles is rare elsewhere on the ARCP. Breeding golden eagles return to Alaska, presumably including the Arctic Refuge, from late February to mid-April, with

nonbreeders arriving later (summarized in Kochert et al. 2002). Golden eagles are commonly observed on the ARCP in late June and early July, when calving and post-calving caribou herds are present; these are primarily subadult birds that are preying on or scavenging caribou calves (summarized in USFWS 2015a). In a 1983–1985 study, golden eagles were the main predators of caribou calves on the calving grounds (Whitten et al. 1992; Griffith et al. 2002). It also appears that golden eagles from other regions in the state use northern Alaska, including the Brooks Range and ARCP. Eagles that hatched in the Alaska Range were found in the Arctic Refuge during at least two subsequent summers (summarized in USFWS 2015a).

Surveys on the ARCP were conducted on the Canning, Hulahula, and Kongakut rivers in the 1990s and early 2000s to monitor cliff-nesting raptors (summarized in USFWS 2015a). Raptors nesting on cliffs along these rivers are golden eagles, peregrine falcons, gyrfalcons, and rough-legged hawks. In the program area, cliff nest habitats occur primarily in river corridors; outside of these areas the overall abundance of nesting raptors is low.

The two owl species that breed on the ARCP, snowy owl and short-eared owl, are variable in abundance among years. As in other regions on the North Slope, both species are substantially more common as breeders in years of high vole or lemming abundance (Johnson and Herter 1989).

### Landbirds

As treated in this EIS, landbirds on the ARCP include a diversity of species that are strongly dominated in abundance by passerines[24] (primarily Lapland longspurs) and two species of ptarmigan. Of the 50 landbird species occurring on the ARCP, 18 are confirmed breeders and 2 possible breeders (**Table J-13** in **Appendix J**).

Thirty landbird species occur only as rare, casual, or accidental visitors. Eleven landbird species are fairly common to abundant: willow ptarmigan, rock ptarmigan, eastern yellow wagtail, American pipit, common redpoll, hoary redpoll, Lapland longspur, snow bunting, American tree sparrow, common raven, and savannah sparrow. The 7 accidentals and many of the rare and uncommon breeding or possible breeding species comprise mainly birds observed outside of their historical ranges; however, 10 of 17 rare or uncommon landbird species are confirmed or possible breeders on the ARCP. None of the 20 breeding or possibly breeding landbird species are BLM sensitive species or USFWS birds of conservation concern (BLM 2019; USFWS 2008a), and 8 are listed by the ADFG as at-risk species (ADFG 2015) (**Table J-13** in **Appendix J**).

Most landbirds on the coastal plain of the North Slope are migrant species that arrive in mid-May through June and begin nesting shortly thereafter (Johnson and Herter 1989). The American dipper, willow ptarmigan, rock ptarmigan, and common raven are year-round residents. By far the most abundant landbird species on the ARCP is Lapland longspur, which nests throughout the area in wet and moist tundra habitats. Other relatively common species on the ARCP are rock ptarmigan (found throughout the area), willow ptarmigan (more common inland), common raven (found throughout the area), eastern yellow wagtail (most common in riparian areas), common and hoary redpoll (found throughout the area), snow bunting (more common on the coast), savannah sparrow (more common inland), and American tree sparrow and white-crowned sparrow (more common inland) (Pearce et al. 2018).

### Seabirds

Seabirds occurring in marine waters next to the ARCP are fulmars, shearwaters, and alcids. Eight seabird species have been recorded in marine waters off the ARCP, but 6 of those species are rare or casual visitors,

---

[24] Perching birds

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 19 of 201

including Kittlitz's murrelet, which have been recorded during at-sea surveys by the USFWS (Kuletz et al. 2015). Only two seabird species occur as summer residents or migrants in the region: the black guillemot occurs as a rare breeder on barrier islands and an uncommon resident of marine waters, where the thick-billed murre also occurs as a rare migrant (**Table J-13** in **Appendix J**). Neither is listed by any of the four agencies as a species of conservation concern (ADFG 2015) (**Table J-13** in **Appendix J**).

Thirteen additional seabird species are present along the marine vessel route to Dutch Harbor, including alcids (auklets, murres, and puffins), cormorants, and albatrosses (Audubon Alaska 2017) (**Table J-15** in **Appendix J**). Short-tailed, black-footed, and Laysan albatrosses all have increased in abundance and shifted their ranges northward in the Bering Sea in recent decades (Kuletz et al. 2015). The short-tailed albatross is federally listed as endangered, and individuals have been found as far north as the southern Chukchi Sea in recent years (Day et al. 2013).

*Climate Change*

The changing climate has varied impacts on different bird species; impacts would depend on how quickly and dramatically the vegetation and hydrology change. Some bird species could benefit from longer breeding seasons and expansion of shrub and coastal habitats, while others could lose habitat, food, or prey and could experience seasonal mismatches in breeding and plant/insect phenology (seasonal timing of events) (i.e., trophic mismatches; see Doiron et al. 2015). It is possible that birds are unable to adapt to trophic mismatch (Dawson 2008; Kumar et al. 2010). The historically dominant landbirds and waterbird species may be displaced northward or into shrinking remnant habitats. Kubelka et al. (2018) suggested predation is increasing in the Arctic and is linked to climate-induced shifts in predator-prey relationships, which could adversely affect both numbers and productivity of nesting birds. However, Bulla et al. (2019) argues that there is no robust evidence for a global disruption of nest predation rates due to climate change.

Climate change is expected to increase temperatures, increase precipitation, and lengthen the snow-free season (see **Section 3.2.1**). Summer temperatures above freezing could occur for 6 weeks longer by 2099 (SNAP 2011). Warmer temperatures and earlier snowmelt would likely change the timing of seasonal events on the North Slope, but it is unclear how bird populations would respond. For birds, climate change would affect phenology, habitat and forage availability, and alteration of ranges.

A species may experience both beneficial and adverse effects, as outlined below, with outcomes uncertain; however, many species that nest on the ARCP already are experiencing decreasing populations, and many could suffer catastrophic consequences from the effects of global climate change in one or more of their seasonal continental or even global habitats. These effects combined with development-related impacts across the ranges of many bird species may result in extinction during the 85-year scope of this analysis (IPBES 2019). This is particularly the case for the 69 of 157 total bird species on the ARCP (44 percent) that are listed as species of conservation concern by at least one of eight major government or conservation entities (see **Table J-13** in **Appendix J**).

Earlier and warmer spring and fall temperatures may have positive effects on some species. Geese are known to initiate nests as soon as snow-free sites are available, and they may benefit from earlier and longer breeding seasons (Dickey et al. 2008). Common eiders may benefit from earlier ice-melt around barrier islands, which has been correlated with earlier laying and larger clutch sizes (Love et al. 2010; Chaulk and Mahoney 2012). Delayed freeze-up in fall may be advantageous to the slow-growing young of such species as loons and swans, which are not always flight capable by the time of freeze-up (Johnson and Herter 1989; Ritchie and King 2000).

higher (Downes et al. 1986; Walsh et al. 1992; Murphy and Lawhead 2000; Yokel et al. 2009; Wilson et al. 2012).

Oestrid flies emerge in July and exert strong effects on caribou behavior and body condition (Murphy and Lawhead 2000; Hughes et al. 2009). In response to fly harassment, large caribou herds break up and disperse widely in small groups, seeking relief in unvegetated habitats, such as river bars, dunes, drained-lake basins, pingos,[29] and ridgetops. In areas of northern Alaska with industrial development, caribou often use elevated sites on gravel roads and pads and in shaded areas under buildings and pipelines when flies are active (White et al. 1975; Pollard et al. 1996; Murphy and Lawhead 2000). Hot summers with severe insect harassment can substantially decrease caribou conditions in fall, causing them to enter the winter in poor condition (Helle and Tarvainen 1984; Colman et al. 2003; Weladji et al. 2003; Couturier et al. 2009) and potentially leading to lower productivity (Cameron and Ver Hoef 1994).

During late summer and fall, caribou feed heavily to restore body reserves before the onset of winter (Haskell and Ballard 2004; Gustine et al. 2017). The birth rate for female caribou in spring is strongly related to body mass in the previous autumn (Cameron and Ver Hoef 1994; Cameron et al. 2000). On the range of the CAH, the length of the growing season has increased by 15 to 21 days as the climate warmed between 1970 and 2013 (Gustine et al. 2017); despite a 9- to 10-day increase in the fall growing season during that period, no significant change in seasonal forage quality was evident. Caribou migration to winter ranges in the fall coincides with the breeding season (rut) in October, a period when male caribou experience high energy demands. In one study, adult males lost 23 percent of body protein and 78 percent of body fat during the rut (Barboza et al. 2004).

Compared with the conditions experienced by other arctic migratory herds, the range of the PCH has warm spring conditions and cool moist summers, which likely result in longer periods of high plant quality and lower mosquito harassment (Russell and Gunn 2017). The winter range has relatively high snow depths, but diverse terrain provides a wide range of wintering locations. PCH animals accumulate less back fat and get pregnant at higher fall body weights (indicating lower productivity) than other herds, but pregnancy rates change less dramatically with changing fall body weights (indicating lower vulnerability). The PCH has had a more stable population size than other herds in recent decades (Fauchald et al. 2017; Russell and Gunn 2017).

<u>PCH Use of the Program Area</u>

Caribou use of the program area varies greatly throughout the year. The principal use by the PCH occurs in the spring and summer, during spring migration and the calving, post-calving, and insect seasons (**Map 3-28**, Seasonal Distribution of the Porcupine Caribou Herd, in **Appendix A**). The PCH give birth from the northern portion of the Arctic Refuge into northern Yukon, an area of 8.9 million acres (Griffith et al. 2002), but, the extent of use of those areas varies substantially among years (Map 4-9 in USFWS 2015a; **Maps 3-28**, **3-29**, and **3-30** in **Appendix A**).

Four terms are used to describe the use of calving grounds by caribou, as follows (Griffith et al. 2002):

- Annual calving ground—the calving ground for a particular year
- Extent of calving—the outer perimeter of all known annual calving grounds

---

[29] A dome-shaped hill formed in a permafrost area when the pressure of freezing groundwater pushes up a layer of frozen ground

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 21 of 201
AR0215

- Annual concentrated calving area—the area of higher than average calving density in an annual calving ground
- Extent of concentrated calving—the outer perimeter of all known annual concentrated calving areas

Early descriptions of range use of the PCH are complicated by the lack of telemetry data and the unknown status of the CAH (CAH movements could have been attributed to the PCH); nevertheless, the available historical information shows the entire program area has been used for calving at times but with large inter-annual, and perhaps decadal, variability in distribution. Skoog et al. (1963) surveyed the area in 1961 and estimated that 60,000 caribou were between the Canning and Kongakut Rivers during calving; approximately one-third were between the Canning and Katakturak Rivers. Hemming (1971) describes the calving range as between the Kataktruk and Kongakut Rivers.

Between 1983 and 2001, the annual percentage of PCH females calving in the ANILCA 1002 Area (essentially the program area) averaged 42.7 percent (a portion of the concentrated calving area was in Alaska each year from 1983 to 1999; **Maps 3-29** and **3-30** in **Appendix A**). The percent calving occurring in the area was highest in years with early spring conditions (as measured by the Normalized Difference Vegetation Index [NDVI] calculated from satellite imagery during calving; Griffith et al. 2002). In 8 of the 12 years from 2000 to 2011, the annual concentrated calving areas occurred in the Yukon or near the Yukon-Alaska border, largely outside the program area (USFWS 2015a). The PCH calved predominantly in the Yukon in 2012/2013 (**Map 3-30** in **Appendix A**; Caikoski 2013, 2015) but predominantly in Alaska between 2014 and 2017, and calving was widely dispersed in 2018 (**Maps 3-29** and **3-30** in **Appendix A**; Caikoski 2015).[30] In 2017, much of the PCH concentrated calving area was west of the Sadlerochit River.[31] Russell and Gunn (2019) found that use of the program area for calving is higher in years with shallower snow in mid-May.

The annual calving grounds were in areas with higher rates of increase in NDVI, which is thought to indicate higher quality forage. The annual concentrated calving grounds in those annual calving grounds were characterized by higher forage biomass, as measured by NDVI (Griffith et al. 2002). PCH caribou feed primarily on immature flowers of tussock cottongrass early in June, in wet sedge meadows, herbaceous tussock tundra, and riparian vegetation types; then later in June they forage primarily on willows and herbaceous plants (Griffith et al. 2002; Johnstone et al. 2002).

Between 1983 and 1985, PCH calf mortality during June averaged 29 percent, and 61 percent of that mortality was due to predation, primarily by golden eagles, grizzly bears, and wolves. Predation rates and predator densities were higher in the foothills south of the program area (Whitten et al. 1992; Young and McCabe 1997), and calf survival was lower for calves born in the foothills (Griffith et al. 2002). Mean annual calf survival was higher when the forage biomass at peak lactation (estimated by NDVI on June 21) was higher (Griffith et al. 2002); hence, calving grounds for the PCH varied annually, at least in part due to spring weather and vegetation growing conditions; calving location and vegetation growing conditions appear to affect calf survival. The USFWS (2015a) concluded that, due to the annual variability in the calving area, the PCH needs a large region from which to select the best conditions for calving in a given year.

During the post-calving season (last week of June and first week of July), most locations of PCH caribou were in the program area; even if they calved outside of it, PCH caribou moved west toward the program area (Griffith et al. 2002; **Map 3-31** in **Appendix A**). Sixty-seven percent of all caribou outfitted with radio collars

---

[30] Jason Caikoski, ADFG, phone call to Alex Prichard, ABR Inc., on September 11, 2018, regarding annual calving distribution of the PCH.
[31] Ibid.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 22 of 201
AR0216

(1985-2017) spent time in the program area in a year (Russell and Gunn 2019). Of those caribou, the ones that calved in the program area spent an average 26.5 days there, while caribou that calved outside the program area spent an average of 9.8 days in the program area. Five percent of caribou using the program area remained there for more than 5 weeks (Russell and Gunn 2019).

PCH caribou may use both coastal areas and inland ridgetops for insect relief (Walsh et al. 1992; USFWS 2015a). Most PCH caribou move out of the program area by mid to late summer. During the summer insect season (July 7–August 14) in the years before 2000, caribou spread out across the Coastal Plain and in the Brooks Range in Alaska and Yukon, with few remaining in the program area (**Map 3-31** in **Appendix A**; Russell et al. 1992; Griffith et al. 2002). From 2000 to 2014, PCH caribou generally left the Coastal Plain by the end of June (USFWS 2015a), but between 2015 and 2018 caribou used the program area later in the summer (see comments in **Appendix S**).

CAH Use of the Program Area

Roby (1978) and Shideler (1986) describe the observations of biologists working in the area of the CAH range before the advent of telemetry collars. Females in the CAH calve in two areas west of the Arctic Refuge: one south and southwest of the Kuparuk oil field, between the Colville and Kuparuk Rivers, and the other between the Sagavanirktok and Canning Rivers in an area with little development (**Map 3-32**, Seasonal Distribution of the Central Arctic Herd, in **Appendix A**). Since construction of the Alaska North Slope oil fields, the CAH has been exposed to some level of development for about 40 years (Cameron et al. 2005). During most years since at least 2003, a portion of the CAH has moved through the program area during the summer insect season (**Map 3-32** in **Appendix A**; Lenart 2015b; Nicholson et al. 2016; Prichard et al. 2017), but the proportion of the summer individual caribou spend in the area varies widely among years. The proportion of collared CAH females using the program area at some point during the summer (June–August) has varied annually between 39 and 100 percent (2003–2018), but the average proportion of locations in the program area for individual collared caribou varied between 3 and 23 percent during that period (**Table J-21** in **Appendix J**). The program area is the only portion of the primary CAH mosquito-relief habitat that does not currently contain some development.

Coastal movements by large groups of caribou occur during periods of mosquito harassment, with caribou typically moving into the wind (which tends to be easterly); however, those groups tend to break up and disperse when oestrid flies become the dominant insect pests (Murphy and Lawhead 2000).

The number of CAH animals using the program area varies annually, likely in response to weather conditions and the resulting levels of insect harassment and longer time scale shifts in CAH summer movement patterns.

*Muskox*

This native species became extinct in Alaska in the nineteenth century; the history, distribution, and habitat preferences of muskoxen were described previously (BLM 2012, Section 3.3.6.2, page 293; USFWS 2015a). The current population in northeastern Alaska was reestablished by translocation when 64 animals from Greenland stock were released at Barter Island and the Kavik River in 1969 and 1970 (USFWS 2015a). As their numbers increased, they expanded westward on the ACP to the Colville River drainage and eastward across the international border to the Babbage River in northern Yukon.

The population in northeastern Alaska and northwestern Canada was estimated at 700–800 animals in the mid-1990s, but it subsequently declined to approximately 300 animals from 2007 to 2014; about 200 were located west of the Arctic Refuge and 100 were located east of it in northern Yukon (Lenart 2015c; Arthur and Del Vecchio 2017). The decline was especially steep in the Arctic Refuge, where only one muskox was

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 23 of 201
AR0217

the entire Beaufort Sea coast between Point Barrow and the Canada border in fall 2000 to 2014, averaging 64 bears per survey and recording a maximum of 156 bears on a single survey in August 2012 (Wilson et al. 2017). On average, 4 to 8 percent of the bears in the SBS stock were observed on land per survey (Schliebe et al. 2008). Most sightings on those coastal surveys (82 percent) were recorded on barrier islands, with 11 percent on the mainland and 6 percent on landfast ice (74 FR 56068).

Peak numbers of polar bears observed on land generally occurred in late September and early October (USFWS 1995; Schliebe et al. 2001, 2008; Kalxdorff et al. 2002). The number of polar bears on shore is related to sea ice dynamics, although the distribution of bears on shore was influenced most strongly by the availability of food from subsistence whaling (Wilson et al. 2017). Bear numbers on shore have increased in late summer and autumn in certain locations, with the greatest concentrations occurring at Barter Island, Cross Island, and Point Barrow, where bears feed on bone piles of butchered bowhead whales taken during the autumn subsistence hunt (Miller et al. 2006; Schliebe et al. 2008; Atwood et al. 2016b; Lillie 2018).

Polar bears using terrestrial habitats near the program area have shown increases in the amount of bowhead whale consumed in their diets in recent years. This reflects increased foraging on the Kaktovik whale-bone pile, with bowhead whale constituting 50–70 percent of the fall diet of those bears that spent more time on and near the coast than bears farther offshore (Rogers et al. 2015; McKinney et al. 2017). Increased consumption of bowhead whale was associated with better body condition.

Genetic analysis of hair-snare samples estimated that as many as 146 individuals (standard error = 21), representing approximately 16 percent of the most recent SBS stock estimate, visited the whalebone pile in Kaktovik in 2012 (Lillie 2018). In one recent study, the percentage of collared SBS bears spending time along the coast of northeast Alaska ranged from 22 to 33 percent annually, averaging 27 percent, with the area near Kaktovik receiving the most use (Pongracz and Derocher 2017).

<u>Life History</u>
Polar bears are large, long-lived (29–32 years), opportunistic hunters that feed primarily on ringed and bearded seals but also on beached carcasses of marine mammals (whales and walruses) (Smith 1980; Amstrup 2003a; Schliebe et al. 2006; Miller et al. 2006). Adult males and non-pregnant females are active all year. Mating occurs from March to late May. Pregnant females construct and enter snowdrift natal dens in October or November (Amstrup and Gardner 1994; Joint Secretariat 2015) and give birth in late December or early January.

Litter size ranges from one to three cubs, averaging 1.63; litters of two cubs are most common (Amstrup 2003a). Mothers and cubs emerge from natal dens in late March or April, when the cubs are 3 to 4 months old (Lentfer and Hensel 1980; Amstrup and Gardner 1994; Smith et al. 2007; Joint Secretariat 2015). The cubs remain near the dens for up to 2 weeks (Smith et al. 2007) as they adapt to outside temperatures.

Young cubs are vulnerable to predation during the brief period after den emergence and before moving onto sea ice (Richardson and Andriashak 2006). Cubs usually stay with their mothers until they are 1.5 to 2.5 years old (Stirling et al. 1975). Females breed again at about the same time they separate from their young, resulting in a breeding interval of females that successfully wean cubs of 3 years or longer.

<u>Critical Habitat</u>
The USFWS designated critical habitat for polar bears in Alaska in 2011 (75 FR 76086). Three units of critical habitat (all of which occur in the program area; **Map 3-37**, Polar Bear Habitat, in **Appendix A**) were

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 24 of 201
AR0244

designated, corresponding to the following primary constituent elements of critical habitat described in the final rule:

- Sea ice habitat, used for feeding, breeding, denning, and movements, in US territorial waters;
- Terrestrial denning habitat, on land along the northern coast of Alaska, with characteristics suitable for capturing and retaining snow drifts of sufficient depth to sustain maternal dens through winter, occurring within 20 miles of the coast between the US-Canada border on the east and the Shaviovik and Kavik Rivers on the west (including the program area), and within 5 miles of the coast from the Shaviovik and Kavik Rivers west to Point Barrow;
- Barrier island habitat, used for denning, refuge from human disturbance, and movements along the coast for access to denning and feeding habitats, comprising barrier islands and associated mainland spits, along with the water, ice, and terrestrial habitat within 1 mile of those features, designated as a no-disturbance zone.

Critical habitat excludes human-made structures and the land on which they are located, as well as seven specific areas consisting of the communities of Utqiaġvik and Kaktovik and five US Air Force radar sites (Point Barrow, Point Lonely, Oliktok Point, Bullen Point, and Barter Island). The acreages and percentages of each critical habitat unit in the program area are described below, under *Impacts Common to All Alternatives*.

<u>Habitat Use</u>

Polar bears rely principally on the availability of sea ice habitats to roam, hunt, breed, and rest. Although most of the SBS bears remain on sea ice during summer (Pongracz and Derocher 2017), their use of terrestrial habitats has been increasing as sea ice cover has declined. Between 2000 and 2014, the percentage of collared adult female bears coming ashore tripled (averaging 20 percent and ranging up to 37 percent). The average length of stay ashore increased to 56 days, from 20 days in the 1990s (Atwood et al. 2016b). Given that adult males and subadult bears of both sexes cannot be collared to track their movements, it is not clear what proportion of those bears use land; however, it is clear that they also use land in the summer and autumn (Miller et al. 2015).

Preferred habitats are in the active seasonal ice zone that overlies the continental shelf and associated islands and in areas of heavy offshore pack ice (Stirling 1988; Durner et al. 2004, 2009; Joint Secretariat 2015; Pongracz and Derocher 2017). Adult males usually remain there, rarely coming ashore (Amstrup and DeMaster 1988). Habitat use changes seasonally with the formation, advance, movement, retreat, and melt of sea ice (Amstrup et al. 2000; Ferguson et al. 2000; Durner et al. 2004, 2009; Schliebe et al. 2008; Joint Secretariat 2015).

During winter and spring, polar bears tend to concentrate in areas of ice with pressure ridges, at floe edges, and on drifting seasonal ice at least 8 inches thick (Stirling et al. 1975, 1981; Schliebe et al. 2006); the greatest densities occur in the latter two categories, presumably because those habitats provide greater access to seals. Use of shallow water is greatest in winter, in areas of active ice with shear zones and leads (Durner et al. 2004). Use of landfast ice increases in spring during the pupping season of ringed seals. Multiyear ice is selected in late summer and early autumn as the pack ice retreats to its minimal extent (Ferguson et al. 2000; Durner et al. 2004).

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 25 of 201
AR0245

Although travel distance and speed have increased with decreasing sea ice extent and thickness and increased rate of drift, habitat selection by female polar bears on sea ice does not appear to have changed (Durner et al. 2017).

<u>Maternal Denning</u>

In comparison with core denning areas known to support relatively high concentrations of maternal females of other population stocks, such as those on Wrangel Island in the Chukchi Sea and Svalbard in the North Atlantic, the southern Beaufort Sea is an area of widespread, low-density denning by maternal polar bears (Amstrup 2003b; Schliebe et al. 2006; USFWS 2017a). The total number of maternal dens occupied annually by females of the SBS stock has been estimated at 140 to 240 (Amstrup and Gardner 1994; 75 FR 76099), with the most recent USFWS estimate being approximately 153 (see **Appendix J**).

Notable shifts in the distribution of maternal dens in northern Alaska were documented by comparing 124 den locations used by 85 collared SBS bears between 1985 and 1994 and between 1997 and 2004, documenting a landward and eastward shift in maternal denning along the Beaufort Sea coast (Fischbach et al. 2007). The proportion of dens on drifting sea ice decreased from 62 percent in the early period to 37 percent in the later period, and proportionately fewer dens occurred on pack ice in the western Beaufort Sea in the later period. Although female polar bears do not show fidelity to specific den locations, they tend to den on the same substrate (sea ice or land) from year to year and may return to the same general area to den (Amstrup and Gardner 1994; Amstrup 2003b; Schliebe et al. 2006; Fischbach et al. 2007). Fischbach et al. (2007) noted that more females shifted from sea ice to land during both periods studied and that females in the later period showed greater fidelity to land for denning.

This increasing trend of more bears denning on land has continued (Olson et al. 2017). The use of denning substrate (sea ice or land) is significantly related to where bears occur in autumn. Pregnant polar bears in the SBS stock that spent 25 days or more on land in autumn all subsequently denned on land (Olson et al. 2017), and between 1985 and 2013, the percentage of SBS females denning on land increased from 34 to 55 percent, linked to sea ice declines. Terrestrial denning critical habitat composes 76.3 percent of the program area, and 38 percent more potential maternal denning habitat is available in the program area than in the region immediately west of it (Durner et al. 2006).

Polar bears have been shown to den in the program area with greater frequency than expected, based on available habitat (Amstrup 1993). From 2000 to 2010, 22 percent of the known maternal dens of the SBS stock occurred in the program area (Durner et al. 2010). The USFWS estimates that 23.1 percent of terrestrial dens of the SBS stock occur in the program area annually (see **Appendix J**); thus, the program area is known to be an important area for maternal denning and will likely increase in importance as the percentage of bears denning on land increases with continuing sea ice loss (Olson et al. 2017).

Because of bears' greater proximity to settlements, industrial sites, and other coastal areas of human activity, dens on land and land-fast ice are more vulnerable to disturbance by human activity than are dens on sea ice. A few records of female polar bears denning successfully in snow drifts near oil infrastructure have been recorded since development began in the oil fields along the central Beaufort Sea coast.

Pregnant polar bears denning in terrestrial habitats excavate maternal dens in compacted snow drifts next to coastal banks of barrier islands and mainland bluffs, river, stream, and lake banks, and other areas with suitable topographic relief (Amstrup and DeMaster 1988; Durner et al. 2001, 2003, 2006). In the program area, 46 maternal dens have been documented in terrestrial habitats, 18 of which were located between the Katakturuk and Sadlerochit River drainages in the central portion of the program area; 12 additional dens were found on

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 26 of 201
AR0246

sea ice within 5 miles of the program area and in the Arctic Refuge south of the program area (**Map 3-37** in **Appendix A**).

The dens in this sample were found using a variety of methods; most were found by radio-tracking bears collared with very high frequency radio collars or satellite transmitters from 1989 to 2010, whereas others were found through opportunistic encounters or dedicated searches from as early as 1913 to as recently as 2010 (Durner et al. 2010). Using the best available data on the estimated population of the SBS stock, the proportion of adult females in the population, the breeding probability of adult females, the proportion of dens on land, and the proportion of historical dens in the program area, the USFWS estimates that approximately 20 female bears may den in the program area annually (see **Appendix J**).

The most important characteristic of maternal denning habitat is the presence of topographic features of sufficient height and slope to catch blowing snow and form persistent drifts in early winter, with at least 4.3 feet of vertical topographic relief and steep slopes (mean 40°, range 15.5–50°) (Amstrup and DeMaster 1988; Durner et al. 2001, 2003, 2006). Biologists characterized and mapped landscape features (bank-habitat segments) considered to provide suitable maternal denning habitat along the Alaska Beaufort Sea coast, from the NPR-A to the Canada border (Durner et al. 2001, 2003, 2006, 2013; **Map 3-37** in **Appendix A**). Based on interpretation of aerial imagery by Durner et al. (2006), approximately 1,769 miles of suitable bank habitats have been delineated in the program area (see **Table 3-24** below). Since then, synthetic aperture radar also has been used to detect maternal denning habitat, producing similar results (Durner and Atwood 2018).

Other researchers recently developed a three-dimensional (3D) spatial model, integrating snow physics, weather data, and a high-resolution digital elevation model, to predict the occurrence of potential denning habitat along the Beaufort Sea coast (Liston et al. 2015). All of these techniques can provide fine-scale results to focus aerial surveys of denning habitat using thermal imaging equipment (forward-looking infrared radiometry [airborne FLIR; Amstrup et al. 2004b], also known as aerial infrared [AIR; Owyhee Air Research 2018]). This method is the most suitable for searching large areas for maternal dens in advance of seismic exploration or other potentially disturbing activities (Amstrup et al. 2004b; York et al. 2004; Owyhee Air Research 2018).

*Bowhead Whale*

Bowhead whales transit past the program area during spring (April–June) and fall (September and October) migration, traveling along the shelf break and coming close to shore to feed (Quakenbush et al. 2010; Citta et al. 2015; **Map 3-38**, Bowhead and Beluga Whale Sightings, in **Appendix A**). The spring migratory corridor between the Bering Strait and Cape Bathurst in the Amundsen Gulf (Canada) has been relatively distinct and consistent over time (Citta et al. 2015).

During the summer, bowhead whales feed throughout the Beaufort Sea and may occur in the program area throughout the open-water season. Historically, they have largely aggregated in the Canadian Beaufort Sea and Barrow Canyon (US) in deep water, where upwellings concentrate prey species, although some whales remain in the eastern Chukchi and western Beaufort Seas (Ireland et al. 2009; Quakenbush et al. 2010; Clarke et al. 2011). In the last several years, however, increasing numbers of animals have been observed in nearshore, shallow areas (Clarke et al. 2015), and their historical distribution patterns may be changing.

Fall migrating whales typically reach Cross Island in September and October, although some might arrive as early as late August (BOEM 2018b) and continue on to Point Barrow. After passing Point Barrow, the migration paths of individual bowhead whales fan out across the Chukchi Sea, with some heading toward Wrangel Island (Russia) and then the coastal waters of Chukotka, (Russia); others travel across the Chukchi

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 27 of 201
AR0247

vibration, noise, visual, or olfactory) that contribute to the resource's importance and potential eligibility for the NRHP, or change in access to traditional use sites by traditional users.

In areas where avoidance does not occur, examples of ground-disturbing activities that could potentially cause direct impacts include excavation of material sites; construction and maintenance of gravel roads, pads, airstrips, bridges and culverts; construction of ice roads and pads; construction of VSMs for power lines and pipelines; and any other disturbance of the ground surface in the proximity of development project components. Lease Stipulation 4, which imposes NSO conditions in coastal waters, lagoons, and barrier islands, would reduce the potential for ground-disturbing activities to harm submerged archaeological sites; however, the authorizations for certain infrastructure under Lease Stipulation 4, such as pipelines, docks, and barge landings, could affect these types of sites.

Other activities and events that could potentially cause direct impacts on cultural resources include seismic and other exploratory activities, damage caused by equipment during the exploration, development, production, and abandonment and reclamation phases of development projects, and unanticipated accidents, such as blowouts, spills, or fires, and subsequent cleanup activities (see **Appendix B** for description of the reasonably foreseeable development scenario). Certain future impacts, such as oil spills, can contaminate site artifacts and organic materials to make them undatable. Section 4.3.12.2 in BLM 2012 provides additional discussion of potential direct impacts on cultural resources associated with oil and gas exploration and development.

Potential indirect impacts on cultural resources could also occur at distances greater than the development project footprints. Indirect impacts on cultural resources could occur throughout the five phases of a development project and during closure and reclamation. Examples of indirect impacts on cultural resources could include increased access and potential unauthorized removal, trampling, or dislocation of cultural resources and culturally sensitive areas by personnel and visitors; complete or partial destruction of a site from erosion, thawing permafrost, and thermokarsting; the loss of traditional meaning, identity, association, or importance of a resource; effects on beliefs and traditional religious practices; or neglect of a resource that causes its deterioration.

While potential impacts on specific cultural resource sites would differ by alternative (see discussion below), broader cultural impacts on belief systems/religious practices would be common across all alternatives. Particularly for the Gwich'in, who hold the program area as sacred ground to their culture and as *Iizhik Gwats'an Gwandaii Goodlit* (Gwich'in Steering Committee 2004), the presence of development in the program area would constitute a cultural impact on the Gwich'in. This is because they believe that development in the program area would harm the caribou and other migratory resources (such as waterfowl) that migrate to the Coastal Plain to give birth.

This sacred pattern of migration and birth maintains the value of, and gives essence to, the Coastal Plain as the place where life began. This sacred belief is based on the intergenerational traditional knowledge of the Gwich'in that is built on millennia of residence in the region (see Irving 1958 and Kofinas et al. 2002 for examples of this knowledge). Similar to the cultural value that Iñupiat place on bowhead whales in their culture, caribou are held in the highest regard by the Gwich'in and are the backbone of their cultural identity (Slobodin 1981). Any potential impacts on the resource would constitute a cultural effect. These effects, including those on belief systems, are also discussed in **Section 3.4.4**.

Both the Iñupiat and the Gwich'in have cultural and ethnographic ties to the program area, as evidenced by cultural sites, traditional and contemporary uses, oral histories, and current beliefs and values. When these are

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 28 of 201
AR0292

This section provides a brief overview of sociocultural systems among the Iñupiat, Inuvialuit and Gwich'in (in both Alaska and Canada), including history, social/political organization, the mixed cash/subsistence economy, and belief systems. There is an emphasis on the communities closest to the program area: Kaktovik, Nuiqsut, Arctic Village, and Venetie. The 2012 Point Thomson EIS (USACE 2012, Sections 3.21 and 3.22) and 2012 NPR-A IAP/EIS (BLM 2012, Sections 3.4.2, 3.4.3, and 3.4.4) are incorporated here by reference. They contain additional relevant details regarding Iñupiat subsistence values, their relationship to the environment, and the history of Kaktovik.

The Iñupiat of Kaktovik (Kaktovikmiut) are the primary users of the program area. They have strong cultural and subsistence ties and consider themselves the stewards of the program area (Native Village of Kaktovik 2019). Because of this, the Iñupiat are most likely to experience sociocultural impacts associated with development of the program area. Because of the potential for indirect and cumulative impacts on subsistence for the Inuvialuit and Gwich'in and because of their concerns about development of the Coastal Plain, Inuvialuit and Gwich'in sociocultural systems are also addressed in this affected environment section. Differences in how these sociocultural systems may be affected by development of the program area are described below under *Direct and Indirect Impacts*. Additional associated information relevant to sociocultural systems is given in **Sections 3.4.2**, **3.4.3**, **3.4.10**, and **3.4.11**.

### *History*

#### Iñupiaq

Prehistory and history associated with the program area is described in more detail in USFWS (2015a). Kaktovik and Nuiqsut are the two Iñupiaq communities closest to the program area. The Iñupiat are an Alaska Native people whose territory ranges throughout Northwest and Northern Alaska. Archaeological research indicates that humans have occupied northern Alaska for roughly 14,000 years (Kunz and Reanier 1996). The earliest people entering the North American Arctic were the bearers of the Paleoindian and Paleoarctic traditions. Over thousands of years different cultures came to occupy Arctic Alaska and various parts of the program area, subsisting on resources available to them and developing various tools for survival. The Thule people, whose culture emerged about 1,000 years ago, are the direct ancestors of the Iñupiat living on the North Slope today and are the forebearers of modern whaling technologies and culture.

At the time of Euro-American contact, the North Slope was inhabited by kinship-based groups of Iñupiat who lived in either coastal or inland areas and traveled as needed, depending on food supplies and other factors (Spencer 1984). The coastal settlement pattern was characterized by permanent villages along the coast with outlying minor permanent and temporary settlements (Spencer 1959). One reason for the coastal villages' permanence was due to the marine mammal resource base—particularly bowhead whales—on which community members subsisted. On the North Slope, there is evidence for coastal Iñupiaq settlements from Point Hope (Tikigaq) in the west to as far as Demarcation Point near Canada in the east. The Nuiqsut and Kaktovik areas were known as places where Iñupiat and Athabascan people gathered to trade and fish, maintaining connections between the inland areas and the coast (Maguire 1988; Brown 1979; Impact Assessment Inc. 1990b).

Initial contact between the Iñupiat of the North Slope and Euro-Americans occurred in the early nineteenth century with the arrival of explorers. Exploration of the North Slope began in 1825 with the first Franklin expedition, which included stays by Sir John Franklin and his crew at Herschel and Barter islands. Commercial whaling along the North Slope durin the second half of the nineteenth century brought the first major outside influence on Iñupiaq settlement patterns, affecting both coastal and inland settlements.

use of land-based resources, spreading into the Mackenzie River delta by around AD 1300 (Wildlife Management Advisory Council [North Slope] 1996; Inuvialuit Regional Corporation 2011).

At the time of contact with Europeans, the Inuvialuit were divided into approximately eight territorial groups, living along the Arctic coastal plain, from Barter Island in Alaska to Franklin Bay in the Inuvialuit Settlement Region of the Northwest Territories (Lyons 2009). The estimated Inuvialuit population at the time was between 2,000 and 2,500 (Wildlife Management Advisory Council [North Slope] and Aklavik Hunters and Trappers Committee 2018a). Each of the eight territorial groups resided in a primary winter village for a portion of the year, then dispersed into smaller harvesting camps during the rest of the year (Wildlife Management Advisory Council North Slope]and Aklavik Hunters and Trappers Committee 2018a). The territorial groups established active trade networks with other Inuit, including the Iñupiat, and Gwich'in. Regular trade routes covered north Alaska and the central Arctic and stretched across the ACP to Point Barrow and Barter Island (Wildlife Management Advisory Council [North Slope] 1996).

Although contact with the West began as early as the late 1700s with European expeditions to search for a Northwest Passage, the Inuvialuit generally maintained a traditional way of life throughout much of the 1800s (Inuvialuit Regional Corporation 2011). A trading post was established south of the Inuvialuit settlement region, at the current location of Fort McPherson in the mid-1800s. This increased trade across the regions (Lyons 2009).

Direct, sustained contact with Western culture for the Inuvialuit began at the end of the nineteenth century, when crews from American whaling ships began overwintering at Herschel Island. This was a time of profound and rapid change for Inuvialuit people. Within a few decades, Western residential schools and hospitals and Anglican and Roman Catholic missions were established in Inuvialuit homelands. With the advent of the Western education system, it also became common for Inuvialuit children to be sent away to more distant residential schools for a large portion of the year. This directly affected a family's ability to teach Inuvialuiktun languages and Inuvialuit traditional cultural values and practices to the younger generations (Wildlife Management Advisory Council [North Slope] and Aklavik Hunters and Trappers Committee 2018).

Today, there are approximately 5,000 Inuvialuit people residing in six main communities: Aklavik, Inuvik, Tuktoyaktuk, Paulatuk, Ulukhaktok, and Sachs Harbour (Joint Secretariat 2015). Aklavik, which is the Inuvialuit community closest to the program area, became a center of commerce and administration during the 1930s (Wildlife Management Advisory Council [North Slope and Aklavik Hunters and Trappers Committee 2018a). While Inuvik has since replaced Aklavik as the center of commerce and administration in the region, Aklavik still has a population of approximately 600 (Government of Northwest Territories, no date). Residents of both Inuvik and Aklavik have family and social ties with residents of the Iñupiaq community of Kaktovik in Alaska. Many Inuvialuit still feel culturally connected to the North Slope of Alaska, including the Coastal Plain, due to their ancestral ties there.

<u>Gwich'in (Alaska)</u>

Prehistory and history associated with the program area is described in USFWS (2015a). The Gwich'in are an Athabascan cultural group who traditionally occupied a massive territory that incorporated long sections of the Yukon, Porcupine, Peel, Chandalar, Itkillik, and Sagavanirktok Rivers and into present-day Canada to the Mackenzie Flats and River Delta (Burch 1998; Raboff 2001, 1999; Slobodin 1981). Archaeological data suggest a Paleoarctic human occupation in the Yukon River region, which includes the contemporary Gwich'in communities of Arctic Village and Venetie, beginning at least 12,000 years ago (Griffin and Chesmore 1988). Ancestral to the Gwich'in Athabascans, the Kavik culture occupied areas of the North Slope and Brooks Range as early as 600 years ago and as late as the early to mid-nineteenth century.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 30 of 201
AR0329

In the north, interactions between the Gwich'in or Koyukon and the Kukpigmiut Iñupiat of the Colville River were marked by territorial tensions and hostility, culminating in a series of violent incidents that forced the Athabascans south of the mountains (Raboff 2001). Continuing battles with the Iñupiat and other Athabascans in the 1840s pushed the Gwich'in from the Koyukuk River east to Chandalar Lake and beyond. The Gwich'in were among the most nomadic of the Athabascan groups in their settlement patterns and continued to travel north to trade with the Iñupiat at Barter Island into the 1920s (Jacobson and Wentworth 1982). Similar to the Nunamiut farther north, the Gwich'in relied heavily on the harvest of large land mammals—particularly caribou, but also moose and Dall sheep—for their livelihood.

Some of the first contact with the Gwich'in by Europeans likely took place with the Hudson's Bay Company trading post at Fort Yukon in 1847, some of the latest in terms of first contact in Alaska. It continued with little contact through the end of the nineteenth century (Hadleigh-West 1963). Still, the indirect contact that occurred with other groups trading with the Gwich'in in the 1850s resulted in an epidemic that devastated their population, especially in the western extent of their territory near the Kanuti River. By 1870, most Gwich'in groups had moved into the Yukon Flats or east of Chandalar River. This constitutes the known modern territorial range of the Gwich'in today (Burch and Mishler 1995).

Continuous Euro-American presence in Gwich'in territory came later than for some other indigenous groups in Alaska. As such, the traditional subsistence lifestyle, including a continued reliance on hunting and fishing as a primary source of food and as a primary basis for Gwich'in belief systems, was substantially maintained until World War II (Caulfield 1983).

A severe decline in caribou populations in the Yukon Flats area in the late 1930s and 1940s may have precipitated the need for the Gwich'in to adapt to a more cash-based economy (Caulfield 1983). The US established several Native reservations in Alaska following the inclusion of Alaska in the Indian Reorganization Act of 1936. The Venetie Indian Reservation included the Gwich'in of Arctic Village, Venetie, Christian Village, and Robert's Fish Camp. It was during this period that the Gwich'in made a final transition to permanent settlements (Inoue 2004). The early 1960s saw the creation of the Arctic Refuge, which included lands traditionally used by the Gwich'in.

Gwich'in (Canada)

Despite being separated by the border between the US and Canada, the Canadian Gwich'in and the Alaskan Gwich'in share the same Athabascan heritage and history. Archaeological evidence suggests that the area of Northwest Canada has been inhabited for tens of thousands of years (Wolfe et al. 2011). Before European contact, the Gwich'in were organized into nine regional groups (bands) and occupied a large area extending from the Alaskan interior to the Mackenzie River Valley.

The Canadian Gwich'in reside in the Northern Yukon and Mackenzie River Valley in the Northwest Territories (Western Arctic Handbook Committee 2002; Fafard and Kritsch 2003). They continue to have kinship ties to Gwich'in in Alaska and maintain sharing and social networks. Similar to other Gwich'in groups, the Gwich'in of Northwest Canada, known as the Tsii'deii, lived a semi-nomadic lifestyle based on the seasonal availability of wild resources (Western Arctic Handbook Committee 2002).

Today, the primary Canadian Gwich'in groups are the Vuntut Gwich'in (Old Crow), Teetlit Gwich'in (Fort McPherson), Ehdiitat Gwich'in (Aklavik), Nihtat Gwich'in (Inuvik), and Gwichya Gwich'in (Tsiigehtchic) (Western Arctic Handbook Committee 2002). The Vuntut Gwich'in of Old Crow have a territory and dialect that is distinct from the Gwich'in of the Northwest Territories (Fort McPherson, Aklavik, Inuvik, and Tsiigehtchic) (Fafard and Kritsch 2003).

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 31 of 201
AR0330

(Dinero 2005). The Gwich'in highly value traditional knowledge of the land and its resources; also, the passing on of traditional knowledge to younger generations is of utmost importance.

In the early 1940s, as a result of the combined efforts of the residents of the area, the US Department of the Interior established the Venetie Indian Reservation, which was meant to protect the lands for subsistence uses. After passage of ANCSA, residents of Arctic Village and Venetie, opted for title to the 1.8 million acres of reserve land, which they now own jointly through the Native Village of Venetie Tribal Government (Venetie Village Council 2013; Inoue 2004).

Unlike many Alaska Native communities, Arctic Village and Venetie are not shareholders in a regional ANCSA corporation and do not have ANSCA village corporations. As such, those communities do not receive any increased economic activity associated with resource development or shares therein by ANCSA corporations.

Since interest in developing the Arctic Refuge began in the 1980s, the Gwich'in—particularly the Gwich'in of Arctic Village and Venetie—have taken various legal and political actions to prevent such development. Based primarily on concerns about impacts on caribou who calve in the Coastal Plain and subsequent impacts on Gwich'in cultural survival, their opposition has led to many residents advocating for caribou and the Gwich'in way of life. Many of their people wish to protect their traditional lifestyle centered on the PCH. However, in 1984, the Native Village of Venetie Tribal Government, proposed to offer their approximately 1.8 million acres of land for competitive oil and gas leasing (Senator Murkowski 2000)

In 1988, the first of many Gwich'in gatherings was held in Arctic Village to discuss the potential for development in the Arctic Refuge. Out of this meeting the Gwich'in Steering Committee was established, whose stated goal was to "establish Gwich'in cultural survival as a major issue in the debate over oil development in the Arctic Refuge" (Inoue 2004). Meeting attendees included over 500 Gwich'in from both Alaska and Canada.

Community institutions in Arctic Village include the Arctic Village Council; community institutions in Venetie include the Venetie Village Council. Both Arctic Village and Venetie are members of the Native Village of Venetie Tribal Government, the Council of Athabascan Tribal Governments, and the Tanana Chiefs Conference (ADCCED 2018c).

<u>Gwich'in (Canada)</u>
Traditional Canadian Gwich'in social structure is similar to that described for the Alaska Gwich'in (above); however, as residents of separate nations, their more recent social and political organizations involve the Canadian Government, the Gwich'in Tribal Council (GTC) and associated communities, and the Vuntut Gwich'in First Nation. All of these entities work together to co-manage Gwich'in land and wildlife (Gwich'in Tribal Council 2018).

There have been numerous studies conducted or funded by various Gwich'in organizations, such as *At the Heart of the Teetlit Gwich'in Cultural Landscape*, funded by the Teetlit Gwich'in First Nation. Such studies demonstrate a lasting commitment to preserving their land and resources.

The PCH is of high importance to the Canadian Gwich'in and has been a driver in the formation of agreements and legislation, such as the International Porcupine Caribou Agreement. It was established in 1987 and was signed by both the Canadian and US governments and was intended to help protect the PCH, which migrates between northeastern Alaska and northwestern Canada (Vuntut Gwich'in Government 2017). Caribou Leadership: A Study of Traditional Knowledge, Animal, Behavior, and Policy is another example of co-

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 32 of 201
AR0335

of areas viewable from the stream by limiting vistas. It is possible that melting permafrost could increase sedimentation and turbidity in these streams, reducing water quality.

*Wilderness Characteristics, Qualities, and Values*

The USFWS (2015a, Section 4.1.3.5) described the wilderness characteristics in the Arctic Refuge. This section tiers to and incorporates by reference relevant information, while placing emphasis on the program area location. There have been no new data on the wilderness values associated with the program area since the completion of the Arctic Refuge CCP (USFWS 2015a).

The 1964 Wilderness Act established a national system of lands to preserve the natural and wild condition for the benefit of future generations. Public Land Order 2214 (1960) established the original Arctic Range for the purpose of preserving unique wildlife, wilderness, and recreation values. ANILCA Section 101(b) outlines the intent "to preserve in their natural state extensive unaltered arctic tundra...ecosystems; and to preserve wilderness resource values and related recreational opportunities including but not limited to hiking, canoeing, fishing, and sport hunting, in large arctic and subarctic wildlands and on free-flowing rivers...." ANILCA Section 707 directs agencies to manage Congressionally designated wilderness in accordance with the Wilderness Act, except as provided in ANILCA. Further, ANILCA 304(g)(2)(B) requires the Secretary of the Interior to identify and describe "the special values of the refuge, as well as...wilderness value of the refuge" when developing plans. In the Arctic Refuge CCP (USFWS 2015a) the USFWS recommended the lands in the program area for wilderness designation; however, Congress did not act on these wilderness recommendations, and subsequently, the minimal management standard for the Coastal Plain must now be adjusted to account for the oil and gas leasing program required by the PL 115-97.

While executive or administrative enabling actions for existing units of the Arctic Refuge system are still in effect, in the event of a conflict, pursuant to Section 305 of ANILCA, the provisions of ANILCA and ANCSA would prevail.

The Wilderness Act describes four primary qualities of wilderness, as follows:

- Generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable
- Has outstanding opportunities for solitude or a primitive and unconfined type of recreation
- Has at least 5,000 acres or is of sufficient size as to make practicable its preservation and use in an unimpaired condition
- May also contain ecological, geological, or other features of scientific, educational, scenic, or historic value

These qualities are found throughout the program area, except for certain tracts in the vicinity of Kaktovik.

### Direct and Indirect Impacts

Issuance of oil and gas leases under the directives of Section 20001(c)(1) of PL 115-97 would have no direct impacts on the environment because by itself a lease does not authorize any on the ground oil and gas activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to further environmental review and reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease. The impacts of such future exploration and development activities that may occur because of the issuance of leases are considered potential indirect impacts of leasing. Such post-lease activities could include seismic and drilling exploration, development, and transportation of oil and gas in and from the

Affected Environment and Environmental Consequences

Hydrocarbon Potential, Alternative B

U.S. DEPARTMENT OF THE INTERIOR | BUREAU OF LAND MANAGEMENT | ALASKA | COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL EIS



**Not offered for lease sale (none)**

**Available for lease sale:**
- Subject to no surface occupancy
- Subject to controlled surface use (none)
- Subject to timing limitations
- Subject to only standard terms and conditions

**Hydrocarbon potential**
- High
- Medium
- Low

Public Law 115-97 Coastal Plain

Excluded from Public Law 115-97
Coastal Plain or outside the BLM's
oil and gas leasing authority

Data Source: BLM GIS 2018,
USFWS GIS 2018a, USGS
GIS 1998
Print Date: 08/27/2019

**Map 3-6**

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.

Affected Environment and Environmental Consequences

Hydrocarbon Potential, Alternative C

U.S. DEPARTMENT OF THE INTERIOR | BUREAU OF LAND MANAGEMENT | ALASKA | COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL EIS



**Not offered for lease sale (none)**

**Available for lease sale:**
- Subject to no surface occupancy
- Subject to controlled surface use (none)
- Subject to timing limitations
- Subject to only standard terms and conditions

**Hydrocarbon potential**
- High
- Medium
- Low

Public Law 115-97 Coastal Plain

Excluded from Public Law 115-97 Coastal Plain or outside the BLM's oil and gas leasing authority

Data Source: BLM GIS 2018, USFWS GIS 2018a, USGS GIS 1998
Print Date: 08/27/2019

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.

Map 3-7

Affected Environment and Environmental Consequences

Hydrocarbon Potential, Alternative D1

U.S. DEPARTMENT OF THE INTERIOR | BUREAU OF LAND MANAGEMENT | ALASKA | COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL EIS





**Not offered for lease sale**

**Available for lease sale:**
- Subject to no surface occupancy
- Subject to controlled surface use
- Subject to timing limitations
- Subject to only standard terms and conditions

**Hydrocarbon potential**
- High
- Medium
- Low

Public Law 115-97 Coastal Plain

Excluded from Public Law 115-97
Coastal Plain or outside the BLM's
oil and gas leasing authority

Data Source: BLM GIS 2018,
USFWS GIS 2018a, USGS
GIS 1998
Print Date: 08/27/2019

No warranty is made by the Bureau of Land Management as to the
accuracy, reliability, or completeness of these data for individual or
aggregate use with other data. Original data were compiled from
various sources. This information may not meet National Map
Accuracy Standards. This product was developed through digital
means and may be updated without notification.

**Map 3-8**

Affected Environment and Environmental Consequences

Hydrocarbon Potential, Alternative D2

U.S. DEPARTMENT OF THE INTERIOR | BUREAU OF LAND MANAGEMENT | ALASKA | COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL EIS





**Not offered for lease sale**

**Available for lease sale:**
- Subject to no surface occupancy
- Subject to controlled surface use
- Subject to timing limitations
- Subject to only standard terms and conditions (none)

**Hydrocarbon potential**
- High
- Medium
- Low

**Public Law 115-97 Coastal Plain**

**Excluded from Public Law 115-97**
Coastal Plain or outside the BLM's oil and gas leasing authority

Data Source: BLM GIS 2018,
USFWS GIS 2018a, USGS
GIS 1998
Print Date: 08/27/2019

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.

**Map 3-9**

# Appendix B. Reasonably Foreseeable Development Scenario for Oil and Gas Resources in the Public Law 115-97 Coastal Plain, Alaska

## B.1 SUMMARY

This hypothetical development scenario represents a good faith effort to project reasonably foreseeable oil and gas exploration, development, production, and abandonment in accordance with the Tax Cuts and Jobs Act of 2017, Public Law 115-97 (Dec. 22, 2017) (PL 115-97) Coastal Plain (Coastal Plain), and 40 Code of Federal Regulations (CFR) 1508.8(b). Estimating the level of future oil and gas activity in this area is difficult at best. Timing and location of future commercially viable discoveries cannot be more accurately projected until these undiscovered resources are explored. The hypothetical unconstrained scenario projects development under standard lease terms and encompasses restrictions in the enacting legislation. Scenarios by alternative incorporate the leasing stipulations and required operating procedures in the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (Leasing EIS) into the hypothetical projections.

The Coastal Plain encompasses approximately 1,563,500 acres of federal land in the northernmost end of the Arctic National Wildlife Refuge (Arctic Refuge). Alaska Native Claims Settlement Act (ANCSA) corporation lands that are patented or interim conveyed are excluded from the program area.

Very little oil and gas exploration has occurred in this area, and there are no proven plays[1] at this point. The United States Geological Survey (USGS) estimated that there is a 95 percent probability that the federal lands in the 1002 Area (as defined by ANILCA) of the Arctic Refuge[2] contain a technically recoverable volume of least 4.25 billion barrels of oil (BBO). There is a 5 percent probability that the technically recoverable volume of oil could exceed 11.80 BBO. The mean estimate of technically recoverable oil for the federal lands in the ANILCA 1002 Area of the Arctic Refuge is 7.69 BBO. Of this, a mean of 7.14 BBO was estimated to be economically recoverable at $55 per barrel (2005 dollars, approximately $70 in 2018 dollars; Attanasi 2005). Alaska North Slope crude is currently priced around $65 per barrel (ycharts.com 2018), and the US Energy Information Administration (EIA) projects that crude oil prices will continue to rise in the next 20 years (EIA 2018). More recent estimates published by the EIA estimate mean oil production in the Coastal Plain at 3.4 BBO produced by 2050 (Van Wagner 2018).

Technically recoverable associated and unassociated natural gas resources are estimated at 7.04 trillion cubic feet (TCF; Attanasi 2005). Proposed gas pipelines connecting the North Slope to potential markets would first connect to better understood and established fields before connecting to the Coastal Plain. There are estimated to be 225 million barrels of natural gas liquids in the program area; some amount of natural gas liquids would be produced as a byproduct of oil production in some formations.

---

[1]A play is a group of oil fields or prospects in the same region that are controlled by the same set of geological circumstances.
[2]Similar in area and boundary, but not identical to the Coastal Plain program area boundary.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 38 of 201
AR0608

Additional assumptions, some of which also tend to support an optimistic set of hypothetical development scenarios, are as follows:

- Multiple lease sales would be held, with the first sale within first year after the signing of the Record of Decision (ROD).

- Industry would aggressively lease and explore the tracts offered.

- Economic conditions (particularly oil and gas prices) would be high enough to support development in the Coastal Plain.

- Undiscovered oil deposits would be discovered in all potential areas (high, medium, and low).

- Industry groups would independently explore and develop new fields in the Coastal Plain.

- Operators would enter agreements to share road and pipeline infrastructure, where feasible.

- Discoveries could be announced any time during a 10-year period (primary lease term) following lease sale, or during a subsequent 10-year lease renewal period (per 43 CFR 3135.1-6).

- Up to three anchor fields, with a minimum of 400 million barrels of producible reserves in each, would be discovered.

- Future oil production would use existing North Slope infrastructure, including the Trans-Alaska Pipeline System (TAPS).

- If the Coastal Plain is connected to a future natural gas pipeline, the plant for compressing produced natural gas into liquid natural gas would be located outside of the Coastal Plain.

- Production wells would have horizontal wellbores, with the lateral portion coinciding with the target formation.

- Each producing horizontal oil well would require a horizontal injection well.

- Once all wells are online for a field, the projected yield would be approximately 100,000 barrels of oil per day (peak production) for approximately 3 years, with an 8 percent annual production decline.[4]

- The maximum production range from CPF to satellite pads is an approximately 35-mile radius.

- Production activities would continue year-round for approximately 10 to 50 years, depending on field size.

- Production would end when the value of production cannot meet operating expenses.

- Fuel for equipment operation would be hauled overland.

- Gas would be re-injected into the formation to maintain reservoir pressure and enhance oil recovery.

Gas would be flared or vented only in situations where an equipment failure prevents re-injection or there is danger of equipment becoming over-pressurized. Federal operators must use flaring over venting (43 CFR 3179.6(b)).

## B.6.1  Surface Development Limitations

Section 1.9.1 of the EIS contains the BLM's interpretation of Section 20001(c)(3) of PL 115-97, which states the following:

---

[4]The 100,000 barrels of oil per day represents the minimum for a CPF in the Coastal Plain based on Willow and Pikka Nanushuk on the North Slope, though for any particular development this number may be exceeded. Decline estimate is based on standard decline estimates from the State of Alaska and the estimates used in NPR-A analyses.

> SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

For the purposes of impact analysis, BLM employs that interpretation as an assumption in each of the action alternatives analyzed in the EIS. See Section S.1.2 of **Appendix S** for a detailed explanation of the basis for the interpretation, including BLM's response to public comments received on the interpretation included in the Draft EIS.

## B.7    HYPOTHETICAL UNCONSTRAINED SCENARIO

This hypothetical unconstrained scenario projects an estimated projection of activity on federal lands in the Coastal Plain, assuming all potentially productive areas will be open to leasing, subject to standard terms and conditions. The exception is those areas designated as closed to leasing by law, regulation, or executive order. The activities and methods described in the hypothetical unconstrained scenario are based on the activities typically associated with oil and gas operations on the North Slope of Alaska.

For a further description of typical activities and methods in the North Slope, see Section 4.2.1.2 of the National Petroleum Reserve-Alaska Final Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) (BLM 2012).

The hypothetical development scenario is meant to convey the most likely unconstrained development scenario, with no management restrictions except those mandated by law. The hypothetical scenario provides the mechanism to analyze the effects that discretionary management decisions under the Leasing EIS alternatives would have on estimated future oil activity.

**Table B-3**, below, describes the general time frames in which hypothetical exploration, development, and production might occur in the Coastal Plain. As described in *Method and Assumptions for Hypothetical Development Scenario Projections*, a time lag of at least 8 years is expected between the first lease sale and the beginning of production. As previously discussed, the time frames below represent an optimistic, aggressive hypothetical scenario. Activities projected to occur within 5 years after the first lease sale are considered short term; activities projected to occur more than 5 years after the first lease sale are considered long term.

### Table B-3
### Estimated Hypothetical Development Time Frames

| Project Phase | Estimated Time Frames of Activities | Projected Activities |
|---|---|---|
| Initial 3D seismic exploration | Within the next 2 years | Area-wide 3D seismic exploration |
| Leasing | Within 1 year of ROD | First lease sale |
| Exploration | Within 2 years after first lease sale (winter) | • First application for permit to drill submitted for exploration well<br>• First exploration well drilled<br>• Assumes discovery with first exploration well |

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 40 of 201
AR0617

CPF in the medium potential area south of Kaktovik, and one CPF in the low potential area. This hypothetical scenario includes the possibility that one or more CPFs could be located on state or native lands. Approximately 14 satellite pads are projected to be developed, in addition to the four anchor pads associated with the CPFs; an estimated 174 miles of gravel road would be needed to connect facilities.

It is projected that one seawater treatment plant and at least one barge landing and storage pad would be needed under this hypothetical scenario. It is possible that one or more of the CPF development clusters under the hypothetical scenario would be roadless. This would entail an expanded airstrip at the CPF with the capacity to handle the larger cargo planes and increased air traffic. In a hypothetical roadless development scenario, it is expected that service roads would still connect satellite pads to the central CPF, so no airstrips would be required at satellites.

An ice road would be constructed each winter under a roadless hypothetical scenario to connect to the CPF and to transport larger and heavier supply items required for the coming year. Any equipment or supplies not transported during the winter would be flown in. Additional flights would be needed, compared to a hypothetical roaded development. Roadless development would depend on sufficient water resources for the construction of ice roads each winter. Under the hypothetical development scenario for this alternative, it is expected that the 2,000-acre surface development limit would be reached. See *Surface Disturbance Due to Oil and Gas*, below, for more details on the surface disturbance projected to be created under the hypothetical development scenario for this alternative.

### B.8.3 Alternative C

Under this alternative, hypothetical development would be expected to occur in approximately the same manner as the hypothetical unconstrained scenario. In the long term, three CPFs are projected to be built under a hypothetical scenario. This could include two in the high potential area and one in the medium potential area south of Kaktovik. Approximately 15 satellite pads are projected to be developed under a hypothetical scenario, in addition to the three production pads associated with the CPFs. An estimated 180 miles of gravel road would be needed to connect facilities, and one seawater treatment plant and one barge landing and storage pad would be needed under a hypothetical scenario. Under the hypothetical development scenario for this alternative, it is expected that the 2,000-acre surface development limit would be reached. See *Surface Disturbance Due to Oil and Gas*, below, for more details on the surface disturbance projected to be created under the hypothetical development scenario for this alternative.

### B.8.4 Alternative D1

Due to additional restrictions and stipulations under this alternative, the potential locations for drill pads and CPFs under a hypothetical development scenario could be limited, and pad configurations and locations could change. In the long term, two CPFs are projected to be built under a hypothetical scenario. This could include one in the high potential area and one in the medium potential area south of Kaktovik. The assumption is that approximately 16 satellite pads would be developed under this hypothetical scenario, in addition to the two production pads associated with the CPFs. An estimated 185 miles of gravel road would be needed to connect facilities, and one seawater treatment plant and one barge landing and storage pad would be needed under a hypothetical scenario. Under the hypothetical development scenario for this alternative the 2,000-acre surface development limit is expected to be reached. See *Surface Disturbance Due to Oil and Gas*, below, for more details on the surface disturbance projected to be created under the hypothetical development scenario for this alternative.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 41 of 201
AR0630

**Table B-4**
**Estimated Surface Disturbance by Facility**

| Estimated Facility Sizes[11] | Acres of Estimated Surface Disturbance |
|---|---|
| CPF, airstrip, anchor well pad | 50 |
| Satellite pads | 12 |
| Gravel roads | 7.5 per mile |
| VSMs | 0.04 per mile |
| Seawater treatment plant | 15 |
| Barge landing and equipment storage | 10 |

Sources: BLM 2004, 2012; USACE 2017

**Table B-5**
**Hypothetical Projected Facilities and Estimated Surface Disturbance by Alternative[1]**

| Facility Type | Alternative B | | Alternative C | | Alternatives D1 and D2 | |
|---|---|---|---|---|---|---|
| | Number of Potential Facilities | Estimated Acres of Disturbance | Number of Potential Facilities | Estimated Acres of Disturbance | Number of Potential Facilities | Estimated Acres of Disturbance |
| CPF, airstrip, anchor well pad | 4 | 200 | 3 | 150 | 2 | 100 |
| Satellite pads | 14 | 168 | 15 | 180 | 16 | 192 |
| Roads | 174 miles | 1,305 | 180 miles | 1,350 | 185 miles | 1,388 |
| VSMs (pipeline miles) | 212 miles | 8 | 214 miles | 9 | 217 miles | 9 |
| Seawater treatment plant | 1 | 15 | 1 | 15 | 1 | 15 |
| Barge landing and storage | 1 | 10 | 1 | 10 | 1 | 10 |
| Gravel pits and stockpiles[2] | — | 296 | — | 292 | — | 288 |
| **Total (approximate)** | — | **2,000** | — | **2,000** | — | **2,000** |

[1]All potential facility numbers and surface disturbance acreages are general hypothetical estimates and are not based on specific project proposals. Acreages are approximate and rounded to the nearest acre.
[2]The number of gravel pits is dependent on the locations of gravel resources in relation to project components and thus is unknown at this time.
— = not applicable

## B.10 ECONOMIC IMPACTS

Issuance of an oil and gas lease under the directives of Section 20001(c)(1) of PL 115-97 has no direct impacts on the environment; however, it is a commitment of oil and gas resources for potential future exploration and development, subject to environmental review and permits, that would result in future indirect impacts from exploration and development activities. Indirect impacts because of a lease sale include direct and indirect impacts from post-lease activities, including seismic and drilling exploration, development, and transportation of oil and gas in and from the Coastal Plain. Therefore, an analysis is provided of the potential direct and indirect impacts that may follow a leasing decision along with the potential cumulative impacts throughout the entire program area.

---

[11]Estimated facility sizes were determined based on facility sizes from comparable North Slope projects, such as Alpine, and the professional expertise of the BLM and Alaska Department of Natural Resources staff.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 42 of 201
AR0633

# Appendix E
ANILCA Section 810 Final Evaluation

AR0682

This page intentionally left blank.

AR0683

# TABLE OF CONTENTS

Chapter                                                                     Page

**APPENDIX E. ANILCA SECTION 810 FINAL EVALUATION**.................................................... **E-1**

    E.1    Subsistence Evaluation Factors.............................................................. E-1

    E.2    ANILCA Section 810(a) Evaluations and Findings for All Alternatives and
          the Cumulative Case ........................................................................... E-2

          E.2.1   Evaluation and Finding for Alternative A: No Action.................... E-4

          E.2.2   Evaluation and Finding for Alternative B................................... E-4

          E.2.3   Evaluation and Finding for Alternative C.................................. E-11

          E.2.4   Evaluation and Finding for Alternative D1 ................................ E-13

          E.2.5   Evaluation and Finding for Alternative D2 ................................ E-15

          E.2.6   Evaluation and Finding for the Cumulative Case ........................ E-16

    E.3    Notice and Hearings........................................................................... E-20

    E.4    Subsistence Determinations under the ANILCA Section 810(a)(3)(A), (B),
          and (C) ............................................................................................. E-20

          E.4.1   Significant Restriction of Subsistence Use is Necessary, Consistent
                  with Sound Management Principles for the Utilization of Public Lands...... E-21

          E.4.2   The Proposed Activity will involve the Minimal Amount of Public
                  Lands Necessary to Accomplish the Purposes of such Use, Occupancy,
                  or Other Disposition........................................................................ E-21

          E.4.3   Reasonable Steps will be taken to Minimize Adverse Impacts upon
                  Subsistence Uses and Resources Resulting from Such Actions .................. E-21

    E.5    References........................................................................................... E-23

# TABLES

 Page

E-1    Lease Restrictions in High-Use Porcupine Caribou Herd Calving Area (acres) ................... E-27

E-2    Summary of Impacts on Abundance and Availability of Major Subsistence Resources
        for Kaktovik, Nuiqsut, Arctic Village, and Venetie ............................................... E-28

E-3    Summary of Impacts on Access to Major Subsistence Resources for Kaktovik,
        Nuiqsut, Arctic Village, and Venetie ................................................................ E-29

# MAP

 Page

E-1    High Use Porcupine Caribou Herd Calving Area ................................................. E-25

This page intentionally left blank.

AR0685

# Appendix E. ANILCA Section 810 Final Evaluation

## E.1 SUBSISTENCE EVALUATION FACTORS

Section 810(a) of the Alaska National Interest Lands Conservation Act (ANILCA), 16 United States Code (USC) 3120(a), requires that an evaluation of subsistence uses and needs be completed for any federal determination to "withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands." As such, an evaluation of potential impacts on subsistence under ANILCA Section 810(a) must be completed for the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (Leasing EIS or EIS). ANILCA requires that this evaluation include findings on three specific issues, as follows:

- The effect of use, occupancy, or disposition of public lands on subsistence uses and needs
- The availability of other lands for the purposes sought to be achieved
- Other alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes

Per Bureau of Land Management (BLM) Instruction Memorandum No. AK-2011-008 (BLM 2011), three factors are considered when determining if a significant restriction of subsistence uses and needs may result from the proposed action, alternatives, or in the cumulative case, as follows:

- Reduction in the *abundance* of harvestable resources used for subsistence purposes
- Reduction in the *availability* of resources used for subsistence caused by alteration of their distribution, migration patterns, or location
- Legal or physical limitations on *access* of subsistence users to harvestable resources

Each alternative must be analyzed according to these criteria. ANILCA Section 810 also requires that cumulative impacts be analyzed. This approach helps the reader separate subsistence restrictions that could be caused by activities proposed under the five alternatives from those that could be caused by past, present, or future activities that have occurred or could occur in the surrounding area.

An alternative would be considered to significantly restrict subsistence uses if, after consideration of protection measures, such as lease stipulations or required operating procedures, it can be expected to substantially reduce the opportunity to use subsistence resources (BLM 2011). Substantial reductions are generally caused by large reductions in resource abundance, a major redistribution of resources, extensive interference with access, or major increases in the use of those resources by non-subsistence users.

If the analysis determines that the proposed action, alternatives, or the cumulative case may significantly restrict subsistence uses, the BLM is required to notify the State of Alaska and appropriate regional and local subsistence committees. It also must conduct ANILCA Section 810 hearings in potentially affected communities.

It is possible that the finding may be revised to "will not significantly restrict subsistence uses" based on changes to alternatives, new information, or new mitigation measures resulting from the hearings. If the significant restriction remains, the BLM may prohibit the action or finalize the evaluation by making the following determinations:

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 47 of 201
AR0686

- A significant restriction of subsistence uses would be necessary, consistent with sound management principles for the use of public lands

- The proposed activity would involve the minimal amount of public land necessary to accomplish the purpose of the use, occupancy, or other disposition

- Reasonable steps would be taken to minimize adverse effects on subsistence uses and resources resulting from such actions (Section 810(a)(3))

The BLM can then authorize use of the public lands.

## E.2    ANILCA SECTION 810(A) EVALUATIONS AND FINDINGS FOR ALL ALTERNATIVES AND THE CUMULATIVE CASE

This ANILCA Section 810 evaluation relies primarily on the information contained in the Leasing EIS. **Chapter 3** describes areas and resources important for subsistence, and specific communities' degree of dependence on various fish and wildlife resources. It also describes the environmental consequences anticipated under each alternative, which the BLM uses to determine whether each alternative and the cumulative case would cause a significant restriction to subsistence uses. Consistent with NEPA and Council on Environmental Quality (CEQ) guidance, this evaluation does not analyze or present impacts under a worst-case scenario. Rather, it discusses impacts under each alternative based on the assumptions and discussion in the hypothetical development scenario (**Appendix B**).

Issuance of oil and gas leases under the directives of Section 20001(c)(1) of Public Law (PL) 115-97 would have no direct impacts on the environment because by itself a lease does not authorize any on the ground oil and gas activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to further environmental review and reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease. The impacts of such future exploration and development activities that may occur because of the issuance of leases are considered potential indirect impacts of leasing. Such post-lease activities could include seismic and drilling exploration, development, and transportation of oil and gas in and from the Coastal Plain. Therefore, the analysis in Chapter 3 is of potential direct, indirect, and cumulative impacts from on-the-ground post-lease activities.

The Leasing EIS uses a hypothetical development scenario (see **Appendix B**) to inform the impact analysis for each alternative; however, additional National Environmental Policy Act (NEPA) and ANILCA Section 810 analyses would occur with future project-specific proposals. The regulations governing leasing and development provide for multiple decision stages prior to any ground-disturbing activities being authorized and require further compliance with applicable laws, including NEPA, during post-leasing decision stages. Until the BLM receives and evaluates an application for an exploration permit, permit to drill, or other authorization that includes site-specific information about a particular project, impacts of actual exploration and development that might follow lease issuance are speculative, as so much is unknown as to location, scope, scale, and timing of that exploration and development. At each decision stage, the BLM retains the authority to approve, deny, or reasonably condition any proposed on the ground-disturbing activity based on compliance with applicable laws and policies. Therefore, the analysis of effects of exploration and development in the Leasing EIS, including this ANILCA 810 evaluation, necessarily reflects a more general, programmatic approach than could occur at the post-lease project-specific stage.

The EIS summarizes the relevant subsistence activities of communities that use the program area or the resources that migrate through the program area and are harvested elsewhere. Consistent with the EIS, this evaluation focuses on subsistence impacts to four communities: Kaktovik, Nuiqsut, Arctic Village, and

Venetie. They are the closest to the program area and have subsistence uses in or near the program area or rely heavily on resources that use the program area.

In addition, because of the importance of the program area to caribou-particularly the PCH and CAH – relevant data on subsistence uses of caribou by 22 Alaskan communities, including the four subsistence study communities listed above is also included in the EIS.

The EIS recognizes that the Gwich'in people, Inuvialuit, and other user groups in Canada have cultural, historical, and subsistence ties to the Arctic Refuge or the PCH or both; however, Section 810 of ANILCA only applies to subsistence uses by rural Alaska residents, per the definition of "subsistence uses" in Section 803 of ANILCA. More information regarding subsistence impacts affecting Canadian communities and user groups can be found in **Section 3.4.3**, Subsistence Uses and Resources.

Kaktovik and Nuiqsut engage in subsistence activities in and around the program area. Kaktovik uses the program area to procure most of the resources they harvest (**Map 3-28** through **Map 3-39** in **Appendix A**). Nuiqsut's marine mammal and furbearer use areas overlap the program area (**Map 3-40** through **Map 3-43** in **Appendix A**). Arctic Village and Venetie subsistence use areas do not overlap the program area, but these communities rely heavily on resources that use the program area, specifically caribou from the Porcupine Caribou Herd (PCH) (**Map 3-44** in **Appendix A**).

While the EIS describes potential impacts to subsistence use of all resources, this evaluation focuses on impacts to subsistence use of fish, marine mammals (bowhead and beluga whales, bearded seals), and caribou. Other resources such as waterfowl, polar bears, and furbearers may be culturally important to residents of these communities, but they do not comprise the majority of the wild foods consumed by residents of Kaktovik, Nuiqsut, Arctic Village, or Venetie (**Section 3.4.3**, Subsistence Uses and Resources). Residents of Kaktovik and Nuiqsut rely most heavily on fish, marine mammals, and caribou. Combined, these resources make up 98 percent of the harvest for Kaktovik and 97 percent of the harvest for Nuiqsut (**Tables 3-32** and **3-33** in **Chapter 3**). Fish and large mammals (caribou and moose) make up 86 percent of the harvest for Venetie (**Table 3-35** in **Chapter 3**). Nineteen percent of Venetie's annual harvest is caribou, although they receive appreciably more through sharing with other communities (Van Lanen et al. 2012; Kofinas et al. 2016). Detailed harvest data for Arctic Village is not available but it is likely similar to the harvest documented for Venetie.

In addition to Kaktovik, Nuiqsut, Arctic Village, and Venetie, 18 communities have positive customary and traditional use determinations for the PCH and/or the Central Arctic Herd (CAH) (**Map 3-27**, Subsistence Study Communities, in **Appendix A**). These 22 communities, referred to in the EIS as the caribou study communities, could be affected by impacts on caribou abundance and availability, and were therefore included in **Chapter 3**. Those communities with the greatest reliance (where caribou accounts for greater than 10 percent of the annual subsistence harvest, and on average over 50 percent of households use caribou) include Alatna, Anaktuvuk Pass, Bettles, Coldfoot, Eagle, Kaktovik, Nuiqsut, Point Lay, Utqiagvik, Venetie, Wainwright, Wiseman, and likely Arctic Village (although detailed harvest data is not available for this community). Alatna, Bettles, Point Lay, Utqiagvik and Wainwright harvest caribou primarily from the Western Arctic Herd, and Eagle harvests caribou primarily from the Fortymile Herd. These herds would not be impacted by development in the program area. Coldfoot, and Wiseman harvest primarily CAH caribou. The majority of Nuiqsut's harvest consists of Teshekpuk Lake Caribou Herd animals, although Nuiqsut also harvests caribou from the CAH. Anaktuvuk Pass harvests a combination of Western Arctic, Teshekpuk Lake, and CAH caribou. Teshekpuk Lake caribou would not be impacted by future oil and gas exploration, development, and production activities in the program area, and potential impacts on CAH caribou are

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 49 of 201
AR0688

expected to be low for Alternatives B, C, D1, and D2. Kaktovik, Arctic Village and Venetie rely heavily on PCH caribou. Therefore, Kaktovik, Arctic Village, and Venetie are the only communities that may be appreciably affected by changes in the abundance or availability of PCH caribou. For these reasons, caribou-related discussion in this evaluation focuses exclusively on impacts on the PCH caribou from future on-the-ground activities and consequent impacts on subsistence use of them by these three communities.

## E.2.1 Evaluation and Finding for Alternative A: No Action

Alternative A would not comply with the directive in Section 20001 of PL 115-97 to establish and administer a competitive oil and gas program for leasing, developing, producing, and transporting oil and gas in and from the Arctic Refuge Coastal Plain. There would be no oil and gas lease sales in the program area. Current management actions and resource trends would continue in the program area, as described in the Arctic Refuge Revised Comprehensive Conservation Plan (CCP) (USFWS 2015). Existing impacts on subsistence uses and resources, described in **Section 3.4.3**, Subsistence Uses and Resources, would continue along current trends.

### E.2.1.1 Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

The United States (US) Fish and Wildlife Service (USFWS) determined that the preferred alternative selected in the Record of Decision (ROD) for the Arctic Refuge Revised CCP (USFWS 2015) and subsequent cumulative effects would not significantly restrict subsistence use of resources in the program area.

### E.2.1.2 Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Alternative A does not propose the disposition or use of public lands with regard to the proposed action; therefore, evaluating the availability of other lands is not applicable.

### E.2.1.3 Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Alternative A would eliminate the use of public lands needed for subsistence purposes, but it does not meet the purpose of the proposed action, nor does it comply with PL 115-97.

### E.2.1.4 Findings

Alternative A will not result in a significant restriction in subsistence uses. A positive determination pursuant to ANILCA Section 810 is not required.

## E.2.2 Evaluation and Finding for Alternative B

**Section B.8.2**, Alternative B in **Appendix B**, speculates up to four central processing facilities (CPFs) would be built under Alternative B: two CPFs would be built in the high potential area, one CPF would be built in the medium potential area on State or native lands, or just south of Kaktovik, and one CPF would be built in the low potential area. Under this scenario, four CPFs and associated airstrips, 14 satellite pads, 174 miles of road, a seawater treatment plant, and at least one barge landing and storage pad would be built. The 2,000-acre surface disturbance limit would be reached under Alternative B.

The hypothetical development scenario anticipates that future development would occur in the same manner as the baseline scenario described in **Appendix B** under Alternative B. The entire Coastal Plain would be offered for lease sale. Compared to the other action alternatives, this alternative has the largest amount of acres where only Required Operating Procedures (ROPs) would apply (**Table 2-1** in **Chapter 2**). Approximately 359,400 acres would be subject to a no surface occupancy (NSO) stipulation to protect caribou

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 50 of 201
AR0689

calving habitat, fish and hydrologic resources, and subsistence activities adjacent to major rivers. There would be zero acres subject to controlled surface use (CSU), and 585,400 acres would be subject to timing limitations (TLs). While the 46 ROPs apply to the entire program area, approximately 618,700 acres would be subject to ROPs only. **Map 2-1**, Alternative B and **Map 2-2**, Alternative B, Lease Stipulations (**Appendix A**) illustrate where NSO and TLs would be adopted.

### E.2.2.1  Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

This evaluation summarizes potential impacts on major subsistence resources (fish, marine mammals, and caribou) for residents of Kaktovik, Nuiqsut, Arctic Village, and Venetie before a discussion of other issues, such as impacts on resource access anticipated under Alternative B. **Table E-2** classifies each impact as minor, moderate, or major, based on the discussion in the EIS and BLM policy guidance (BLM 2011). **Table E-3** summarizes the extent to which impacts on access would affect subsistence users.

#### Fish

**Section 3.3.2**, Fish and Aquatic Species, describes potential impacts on non-salmon fish (primarily Dolly Varden and Bering cisco), which are important subsistence resources for residents of Kaktovik (**Table 3-32**). Impacts from future oil and gas exploration, development, and production that may affect subsistence harvest of non-salmon fish are as follows:

- Habitat loss or alteration
- Disturbance or displacement
- Injury or mortality due to noise, entrainment, or contaminants

Select streams listed in **Chapter 2** would have 0.5- to 1-mile setbacks for surface development under Alternative B; all other fish-bearing streams would have a 500-foot setback, and all of the nearshore marine, lagoon, and barrier island habitats of the Southern Beaufort Sea (within the boundary of the Arctic Refuge) would be subject to NSO. In addition, an impact and conflict avoidance and monitoring plan to assess, minimize and mitigate the effects of infrastructure on coastal habitats would be required. Numerous mitigation measures would be implemented to address impacts on fish and fish habitat, namely Lease Stipulations 1, 3, 4, and 9, and ROPs 3, 8, 9, 12, 13, 14, 15, 16, 18, 19, 20, 22, 24, 40, and 41. While potential impacts on fish would be most pronounced under this alternative, it is likely that the proposed mitigation measures would effectively reduce impacts on fish that are important to residents of Kaktovik. Dolly Varden or Bering cisco abundance or availability would not likely be affected to the extent that subsistence use of these fish would be significantly impaired.

#### Marine Mammals

**Section 3.3.5**, Marine Mammals, describes potential impacts on bowhead whales and ringed/bearded seals, which are important subsistence resources for residents of Kaktovik and Nuiqsut (**Tables 3-32** and **3-33**). Impacts from future oil and gas exploration, development, and production that may affect subsistence harvest of marine mammals are mortality or injury due to vessel strikes and disturbance or displacement due to vessel traffic or noise and activity associated with onshore infrastructure.

Whales and seals could be injured or killed by vessel strikes, although such events would be highly unlikely. Collisions with whales are rare for slow-moving vessels such as barges, and ringed/bearded seals are able to avoid oncoming vessels (George et al. 1994; Laist et al. 2001). There is no indication that vessel strikes would

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 51 of 201
AR0690

be a major source of mortality for whales or bearded/ringed seals during marine transport associated with future on-the-ground activities in the program area.

Large vessel traffic in the vicinity of Kaktovik could temporarily disturb or displace whales or bearded/ringed seals. These animals demonstrate habituation to noise and activity associated with vessel traffic and onshore infrastructure when disturbance does not result in physical injury, discomfort, or social stress (NRC 2003). This impact would not have population-level effects, and ROP 46 is designed to minimize impacts on marine mammals from vessel traffic.

Potential impacts on marine mammals important for subsistence would be minor or effectively mitigated under Alternative B. Specifically, Lease Stipulation 4 would require NSO in nearshore marine, lagoon and barrier island habitats, Lease Stipulation 9 would require that lessees implement a conflict avoidance and monitoring plan for coastal areas. In addition, ROPs that would apply under Alternative B would sufficiently mitigate residual impacts to subsistence use of bowhead whales and seals by residents of Kaktovik and Nuiqsut.

### Caribou

**Table 3-19** lists potential impacts on terrestrial mammals, including caribou. Impacts from future oil and gas exploration, development, and production that may affect subsistence use of caribou are as follows:

- Displacement of maternal caribou during calving
- Habitat loss or alteration
- Mortality or injury due to vehicle collisions
- Altered movement patterns due to linear infrastructure
- Altered caribou behavior due to aircraft traffic and development activities

Displacement of maternal caribou during calving was one of the primary issues raised during scoping and in comments on the Draft EIS. Oil and gas development on the Coastal Plain of the Arctic Refuge and its potential impact on the PCH calving grounds has been the subject of much discussion for decades. As a result, PCH habitat, movement, and population dynamics have been well studied. Studies on the CAH and others have shown that maternal caribou with young calves would avoid infrastructure by about 2.49 miles (Dau and Cameron 1986; Cameron et al. 1992; Lawhead et al. 2004). The literature generally suggests that calving would most likely shift to the east or southeast if displacement of maternal caribou occurs during the calving season (Griffith et al. 2002). This could result in reduced calf survival, as areas east of the program area are characterized by suboptimal forage and, as a result, higher calf mortality and lower pregnancy rates (Russell et al. 1996). These areas also have higher predation rates, which contributes to higher calf mortality (Young et al. 2002).

The likelihood or extent to which impacts to PCH caribou abundance could occur depends largely on the extent of surface development associated with future on-the-ground activities happening within important calving grounds. Although calving can occur throughout the program area, the EIS defines the most important calving grounds as the high-use PCH calving area (area used in greater than 40 percent of years). This area spans 2,745,109 acres across northeastern Alaska and Canada (Yukon Environmental GIS 2018, Map C-1). More surface development within this area could result in greater displacement of maternal caribou during calving, and thus could contribute to lower pregnancy rates and lower calf survival rates (Griffith et al. 2002; Russell and Gunn 2019). Alternatively, less or no surface development in this area, and the calving grounds in general, would result in less, negligible, or no displacement.

Direct habitat loss associated with future on-the-ground activities could occur on 2,000 acres in the program area. Additional habitat in the vicinity of infrastructure would be affected by dust deposition, gravel spray, thermokarst, flow alteration, and impoundments. Direct habitat loss would reduce forage availability for caribou. Aside from concentrations of the high-quality tussock tundra and moist sedge-willow tundra vegetation types, which are a critical feature of the PCH primary calving grounds, foraging habitat is abundant across the program area.

Development in the PCH calving grounds may have behavioral effects on maternal caribou which could affect population size (described below); nevertheless, it is not likely that development on 2,000 acres in the calving grounds, insect relief habitat, or general summer habitat would reduce forage enough through direct habitat loss to affect caribou health or body fat reserves on a large scale. Caribou would be displaced from areas that no longer have suitable forage, but displacement due to direct habitat loss is not expected to be widespread (Truett and Johnson 2000). Caribou abundance or availability and the subsistence use thereof would not likely be affected as a result of direct habitat loss.

Small numbers of PCH caribou could be killed or injured due to vehicle collisions associated with future oil and gas exploration, development, and production in the program area during construction, drilling, and operations. Collision risk would be highest during periods of oestrid fly harassment, when caribou move erratically and often seek relief on gravel pads, roads, and airstrips. Alternative B proposes a number of mitigation measures to reduce vehicle collisions with caribou. ROP 23 would require that lessees design and implement a traffic management and vehicle use plan, and ROP 42 would prohibit chasing wildlife (specifically caribou) with vehicles. These measures would minimize vehicle-related mortality risk to caribou on the North Slope (Truett and Johnson 2000). Residual mortality would likely be very low and would not significantly affect the abundance of caribou for subsistence use.

Movement patterns could be altered due to future linear infrastructure under Alternative B. Caribou movements can be delayed or deflected by roads or pipelines. Traffic volumes greater than 15 vehicles per hour have been shown to increase the probability of delays or deflections during road crossings (Curatolo and Murphy 1986; Cronin et al. 1994). Caribou crossing success would vary by season, behavioral motivation, level of habituation, and activity levels. Movements in response to insect harassment between late June and mid-August would be most likely to be affected.

Caribou are highly motivated to seek relief in coastal areas during insect harassment (Cronin et al. 1994; Murphy and Lawhead 2000). Thus, they are less likely to be affected by roads and vehicle traffic from mid- to late summer if appropriate mitigation measures, such as vehicle management plans, elevated pipelines and road-pipeline separations are used. Some deflection or movement delays may occur but is not expected to be of extended duration. The mitigation measures proposed under Alternative B (Lease Stipulations 3, 4, 7 and 9, and ROPs 23 and 42) should be adequate to maintain caribou passage to coastal areas. These stipulations would affect both PCH and CAH caribou during midsummer.

PCH caribou would likely still be available to subsistence hunters along the coast during traditional timeframes, but some uncertainty exists due to three factors that differ from the experience with the Central Arctic Herd: 1) PCH postcalving aggregations can be greater than 100,0000 animals (Russell and Gunn 2019), the CAH does not provide any data on how well groups of this size navigate oilfields; 2) hunting along roads in the program area could increase the probability of delays or deflections; and 3) the PCH uses both coastal areas and inland ridges for mosquito-relief habitat (Walsh et al. 1992) thus caribou could use inland areas more frequently in response to coastal development.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 53 of 201
AR0692

A CPF or one or more satellite pads could be located south of Kaktovik in the area bounded by the Hulahula and Jago Rivers. This is an important subsistence use area for residents of Kaktovik (**Map 3-28**, Kaktovik Subsistence Use Areas in **Appendix A**). The majority of Kaktovik's subsistence use area that is bounded by the Hulahula and Jago Rivers would be subject to NSOs or TLs. Development would not significantly affect the availability of caribou for subsistence use.

Caribou behavior could be altered by future oil and gas exploration, development, and production, specifically from aircraft traffic (see **Section 3.3.4**, Terrestrial Mammals). Responses vary depending on the season, degree of habituation, aircraft type, altitude, flight patterns, weather conditions, frequency of overflights, and the sex and age composition of caribou groups. Low-level flights or maneuvering in the presence of unhabituated caribou can elicit increased speed and abrupt direction change. Alternatively, caribou can become habituated to aircraft, particularly when aircraft pilots maintain altitudes greater than 500 feet above ground level and do not haze or harass the caribou (Valkenburg and Davis 1985). The EIS describes potential impacts of aircraft associated with future on-the-ground activities on caribou and caribou behavior in detail.

Although short-lived, caribou responses to aircraft can affect subsistence hunters. Residents of Nuiqsut consistently highlight aircraft disturbance of caribou as a concern and state that aircraft activity makes animals more wary and harvest more difficult (Stinchcomb 2017). The extent of this potential impact is highly contingent on the location of frequently used flight paths, which would depend on the locations of airstrips, CPFs, and other major facilities. Air traffic in the vicinity of Kaktovik associated with future oil and gas activities would increase under Alternative B, and could increase further if one or more CPF development clusters were roadless, as is described in **Appendix B**. If a CPF development cluster is either along the coast or in the area bounded by the Hulahula and Jago Rivers (**Map 3-29**, Kaktovik Caribou Subsistence Use Areas, in **Appendix A**), which would be permissible under Alternative B, caribou could be more difficult to harvest. Arctic Village and Venetie would not be affected by this short-term impact; however, this could affect the availability of caribou for residents of Kaktovik.

ROPs 34, 36 and 40 would require lessees to follow numerous mitigation measures to ensure that the effects of aircraft on caribou and caribou hunting would be minimized. These strict operating procedures are used on BLM-administered lands in the National Petroleum Reserve-Alaska (NPR-A) and are generally successful in reducing impacts. ROP 36 would require that lessees, operators, and contractors work closely with residents of Kaktovik during all phases of project application, design, and implementation. If done effectively, this consultation would assist permittees in the design and orientation of facilities, including airstrips, such that frequent, low-level traffic in caribou subsistence use areas would be nonexistent or considered minor to moderate (**Table E-2**). It is likely that residual impacts associated with future on-the-ground activities would not significantly affect caribou availability for residents of Kaktovik, if these requirements are followed closely.

A total of 22 percent of the high-use calving area (592,800 of the 2,745,109 acres) could be leased and subject to surface occupancy under Alternative B (**Table J-12** in **Appendix J**; **Table E-1**). Development on all of the acres subject to surface occupancy within the high-use calving area is not possible given the 2,000-acre surface disturbance limit mandated by PL 115-97. Using a 2,000 acre maximum footprint, the total potential disturbance and displacement is 633,000 acres; however, this number would vary with different road and pad scenarios, and some portion of this area could be overlapping the buffer from other development, outside of the program area, or in the ocean. All of the areas available for lease within the high-use calving area would be subject to TLs. Lower activity levels resulting from TLs result in lower levels of disturbance to caribou,

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 54 of 201
AR0693

but they do not effectively mitigate the displacement of maternal caribou during calving. Thus, maternal caribou could still be displaced within areas subject to TLs.

Under Alternative B, two CPFs and associated well pads and roads could potentially be located within the medium and low hydrocarbon potential areas, with one CPF potentially sited on private lands and one within or partially within the high-use PCH calving area. Surface disturbance associated with one CPF in the high use PCH calving area could total up to 488 acres based on Figures B1 and B2 in **Appendix B**. These facilities do not include coastal facilities and access roads to coastal facilities that would be located outside of the high-use PCH calving area. Depending on the configuration of the oil field, displacement of maternal caribou around 488 acres of surface disturbance could total up to 118,500 acres (4 percent) of the high use calving area based on 2.49 miles of observed displacement around infrastructure on the North Slope during calving. However, the precise location of infrastructure, and thus the extent of overlap between surface disturbance and the high-use PCH calving area, is unknown. It is possible there would be very little surface disturbance within the high-use PCH calving area, given that the hypothetical development scenario suggests that future development would move from west to east, would be concentrated along the coast, and that lessees would attempt to minimize lengthy travel from coastal and existing infrastructure, and between CPFs. Some additional displacement would occur for individual caribou calving west of the high-use PCH calving area and in some years when high density calving occurs in areas to the west that have been used less than 40 percent of years. The calving distribution may move farther west in years with warmer springs as discussed in **Section 3.3.4**, Terrestrial Mammals.

Griffith et al. (2002) modeled changes in calf survival under development scenarios outlined by Tussing and Haley (1999). Similarly, Russell and Gunn (2019) estimated calf survival between calving areas within and outside the program area. The 2,000-acre surface disturbance limit was not used in these models. Griffith et al. (2002) predicted an 8.2 percent decline in annual calf survival if the full development scenario described by Tussing and Haley (1999) occurred. Griffith updated the 2002 analysis in 2018, and recalculated an average 6.2 percent decline in calf survival under the full development scenario described by Tussing and Haley (1999) using data from 1985-2017, but Russell and Gunn (2019) used different methods and estimated a 10 percent decline in calf survival if calving is displaced from the program area. The full development described by Tussing and Haley (1999) and used in Griffith et al. (2002) and the development scenario described by Russell and Gunn (2019), would not occur under Alternative B.

Russell and Gunn (2019) used models of caribou movement, energy and protein intake, and demography to model the impact of potential development on population size based on changes in caribou activity budgets in the project area. The models predicted population change under each alternative for two starting populations (218,000 and 100,000 caribou), and under three climate conditions ("poor," "average," and "good"). As summarized in **Section 3.3.4**, Terrestrial Mammals, these models assumed that changes in behavior (e.g. time spent foraging; time spent moving) as a result of disturbance would result in changes in body condition and consequently, would affect calf survival and cows' probability of pregnancy. Russell and Gunn (2019) modelled the worst-case scenario with respect to 1002 development, making the assumption that any area within the program area could be developed. Further, in this worst-case scenario they did not account for mitigation measures (e.g., lease stipulations and required operating procedures), that could limit development under the action alternatives, including Alternative B (see Russell and Gunn 2019, page 52). See **Section 3.3.4**, Terrestrial Mammals, for further discussion.

While these modelling results suggest that PCH population size will be impacted under multiple population and climate scenarios to the extent that subsistence hunting will be impacted, the lack of support for specific

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 55 of 201
AR0694

model assumptions in the literature limit the utility of these models when determining whether impacts to subsistence will be significant. As described in **Section 3.3.4**, Terrestrial Mammals, some of the assumptions used in these models are not well supported in the literature, nor do the models accurately integrate the 2,000 acres development limit and predicted development under Alternative B. Specific changes in feeding behavior and duration assumed for areas under NSO, CSU, and TLs are not supported by the literature. As a result, anticipated changes to body condition and consequent cow pregnancy rates and calf survival are difficult to compare among alternatives. They did not specify a zone of influence for these impacts, stating that they, "modeled the worst-case scenario with respect to [program area] development, making the assumption that any area in the [program area] would be potentially developed in the future." They add that, "any day a caribou spends in [the program area] would potentially cause it to be disturbed." Given the 2,000 acre limit on development,, approximately 57 percent of the total project area could be more than 2.49 miles from roads, pads, or gravel mines, and based on the hypothetical development scenario, much of the development would be outside of the high-use PCH calving area; thus, the model assumes changes to caribou behavior extend beyond 2.49 miles from infrastructure, the distance of reported displacement around infrastructure on the North Slope during calving (Dau and Cameron 1986; Cameron et al. 1992; Lawheadet al. 2004) and much of the program area would be outside of the 1.9 mile distance reported for changes in time spent feeding and resting near a large open pit mine (BHP 2004; Golder 2011). In addition, maternal caribou may respond to infrastructure by moving away as described above, rather than changing their activity budget.

While the PCH caribou population size would continue to fluctuate, but based on the hypothetical development scenario, potential impacts to herd size as a result of displacement of maternal caribou are still anticipated to be negligible. Potential impacts to herd size as a result of behavior, feeding, and body condition changes are not anticipated to impact population size. Caribou abundance for Kaktovik, Arctic Village, and Venetie would not be significantly impacted.

*Subsistence Access*

Kaktovik and Nuiqsut are the only communities whose subsistence use areas overlap the program area. Thus, they are the only communities that could be legally or physically prohibited from accessing these areas. Potential impacts on subsistence access from future oil and gas exploration, development, and production are as follows:

- Loss of subsistence use areas due to direct overlap with infrastructure
- Physical obstruction of subsistence users or activities by infrastructure
- Legal or regulatory barriers

Under Alternative B, numerous lease stipulations and ROPs would ensure that Kaktovik and Nuiqsut residents' ability to access resources is maintained. These include Lease Stipulations 1, 3, 4, 7, 9 and ROPs 23, 34, 36, 37, 39, 40, 41, and 42. Legal and physical access to subsistence resources may be altered, depending on the locations of CPFs and industry-established safety areas; however, it is likely that large-scale access to subsistence resources would be maintained.

### E.2.2.2  Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Section 1003 of ANILCA, 16 USC 3143, deferred the decision to conduct leasing in the program area until authorized by Congress. PL 115-97 provides that decision, and requires the Secretary of the Interior, acting through the BLM, to conduct leasing in the program area. The purpose of the EIS is to inform the BLM's

implementation of PL 115-97; Alternative B would fulfill this purpose. Lands outside the program area are not subject to PL 115-97 and would therefore not fulfill this purpose.

### E.2.2.3  Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Alternatives that would reduce or eliminate the use of public lands needed for subsistence are those that make more land in the program area unavailable for oil and gas leasing or those that would not allow oil and gas activity. Alternatives D1 and D2 would make more land in the program area unavailable for oil and gas leasing. Alternative A would not allow oil and gas leasing to occur.

### E.2.2.4  Findings

Alternative B will not result in a significant restriction to subsistence uses. Potential impacts on subsistence resources and access from future oil and gas exploration, development, and production would be minimal or would be adequately mitigated by stipulations or ROPs under which lessees must operate. PCH caribou abundance may be affected due to minor displacement of maternal caribou, but large-scale displacement and consequent large decreases in the abundance of PCH caribou available for subsistence use is unlikely. A positive determination pursuant to ANILCA Section 810 is not required.

## E.2.3  Evaluation and Finding for Alternative C

**Section B.8.3**, Alternative C in **Appendix B** anticipates that three CPFs would be built under Alternative C: 2 CPFs would be built in the high potential area and one CPF would be built in the medium potential area sound of Kaktovik. Under this hypothetical scenario, three CPFs and associated airstrips, 15 satellite pads, and 180 miles of road, a seawater treatment plant, and one barge landing and storage pad would be built. The 2,000-acre surface disturbance cap would be reached within the high and medium potential areas.

Under Alternative C, approximately 932,500 acres would be subject to NSO which would protect caribou calving habitat, in addition to other resources and uses (**Table 2-1** in **Chapter 2**). 317,100 acres would be subject to TLs, and 313,900 would be subject only to the ROPs. **Map 2-3**, Alternative C and **Map 2-4**, Alternative C, Lease Stipulations, in **Appendix A** illustrate where NSOs, TLs, and areas subject only to ROPs would be adopted.

### E.2.3.1  Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

#### Fish

Potential impacts on subsistence fish species from future oil and gas exploration, development, and production under Alternative C would be similar to that described under Alternative B, although facility locations may differ due to the lands available for surface occupancy. Similar mitigation measures would be used, although lands along the coast would be designated as NSO (Lease Stipulations 1, 4 and 9). Minor impacts on fish are not anticipated to affect fish availability or abundance for residents of Kaktovik.

#### Marine Mammals

The potential impacts of disturbing and displacing bowhead whales and ringed seals from future oil and gas activities under Alternative C would be similar to that described under Alternative B; however, facility locations may differ, due to the lands available for surface occupancy. These minor impacts are not anticipated to affect bowhead whale or ringed seal availability or abundance.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 57 of 201
AR0696

*Caribou*

Direct habitat loss or alteration from future oil and gas activities would be similar to that described under Alternative B, because development of 2,000 acres in the program area would not vary by alternative. Direct habitat loss or alteration would not appreciably affect the availability or abundance of caribou for subsistence use.

Mortality or injuries from vehicle collisions would be similar to that described under Alternative B. ROP 23 would apply under Alternative C and would sufficiently address collision risk. Low-incidence mortality would not significantly affect the abundance of caribou for subsistence use.

Altered movement patterns due to linear infrastructure associated with future on-the-ground activities would be minor under Alternative C. The mitigation measures proposed under Alternative C would reduce impacts on caribou movement. The majority of Kaktovik's subsistence use area that is bounded by the Hulahula and Jago Rivers would be subject to NSOs or TLs. Altered movement patterns would not significantly affect the availability of caribou for subsistence use by Kaktovik. Altered PCH caribou movement patterns during spring and summer would be unlikely to affect residents of Arctic Village or Venetie.

Altered caribou behavior due to aircraft traffic associated with future on-the-ground activities would be the same as that described under Alternative B. Aircraft traffic associated with Kaktovik would be the same as that described under Alternative B and would likely cause some caribou disturbance in the vicinity of Kaktovik; however, additional CPFs, airstrips, and heavily used flight paths would also be located outside Kaktovik's primary subsistence use areas. Additionally, ROPs 34, 36, and 40 would also apply under Alternative C, further reducing adverse impacts on hunters. Minor impacts of aircraft on caribou behavior would not significantly affect caribou availability for residents of Kaktovik.

Under Alternative C, the majority of the high-use calving area within the program area could be leased but would be subject to NSO (**Table J-12** in **Appendix J**; **Table E-1**). Eighty-three thousand four hundred acres of the overall high-use calving area (3 percent) would be subject to TLs and 13,700 acres (0.5 percent) would be subject to ROPs only. As discussed under Alternative B, caribou could still be displaced within areas subject to TLs.

Under Alternative C, one CPF and associated well pads and roads could potentially be located within the medium hydrocarbon potential area. This CPF could be sited on private lands. If so, the CPF would be located north of the high-use calving area. Some maternal caribou could be displaced as a result of the CPF, but displacement would not be widespread. If a CPF were sited on private lands, one to two well pads could be located within the high-use calving area. Displacement of maternal caribou around two well pads could total up to 26,648 acres (less than 1 percent) of the high-use calving area based on 2.49 miles of observed displacement around infrastructure during calving.

As discussed under Alternative B, the precise location of future oil and gas-related infrastructure, and thus the extent of overlap between surface disturbance and the high-use calving area, is unknown. The majority of the high-use calving area would be NSO under Alternative C. In addition, it is likely that there would be no or very little surface disturbance within the high-use calving area, given that the hypothetical development scenario suggests that future development would move from west to east, would be concentrated along the coast, and that a CPF in the medium potential hydrocarbon area would likely be sited on private lands. Based on these assumptions, potential impacts to herd size as a result of displacement of maternal caribou would be negligible. Caribou abundance for Kaktovik, Arctic Village, and Venetie would not be significantly impacted.

*Subsistence Access*

Access to subsistence resources would be similar to Alternative B, and, in general, this access would be maintained.

### E.2.3.2 Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Evaluation of the availability of other lands is identical to that described under Alternative B (see **Section E.2.2.2**, above).

### E.2.3.3 Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Evaluation of other alternatives is identical to that described under Alternative B (see **Section E.2.2.3**, above).

### E.2.3.4 Findings

Alternative C will not result in a significant restriction to subsistence uses. Potential impacts on subsistence resources and access from future oil and gas exploration, development, and production would be minimal or would be adequately mitigated by stipulations or ROPs under which lessees must operate. A positive determination pursuant to ANILCA Section 810 is not required.

## E.2.4 Evaluation and Finding for Alternative D1

**Section B.8.4**, Alternative D1 in **Appendix B** anticipates that two CPFs would be built: one CPF would be built in the high potential area and one in the medium potential area south of Kaktovik. Under this scenario, two CPFs and associated airstrips, 16 satellite pads, and 185 miles of road, a seawater treatment plant, and one barge landing and storage pad would be built. The 2,000-acre surface disturbance cap would be reached in the high and medium potential areas.

Approximately 526,300 acres would be closed to leasing to protect caribou calving habitat under Alternative D1 (**Table 2-1** in **Chapter 2**). Of the remaining 1,037,200 acres available for leasing, 708,600 would be subject to NSO, 123,900 would be subject to CSU, 0 would be subject to TLs, and 204,700 would be subject to ROPs only. **Map 2-5**, Alternative D1 and **Map 2-6**, Alternative D1, Lease Stipulations, in **Appendix A** illustrate where NSO, CSU, ROPs would be adopted.

### E.2.4.1 Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

*Fish*

Potential impacts on subsistence fish species would be similar to those described under Alternatives B and C, although future facility locations may differ due to the lands available for lease and surface occupancy. More extensive mitigation measures would be used, a 0.5- to 4-mile setback for surface development would apply on all streams and waterbodies, and NSO would apply along the coast. While minor impacts on fish could still occur from future oil and gas exploration, development, and production, they are not anticipated to affect fish availability or abundance for residents of Kaktovik.

*Marine Mammals*

Disturbance and displacement of bowhead whales and ringed seals associated with future on-the-ground activities would be similar to that described under Alternatives B and C, although future facility locations may differ due to the lands available for lease and surface occupancy. These potential minor impacts are not anticipated to affect bowhead whale or ringed seal availability or abundance.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 59 of 201
AR0698

*Caribou*

Direct habitat loss or alteration from future oil and gas exploration, development, and production would be similar to that described under Alternatives B and C, as development of 2,000 acres in the program area would not vary by alternative. Direct habitat loss or alteration from future on-the-ground activities would not affect the availability or abundance of caribou for subsistence use.

Mortality or injuries due to vehicle strikes associated with future oil and gas development in the Coastal Plain would be similar to that described under Alternatives B and C. ROP 23 would apply under Alternative D1 as well and would sufficiently address collision risk. Low-incidence mortality would not significantly affect the abundance of caribou for subsistence use.

Altered movement patterns due to roads and pipelines associated with future oil and gas development in the Coastal Plain would be similar to what is expected to occur under Alternative C, but the extent of this impact would be lessened. This is because the areas important for caribou movement would be largely subject to NSO, TLs, or would not be offered for lease sale. This would apply to spring migration and movements to and from the coast in response to insect harassment, and potentially to fall migration. Although some delays and deflections while crossing roads and pipelines are expected, PCH and CAH caribou movements would be relatively undisturbed and would not significantly affect the availability of caribou for subsistence use by residents of Kaktovik.

A total of 14,300 acres (0.5 percent) of the high-use calving area could be leased and subject to surface occupancy under Alternative D1 (**Table J-12** in **Appendix J**; **Table E-1**). 5,400 acres (0.2 percent) would be subject to CSU and 8,900 acres (0.3 percent) would be subject to standard lease terms and conditions only. Caribou could be displaced within these areas.

Similar to Alternative C, one CPF and associated well pads and roads could potentially be located within the medium hydrocarbon potential area under Alternative D1. This CPF would likely be sited on private lands. Since these assumptions are identical to Alternative C, impacts to maternal caribou would likewise be the same. Displacement would not be widespread and could occur on up to 26,648 acres (less than 1 percent) of the high-use calving area if one to two well pads were constructed in this area. Based on these assumptions, potential impacts to herd size as a result of displacement of maternal caribou from future on-the-ground activities would be small or negligible. Caribou abundance for Kaktovik, Arctic Village, and Venetie would not be significantly impacted.

*Subsistence Access*

Access to subsistence resources would be similar to Alternative B. In general, access to subsistence resources would be maintained.

### E.2.4.2  Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Evaluation of the availability of other lands would be similar to Alternative B (see **Section E.2.2.2,** above).

### E.2.4.3  Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Alternative D2 would make more land in the program area unavailable for oil and gas leasing. Alternative A would not allow oil and gas leasing to occur.

### E.2.4.4   Findings

Alternative D1 will not result in a significant restriction in subsistence uses. Potential impacts on subsistence resources and access from future oil and gas exploration, development, and production would be minimal or would be adequately mitigated by stipulations or ROPs under which lessees must operate. A positive determination pursuant to ANILCA Section 810 is not required.

## E.2.5   Evaluation and Finding for Alternative D2

**Section B.8.5**, Alternative D2 in **Appendix B** anticipates that two CPFs would be built under Alternative D2: one CPF would be built in the high-potential area and one in the medium-potential area sound of Kaktovik. Under this scenario, two CPFs and associated airstrips, 16 satellite pads, and 185 miles of road, a seawater treatment plant, and one barge landing and storage pad would be built. The 2,000-acre surface disturbance cap would be reached in the high- and medium- potential areas.

Approximately 763,500 acres would be closed to leasing to protect caribou calving habitat under Alternative D2 (**Table 2-1** in **Chapter 2**). Of the remaining 800,000 acres available for leasing, 505,800 would be subject to NSO, 105,200 would be subject to CSU, 189,000 would be subject to TLs, and 0 would be subject to ROPs only. **Map 2-7**, Alternative D2, and **Map 2-8**, Alternative D2, Lease Stipulations, in **Appendix A** illustrate where NSO, CSU, TLs, and areas subject to ROPs only would be adopted.

### E.2.5.1   Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

*Fish*

Potential impacts on fish would be similar to those described under Alternative D1, although future facility locations may differ due to the lands available for lease and surface occupancy. While minor impacts on fish could still occur from future oil and gas exploration, development, and production, they are not anticipated to affect fish availability or abundance for residents of Kaktovik.

*Marine Mammals*

Potential impacts on marine mammals would be similar to those described under Alternative D1, although future facility locations may differ due to the lands available for lease and surface occupancy. While minor impacts on marine mammals could still occur from future oil and gas exploration, development, and production, they are not anticipated to affect marine mammal availability or abundance.

*Caribou*

Direct habitat loss or alteration from future oil and gas exploration, development, and production would be similar to that described under Alternatives B, C, and D1, as development of 2,000 acres in the program area would not vary by alternative. Direct habitat loss or alteration from future activities in the Coastal Plain would not affect the availability or abundance of caribou for subsistence use.

Mortality or injuries due to vehicle strikes associated with future oil and gas development in the Coastal Plain would be similar to those described under Alternatives B, C, and D1. ROP 23 would apply under Alternative D2, and Lease Stipulation 6 would be adopted as part of a suite of mitigation measures. These measures would sufficiently address collision risk. Low-incidence mortality from future activities would not significantly affect the abundance of caribou for subsistence use.

Alteration of movement patterns associated with future oil and gas development in the Coastal Plain would be similar to that expected under Alternative D1. Caribou movement would be relatively undisturbed and would not significantly affect the availability of caribou for subsistence use by Kaktovik residents.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 61 of 201
AR0700

Displacement of maternal caribou associated with future oil and gas development in the Coastal Plain would be similar to that expected under Alternative D1, although the extent of potential displacement would be less given that less area would be offered for lease sale. Potential impacts to caribou abundance as a result of maternal caribou displacement would be small or negligible. Caribou abundance for Kaktovik, Arctic Village, and Venetie would not be significantly impacted.

### Subsistence Access

Access to subsistence resources would be similar to Alternative B, and this access would be maintained.

### E.2.5.2  Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Evaluation of the availability of other lands would be similar to that described under Alternative B (see **Section E.2.2.2**, above).

### E.2.5.3  Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Of the action alternatives analyzed in the EIS, Alternative D2 offers the fewest amount of public lands for leasing, representing the minimum leasing acreage allowable under PL 115-97. Alternative A, the No Action Alternative, would not allow oil and gas leasing to occur.

### E.2.5.4  Findings

Alternative D2 will not result in a significant restriction in subsistence uses. Potential impacts on subsistence resources and access from future oil and gas exploration, development, and production would be minimal, or they would be adequately mitigated by stipulations or ROPs under which lessees must operate. A positive determination pursuant to ANILCA Section 810 is not required.

## E.2.6  Evaluation and Finding for the Cumulative Case

The goal of the cumulative case analysis presented in **Chapter 3** is to evaluate the incremental impact of the actions considered in the EIS, in conjunction with all past, present, and reasonably foreseeable future activities in or near the Coastal Plain, specifically, in the Kaktovik, Nuiqsut, Arctic Village, and Venetie subsistence use areas.

Actions included in the cumulative case analysis are listed in **Section F.3.2** in **Appendix F**. Past and present actions that have affected subsistence uses and resources are as follows:

- Oil and gas exploration, development, and production on the North Slope
- Transportation
- Subsistence activities
- Recreation and tourism
- Scientific research
- Community development
- Climate change

Reasonably foreseeable future actions include the following:

- Infrastructure projects developed through the Arctic Strategic Transportation and Resources (ASTAR) program

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 62 of 201
AR0701

- Oil and gas development in the Colville-Canning Area
- Oil and gas activity in the vicinity of Alpine

### E.2.6.1 Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs

Actions included in the cumulative case analysis are listed in **Section F.2.2** in **Appendix F**. These actions fall in to six broad categories: oil and gas exploration and development, transportation, subsistence activities, recreation and tourism, scientific research, and community development. Additionally, climate change is considered a variable that could contribute to potential cumulative effects of the proposed alternatives and reasonably foreseeable future actions. This section describes the potential impacts each of these categories could have to Kaktovik, Nuiqsut, Arctic Village, and Venetie subsistence uses.

*Oil and Gas Exploration, Development, and Production*

Oil and gas exploration, development, and production is ongoing and planned within the onshore North Slope, State and Federal waters in the Beaufort Sea, and in the Western Canadian Arctic. These activities include exploration work, infrastructure development, construction, and maintenance, gravel mining, and production associated with existing wells. These activities are expected to continue under all alternatives.

**Section 3.4.3**, Subsistence Uses and Resources, identifies cumulative infrastructure development on the North Slope as a major impact to subsistence activities. This is corroborated by other analyses and 810 evaluations. In the NPR-A Integrated Activity Plan/EIS, the BLM (2012) indicated that, irrespective of the alternative selected, cumulative activity on the North Slope had the potential to significantly restrict subsistence access for a number of communities. Increased infrastructure has contributed to a feeling of being "boxed in" by development in and around Nuiqsut. Impacts to Nuiqsut's ability to access subsistence resources, according to previous EISs, would be significant.

Similar to issues associated with development around Nuiqsut, ongoing and proposed oil and gas activities associated with Point Thomson and Liberty, together with Coastal Plain oil and gas activities, would impact lands in the vicinity of Kaktovik, and would potentially restrict subsistence activities and access to subsistence resources within their subsistence use area. Past, present, and future development would not mirror the scenario observed for Alpine-associated development and Nuiqsut. Future development within the program area beyond the surface disturbance limit of 2,000 acres would require additional action by Congress, and is not included in the hypothetical development scenario (**Appendix B**). Future development associated with the Leasing EIS would not surround Kaktovik, but residents may still feel surrounded if there is development to the west, south, and east of their traditional hunting areas[1]. This could occur under Alternative B. Future development associated with oil and gas activities could occur along the coast, where multiple ports or seawater treatment plants could be constructed, and within the important subsistence use area bounded by the Hulahula and Jago Rivers. It could also occur under Alternatives C, D1, and D2, as future on-the-ground development could occur on corporation lands directly south of Kaktovik.

Numerous measures would be adopted to mitigate potential impacts to subsistence access. Under all alternatives, Lease Stipulation 1 would implement NSO along rivers that are important for subsistence use by residents of Kaktovik. Lease Stipulation 9 would require lessees to develop and implement an impact and conflict avoidance and monitoring plan to assess, minimize, and mitigate the effects of the infrastructure and its use on subsistence users. ROPs 18, 20, and 23 would require that roads and other infrastructure be designed

---

[1]S. Braund, [Stephen R. Braund and Associates Senior Scientist], personal communication with E. Julianus [BLM Wildlife Biologist], EMPSi, [08 September 2018].

to avoid or minimize impacts to subsistence access to traditional hunting and fishing areas. ROPs 36-40 would require that lessees participate in extensive consultation with subsistence communities. Lessees would be required to coordinate directly with Kaktovik and seek input from local advisory councils such as the North Slope and Eastern Interior Subsistence Regional Advisory Council. They would be required to develop a plan to prevent unreasonable conflicts with subsistence activities, and to develop a subsistence access plan prior to beginning exploration or development. All future development plans would be subject to BLM review prior to approval.

Public testimony indicates that residents believe conflict avoidance and subsistence access plans mitigate potential impacts to subsistence. However, access patterns have changed in response to development on the North Slope, and residents still report feeling "boxed in" by existing development (SRB&A 2017). Potential impacts to subsistence access would likely be effectively mitigated under Alternatives B, C, D1, and D2. However, cumulative impacts associated with Point Thomson, Liberty, and other projects could result in extensive interference[2] of the ability of Kaktovik harvesters to reach and use active subsistence harvest sites. Therefore, cumulative impacts of oil and gas exploration, development, and construction could significantly impact Kaktovik's ability to access subsistence resources.

The BLM (2012) found that caribou availability for residents of Nuiqsut could be significantly impacted as a result of development in the vicinity of Alpine. Impacts to PCH caribou availability would not affect Nuiqsut, as their caribou subsistence use area does not overlap with the PCH range nor is there documented harvest of PCH caribou by Nuiqsut. Cumulative impacts to PCH caribou would not significantly impact residents of Nuiqsut under all alternatives.

Ongoing and future actions along the coast may contribute to some impacts to caribou availability. These impacts to caribou availability for Kaktovik are limited to aircraft and vehicle disturbance and are described below in *Transportation*.

Potential impacts from future oil and gas exploration, development, and production to CAH and PCH caribou abundance for residents of Kaktovik, Arctic Village, and Venetie under Alternatives B, C, D1, and D2, would be minor due to the lease stipulations and ROPs. Ongoing or future development are not expected to impact caribou abundance. Therefore, the cumulative impact, in conjunction with Alternatives B, C, D1, and D2, would not significantly restrict subsistence uses of PCH caribou.

## Transportation

Surface, air, and marine transportation within Kaktovik and Nuiqsut's subsistence use areas would continue under all alternatives. This includes roads and vehicular traffic, shipping and barging, and aircraft traffic. Increased activity associated with future oil and gas developments would result in higher levels of vessel, ground, and air traffic. This increased activity is likely under Alternatives B, C, D1, and D2. Under each alternative, NSOs, TLs, and ROPs would be sufficient to effectively mitigate potential impacts of transportation associated with future on-the-ground oil and gas activities on subsistence resources. Potential impacts to subsistence resource abundance and availability for Kaktovik would not be significant under all alternatives. Roads and transportation activities would contribute to the potentially extensive interference of the ability of Kaktovik harvesters to reach and use subsistence harvest sites. Impacts to caribou availability due to development in the vicinity of Nuiqsut were found to be potentially significant for Nuiqsut. However,

---

[2]Significance threshold defined on page 7 of BLM Instruction No. AK-2011-008.

*Coastal Plain Oil and Gas Leasing Program*
*Final Environmental Impact Statement*

potential impacts to caribou from future oil and gas activities associated with all alternatives would not contribute to cumulative effects on Nuiqsut's resource availability.

*Subsistence Activities*

Subsistence activities on the North Slope would continue under all alternatives. Although subsistence practices are somewhat fluid and subject to annual variation, current and past hunting, gathering, fishing, and trapping activities would be similar in the types of activities and areas used by the communities in the program area in the foreseeable future. Subsistence activities would not vary by alternative and would not contribute to adverse effects on the abundance or availability of subsistence resources, nor would they impact subsistence users' ability to access subsistence resources.

*Recreation and Tourism*

Recreation and tourism would continue under all alternatives. Recreation and tourism activities would occur independent of development activities proposed under each of the proposed alternatives, and thus are not expected to vary by alternative. Although these activities occur across the North Slope, recreation and tourism are most concentrated in the Arctic Refuge and Kaktovik, where polar bear viewing is a popular activity. Recreation and tourism do have the potential to adversely affect the availability of subsistence resources if these resources are disturbed by aircraft conducting flightseeing tours. Such activities are carefully managed to avoid impacts to subsistence (USFWS 2015) and would not significantly affect the availability of subsistence resources. The abundance of subsistence resources would not be affected by recreation and tourism. Subsistence users' ability to access subsistence resources would not be affected.

*Scientific Research*

Scientific research is ongoing in the program area and within Kaktovik, Nuiqsut, Arctic Village, and Venetie's subsistence use areas. It is likely that scientific research would increase under Alternatives B, C, D1, and D2, particularly if mitigation measures are adopted that require companies to fund research documenting and monitoring impacts on specific resources, such has been done elsewhere (BLM 2012). Research activities typically involve vessel, air, and overland transport of researchers and equipment, and could contribute to cumulative effects. Research activities could affect the availability of subsistence resources under Alternatives B, C, D1, and D2. Caribou could be disturbed during aerial surveys, but impacts would be short-lived. The availability of subsistence resources would not be significantly impacted by research activities under the cumulative case if Alternatives B, C, D1, or D2 are adopted, nor would the abundance of or access to subsistence resources be significantly impacted.

*Community Development*

Community development projects would occur under all alternatives. The type and size of development projects could vary by alternative. Kaktovik would likely undertake community development projects if Alternatives B, C, D1, or D2 are selected. Comparatively more projects may occur in or near Kaktovik if Alternatives C, D1, or D2 are selected than under Alternative B. NSOs would be in place along the majority of the coast under these alternatives, creating a situation where seawater treatment plants or port and airport infrastructure may be more likely to be constructed or expanded in or near Kaktovik. Community development projects would not contribute to adverse impacts on the abundance or availability of subsistence resources, nor would they impact subsistence users' ability to access subsistence resources.

*Climate Change*

Climate change is an ongoing factor considered in cumulative effects analyses on the North Slope. Climate change could affect the habitat, behavior, distribution, and populations of fish and wildlife within the program

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 65 of 201
AR0704

area. It could also impact access to these resources. The trends in climate change that were described in BLM 2018 are expected to continue.

### E.2.6.2 Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved

Evaluation of the availability of other lands is identical to that described under Alternative B (see **Section C.2.2.2**, above).

### E.2.6.3 Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence

Evaluation of other alternatives is identical to that described under Alternative B (see **Section E.2.2.2**, above).

### E.2.6.4 Findings

The cumulative case, when taken in conjunction with Alternatives B, C, D1, and D2, will not result in a significant restriction to subsistence uses for the communities of Nuiqsut, Arctic Village, and Venetie.

The cumulative case, when taken in conjunction with Alternatives B, C, D1, and D2, may result in a significant restriction to subsistence uses for the community of Kaktovik due to potential decrease in access to fish, marine mammals, and caribou. A positive determination pursuant to ANILCA Section 810 is required.

## E.3 NOTICE AND HEARINGS

ANILCA Section 810(a) provides that there shall be no "withdrawal, reservation, lease, permit, or other use, occupancy, or disposition of the public lands which would significantly restrict subsistence uses," until the federal agency gives the required notice and holds a hearing in accordance with ANILCA Section 810(a)(1) and (2). The BLM provided notice in the *Federal Register* that the cumulative case presented in the EIS met the "may significantly restrict" threshold; therefore it made a positive finding pursuant to ANILCA Section 810. As a result, a public hearing was held in the potentially affected community of Kaktovik on February 5, 2019 in conjunction with the Draft EIS public meeting. Notice of this hearing was provided in the *Federal Register* and in local media, including the *Arctic Sounder* and KBRW, the Utqiagvik radio station with coverage to all villages on the North Slope. The meeting/hearing transcript is posted on BLM's website at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=152110.

## E.4 SUBSISTENCE DETERMINATIONS UNDER THE ANILCA SECTION 810(A)(3)(A), (B), AND (C)

ANILCA Section 810(a) provides that there would be no "withdrawal, reservation, lease, permit, or other use, occupancy or disposition of the public lands which would significantly restrict subsistence uses," until the federal agency gives the required notice and holds a hearing, in accordance with ANILCA Section 810(a)(1) and (2), and makes the following three determinations required by ANILCA Section 810(a)(3)(A), (B), and (C): 1) that such a significant restriction of subsistence use is necessary, consistent with sound management principles for the use of the public lands; 2) that the proposed activity would involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other such disposition; and 3) that reasonable steps would be taken to minimize adverse impacts on subsistence uses and resources resulting from such actions (16 USC 3120(a)(3)(A), (B), and (C)).

The BLM has found in this evaluation that the cumulative case considered in this EIS may significantly restrict subsistence uses for the community of Kaktovik. The BLM undertook the notice and hearing procedures

required by ANILCA Section 810 (a)(1) and (2), in conjunction with releasing the Draft EIS in order to solicit public comment from the potentially affected community of Kaktovik.

The determinations below satisfy the requirements of ANILCA Section 810(a)(3)(A), (B), and (C).

### E.4.1 Significant Restriction of Subsistence Use is Necessary, Consistent with Sound Management Principles for the Utilization of Public Lands

BLM undertook the Leasing EIS to fulfill the Secretary of the Interior's responsibilities under ANILCA, the Federal Land Policy and Management Act (FLPMA), and PL 115-97. Section 20001(c)(1)(A) of PL 115-97 directs the Secretary to hold not fewer than two lease sales in the program area before December 22, 2024. In accordance with Section 20001(c)(1)(B), each sale must offer not fewer than 400,000 acres in areas with the highest hydrocarbon potential. Section 20001(c)(3) allows for up to 2,000 surface acres of Federal land in the program area to be covered by production and support facilities.

Alternative B, the preferred alternative, will provide the opportunity, subject to appropriate conditions developed through the NEPA process, to conduct at least two lease sales in the program area. These conditions include lease stipulations and ROPs that incorporate protective measures that would minimize impacts to important subsistence resources and subsistence use areas.

The cumulative case, in conjunction with the preferred alternative, could significantly restrict subsistence uses for the community of Kaktovik. The BLM determined that such a significant restriction is necessary, consistent with sound management principles for the use of the public lands, and for BLM to fulfill the Secretary of the Interior's responsibilities under PL 115-97, described above.

### E.4.2 The Proposed Activity will involve the Minimal Amount of Public Lands Necessary to Accomplish the Purposes of such Use, Occupancy, or Other Disposition

The BLM has determined that Alternative B involves the minimal amount of public lands necessary to accomplish the purpose and need of the Leasing EIS: establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic Refuge in accordance with the directives of PL 115-97. PL 115-97 limits the use of public lands for oil and gas infrastructure. Under all action alternatives, including Alternative B, no more than 2000 acres of public lands may be used for production and support facilities. Alternative B includes numerous oil and gas leasing stipulations and required operating procedures that apply across the Coastal Plain for protection of specific habitats and site-specific resources and uses, while allowing reasonable opportunity for necessary infrastructure to support oil and gas exploration and development. More restrictive alternatives that varied and offered less acres available for leasing or surface occupancy were analyzed, and it was determined Alternative B best meets the purpose and need of the oil and gas program. Important subsistence habitats along rivers and streams, as well as nearshore marine, lagoon, and barrier island habitats contain no surface occupancy restrictions, to ensure the habitat is protected for the important subsistence uses and resources.

### E.4.3 Reasonable Steps will be taken to Minimize Adverse Impacts upon Subsistence Uses and Resources Resulting from Such Actions

When BLM began its NEPA scoping process, it internally identified subsistence as one of the major issues to be addressed. The information found within the analysis of impacts to subsistence, including access, harvests and traditional use patterns, as well as the results of workshops with the cooperating agencies, public scoping meetings in the villages, and meetings with tribal and local governments were used to craft Alternative B.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 67 of 201
AR0706

This information resulted in the development of several protective measures that minimize adverse impacts to subsistence uses and resources, such as:

- Lease Stipulation 1 specifically minimizes impacts on subsistence cabins and campsites, as well as the disruption of subsistence activities.

- Lease Stipulation 4 protects fish and wildlife habitat and minimizes impacts on subsistence activities.

- Required Operating Procedure 7 ensures that permitted activities do not create human health risks by contaminating subsistence foods.

- Required Operating Procedure 18 protects subsistence uses and access to subsistence hunting and fishing areas and minimize the impact of oil and gas activities on air, land, water, fish, and wildlife resources.

- Required Operating Procedure 20 protects subsistence use and access to subsistence hunting and fishing and anadromous fish and protect subsistence use and access to subsistence and non-subsistence hunting and fishing.

- Required Operating Procedure 23 minimizes disruption of caribou movement and subsistence use.

Given these steps, as well as other lease stipulations and required operating procedures that serve to directly protect various subsistence resources or their habitat, the BLM has determined that Alternative B includes reasonable steps to minimize adverse impacts on subsistence uses and resources.

## E.5 REFERENCES

BLM (US Department of Interior Bureau of Land Management). 2011. Bureau of Land Management instructions and policy for compliance with Section 810 of the Alaska National Interest Lands Conservation Act. Instruction Memorandum No. AK-2011-008. Internet website: https://www.blm.gov/policy/im-ak-2011-008.

_____. 2012. National Petroleum Reserve – Alaska Integrated Activity Plan/Final Environmental Impact Statement. Bureau of Land Management, Alaska State Office. 2012.

_____. 2018. Alpine Satellite Development Plan for the Proposed Greater Mooses Tooth 2 Development Project Final Environmental Impact Statement. Bureau of Land Management, Alaska State Office. September 2018. Anchorage, Alaska.

BLM GIS. 2018. GIS data used in the Coastal Plain Oil and Gas Leasing Program EIS alternatives, affected environment, and impact analysis. Alaska Bureau of Land Management.

Cronin, M. A., W. B. Ballard, J. Truett, and R. Pollard. 1994. Mitigation of the Effects of Oilfield Development and Transportation Corridors on Caribou. Final report prepared for the Alaska Oil and Gas Association, Anchorage, by LGL Alaska Research Associates, Anchorage.

Curatolo, J. A., and S. M. Murphy. 1986. The effects of pipelines, roads, and traffic on the movements of caribou, *Rangifer tarandus*. *Canadian Field-Naturalist* 100: 218–224.

George, J. C., L. M. Philo, K. Hazard, D. Withrow, G. M. Carroll, and R. S. Suydam. 1994. Frequency of killer whale attacks and ship collisions based on scaring on bowhead whales of the Bering-Chukchi-Beaufort Seas Stock. *Arctic* 47(3): 247–255.

Griffith, D. B., D. C. Douglas, N. E. Walsh, D. D. Young, T. R. McCabe, D. E. Russell, R. G. White, R. D. Cameron, and K. R. Whitten. 2002. Section 3: The Porcupine Caribou Herd. Pp. 8-37, in Arctic Refuge Coastal Plain Terrestrial Wildlife Research Summaries (D. C. Douglas, P. E. Reynolds, and E. B. Rhode, editors). US Geological Survey, Biological Resources Division, Biological Science Report USGS/BRD/BSR-2002-0001.

Kofinas, G., S. B. BurnSilver, J. Magdanz, R. Stotts, and M. Okada. 2016. Subsistence Sharing Networks and Cooperation: Kaktovik, Wainwright, and Venetie, Alaska. BOEM Report 2015-023 DOI; AFES Report MP 2015-02. School of Natural Resources and Extension, University of Alaska Fairbanks.

Laist, D. W., A. R. Knowlton, J. G. Mead, A. S. Collet, and M. Podesta. 2001. "Collisions between ships and whales." *Marine Mammal Science* 17: 35–75.

Lawhead, B. E., A. K. Prichard, M. J. Macander, and M. Emers. 2004. Caribou Mitigation Monitoring Study for the Meltwater Project, 2003. Third annual report for ConocoPhillips Alaska, Inc., Anchorage, by ABR, Inc., Fairbanks.

Murphy, S. M., and B. E. Lawhead. 2000. Caribou. Chapter 4, pp. 59–84, in *The Natural History of an Arctic Oil Field: Development and the Biota* (J. Truett and S. R. Johnson, editors). Academic Press, San Diego, California.

NRC (National Research Council). 2003. *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*. Washington, DC: National Academies Press.

Russell, D.E., D. van de Wetering, R.G. White, and K.L. Gerhart. 1996. Oil and the Porcupine caribou herd-can we quantify the impacts?. *Rangifer* Special Issue 9: 255-257.

SRB&A (Stephen R. Braund & Associates). 2017. Nuiqsut Caribou Subsistence Monitoring Project: Results of Year 8 Hunter Interviews and Household Harvest Surveys. Prepared for ConocoPhillips, Alaska, Inc. Anchorage.

Stinchcomb, T. R. 2017. Social-ecological soundscapes: examining aircraft-harvester-caribou conflict in Arctic Alaska. M.S. Thesis. University of Alaska Fairbanks. Fairbanks, Alaska.

Truett, J. C., and S. R. Johnson. 2000. The Natural History of an Arctic Oilfield. Academic Press.

Tussing, A. R., and S. Haley. 1999. Drainage pierces ANWR in Alaska study scenario. Oil and Gas Journal 97: 71–84. Internet website: https://www.ogj.com/articles/print/volume-97/issue-27/special-report/drainage-pierces-anwr-in-alaska-study-scenario.html.

USFWS (US Fish and Wildlife Service). 2015. Arctic National Wildlife Refuge revised comprehensive conservation plan. US Fish and Wildlife Service, Final Environmental Impact Statement, Vol. 1. Internet website: https://www.fws.gov/home/arctic-ccp/.

Valkenburg, P., and J. L. Davis. 1985. "The Reaction of Caribou to Aircraft: A comparison of two herds." Pp. 7–9, in Proceedings of the First North American Caribou Workshop, 1983 (A. H. Martell and D. E. Russell, editors). Canadian Wildlife Service, Whitehorse, Yukon.

Van Lanen, J. M., C. Stevens, C. Brown, B. K. Maracle, and D. Koster. 2012. Subsistence and Mammal Harvests and Uses, Yukon Flats, Alaska 2008–2010 Harvest Report and Ethnographic Update. Alaska Department of Fish and Game, Division of Subsistence, Anchorage.

Walsh, N.E., S.G. Fancy, T.R. McCabe, and L.F. Pank. 1992. Habitat use by the Porcupine caribou herd during predicted insect harassment. *Journal of Wildlife Management* 56: 465-473.

Young, D. D., T. R. McCabe, and M. S. Udezitz. 2002. Section 6: Predators. Pp. 51-53 in Arctic Refuge Coastal Plain Terrestrial Wildlife Research Summaries (D. C. Douglas, P. E. Reynolds, and E. B. Rhode, editors). US Geological Survey, Biological Resources Division, Biological Science Report USGS/BRD/BSR-2002-0001.

Yukon Environmental GIS. 2018. GIS data provided by Yukon Environmental, Mike Suitor, July 2018.

ANILCA Section 810 Final Evaluation

High Use Porcupine Caribou Herd Calving Area

U.S. DEPARTMENT OF THE INTERIOR | BUREAU OF LAND MANAGEMENT | ALASKA | COASTAL PLAIN OIL AND GAS LEASING PROGRAM FINAL EIS



Calving period, just cows and calves
May 26–June 10
Years of data: 37

**Percent of years of caribou are present**
■ ≥40%

□ **Public Law 115-97 Coastal Plain**

▨ **Excluded from Public Law 115-97**
**Coastal Plain or outside the BLM's**
**oil and gas leasing authority**

Data Source: BLM GIS 2018,
Environment Yukon
GIS 2018
Print Date: 07/18/2019

No warranty is made by the Bureau of Land Management as to the
accuracy, reliability, or completeness of these data for individual or
aggregate use with other data. Original data were compiled from
various sources. This information may not meet National Map
Accuracy Standards. This product was developed through digital
means and may be updated without notification.

**Map E-1**

This page intentionally left blank.

**Table E-1**
**Lease Restrictions in High-Use Porcupine Caribou Herd Calving Area (acres)**

| Lease Stipulations | Alternative A | Alternative B | Alternative C | Alternative D1 | Alternative D2 |
|---|---|---|---|---|---|
| **No surface occupancy/not offered for lease sale** | 728,300 | 135,500 | 631,200 | 713,900 | 722,100 |
| **Timing limitation** | 0 | 564,900 | 83,400 | 0 | 5,800 |
| **Controlled surface use** | 0 | 0 | 0 | 5,400 | 5,400 |
| **Subject to required operating procedures only** | 0 | 27,900 | 13,700 | 8,900 | 3,400 |

Source: BLM GIS 2018

AR0712

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 73 of 201

**Table E-2**
**Summary of Impacts on Abundance and Availability of Major Subsistence Resources for Kaktovik, Nuiqsut, Arctic Village, and Venetie**

| Resource | Impact | Context | Alternative A | | Alternative B | | Alternative C | | Alternative D1 | | Alternative D2 | | Cumulative | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Abundance | Availability | Abundance | Availability | Abundance | Availability | Abundance | Availability | Abundance | Availability | Abundance | Availability |
| Fish | Habitat loss or alteration | Site-specific | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 2 |
| Fish | Disturbance or displacement | Regional | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 2 |
| Fish | Injury or mortality | Site-specific | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 2 |
| Marine mammals | Injury or mortality | Site-specific | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 0 |
| Marine mammals | Disturbance or displacement | Regional | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 |
| Caribou | Habitat loss or alteration | Site-specific | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 |
| Caribou | Mortality or injury | Site-specific | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| Caribou | Altered movement | Local | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 2 | 0 | 2 | 2 | 2 |
| Caribou | Altered behavior | Local | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 2 | 2 |
| Caribou | Displacement of maternal caribou | Regional | 0 | 0 | 2 | 0 | 2 | 0 | 1 | 0 | 1 | 0 | 2 | 2 |

Notes:
1. Table does not specify the degree to which each community is affected.
2. Gray (0) indicates no impact, yellow (1) indicates minor impact, orange (2) indicates moderate impact, and red (3) indicates major impact.

AR0713

**Table E-3**
**Summary of Impacts on Access to Major Subsistence Resources for Kaktovik, Nuiqsut, Arctic Village, and Venetie**

| Resource | Potential Effect | Context | Alternative A | | Alternative B | | Alternative C | | Alternative D1 | | Alternative D2 | | Cumulative | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Legal | Physical | Legal | Physical | Legal | Physical | Legal | Physical | Legal | Physical | Legal | Physical |
| Fish | Use of traditional fishing areas | Local | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 |
| Marine mammals | Use of traditional marine mammal hunting areas | Local | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 |
| Caribou | Use of traditional caribou hunting areas | Local | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 3 |

Notes:
1. Table does not specify the degree to which each community is affected.
2. Gray (0) indicates no impact, yellow (1) indicates minor impact, orange (2) indicates moderate impact, and red (3) indicates major impact.

AR0714



U.S. Department of the Interior
Bureau of Land Management

# Coastal Plain Oil and Gas Leasing Program Record of Decision

**August 2020**

Prepared by:

US Department of the Interior
Bureau of Land Management

In cooperation with:

US Fish and Wildlife Service
US Environmental Protection Agency
State of Alaska
North Slope Borough
Arctic Village Council
Native Village of Kaktovik
Native Village of Venetie Tribal Government
Venetie Village Council

Cover Photo: Northward view in central coastal plain area near the Sadlerochit River showing gently rolling topography typical of the area. Natural oil indications are visible of an oil seep that occurs along the coast (Barter Island). Photo by David Houseknecht (USGS).

DOI-BLM-AK-0000-2018-0002-EIS

BLM/AK/PL-20/003+1610+930

AR3139

# Record of Decision

I hereby adopt Alternative B of the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement as described further and modified herein, and subject to the lease stipulations, required operating procedures, and lease notices developed by the Bureau of Land Management for that alternative, as reflected in this Record of Decision. My approval of this Decision constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4.

Approved by:

David L. Bernhardt
Secretary of the Interior

This page intentionally left blank.

AR3141

# TABLE OF CONTENTS

Chapter                                                                                                          Page

RECORD OF DECISION ........................................................................................................... 1
    Summary ............................................................................................................................. 1
    1.  Decision .......................................................................................................................... 4
        1.1   Statutory Background ........................................................................................... 5
        1.2   Section 20001(b)(2)(A) of PL 115-97—Establishment of the Program ..................... 6
        1.3   Section 20001(b)(2)(B) of PL 115-97—The Purposes of the ANWR ...................... 7
        1.4   Section 20001(b)(3) of PL 115-97—Management in a Manner Similar to the
                Administration of Lease Sales in the NPR-A ........................................................ 8
        1.5   Section 20001(c) of PL 115-97 ............................................................................. 9
    2.  Alternatives ................................................................................................................... 13
        2.1   Alternative A: No Action Alternative .................................................................. 15
        2.2   Alternative B: Preferred Alternative ................................................................... 15
        2.3   Alternative C ...................................................................................................... 15
        2.4   Alternative D ...................................................................................................... 15
        2.5   Environmentally Preferred Alternative ............................................................... 16
    3.  Management Considerations ........................................................................................... 16
        3.1   Key Considerations to the Decision .................................................................... 16
        3.2   Amendment of the Comprehensive Conservation Plan ......................................... 18
        3.3   Mitigation Measures .......................................................................................... 19
        3.4   Endangered Species Act Consultation ................................................................. 21
        3.5   National Historic Preservation Act ..................................................................... 24
        3.6   ANILCA Section 810 Subsistence Evaluation ..................................................... 24
        3.7   Environmental Justice ........................................................................................ 27
        3.8   Floodplain Management and Protection of Wetlands ............................................ 28
    4.  Public Involvement ....................................................................................................... 31
        4.1   Comments Prior to Final Leasing EIS ................................................................ 32
        4.2   Comments Received After Final Leasing EIS ...................................................... 32

# APPENDICES

Appendix A      Lease Stipulations and Required Operating Procedures
Appendix B      Maps

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 80 of 201
AR3142

This page intentionally left blank.

*Coastal Plain Oil and Gas Leasing Program*
*Record of Decision*

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 81 of 201
AR3143

# Record of Decision

## SUMMARY

On December 22, 2017, after decades of congressional consideration regarding whether oil and gas development should take place on any area of the 1.56 million-acre Coastal Plain within the 19.3 million-acre Arctic National Wildlife Refuge (ANWR), Congress looked to the oil and gas potential of this area for needed federal revenues and enacted Section 20001 of the Tax Cuts and Jobs Act (Public Law [PL] 115-97). The law was considered pursuant to rules contained in the Congressional Budget Act of 1974 (2 United States Code (U.S.C.) 644) that limited the scope of the text to matters necessary for establishing an oil and gas program that would generate revenue for the treasury.

Section 20001(b)(1) of PL 115-97 lifted a prior prohibition on oil and gas leasing and development in the ANWR that had been established by Section 1003 of the Alaska National Interest Lands Conservation Act (ANILCA), as that prohibition pertained to the Coastal Plain. Section 20001(b)(2)(A) of PL 115-97 went further to *require* the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM)[1], to establish and administer a competitive oil and gas program for the "leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." The Secretary is required to manage the oil and gas program on the Coastal Plain "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et. seq.) (including regulations)."

In addition to directing the establishment of a new competitive oil and gas program in the Coastal Plain, the statute also includes additional mandates to the Secretary, acting through the BLM, to expedite and provide certainty toward establishment and development of the program in order to meet the statute's revenue-generating purpose. First, Section 20001(c)(1) requires that at least two lease sales be held by December 22, 2024, including the first by December 22, 2021, and that each sale offer for lease at least 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain. Section 20001(c)(2) requires that the BLM issue any rights-of-way or easements across the Coastal Plain "for the exploration, development, production, or transportation" necessary to carry out the oil and gas program. Finally, Section 20001(c)(3) requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land on the Coastal Plain to be covered by production and support facilities during the term of the leases under the oil and gas program.

In summary, exercising its plenary authority over the management of federal lands, Congress's enactment of Section 20001 of PL 115-97 decided the question of whether activities related to leasing, exploration, development, production and transportation of oil and gas would take place on the Coastal Plain. In doing so, Congress, among other things: (1) directed the Secretary, acting through the BLM, to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) included a Coastal Plain oil and gas program as a refuge purpose on equal footing with the other refuge purposes; (3) directed the Secretary, acting through the BLM, to manage the program in a manner similar to the administration of lease sales on the National Petroleum Reserve-Alaska

---

[1]This provision grants authority to the Secretary but prevents the Secretary from re-delegating his authority to an agency within Interior other than the Bureau of Land Management. *See Trustees for Alaska v. Watt*, 524 F. Supp. 1303 (D. Alaska 1981) (holding that certain delegations of authority to the US Geological Survey were invalid because Congress had required those functions to be performed by the U.S. Fish and Wildlife Service).

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 82 of 201
AR3144

(the NPR-A); (4) directed the Secretary, acting through the BLM, to issue rights-of-way or easements "for the exploration, development, production, or transportation necessary" to carry out the program; and (5) directed the Secretary, acting through the BLM, to authorize up to 2,000 surface acres to be covered by production and support facilities.

This Record of Decision (ROD or Decision) approves a program to carry out this statutory directive. By determining *where and under what terms and conditions* leasing will occur, this Decision takes into account the requirements of PL 115-97 and other applicable law. To inform this Decision, the BLM prepared the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (Leasing EIS).

As explained further in the Leasing EIS, there is tremendous uncertainty regarding future potential exploration and development on the Coastal Plain. Any development scenario at this point is highly speculative because: it is unknown whether or where leases will be issued, it is unknown whether or where exploratory drilling may occur under such leases, and it is unknown whether or where commercially developable oil and gas discoveries may be made.

Despite these vast uncertainties, to meet its obligations under the National Environmental Policy Act (NEPA) the BLM endeavored to develop a hypothetical development scenario in a good faith effort to identify plausible indirect effects of leasing that are not known at this time but nonetheless might be theoretically considered "reasonably foreseeable" if leasing was to result in the exploration and development of oil and gas resources (40 Code of Federal Regulations [CFR] Section 1508.8(b)) (see Appendix B to the Leasing EIS). Further, in order to minimize the chance that the resultant impact analysis would understate potential impacts, the hypothetical scenario described in the Leasing EIS represents a successful discovery and optimistic high-production development scenario in a situation of favorable market prices.

Given the uncertainty, and the hypothetical, speculative and aggressive nature of the development scenario analyzed, the potential impacts described in the Leasing EIS are necessarily uncertain and likely overstated. At some future stage in the administration of the oil and gas program where impacts from proposed actions are actually reasonably foreseen, i.e., if and when the BLM is presented with proposals for exploration or development, those decisions by the BLM for specific authorizations will also be subject to project-specific analysis, including compliance with NEPA and other laws.

This Decision adopts Alternative B of the Leasing EIS as to where and under what terms and conditions leasing may occur subject to future specific environmental analysis and permitting decisions, except clarifications have been provided for required operating procedures (ROP) 11 and 17, as well as Lease Notice 2.[2] The ROD also does not adopt the interpretive assumptions made in the Leasing EIS as to the implementation of Section 20001(c)(3) of PL 115-97. Rather, it provides guidance regarding certain general principles for the future application of that section of the law. As explained in further detail below, this is not a substantial change in the proposed action.

This Decision implements the requirement that the Secretary, acting through the BLM, provide for a competitive oil and gas program for the leasing, production, development, and transportation of oil and gas in and from the Coastal Plain. This Decision takes into account protection of important surface resources and other uses of the Coastal Plain in consideration of the purposes of the ANWR set out in Section 303(2)(B) of ANILCA, as amended by Section 20001(b)(2)(B) of PL 115-97.

---

[2] See Section 3.4 and Appendix A of the ROD.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 83 of 201
AR3145

This Decision makes approximately 1,563,500 acres, or the entire program area,[3] available for oil and gas leasing, and consequently for potential future exploration, development, and transportation. While providing these opportunities, the program adopted in this ROD also provides protections for surface resources and other uses, including subsistence use, through a comprehensive package of lease stipulations and ROPs, listed in **Appendix A**, that will apply to future oil and gas activities. Together these lease stipulations and ROPs build on, without frustrating, the statutorily-mandated oil and gas program taking into account other refuge purposes, which include conservation of fish and wildlife populations and habitats, fulfillment of international treaty obligations, allowance for continued subsistence use, and protection of water quality and quantity necessary to meet fish and wildlife conservation needs. This Decision also takes into account that any future specific exploration and development proposals will be subject to further environmental analysis and additional, project-specific ROPs as appropriate and necessary.

This Decision establishes a program to achieve the statutory oil and gas program while still providing that approximately 359,400 acres (23 percent of lands available) will be subject to No Surface Occupancy (NSO) stipulations within barrier islands and important aquatic habitats, including rivers and streams, nearshore marine waters, and lagoons, and that approximately 721,200 acres (46 percent of lands available) will be subject to operational timing limitations (TLs) in the primary calving habitat area for the Porcupine caribou herd. Together, these partially overlapping lease stipulations cover more than 60 percent of the program area. Additional lease stipulations and the 44 ROPs that apply to oil and gas activities throughout the program area provide further protections for important resources and uses, as discussed in **Section 3.3**, below.[4]

This Decision was reached after an extensive review and is made after an outreach effort where the BLM and the Department of the Interior heard and benefited from a wide variety of perspectives. The U.S. Fish and Wildlife Service (USFWS), U.S. Environmental Protection Agency (EPA), State of Alaska, North Slope Borough (NSB), Native Village of Kaktovik, Native Village of Venetie Tribal Government, Venetie Village Council, and Arctic Village Council participated in the NEPA process as cooperating agencies. These agencies worked with the BLM by providing input as to what should be analyzed in the Leasing EIS, including suggestions for alternatives, lease stipulations, and ROPs, and by reviewing in-house drafts of the Draft and Final Leasing EISs; however, as the lead agency for the Leasing EIS, the BLM is ultimately responsible for the analysis therein, as well as this ROD.

In addition, the BLM met with Canadian government officials in Canada and conducted tribal consultation throughout the NEPA process with tribes in northern Alaska, including the four tribes that served as cooperating agencies and other tribes whose members have the potential to be substantially impacted by implementation of the Coastal Plain oil and gas leasing program. The BLM also held Native consultations with Alaska Native Claims Settlement Act (ANCSA) corporations during development of the EIS. See Appendix C of the Leasing EIS for complete listings of consultations.

The BLM provided for public involvement in the development of the Leasing EIS. Public meetings, both during scoping and on the Draft EIS, were held in Anchorage, Arctic Village, Fairbanks, Kaktovik, Utqiaġvik, and Venetie, Alaska, and Washington, DC. A public meeting on the Draft EIS was also held in Fort Yukon,

---

[3] The program area includes all lands within the Coastal Plain for which the federal government owns the mineral interest, with the exception of Air Force-administered lands near Kaktovik and approximately 4,400 acres of federal lands selected for conveyance under the Alaska Native Claims Settlement Act.

[4] The specific conditions of those stipulations and ROPs are contained in Table 2-3 in Chapter 2 of the Final EIS. As noted therein, PL 115-97 requires that the BLM issue lease rights-of-way for essential roads and pipeline crossings, and other necessary access, even in areas subject to an NSO stipulation.

Alaska. In addition to receiving public comments at the scoping and Draft EIS public meetings, comments were also taken online, by email, and through the mail. Altogether, during the public scoping period and public review period for the Draft EIS, the BLM received more than 1.8 million comment submissions, containing more than 8,000 unique substantive comments. Additionally, the BLM and Departmental officials met with representatives of a broad range of stakeholders, including local and state governments, tribes, Canadian government, Alaska Native corporations, and industry and environmental organizations.

## 1. DECISION

An environmental impact statement informs a decision-maker before the decision is made. See 40 CFR 1502.1, 1505.2. To facilitate this outcome, the Council on Environmental Quality's (CEQ) NEPA regulations establish a minimum 30-day period after notice is published that the Final EIS has been filed with EPA before the agency may make a decision on a proposed action. See 40 CFR 1506.10. During this period, the decisionmaker completes its own internal final review, and the public and other agencies may comment on the Final EIS prior to the agency's final action on the proposal. See CEQ's NEPA's Forty Most Asked Questions (Q&A 34b). Consistent with this process, this Decision is rendered after carefully reviewing the Draft EIS and the Final EIS, public comments, and the BLM's response to public comments submitted on the Draft EIS.

The Decision described and adopted in this ROD implements the Congressional directive to the BLM in Section 20001(b)(2)(A) of PL 115-97 to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area of the ANWR, as that area is defined by Section 20001(a)(1) of PL 115-97 (see **Map 1-1** in **Appendix B**).

In accordance with the provisions of PL 115-97 and for the reasons stated in more detail below,[5] this Decision adopts Alternative B in the Leasing EIS as to where and under what terms and conditions leasing may occur subject to future specific environmental analysis and permitting decisions, except clarifications have been provided for ROPs 11 and 17, as well as Lease Notice 2. The ROD also does not adopt the interpretive assumptions made in the Leasing EIS as to the implementation of Section 20001(c)(3) of PL 115-97. The Decision makes the entire "program area" covered by the Congressional directive in PL 115-97, approximately 1,563,500 acres, available for oil and gas leasing, and consequently, for potential oil and gas exploration and development (**see Map 1-2 in Appendix B**), subject to the lease stipulations and ROPs listed in **Appendix A**.

**Map 1-3** in **Appendix B** illustrates the geographic scope of some of these lease stipulations. These stipulations and ROPs are derived from those listed for Alternative B in Table 2-3 of the Leasing EIS. This Decision expressly establishes the program to carry out the statutorily-required lease sales as described in **Section 1.5** below, including the issuance of necessary rights-of-way and easements and the authorization of up to 2,000 surface acres to be covered by production and support facilities as mandated by PL 115-97.

As noted above, the program area includes all lands within the Coastal Plain for which the federal government owns the mineral interest, with the exception of Air Force-administered lands near Kaktovik and approximately 4,400 acres of federal lands selected for conveyance under ANCSA; however, while the BLM may lease the subsurface mineral interest underlying Native allotments, which comprise approximately 900 acres of the program area (0.06 percent), lease stipulations and ROPs will not apply on Native allotments,

---

[5] This section describes how the Decision conforms to the applicable provisions of PL 115-97. Additional considerations, including compliance with other applicable laws, are discussed in **Section 3**, *Management Considerations*.

except for Lease Stipulation 11, which requires written consent from allotment owners for the construction and maintenance of improvements on allotments. Instead, as the surface owners of these privately-owned lands, Native allotment owners have the authority to establish conditions for oil and gas operators' surface use of their allotments.

Future on-the-ground actions requiring BLM approval, including potential exploration, development, production and transportation proposals, will require further NEPA analysis based on site-specific proposals. For example, before drilling on any lease, a leaseholder will be required to submit an application for permit to drill, which will require appropriate NEPA analysis (as well as compliance with other applicable laws) before any drilling may be authorized. Potential applicants will be subject to the terms of the lease; however, the BLM Authorized Officer may require additional project-specific terms and conditions before authorizing any oil and gas activity based on the required project-level environmental, marine mammal, endangered species and subsistence impact analyses.

As described in more detail in **Section 1.5** below, this Decision provides guidance for potential future permitting purposes, regarding Section 20001(c)(3) of PL 115-97. The determination as to whether particular surface acreage must be authorized to be covered by "production and support facilities" is necessarily left to future fact specific determinations. This Decision determines where and under what conditions to apply to the statutorily-required lease sales that will benefit from the statutory mandate for authorizing production and support facilities covering up to the 2,000 acres of federal land. In so doing, this Decision takes a conservative approach to the highly speculative oil and gas program analyzed under the Leasing EIS that could span more than five decades.

## 1.1 Statutory Background

The ANWR established by ANILCA (PL 96-487) on December 2, 1980, consists of approximately 19.3 million acres in northeast Alaska. Section 303(2) of ANILCA established the ANWR, converting and expanding by approximately 9.2 million acres of public domain lands to the south and west the prior Arctic National Wildlife Range established by the Secretary of the Interior in 1960. Section 702(3) of ANILCA designated approximately 8 million acres of the ANWR as wilderness. Section 1002 of ANILCA excluded the Coastal Plain from wilderness designation, setting aside 1.56 million acres for study of all the resources of what is referred to commonly as the "1002 area" in recognition of the area's potential for oil and gas resources. Section 1003 of ANILCA prohibited oil and gas development throughout the ANWR until authorized by Congress.

Pursuant to Section 1002(a) of ANILCA, the Secretary was required to conduct ". . . an analysis of the impacts of oil and gas exploration, development, and production, and to authorize exploratory activity within the coastal plain in a manner that avoids significant adverse effects on the fish and wildlife and other resources." Section 1002(c)(D) of ANILCA required the Secretary to analyze the potential impacts of oil and gas exploration, development, and production on such wildlife and habitats, and Section 1002(c)(E) of ANILCA required the Secretary to analyze the potential effects of such activities on the culture and lifestyle (including subsistence) of affected Native and other people.

Section 1002(h) of ANILCA required the Secretary to prepare and submit a report to Congress with recommendations with respect to whether further exploration for, and the development and production of, oil and gas within the coastal plain should be permitted and, if so, what additional legal authority is necessary to ensure that the adverse effects of such activities on fish and wildlife, their habitats, and other resources are avoided or minimized.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 86 of 201
AR3148

On April 21, 1987, the Department of the Interior's *Arctic National Wildlife Refuge, Alaska, Coastal Plain Resource Assessment: Report and Recommendation to the Congress of the United States and Final Legislative Environmental Impact Statement* was published in accordance with Section 1002(h) of ANILCA. The report analyzed the environmental consequences of five management alternatives, ranging from opening the entire Coastal Plain area to oil and gas leasing, to wilderness designation. Therein, after 5 years of scientific study by the USFWS, U.S. Geological Survey (USGS) and BLM, the Secretary of the Interior selected as the preferred alternative making available for consideration the entire ANWR Coastal Plain for oil and gas leasing.

On December 22, 2017, following more than three decades of Congressional debate and consideration of the Secretary's recommendation to Congress, Congress enacted the Tax Cuts and Jobs Act (PL 115-97). Section 20001(b)(1) of PL 115-97 amends ANILCA to provide that Section 1003, which prohibited oil and gas development in the ANWR unless authorized by Congress, does not apply to the Coastal Plain. Section 20001(b)(2)(A) directs the Secretary, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area of the ANWR, as that area is defined by Section 20001(a)(1).

Section 20001(b)(2)(B) amended Section 303(2)(B) of ANILCA to add as a purpose of the ANWR: "to provide for an oil and gas program on the Coastal Plain." Section 20001(b)(3) requires the Secretary, acting through the BLM, to "manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)." Section 20001(b)(4) sets a royalty rate of 16.67 percent for leases, and Section 20001(b)(5) requires 50 percent of revenues from lease bonus bids, rentals, and royalties to be paid to the State of Alaska and the other 50 percent to be deposited into the Federal Treasury.

Section 20001(c)(1) of PL 115-97 requires that at least two lease sales be held by December 22, 2024, with the first sale conducted by December 22, 2021, and that each sale offer for lease not fewer than 400,000 acres of the highest hydrocarbon potential lands within the Coastal Plain. Section 20001(c)(2) requires the Secretary, acting through the BLM, to issue any rights-of-way or easements across the Coastal Plain for "exploration, development, production, or transportation necessary to carry out the program." Additionally, Section 20001(c)(3) requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land to be covered by production and support facilities.

As set forth more fully below, this Decision takes into account and is fully consistent with all the foregoing provisions of Section 20001 of PL 115-97.

## 1.2   Section 20001(b)(2)(A) of PL 115-97—Establishment of the Program

As noted above, this Decision establishes a competitive oil and gas program. Section 20001(b)(2)(A) of PL 115-97 requires the Secretary, acting through the BLM, to both establish and to administer "a competitive oil and gas program for leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." This broad directive by Congress plainly gives the Secretary, acting through the BLM, both a directive and the express authority necessary to carry out all elements typically associated with a competitive oil and gas program, including leasing, exploration, development, production, and transportation of oil and gas in and from the Coastal Plain. The lease stipulations and ROPs adopted in this ROD provide terms and conditions applicable to each such aspect of the program, from lease sales through reclamation of resulting oil and gas developments.

### 1.3 Section 20001(b)(2)(B) of PL 115-97—The Purposes of the ANWR

After the amendment by Section 20001(b)(2)(B) of PL 115-97, Section 303(2)(B) of ANILCA now provides (emphasis added in italic):

> The purposes for which the Arctic National Wildlife Refuge is established and shall be managed include—
>
> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;
>
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
>
> (iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents;
>
> (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge; *and*
>
> *(v) to provide for an oil and gas program on the Coastal Plain.*

Under Section 20001 of PL 115-97, Congress directed the Secretary, acting through the BLM, to implement the Coastal Plain oil and gas program in the ANWR. See Sections 20001(a)(2) and (b)(2)(A). Thus, under Section 20001 of PL 115-97 and, acting through the BLM, the Secretary's administration of the Coastal Plain oil and gas program, the USFWS does not have jurisdiction over matters related to administration of the oil and gas program within the Coastal Plain, but exercises its authorities and responsibilities with regard to all other matters not related to the oil and gas program throughout the entire ANWR, under the National Wildlife Refuge System Administration Act (NWRSAA), ANILCA, and various other applicable fish and wildlife and conservation-related statutes.

Jurisdiction for the authorization and administration of uses related to the oil and gas program rests with the Secretary, acting through the BLM. The specific requirements of Section 20001 and its directive to establish an oil and gas program on the Coastal Plain in accordance with the terms set by Congress requires, among other things, that the Secretary, acting through the BLM, hold lease sales and authorize all uses necessary to carry out the Coastal Plain oil and gas program.

By adding an oil and gas program on the 1.56 million-acre Coastal Plain as a purpose of the ANWR, Congress itself balanced the purposes of the 19.3 million-acre refuge, a balance which is now law. Although the ANWR has multiple purposes, Congress has mandated more specific management within particular areas. Just as Congress has mandated that 8 million acres of the ANWR be managed as wilderness, it has mandated that the 1.56 million-acre Coastal Plain be managed for an oil and gas program. Following the statutory directive, should leasing, exploration, development, production, and transportation activities actually take place on the Coastal Plain, those actions would potentially be limited in scope to only approximately 8 percent of the ANWR, with some potential impact on the other four refuge purposes.

Case 3:24-cv-00051-SLG   Document 71-2   Filed 08/13/24   Page 88 of 201
AR3150

Within this statutory framework, this Decision takes into account the other purposes of the ANWR. In developing lease stipulations and ROPs for evaluation in the Leasing EIS, and for purposes of adopting Alternative B's lease stipulations and ROPs in this Decision, the Secretary, acting through the BLM, implements purpose (v) of the ANWR in a way that takes into consideration that Congressional direction in light of the other four purposes of the ANWR.

This Decision provides consideration to the other refuge purposes so that the fifth purpose does not defeat the other four. In this way, the oil and gas program can take into account all of the purposes of the ANWR. For example, Alternative B, as adopted by this ROD, incorporates several lease stipulations and ROPs for the protection of the types of resources and uses that are cited in the statutory purposes of the ANWR. Such lease stipulations and ROPs include for example, but are not limited to: Lease Stipulation 9 and ROP 4, which provide protection for polar bears and their habitat, consistent with purpose (i); Lease Stipulation 7 and ROP 23, which provide protections for Porcupine herd caribou and their habitat, consistent with purpose (ii); Lease Stipulation 4 and ROP 18, which protect subsistence uses, consistent with purpose (iii); and Lease Stipulation 1 and ROP 8, which protect water quality and quantity, consistent with purpose (iv).

## 1.4 Section 20001(b)(3) of PL 115-97—Management in a Manner Similar to the Administration of Lease Sales in the NPR-A

This Decision follows the statutory direction to "manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)," required by Section 20001(b)(3) of PL 115-97, except as otherwise provided. In this regard, where appropriate, and except as otherwise provided in Section 20001, the elements of the Coastal Plain oil and gas leasing program adopted by this Decision follow the NPR-A program statutory and regulatory scheme. For example, both programs determine which areas are available for leasing in future lease sales, and both establish the terms and conditions under which oil and gas activities will be conducted.

In many cases the terms and conditions (i.e., lease stipulations and ROPs) that will apply to oil and gas activities in the Coastal Plain pursuant to this Decision are derived from (with appropriate adjustments relevant to the Coastal Plain) lease stipulations and required best management practices contained in the February 2013 ROD for the current NPR-A Integrated Activity Plan, which governs the NPR-A program. Additionally, future on-the-ground oil and gas activities will be evaluated through additional, project-specific NEPA analysis, as is the case with the NPR-A program.

The words "similar to," in this context means consistent except where the statutory goals and mandates or differences in circumstances between the NPR-A and the Coastal Plain support a departure. For example, special areas, as that term is used by the BLM in its management of the NPR-A, including in its current NPR-A Integrated Activity Plan, are not established for the Coastal Plain.

In the NPR-A, the BLM is both the oil and gas program manager and the surface manager of the entire Petroleum Reserve. The term special area is used by the BLM to describe areas in the NPR-A that contain significant surface resource values which require specialized management prescriptions in order to adequately protect those values (see 42 U.S.C. 6504(a)).

Given that the USFWS is responsible for management of the ANWR, except for implementation of the oil and gas program, this Decision declines to establish special areas in the Coastal Plain. Nevertheless, the Decision treats much of the Coastal Plain as special, adopting particular, location-specific management

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 89 of 201
AR3151

prescriptions in certain areas where appropriate, in a manner similar to the BLM's management of the NPR-A oil and gas program.

In this regard, the Leasing EIS considered, and this Decision adopts, the use of special, particularly stringent lease stipulations described in **Appendix A** that apply in certain large areas containing significant surface values. These include Lease Stipulations 1 and 4, establishing NSO prohibitions on 359,400 acres within barrier islands and important aquatic habitats, including rivers and streams, nearshore marine waters, and lagoons, and Lease Stipulation 7, which applies operational timing limitations on 721,200 acres of the program area within the primary calving habitat area for the Porcupine caribou herd during the calving season, prohibiting construction activities using heavy equipment (except drilling from established pads), and applying ground and air traffic restrictions.

In applying the NPR-A statutory and regulatory framework to the Coastal Plain oil and gas program, the BLM has determined that Section 202 of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. 1712, which applies to lands managed by the BLM and provides for its development of land use plans, does not apply to the surface management of the ANWR. In particular, the Naval Petroleum Reserves Production Act explicitly exempts the NPR-A program from the land use planning requirements of Section 202 of FLPMA. See 42 U.S.C. 6506a(c). Thus, similar to its management of the NPR-A, the Secretary, acting through the BLM, is not preparing land use plans under FLPMA for the Coastal Plain program. Moreover, as stated above, and except for jurisdiction over the oil and gas program on the Coastal Plain, the USFWS is responsible for management of the entire ANWR, as governed by its Comprehensive Conservation Plan (CCP) and in accordance with the NWRSAA and ANILCA.[6]

## 1.5   Section 20001(c) of PL 115-97

### *In General*

To reduce uncertainty for prospective leaseholders and thereby increase the likelihood of achieving revenue goals for the ANWR oil and gas program, Congress went beyond the authorizations applicable to the NPR-A and required that necessary rights of way, easements and production and support facilities be authorized; thus, in contrast to the legislation and regulations establishing an oil and gas leasing program for the NPR-A, Section 20001(c) provides three striking differences. First, unlike in the NPR-A, where the timing of lease sales is left to the BLM's discretion, Section 20001(c)(1) directs the Secretary, acting through the BLM, to conduct "not fewer than 2 lease sales area-wide" by not later than December 22, 2024, each sale offering not fewer than 400,000 acres in areas with the highest hydrocarbon potential. The question as to whether or not to offer oil and gas leases in the Coastal Plain of the ANWR is not an open one. The BLM will comply with these mandatory provisions for lease sales under this ROD.

Second, Section 20001(c)(2) states that the Secretary, acting through the BLM, "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." The BLM interprets the plain language of this provision as requiring that it authorize any such rights-of-way necessary to carry out the Coastal Plain oil and gas program established by Section 20001 of PL 115-97.

---

[6] Subsections (b)(4) and (b)(5) of 16 U.S.C. 3143 provide that the royalty rate for leases will be 16.67 percent and that 50 percent of adjusted bonus, rental and royalty receipts derived from the program shall go to the State of Alaska, respectively. These provisions will be appropriately implemented for leases issued under the program. These provisions are not significantly different from the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et. seq.), which sets a 12.5 percent minimum royalty rate for low potential areas and a 16.67 percent rate in high potential areas. As under subsection (b)(5), 50 percent of NPR-A receipts are paid to the State.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 90 of 201
AR3152

Clearly Congress intended that successful implementation of the mandated oil and gas program should not be frustrated by an unavailability of necessary access. This directive is unlike the NPR-A, where issuance of such rights-of-way are at the BLM's discretion. This directive is not limited to development under a particular *lease*, but rather any right-of-way necessary to carry out the *section*. It would, for example, apply to a request for a road or pipeline right-of-way, even if sought by a non-leaseholder.

Finally, Section 20001(c)(3) provides:

> SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

This provision requires the Secretary, acting through the BLM, to authorize up to 2,000 surface acres of federal land to be covered by production and support facilities during the term of the leases under the oil and gas program. Just as with the rest of Section 20001, Congress's use of the term "shall" constitutes a directive to the Secretary, acting through the BLM, that he or she must: (1) establish and administer a competitive oil and gas program (Section 20001(b)), (2) hold lease sales within certain timeframes (Section 20001(c)(1)), (3) issue certain rights-of-way (Section 20001(c)(2)), and (4) authorize production and support facilities consistent with those leases (Section 20001(c)(3)).

In a letter dated October 21, 2019, after publication of the Final EIS, Region 10 of the EPA commented on several aspects of the document. As relevant here, Region 10 reiterated its comment on the Draft EIS that the BLM should have considered an alternative to reduce the impact area to less than 2,000 acres of production and support facilities.[7]

Such an interpretation is inconsistent with the mandate in Section 20001(c)(3), and, as described in the Final EIS, therefore inconsistent with the purpose and need for action. This mandate, requiring the authorization of up to 2,000 surface acres of federal land to be covered by production and support facilities during the term of the leases, will be carried out through leases that allow for regulation of facilities but may not preclude such infrastructure.

If a lessee discovers oil or gas, it may seek approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations. In addition to the stipulations and ROPs included in this Decision, the BLM may require additional project-specific measures to further protect surface resources.

Consistent with Congress's objective to achieve revenue from the Coastal Plain oil and gas program, the "shall authorize" language in (c)(3) functions as a directive to the BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities.

---

[7] The October 21 letter actually states that the BLM should "reduce the impact area" to less than 2,000 surface acres where practicable. Given the reference to 2,000 acres and EPA's prior comments on the draft, the BLM interprets this comment to suggest that the BLM consider an alternative of less than 2,000 acres of production and support facilities, not "impact area."

10     *Coastal Plain Oil and Gas Leasing Program*
*Record of Decision*
Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 91 of 201
AR3153

While Congress clearly mandated that the Secretary, acting through the BLM, authorize up to 2,000 acres to be covered by production and support facilities, it did not define the terms "covered by" or "production and support facilities." There are a broad range of actions potentially carried out during the entire life of an oil and gas program which may necessitate authorization of facilities related to exploration, development, transportation, production, and related facilities. In implementing the mandate of Section 20001(c)(3), the Secretary, acting through the BLM, will have to determine whether each type of proposed facility constitutes a "production and support facility," and if so, whether such proposed facilities would cover federal land on the Coastal Plain.

Future BLM determinations about which facilities benefit from the 2,000-surface acre mandate, and which do not, could potentially influence the total extent of development in the Coastal Plain and, thus, the potential environmental impacts stemming from the leasing program. Recognizing this, the BLM included in its Leasing EIS several preliminary interpretative assumptions that facilitated the creation of a more detailed reasonably foreseeable development (RFD) scenario and thus provided a clearer picture of how much total development is reasonably foreseeable at this preliminary stage. For example, all transportation facilities were included whether or not they supported production, the authorization of gravel mines was considered discretionary in the Draft EIS and mandatory in the Final EIS, and the reclamation of covered land over time was considered to increase the required authorization of surface acres covered by production and support facilities beyond 2,000 acres.

The analytical assumptions contained in Section 1.9.1 of the Leasing EIS generally had the effect of assuring that overall program impacts from the hypothetical RFD scenario would be evaluated in the EIS.

### *Statutory Interpretation and Guidance for Future Project-Specific Decisions*

This Decision does not need to adopt the Leasing EIS's interpretive assumptions concerning Section 20001(c)(3) for several reasons. First, interpreting the language "covered by production and support facilities" is unnecessary at this preliminary stage of the leasing program, which focuses on broader issues such as which federal lands within the Coastal Plain are suitable for leasing, and under what general terms and conditions. To accomplish a good faith effort to meet its obligation under NEPA, the BLM reached these interpretive assumptions regarding the phrase "production and support facilities," to apply the mandatory authorization requirement to the hypothetical development scenario. This Decision does not actually authorize any surface acreage to be covered by "production and support facilities," so whether a particular facility will or will not fall within the 2,000-acre mandate is speculative at this stage and merely illustrative to provide an understanding of the hypothetical impacts.

Second, adopting and applying interpretive assumptions at this initial stage of the program would be premature. It is currently unknown whether any leases will ever be issued, it is unknown if any exploration will take place,[8] and if so, it is unknown whether eventually any lessees will ever apply to the BLM for authorization of any production and support facilities. It bears repeating that as we make this Decision all aspects of a future oil and gas program are highly speculative and dependent on unpredictable circumstances that will play out over decades. If leases are issued, if exploration takes place, and if lessees apply for BLM authorization of any production and support facilities, the types of facilities and technologies deployed may be very different than what is foreseeable today. It is, at this stage, not possible, reasonable or necessary to

---

[8] ROP 17, as amended by this Decision, prohibits construction of gravel roads and pads for exploratory drilling, and geophysical exploration does not result in the construction of production and support facilities.

establish for future administration the interpretive assumptions contained in the Leasing EIS regarding the treatment of each hypothetical facility for purposes of applying the mandate under Section 20001(c)(3).

Third, further review and consideration of the Leasing EIS's interpretive assumptions concerning Section 20001(c)(3) have highlighted several opportunities for improvement. Certain interpretive principles can be gleaned from the plain language of the statute, some of which may differ in some respects from the interpretive assumptions made in the Leasing EIS. Accordingly, this Decision provides the following guidance to help inform future project specific decisions about what does and does not qualify as "covered by production and support facilities":

- First, a proposal to cover surface acreage must be a facility; that is, under that term's ordinary dictionary definition, something that is built, installed, or established to serve a particular purpose.
- Second, under the plain language of the statute, the facility must be a "production and support facility." The term "production" is used elsewhere in Section 20001, but, in contrast to Section 20001(c)(3), in each of those other paragraphs the term is included as part of a longer list of various aspects that will likely occur with a successful oil and gas program. For example, Section 20001(c)(2) requires the issuance of rights-of-way or easements for necessary "exploration, development, production, or transportation," and Section 20001(b)(2)(A), refers to "leasing, development, production, and transportation." Had Congress decided to encompass a broad range of facilities for various aspects of an oil and gas program into 20001(c)(3) it knew how to do so. "Production and support facilities" are not "exploration and support facilities," nor are they "transportation and support facilities," or facilities that support some other aspect of the program that is not "production and support."

  This understanding of Section 20001(c)(3) is particularly clear, given Congress's use of the conjunctive "and" rather than the disjunctive "or." Further, Congress's inclusion of the parenthetical reference in Section 20001(c)(3) to "airstrips and any area covered by gravel berms or piers for support of pipelines" supports this understanding of 20001(c)(3). Depending upon particular factual circumstances, such facilities may necessarily constitute "production and support facilities," and they should be included in the 2,000-acre mandate if they are a facility for production or a facility supporting production, but otherwise they would not. With respect to airstrips in particular—which outside of the context of oil and gas development in Alaska could on their face seem to be "transportation" facilities –production of oil and gas in Alaska often requires an airstrip at the actual site of production. In such a case, an airstrip would reasonably be considered a facility in support of production benefitting from the 2,000-acre mandate, but an airstrip that is not incident to the actual site of production, and which generally supports transportation in support of the program, may not.

- Third, the BLM's authorization of a qualifying facility above must be to cover the surface of the federal land supporting that facility. This follows from the plain language of the provision, which provides that the Secretary, acting through the BLM, shall authorize up to 2,000 acres to be covered by the qualifying facilities.
- Fourth, the inclusion of the phrase "during the term of the leases under the oil and gas program under this section" should be reasonably read to mean the 2,000-acre mandate must be authorized throughout the term of all of the leases issued under the program. The interpretive assumption reached in the Leasing EIS that the phrase could reasonably be read to mean at any point in time during the term of all the leases is not supported by the plain meaning of the statutory language.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 93 of 201
AR3155

Although, again, no definitive application of these principles to particular types of development need be reached at this early stage given the uncertainty and hypothetical nature of projected development, the future application of these principles may differ in some respects from some of the assumptions made in the Leasing EIS as to their interpretation. In particular:

- Although the EIS assumed for analytical purposes that reclaimed acreage of federal land formerly containing production and support facilities would free up additional acreage to be subject to the 2,000-acre mandate in Section 20001(c)(3) once they are reclaimed, this would not be the case given the fourth sideboard referenced above.

- Ice roads and pads are not production and support facilities. Although the EIS assumed that such roads would not be such facilities within the meaning of Section 20001(c)(3) because they are temporary, as noted above, they are also reasonably understood to be a transportation or exploration facility, not a "production and support" facility.

- Depending on the precise facts of a future proposal, certain other types of facilities that the BLM assumed were included within the 2,000 acre limit in the EIS, such as gravel roads not required for production,[9] barge landing and storage, and gravel pits and stockpiles, may or may not be "production and support facilities," depending on particular circumstances at issue.

That this ROD does not adopt the assumptions made in the Final EIS as to the interpretation of 20001(c)(3) now and instead provides general guidance and principles for the future is not a change in the proposed action. Although the Leasing EIS made certain hypothetical development assumptions for purposes of analysis, the decision made in this ROD, consistent with the description in the EIS of the BLM's decisions to be made, are where and under what terms and conditions lease sales will occur. See Final EIS, Section 1.3. That decision need not, and does not here, adopt a particular interpretation of 20001(c)(3) or attempt to apply it to hypothetical future development. Providing guidance on how the BLM may interpret 20001(c)(3) in a potential subsequent permitting phase does not constitute a change to the BLM's present leasing action.

For the purpose of proceeding with the lease sales required to be offered by the statutorily-mandated oil and gas program, the hypothetical RFD reasonably projects that development so that the Leasing EIS can project what the effects might be of potential future development associated with oil and gas leases that will benefit from statutory mandates related to rights of way, easements and surface use for production and support facilities. See *Conner v. Burford*, 848 F.2d 1441, 1449 (9th Cir. 1988); see also *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (2006). The resulting analysis informs decision-making to the best of the agency's current abilities by providing a general but sufficient understanding (i.e., a reasonable "picture") of the potential types and potential extent of environmental impacts that may occur if leases are developed all the way up to the 2,000-surface acre mandate of 20001(c)(3).

## 2. ALTERNATIVES

Under the NEPA, an agency is required to take a "hard look" at the environmental effects of an agency action and its reasonable alternatives, including foreseeable direct, indirect, and cumulative impacts. The Leasing EIS presents four alternatives that were analyzed in detail. The alternatives focus on the questions of which areas within the Coastal Plain to make available for oil and gas leasing, and which terms and conditions (i.e., lease stipulations and ROPs) to apply to future oil and gas activities in order to avoid, minimize, and mitigate adverse impacts on Coastal Plain resources and uses, including subsistence use.

---

[9] That is, roads connecting production facilities to barge landings or other facilities, as opposed to roads connecting satellite well pads to the central processing facility. See Final EIS Appendix B, Figure B-1.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 94 of 201
AR3156

Under the NEPA, the BLM is generally required to analyze the reasonably foreseeable impacts of its action. Although the uncertain and speculative nature of oil and gas exploration and development can make those projections difficult at the leasing stage of the process, the Ninth Circuit has held that, unless future surface-disturbing activities on those leases can be absolutely precluded, the agency issuing the leases must prepare an EIS before issuing a lease and estimate what the reasonably foreseeable effects of future development of those leases might be. See *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988).

Hypothetical future projections of development at the leasing stage are sufficient. See *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006). Here, as explained further in the Leasing EIS, the BLM's ability to gauge the impacts of future exploration and development at the leasing stage is necessarily far from clear. Indeed, the issuance of an oil and gas lease does not have any direct effects on the environment since it does not authorize drilling or any other ground disturbing activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease.

Although the BLM cannot ascertain the precise extent of the effects of granting those rights until it receives and reviews potential future site-specific proposals for exploration and development, in order to meet the intent of NEPA, the BLM developed a hypothetical development scenario consistent with those leases, in a good faith effort to identify indirect effects that are not known at this time but nonetheless could be considered reasonably foreseeable (40 CFR 1508.8(b)) (see Appendix B of the Leasing EIS). Again, there is tremendous uncertainty regarding potential exploration and development on the Coastal Plain, due in part to the remoteness and lack of previous exploration and development as well as its harsh environment and potentially challenging engineering considerations, along with the extended time it has taken to go from leasing to development in other regions of the North Slope of Alaska including in the NPR-A.

As noted above and described in the Leasing EIS, these uncertainties include the amount and location of technically and economically recoverable oil, the timing of oil field discoveries and associated development, the future prices of oil and gas, and, more to the point, the many exploration companies' individual assessment of future prices and other competitive calculations that play into corporate investment decisions, and the ability of industry to find petroleum and to mobilize the requisite technology to exploit it. Indeed, USGS has repeatedly revised their prior assessments of producible oil and gas for the NPR-A and surrounding areas, as new information has become available and additional analysis has been conducted.

These assessments have proven to fluctuate significantly over time. This is evidenced by the fact that the assessments of technically recoverable reserves for the NPR-A and surrounding areas were projected by USGS to be 10.5 billion barrels of oil and 61 trillion cubic feet of gas in 2002. This was revised in 2010 to be 896 million barrels of oil and 53 trillion cubic feet of gas. In 2017 it was revised again to be 8.7 billion barrels of oil and 25 trillion cubic feet of gas in 2017 (USGS 2002, 2010, and 2017, cited in Appendix B of the Leasing EIS).

Future studies and assessments, whether by the USGS or others, will likely continue to evolve and shift based on advancements in geophysical assessment and drilling technology and as new geophysical data is acquired and made available.

Given the uncertainty, and in order to minimize the chance that the resultant impact analysis will understate potential impacts, the hypothetical scenario described in the Leasing EIS assumes a successful discovery and optimistic high-production development scenario in a situation of favorable market prices; thus, the projected impacts, which are necessarily uncertain, are likely overstated. At the stage at which those impacts would be

more reasonable to foresee—i.e., when the BLM is presented with proposals for exploration or development—those authorizations would be subject to project-specific and site-specific analysis, including compliance with NEPA, the Marine Mammal Protection Act (MMPA), the Endangered Species Act (ESA), ANILCA, and other laws.

The Leasing EIS alternatives include the following:

## 2.1 Alternative A: No Action Alternative

Under Alternative A, the No Action Alternative, no federal oil and gas in the Coastal Plain would be offered for future lease sales. Alternative A would not comply with the directive in PL 115-97 to establish and administer a competitive oil and gas program for leasing, developing, producing, and transporting oil and gas in and from the Coastal Plain in the ANWR that requires authorizations for necessary rights-of-way, easements and surface acres for production and support facilities. It also would not meet the purpose of the ANWR to provide for an oil and gas program on the Coastal Plain, set out in Section 303(2)(B)(v) of ANILCA. Under this alternative, current management actions would be maintained, and resource trends are expected to continue, as described in the USFWS's ANWR Revised CCP.

Alternative A would not meet the purpose and need of the action, which is the BLM's implementation of a Coastal Plain oil and gas program as required by PL 115-97, including the requirement to hold lease sales and to permit oil and gas activities; however, Alternative A was carried forward for analysis to provide a baseline for comparing impacts under the action alternatives, as required by 40 CFR 1502.14(d).

## 2.2 Alternative B: Preferred Alternative

Alternative B is the Preferred Alternative in the Leasing EIS and is the basis for this ROD. Alternative B offers the opportunity to lease the entire "program area" (1,563,500 acres) and has the fewest acres with NSO stipulations. In addition to applicable lease stipulations, 44 ROPs would apply to oil and gas activities to avoid, minimize, and mitigate potential adverse impacts on resources and uses. The development scenario for this alternative incorporates the Alternative B lease stipulations and ROPs from Table 2-3 of the Leasing EIS into the hypothetical projections.

## 2.3 Alternative C

The entire program area (1,563,500 acres) would also be available for lease under Alternative C; however, a majority of the program area would be subject to NSO. The BLM would rely on the same ROPs as under Alternative B to reduce potential adverse impacts on resources and uses from oil and gas activities.

## 2.4 Alternative D

Under Alternative D, portions of the Coastal Plain would not be available for lease, including the primary calving habitat for the Porcupine caribou herd. In addition, a large portion of the remaining area would be subject to NSO. In some instances, more prescriptive ROPs are included under Alternative D than under Alternatives B and C.

Alternative D contains two sub-alternatives, Alternatives D1 and D2, which use different approaches to avoid, minimize, and mitigate potential impacts on resources and uses through lease stipulations. The amount of land available for leasing under Alternative D1 is 1,037,200 acres and under Alternative D2 800,000 acres. Alternative D2 maximizes high hydrocarbon potential areas available for lease, while making unavailable for leasing additional caribou calving and post-calving habitat (areas along the coast of Camden Bay and east of the mouth of the Niguanak River), and expanding existing NSO buffers, including lands adjacent to springs

and aufeis habitats. Alternative D2 reflects the total minimum acreage PL 115-97 requires to be offered in two mandated lease sales.

## 2.5 Environmentally Preferred Alternative

Alternative D2 is the environmentally preferred alternative. This is primarily because Alternative D2 would make the least amount of land available for leasing (800,000 acres). Fewer acres available for leasing would reduce potential for adverse impacts from oil and gas exploration and development in the Coastal Plain. Further, though most of the lease stipulations and ROPs are the same as Alternative D1 and many of the ROPs are common across the action alternatives, where there are differences Alternative D2 typically has the most protective measures across the program area.

## 3. MANAGEMENT CONSIDERATIONS
## 3.1 Key Considerations to the Decision

In reaching this Decision, and with the aid of the Leasing EIS and the input provided by the public and various stakeholders throughout the development of the EIS, the Secretary, acting through the BLM, considered and weighed several important factors. An overriding consideration was the need to implement the Congressional directive in Section 20001 of PL 115-97 to establish and administer a competitive oil and gas leasing program for the Coastal Plain in a manner similar to the NPR-A leasing program. PL 115-97 requires that the program be administered in such a way that would allow the BLM to hold at least two lease sales within seven years, each of not fewer than 400,000 acres of land having the highest potential for oil and gas discovery, and to provide for authorization of up to 2,000 surface acres to be covered by production and support facilities, and granting of all necessary rights-of-way or easements to support the oil and gas program.

This Decision is constructed to provide for the protection of important surface resources and uses thereof, such as caribou (especially the Porcupine herd), polar bears, migratory birds, surface waters, and subsistence uses, among other resources and uses, and to take into account the other, non-oil and gas purposes of the ANWR, which include conservation of fish and wildlife populations and habitats, fulfillment of international treaty obligations, allowance for continued subsistence use, and protection of water quality and quantity necessary to meet fish and wildlife conservation needs.

Subsistence uses of Coastal Plain resources by rural Alaska residents and indigenous communities in Canada was given important consideration, in recognition of the life-sustaining customary and traditional uses of these resources. The Kaktovikmiut (i.e., Iñupiat of Kaktovik) are the primary users of the program area. They have strong cultural and subsistence ties, having occupied the Coastal Plain and relied on its resources for thousands of years, and consider themselves the stewards of the program area.

One particular aspect of this consideration is the cultural importance of the Porcupine caribou herd to Native communities in both Alaska and Canada, which the Gwich'in have stated is "central to their cultural identity," in addition to the importance of the herd to many Iñupiat and Gwich'in for biological sustenance.

A related aspect of this consideration was the recognition that the program will have transboundary impacts on resources such as caribou, polar bears, and migratory birds, particularly affecting Native communities in Canada as well as in Alaska. For all these reasons, protection of subsistence uses of Coastal Plain resources and of the resources themselves, such as caribou, waterfowl and fish, as well as access to the resources and traditional hunting areas, was given due consideration in the development and adoption of lease stipulations and ROPs.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 97 of 201
AR3159

Another important factor in this Decision was to provide additional economic and community development opportunities to local residents and Alaska Native communities within and near the Coastal Plain. In this regard, much of the economic and community development that has occurred in Native communities on the North Slope of Alaska has been a direct result of North Slope oil and gas development, which provides job opportunities and substantial property taxes and other funding for community infrastructure development such as new schools, healthcare centers, roads, and drinking water, wastewater, and other utility systems. Prior to oil and gas development on the North Slope, many Native communities lacked these types of basic community infrastructure, including indoor plumbing in homes.

One particular aspect of this consideration was to ensure that the BLM's program will not impinge on the ability of ANCSA corporations owning lands and mineral interests within the Coastal Plain to develop their resources and thus provide economic and other benefits to the Native shareholders and communities they represent, as intended by ANCSA.

These types of considerations, together with the opportunity to generate substantial revenues for the State of Alaska and the Federal Treasury from the program, including from lease bonus bids, lease rentals, production royalties, and property and income taxes, played an important role in addressing the direction of Congress. This Decision does this by making the entire program area available for leasing, albeit subject to lease stipulations and ROPs that will serve to protect important resources and uses. By making the entire program area available for leasing, potential economic state and local opportunities and federal revenues from the program are maximized.

Additionally, making all of the "program area" available for leasing provides maximum flexibility for future decision-making and innovation for project proposals by potential lessees. This is particularly the case given that until exploration drilling occurs, the BLM cannot reasonably foresee which areas of the Coastal Plain have the highest prospects for oil and gas discoveries. Also, given the limited geophysical information that currently exists for the Coastal Plain, making the entire program area available for leasing ensures that the areas having the highest potential for the discovery of oil and gas can be prioritized for offering in the first two lease sales, as required by Section 20001(c)(1)(B)(i)(II) of PL 115-97.

This Decision recognizes that the ANWR provides large expanses of habitat for numerous species of fish and wildlife, including polar bear, Steller's eider, and spectacled eider, which are listed as threatened under the ESA, as well as support for meeting international treaty obligations associated with animals such as Porcupine caribou, polar bears, and migratory birds. The USFWS was a key partner in the BLM's development of the Leasing EIS and the Coastal Plain oil and gas program directed by Congress and adopted by this Decision. The BLM will continue to coordinate and consult with the USFWS, especially its ANWR management team, as the BLM implements the program, including during review of each application for proposed oil and gas activities in the Coastal Plain.

All of these and other factors were considered against the backdrop of our changing environment, with a recognition that the Arctic environment has been and will continue to be affected by a changing climate, experiencing such impacts as coastal erosion, melting permafrost, and changing sea ice patterns, among many others. There is a thorough discussion of climate change effects in the Leasing EIS in the Climate Change subsections of the Affected Environment as well as under the Direct and Indirect Impacts and Cumulative Impacts for each resource, as applicable. While the Coastal Plain program's contribution to global climate change is speculative, limited, and incremental in nature, this Decision was arrived at in full awareness of the potential environmental impacts associated with the potential development and continued use of fossil fuels.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 98 of 201
AR3160

Despite the vast uncertainty, the impact analysis undertaken for the Coastal Plain oil and gas development program presented in the Leasing EIS is robust and suitably specific for the broad-scale management decisions made in this ROD. This Decision authorizes multiple lease sales, including, at a minimum, the two sales mandated by Section 20001(c) of PL 115-97, as well as potential additional sales.

It is intended that the Leasing EIS and this ROD will provide NEPA compliance for multiple sales. Prior to the second and any subsequent sales, the BLM will evaluate the Leasing EIS to determine whether it remains adequate or requires supplementation based on new circumstances or information, or substantial changes to the leasing program (see 40 CFR 1502.9(c)(1) and 43 CFR 46.120(c)). The timing of the second and subsequent lease sales would depend in part on the response to earlier sales and the results of any exploration that may follow.

The Leasing EIS evaluates which lands to offer for lease and what terms and conditions to apply to oil and gas activities; it does not by itself provide NEPA compliance for any particular on-the-ground exploration or development. Future on-the-ground activities requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the project-specific and site-specific proposal. In appropriate circumstances, such additional analyses could be tiered from the Leasing EIS, in accordance with 40 CFR 1502.20 and 43 CFR 46.140.

Applicants for oil and gas activities would be subject to the lease stipulations and ROPs adopted by this Decision; however, the BLM Authorized Officer may require additional project-specific and site-specific terms and conditions before authorizing any oil and gas activity based on the project-specific NEPA analysis. Provisions built in at the leasing stage through lease stipulations and ROPs allow for this Decision's selection of an alternative that both protects valuable resources and uses and is consistent with Congress's direction in PL 115-97 to establish and administer a competitive oil and gas program within the authorized area of the Coastal Plain.

In implementing the oil and gas development program required by Section 20001 of PL 115-97, the Secretary, acting through the BLM, will comply with applicable international agreements, federal, state, and local laws, regulations, and executive orders (see Appendix D of the Leasing EIS for a summary). The Secretary, acting through the BLM, will continue to consult with regulatory agencies, tribal governments, and ANCSA corporations, as appropriate, during subsequent NEPA processes before oil and gas activities are authorized, to ensure that all legal requirements are met.

## 3.2   Amendment of the Comprehensive Conservation Plan

To guide its management of the ANWR and other refuges in Alaska, the USFWS develops and implements CCPs as required by Section 304(g) of ANILCA. The USFWS adopted its most recently revised ANWR CCP in 2015,[10] prior to enactment of PL 115-97. Certain aspects of the current CCP, as it applies to the "program area," are overridden by Congress's enactment of PL 115-97.[11] The CCP does not constrain BLM actions taken consistent with its jurisdiction over the statutorily mandated oil and gas program within ANWR. As the USFWS previously explained in the CCP, until Congress took action to allow oil and gas exploration, leasing,

---

[10] USFWS 2015. Arctic National Wildlife Refuge Revised Comprehensive Conservation Plan. U.S. Fish and Wildlife Service, Final Environmental Impact Statement, Vol. 1. Internet website: https://www.fws.gov/home/arctic-ccp/.

[11] Both the Constitution's property clause and existing federal law make clear that Congress may direct the conduct of activities on Refuges that supersede the USFWS's administrative decisions. See 16 U.S.C. 668dd(c).


Case 3:24-cv-00051-SLG      Document 71-2      Filed 08/13/24      Page 99 of 201

development and production, the Service could not permit it. Nevertheless, if Congress took such action, it would be incorporated into the CCP and implemented (see CCP at p. 1-1).

Now that Congress, through PL 115-97, has amended the purposes of the ANWR to provide for, and required the Secretary, acting through the BLM, to establish and administer, a competitive oil and gas program for leasing, developing, producing, and transporting oil and gas in and from the Coastal Plain, including authorizations for necessary rights-of-way, easements, and surface acres for production and support facilities, and in light of this ROD establishing the structure of such a program, the USFWS will take into account the statutory requirements and the Secretary's, acting through the BLM, jurisdiction over the "program area" oil and gas activities when it next amends the CCP. Thus, given the requirements of PL-115-97, this Decision does not require that the USFWS first amend its CCP governing the ANWR prior to its adoption.

Moreover, Section 304(g) of ANILCA, which requires the USFWS to develop management plans for Alaska Refuges, does not stipulate when the management plans must be amended. It leaves that matter to the USFWS's discretion, directing that the plans be amended, ". . . from time to time." While the USFWS adopted its original ANWR Management Plan in 1988, the plan was not amended until the adoption of the current plan in 2015. In the 2015 plan, the USFWS acknowledged that, ". . . much has changed since the (1988) Arctic Plan was completed" (see CCP at 1-1), and yet the USFWS had continued to manage the ANWR over the course of 27 years before amending the Plan. Thus, until the USFWS amends the CCP to be consistent with PL 115-97, the Congressional action directing the Secretary, acting through the BLM, to establish and administer an oil and gas development program in the ANWR supersedes any conflicting provisions in the current CCP.

## 3.3 Mitigation Measures

This Decision includes all practicable and reasonable means to avoid or minimize environmental harm consistent with the purpose and need of the action, including potential adverse direct, indirect, and cumulative impacts, through the lease stipulations, ROPs, and lease notices listed in **Appendix A**, which are designed to provide protection for a wide range of surface resources and non-oil and gas uses throughout the program area, including subsistence use. The lease stipulations, ROPs and lease notices, adopted herein will apply to all oil and gas activities authorized by the BLM in the Coastal Plain, according to the management framework outlined in Section 2.2.5 of the Leasing EIS.

Significant constraints on potential future oil and gas exploration and development activities are presented by lease stipulations adopted in this ROD. These include Lease Stipulations 1 and 4, which together apply NSO designations on approximately 359,400 acres of the program area within barrier islands and important aquatic habitats, including rivers and streams, nearshore marine waters, and lagoons; and Lease Stipulation 7, which applies operational timing limitations on 721,200 acres of the program area within the primary calving habitat area for the Porcupine caribou herd during the calving season, prohibiting construction activities using heavy equipment (except drilling from established pads), and applying ground and air traffic restrictions.

NSO stipulations prohibit the construction of most oil and gas facilities in areas open to leasing, with exceptions for facilities necessary to be located in such areas, such as essential road and pipeline crossings of streams and rivers as required by Section 20001(c)(2) of PL 115-97, and docks and seawater treatment plants located along coastlines (see Lease Stipulations 1 and 4).

Under Lease Stipulation 1, ten identified rivers and creeks will have 0.5 to 1-mile setbacks prohibiting permanent oil and gas facilities in the streambed and within the described setback distance, except for essential pipelines and road crossings. Under Lease Stipulation 4, exploratory well drill pads, production well drill

pads, and central processing facilities are prohibited in the nearshore marine waters, lagoons, and barrier island habitats to protect wildlife and subsistence uses and resources. Making these areas subject to an NSO stipulation allows for the use of modern technology to access oil and gas in accordance with the Congressional direction in PL 115-97. Other lease stipulations adopted by this ROD include measures to protect sensitive aquatic and coastal areas, polar bear denning habitat, and Native allotments.

In addition to lease stipulations, the 44 ROPs adopted by this ROD will apply to oil and gas activities throughout the Coastal Plain to provide further protections for numerous resources and uses. For example, ROP 4 requires operators to develop and implement polar bear interaction plans, ROP 19 requires 500-foot setbacks on all fish-bearing waterbodies (many of which are key drainages for subsistence activities) within which permanent oil and gas facilities (except essential road and pipeline crossings) are prohibited, ROP 23 requires roads and pipelines to be designed to allow for the free movement of caribou and the safe passage of subsistence users, ROP 27 requires power lines to be buried or hung from pipeline vertical support members to reduce bird collisions, ROP 34 restricts use of aircraft to reduce interference with subsistence activities, and ROP 36 requires operators to coordinate activities directly with local communities to prevent unreasonable conflicts with subsistence uses and other activities.

In addition to ROPs and lease stipulations, this Decision requires baseline studies, oversight monitoring, and effectiveness monitoring for oil and gas related activities.

*Baseline studies: Studies or surveys prior to activities to better mitigate impacts associated with the activities.*

Project proponents may be responsible for conducting or funding baseline studies, including fish, wildlife, and vegetation surveys where applicable, to provide BLM decision-makers with sufficient information to make informed decisions on a project or series of projects. The type and scale of such studies will be determined by the BLM, based on the characteristics of the proposed project and location. The BLM will work with project proponents to coordinate any necessary surveys to ensure that consistent methods are used and that surveys are not duplicative of existing federal and state data or other publicly available data. Some such studies and surveys are described in Lease Stipulation 3, and ROPs 10, 23, 28, 29, 30, 32, 41, 43, 44 and 45.

*Oversight monitoring: Monitoring to ensure compliance with applicable requirements.*

The BLM will conduct oversight monitoring to ensure that project proponents' plans for activities and implementation of those plans conform to the relevant requirements. Commonly oversight monitoring will require review of planning documents; field visits prior to activities to ensure compliance with requirements at the on-the-ground preparation stage for construction, operational start-ups, and abandonment activities; presence in the field during activities to ensure compliance; and follow-up field visits to ensure that any required clean-up and abandonment activities were in compliance with requirements.

*Effectiveness monitoring: Monitoring to evaluate the effectiveness of project designs and mitigation measures.*

Project proponents may be responsible for planning and implementing monitoring to assess the effectiveness of project designs and required mitigations in protecting resources. As with baseline monitoring, the type and scale of such monitoring will be determined by the BLM Authorized Officer based on the characteristics of the proposed project and location. Lease Stipulation 9 is a specific example of a requirement at the leasing stage, for the development and implementation of an impact and conflict avoidance and monitoring plan to assess, minimize, and mitigate the effects of infrastructure and its use on the coastal habitats and their use by wildlife and people.

Case 3:24-cv-00051-SLG     Document 71-2     Filed 08/13/24     Page 101 of 201
AR3163

Studies and monitoring undertaken to provide baseline data or to monitor effectiveness of mitigation measures must meet the approval of the BLM Authorized Officer. As the Authorized Officer determines to be appropriate, the data collection process and product shall be consistent with standards established by the BLM's Assessment, Inventory, and Monitoring program. If studies and monitoring reveal significant changes in circumstances or conditions associated with the implementation of the oil and gas program, the BLM may re-evaluate its management of the program, including consideration of potential new lease stipulations and ROPs that would apply to future lease sales and oil and gas activities.

Taken together, the provisions of the program adopted by this ROD provide protections for areas important to numerous wildlife, bird, fish, and aquatic subsistence species, including primary calving habitat for the Porcupine caribou herd, and nearshore marine, lagoon, and barrier island habitats. Additionally, protections are put in place for coastal and river routes important for water quality, fish, wildlife, raptors, cultural resources, and subsistence uses and activities.

It is important to note that the lease stipulations and ROPs adopted in this ROD are the baseline for protection of the various resources and uses within the Coastal Plain. Subsequent NEPA analysis for on-the-ground oil and gas activities may evaluate additional, project-specific mitigation measures, including site-specific measures, suited and appropriate to the specific proposals, which could be adopted by the BLM and applied as additional required protective measures on a project-specific basis consistent with 40 CFR 1508.20.

## 3.4 Endangered Species Act Consultation

Section 7(a)(2) of the ESA requires federal agencies to consult with the USFWS and National Marine Fisheries Service (NMFS), as appropriate depending on the species at issue, to ensure that their actions do not jeopardize the continued existence of species listed as threatened or endangered under the ESA or destroy or adversely modify their critical habitat. To meet requirements outlined in Section 7(a)(2), the BLM consulted with the USFWS and NMFS on the species listed and described below.

USFWS-"managed species" under the ESA that are within or in close proximity to the program area include three threatened species: polar bear (*Ursus maritimus*), spectacled eider (*Somateria fischeri*), and the Alaska-breeding Steller's eider (*Polysticta stelleri*). In addition, there is USFWS-designated Critical Habitat for the polar bear within the program area.

The USFWS determined the oil and gas leasing program is *not likely to jeopardize the continued existence* of Spectacled eiders, Steller's eiders, or polar bears, and it is *not likely to destroy or adversely modify* polar bear critical habitat.

In addition, the threatened northern sea otter, Southwest Alaska Distinct Population Segment (DPS) (*Enhydra lutris kenyoni*), is present *en route* to the program area along the marine transit route described in the Leasing EIS. There is also USFWS-designated Critical Habitat for the northern sea otter, spectacled eider, and Steller's eider within or next to the marine transit route. USFWS has determined the oil and gas leasing program is *not likely to adversely affect* the southwest Alaska DPS of the northern sea otter, and *not likely to adversely affect* designated sea otter, spectacled eider, or Steller's eider critical habitat.

The USFWS identified four project design criteria (PDC) that would ensure compliance with Section 7(a)(2) of the ESA. They are:

1. Section 7 Consultation on Future Activities—The lease areas may now or hereafter contain plants, animals, or their habitats determined to be threatened or endangered. The BLM would not approve any activity that may affect any such species or critical habitat until it completes its obligations under

Case 3:24-cv-00051-SLG     Document 71-2     Filed 08/13/24     Page 102 of 201
AR3164

applicable requirements of the ESA, as amended (16 U.S.C. 1531 et seq.), including completion of any required procedure for conference or consultation.

*Lease Notice 1 is adopted as part of this Decision, which is the PDC described above (see **Appendix A**). It applies to all future oil and gas activities authorized by the BLM, including lease-based activities and non-lease-based activities.*

2. The lease area and/or potential project areas may now or hereafter contain marine mammals. The BLM may require modifications to exploration and development proposals to ensure compliance with federal laws, including the MMPA. The BLM would not approve any exploration or development activity absent documentation of compliance under the MMPA. Such documentation shall consist of a Letter of Authorization, Incidental Harassment Authorization, and/or written communication from USFWS and/or NMFS confirming that a take authorization is not warranted.

*Lease Notice 2 is adopted as part of this Decision, which is the PDC described above, the last two sentences of which are modified from what was published in the Final Leasing EIS (see **Appendix A**). It applies to all future oil and gas activities authorized by the BLM, including lease-based activities and non-lease-based activities.*

3. The USFWS and the BLM will conduct programmatic reviews by meeting at least annually beginning one year after the first Lease Sale. These reviews will evaluate, among other things, 1) whether activities proposed are consistent with the RFD scenario, as described, for the Proposed Program, 2) whether the nature and scale of predicted effects remain valid, and 3) whether the programmatic consultation, including the PDCs and determinations reached, remain adequate and appropriate. In addition, these meetings will provide a venue where any new information on the status of species, their critical habitat, or new methods to avoid or minimize impacts can be shared.

*This requirement is adopted as part of this Decision. Annual meetings will be coordinated between the BLM and USFWS staff.*

4. All activities, including plan development, study development, and consideration of exceptions, modifications, or waivers would include coordination with the USFWS as the refuge surface management agency[12] and would comply with the ESA. In addition, the BLM would coordinate with other appropriate federal, state, and NSB agencies, tribes, and ANCSA corporations.

*This requirement is adopted as part of this Decision (see **Appendix A**).*

NMFS "managed species" under the ESA that are within or in close proximity to the program area, include the endangered bowhead whale (*Balaena mysticetus*), and the threatened bearded seal, Beringia DPS (*Erignathus barbatus*) and ringed seal, Arctic subspecies (*Phoca hispida hispida*). Additionally, along the marine transit route in the Bering and Chukchi Seas, seven additional species are protected under the ESA, the threatened humpback whale, Mexico DPS (*Megaptera novaeangliae*), and endangered: Steller sea lion, western DPS (*Eumetopias jubatus*), North Pacific right whale (*Eubalaena japonica*), blue whale

---

[12] The USFWS manages the refuge except for implementation of the oil and gas program. As described above, implementation of the oil and gas program (including surface authorizations for those purposes) is under the jurisdiction of the BLM. References in this Record of Decision to USFWS as the surface manager of the refuge refer to its role as the manager for purposes other implementation of the oil and gas program.

22      *Coastal Plain Oil and Gas Leasing Program*
*Record of Decision*
Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 103 of 201
AR3165

(*Balaenoptera musculus*), fin whale (*Balaenoptera physalus*), humpback whale, Western North Pacific DPS (*Megaptera novaeangliae*), and the sperm whale (*Physeter catodon*).

NMFS determined that the proposed action is *not likely to jeopardize the continued existence* of Beringia DPS bearded seals, Arctic ringed seals, western DPS Steller sea lions, bowhead whales, blue whales, fin whales, Western North Pacific DPS and Mexico DPS humpback whales, North Pacific right whales, and sperm whales; and it is *not likely to destroy or adversely modify* designated critical habitat for North Pacific right whales and Steller sea lions.

Section 7(a)(1) of the ESA directs federal agencies to use their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of the threatened and endangered species. Specifically, conservation recommendations are suggestions regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information (50 CFR 402.02). In this regard, both USFWS and NMFS provided two conservation recommendations each as follows:

**USFWS**

1. Continue to monitor threatened eiders, polar bears, and BLM special status species in the Arctic Refuge. Results will allow the Service and BLM to better evaluate abundance, distribution, and population trends of listed eiders, polar bears, and other special status species. These efforts will enhance the likelihood that future oil and gas development within the Arctic Refuge will not jeopardize listed species, impact the conservation value of critical habitat, or increase the need to list additional species.

2. Work with the Service and other Federal and State agencies in implementing recovery actions identified in the Steller's and spectacled eider recovery plans and the Polar Bear Conservation Management Plan. Research to determine habitat requirements, sensitivity to disturbance and other program-related impacts, and response to current population threats is an important step toward minimizing conflicts with current and future North Slope oil and gas activities.

**NMFS**

1. The BLM should conduct or fund surveys to determine densities and distribution of ringed and bearded seals on ice and in marine waters offshore of the Coastal Plain.

2. The BLM should conduct or fund surveys to determine densities and distribution of cetaceans in marine waters offshore of the Coastal Plain.

It should be noted that any proposed exploration or development projects will be subjected to further project-specific ESA consultation before permits or approvals for those projects will be granted to ensure that the BLM's decisions continue to be well informed as activities proceed. These subsequent ESA consultations will assess potential impacts from the specific projects on listed species in the project area, based on any new information about the resources and known information about the location and technology of the proposed projects. These subsequent ESA consultations will occur for each stage of oil and gas exploration and development activities proposed to be authorized by the BLM. It is during these subsequent reviews and through consultation with NMFS that the BLM will make a decision based on the proposed activities as to whether a survey to determine densities or distributions of marine mammals as identified above is necessary in order to minimize or avoid adverse effects on the listed species. Further, BLM will continue to work with USFWS, NMFS, and other federal agencies as appropriate to ensure continued compliance with ESA and

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 104 of 201
AR3166

MMPA, and to ensure best available information is being gathered and used to inform decision making as it may relate to oil and gas development.

Lease Stipulation 5 further emphasizes the requirement to comply with the ESA and the MMPA to specifically minimize disturbance to denning polar bears and denning habitat areas. Lease Notice 1 notifies the lessee that the BLM would not approve any activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the ESA. Lease Notice 2 notifies lessees that activities that could result in the potential "take" of marine mammals would not be authorized without documentation of compliance with the MMPA by the USFWS and/or NMFS prior to commencement of such activities.

## 3.5  National Historic Preservation Act

In compliance with Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. 306108, the BLM developed a programmatic agreement concurrent with the NEPA process, in accordance with 36 CFR 800.14(b)(1)(ii), and in consultation with the Advisory Council on Historic Preservation, the State Historic Preservation Officer, and the USFWS, who are signatories to the agreement. In addition, the BLM consulted with federally recognized Indian Tribes, as defined in 36 CFR 800.16(m), including Native villages, and regional and village ANCSA corporations.

The programmatic agreement establishes the process the BLM will follow to fulfill its responsibilities under Section 106 of the NHPA, including consultation with Indian Tribes, while implementing the oil and gas leasing program within the Coastal Plain.

## 3.6  ANILCA Section 810 Subsistence Evaluation

ANILCA Section 810(a), 16 U.S.C. 3120(a), requires that in determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the federal agency having primary jurisdiction over such lands or his designee must evaluate and include findings on three specific issues:

1. The effect of such use, occupancy, or disposition on subsistence uses and needs;

2. The availability of other lands for the purpose sought to be achieved; and

3. Other alternatives that reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.

The following discussion summarizes the ANILCA Section 810 Final Evaluation for the Decision in this ROD. The summary is based on the detailed ANILCA Section 810 Final Evaluation contained in Appendix E of the Final Leasing EIS, as it pertains to the alternative selected by this Decision, Alternative B. The BLM's evaluation of the effects of this Decision are based on the impact analysis in the Final Leasing EIS, which, as described in this ROD, is based on the BLM's hypothetical, speculative, and aggressive development scenario.

- *Without the Cumulative Case:* The effects of the alternative adopted in this ROD, Alternative B, will not result in a significant restriction to subsistence uses. A positive determination pursuant to ANILCA Section 810 is not required. Adequate lease stipulations and ROPs have been incorporated into the alternative, including specific procedures for subsistence consultation with directly affected subsistence communities, requirements for extensive studies of caribou movement, and setbacks or other protective measures specific to birds, to ensure that significant restrictions to subsistence uses and needs would not occur. This finding applies to the communities of Arctic Village, Kaktovik, Nuiqsut, and Venetie.

24       *Coastal Plain Oil and Gas Leasing Program*
*Record of Decision*
Case 3:24-cv-00051-SLG     Document 71-2     Filed 08/13/24     Page 105 of 201
AR3167

- *With the Cumulative Case:* The cumulative case includes, but is not limited to, a road and pipeline between the Kaktovik area and the Dalton Highway/Trans-Alaska Pipeline, oil and gas development in the Colville-Canning Area, and oil and gas activity in the vicinity of Alpine. The cumulative case, when taken in conjunction with the selected alternative, will not result in a significant restriction to subsistence uses for the communities of Arctic Village, Nuiqsut, and Venetie; however, the effects of the cumulative case exceed the "may significantly restrict" threshold for the community of Kaktovik, and thus a positive ANILCA Section 810 determination was made. Although the effects of the activities proposed under the program adopted in this ROD alone fall below the threshold, adding them to those of the cumulative case results in a level of effects that "may significantly restrict" subsistence uses, with the potential to affect Kaktovik due to the potential decrease in the community's access to fish, marine mammals, and caribou.

ANILCA Section 810(a) provides that no "withdrawal, reservation, lease, permit, or other use, occupancy or disposition of the public lands which would significantly restrict subsistence uses shall be effected" until the federal agency gives the required notice and holds a hearing in accordance with Section 810(a)(1) and (2), and makes the three determinations required by Section 810(a)(3)(A), (B), and (C). The BLM has found in this subsistence evaluation that all the action alternatives (Alternatives B, C, D1, and D2) considered in the Leasing EIS, when considered together with all the past, present, and reasonably foreseeable future cumulative effects of the hypothetical development scenario discussed in the Leasing EIS, may significantly restrict subsistence uses for the community of Kaktovik; therefore, the BLM undertook the notice and hearing procedures required by ANILCA Section 810(a)(1) and (2), as described above, including a subsistence hearing held in Kaktovik in conjunction with the public meeting on the Draft Leasing EIS, and now must make the three determinations required by Section 810(a)(3)(A), (B), and (C) (16 U.S.C. Section 3120(a)(3)(A), (B), and (C)).

The BLM has determined that the program adopted in this ROD meets the following requirements (16 U.S.C. Section 3120(a)(3)(A), (B), and (C)) for federal actions that may result in a significant restriction on subsistence uses:

*1. The significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands.*

The BLM undertook the Leasing EIS to fulfill the Secretary of the Interior's responsibilities under Section 20001 of PL 115-97, including the requirement to establish and administer an oil and gas program for the Coastal Plain, and to hold not fewer than two lease sales in the program area before December 22, 2024, each sale offering not fewer than 400,000 acres in areas with the highest hydrocarbon potential.

Alternative B, selected by this ROD, will provide the opportunity, subject to appropriate conditions developed through the NEPA process, to conduct at least two lease sales in the program area meeting the requirements of Section 20001 of PL 115-97. These conditions include lease stipulations and ROPs, attached as **Appendix A** of this ROD, that incorporate protective measures that would minimize potential impacts on important subsistence resources and subsistence use areas.

The cumulative case, in conjunction with Alternative B, could significantly restrict subsistence uses for the community of Kaktovik. The BLM has determined that such a significant restriction is necessary, consistent with sound management principles for the use of the public lands, and for the BLM to fulfill the Secretary of the Interior's responsibilities under PL 115-97, described above.

*2. The proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition.*

The BLM has determined that Alternative B involves the minimal amount of public lands necessary to accomplish the purposes of the oil and gas leasing program required by Section 20001 of PL 115-97. Under all alternatives analyzed in the Leasing EIS, including Alternative B, no more than 2,000 acres of public lands would be covered by production and support facilities during the oil and gas program mandated by the law. In this regard, the alternatives do not vary with respect to the amount of public lands that would be covered by production and support facilities. An alternative that allowed less than 2,000 acres to be covered by production and support facilities would be inconsistent with the mandate contained in PL 115-97. In this regard, Section 20001(c)(3) states "the Secretary *shall* authorize up to 2,000 surface acres to be covered by production and support facilities."

The BLM cannot administratively modify this explicit statutory directive. Alternative B includes numerous lease stipulations and ROPs that apply across the Coastal Plain for protection of specific habitats and site-specific resources and uses, while allowing reasonable opportunity for necessary infrastructure to support oil and gas exploration and development. Important subsistence habitats along rivers and streams, as well as nearshore marine, lagoon, and barrier island habitats contain no surface occupancy restrictions, to ensure the habitat is protected for the important subsistence uses and resources.

More restrictive alternatives that varied and offered less acreage for leasing were analyzed, and it was determined Alternative B best meets the purpose and need of the oil and gas program required by the law. As discussed in **Section 3.1** of this ROD, having the entire Coastal Plain program area available for leasing provides maximum flexibility for future decision-making and innovation for project proposals by potential lessees. This is particularly the case given that unless and until exploration drilling occurs, the BLM cannot be reasonably certain as to which areas of the Coastal Plain have the highest prospects for oil and gas discoveries. Furthermore, given the limited geophysical information that currently exists for the Coastal Plain, the BLM has determined that making the entire program area available for leasing is the only way to ensure that the areas having the highest potential for the discovery of oil and gas can be offered in the first two leases sales, as required by Section 20001(c)(1)(B)(i)(II) of PL 115-97.

*3. Reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.*

When the BLM began its NEPA scoping process, it internally identified subsistence as one of the major issues to be addressed. The information found within the Leasing EIS's analysis of impacts on subsistence were used to craft Alternative B. This information included access, harvests, and traditional use patterns, as well as the results of workshops with the cooperating agencies, public scoping meetings in the villages, and meetings with tribal and local governments.

This information resulted in the development of strict mitigation measures similar to those used on BLM-administered lands in the NPR-A. Several protective measures specifically minimize adverse impacts on subsistence uses and resources, such as, but not limited to:

- Lease Stipulation 1 minimizes impacts on subsistence cabins and campsites, as well as the disruption of subsistence activities.
- Lease Stipulation 4 protects fish and wildlife habitat and minimizes impacts on subsistence activities.
- Lease Stipulation 9 protects nearshore marine subsistence resources and activities.

- ROP 18 protects subsistence uses and access to subsistence hunting and fishing areas and minimizes the impact of oil and gas activities on air, land, water, fish, and wildlife resources.
- ROP 20 protects subsistence use and access to subsistence hunting and fishing and anadromous fish.
- ROP 23 minimizes disruption of caribou movement and subsistence use.
- ROP 34 minimizes impacts of aircraft activity on subsistence use.
- ROP 36 and ROP 37 require coordination and consultation with subsistence users.
- ROP 38 minimizes impacts on subsistence resources from non-local hunting, trapping, and fishing.
- ROP 39 minimizes impacts on subsistence access.

Based on these and several other lease stipulations and ROPs (see **Appendix A**) that serve to protect various subsistence resources or their habitat, and subsistence uses generally, including access to subsistence resources, the BLM has determined that the Decision presented in this ROD includes reasonable steps to minimize adverse impacts on subsistence uses and resources resulting from the Coastal Plain program. In addition to the lease stipulations and ROPs, the BLM will consider alternatives to avoid adverse effects and incompatible development to subsistence resources and uses and subsistence access before any on-the-ground activities are approved. This will be done through subsequent NEPA analysis, which will be conducted before any construction or operation permits or approvals are issued. Compliance with ANILCA Section 810(a) will be undertaken at these subsequent stages through project-specific ANILCA Section 810 evaluations.

## 3.7   Environmental Justice

Executive Order 12898 requires that an agency identify and address "as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." Section 3.4.5 of the Leasing EIS identifies direct and indirect impacts that may affect the communities of Arctic Village, Kaktovik, Nuiqsut, and Venetie. The residents of these communities qualify as low-income and minority populations and could potentially be disproportionately impacted by this Decision.

This Decision avoids, minimizes, and mitigates potential adverse impacts on these populations. It accomplishes this primarily through adopting measures that protect subsistence resources, access to those resources, and public health; and by monitoring operators' activities to ensure compliance with requirements and other monitoring to assess the effectiveness of lease stipulations and ROPs and help adapt management to better meet resource and use objectives.

The following are examples of some of the mitigation measures that accomplish this:

- Lease Stipulation 1 minimizes impacts on subsistence habitat and resources, as well as cultural and paleontological sites, by requiring setbacks for specific rivers and creeks that contain these important resources and sites.
- Lease Stipulation 4 protects fish and wildlife habitat and minimizes impacts on subsistence activities, by limiting development activities in nearshore marine, lagoon, and barrier island habitats, as well as requiring development and implementation of an impact and conflict avoidance and monitoring plan.
- Lease Stipulation 7 minimizes disturbance and hindrance of caribou or alteration of their movements in the areas identified as important for calving.
- ROP 6 contains specific requirements related to avoiding, minimizing, or mitigating impacts on air quality for various phases of development to prevent unnecessary or undue degradation of the air and lands and to protect health.

response options should be parallel between the two items. Moreover, we cannot add additional open-ended questions to the survey without increasing participant fatigue. Thus, we will maintain the closed-ended nature of the question. We recognize that this will be a difficult question for participants, and therefore, we prefer not to provide an option for "don't know."

FDA estimates the burden of this collection of information as follows:

TABLE 3—ESTIMATED ANNUAL REPORTING BURDEN [1]

| Activity | Number of respondents | Number of responses per respondent | Total annual responses | Average burden per response | Total hours |
|---|---|---|---|---|---|
| Study 1 Screener | 933 | 1 | 933 | 0.08 (5 minutes) | 74.64 |
| Study 1 Pretest | 249 | 1 | 249 | 0.33 (20 minutes) | 82.17 |
| Study 1 Main Test | 405 | 1 | 405 | 0.33 (20 minutes) | 133.65 |
| Study 2 Screener | 1,417 | 1 | 1,417 | 0.08 (5 minutes) | 113.36 |
| Study 2 Pretest | 266 | 1 | 266 | 0.33 (20 minutes) | 87.78 |
| Study 2 Main Test | 432 | 1 | 432 | 0.33 (20 minutes) | 142.56 |
| Total | | | | | 634.16 |

[1] There are no capital costs or operating and maintenance costs associated with this collection of information.

## II. References

The following references are on display with the Dockets Management Staff (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852, 240–402–7500, and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; these are not available electronically at *https://www.regulations.gov* as these references are copyright protected. Some may be available at the website address, if listed. FDA has verified the website addresses, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

1. LaTour, C. and M. Smith (1986). "A Study of Expert Endorsement of OTC Pharmaceutical Products." *Journal of Pharmaceutical Marketing & Management,* vol. 1(2), pp. 117–128.
2. Bhutada, N.S. and B.L. Rollins (2015). "Disease-Specific Direct-to-Consumer Advertising of Pharmaceuticals: An Examination of Endorser Type and Gender Effects on Consumers' Attitudes and Behaviors." *Research in Social Administrative Pharmacy,* vol. 11(6), pp. 891–900.
3. Boerman, S.C., L.M. Willemsen, and E.P. Van Der Aa (2017). "'This post is sponsored': Effects of Sponsorship Disclosure on Persuasion Knowledge and Electronic Word of Mouth in the Context of Facebook." *Journal of Interactive Marketing,* vol. 38, pp. 82–92.
4. Cohen, J. (1988). "Statistical Power Analysis for the Behavioral Sciences." Routledge. ISBN 978–1–134–74270–7.
5. Faul, F., E. Erdfelder, A.G. Lang, et al. (2007). "G*Power 3: A Flexible Statistical Power Analysis Program for the Social, Behavioral, and Biomedical Sciences." *Behavior Research Methods,* vol. 39, pp. 175–191.
6. Woods, C.B., S. Baxter, E. King, et al. (2017). "Celebrity? Doctor? Celebrity doctor? Which Spokesperson Is Most Effective for Cancer Prevention?" In E. Kendal and B. Diug (Eds.) *Teaching Medicine and Medical Ethics Using Popular Culture* (pp. 71–98). Palgrave Studies in Science and Popular Culture. Cham, Switzerland: Palgrave Macmillan. doi:10.1007/978–3–319–65451–5_5.
7. *https://www.statista.com/statistics/398166/us-instagram-user-age-distribution/*.
8. Zaichkowsky, J.L. (1994). "The Personal Involvement Inventory: Reduction, Revision, and Application to Advertising." *Journal of Advertising,* vol. 23(4), pp. 59–70.
9. Ohanian, R. (1990). "Construction and Validation of a Scale to Measure Celebrity Endorsers' Perceived Expertise, Trustworthiness, and Attractiveness." *Journal of Advertising,* vol. 19(3), pp. 39–52.
10. Kamins, M.A. and K. Gupta (1994). "Congruence Between Spokesperson and Product Type: A Matchup Hypothesis Perspective." *Psychology & Marketing,* vol. 11(6), pp. 569–586.
11. Phua, J., J.S.E. Lin, and D.J. Lim (2018). "Understanding Consumer Engagement with Celebrity-Endorsed E-Cigarette Advertising on Instagram." *Computers in Human Behavior,* vol. 84, pp. 93–102.
12. Brown, W.J. and M.C. Bocarnea (2007). "Celebrity-Persona Interaction Scale." In R.A. Reynolds, R. Woods, and J.D. Baker (Eds.) *Handbook of Research on Electronic Surveys and Measurements* (pp. 302–305). Hershey, PA: Idea Group Reference.
13. Brown, W.J. and M.A.C. De Matviuk (2010). "Sports Celebrities and Public Health: Diego Maradona's Influence on Drug Use Prevention." *Journal of Health Communication,* vol. 15(4), pp. 358–373.
14. Huh, J., D.E. DeLorme, and L.N. Reid (2005). "Factors Affecting Trust in On-Line Prescription Drug Information and Impact of Trust on Behavior Following Exposure to DTC Advertising." *Journal of Health Communication,* vol. 10(8), pp. 711–731.
15. Till, B.D. and M. Busler (2000). "The Match-Up Hypothesis: Physical Attractiveness, Expertise, and the Role of Fit on Brand Attitude, Purchase Intent and Brand Beliefs." *Journal of Advertising,* vol. 29(3), pp. 1–13.
16. Biswas, D., A. Biswas, and N. Das (2006). "The Differential Effects of Celebrity and Expert Endorsements on Consumer Risk Perceptions: The Role of Consumer Knowledge, Perceived Congruency, and Product Technology Orientation." *Journal of Advertising,* vol. 35(2), pp. 17–31.
17. Bocarnea, M.C. and W.J. Brown (2007). "Celebrity-Persona Parasocial Interaction Scale." In R.A. Reynolds, R. Woods, and J.D. Baker (Eds.) *Handbook of Research on Electronic Surveys and Measurements* (pp. 309–312). Hershey, PA: Idea Group Reference.

Dated: December 1, 2020.

**Lauren K. Roth,**
*Acting Principal Associate Commissioner for Policy.*

[FR Doc. 2020–26799 Filed 12–4–20; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[19X.LLAK930000.L13100000. EI0000.241A]**

### Notice of 2021 Coastal Plain Alaska Oil and Gas Lease Sale and Notice of Availability of the Detailed Statement of Sale

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of sale.

**SUMMARY:** The Bureau of Land Management (BLM) Alaska State Office will hold an oil and gas lease sale bid opening for tracts in the Coastal Plain of the Arctic National Wildlife Refuge.

**DATES:** The oil and gas lease sale bid opening will be at 10 a.m. Alaska Standard Time (AKST) on January 6,

2021. The BLM must receive all sealed bids by 4 p.m. AKST, Thursday, December 31, 2020. The Detailed Statement of Sale for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available to the public immediately after publication of this notice.

**ADDRESSES:** Sealed bids must be received at the BLM Alaska State Office, Attn: BLM Energy and Minerals Branch Chief; Bureau of Land Management, Alaska State Office, 222 West 7th Avenue, Mailstop 13, Anchorage, Alaska 99513–7504. The Detailed Statement of Sale for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available at the BLM Alaska website at *https://www.blm.gov/alaska*, and copies are available from the BLM Alaska Public Information Center (Public Room), 222 West 7th Avenue, Mailstop 13, Anchorage, Alaska 99513–7504; telephone 907–271–5960.

**FOR FURTHER INFORMATION CONTACT:** BLM Alaska Energy and Minerals Branch Chief, 907–271–4407. People who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FRS is available 24 hours a day, 7 days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The January 2021 Coastal Plain Alaska Oil and Gas Lease Sale will include tracts and acreage (no less than 400,000 acres) identified in the Detailed Statement of Sale and available for leasing under the Coastal Plain Oil and Gas Leasing Program Record of Decision issued in August 2020. The opening and reading of the bids for the 2021 Coastal Plain Alaska Oil and Gas Lease Sale will be available via video livestreaming at *https://www.blm.gov/live*. The Detailed Statement of Sale includes a description of the areas the BLM is offering for lease, as well as the lease terms, conditions, special stipulations, required operating procedures, and directions about how to submit bids. If you plan to submit one or more bids, please note that all bids must be sealed in accordance with the provisions identified in the Detailed Statement of Sale.

(Authority: Section 20001 of the Tax Cuts and Jobs Act (Public Law 115–97))

**Chad B. Padgett,**
*State Director, Alaska.*
[FR Doc. 2020–26788 Filed 12–4–20; 8:45 am]
**BILLING CODE 4310–JA–P**

# INTERNATIONAL TRADE COMMISSION

**[Investigation No. 332–582]**

## Monitoring of Fresh or Chilled Bell Peppers

**AGENCY:** International Trade Commission.

**ACTION:** Notice of Investigation and Scheduling of a Public Hearing.

**SUMMARY:** Following receipt on November 4, 2020, of a request from the U.S. Trade Representative (USTR), the Commission instituted Investigation No. 332–582, Monitoring of Fresh or Chilled Bell Peppers, under section 332(g) of the Tariff Act of 1930 for the purpose of collecting and analyzing information that would expedite an investigation under section 202(b) of the Trade Act of 1974 (Trade Act) (the U.S. global safeguard law). For purposes of this investigation, the fresh or chilled bell peppers are those provided for in statistical reporting numbers 0709.60.4015, 0709.60.4025, 0709.60.4065, and 0709.60.4085 of the Harmonized Tariff Schedule of the United States (HTS).

**DATES:** (date of publication in the **Federal Register**): Commencement of monitoring.

**ADDRESSES:** All Commission offices, including the Commission's hearing rooms, are located in the U.S. International Trade Commission Building, 500 E Street SW, Washington, DC. All written submissions should be submitted electronically and addressed to the Secretary, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Project Leader Steven LeGrand (202–205–3094 or *steven.legrand@usitc.gov*) for information specific to this investigation. For information on the legal aspects of this investigation, contact William Gearhart of the Commission's Office of the General Counsel (202–205–3091 or *william.gearhart@usitc.gov*). The media should contact Margaret O'Laughlin, Office of External Relations (202–205–1819 or *margaret.olaughlin@usitc.gov*). Hearing-impaired individuals may obtain information on this matter by contacting the Commission's TDD terminal at 202–205–1810. General information concerning the Commission may also be obtained by accessing its website (*https://www.usitc.gov*).

Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000.

**SUPPLEMENTARY INFORMATION:** On October 6, 2020, the Florida Fruit and Vegetable Association, and the Florida Farm Bureau requested that U.S. imports of bell peppers be monitored under the perishable agricultural product provisions of section 202(d)(1) of the Trade Act (19 U.S.C. 2252(d)(1). In response to that request, the USTR determined that imports of bell peppers satisfy the requirements of section 202(d)(1)(A) of the Trade Act.

Accordingly, in accordance with section 202(d)(1)(B) of the Trade Act, the USTR requested, under section 332(g) of the Tariff Act of 1930, that the Commission monitor and investigate imports of fresh or chilled bell peppers, provided for in statistical reporting numbers 0709.60.4015, 0709.60.4025, 0709.60.4065, and 0709.60.4085 of the HTS. He further requested that the monitoring and investigation include the collection and analysis of information that would expedite an investigation under section 202(b) of the Trade Act. He further stated that the product in question consists of all imports that fall within the product description under the above HTS statistical reporting numbers.

Section 202(d)(1)(C) of the Trade Act provides procedures under which domestic producers of a perishable agricultural product may, in a petition filed under section 202(a) of the Trade Act, request provisional relief. Under those procedures, if the Commission has monitored imports of the article for at least 90 days, the domestic industry may, in such a petition, request a preliminary determination and provisional relief pending completion of a full Commission investigation. Should that occur, the Commission would have 21 days, from the day on which the request was received, to make a preliminary injury determination, and if in the affirmative, to recommend provisional relief to the President.

*Public Hearing:* No public hearing is planned at this time in connection with this investigation. However, should a public hearing or conference be scheduled, the Commission will publish a notice in the **Federal Register** and post information about the hearing on the Commission's website at (*https://usitc.gov/research_and_analysis/what_we_are_working_on.htm*). Once on that web page, scroll down to the entry for Investigation No. 332–582, Monitoring of Fresh or Chilled Bell Peppers, and

way and easements necessary for development under a particular lease will be granted, as well as any right-of-way or easement necessary to carry out the oil and gas program across the Coastal Plain.

Section 20001(c)(3) of Public Law 115-97 provides that BLM shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program. This mandate, requiring the authorization of up to 2,000 surface acres of Federal land to be covered by production and support facilities during the term of the leases, will be carried out through leases that allow for regulation of facilities but may not preclude such infrastructure. If a lessee discovers oil or gas, it may seek approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations. This statutory requirement functions as a directive to BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities.

a) The ROD established Required Operating Procedures (ROPs) for the CP. These are pre-application requirements, procedures, management practices, or design features that BLM has adopted as operational requirements. These requirements will be addressed through the permitting process. An oil and gas lease does not in itself authorize any on-the-ground activity. Seismic operations, drilling, ice road construction, pipeline construction, etc. require additional land use authorizations from the BLM. Any applicant requesting such authorization will have to address the required operating procedures either before submitting the application (e.g., subsistence consultation) or as part of the application proposal (e.g., proposal states garbage will not be buried, or pipelines and roads will be separated by 500 ft or more). Requirements that are met prior to submission of the application, as well as procedures, practices, and design features that are an integral part of a proposal, do not need to be stipulated in a permit or lease. Because ROPs are operational requirements and not lease stipulations, their applicability goes beyond oil and gas leasing to any permitted activity where the requirement is relevant.

Consistent with the terms of the lease rights granted and other applicable law (including Section 20001 of Public Law 115-97), the AO may add additional conditions of approval as determined necessary following analysis under National Environmental Policy Act (NEPA) [42 U.S.C. 4321 et seq.] and as developed through consultation with federal, state, and North Slope Borough (NSB) regulatory and resource agencies. Laws or regulations may require other federal, state, and NSB permits (e.g., Clean Water Act [CWA] Section 404) for an oil and gas project to proceed. Specific state permits are required when the state has authority, under federal or state law or regulation, to enforce the provision in question. Specific permits issued by federal agencies other than BLM could include permit conditions that are more stringent than those identified in the ROD.

The Stipulations and ROPs for the planning area are available in Exhibit C: Appendix A of the ROD. A detailed discussion of ROPs is in the ROD's Appendix A.

b) Energy Policy Act of 2005. On August 8, 2005, the Energy Policy Act of 2005 was signed into law. The BLM issued a final regulation, codified at 43 CFR Part 3130, effective March 5, 2008, which implemented the change in lease terms mandated by the Act. In furtherance of the statutory direction to "manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations),"required by

| Tract | Acres | Bid No. | Company (High bid in RED) | Bid Amount | High Bid | High Bid Per Acre | Minimum Bid | 1/5 Bid Amount (due at sale) | 4/5 Amount Due | First Year's Rental |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021-CP-016 | 57507 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,437,675.00 | $ 1,437,675.00 | $ 25.00 | $ 1,437,675.00 | $ 287,535.00 | $ 1,150,140.00 | $ 575,070.00 |
| 2021-CP-017 | 43876 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,096,900.00 | $ 1,096,900.00 | $ 25.00 | $ 1,096,900.00 | $ 219,380.00 | $ 877,520.00 | $ 438,760.00 |
| 2021-CP-022 | 56168 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,404,200.00 | $ 1,404,200.00 | $ 25.00 | $ 1,404,200.00 | $ 280,840.00 | $ 1,123,360.00 | $ 561,680.00 |
| 2021-CP-023 | 58830 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,470,750.00 | $ 1,470,750.00 | $ 25.00 | $ 1,470,750.00 | $ 294,150.00 | $ 1,176,600.00 | $ 588,300.00 |
| 2021-CP-024 | 58176 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,454,400.00 | $ 1,454,400.00 | $ 25.00 | $ 1,454,400.00 | $ 290,880.00 | $ 1,163,520.00 | $ 581,760.00 |
| 2021-CP-025 | 48603 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,215,075.00 | $ 1,622,260.00 | $ 33.38 | $ 1,215,075.00 | $ 324,452.00 | $ 1,297,808.00 | $ 486,030.00 |
| | | 2 | Knik Arm Services, LLC | $ 1,622,260.00 | | | | | | |
| 2021-CP-026 | 53412 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,335,300.00 | $ 1,335,300.00 | $ 25.00 | $ 1,335,300.00 | $ 267,060.00 | $ 1,068,240.00 | $ 534,120.00 |
| 2021-CP-027 | 52447 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,311,175.00 | $ 1,311,175.00 | $ 25.00 | $ 1,311,175.00 | $ 262,235.00 | $ 1,048,940.00 | $ 524,470.00 |
| 2021-CP-029 | 23446 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 586,150.00 | $ 771,373.00 | $ 32.90 | $ 586,150.00 | $ 154,274.60 | $ 617,098.40 | $ 234,460.00 |
| | | 2 | Regenerate Alaska, Inc. | $ 771,373.00 | | | | | | |
| | | 3 | Bid Incomplete | | | | | | | |
| 2021-CP-030 | 46791 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,169,775.00 | $ 1,169,775.00 | $ 25.00 | $ 1,169,775.00 | $ 233,955.00 | $ 935,820.00 | $ 467,910.00 |
| 2021-CP-031 | 53546 | 1 | Alaska Industrial Development and Export Authority (AIDEA) | $ 1,338,650.00 | $ 1,338,650.00 | $ 25.00 | $ 1,338,650.00 | $ 267,730.00 | $ 1,070,920.00 | $ 535,460.00 |
| | | 2 | Bid Incomplete | | | | | | | |
| 2021-CP-032 | | 1 | Bid Incomplete | | $ - | | $ - | $ - | $ - | $ - |

AR3314

# UNITED STATES DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
### *Alaska Arctic National Wildlife Refuge, 1002 Area*
### Oil & Gas Lease Sale - January 6, 2021

| | |
|---|---|
| 1.  SUM OF ALL BIDS | $  16,213,683.00 |
|     SUM OF ALL HIGH BIDS | $  14,412,458.00 |
| | |
| 2.  TOTAL TRACTS OFFERED | 22 |
| | |
| 3.  TOTAL TRACTS RECEIVING BIDS | 11 |
| | |
| 4.  TOTAL NUMBER OF BIDS | 13 |
| | |
| 5.  ACRES OFFERED | 1,089,053 |
| | |
| 6.  TOTAL ACRES RECEIVING BIDS | 552,802 |
| | |
| 7.  HIGHEST BID SUBMITTED | |
|          COMPANY NAME(S) | Knik Arm Services, LLC |
|          TRACT | 2021-CP-025 |
|          HIGHEST BID AMOUNT | $  1,622,260.00 |
|          HIGHEST BID AMOUNT PER ACRE | $  33.38 |
| | |
| 8.  NUMBER OF BIDDERS PARTICIPATING | 4 |
| | |
| 9.  STATE OF ALASKA 50% | $    7,206,229.00 |

| SUMMARY | |
|---|---|
| Total Acres Offered | 1,089,053 |
| Total Tracts Offered | 22 |
| Total Acres Receiving Bids | 552,802 |
| Total Tracts Receiving Bids | 11 |
| Total Number of Bids Received | 13 |
| Sum Of All successful High Bids | $  14,412,458.00 |
| High Bid Amount | $    1,622,260.00 |
| Highest Bid Amount Per Acre | $          33.38 |
| State of Alaska 50% | $    7,206,229.00 |



**Lease Sale Results**

Alaska Industrial Development and Export Authority (AIDEA)

Knik Arm Services LLC

Regenerate Alaska, Inc.

Coastal Plain Lease Tract Available for Bid

Lease Tract Unavailable for Leasing

Excluded from Public Law 115-97 Coastal Plain or outside the BLM's oil and gas leasing authority

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources. This information may not meet National Map Accuracy Standards. This product was developed through digital means and may be updated without notification.



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

In Reply Refer To:
3132 (932)
AA095889, AA095890
AA095893, AA095897
AA095898, AA095900
AA095901

JAN 13 2021

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

## <u>NOTICE OF DECISION</u>

Alaska Industrial Development
and Export Authority                            :
813 West Northern Lights Blvd.          :
Anchorage, Alaska 99503                      :
                                                            :
                                                            :

### <u>Coastal Plain Oil and Gas Leases Issued</u>

On January 12, 2021, the Bureau of Land Management received your signed lease documents, bond information and the remainder of the money due for 7 tracts for which the Alaska Industrial Development and Export Authority was the high bidder at the January 6, 2021 Coastal Plain lease sale. Enclosed is the Departmental Approval and the following issued leases: AA095889, AA095890, AA095893, AA095897, AA095898, AA095900, AA095901, which are effective January 1, 2021. BLM Alaska will process your remaining high bids upon timely receipt of requested information.

If you have any questions, you may contact Wayne Svejnoha at 907-271-4407, or at the address on the letterhead.

Chad Padgett
State Director

Enclosures:    Department Approval Executed Leases

# Decision to Issue Coastal Plain Leases

Under the authority of Section 20001 of the Tax Cuts and Jobs Act, Public Law 115-97 (Dec. 22, 2017); 131 Stat. 2235, I hereby approve issuance of the following leases located in the Coastal Plain of the Arctic National Wildlife Refuge to the Alaska Industrial Development and Export Authority. The leases are to be executed by the BLM Alaska State Director.

AA095889 (Tract 016)
AA095890 (Tract 017)
AA095893 (Tract 024)
AA095897 (Tract 026)
AA095898 (Tract 027)
AA095900 (Tract 030)
AA095901 (Tract 031)

My approval constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4.

Departmental Approval:

_David L. Bernhardt_
David L. Bernhardt
Secretary of the Interior

DATE: 1/13/2021

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017, 131 Stat. 2235, 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Boulevard

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:

*Tract No. ____2021-CP-016____    *Sale Date  Jan / 06 / 2021 (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-3, 10-15, 22-27, 34-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $_____170.00    Rental fee $____575,070

Total acres applied for____57,507
Total $____575,240

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-3, 10-15, 22-27, 34-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease ____57,507

Rental retained $ ____575,070

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease

Competitive Coastal Plain Lease with a term of 10 years

THE UNITED STATES OF AMERICA

by _____
(Signing Officer)

_____ _____
(Title)                                     (Date)
State Director          1/13/2021

EFFECTIVE DATE OF LEASE  1 January 2021

---

4    (a) Undersigned certifies that (1) offeror is a citizen of the United States, an association of such citizens, a municipality, or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities, (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information.

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease, and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this  12ᵗʰ  day of  January  , 20 21    _____
(Signature of Lessee or Attorney-in-fact)

Sec. 1 Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2 Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on production after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C 1701) Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec 4 Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in an amount determined by lessor

Sec 5 Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C 552)

Sec 6 Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7 Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8 Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec 9 Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto Neither lessee nor lessee's subcontractors shall maintain segregated facilities During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec 10 Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11 Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12 Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)   a well capable of production of oil and gas in paying quantities or

    (b)   meets criteria under 43 CFR 3135 1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)   contains a well capable of production of unitized substances in paying quantities or

    (b)   meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.

This provision shall not be construed to prevent the exercise by lessee of any other legal and equitable remedy, including waiver of the default As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec 13 Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec 14 Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

AR3321

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A  General

  1.  The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

  2.  Entries must be typed or printed plainly. Offeror must sign Item 4.

  3.  An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

  4.  If more space is needed, additional sheets must be attached to each copy of the form submitted.

B  Special

  Item 1 - Enter offeror's name and billing address

  Item 2 - A single tract number and Sale Date shall be the only acceptable description.

  Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1.  This information is being collected pursuant to the law.

2.  This information will be used to create and maintain a record of oil and gas lease activity.

3.  Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

AR3322

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
### ALASKA STATE OFFICE
# OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Blvd

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:          *Tract No.: _____2021-CP-017_____    *Sale Date    Jan / 06 / 2021 (m/d/y):

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 5 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 1-5, 8-17, 21-28, 35 & 36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| | | | | |
|----|----|----------|-------|--------|
| T. 6 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 1-3, 9-17, 20-29, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| | | | | |
|----|----|----------|-------|--------|
| T. 7 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 12, 13, 23-27, 34-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| | | | | |
|----|----|----------|-------|--------|
| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 4-9, 16-21, 28-33
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $_____170.00          Rental fee $____438,760

Total acres applied for_____43,876
Total $____438,930

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 5 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 1-5, 8-17, 21-28, 35 & 36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| | | | | |
|----|----|----------|-------|--------|
| T. 6 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 1-3, 9-17, 20-29, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 7 N. | R. 23 E. | Umiat Meridian | Alaska | |

Sections 12, 13, 23-27, 34-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 5 N. | R. 24 E. | Umiat Meridian | Alaska | |
|---|---|---|---|---|

Sections 4-9, 16-21, 28-33
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 43,876

Rental retained $ _____ 438,760

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

State Director (Title)   1/13/2021 (Date)

EFFECTIVE DATE OF LEASE   1 January 2021

4     (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you are furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017, 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form. (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation, (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this 12th day of January, 20 21   _____ (Signature of Lessee or Attorney-in-fact)

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552)

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section.

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1.4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:
    (a)   a well capable of production of oil and gas in paying quantities or
    (b)   meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
    (a)   contains a well capable of production of unitized substances in paying quantities or
    (b)   meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessee of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701)

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

AR3325

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
## ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

### READ INSTRUCTIONS BEFORE COMPLETING

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Blvd.

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

   Legal description of land requested:    *Tract No.: __2021-CP-024__    *Sale Date   __Jan__ / __06__ / __2021__
      (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 19-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 2-36
Stipulations: 1(fiv), 2-6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 17-20, 28-32
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $ _____ 170.00    Rental fee $ _____ 581,760

Total acres applied for _____ 58,176
Total $ _____ 581,930

### DO NOT WRITE BELOW THIS LINE

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 19-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 2-36
Stipulations: 1(fiv), 2-6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 8 N. | R. 28 E. | Umiat Meridian | Alaska | |

Sections 17-20, 28-32
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 58,176

Rental retained $ _____ 581,760

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance; and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

State Director _____ (Title) _____ 1/13/2021 (Date)

EFFECTIVE DATE OF LEASE _1 January 2021_

4. (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

<center>NOTICE</center>

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicating body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20_21_ _____

(Signature of Lessee or Attorney-in-fact)

AR3328

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section.

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1.4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135.1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137.70 and 43 CFR 3137.82.

This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

AR3329

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A  General

1.  The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2.  Entries must be typed or printed plainly. Offeror must sign Item 4.

3.  An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

4.  If more space is needed, additional sheets must be attached to each copy of the form submitted.

B.  Special:

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1.  This information is being collected pursuant to the law.

2.  This information will be used to create and maintain a record of oil and gas lease activity.

3.  Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

AR3330

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name **Alaska Industrial Development and Export Authority**

   Street **813 West Northern Lights Blvd.**

   City, State, Zip Code **Anchorage, Alaska 99503**

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

   Legal description of land requested:     *Tract No.: __2021-CP-026__     *Sale Date __Jan__ / __06__ / __2021__ (m/d/y):

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 6 N. | R. 25 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---------|----------|----------------|--------|--|

Sections 31-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---------|----------|----------------|--------|--|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---------|----------|----------------|--------|--|

Sections 31-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $ __170.00__     Rental fee $ __534,120__

Total acres applied for __53,412__
Total $ __534,290__

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 6 N. | R. 25 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|---------|----------|----------------|--------|--|

Sections 31-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 6 N. | R. 26 E. | Umiat Meridian | Alaska | |
|---------|----------|----------------|--------|--|

Sections 1-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

AR3331

| T | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |

Sections 31-36
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 53,412

Rental retained $ _____ 534,120

---

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease

Competitive Coastal Plain Lease with a term of 10 years

THE UNITED STATES OF AMERICA

by _____ (Signing Officer)

_____ State Director _____ (Title)    _____ 1/13/2021 _____ (Date)

EFFECTIVE DATE OF LEASE _____ 1 January 2021 _____

---

4.    (a) Undersigned certifies that (1) offeror is a citizen of the United States, an association of such citizens, a municipality, or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

NOTICE

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

AUTHORITY: Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

PRINCIPAL PURPOSE: The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

ROUTINE USES: BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

EFFECT OF NOT PROVIDING THIS INFORMATION: If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20_21_    _____ (Signature of Lessee or Attorney-in-fact)

# LEASE TERMS

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on production after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C. 552)

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains;
    (a)  a well capable of production of oil and gas in paying quantities or
    (b)  meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
    (a)  contains a well capable of production of unitized substances in paying quantities or
    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

AR3333

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A. General

    1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

    2. Entries must be typed or printed plainly. Offeror must sign Item 4.

    3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

    4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special:

    Item 1 - Enter offeror's name and billing address

    Item 2 - A single tract number and Sale Date shall be the only acceptable description.

    Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

AR3334

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name   Alaska Industrial Development and Export Authority

   Street   813 West Northern Lights Blvd.

   City, State, Zip Code   Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

   Legal description of land requested:   *Tract No.:   2021-CP-027       *Sale Date   Jan / 06 / 2021
   (m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 12-14, 21-28, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $_____170.00       Rental fee $____524,470       Total acres applied for____52,447____
Total $____524,640____

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 12-14, 21-28, 32-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

Total acres in lease____52,447____

Rental retained $____524,470____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _Chad B. _____ (Signing Officer)

_State Director_ (Title)     _1/13/2021_ (Date)

EFFECTIVE DATE OF LEASE   _1 January 2021_

---

4.    (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation, (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_, 20 _21_ _____
(Signature of Lessee or Attorney-in-fact)

AR3336

Sec. 1 Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2 Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on production after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C 1701) Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec. 3 Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4 Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5 Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C 552)

Sec. 6 Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7 Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8 Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9 Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto Neither lessee nor lessee's subcontractors shall maintain segregated facilities During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10 Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11 Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12 Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:
    (a)   a well capable of production of oil and gas in paying quantities or
    (b)   meets criteria under 43 CFR 3135 1-5 or
The lease is committed to an approved cooperative or unit plan or communitization agreement which,
    (a)   contains a well capable of production of unitized substances in paying quantities or
    (b)   meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.
This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec. 13 Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14 Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed; the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved; and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A. General

    1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

    2. Entries must be typed or printed plainly. Offeror must sign Item 4.

    3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

    4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

    Item 1 - Enter offeror's name and billing address

    Item 2 - A single tract number and Sale Date shall be the only acceptable description.

    Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

Serial No.

AA095900

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name    Alaska Industrial Development and Export Authority

   Street    813 West Northern Lights Blvd.

   City, State, Zip Code    Anchorage, Alaska 99503

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:    *Tract No.: _____ 2021-CP-030 _____    *Sale Date    Jan / 06 / 2021
(m/d/y):

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 14, 23-26, 35, 36<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-30<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 8 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 9 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 29-34<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |

Amount remitted: Filing fee $_____ 170.00    Rental fee $_____ 467,910    Total acres applied for _____ 46,791
Total $_____ 468,080

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
| Sections 14, 23-26, 35, 36<br>Stipulations: 1(a), 2-6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 7 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-30<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |
| T. 8 N. | R. 26 E. | Umiat Meridian | Alaska | |
| Sections 1-36<br>Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11<br>Required Operating Procedures | | | | |

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T 9 N | R. 26 E | Umiat Meridian | Alaska | |

Sections 29-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 46,791

Rental retained $ _____ 467,910

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

THE UNITED STATES OF AMERICA

Competitive Coastal Plain Lease with a term of 10 years.

by _____ (Signing Officer)

_____ State Director _____ 1/13/2021
(Title)                        (Date)

EFFECTIVE DATE OF LEASE   1 January 2021

4.   (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR Part 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

NOTICE

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information:

AUTHORITY: Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

PRINCIPAL PURPOSE: The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

ROUTINE USES: BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

EFFECT OF NOT PROVIDING THIS INFORMATION: If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this 13th day of _____ January _____, 20 21 _____
(Signature of Lessee or Attorney-in-fact)

# LEASE TERMS

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16⅔ percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority.

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section.

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1.4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation.

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135.1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137.70 and 43 CFR 3137.82.

This provision shall not be construed to prevent the exercise by lessee of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

AR3341

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A. General

   1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

   2. Entries must be typed or printed plainly. Offeror must sign Item 4.

   3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations.

   4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

   Item 1 - Enter offeror's name and billing address

   Item 2 - A single tract number and Sale Date shall be the only acceptable description.

   Item 3 - This space will be completed by the United States.

## PAPERWORK REDUCTION ACT STATEMENT

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# ALASKA STATE OFFICE
# OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235; 16 U.S.C. 3143 Note).

## READ INSTRUCTIONS BEFORE COMPLETING

1. Name **Alaska Industrial Development and Export Authority**

   Street **813 West Northern Lights Blvd.**

   City, State, Zip Code **Anchorage, Alaska 99503**

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

   Legal description of land requested: *Tract No.: 2021-CP-031   *Sale Date (m/d/y): Jan / 06 / 2021

| T. | R. | Meridian | State | County |
|----|----|----|----|----|
| T. 9 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 24, 25, 35, 36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|----|----|----|----|----|

Sections 1-30
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 25 E. | Umiat Meridian | Alaska | |
|----|----|----|----|----|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |
|----|----|----|----|----|

Sections 4, 5, 7-10, 15-22, 27-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $ 170.00     Rental fee $ 535,460

Total acres applied for 53,546
Total $ 535,630

## DO NOT WRITE BELOW THIS LINE

3. Land included in lease:

| T. | R. | Meridian | State | County |
|----|----|----|----|----|
| T. 9 N. | R. 24 E. | Umiat Meridian | Alaska | |

Sections 24, 25, 35, 36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 7 N. | R. 25 E. | Umiat Meridian | Alaska | |
|----|----|----|----|----|

Sections 1-30
Stipulations: 1(fii), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. 8 N. | R. 25 E. | Umiat Meridian | Alaska | |
|----|----|----|----|----|

Sections 1-36
Stipulations: 1(a), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|----|----|----------|-------|--------|
| T. 9 N. | R. 25 E. | Umiat Meridian | Alaska | |

Sections 4, 5, 7-10, 15-22, 27-34
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease _____ 53,546 _____

Rental retained $ _____ 535,460 _____

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas (except helium) in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to reasonable regulations and formal orders hereafter promulgated when not inconsistent with, or unduly burdensome on, lease rights granted or specific provision of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR Part 3130 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

Competitive Coastal Plain Lease with a term of 10 years.

THE UNITED STATES OF AMERICA

by _____
(Signing Officer)

State Director _____ 1/13/2021
(Title)                          (Date)

EFFECTIVE DATE OF LEASE  1 January 2021

4    (a) Undersigned certifies that (1) offeror is a citizen of the United States, an association of such citizens, a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR 3132.1 and the leasing authorities; (3) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part.

This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, or if it is not accompanied by the required payments. 18 U.S.C. Sec. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

**NOTICE**

The Privacy Act of 1974 and the regulations at 43 CFR 2.223(d) provide that you be furnished with the following information.

**AUTHORITY:** Section 20001 of PL 115-97 (Dec. 22, 2017; 131 Stat. 2235)

**PRINCIPAL PURPOSE:** The primary uses of the records are (1) to determine your qualification to receive an oil and gas lease; and (2) to provide information concerning oil and gas leases for administrative and public use.

**ROUTINE USES:** BLM and the Department of the Interior (DOI) may disclose your information on this form: (1) to members of the public who have a need for the information that is maintained by BLM for public record; (2) to the U.S. Department of Justice, court, or other adjudicative body when DOI determines the information is necessary and relevant to litigation; (3) to appropriate Federal, State, local or foreign agencies responsible for investigating, prosecuting violations, enforcing or implementing this statute, regulation, or lease; and (4) to a congressional office when you request the assistance of the Member of Congress in writing.

**EFFECT OF NOT PROVIDING THIS INFORMATION:** If you do not furnish all the information required by this form, your application may be rejected.

Duly executed this _12th_ day of _January_ , 20 _21_ _____
(Signature of Lessee or Attorney-in-fact)

AR3344

# LEASE TERMS

Sec. 1. Rentals – Rentals must be paid to the proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are specified in the detailed statement of sale.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, or a well that meets criteria in 43 CFR 3137.82 and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified for those lands not within a participating area.

Failure to pay annual rent, within 30 days after receipt of a Notice of Delinquency shall cause this lease to terminate. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties – Royalties shall be paid to the proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. The royalty rate is 16 67 percent.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where production without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of the lessee.

An interest charge shall be assessed on the late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U S C 1701) Lessee shall be liable for royalty payments on oil and gas loss or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rules, regulations, orders, or citations issued under FOGRMA or the leasing authority

Sec. 3. Bonds – A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage – Lessee must exercise reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor

Sec. 5. Documents, evidence, and inspection – Lessee shall file with the proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that support costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting office for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U S C 552)

Sec. 6. Conduct of operations – Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. To the extent consistent with the lease rights granted, lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. Such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the

approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with the rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If, in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Extraction of helium – Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provision of this section

Sec. 8. Damages to property – Lessee shall pay lessor for damage to lessor's improvements and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 9. Protection of diverse interests and equal opportunity – Lessee shall pay when due, all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920

Lessee shall comply with Executive Order No 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities. During the performance of this lease, the lessee must comply fully with paragraphs (1) through (8) of 41 CFR 60-1 4(a) with respect to employment discrimination on the basis of race, color, religion, sex, or national origin, and must incorporate the requirements set forth in those paragraphs in every subcontract or purchase order, as provided by that regulation

Sec. 10. Transfer of lease interests and relinquishment of lease – As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office, a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties

Sec. 11. Delivery of premises – At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor, and within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells

Sec. 12. Proceedings in case of default – If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains:

    (a)  a well capable of production of oil and gas in paying quantities or

    (b)  meets criteria under 43 CFR 3135 1-5 or

The lease is committed to an approved cooperative or unit plan or communitization agreement which,

    (a)  contains a well capable of production of unitized substances in paying quantities or

    (b)  meets the criteria under 43 CFR 3137 70 and 43 CFR 3137 82.

This provision shall not be construed to prevent the exercise by lessee of any other legal and equitable remedy, including waiver of the default. As such, remedy or waiver shall prevent later cancellation of the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U S C 1701)

Sec. 13. Heirs and successors-in-interest – Each obligation of this lease shall extend to and be binding upon and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto

Sec. 14. Coastal Plain leases and associated lease rights, other development rights, and access rights are granted

pursuant to the authority contained in Section 20001 of PL 115-97; and are subject to the lease stipulations established by the ROD for the ANWR Coastal Plain Leasing Environmental Impact Statement (Leasing EIS) in effect at the time this lease is issued or renewed, the required operating procedures established by the ROD for the ANWR Coastal Plain Leasing EIS in effect at the time lease operations are approved, and compliance with the Section 106 National Historic Preservation Act Programmatic Agreement for the Coastal Plain leasing program in effect at the time lease operations are approved.

## INSTRUCTIONS

A. General

1. The front of this form is to be completed only by parties filing for a noncompetitive lease. The BLM will complete front of the form for all other types of leases.

2. Entries must be typed or printed plainly. Offeror must sign Item 4.

3. An original and two copies of this offer must be prepared and filed in the proper BLM State Office. See regulations at 43 CFR 1821.10 for office locations

4. If more space is needed, additional sheets must be attached to each copy of the form submitted.

B. Special

Item 1 - Enter offeror's name and billing address

Item 2 - A single tract number and Sale Date shall be the only acceptable description.

Item 3 - This space will be completed by the United States.

**PAPERWORK REDUCTION ACT STATEMENT**

The Paperwork Reduction Act of 1990 (44 U.S.C. 3501 et seq.) requires us to inform you that:

1. This information is being collected pursuant to the law.

2. This information will be used to create and maintain a record of oil and gas lease activity.

3. Response to this request is required to obtain a benefit.

**EFFECT OF NOT PROVIDING INFORMATION - If you do not provide all the information, the offer may be rejected. See regulations at 43 CFR Part 3130.**

**Alaska Industrial Development and Export Authority AIDEA %RTI 100**

| # | Serial Number | Tract | Umiat Meridian | Acreage |
|---|---------------|-------|----------------|---------|
| 1 | AA095899 | 2021-CP-016 | 5N, 24E | 57,507 |
| | | | 5N, 25E | |
| | | | 5N, 26 E | |
| 2 | AA095890 | 2021-CP-017 | 5N, 23E | 43,876 |
| | | | 6N, 23E | |
| | | | 7N, 23E | |
| | | | 5N, 24E | |
| 3 | AA095893 | 2021-CP-024 | 6N, 27E | 58,176 |
| | | | 6N, 28E | |
| | | | 7N, 28E | |
| | | | 8N, 28E | |
| 4 | AA095897 | 2021-CP-026 | 6N, 25E | 53,412 |
| | | | 7N, 25E | |
| | | | 6N, 26E | |
| | | | 7N, 26E | |
| 5 | AA095898 | 2021-CP-027 | 6N, 24E | 52,447 |
| | | | 7N, 24E | |
| | | | 8N, 24E | |
| 6 | AA095900 | 2021-CP-030 | 9N, 25E | 46,791 |
| | | | 7N, 26E | |
| | | | 8N, 26E | |
| | | | 9N, 26E | |
| 7 | AA095901 | 2021-CP-031 | 9N, 24E | 53,546 |
| | | | 7N, 25E | |
| | | | 8N, 25E | |
| | | | 9N, 25E | |

**Number of leases:  7**                              **Total Acreage: 365,755**

**Knik Arm Services LLC - %RTI 100**

| # | Serial Number | Tract | Umiat Meridian | Acreage |
|---|---|---|---|---|
| 1 | AA095895 | 2021-CP-025 | 6N, 27E | 48,603 |
| | | | 7N, 27E | |
| | | | 8N, 27E | |

Number of leases:                    1                    Total Acreage:  48,603

**Regenerate Alaska Inc  - %RTI 100**

| # | Serial Number | Tract | Umiat Meridian | Acreage |
|---|---|---|---|---|
| 1 | AA095899 | 2021-CP-029 | 6N, 23E | 23,446 |
| | | | 7N, 23E | |
| | | | 7N 24E | |
| | | | 8N, 24E | |
| | | | 9N, 24E | |
| | | | 10N, 24E | |
| | | | 8N, 25E | |
| | | | 9N, 25E | |

Number of leases:                    1                    Total Acreage:  23,446

# Summary

| Lessees | Leases | RTI | Acreage |
|---|---|---|---|
| AIDEA | 7 | 100 | 365,755 |
| Knik Arm Services LLC | 1 | 100 | 48,603 |
| Regenerate Alaska Inc | 1 | 100 | 23,446 |
| Total | 9 | N/A | 437,804 |



# Presidential Documents

Executive Order 13990 of January 20, 2021

## Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy*. Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment; and conserve our national treasures and monuments, places that secure our national memory. Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice. In carrying out this charge, the Federal Government must be guided by the best science and be protected by processes that ensure the integrity of Federal decision-making. It is, therefore, the policy of my Administration to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

To that end, this order directs all executive departments and agencies (agencies) to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with these important national objectives, and to immediately commence work to confront the climate crisis.

**Sec. 2**. *Immediate Review of Agency Actions Taken Between January 20, 2017, and January 20, 2021*. (a) The heads of all agencies shall immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (agency actions) promulgated, issued, or adopted between January 20, 2017, and January 20, 2021, that are or may be inconsistent with, or present obstacles to, the policy set forth in section 1 of this order. For any such actions identified by the agencies, the heads of agencies shall, as appropriate and consistent with applicable law, consider suspending, revising, or rescinding the agency actions. In addition, for the agency actions in the 4 categories set forth in subsections (i) through (iv) of this section, the head of the relevant agency, as appropriate and consistent with applicable law, shall consider publishing for notice and comment a proposed rule suspending, revising, or rescinding the agency action within the time frame specified.

(i) Reducing Methane Emissions in the Oil and Gas Sector: "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration," 85 FR 57398 (September 15, 2020), by September 2021.

(ii) Establishing Ambitious, Job-Creating Fuel Economy Standards: "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 FR 51310 (September 27, 2019), by April 2021; and "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks," 85 FR 24174 (April 30,

(d) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order and any actions taken pursuant to section 2(a) of this order to any court with jurisdiction over pending litigation related to those agency actions identified pursuant to section (2)(a) of this order, and may, in his discretion, request that the court stay or otherwise dispose of litigation, or seek other appropriate relief consistent with this order, until the completion of the processes described in this order.

(e) In carrying out the actions directed in this section, heads of agencies shall seek input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations.

**Sec. 3.** *Restoring National Monuments.* (a) The Secretary of the Interior, as appropriate and consistent with applicable law, including the Antiquities Act, 54 U.S.C. 320301 *et seq.,* shall, in consultation with the Attorney General, the Secretaries of Agriculture and Commerce, the Chair of the Council on Environmental Quality, and Tribal governments, conduct a review of the monument boundaries and conditions that were established by Proclamation 9681 of December 4, 2017 (Modifying the Bears Ears National Monument); Proclamation 9682 of December 4, 2017 (Modifying the Grand Staircase-Escalante National Monument); and Proclamation 10049 of June 5, 2020 (Modifying the Northeast Canyons and Seamounts Marine National Monument), to determine whether restoration of the monument boundaries and conditions that existed as of January 20, 2017, would be appropriate.

(b) Within 60 days of the date of this order, the Secretary of the Interior shall submit a report to the President summarizing the findings of the review conducted pursuant to subsection (a), which shall include recommendations for such Presidential actions or other actions consistent with law as the Secretary may consider appropriate to carry out the policy set forth in section 1 of this order.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Grand Staircase-Escalante, Bears Ears, and Northeast Canyons and Seamounts Marine National Monuments, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 4.** *Arctic Refuge.* (a) In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

(b) In Executive Order 13754 of December 9, 2016 (Northern Bering Sea Climate Resilience), and in the Presidential Memorandum of December 20, 2016 (Withdrawal of Certain Portions of the United States Arctic Outer Continental Shelf From Mineral Leasing), President Obama withdrew areas in Arctic waters and the Bering Sea from oil and gas drilling and established the Northern Bering Sea Climate Resilience Area. Subsequently, the order was revoked and the memorandum was amended in Executive Order 13795 of April 28, 2017 (Implementing an America-First Offshore Energy Strategy). Pursuant to section 12(a) of the Outer Continental Shelf Lands Act, 43 U.S.C. 1341(a), Executive Order 13754 and the Presidential Memorandum of December 20, 2016, are hereby reinstated in their original form, thereby restoring the original withdrawal of certain offshore areas in Arctic waters and the Bering Sea from oil and gas drilling.

(c) The Attorney General may, as appropriate and consistent with applicable law, provide notice of this order to any court with jurisdiction over pending litigation related to the Coastal Plain Oil and Gas Leasing Program in the Arctic National Wildlife Refuge and other related programs, and may, in his discretion, request that the court stay the litigation or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the actions described in subsection (a) of this section.

**Sec. 5.** *Accounting for the Benefits of Reducing Climate Pollution.* (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account. Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions.

(b) There is hereby established an Interagency Working Group on the Social Cost of Greenhouse Gases (the "Working Group"). The Chair of the Council of Economic Advisers, Director of OMB, and Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Working Group.

(i) Membership. The Working Group shall also include the following other officers, or their designees: the Secretary of the Treasury; the Secretary of the Interior; the Secretary of Agriculture; the Secretary of Commerce; the Secretary of Health and Human Services; the Secretary of Transportation; the Secretary of Energy; the Chair of the Council on Environmental Quality; the Administrator of the Environmental Protection Agency; the Assistant to the President and National Climate Advisor; and the Assistant to the President for Economic Policy and Director of the National Economic Council.

(ii) Mission and Work. The Working Group shall, as appropriate and consistent with applicable law:

(A) publish an interim SCC, SCN, and SCM within 30 days of the date of this order, which agencies shall use when monetizing the value of changes in greenhouse gas emissions resulting from regulations and other relevant agency actions until final values are published;

(B) publish a final SCC, SCN, and SCM by no later than January 2022;

(C) provide recommendations to the President, by no later than September 1, 2021, regarding areas of decision-making, budgeting, and procurement by the Federal Government where the SCC, SCN, and SCM should be applied;

(D) provide recommendations, by no later than June 1, 2022, regarding a process for reviewing, and, as appropriate, updating, the SCC, SCN, and SCM to ensure that these costs are based on the best available economics and science; and

(E) provide recommendations, to be published with the final SCC, SCN, and SCM under subparagraph (A) if feasible, and in any event by no later than June 1, 2022, to revise methodologies for calculating the SCC, SCN, and SCM, to the extent that current methodologies do not adequately take account of climate risk, environmental justice, and intergenerational equity.

ORDER NO. 3401

**Subject:** Comprehensive Analysis and Temporary Halt on all Activities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program

Sec. 1 **Purpose.** This Order is taken in furtherance of Section 4(a) of Executive Order (EO) 13990, entitled, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" (January 20, 2021).

Sec. 2 **Authorities.** This Order is issued under the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, and other applicable statutory authorities.

Sec. 3 **Background.** Section 4(a) of EO 13990, provides, in full:

> *In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.*

My review of the Coastal Plain Oil and Gas Leasing Program (Program) as directed by EO 13990 has identified multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and (2) failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act).

Sec. 4 **Directive.** Based on those identified deficiencies, the Department of the Interior (Department) will conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies. While that analysis is pending, I direct a temporary halt on all Department activities related to the Program in the Arctic Refuge.

Sec. 5 **Implementation**. Consistent with EO 13990 and governing laws and regulations, I direct the following actions:

a. Within 60 days of the issuance of this Order, the Assistant Secretary for Land and Minerals Management will, in coordination with the Assistant Secretary for Fish and Wildlife and Parks and the Solicitor's Office, publish a notice of intent in the Federal Register to initiate the process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies.

b. Until the analysis in Sec. 5(a) above is complete, the Directors of the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service shall not take any action to authorize any aspect of the Program, including, but not limited to, any leasing, exploration, development, production, or transportation, and shall not process any pending or future applications for such activities.

c. The Assistant Secretary for Land and Minerals Management and the Director of the BLM shall, as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein. To the extent not already redelegated, I hereby redelegate the authority to take such action or to exercise any authority granted to the Secretary of the Interior by Section 20001 of Pub. L. No. 115-97 (December 20, 2017) to the Assistant Secretary for Land and Minerals Management, the Principal Deputy Assistant Secretary for Land and Minerals Management, the Director of the BLM, and the Deputy Director for Policy and Programs for the BLM.

d. The Solicitor's Office will work with the Department of Justice to seek additional stays on litigation until the analysis in Sec. 5(a) is complete.

Sec. 6 **Effect of the Order**. This Order is intended to improve the internal management of the Department. This Order and any resulting report or recommendations are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officer or employees, or any other person. To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7 **Expiration Date**. This Order is effective immediately and will remain in effect until it is amended, superseded, or revoked, whichever occurs first.

Secretary of the Interior

Date: June 1, 2021



# United States Department of the Interior

## OFFICE OF THE SECRETARY
### Washington, DC 20240

**June 1, 2021**

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| Alaska Industrial Development | : | Oil and Gas Leases |
|---|---|---|
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska 99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

Suspension of Operations and Production

On January 20, 2021, Executive Order 13990 directed that the Secretary of the Interior "place a temporary moratorium on activities of the Federal Government relating to the Coastal Plain Oil and Gas Leasing Program" and "review the program and … conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program."

After conducting the required review of the program, the Department identified defects in the underlying record supporting the leases, including, but not limited to: insufficient analysis under the National Environmental Policy Act (NEPA), including failure to adequately analyze a reasonable range of alternatives in the environmental impact statement (EIS); and failure in the August 17, 2020, Record of Decision (ROD) to properly interpret Section 20001 of Public Law 115-97 (Tax Act). In addition to these specific defects, the Department has identified several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action. These include, but are not limited to, the EIS's treatment of foreign greenhouse gas (GHG) emissions and compliance with section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). Further, any new NEPA analysis involving an additional alternative may also involve connected reviews, such as under section 106 of the National Historic Preservation Act and consultation under section 7 of the Endangered Species Act.

Specifically, the Coastal Plain Leasing Program EIS failed to analyze a reasonable range of alternatives in that it did not analyze an alternative, besides the no action alternative, that involved fewer than 2,000 acres of surface development. The Tax Act provides for authorization of *up to* 2,000 acres to be covered by "production and support facilities."[1] However, inclusion of the phrase "up to" indicates that less than 2,000 acres may be authorized in appropriate circumstances, such as for alternatives that make large areas unavailable for leasing or surface development and thus may require fewer production and support facilities. The explanation in the ROD for not considering such an alternative – that the Tax Act provides a *mandate* to the BLM requiring it to approve production and support facilities up to that limit – is both implausible and contrary to Congressional intent, which is itself a legal error.

While not identified as a legal defect at this point, the Department recognizes that the recent Ninth Circuit opinion involving the Liberty Project in Alaska, *Center for Biological Diversity v. Bernhardt*, issued on December 7, 2020, has implications for the analysis of foreign greenhouse gas emissions in many of its programs and projects, including those already in litigation, like the Coastal Plain Oil and Gas Leasing Program. The Department is carefully evaluating its approach to this issue and may later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues.

Based on the identified defects noted above with the NEPA documents underlying the competitive lease sale that resulted in the issuance of the lease(s) referenced above, and in exercise of the Department's inherent authority to correct legal errors, the Department has concluded that it is necessary to suspend the above-referenced lease(s) and complete further environmental analysis under NEPA, consistent with the direction provided in Executive Order 13990 and Secretarial Order 3401. The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD. When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

This SOP is effective the first day of June 2021. While this SOP is in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended. If you have any questions, please contact Nada Wolff Culver at nculver@blm.gov.

Sincerely,

Laura Daniel-Davis
Digitally signed by Laura Daniel-Davis
Date: 2021.06.01 16:17:14 -04'00'

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management

---

[1] Section 20001(c)(3) of the Tax Act provides: "SURFACE DEVELOPMENT—In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section."



June 11, 2021

**VIA EMAIL**

Attn: Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management
United States Department of the Interior
Office of the Secretary
1849 C Street NW
Washington, DC 20240

**Re**: AIDEA's Response to June 1, 2021, Letter from the United States Department of the Interior

Dear Ms. Daniel-Davis:

The Alaska Industrial Development and Export Authority ("AIDEA") is in receipt via email on June 2nd of a letter dated June 1, 2021 ("Letter"), from the U.S. Department of the Interior ("Department"), Principal Deputy Assistant Secretary – Land and Minerals Management, which purports to suspend oil and gas leases AA095889, AA095890, AA095893, AA095897, AA095898, AA095900, and AA095901 ("subject leases").

Notably, the Letter identifies no statutory or regulatory authority on which the Department relies in suspending AIDEA's subject leases with the Department. AIDEA respectfully requests that the Department identify the statutory or regulatory basis underlying the suspension of operations and production ("SOP") described in its Letter.

AIDEA has substantial interests that are directly and significantly affected by the SOP. AIDEA acquired the subject leases to further its mission to increase job opportunities and otherwise promote and develop economic growth in Alaska, including rights of access and development of Alaska's abundant natural resources. Specifically, AIDEA's purpose in acquiring the subject leases was to undertake mineral resource exploration, development, and production in the Arctic Coastal Plain ("Section 1002 Area") consistent with the Congressional commitments memorialized in the Alaska Statehood Act and the Alaska National Interest Lands Conservation Act ("ANILCA").

Support for developing the Section 1002 Area comes from a wide cross-section of Alaskans, including the Voice of the Arctic Iñupiat, a non-profit coalition comprised of 24 entities including tribal councils, regional organizations, municipal governments, and Alaska Native Claims Settlement Act ("ANCSA") corporations located in and around the Section 1002 Area. Much of the economic and community development that has occurred in Alaska's communities on the North Slope has been a direct result of North Slope oil and gas development. This development provides job opportunities and substantial property taxes and other funding for community infrastructure development such as new schools, healthcare centers, roads, and drinking water, wastewater, and other utility systems. Responsible development of the oil and gas leases within

AR3366

*Investing in Alaskans*  **aidea.org**

813 West Northern Lights Boulevard  Anchorage, Alaska  99503  **T** 907.771.3000  **Toll Free** (Alaska Only) 888.300.8534  **F** 907.771.3044

the Section 1002 Area would provide additional economic and community development opportunities to local residents and Alaska Native communities within and near the Section 1002 Area.

The Department's suspension threatens the multiple public benefits AIDEA anticipated with its lease acquisitions, including direct employment for exploration and possible development of oil and gas resources, indirect employment related to exploration and development activities, and significant revenues from production of the subject leases' vast oil and gas resources paid to local and state governments and Alaska Native Corporations.

AIDEA holds seven valid and enforceable leases covering 365,775 acres within the Section 1002 Area. Our leases provide AIDEA with legal, exclusive rights of access to explore for reserves and develop the tracts. The Department's description of the additional reviews it intends to undertake during the SOP raises serious questions about the Department's compliance with ANILCA and other binding legal authority. We will continue to assert our legal rights as authorized for the responsible development of the subject leases.

Sincerely,

DocuSigned by:

*Alan Weitzner*

1AC500F7245F479...

Alan Weitzner
Executive Director
Alaska Industrial Development and Export Authority



*America* v. *State of Alaska,* Civil Action No. A91–081 CV.

The EVOS PAC meeting agenda will include the FY22 Work Plan. An opportunity for public comments will be provided. The final agenda and materials for the meeting will be posted on the EVOS Trustee Council website at *www.evostc.state.ak.us.* All EVOS PAC meetings are open to the public.

**Public Input**

Interested persons may choose to make oral comments at the meeting during the designated time. Depending on the number of people wishing to comment and the time available, the amount of time for oral comments may be limited. Interested parties should contact the Designated Federal Officer (see **FOR FURTHER INFORMATION CONTACT**) for advance placement on the public speaker list for this meeting.

*Submitting Written Information or Questions*

Interested members of the public may submit relevant information or questions for the Committee to consider during the public meeting. Written statements must be received by September 22, 2021, so that the information may be made available to the Committee for their consideration prior to this meeting. Written statements must be supplied to the Designated Federal Officer via email at *philip_johnson@ios.doi.gov.*

*Public Disclosure of Comments*

Before including your address, phone number, email address, or other personal identifying information in your comments, please be aware that your entire comment, including your personal identifying information, may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Authority:* 5 U.S.C. appendix 2.

**Philip Johnson,**

*Regional Environmental Officer, Office of Environmental Policy and Compliance.*

[FR Doc. 2021–16570 Filed 8–3–21; 8:45 am]

**BILLING CODE 4334–63–P**

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

**[21X.LLAK930100.L16100000.PN0000]**

**Notice of Intent To Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program, Alaska**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of intent.

**SUMMARY:** In accordance with Secretary's Order 3401, *Comprehensive Analysis and Temporary Halt on all Activities in the Arctic National Wildlife Refuge Relating to the Coastal Plain Oil and Gas Leasing Program,* the Bureau of Land Management (BLM) Alaska State Office, Anchorage, Alaska, intends to prepare a Supplemental Environmental Impact Statement (EIS) to the September 2019 Coastal Plain Oil and Gas Leasing Program EIS. The Supplemental EIS will provide a comprehensive analysis of the potential environmental impacts of the Program, including by addressing the deficiencies identified in Secretary's Order 3401.

**DATES:** This Notice initiates the public scoping process for the Supplemental EIS. Comments on issues, impacts, and potential new alternatives to be analyzed may be submitted in writing until October 4, 2021. The BLM will announce on its website any additional venues for commenting during scoping.

**ADDRESSES:** You may submit comments by any of the following methods:

• *Website: https://eplanning.blm.gov/ eplanning-ui/project/102555/510.*

• *Mail:* BLM, Alaska State Office, Attention—Coastal Plain Supplemental EIS, 222 West 7th Avenue, #13, Anchorage, AK 99513–7599.

**FOR FURTHER INFORMATION CONTACT:** Serena Sweet, Project Lead, via email at *blm_ak_coastalplain_supplementalEIS@ blm.gov,* or via telephone at 907–271–5960; or by mail at Bureau of Land Management, 222 West 7th Avenue, #13, Anchorage, Alaska 99513–7599. You may also request to be added to the mailing list for the Supplemental EIS. Additional background information and supporting documents may be found at the *https://eplanning.blm.gov/ eplanning-ui/project/102555/510.*

Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1–800–877–8339 to contact the above individual during normal business hours. FRS is available 24 hours a day, 7 days a week, to leave a message or question with the above

individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The area comprising the Coastal Plain includes approximately 1.6 million acres within the approximately 19.3 million-acre Arctic National Wildlife Refuge. In September 2019 and in connection with Public Law 115–97, Dec. 22, 2017, the BLM completed the Coastal Plain Oil and Gas Leasing Final EIS. The BLM then issued a Record of Decision (ROD) for the Coastal Plain Oil and Gas Leasing Program on August 8, 2020 (85 FR 51754). The ROD approved a program to implement Section 20001 of Public Law 115–97, which directed the BLM to manage the oil and gas leasing program on the Coastal Plain in a manner similar to lease sales under the Naval Petroleum Reserves Production Act of 1976 (including regulations).

On June 1, 2021, the Secretary of the Interior issued Secretary's Order 3401, Section 4 of which directed "a temporary halt on all Department activities related to the [Leasing] Program in the Arctic Refuge" pending "a new, comprehensive analysis of the potential environmental impacts of the Program" to "address . . . identified legal deficiencies."

The purpose of this public scoping process is to determine the scope of issues to be addressed and to identify the significant issues, including any legal deficiencies in the Final EIS, related to an oil and gas leasing program within the Coastal Plain. Information received during this process will influence the development of the Supplemental EIS and guide the scope of the environmental analysis. The BLM will work collaboratively with interested parties to identify the management decisions best suited to local, regional, and national needs and concerns.

The purpose and need of the Supplemental EIS is bound by statute and remains the same as for the September 2019 Final EIS, *i.e.,* to implement Section 20001 of Public Law 115–97. Potential new alternatives to be considered in the Supplemental EIS include, but are not limited to, those that would: Designate certain areas of the Coastal Plain as open or closed to leasing; permit less than 2,000 acres of surface development throughout the Coastal Plain; prohibit surface infrastructure in sensitive areas; and otherwise avoid or mitigate impacts from oil and gas activities.

The Supplemental EIS will evaluate impacts to various surface resources including, but not limited to, caribou, polar bears, birds, vegetation, and

surface waters including wetlands, as well as to other uses of the Coastal Plain, including subsistence uses. The Supplemental EIS will also consider impacts from greenhouse gas emissions from any Leasing Program.

After the scoping comment period is closed, the BLM will review and consider the scoping comments received and will develop a Draft Supplemental EIS, which BLM estimates will be completed approximately 6 to 8 months after the scoping comment ends. At that time the Draft Supplemental EIS will be made available for public comment for at least 45 days. After the close of the Draft Supplemental EIS comment period, BLM will develop a Final Supplemental EIS incorporating comments received on the Draft, which BLM estimates will be completed approximately 6 months after the Draft Supplemental EIS comment period ends. A record of decision selecting a program alternative from the Final Supplemental EIS would be issued no sooner than 30 days after notice of the availability of the Final Supplemental EIS is published in the **Federal Register**.

*Authority:* 40 CFR 1501.9(d), 40 CFR 1501.7 (2019).

**Laura Daniel-Davis,**
*Principal Deputy Assistant Secretary, Land and Minerals Management.*
[FR Doc. 2021–16572 Filed 8–3–21; 8:45 am]
**BILLING CODE 4310–JA–P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Reclamation**

**[RR85672000, 21XR0680A2, RX.31480001.0040000; OMB Control Number 1006–0003]**

**Agency Information Collection Activities; Bureau of Reclamation Use Authorization Application**

**AGENCY:** Bureau of Reclamation, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, we, the Bureau of Reclamation (Reclamation) are proposing to renew an information collection.

**DATES:** Interested persons are invited to submit comments on or before October 4, 2021.

**ADDRESSES:** Send your comments on this information collection request (ICR) by mail to Jason Kirby, Bureau of Reclamation, P.O. Box 25007, Denver, CO 80225–0007; or by email to *jkirby@usbr.gov.* Please reference Office of

Management and Budget (OMB) Control Number 1006–0003 in the subject line of your comments.

**FOR FURTHER INFORMATION CONTACT:** To request additional information about this ICR, contact Jason Kirby by email at *jkirby@usbr.gov,* or by telephone at (303) 445–2895. Individuals who are hearing or speech impaired may call the Federal Relay Service at (800) 877–8339 for TTY assistance.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act of 1995 (PRA, 44 U.S.C. 3501 *et seq.*) and 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid OMB control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of response.

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may

be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Reclamation is responsible for approximately 6.5 million acres of land which directly support Reclamation's Federal water projects in the 17 Western States. Under Title 43 CFR part 429, individuals or entities wanting to use Reclamation's lands, facilities, or waterbodies must apply Form 7–2540. Examples of such uses are:

—Agricultural uses such as grazing and farming;
—commercial or organized recreation and sporting activities;
—other commercial activities such as "guiding and outfitting" and "filming and photography;" and,
—resource exploration and extraction, including sand and gravel removal and timber harvesting.

We review applications to determine whether granting individual use authorizations are compatible with Reclamation's present or future uses of the lands, facilities, or waterbodies. When we find a proposed use compatible, we advise the applicant of the estimated administrative costs and estimated application processing time. In addition to the administrative costs, we require the applicant to pay a use fee based on a valuation or by competitive bidding. If the application is for construction of a bridge, building, or other significant construction project, Reclamation may require that all plans and specifications be signed and sealed by a licensed professional engineer.

*Title of Collection:* Bureau of Reclamation Use Authorization Application.

*OMB Control Number:* 1006–0003.
*Form Number:* Form 7–2540.
*Type of Review:* Extension of a currently approved collection.

*Respondents/Affected Public:* Individuals, corporations, companies, and State and local entities who want to use Reclamation lands, facilities, or waterbodies.

*Total Estimated Number of Annual Respondents:* 225.

*Total Estimated Number of Annual Responses:* 225.

*Estimated Completion Time per Response:* 2 hours.

*Total Estimated Number of Annual Burden Hours:* 450 hours.

*Respondent's Obligation:* Required to obtain or retain a benefit.

*Frequency of Collection:* Each time a use authorization is requested.

Form DI-1926 (Rev. 04/2018)
Department of the Interior

OMB Control No. 1024-0037
Expiration Date 04/30/2021



**APPLICATION FOR PERMIT FOR ARCHEOLOGICAL INVESTIGATIONS**

Under the Authority of
**The Archaeological Resources Protection Act of 1979**
(16 U.S.C. 470aa-mm; 43 CFR 7);

and/or **The Antiquities Act of 1906**
(P.L. 59-209; 34 Stat. 225; 54 U.S.C. 320301-320303; 43 CFR 3)

and/or the appropriate **Bureau-specific statute** Such as
The Reclamation Act; The National Park Service Organic Act;
The National Wildlife Refuge System Administration Act;
The Federal Land Policy and Management Act

| FOR OFFICIAL USE ONLY |
| --- |
| Date Received: _____ |
| Sent for Review: _____ |
| Control No. _____ |

**Instructions:** Complete and return two copies of this application form and required attachments to the appropriate State or Regional Office of the land managing bureau involved. All information requested must be completed before the application will be considered. Use separate pages if more space is needed to complete a section.

**1. Name of applicant** (institution, corporation, partnership, individual, or other entity)

Richard E. Reanier, Ph.D.; dba Reanier & Associates, Inc.

**2. Mailing address**

Reanier & Associates, Inc.; 1215 SW 170th Street; Seattle, WA 98166

**3. Telephone Number**  206-242-7817  ☐ Home ☒ Work ☐ Cell   |   **3A. Alternate Telephone Number**  206-724-5582  ☐ Home ☐ Work ☒ Cell

**4. Email address(es)**

reanier@att.net

**5. Nature of archeological work proposed**
☒ Survey and Recordation
☐ Limited Testing and/or Collection (project-specific)
☐ Excavation and/or Removal (project-specific)

**6. Location of proposed work** (attach additional sheets)

    **a.** Description of Federal lands involved. Indicate State, county, and Federal administrative unit. Specify the best available location data, e.g., GPS coordinates, UTM coordinates, township, range and section (cadastral) subdivisions, or metes and bounds. Include a readable copy of a map or plan at an appropriate scale showing specific areas for which permit is desired. Please see attached sheet

    **b.** Identification of archeological resource(s) or other cultural resource(s) involved (if applicable). To be determined

**7. Time of Proposed Work**

| Overall Duration of Project: | Estimated Duration of Fieldwork: |
| --- | --- |
| From 30 August 2021 To 31 December 2022 | From 30 August 2021 To 30 September 2021 |

**8. Principal Investigator**  Richard E. Reanier

Name of individual(s) responsible for planning and generally overseeing field projects, including overall supervision of staff and overall responsibility for the professional quality of resource evaluations and recommendations.

Telephone Number
206-242-7817  ☒ Work ☐ Cell

Email address(es)
reanier@att.net

**9. Field Director**  Richard E. Reanier

Name of individual(s) responsible for carrying out field projects, for technical quality of fieldwork through direct on-the-ground supervision of all aspects of fieldwork and data gathering, for proposing resource evaluations and recommendations for further treatment, and for preparing field records and descriptive reports.

Telephone Number
206-242-7817  ☒ Work ☐ Cell

Email address(es)
reanier@att.net

**10. Permit Administrator**  Richard E. Reanier

Name of individual responsible for fulfilling the terms and conditions of the permit

(must be legally empowered to obligate applicant organization).

Telephone Number
206-724-5582  ☐ Work ☒ Cell

Email address(es)
reanier@att.net

**From:** King, Robert (Bob) <r2king@blm.gov>
**Sent:** Thursday, August 19, 2021 11:17:34 AM
**To:** Richard Reanier <reanier@a  .net>
**Cc:** Keeney, Joseph W <jkeeney@blm.gov>; Jones, Nichelle (Shelly) <njones@blm.gov>; Pendergast, Kevin J <kpendergast@blm.gov>; Hayes, Miriam (Nicole) <mnhayes@blm.gov>
**Subject:** Re: [EXTERNAL] Archaeological permit for ANWR

Hi Rick,

Thank you for your 8/15/21 permit applica  on to conduct cultural resources work in the Coastal Plain of ANWR. This work would be located on the AIDEA lease tracts and would support seismic data acquisi  on.  Please note that the Secretary of the Interior issued Secretary's Order (SO) 3401 on June 1, 2021. Per SO 3401, we at the BLM are directed to temporarily place a "…halt on all Department ac  vi  es related to the Program in the Arc  c Refuge" pending comple  on of a new comprehensive environmental analysis of the Coastal Plain oil and gas leasing program.  This new analysis will take the form of a Supplemental EIS, which we recently ini  ated with a no  ce in the Federal Register on August 4.  Un  l that Supplemental EIS is complete, "…the Directors of the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service shall not take any ac  on to authorize any aspect of the Program, including, but not limited to, any leasing, explora  on, development, produc  on, or transporta  on, and shall not process any pending or future applica  ons for such ac  vi  es."

Based on the above, we will delay the processing of your applica  on un  l the Supplemental EIS process is complete, and the Department of the Interior issues a new decision on the Coastal Plain oil and gas leasing program.  We appreciate your pa  ence as we work through the new analysis.

Sincerely,

Robert King
BLM-AK State Archaeologist
222 W. 7th Ave., #13
Anchorage, AK 99513
(907) 271-5510

---

**From:** Richard Reanier <reanier@a  .net>
**Sent:** Sunday, August 15, 2021 9:40 PM
**To:** King, Robert (Bob) <r2king@blm.gov>
**Cc:** Keeney, Joseph W <jkeeney@blm.gov>; Jones, Nichelle (Shelly) <njones@blm.gov>
**Subject:** [EXTERNAL] Archaeological permit for ANWR

This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.

Hi Bob-

Attached is the permit application we discussed for cultural resources work in ANWR on the AIDEA lease tracts in support in support of seismic data acquisition.

I am leaving for other work on the North Slope tomorrow, but I will have internet and cell phone (206-724-5582) access so I will be able to answer any questions you might have.

Thanks very much,

-Rick

_____

Richard E. Reanier, Ph.D.
Reanier & Associates, Inc.
1215 SW 170th Street
Seattle, Washington 98166
Phone/FAX: (206) 242-7817
e-mail: reanier@att.net
_____

**From:** Rick Trupp <rtrupp@saexploration.com>
**Sent:** Monday, November 22, 2021 1:45 PM
**To:** Franks, Sierra E <sierra_franks@fws.gov>
**Cc:** Patterson, Heather M <heather_patterson@fws.gov>
**Subject:** [EXTERNAL] Pre application meeting request

<div style="border: 2px solid black; background-color: yellow; padding: 10px; text-align: center;">

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

</div>

Good afternoon Sierra,

SAExploration Inc., on behalf of our client AIDEA, would like to schedule a pre application meeting to discuss the impending submittal of an ITR petition for a seismic acquisition programs on AIDEA secured leases in ANWR 1002 area. Additionally, we'd like to discuss the submittal of an IHA application for the required field archaeology effort in advance of a seismic program for this summer 2022.

Our team is available next Thursday, Dec 2nd or Friday, Dec 3rd between the hours of 11-4 on either day to facilitate this discussion. Please advise as to your availability on those days to set the meeting.

Regards

Rick Trupp
General Manager
907-522-4499 office

**From:** Rick Trupp <rtrupp@saexploration.com>
**Sent:** Monday, November 22, 2021 1:45 PM
**To:** Jones, Nichelle (Shelly) <njones@blm.gov>
**Cc:** Wixon, Donna L <dwixon@blm.gov>
**Subject:** [EXTERNAL] Pre application meeting request

<div style="border:2px solid black; background-color:yellow; text-align:center; font-weight:bold">

This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.

</div>

Good afternoon Shelly,

SAExploration Inc., on behalf of our client AIDEA, would like to schedule a pre application meeting to discuss the impending submittal of a Land Use seismic acquisition permit and BLM archaeology permit on AIDEA secured leases in ANWR 1002 area.

Our team is available next Thursday, Dec 2nd or Friday, Dec 3rd between the hours of 11-4 on either day to facilitate this discussion. Please advise as to your availability on those days to set the meeting.

Regards

Rick Trupp
General Manager
907-522-4499 office

# Re: [EXTERNAL] Pre application meeting request

**Franks, Sierra E <sierra_franks@fws.gov>**

Fri 12/3/2021 1:52 PM

**To:** Rick Trupp <rtrupp@saexploration.com>
**Cc:** Lemons, Patrick R <Patrick_Lemons@fws.gov>; Routhier, Michael P <michael.routhier@sol.doi.gov>
**Bcc:** Deam, Seth R <seth.deam@sol.doi.gov>; Crane, Drew <drew_crane@fws.gov>; Fasbender, Peter <peter_fasbender@fws.gov>; Berendzen, Steve <steve_berendzen@fws.gov>

Hello Rick,

The Service has reviewed your request to schedule a pre-application meeting to discuss your expected ITR petition and IHA application in advance of a seismic program on AIDEA lease tracts in the Arctic Refuge.

As you may be aware, on June 1, 2021, the Principal Deputy Assistant Secretary for Land and Minerals Management issued to AIDEA a "Suspension of Operations and Production," suspending AIDEA's leases issued on the Coastal Plain pending completion of further NEPA analysis. While this suspension is in place, "no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended." That includes the exploration activities that are the basis of your expected petition and application. Even if the suspension were not in place, it would be implausible in the available timeframe to sufficiently evaluate and process the expected petition and application in a manner that would allow activity to proceed in the 2021-2022 winter season. The Coastal Plain Oil and Gas Leasing Program decision documents contemplate exploration for years and production over a decades-long timeframe.

In light of the foregoing, we will delay conducting any pre-application meetings associated with lease operations as the risk of FWS providing incomplete guidance while this further NEPA analysis is ongoing outweighs any potential benefit in conducting such a meeting at this time. We will delay processing any petition or application associated with lease operations until the NEPA analysis is complete and the Department of the Interior issues a new decision concerning the Suspension of Operations and Production.

Sierra E. Franks (*she/her*)
Regulatory Program Branch Manager
DOI Diversity Change Agent
U.S. Fish and Wildlife Service
Marine Mammals Management
Alaska Regional Office
1011 East Tudor Road, MS-341
Anchorage, Alaska 99503
Work Cell #: 907-268-0577
sierra_franks@fws.gov

https://www.fws.gov/alaska/pages/MMM-regulatory-program
doi.gov/pmb/eeo/diversity-change-agents

"You don't have to be one of, to stand with"



# United States Department of the Interior

### OFFICE OF THE SECRETARY
### Washington, DC 20240

**August 19, 2022**

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| | | |
|---|---|---|
| Alaska Industrial Development | : | Oil and Gas Leases |
| and Export Authority | : | AA095889 |
| 813 West Northern Lights Blvd. | : | AA095890 |
| Anchorage, Alaska 99503 | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

Addendum to Suspension of Operations and Production

In the Suspension of Operations and Production, dated June 1, 2021, the Department identified two legal defects and also several areas involving a potential legal defect, specifically including the treatment of foreign greenhouse gas (GHG) emissions in the Environmental Impact Statement (EIS). The Department recognized that the recent Ninth Circuit opinion involving the Liberty Project in Alaska, *Center for Biological Diversity v. Bernhardt*, issued on December 7, 2020, had implications for the analysis of foreign GHG emissions in the Coastal Plain Oil and Gas Leasing Program. The Department noted it was carefully evaluating its approach to this issue and that it might later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues.

Two of those pending court cases involving similar issues are the cases challenging the Willow Project in the National Petroleum Reserve in Alaska. On August 18, 2021, the U.S. District Court for the District of Alaska, Judge Sharon Gleason presiding, concluded that BLM's exclusion of foreign GHG emissions in its alternatives analysis in the Willow Project EIS was arbitrary and capricious. Recognizing that the BLM also excluded foreign GHG emissions from its analysis of alternatives in the Coastal Plain EIS for the same basic reasons cited in the Willow Project EIS, the Department, in consultation with the Solicitor's Office, has now identified this exclusion as an additional specific legal defect. The Coastal Plain EIS did not give a quantitative estimate of the downstream GHG emissions that would result from changes in consumption of oil abroad due to the foreseeable production of Coastal Plain oil nor did it sufficiently explain why it could not do so and provide a more thorough discussion of how changes in foreign oil consumption might

change the GHG emissions analysis.

The Department has concluded that this legal defect provides an additional basis to continue to suspend the above-referenced leases and complete further environmental analysis under NEPA. On August 4, 2021, the BLM issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, 86 Fed. Reg. 41989, which contains a schedule for completion of a Supplemental EIS and issuance of a new decision. The BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided or subject to additional mitigation measures. Once sufficient information is developed, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

This SOP remains effective from the first day of June 2021. While this SOP remains in place, no lease operations may transpire on the leases, the terms of the leases are tolled, and lease rentals are suspended. If you have any questions, please contact Nada Wolff Culver at nculver@blm.gov.

Sincerely,

Laura
Daniel-Davis

Digitally signed by Laura
Daniel-Davis
Date: 2022.08.19
08:50:51 -04'00'

Laura Daniel-Davis
Principal Deputy Assistant Secretary
Land and Minerals Management

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

In Reply Refer To:
3132 (932)
AA095895

JAN 15 2021

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

## NOTICE OF DECISION

Knik Arm Services LLC  :
56 Oakwell Farms Parkway  :
San Antonio, Texas 78218  :
  :

### Coastal Plain Oil and Gas Leases Issued

On January 15, 2021, the Bureau of Land Management received your signed lease documents, bond information and the remainder of the money due for 1 tract for which Knik Arm Services LLC was the high bidder at the January 6, 2021 Coastal Plain lease sale. Enclosed is the Departmental Approval and the following issued lease: AA095895 which is effective February 1, 2021.

If you have any questions, you may contact Wayne Svejnoha at 907-271-4407, or at the address on the letterhead.

Chad Padgett
State Director

Enclosures:  "Department Approval"; "Executed Leases"

INTERIOR REGION 11 • ALASKA

# Decision to Issue Coastal Plain Leases

Under the authority of Section 20001 of the Tax Cuts and Jobs Act, Public Law 115-97 (Dec. 22, 2017); 131 Stat. 2235, I hereby approve issuance of the following lease located in the Coastal Plain of the Arctic National Wildlife Refuge to the Knik Arm Services LLC. The lease is to be executed by the BLM Alaska State Director.

AA095895 (Tract 025)

My approval constitutes the final decision of the Department of the Interior and, in accordance with the regulations at 43 CFR § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4.

Departmental Approval:

_David L. Bernhardt_                                    DATE: 1/15/21

David L. Bernhardt
Secretary of the Interior

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
### ALASKA STATE OFFICE
## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned (page two) offers to lease all or any of the lands in Item 2 that are available for lease pursuant to Section 20001 of Public Law 115-97 (Dec. 22, 2017, 131 Stat. 2235, 16 U.S.C. 3143 Note).

**READ INSTRUCTIONS BEFORE COMPLETING**

1. Name  **Knik Arm Services, LLC**

   Street  **56 Oakwell Farms Pkwy**

   City, State, Zip Code  **San Antonio, Texas 78218**

2. This application/offer/lease is for Federal Lands in the Coastal Plain of the Arctic National Wildlife Refuge (ANWR).

Legal description of land requested:  *Tract No.: 2021-CP-025  *Sale Date (m/d/y): Jan / 06 / 2021

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 1-18
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 7 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 8 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 5-9, 15-36
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Amount remitted: Filing fee $ 170.00       Rental fee $ 486,030

Total acres applied for  48,603
Total $ 486,200

**DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 6 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 1-18
Stipulations: 1(fiv), 2, 3, 5, 6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 7 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 1-36
Stipulations: 2-6, 8, 9, 11
Required Operating Procedures

| T. | R. | Meridian | State | County |
|---|---|---|---|---|
| T. 8 N. | R. 27 E. | Umiat Meridian | Alaska | |

Sections 5-9, 15-36
Stipulations: 1(a), 2-6, 8, 9, 11
Required Operating Procedures

Total acres in lease  48,603
Rental retained $  486,030



**United States Department of the Interior**

OFFICE OF THE SECRETARY
Washington, DC 20240

Mr. Mathew Rexford
President
Kaktovik Iñupiat Corporation
P.O. Box 73
Kaktovik, Alaska 99747

Dear Mr. Rexford:

We write further to our previous letter and conversations regarding consideration of Kaktovik Iñupiat Corporation's (KIC's) applications and Plan of Operations for a seismic permit and associated incidental harassment authorization (IHA) for 2022 instead of 2021.

As you are aware, the Secretary of the Interior issued Secretary's Order (SO) number 3401 on June 1, 2021. The Order identifies legal deficiencies in the analysis for the Coastal Plain Oil and Gas Leasing Program (Program), including, but not limited to, compliance with the National Environmental Policy Act (NEPA), and, consistent with applicable law, suspends all activities related to implementing the Program in the Arctic National Wildlife Refuge (Arctic Refuge) and specifically prohibits BLM and FWS from processing any pending or future applications for (among other things) exploration activities under the Program until a comprehensive environmental analysis is complete. In order to ensure compliance with NEPA and other statutory requirements and any additional mitigation measures that may be integrated into the Program, the BLM and FWS will delay processing your applications pending completion of that analysis and the Department's issuance of a new Program decision.

We appreciate your patience as we work through further analysis, and would like to further discuss to answer any questions you may have. Please be in touch with Nada Culver at your convenience and we will prioritize this conversation on our schedules.

Sincerely,

Martha Williams
Principal Deputy Director, Exercising
the delegated Authority of the Director,
U.S. Fish and Wildlife Service

Nada Wolff Culver
Deputy Director, Policy and Programs
Bureau of Land Management

**From:** Wixon, Donna L [mailto:dwixon@blm.gov]
**Sent:** Wednesday, August 25, 2021 3:05 PM
**To:** Rick Trupp <rtrupp@saexploration.com>
**Cc:** Jones, Nichelle (Shelly) <njones@blm.gov>; LaMarr, Sarah L <slamarr@blm.gov>; Suzan Simonds
<ssimonds@contractor.saexploration.com>; David H. Heimke <DHeimke@aidea.org>
**Subject:** Re: [EXTERNAL] RE: BLM Information Needed for ANWR Land Use Authorization

CAUTION EXTERNAL EMAIL: Do not open unexpected attachments or links.
Hi Rick,

Regarding the Right of Way application that SAExploration filed with the Arctic District office
to conduct land use activities in ANWR, please note the Secretary of the Interior Secretary
Order(SO) 3401 issued on June 1, 2021. Per SO 3401, we at the BLM are directed to temporarily
place a"...halt on all Department activities related to the Program in the Arctic Refuge" pending
completion of a new comprehensive environmental analysis of the Coastal Plain oil and gas
leasing program. This new analysis will take the form of a Supplemental EIS, which we recently
initiated with a notice in the Federal Register on August 4. Until that Supplemental EIS is
complete, "..the Directors of the Bureau of Land Management (BLM) and the US Fish and
Wildlife Service shall not take any action to authorize any aspect of the Program, including, but
not limited to, any leasing, exploration, development, production, or transportation, and shall not
process any pending or future applications for such activities."

Based on the above, we will delay the processing of your application until the Supplemental EIS
process is complete, and the Department of the Interior issues a new decision on the Coastal
Plain oil and gas leasing program. We appreciate your patience as we work through the new
analysis.

Please let us know if you have any questions.
Thank-you,
Donna

Donna L Wixon

Natural Resource Specialist, Supervisor

BLM Arctic District Office

222 University Ave

Fairbanks, Alaska 99709

907-474-2301 Office

907-474-2386 Fax

dwixon@blm.gov

**From:** Rick Trupp <rtrupp@saexploration.com>
**Sent:** Tuesday, August 24, 2021 2:15 PM
**To:** Wixon, Donna L <dwixon@blm.gov>
**Cc:** Jones, Nichelle (Shelly) <njones@blm.gov>; LaMarr, Sarah L <slamarr@blm.gov>; Suzan Simonds <ssimonds@contractor.saexploration.com>; David H. Heimke <DHeimke@aidea.org>
**Subject:** [EXTERNAL] RE: BLM Information Needed for ANWR Land Use Authorization

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Donna/Shelly,
Thanks Donna for the timely information.
Please see attached standard form 299 'right of way application for transportation on federal lands and property' which supports AIDEA's request to conduct Archaeological investigations to support future seismic acquisition on leased lands in the 1002 area.
If you have any questions, please call at your convenience.
Regards
Rick Trupp
907-522=4499
907-280-9442 cell

**From:** Wixon, Donna L <dwixon@blm.gov>
**Sent:** Friday, August 6, 2021 12:07 PM
**To:** Rick Trupp <rtrupp@saexploration.com>
**Cc:** Jones, Nichelle (Shelly) <njones@blm.gov>; LaMarr, Sarah L <slamarr@blm.gov>; Inman, Theodore (Ted) <tinman@blm.gov>; King, Robert (Bob) <r2king@blm.gov>
**Subject:** BLM Information Needed for ANWR Land Use Authorization

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Rick,

Sorry for the miscommunication and not responding earlier. For activity in ANWR our permitting authority allows us to grant Right-of-Way authorizations. I am attaching the Right-of-Way application. Along with the application please submit a plan of operations that includes at a minimum the following:

- o Description of general area you want use for your proposed activity
- o Time period of use
- o Number of people participating
- o How you are accessing the area and your transportation methods throughout the activity (i.e., aircraft, helicopter, boat, raft, etc.)
- o An estimate of the total number of helicopter and/or fixed-wing landings that are needed to conduct the project
- o Field camp location(s)
- o Proposed fuel use amount and requested storage location
- o Human waste disposal plan
- o Emergency Plan
- o Any consultation you have had with local communities, residents or entities regarding the proposed activity
- o If there is any ground disturbance (anything going into or being taken out of the ground) please provide specific locations of where it will happen and the size dimensions (e.g. a hole 6 inches-wide and 1 foot-deep)
- Topographic map (township and range) marked with pertinent information (general area and specific locations)

For the ARPA Permit please contact Bob King (cc'd on this email).

Thank-you and let me know if there is anything else you need at this time. Of course, the sooner you can get us the information the better, and there is no guarantee we can complete the process before the snow flies.

Donna

Donna L Wixon

Natural Resource Specialist, Supervisor

BLM Arctic District Office

222 University Ave

Fairbanks, Alaska 99709

907-474-2301 Office

907-474-2386 Fax

dwixon@blm.gov

3

**APPLICATION FOR TRANSPORTATION, UTILITY SYSTEMS, TELECOMMUNICATIONS AND FACILITIES ON FEDERAL LANDS AND PROPERTY**

FORM APPROVED
**OMB Control Number: 0596-0249**
**Expiration Date: 2/28/2023**

FOR AGENCY USE ONLY

Application Number

Date Filed

NOTE: Before completing and filing the application for an authorization (easement, right-of-way, lease, license or permit), the applicant should completely review this package, including instructions, and schedule a pre-application meeting with representatives of the agency responsible for processing the application. Each agency may have specific and unique requirements to be met in preparing and processing the application. Many times, with the help of the agency representative, the application can be completed at the pre-application meeting.

| 1. Name and address of applicant | 2. Name and address of authorized agent if different from item 1 | 3. Applicant telephone number and email: |
|---|---|---|
| Alaska Industrial Development and Export Authority<br>813 West Northern Lights Blvd.<br>Anchorage, AK 99503 | SAExploration, Inc.<br>RIck Trupp<br>8240 Sandlewood Pl, Suite 202<br>Anchorage, AK 99507 | 907-771-3040<br>dheimke@aidea.org<br><br>Authorized agent telephone number and email: |

**4. As applicant are you?** *(check one)*

a. ☐ Individual
b. ☑ Corporation*
c. ☐ Partnership/Association*
d. ☐ State Government/State Agency
e. ☐ Local Government
f. ☐ Federal Agency

\* If checked, complete supplemental page

**5. Specify what application is for:** *(check one)*

a. ☑ New authorization
b. ☐ Renewing existing authorization number
c. ☐ Amend existing authorization number
d. ☐ Assign existing authorization number
e. ☐ Existing use for which no authorization has been received *
f. ☐ Other*

\* If checked, provide details under item 7

6. If an individual, or partnership, are you a citizen(s) of the United States? ☑ Yes ☐ No

7. Project description *(describe in detail)*: (a) Type of use or occupancy, *(e.g., canal, pipeline, road, telecommunications)*; (b) related structures and facilities; (c) physical specifications *(Length, width, grading, etc.)*; (d) term of days/years needed; (e) time of year of use or operation; (f) Volume or amount of product to be transported; (g) duration and timing of construction; and (h) temporary work areas needed for activity/construction *(Attach additional sheets, if additional space is needed.)*

The project area and map has been included in this application via attached map. Please see attached project description on additional sheet.

8. Attach a map covering area and show location of project proposal.

9. State or Local government approval: ☐ Attached ☑ Applied for ☐ Not Required

10. Nonrefundable application fee: ☐ Attached ☐ Not required ☑ To be determined by agency

11. Does project cross international boundary or affect international waterways? ☐ Yes ☑ No *(if "yes," indicate on map)*

12. Give statement of your technical and financial capability to construct, operate, maintain, and terminate system for which authorization is being requested.

The project has contracted a state licensed archaeologist (Dr. Rick Reanier), Dr. Reanier has over 30 years experience on the North Slope of Alaska performing surveys on behalf of seismic exploration. All finances have been secured to support the project to conclusion.

13a. Describe other alternative locations considered.

Project is archaeological fieldwork, there are no alternative locations.

b. Why were these alternatives not selected?

ork needs to be done in the field for ground truthing.

c. Give explanation as to why it is necessary to use or occupy Federal assets (lands or buildings).

For visual verification, to locate known and unknown protection of cultural resources.

14. List authorizations and pending applications filed for similar projects which may provide information to the authorizing agency. *(Specify number, date, code, or name)*

Cultural Resource permit from the BLM, which has been submitted by the qualified archaeologist.

15. Provide statement of need for project, including the economic feasibility and items such as: (a) cost of proposal (construction, operation, and maintenance); (b) estimated cost of next best alternative; and (c) expected public benefits.

Archaeological surveys aer important to protect cultural resources during the course of seismic acquisition through buffers and avoidance practices.

16. Describe probable effects on the population in the area, including the social and economic aspects, and the rural lifestyles.

The study will be of great benefit to protect the heritage of surrounding community.

17. Describe likely environmental effects that the proposed project will have on: (a) air quality; (b) visual impact; (c) surface and ground water quality and quantity; (d) the control or structural change on any stream or other body of water; (e) existing noise levels; and (f) the surface of the land, including vegetation, permafrost, soil, and soil stability; and, (g) historic or archaeological resources or properties.

There will be no environmental effects to surface or ground water. Thr project will include walking with no ground vehicles. The only potential impact might be an archaeological test pit that may be needed to confirm or verify a site for discovery.

18. Describe the probable effects that the proposed project will have on (a) populations of fish, plant life, wildlife, and marine life, including threatened and endangered species; and (b) marine mammals, including hunting, capturing, collecting, or killing these animals.

There will be no impact on wildlife populations, including marine life or endangered species. There will be no hunting or collection of any animals.

19. State whether any hazardous material, as defined in this paragraph, would be used, produced, transported or stored on or in a federal building or federal lands or would be used in connection with the proposed use or occupancy. "Hazardous material" shall mean (a) any hazardous substance under section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601(14); (b) any pollutant or contaminant under section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any petroleum product or its derivative, including fuel oil, and waste oils; and (d) any hazardous substance, extremely hazardous substance, toxic substance, hazardous waste, ignitable, reactive or corrosive materials, pollutant, contaminant, element, compound, mixture, solution or substance that may pose a present or potential hazard to human health or the environment under any applicable environmental laws. The holder shall not store any hazardous materials at the site without prior written approval from the authorized officer. This approval shall not be unreasonably withheld. If the authorized officer provides approval, this permit shall include (or in the case of approval provided after this permit is issued, shall be amended to include) specific terms addressing the storage of hazardous materials, including the specific type of materials to be stored, the volume, the type of storage, and a spill plan. Such terms shall be proposed by the holder and are subject to approval by the authorized officer.

There will be no storage of hazardous materials witin this project area. The helicopter will only be in location during daylight hours and will return to base camp each day.

20. Name all the Federal Department(s)/Agency(ies) where this application is being filed.

BLM Arctic District Office, 222 University Ave, Fairbanks, AK

I HEREBY CERTIFY, That I am of legal age and authorized to do business in the State and that I have personally examined the information contained in the application and believe that the information submitted is correct to the best of my knowledge.

Signature of Applicant | Date

*David Heink* | 8-23-21

Title 18, U.S.C. Section 1001, makes it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

## SUPPLEMENTAL

| | CHECK APPROPRIATE BLOCK | |
|---|---|---|
| NOTE: The responsible agency(ies) will provide instructions | ATTACHED | FILED * |
| **I - PRIVATE CORPORATIONS** | | |
| a. Articles of Incorporation | ☐ | ☐ |
| b. Corporation Bylaws | ☐ | ☐ |
| c. A certification from the State showing the corporation is in good standing and is entitled to operate within the State | ☐ | ☐ |
| d. Copy of resolution authorizing filing | ☐ | ☐ |
| e. The name and address of each shareholder owning 3 percent or more of the shares, together with the number and percentage of any class of voting shares of the entity which such shareholder is authorized to vote and the name and address of each affiliate of the entity together with, in the case of an affiliate controlled by the entity, the number of shares and the percentage of any class of voting stock of that affiliate owned, directly or indirectly, by that entity, and in the case of an affiliate which controls that entity, the number of shares and the percentage of any class of voting stock of that entity owned, directly or indirectly, by the affiliate. | ☐ | ☐ |
| f. If application is for an oil or gas pipeline, describe any related right-of-way or temporary use permit applications, and identify previous applications. | ☐ | ☐ |
| g. If application is for an oil and gas pipeline, identify all Federal lands by agency impacted by proposal. | ☐ | ☐ |
| **II - PUBLIC CORPORATIONS** | | |
| a. Copy of law forming corporation | ☑ | ☐ |
| b. Proof of organization | ☑ | ☐ |
| c. Copy of Bylaws | ☑ | ☐ |
| d. Copy of resolution authorizing filing | ☑ | ☐ |
| e. If application is for an oil or gas pipeline, provide information required by item "I - f" and "I - g" above. | ☐ | ☐ |
| **III - PARTNERSHIP OR OTHER UNINCORPORATED ENTITY** | | |
| a. Articles of association, if any | ☐ | ☐ |
| b. If one partner is authorized to sign, resolution authorizing action is | ☐ | ☐ |
| c. Name and address of each participant, partner, association, or other | ☐ | ☐ |
| d. If application is for an oil or gas pipeline, provide information required by item "I - f" and "I – g" above. | ☐ | ☐ |

* If the required information is already filed with the agency processing this application and is current, check block entitled "Filed." Provide the file identification information *(e.g., number, date, code, name)*. If not on file or current, attach the requested information.

# Standard Form 299
# Additional sheet section 7

### Cultural Resources Field Survey Proposal and Task Descriptions

### AIDEA 2021, Archaeological Survey

**Scope of Work**

The scope of the proposed cultural resources field survey is to identify and acquire precise spatial data on unknown and previously documented archaeological and historical sites that have the potential to be impacted by Alaska Industrial Development Export Authority (AIDEA's) proposed seismic project. The survey is situated on federal lands within the North Slope Borough (NSB). The results of this field survey will be used to support AIDEA's avoidance policy to minimize the potential for impacts to cultural resources during the project. This study will be conducted by Dr Rick Reanier. Fieldwork for the project is anticipated to take approximately 3-4 weeks to complete (weather permitting) and will commence on/around September 1, 2021 with a completion date by September 30th, 2021. The Project covers approximately 718 square miles that includes the following townships, sections and ranges in the Umiat Meridian:

| Township Section and Range | | | |
|---|---|---|---|
| U009N024E | 1,2,10-16,21-29,32-36 | U006N024E | All |
| U009N025E | 5-10,14-36 | U006N025E | All |
| U009N026E | 29-34 | U006N026E | All |
| U008N024E | 1-3,9-17,20-36 | U006N027E | All |
| U008N025E | All | U006N028E | All |
| U008N026E | All | U006N029E | 5-8,17-20,29-32 |
| U008N027E | 5-9,15-36 | U005N023E | 1-5,8-17,21-28,35-36 |
| U008N028E | 17-20,28-36 | U005N024E | All |
| U007N023E | 1,11-14,22-27,33-36 | U005N025E | All |
| U007N024E | All | U005N026E | All |
| U007N025E | All | U005N027E | 1-12,17-20,28-32 |
| U007N026E | All | U005N028E | 1-12 |
| U007N027E | All | U005N029E | 5-8 |
| U007N028E | All | | |
| U007N029E | 7,8,17-20,29-32 | | |
| U006N023E | 1-4,9-17,20-29,32-36 | | |

identified cultural resource sites, a narrative describing the interpretation of the recovered data, and a catalog of the number and kinds of artifacts recovered (if necessary).

**Aircraft Information**

The project will be supported with an A-star or B-2 helicopter provided by Soloy Helicopters. Tail number at the moment for this aircraft is N350SH. See picture below.



There will be no fueling in the field; all fueling will be completed in Deadhorse. The helicopter will be inspected daily for defects and hose connections. The helicopter will carry spill prevention and clean up absorbent pads to handle unforeseen drips and drops in the field. Any used absorbent pads will be backhauled out of the field to Deadhorse facilities. The helicopter will stay with the Archaeologist while in field and SAE will notify the City of Katkovik of the project. An emergency plan will be in place in the event of a need for evacuation. We estimate that there will be 250 landings and take offs. This is due to the amount of previous work in area. If any human waste occurs it will be hauled back to Deadhorse.

Map of Project Area





# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

In Reply Refer To:
AA095899

April 28, 2022

**CERTIFIED-RETURN RECEIPT REQUESTED**

**DECISION**

Regenerate Alaska, Inc.             :        Oil and Gas Lease
1300 Post Oak Blvd.                  :        AA095899
Suite 2400                           :
Houston, Texas 77056                 :
                                     :
                                     :

**OIL AND GAS LEASE**
**CANCELLED**

We issued Federal oil and gas Lease No. AA095899 effective January 1, 2021, for 23,446 acres in the Coastal Plain of the Arctic National Wildlife Refuge.

Pursuant to an agreement, dated April 28, 2022, between Regenerate Alaska, Inc., and the Bureau of Land Management, we are rescinding and cancelling the lease in its entirety effective as of January 1, 2021.

If you have questions, please contact Bud C. Cribley, Senior Advisor for Alaska Affairs with the Bureau of Land Management, at 202-208-4331 or bud_cribley@fws.gov.

THOMAS HEINLEIN   Digitally signed by THOMAS HEINLEIN
Date: 2022.04.28 08:29:54 -08'00'

Thomas Heinlein
Acting Alaska State Director
Bureau of Land Management

**INTERIOR REGION 11 • ALASKA**

## LEASE RESCISSION AND REFUND AGREEMENT

For the purpose of rescinding and cancelling Federal oil and gas Lease No. AA095899 (the "Subject Lease"), held by Regenerate Alaska, Inc. (RAI), and refunding to RAI bonus bid and rental payments RAI paid to the Bureau of Land Management (BLM) to acquire the Subject Lease, RAI and BLM (hereafter "the Parties") stipulate and agree as follows:

1.	RAI is a business corporation incorporated in the State of Alaska for the purpose of conducting oil and gas exploration.

2.	BLM is a bureau within the United States Department of the Interior charged with responsibility for managing certain federal public lands and mineral resources.

3.	Pursuant to Section 20001 of Public Law 115-97 (131 Stat. 2054; Dec. 22, 2017), 16 U.S.C. § 3143 note, BLM is responsible for administering a competitive oil and gas leasing program in the Coastal Plain of the Arctic National Wildlife Refuge (hereafter "Coastal Plain") on behalf of the Secretary of the Interior.

4.	On January 6, 2021, BLM held a Coastal Plain oil and gas lease sale, for which RAI submitted the high bid for Tract No. 2021-CP-029, consisting of 23,446 acres.

5.	After receiving the balance of payments from RAI for the full bonus bid ($771,373) and first year's rental ($234,460), on January 15, 2021, BLM issued the Subject Lease to RAI, with an effective date of January 1, 2021.

6.	The Subject Lease was one of nine oil and gas leases issued by BLM as a result of the January 6, 2021, Coastal Plain lease sale. The Subject Lease is the only lease acquired by RAI in connection with the January 6, 2021 Coastal Plain lease sale.

7.	 On January 20, 2021, President Biden took office and issued Executive Order 13990, Section 4(a) of which states, in full:

In light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act, the Secretary of the Interior shall, as appropriate and consistent with applicable law, place a temporary moratorium on all activities of the Federal Government relating to the implementation of the Coastal Plain Oil and Gas Leasing Program, as established by the Record of Decision signed August 17, 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program.

8.    On June 1, 2021, in furtherance of Executive Order 13990, the Secretary of the Interior issued Secretary's Order 3401, which, in relevant part: identified multiple legal deficiencies in the underlying record supporting issuance of the nine Coastal Plain oil and gas leases; ordered the Department of the Interior to conduct a new, comprehensive analysis of the potential environmental impacts of the Program to address the identified legal deficiencies; and directed a temporary halt on all Department of the Interior activities related to the Program until that analysis is complete.

9.    Also on June 1, 2021, the Principal Deputy Assistant Secretary for Land and Minerals Management issued a Suspension of Operations and Production (SOP) to RAI for the Subject Lease, which took effect immediately.  The SOP states that while it is in place no lease operations may transpire on the lease, the term of the lease is tolled, and lease rentals are suspended.

10.    Neither RAI, nor any other record title owner, has conducted oil and gas operations on the Subject Lease. Since acquiring the Subject Lease in January of 2021, RAI has not filed for any application for permit to drill ("APD") or conducted any geophysical or seismic operations on the Subject Lease. Because there has been no development or surface disturbance on the Subject Lease, RAI has no outstanding reclamation obligations to BLM related to the Subject Lease. Further, RAI owes BLM no outstanding rentals, royalties, compensatory royalties, or payments of any kind for the Subject Lease.

2

11.     On August 4, 2021, BLM published in the Federal Register a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, initiating the new environmental review process directed by Secretary's Order 3401.

12.     Subsequently, RAI requested to have the lease rescinded and its bonus bid and lease rental payments refunded. After coordination with the Office of Natural Resources Revenue ("ONRR"), BLM has identified the process set forth in paragraph 13 below as an efficient means to fully refund RAI's payments for the Subject Lease.

13.     Based on RAI's request, and in light of the BLM's identified legal deficiencies in the underlying record supporting issuance of the Subject Lease, and subject to the provisions of this Agreement, BLM hereby agrees to, within 20 days from the effective date of this Agreement: (a) rescind and cancel the Subject Lease, effective January 1, 2021; and (b) direct the ONRR to refund RAI's full bonus bid ($771,373) and first year's rental ($234,460) within 30 days.

14.     Upon satisfaction of the terms set forth in Paragraph 13, including RAI's receipt of the refund described, RAI releases, waives, and abandons all claims against the United States, its political subdivisions (including the Department of the Interior and its bureaus), its officers, agents, and employees, known or unknown, arising out of or related to the Subject Lease, the SOP, Secretary's Order 3401, and/or Executive Order 13990.  This includes, but is not limited to, any claims for costs, expenses, attorney fees, and damages of any sort.

15.     RAI warrants and represents that it is not party to any action or suit for claims associated with the Subject Lease, the SOP, Secretary's Order 3401, and/or Executive Order 13990, that is pending or will be filed in or submitted to any court or administrative tribunal.

16.     This Agreement is for the sole purpose of rescinding and cancelling the Subject Lease, refunding to RAI the bonus bid and rental payments it paid to the BLM to acquire the Subject

Lease, and confirming that RAI has no further payment, reclamation, or any other obligation related to the Subject Lease. Accordingly, this Agreement shall not bind the Parties, nor shall it be cited or otherwise referred to, in any judicial or administrative proceedings in which the Parties have or may acquire an interest, except as necessary to carry out the terms of this Agreement.

17.     The signatories below each represent that they are authorized to enter into this Agreement on behalf of their respective Party and that they have the authority to bind their respective Party to the terms and obligations set forth herein.

18.     This Agreement shall take effect on the last date of signature below.

19.     This Agreement constitutes a complete integration of the agreement between the Parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between the Parties.

AGREED TO:

_____          04/25/2022
                                            _____
Name:  Ashley Gilbert                       Date
Title:    President
Regenerate Alaska, Inc.

THOMAS          Digitally signed by
HEINLEIN        THOMAS HEINLEIN
                Date: 2022.04.28 08:32:18
                -08'00'
_____          _____
Name:    Thomas Heinlein                    Date   April 28, 2022
Title:      Acting Alaska State Director
Bureau of Land Management

- xxx -

4

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

August 16, 2022

In Reply Refer To:
AA095895

**CERTIFIED-RETURN RECEIPT REQUESTED**

## DECISION

| | | |
|---|---|---|
| Knik Arm Services LLC | : | Oil and Gas Lease |
| 56 Oakwell Farms Parkway | : | AA095895 |
| San Antonio, Texas 78218 | : | |
| | : | |
| | : | |
| | : | |

## OIL AND GAS LEASE CANCELLED

We issued Federal oil and gas Lease No. AA095895 effective February 1, 2021, for 48,603 acres in the Coastal Plain of the Arctic National Wildlife Refuge.

Pursuant to an agreement, dated August 16, 2022, between Knik Arm Services LLC, and the Bureau of Land Management, we are rescinding and cancelling the lease in its entirety effective as of January 15, 2021.

If you have questions, please contact me at 907-271-5080 or scohn@blm.gov.

Steven M. Cohn
Alaska State Director
Bureau of Land Management

INTERIOR REGION 11 • ALASKA

## LEASE RESCISSION AND REFUND AGREEMENT

For the purpose of rescinding and cancelling Federal oil and gas Lease No. AA095895 (the "Subject Lease"), held by Knik Arm Services LLC (KAS), and refunding to KAS the cash bond, bonus bid, and rental payments KAS paid to the Bureau of Land Management (BLM) to acquire the Subject Lease, KAS and BLM (hereafter "the Parties") stipulate and agree as follows:

1.　KAS is a limited liability company established in the State of Alaska for the purpose of owning and managing real estate.

2.　BLM is a bureau within the United States Department of the Interior charged with responsibility for managing certain federal public lands and mineral resources.

3.　Pursuant to Section 20001 of Public Law 115-97 (131 Stat. 2054; Dec. 22, 2017), 16 U.S.C. § 3143 note, BLM is responsible for administering a competitive oil and gas leasing program in the Coastal Plain of the Arctic National Wildlife Refuge (hereafter "Coastal Plain") on behalf of the Secretary of the Interior.

4.　On January 6, 2021, BLM held a Coastal Plain oil and gas lease sale, for which KAS submitted the high bid for Tract No. 2021-CP-025, consisting of 48,603 acres.

5.　After receiving the balance of payments from KAS for the full bonus bid ($1,622,260), first year's rental ($486,030), and an individual lease cash bond ($100,000), on January 15, 2021, BLM issued the Subject Lease to KAS, with an effective date of February 1, 2021.

6.　The Subject Lease was one of nine oil and gas leases issued by BLM as a result of the January 6, 2021, Coastal Plain lease sale. The Subject Lease is the only lease acquired by KAS in connection with the January 6, 2021 Coastal Plain lease sale.

7.    On January 20, 2021, President Biden took office and issued Executive Order 13990,

      Section 4(a) of which states, in full:

> In light of the alleged legal deficiencies underlying the program, including the
> inadequacy of the environmental review required by the National Environmental
> Policy Act, the Secretary of the Interior shall, as appropriate and consistent with
> applicable law, place a temporary moratorium on all activities of the Federal
> Government relating to the implementation of the Coastal Plain Oil and Gas
> Leasing Program, as established by the Record of Decision signed August 17,
> 2020, in the Arctic National Wildlife Refuge. The Secretary shall review the
> program and, as appropriate and consistent with applicable law, conduct a new,
> comprehensive analysis of the potential environmental impacts of the oil and gas
> program.

8.    On June 1, 2021, in furtherance of Executive Order 13990, the Secretary of the Interior

      issued Secretary's Order 3401, which, in relevant part: identified multiple legal

      deficiencies in the underlying record supporting issuance of the nine Coastal Plain oil and

      gas leases; ordered the Department of the Interior to conduct a new, comprehensive

      analysis of the potential environmental impacts of the Program to address the identified

      legal deficiencies; and directed a temporary halt on all Department of the Interior

      activities related to the Program until that analysis is complete.

9.    Also on June 1, 2021, the Principal Deputy Assistant Secretary for Land and Minerals

      Management issued a Suspension of Operations and Production (SOP) to KAS for the

      Subject Lease, which took effect immediately.  The SOP states that while it is in place no

      lease operations may transpire on the lease, the term of the lease is tolled, and lease

      rentals are suspended.

10.   Neither KAS, nor any other record title owner, has conducted oil and gas operations on

      the Subject Lease. Since acquiring the Subject Lease in January of 2021, KAS has not

      filed for any application for permit to drill ("APD") or conducted any geophysical or

seismic operations on the Subject Lease. Because there has been no development or surface disturbance on the Subject Lease, KAS has no outstanding reclamation obligations to BLM related to the Subject Lease. Further, KAS owes BLM no outstanding rentals, royalties, compensatory royalties, or payments of any kind for the Subject Lease.

11. On August 4, 2021, BLM published in the Federal Register a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, initiating the new environmental review process directed by Secretary's Order 3401.

12. Subsequently, KAS requested to have the lease rescinded and its bonus bid, lease rental, and cash bond payments refunded.

13. In light of the legal deficiencies identified by the Department of the Interior in the underlying record supporting issuance of the Subject Lease, and subject to the provisions of this Agreement, BLM hereby accepts KAS's request and agrees to do the following, within 45 days from the effective date of this Agreement: (a) rescind and cancel the Subject Lease, effective January 15, 2021; (b) release and refund to KAS the cash bond ($100,000); and (c) direct the Office of Natural Resources Revenue to refund KAS's full bonus bid ($1,622,260) and first year's rental ($486,030) within 30 days.

14. Upon satisfaction of the terms set forth in Paragraph 13, including KAS's receipt of the refunds described, KAS releases, waives, and abandons all claims against the United States, its political subdivisions (including the Department of the Interior and its bureaus), its officers, agents, and employees, known or unknown, arising out of or related to the Subject Lease, the SOP, Secretary's Order 3401, and/or Executive Order 13990.

This includes, but is not limited to, any claims for costs, expenses, attorney fees, and damages of any sort.

15. KAS warrants and represents that it is not party to any action or suit for claims associated with the Subject Lease, the SOP, Secretary's Order 3401, and/or Executive Order 13990, that is pending or will be filed in or submitted to any court or administrative tribunal.

16. This Agreement is for the sole purpose of rescinding and cancelling the Subject Lease, refunding to KAS the cash bond, bonus bid, and rental payments it paid to the BLM to acquire the Subject Lease, and confirming that KAS has no further payment, reclamation, or any other obligation related to the Subject Lease. Accordingly, this Agreement shall not bind the Parties, nor shall it be cited or otherwise referred to, in any judicial or administrative proceedings in which the Parties have or may acquire an interest, except as necessary to carry out the terms of this Agreement.

17. The signatories below each represent that they are authorized to enter into this Agreement on behalf of their respective Party and that they have the authority to bind their respective Party to the terms and obligations set forth herein.

18. This Agreement shall take effect on the last date of signature below.

19. This Agreement constitutes a complete integration of the agreement between the Parties and supersedes any and all prior oral or written representations, understandings, or agreements among or between the Parties.

Lease Rescission and Refund Agreement (Lease No. AA095895)

AGREED TO:

KNIK ARM SERVICES LLC

By: _~Mark A Graber~_ (signature)        _Aug. 10, 2022_
Name:   Mark A Graber                      Date
Title:   Manager


UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

By: _Steven Cohn_ (signature)            _Aug. 16, 2022_
Name:   Steven M. Cohn                     Date
Title:   Alaska State Director

- xxx -

116295308.4 0072983-00001



October 4, 2021

Bureau of Land Management – Alaska State Office
Attention: Coastal Plain Supplemental Environmental Impact Statement
222 West Seventh Avenue, Number 13
Anchorage, Alaska 99513-7599

Submitted electronically through: https://eplanning.blm.gov/eplanning-ui/project/2015144/510

**Re:     Alaska Industrial Development and Export Authority Scoping Comments on the Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program**

Dear Principal Deputy Assistant Secretary Daniel-Davis,

The Alaska Development and Export Authority (AIDEA) holds seven valid and enforceable oil & gas leases signed by the Department of the Interior for 365,775 acres within the Coastal Plain region of the Arctic National Wildlife Refuge. We commonly refer to the Coastal Plain as the Section 1002 Area given this is the section within the Alaska National Interest Land Conservation Act (better known as ANILCA), signed into law in 1980, designating this area as "non-wilderness" for future oil & gas development.

AIDEA is a public corporation of the State of Alaska, constituting a political subdivision under the laws of the State. AIDEA was created in 1967 to "promote, develop and advance the general prosperity and economic welfare of the people of Alaska, to relieve problems of unemployment, and to create additional employment." AIDEA accomplishes this through its development project finance programs. Development project finance is the effort of the State working through AIDEA to support, encourage, and catalyze enterprise growth. It is a tool to help make a project successful, and in turn, to create a benefit for the long-term economic health of the State and its citizens. Development project finance is a proactive approach towards finance intended to assist enterprise economic development projects. It leverages valuable public resources to support significant private sector investment in fulfillment of the public interest. Since its inception, AIDEA has worked with Alaska Native Corporations and tribal organizations to increase job opportunities and encourage the economic growth of our state, particularly in rural and remote areas.

Much of the economic and community development that has occurred in Alaska's native and rural communities on the North Slope has been a direct result of Alaska's close to fifty-year successful track record for responsible oil and gas development, including in areas adjacent to the Section 1002 Area. In fact, Alaska has been at the forefront illustrating how resource development can safely and responsibly coexist with environmental conservation. The exploration and development of the Section 1002 Area continues to preserve our nation's energy security and economic growth,

813 West Northern Lights Boulevard  Anchorage, Alaska  99503  T 907.771.3000  Toll Free (Alaska Only) 888.300.8534  F 907.771.3044

*Investing in Alaskans*  aidea.org

Case 3:24-cv-00051-SLG     Document 71-2     Filed 08/13/24     Page 190 of 201

AR3793

maintains the same environmental safeguards which has guided Alaska's resource development through the decades, and broadly supports our native and rural Alaskan communities.

All parties should be respectfully sensitive to the voices of those who live in and around the Coastal Plain. The Native Village of Kaktovik is the only federally recognized community in the Section 1002 Area and they, along with more than 20 other Alaska Native organizations and corporations located in and around the Section 1002 Area, have consistently advocated for responsible development of oil and gas on the North Slope. These include: Kaktovik Iñupiat Corporation, City of Kaktovik, North Slope Borough, Arctic Slope Native Association, City of Anaktuvuk Pass, City of Point Hope, Native Village of Atqasuk, Olgoonik Corporation, City of Atqasuk, City of Wainwright, Native Village of Point Lay, Tikigaq Corporation, Atqasuk Corporation, City of Utqiaġvik, Iḷisaġvik College, Ukpeaġvik Iñupiat Corporation, Nunamiut Corporation, Native Village of Point Hope, Arctic Slope Regional Corporation, Wainwright Tribal Council, Iñupiat Community of the Arctic Slope, Native Village of Barrow, and North Slope Borough School District. In order to ensure traditional, local knowledge is incorporated into AIDEA's program activities in the Section 1002 Area, the Kaktovik Iñupiat Corporation is part of the team performing pre-development permitting and planning services and will work closely with the local community and subsistence representatives.

These organizations and corporations are joined by 65%[1] of Alaskans who echo the local voices in support of exploration and production of oil and gas in the Section 1002 Area of ANWR. Responsible resource development is further supported by Alaska Governor Mike Dunleavy, Alaska's Legislature, and all members of Alaska's congressional delegation since 1980. Most recently this spring, the Alaska State Legislature passed House Joint Resolution 12 (HJR 12), which urged the Department of Interior and BLM to honor the recent lease sales and proceed with permitting. Ultimately, there is support from a wide cross-section of Alaskans regarding the development of these resources.

As the State of Alaska's development finance authority, AIDEA chose to participate in the Department of Interior's Coastal Plain Oil & Gas Leasing Program (the "Leasing Program") to further its mission to increase job opportunities and otherwise encourage the State's economic growth, including access to and development of its natural resources. Specifically, AIDEA's purpose in participating in the Leasing Program is to support mineral resource exploration and development in the Section 1002 Area consistent with the directives of ANILCA and the Tax Cuts and Jobs Act (TCJA). AIDEA anticipates multiple public benefits related to the un-delayed development of the leases it acquired in the Leasing Program, including direct employment for exploration and development of oil and gas resources, indirect employment related to exploration and development activities, revenues paid to local and state governments, Alaska Native Corporations, and native villages, profits to AIDEA from its development investment and re-investment of those profits into future economic development projects in Alaska benefiting all Alaskans.

---

[1] According to a recent statewide poll conducted by Dittman Research. *2019 Alaska Opinion Survey Results*. Survey results provided by The Alaska Chamber of Commerce.
https://wordpressstorageaccount.blob.core.windows.net/wp-media/wp-content/uploads/sites/1007/2019/07/2019.08.01-Ketchikan-Chamber-Presentation.pdf

**Scoping Comments**

In 1980, Congress passed ANILCA, which instructed the Secretary of Interior to begin studying the impacts of oil and gas development in the Section 1002 Area and established guidelines for exploration of those leases. In 2017, Congress instructed the Secretary to implement an oil and gas leasing program in the Section 1002 Area, requiring that the first lease sales take place within four years – or by 2021. Two years later, in 2019, the Department of Interior, through the Bureau of Land Management (BLM) completed its EIS for the Leasing Program. By the Department's own account, this EIS was thorough and robust – it was developed and completed in collaboration with "Tribes, partners, the state of Alaska and experts from across the [Fish and Wildlife] Service."[2]

Nearly 40 years after ANILCA's passage, the Department's EIS demonstrated that responsible development of oil and gas is possible in the non-wilderness Section 1002 Area – providing enormous economic and social benefits while having minimal impact on the environment. Both the EIS and the Leasing Program were supported by the local communities who have the most at stake in the process. These communities, the residents of which have lived in the area for thousands of years, have an unparalleled understanding of both the risks and benefits of development, and should be consulted.

The Environmental Impact Statement (EIS) prepared by the Bureau of Land Management (BLM) for the Coastal Plain Alaska Oil and Gas Lease Sale was issued under the authority of Section 20001 of the TJCA (Public Law 115-97 (Dec. 22, 2017; 131 Stat. 2235). The EIS is comprehensive and appropriately addresses all issues relevant to a leasing phase environmental impacts assessment. The completeness of the EIS was recognized in the Record of Decision (RoD) issued in August 2020 and signed by Secretary of Interior Bernhardt constituting the final decision of the Department of Interior in accordance with regulations 43 CFR §4.410(a)(3) and is not subject to appeal under Department regulations at 43 CFR Part 4.[3]

All Alaskans are stakeholders in this public scoping and should be very concerned that Alaska is now being selectively restricted by new policies undertaken without regard for prevailing statute and regulations. We continue to point out that the Department of Interior has not identified the statutory or regulatory basis to suspend all activities related to AIDEA's valid and enforceable leases due to "identified defects" of the Leasing Program's National Environmental Policy Act (NEPA) documents as cited in the Secretary's Order 3401. Congress has mandated that the Secretary *must* lease lands within the Section 1002 Area that have the highest development potential – and must do so according to its statutorily-prescribed schedule. The Department of Interior has no authority to withdraw lands from leasing, and no legal basis to mire the Leasing Program in additional layers of administrative review and delay. AIDEA expects the Department of Interior to administer the Leasing Program consistent with the specific statutory requirements of both ANICLA and the TCJA, and to that end, has the following comments:

---

[2] https://www.doi.gov/pressreleases/interior-announces-availability-coastal-plain-oil-and-gas-leasing-program-final

[3] U.S. Department of Interior, Bureau of Land Management, Coastal Plain Oil and Gas Leasing Program Record of Decision, August 2020, DOI-BLM-AK-0000-2018-0002-EIS

AR3795

**A. The Department Already Determined that its Previous EIS Satisfied NEPA**

The Department of Interior has taken the legal position in challenges to the January 2021 Lease Program that the Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement satisfied the requirements of the National Environmental Policy Act (NEPA). The Department may not now change its position without acknowledging and explaining a change in position.

A Supplemental EIS is unnecessary because the 2019 Lease Program EIS and RoD comply with all applicable laws and are based upon decades of reliable data, robust public engagement, and a federal NEPA process that involved State, federal and local agencies and stakeholders. The 2019 Lease Program EIS followed administrative procedures establishing the framework for a scientifically driven leasing program for oil and gas exploration and development which cannot be selectively abandoned.

As stated by the 9th Circuit, an agency's change in position must: (1) display awareness of its changing position, (2) show the new policy is permissible under the law, (3) believe the new policy is better, and (4) provide "good reasons" for the new policy. *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021). Moreover, if a new policy rests upon factual findings that contradict those underlying the previous policy, the agency must provide a "reasoned explanation" for disregarding facts and circumstances that underlay or were engendered by the prior policy. *Id.*

The fact that the Department is undergoing a separate period of notice-and-comment does not reduce its burden to explain a change in position. *See Saget v. Trump*, 375 F. Supp. 3d 280, 365 (E.D.N.Y. 2019) ("The APA's requirement that an agency articulates some rationale acknowledging and explaining a change in position is separate and apart from the APA's notice-and-comment requirement and applies to legislative and interpretive rules alike.)

**B. A Supplemental EIS is Warranted in Limited Circumstances Not Present Here**

The development of the Supplemental EIS should be guided by federal law regarding the limited circumstances that trigger the duty to supplement. An agency is required to supplement an existing EIS only if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017); *see also Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (explaining that a supplemental impact statement is "only required where new information provides a seriously different picture of the environmental landscape.")

Thus, under NEPA, an agency does not need to supplement an EIS simply because new information comes to light after the EIS is finalized. *Id.* (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)). Unless BLM proposes significant changes in its action, any supplemental EIS should be limited in scope to <u>new</u> information, not available at the time of the previous EIS, which provides a seriously different picture of the environmental landscape. AIDEA is not aware that any such new information exists nor has the Department of Interior identified any such new information.

Page 4

AR3796

## C. Special Order Identified Deficiencies Have Not Been Substantiated

Secretarial Order 3401, drawing on the language of Executive Order 13990 and referenced in the NOI, claims to have identified legal deficiencies in the underlying record. However, the information provided on these claims only states them to be insufficient under NEPA by failing to analyze a range of alternatives and failure to properly interpret the surface use limitation in federal law. The substance to this review has not been provided to AIDEA or to the public despite the EIS procedural requirements for a robust public process.

We note that AIDEA's leasehold rights have been purported to be suspended based on these identified legal deficiencies without the declaration of any statutory or regulatory basis. AIDEA is joined by Knik Arm Services LLC and Regenerate Alaska LLC as current leaseholders of tracts under the Leasing Program. Our investments should be honored and we expect the Department of Interior to continue to process any applications for required permitting in a timely manner, consistent with the RoD and lease stipulations, without further delay. The ability to utilize validly acquired land rights and that terms of a lease contract are sustained are foundational to U.S. law.

## D. Public Scoping Noticed Without a Purpose and Need

Publishing the Notice of Intent (NOI) in the Federal Register begins the formal scoping process and serves as the official legal notice which must include a description of the purpose and need.[4] The "purpose and need" is a formal statement developed for each BLM planning effort. The CEQ regulations direct that an EIS "…shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action" (40 CFR 1502.13). The CEQ regulations also direct that EAs "…shall include brief discussions of the need for the proposal…" (40 CFR 1508.9(b)). As stated in the NOI:

> *The purpose and need of the Supplemental EIS is bound by statute and remains the same as for the September 2019 Final EIS, i.e., to implement Section 20001 of Public Law 115–97.*[5]

However, the purpose and need of the September 2019 Final EIS has already been satisfied through the completion of the EIS as defined within the Record of Decision (RoD) issued in August 2020 and signed by Secretary of Interior Bernhardt constituting the final decision of the Department of Interior in accordance with regulations 43 CFR §4.410(a)(3) and is not subject to appeal under Department regulations at 43 CFR Part 4. We point out that the Department of Interior has failed to comply with its procedures and regulations in defining a purpose and need for this Supplemental EIS.

## E. The Purpose and Need Statement Should Reflect Congress' Mandate

---

[4] BLM National Environmental Policy Act Handbook H-1790-1

[5] Federal Register / Vol. 86, No. 147 / Wednesday, August 4, 2021

AR3797

The TJCA mandated that the Secretary, acting through the BLM, develop and manage "a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Section 1002 Area.[6] The TJCA also requires that the Secretary manage the Leasing Program "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976…(including regulations)."[7] The Naval Petroleum Reserves Production Act of 1976, as amended, and its regulations at 43 CFR 2361 require oil and gas leasing and the protection of surface values to the extent consistent with exploration, development, and transportation of oil and gas. There is no authority to pause, suspend, or otherwise defer the program in any of these statutes.

## F. The TCJA Requires Lands with the Highest Development Potential to be Leased

The NOI to Prepare a Supplemental EIS states that the supplemental EIS will include alternatives that "[d]esignate certain areas of the Coastal Plain as open or closed to leasing." The Notice suggests that the purpose of these designations would be to "avoid or mitigate impacts from oil and gas activities," including impacts to local ecology and from greenhouse gas emissions.

Such alternatives, to the extent that they would involve closing areas of high development potential to leasing, are beyond the scope of the Secretary of Interior's statutory authority. The TCJA requires the Secretary to offer "not fewer than 2 lease sales area-wide" and "not fewer than 400,000 acres area-wide in each lease sale." *See* Pub. L. 115-97, Sec. 20001(c)(1)(B)(i)(I). The TCJA mandates that the lease sales include those areas with "the highest potential for the discovery of hydrocarbons" for lease. *See* Pub. L. 115-97, Sec. 20001(c)(1)(B)(i)(II). This is a prescriptive requirement that removes the Secretary's discretion to select which areas will be offered for leasing and prevents the Secretary from withholding areas from leasing absent a finding that those areas do not have the highest potential for the discovery of hydrocarbons. Any decision to *close* certain areas to leasing that would otherwise be included in lands with the "highest potential for the discovery of hydrocarbons" would directly contravene the plain language of the TCJA, and would exceed the Secretary's authority in administering the Leasing Program.

Put another way, the Department may not reduce the area available for leasing in a given lease sale without determining whether the areas it proposes not to lease are those with the "highest potential for the discovery of hydrocarbons."

## G. There is No Statutory Authority for the Secretary to Withdraw Lands from Leasing

Neither ANILCA nor the TCJA grant the Secretary the authority to temporarily or permanently "withdraw" any portion of the Section 1002 Area from oil and gas leasing or development.

ANILCA specifically identified the Section 1002 Area as a potential area for oil and gas leasing as part of the agreement struck among the State of Alaska, the federal government, and native groups to allocate land within the State. As part of the TCJA, Congress made a final determination to <u>open</u> the Section 1002 Area for leasing and specified a precise timeframe for the Department to

---

[6] Pub. L. No. 115-97, Sec. 20001(b)(2)(A)

[7] Pub. L. No. 115-97, Sec. 20001(b)(3)

AR3798

hold lease sales. The prior Administration complied with the law by holding a lease sale before the first required deadline of December 2021.

Withdrawal of lands from leasing would constitute a separate agency action requiring an independent grant of authority, for which there is none. *See e.g., Chilkat Indian Klukwan v. BLM*, 399 F. Supp. 3d 888, 925 (D. Alaska 2019) ("The issue of withdrawal would constitute a separate agency action . . . with independent statutory and regulatory standards to justify the withdrawal and a distinct procedure that BLM and the Secretary must follow."). Neither ANILCA nor the TCJA includes any mechanism or grant of authority for the Secretary to withdraw some or all of the Section 1002 Area from leasing. If Congress wanted to give the Secretary the authority to withdraw Section 1002 Area lands from leasing, it would have done so, as it has done with other grants of authority. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017) (discussing "withdrawal authority delegated to the Secretary" under FLMPA).

## H. Unexplored Areas Cannot Be Closed to Leasing

For decades, the Department of Interior has refused to consider permits for seismic exploration that are necessary to develop the information to distinguish between the differing hydrocarbon potential of the lands within the Section 1002 Area. This fact alone contravenes the plain language of the TCJA, which requires <u>leasing</u> the areas with the highest potential for hydrocarbon development. This statutory requirement cannot be met if the Department refuses to allow exploration. Further, until such exploration occurs, the Department cannot close unexplored areas to leasing because it has no rational basis to conclude that those unexplored areas are not within the areas having "the highest potential for the discovery of hydrocarbons."

## I. Hindering Oil and Gas Leasing Would Negatively Impact Local Communities

Any alternatives considered by the Department which would make development in the Section 1002 Area more difficult will have negative socioeconomic impacts on nearby residents. These socioeconomic impacts should be respected and considered in any supplemental analysis undertaken by the agency. AIDEA reminds the Department of Interior of the previous robust scoping comments it received from local governmental and Alaska Native groups regarding the original EIS.

For instance, the Native Village of Kaktovik – the tribal entity for the only community within the bounds of the Arctic National Wildlife Refuge – submitted comments supportive of "a robust lease sale as put forth in the [TCJA]," emphasizing that "NVK has been supportive of developing a leasing program for the [Section 1002 Area] as the first step in measured oil and gas development" and "as the only federally-recognized tribe within the bounds of a National Wildlife Refuge, Kaktovik has long been prevented from exercising economic self-determination through the development of [its] own lands."

These comments were echoed by groups such as the Kaktovik Inuit Corporation and the Arctic Slope Regional Corporation. AIDEA encourages the Department to respectfully consider the perspectives of these groups and avoid any administrative actions that would further burden or delay access and responsible resource development within the Section 1002 Area.

AR3799

**Conclusion**

The development of new energy resources in the Section 1002 Area will benefit Alaska, the local communities of the North Slope, and the Nation as a responsible and secure energy resource. Revenues derived from new production will help sustain public services to our rural and indigenous communities, as well as sustain existing infrastructure, provide new job opportunities and boost Alaska's economy.

AIDEA is proud to support the efforts of Alaskans, especially our indigenous communities, which have led the way in advocating for responsible oil and gas development in the Section 1002 Area as codified within ANILCA and the TCJA. AIDEA reminds the Department of Interior of their statutory and regulatory obligations to establish and support an oil and gas leasing, exploration, and development program in the Section 1002 Area and to desist from taking any further actions that seek delays or hinders the statutorily mandated Leasing Program.

Sincerely,

*FILED ELECTRONICALLY*

Alan Weitzner
Executive Director
Alaska Industrial Development and Export Authority

# Chapter 2. Comment Summary

## 2.1 SUMMARY OF PUBLIC COMMENTS RECEIVED

### 2.1.1 Commenters by Affiliation

The BLM categorized all submissions received by the commenter's affiliation. **Table 2-1** shows the number and proportion of commenters by affiliation. Letters written on business, agency, or organization letterhead or letters where the commenter signed using an official agency title were considered to represent that organization or agency; all other letters were considered to represent individuals. In addition, some commenters made multiple submissions, and some letters had more than one signatory.

**Table 2-1**
**Unique Submissions by Affiliation**

| Affiliation | Number of Commenters* | Percentage of Unique Submissions* |
|---|---|---|
| Government (Federal, State, Tribal, and local) | 14 | 6.7 |
| Organizations (businesses and nonprofits) | 40 | 19.0 |
| Individuals | 156 | 74.3 |
| **Total** | **210** | **100** |

*Calculations do not include form letters. All numbers are approximate.

In addition to unique submissions, there were multiple form letter campaigns sponsored by nonprofit organizations and individuals. Letters that represented slight variations of the form letter without additional substantive comments were treated as form letters. Form letter submissions containing additional substantive comments were categorized as unique submissions. In total, the BLM received 104,908 form letter submissions, based on nine different form letter campaigns.

Analyzing identical submissions as a group did not reduce the comment's importance. The NEPA regulations on public comments are clear that the public involvement process is not a vote but an opportunity to determine the scope and the significant issues to be analyzed in depth in the SEIS, as well as to "identify and eliminate from detailed study the issues which are not significant, or which have been covered by prior environmental review" (40 CFR 1501.9).

### 2.1.2 Number of Substantive Comments by Issue Category

**Table 2-2** shows the number and proportion of substantive comments received by issue category. The 1,555 substantive comments were categorized into 51 issue categories. **Chapter 3**, Issue Statements and Comment Summaries, provides a detailed analysis of the comments received for each issue category.

**Table 2-2**
**Number of Substantive Comments by Issue Category**

| Issue Category | Number of Substantive Comments* | Percentage of Total Comments* |
|---|---|---|
| NEPA | 37 | 2.4 |
| Public Outreach | 13 | <1.0 |
| Translation requests | 7 | <1.0 |
| Lead and Cooperating Agencies | 5 | <1.0 |
| Purpose of and Need for SEIS | 31 | 2.0 |
| Alternatives – New Alternative Proposed | 82 | 5.3 |

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 198 of 201

AR3811

| Issue Category | Number of Substantive Comments* | Percentage of Total Comments* |
|---|---|---|
| Alternatives – Change to Existing | 25 | 1.6 |
| Alternatives – Lease Stipulations and Required Operating Procedures (ROPs) | 106 | 6.8 |
| Best Available Information-Baseline Data | 34 | 2.2 |
| GIS Data/Maps and Analysis | 2 | <1.0 |
| Direct or Indirect Impacts | 16 | <1.0 |
| Cumulative Impacts | 24 | 1.5 |
| General Consultation | 12 | <1.0 |
| Government-to-Government Consultation | 41 | 2.6 |
| ANILCA | 56 | 3.6 |
| Alaska Native Claims Settlement Act (ANCSA) | 1 | <1.0 |
| Other Laws and International Agreements | 111 | 7.1 |
| Climate and Meteorology | 128 | 8.2 |
| Air Quality | 30 | 1.9 |
| Acoustic Environment | 9 | <1.0 |
| Physiography | 3 | <1.0 |
| Geology and Minerals | 8 | <1.0 |
| Petroleum Resources | 35 | 2.3 |
| Reasonably Foreseeable Development Scenario | 6 | <1.0 |
| Soil Resources | 20 | 1.3 |
| Sand and Gravel Resources | 13 | <1.0 |
| Water Resources | 50 | 3.2 |
| Solid and Hazardous Waste | 5 | <1.0 |
| Seismic Testing | 46 | 3.0 |
| Biological Resources | 16 | <1.0 |
| Vegetation and Wetlands | 20 | 1.3 |
| Fish and Aquatic Species | 34 | 2.2 |
| Birds | 98 | 6.3 |
| Terrestrial Mammals | 115 | 7.4 |
| Marine Mammals | 77 | 5.0 |
| Social Systems | 2 | <1.0 |
| Landownership and Use | 7 | <1.0 |
| Cultural Resources | 17 | 1.1 |
| Subsistence Uses and Resources | 58 | 3.7 |
| Sociocultural Systems | 8 | <1.0 |
| Environmental Justice | 18 | 1.2 |
| Recreation | 3 | <1.0 |
| Arctic Refuge | 2 | <1.0 |
| Marine Protected Areas | 1 | <1.0 |
| Wild and Scenic Rivers | 6 | <1.0 |
| Wilderness Characteristics, Qualities, and Values | 11 | <1.0 |
| Visual Resources | 6 | <1.0 |
| Transportation | 10 | <1.0 |
| Economy | 54 | 3.5 |
| Public Health and Safety | 29 | 1.9 |
| Irreversible and Irretrievable Commitments of Resources | 7 | <1.0 |
| **Total** | **1,555** | **100** |

*All numbers are approximate.
< = less than

2-2     *Coastal Plain Oil and Gas Leasing Program SEIS*     November 2021
*Final Scoping Report*
Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 199 of 201

AR3812

# Chapter 3. Issue Statements and Comment Summaries

For NEPA analysis, an issue is a point of disagreement, debate, or dispute with a proposed program, based on an anticipated environmental effect. An issue is more than just a position statement, such as disagreement with development on BLM-administered lands. The BLM will use the issues and other information collected during scoping to help formulate a reasonable range of alternatives that will be analyzed in the SEIS.

The issue statements presented below are preliminary and are based on the best information known to date. A summary of the comments received has also been developed that apply to each issue; for the full context of comments, the scoping submissions are posted on the project website https://eplanning.blm.gov/eplanning-ui/project/2015144/510.

The process of developing this SEIS will afford opportunities for collaboration with local, State, Federal, and Tribal governments, land management agencies, public interest groups, public land users, and other stakeholders. As a result of ongoing collaboration, the issues and concerns may be updated and supplemented to accurately reflect public comments and concerns.

## 3.1 NEPA

### Issue: How will the SEIS address the leases issued as part of the 2020 Coastal Plain Oil and Gas Leasing Program?

*Comment Summary*

Commentors were concerned that the nine leases issued in January 2021 as part of the 2020 leasing program were legally deficient and requested that the BLM either cancel or otherwise amend the leases. Commentors gave two justifications for the unlawfulness of the leases. The first was that the leases were issued as part of the 2020 leasing program process that the BLM has already determined to be legally deficient. Second, commentors were concerned that the leases are an irreversible and irretrievable commitment triggering the need for site-specific NEPA analysis, which the 2019 FEIS does not satisfy. Commentors were concerned that if the leases are not cancelled or amended, they would prejudice the outcome of the SEIS by limiting alternatives, analysis, or decision making. Finally, commentors were concerned about how an SEIS would be used to correct the legally deficient leases because the BLM has already committed those resources. If the BLM intends to use the SEIS process to address these leases, commentors requested that the BLM clearly describe the approach in the context of the SEIS.

### Issue: Will the SEIS apply the 1978 or 2020 NEPA regulations?

*Comment Summary*

Commentors were concerned that the application of the 2020 NEPA regulations to the 2020 leasing program resulted in the failure of the 2019 FEIS to adequately analyze cumulative impacts, particularly on greenhouse gas emissions. Commentors encouraged the BLM to apply the 1978 NEPA regulations instead, which require the analysis of cumulative impacts and indirect impacts.

Case 3:24-cv-00051-SLG    Document 71-2    Filed 08/13/24    Page 200 of 201

AR3813

***Issue: What are the legal deficiencies in the 2019 FEIS and 2020 Record of Decision (ROD) that triggered the SEIS process?***

*Comment Summary*

Commentors were concerned that the BLM has not provided adequate justification and legal support in Secretary's Order 3401 to demonstrate the need for an SEIS. Commentors noted that the U.S. Department of the Interior has taken the legal position in challenges to the January 2021 leases that the Coastal Plain Oil and Gas Leasing Program EIS satisfied the requirements of NEPA. Commentors were concerned that the preparation of an SEIS would delay the implementation of the previously approved leasing program, which could have adverse socioeconomic impacts on local Native peoples.

Commentors suggested that the SEIS should be limited in scope to new information unavailable at the time of the 2019 FEIS.

***Issue: Did the 2019 FEIS fail to meet the requirements of NEPA?***

*Comment Summary*

Commentors were concerned that the 2019 FEIS did not consider a range of reasonable alternatives and failed to acknowledge and address missing information, data, and analysis. One commentor mentioned the Public Employees for Environmental Responsibility reports published in March 2019. These reports alleged that the Department of the Interior suppressed internal memoranda written by its scientists which detailed concerns regarding oil and gas development in the Arctic Refuge. In addition, other press reports of emails from BLM scientists alleged about alterations, mischaracterizations, and omissions of key findings of environmental assessments for seismic surveys. Commentors would like the BLM to revise its alternatives analysis and update its analysis of impacts to utilize robust data and accurate scientific analysis in the SEIS.

Commentors were concerned that the Department of the Interior Secretary's Order 3401 did not identify specific deficiencies in the 2019 FEIS and 2020 ROD about which to provide meaningful comments.

Commentors were concerned that the 2019 FEIS had many documents incorporated by reference or as appendices which made it difficult for the public to follow. Additionally, commentors were concerned that the 2019 FEIS had significant information gaps that did not allow for the public to meaningfully understand the baseline conditions and likely impacts; commentors requested that the SEIS address these information gaps. Finally, commentors requested that the BLM provide adequate time to carefully consider and address public comments on the SEIS.

***Issue: What should be included in future NEPA adequacy reviews for development projects that may result from the Coastal Plain leasing program?***

*Comment Summary*

Commentors recommended that the environmental assessments and/or EISs for development projects resulting from the Coastal Plain leasing program include geological and geophysical information that supports the recoverable reserve estimates. Specifically, commentors suggested using development forecasts and production estimates to support the scale, accuracy, and accuracy of potential oil spills, greenhouse gas emissions, and social cost of greenhouse gas estimates and analysis. Commentors additionally recommended that the BLM consider ROPs, such as co-occurring gas reinjected to maintain reservoir pressure or, instead, used to manufacture natural gas liquids to blend and transport with the oil in existing infrastructure.

Case 3:24-cv-00051-SLG     Document 71-2     Filed 08/13/24     Page 201 of 201

AR3814