

THE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON

SEP 06 2023

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

DECISION

| | | |
|---|---|---|
| Alaska Industrial Development and Export Authority | : | Oil and Gas Leases |
| 813 West Northern Lights Blvd. | : | AA095889 |
| Anchorage, Alaska 99503 | : | AA095890 |
| | : | AA095893 |
| | : | AA095897 |
| | : | AA095898 |
| | : | AA095900 |
| | : | AA095901 |

Lease Cancellation

After careful review of all available information related to the seven oil and gas leases identified in the caption above, the Department of the Interior (Department) has determined that the leases were improperly issued due to pre-leasing legal defects. The record before the Department has confirmed the seriousness of those legal defects in the environmental review supporting the leases, and, in light of the minimal disruptive consequences of cancellation, the Department has determined that cancellation is appropriate. The reasons for that determination are set forth below.

## I. Background

### A. First Lease Sale

Section 20001 of the Tax Cuts and Jobs Act of 2017, Public Law 115-97 (Tax Act) directed the Secretary of the Interior (Secretary), acting through the Bureau of Land Management (BLM), to (1) "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain"; (2) issue "any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out [the Program]"; and (3) conduct two oil and gas lease sales by December 2021 and December 2024, respectively, of not less than 400,000 acres each.

In September 2019, BLM issued the "Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement" (Coastal Plain EIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4231-4370h. In August 2020, the Secretary signed a record of decision (2020 ROD) approving a leasing program, determining where and under what terms and conditions leasing would occur. Shortly after issuance of the 2020 ROD, 4 lawsuits were filed by 16 environmental groups, 3 Alaska Native tribes and an Alaska Native organization, and 15 States. On January 5,

2021, without discussing whether plaintiffs were likely to succeed on any of their claims, the U.S. District Court for the District of Alaska denied three motions for preliminary injunction seeking to prevent issuance of leases.[1]

During the first required lease sale held on January 6, 2021, BLM received 13 total bids on 11 tracts covering 552,802 acres of the 1,089,053 acres offered. On January 13, 2021, the Department issued seven leases to the Alaska Industrial Development and Export Authority (AIDEA). On January 15, 2021, the Department issued one lease each to Regenerate Alaska, Inc. and to Knik Arm Services, LLC. AIDEA abandoned its qualifying high bids on the two remaining lease tracts. The BLM relied on the Coastal Plain EIS for its NEPA compliance for the lease sale and conducted the lease sale and issued leases in accordance with the 2020 ROD.[2]

B. Secretary's Order 3401 and Lease Suspensions

On June 1, 2021, the Secretary issued Secretary's Order 3401, which identified "multiple legal deficiencies in the underlying record supporting the leases, including, but not limited to: (1) insufficient analysis under [NEPA], including failure to adequately analyze a reasonable range of alternatives in the [EIS]; and (2) failure in the August 17, 2020, [ROD] to properly interpret [the Tax Act]." Secretary's Order 3401 directed the initiation of a "process to conduct a comprehensive environmental analysis, complete necessary consultation, and correct the identified legal deficiencies" and "as appropriate and consistent with applicable law, take appropriate action with respect to existing leases in light of the direction provided herein."

Also on June 1, 2021, the Department suspended the nine leases, with each suspension decision stating:

> The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD. When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.

On August 4, 2021, BLM issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program*, 86 Fed. Reg. 41989, which initiated the scoping process to begin the comprehensive analysis of potential environmental impacts, including addressing deficiencies identified in Secretary's Order 3401. On November 4, 2021, AIDEA filed a lawsuit in U.S. District Court for the District of Alaska (*Alaska Industrial*

---

[1] The four cases challenging the 2019 Coastal Plain EIS and 2020 ROD have been stayed prior to any briefing on the merits pending completion of the additional environmental analysis, with a court order of September 13, 2021, directing status reports at key milestones in the new environmental review. The next such status report is required at the issuance of the Draft Supplemental Environmental Impact Statement or no later than September 29, 2023.

[2] While the Department did not promulgate implementing regulations for the Tax Act, the Department generally looks to the NPRPA or its implementing regulations for guidance consistent with the Tax Act's direction that "the Secretary shall manage the oil and gas program in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. § 6501 et seq.) [NPRPA] (including regulations)."

AR5354

*Development and Export Authority v. Biden*; 3:21-cv-00245-SLG), challenging, among other things, the Department's issuance of Secretary's Order 3401 and the lease suspensions.[3]

Based on an agreement initiated at the request of the lessee to rescind its lease and refund its payments, on April 28, 2022, BLM rescinded and cancelled the lease held by Regenerate Alaska, Inc. and started the process to refund the full bonus bid and first year's rental. A similar request to rescind its lease and refund its payments, was made by Knik Arm Services LLC. On August 16, 2022, BLM rescinded and cancelled the lease and started the process to refund the cash bond, full bonus bid, and first year's rental.

On August 19, 2022, the Department issued to AIDEA, the only remaining leaseholder under the Program, an "Addendum to Suspension of Operations and Production" ("Addendum"), identifying an additional legal defect related to the analysis of foreign greenhouse gas emissions:

> In the Suspension of Operations and Production, dated June 1, 2021, the Department identified two legal defects and also several areas involving a potential legal defect, specifically including the treatment of foreign greenhouse gas (GHG) emissions in the Environmental Impact Statement (EIS). … The Department has concluded that this legal defect provides an additional basis to continue to suspend the above-referenced leases and complete further environmental analysis under NEPA.

The Addendum repeated that "[t]he BLM is conducting this additional NEPA analysis to determine whether the leases should be affirmed, voided, or subject to additional mitigation measures." The Addendum also indicated that the decision on the existing leases might happen prior to the completion of the additional environmental analysis: "Once sufficient information is developed, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases."

## II.    Exercise of Secretary's Lease Cancellation Authority Due to Pre-Leasing Legal Defects

The Secretary has inherent authority, under her general managerial power over public lands, to cancel or suspend oil and gas leases issued in violation of a statute or regulation. *Boesche v. Udall*, 373 U.S. 472 (1963). This authority exists whether the statute or regulation violated is substantive (e.g., a law prohibiting leasing) or procedural (e.g., the National Environmental Policy Act).[4]

---

[3] On August 7, 2023, the court issued a decision rejecting all the claims raised by AIDEA and dismissing the lawsuit. Order Re Motions for Summary Judgment, Slip Op. at 74.

[4] The BLM has occasionally sought to address procedural errors by completing an additional process *post hoc* (e.g., additional NEPA analysis to address a NEPA error), and then determining whether the leases should be cancelled. *See Clayton W. Williams Jr.*, 103 IBLA 192, 203 (1988); *N. Cheyenne Tribe v. Lujan*, 804 F. Supp. 1281, 1285 (D. Mont. 1991); *see also Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245 (D.D.C. 2011); *S. Utah Wilderness All. (SUWA)*, 194 IBLA 333, 334, 337 and note 28 (2019) (collecting cases); *Bd. of Cnty. Comm'rs of Pitkin Cnty.*, 186 IBLA 288, 293-295 (2015), *reconsideration denied*, 187 IBLA 328 (2016). Nothing obligates BLM to take such an approach, and, for the reasons set forth below, further process is inappropriate in this case given the gravity of the errors and the minimal consequences of cancellation.

3

AR5355

After reviewing the Coastal Plain Oil and Gas Program pursuant to Section 4 of Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis," January 20, 2021, Secretary's Order 3401 identified two specific legal deficiencies in the record supporting the leases: (1) insufficient analysis under NEPA, including failure to adequately analyze a reasonable range of alternatives in the EIS and (2) failure in the August 17, 2020, ROD to properly interpret the Tax Act.

With respect to the first and second identified defects, the Coastal Plain EIS failed to analyze a reasonable range of alternatives because it did not analyze any alternative—besides the no action alternative—that involved fewer than 2,000 acres of surface development. NEPA requires consideration of a reasonable range of alternatives, 40 C.F.R. § 1502.14, as the "heart" of the environmental impact statement. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1207 (9th Circ. 2004). Here, BLM omitted consideration of an alternative that involved fewer than 2,000 acres to be covered by "production and support facilities" on the grounds that such an alternative would conflict with the direction in the Tax Act. *See* Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement (2019) at 2-44; Coastal Plain Oil and Gas Leasing Program Record of Decision (2020) at 10.

This was in error. The Tax Act provides, in relevant part:

> (3) SURFACE DEVELOPMENT.—In administering [the program], the Secretary shall authorize *up to* 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

Pub. L. 115-97, § 20001(c)(3) (2017) (emphasis added).

The phrase "up to" plainly indicates that BLM may authorize less than 2,000 acres for production and support facilities, and BLM's conclusion otherwise was incorrect as a matter of law, as well as unreasonable. *See Terumo Ams. Holding, Inc. v. Tureski*, 2015 U.S. Dist. LEXIS 97592, *12 (D. Mass. July 27, 2015) (collecting cases and concluding that "[t]he ordinary meaning of "up to" is one of limitation, implying a maximum cap or limit"); *see also AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1285 (Fed. Cir. 2003); *Ass'n for Cmty. Affiliated Plans v. US Treasury*, 392 F. Supp. 3d 22, 45 (D.C. Dist. 2019). *Accord* 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (Sen. Murkowski, floor statement on the Tax Act legislation) ("[T]he environment and local wildlife will always be a concern, always be a priority . . . . That is why surface development will cover *up to*, but no more, than 2,000 Federal acres.") (emphasis added).

The BLM's mistaken interpretation of the Tax Act's 2,000-acre provision constrained analysis of the reasonably foreseeable development scenario and IS—every action alternative evaluated in the 2019 EIS involved exactly 2,000 acres of surface development. By omitting any alternative that evaluated fewer than 2,000 acres of surface development, the EIS failed to adequately inform the decisionmaker and to provide a meaningful basis for comparison of alternatives.[5]

---

[5] While the NEPA process is still ongoing, the Draft Supplemental Environmental Impact Statement, incorporating feedback from the Cooperating Agencies, has resulted in a substantially revised and expanded range of alternatives, including considering varying levels of surface development and the development of a new action alternative that is

AR5356

The BLM's omission in this case was noteworthy because the statutory purposes of the Arctic National Wildlife Refuge include not merely provision of "an oil and gas program," but also the existing purposes impacted by surface development, including conservation of "fish and wildlife populations and habitats on their natural diversity," "the opportunity for continued subsistence uses by local residents," and "water quality." Alaska National Interest Lands Conservation Act (ANILCA), P.L. 96-487 (1980) § 303(2)(B),[6] *see Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 804 (D. Alaska Aug. 18, 2021) (finding the errors identified by the court to be serious, including "fail[ing] to adequately analyze a reasonable range of alternatives for the Willow Project—a process that is 'the heart of the environmental impact statement.'"); *Ctr. for Biological Diversity v. DOI*, 623 F.3d 633, 642 (9th Cir. 2010) ("'The existence of reasonable but unexamined alternatives renders an EIS inadequate,'" quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)).

In addition to these specific defects, the Department's June 1, 2021 Suspension Order also identified "several areas for which additional analysis may either address a potential legal defect or, at a minimum, serve NEPA's purpose to meaningfully inform the decisionmaker as to the environmental consequences of federal action." Those areas included, but were not limited to, the EIS's treatment of foreign greenhouse gas (GHG) emissions and compliance with the subsistence analysis required by section 810 of the ANILCA. The Department also noted it was "carefully evaluating its approach to this issue and may later identify this issue as an additional specific legal error depending on the resolution of pending court cases involving similar issues."

On August 19, 2022, in its Addendum to the suspension decision, the Department identified an additional legal error in the record supporting the AIDEA leases. Specifically, the Department noted that, in *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739 (D. Alaska Aug. 18, 2021), the District Court for the District of Alaska had invalidated approval of an oil and gas project that, like the NEPA analysis for the leases here, "did not give a quantitative estimate of the downstream GHG emissions that would result from changes in consumption of oil abroad due to the foreseeable production of Coastal Plain oil . . . [or] sufficiently explain why it could not do so and provide a more thorough discussion of how changes in foreign oil consumption might change the GHG emissions analysis." *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (holding that the Bureau of Ocean Energy Management's (BOEM) approval of the "Liberty" offshore drilling and production facility failed to comply with NEPA because it did not adequately estimate emissions resulting from increased foreign consumption of oil or sufficiently explain why it could not); *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113

---

significantly different from the action alternatives previously considered. For example, BLM has developed a scalable hypothetical development model which applies proportional adjustments across the range of alternatives to guide the hypothetical number of acres that may be developed. Additionally, BLM has developed revised stipulations and required operating procedures that provide significant new restrictions on where surface development can occur. These changes have impacted the availability for surface development of a large portion of the Program area, including a majority of the area currently under lease. These new stipulations and required operating procedures are included in the analysis of a new alternative, Alternative D, significantly expanding the range of alternatives from that previously considered.

[6] Section 1.1 of the Coastal Plain Oil and Gas Leasing Program Final EIS (September 2019) acknowledges that "[t]he oil and gas leasing program must consider the Arctic Refuge purposes set out in Section 303(2)(B) of ANILCA, as amended by Section 20001 of PL 115-97."

AR5357

(D.D.C. 2022), *vacated on other grounds* 2023 U.S. App. LEXIS 10554 (D.C. Cir. 2023) (citing *Ctr. for Biological Diversity* and *Sovereign Inupiat* and holding that BOEM's decision to hold an offshore oil and gas lease sale was arbitrary and capricious because it failed to provide a quantitative estimate of downstream GHG emissions resulting from reduced foreign consumption or adequately explain why it could not). *See also Alaska Industrial Development and Export Authority v. Biden*; Order Re Motions for Summary Judgment, Slip Op. at 58-59 (citing *Ctr. for Biological Diversity* and finding that the Coastal Plain EIS failed to consider GHG emissions resulting from foreign oil consumption, in violation of NEPA).

A recent Court of Appeals decision highlighted the importance of quantifying downstream emissions in a NEPA document for a sizable fossil fuel authorization. *350 Montana v. Haaland*, 50 F.4th 1254, 1268 (9th Cir. 2022) ("The omission of combustion-related emissions also contradicts a key premise of the [agency's environmental assessment and finding of no significant impact]—that climate change is a global problem."). The EIS for the leasing decisions at issue here used the same model (MarketSim) as did BOEM and BLM in the cases cited above, which excluded consideration of the impacts of foreign consumption on downstream GHG emissions. Because the emissions from the leasing decisions at issue—like the discrete projects at issue in *Sovereign Inupiat for a Living Arctic* and *350 Montana*—readily lend themselves to quantification of reasonably foreseeable downstream GHG emissions in order to "inform[] the public and ensur[e] agency consideration of the environmental impacts of its actions," the omission of that quantification was serious and tainted the leasing decisions before they were finalized. *350 Montana v. Haaland*, 50 F.4th at 1265. Furthermore, in the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the [Administrative Procedure Act]." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted), *cert. denied sub nom. Am. Petroleum Inst. v. Env't Def. Ctr.*, No. 22-703, 2023 WL 3801206 (U.S. June 5, 2023).

For the foregoing reasons, the Department has determined that the legal deficiencies undergirding the original lease sale were sufficiently serious and fundamental to the decision-making process to justify addressing the underlying issues in a completely new analysis rather than trying to rectify past errors through remedial NEPA analysis. While the original suspension order indicated that the Department might complete the NEPA process before deciding whether to cancel the leases, we also noted in the addendum to the original lease suspension that "[o]nce sufficient information is developed, BLM will issue a new decision concerning this suspension of operations." As set forth above, that information has been revealed at the draft Supplemental Environmental Impact Statement stage. In addition, there are practical considerations that support cancelling the invalidly-issued leases now. Specifically, cancelling these leases before consummation of the NEPA process to support a 2024 sale as required by the Tax Act will enable the Department to consider whether some or all of the areas at issue in these leases may be offered in the second lease sale contemplated by the Tax Act. As a general matter, moreover, the Department recognizes the value of finality for all interested parties vis-à-vis the subject leases. Accordingly, there is no reason for further delay in his matter.

The Department has also considered the disruptive consequences of cancellation and finds those consequences to be minimal. Less than 140 days after the AIDEA leases were issued, the Department identified serious pre-leasing legal defects and suspended the leases. Since that time,

AR5358

the lease terms have been tolled and lease rentals suspended. No approved permits or authorizations for exploration or other activity on the leases were affected by the lease suspension and no ongoing activity will be disrupted.[7] Because AIDEA will receive a full refund of the bonus bid and first year's rentals consistent with this decision to cancel the leases, the consequences from cancellation are minimal.

## III. Conclusion

In consideration of the foregoing, and in accordance with the Secretary's inherent authority under her general managerial power over public lands, the seven leases identified in the caption above are cancelled as being invalidly issued. I reach this decision based on the seriousness of the pre-leasing legal errors given the special legal and factual circumstances of the original leasing decisions, and on the minimal disruptive consequences from cancellation.

Lease payments not previously refunded, comprising lease sale bonus bids and first year rentals totaling $12,801,425 were made in January 2021 for the seven leases. Our cancellation of the seven leases entitles AIDEA to a refund of that amount.

You are not entitled to interest on that amount because the United States cannot pay interest without statutory authorization and there is no applicable authority allowing payment of interest for refunds of lease bonus bid and rental payments.

## IV. Final Agency Action

It is my decision to hereby cancel all seven of AIDEA's leases. You are entitled to a refund of lease payments totaling $12,801,425. You are not entitled to interest on that amount.

My decision constitutes the final decision of the Department and, in accordance with the regulations at 43 C.F.R. § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 C.F.R. Part 4.

Sincerely,

Tommy P. Beaudreau

---

[7] By way of contrast, this is not a case where the lessee had acquired and held the leases for several years, paying annual rent without notice of pre-leasing legal defects or limitations on development. Nor is it a case where a lessee has spent considerable time and money in exploration activities and invested large amounts in the engineering and preparation of a development plan. In fact, AIDEA has no outstanding reclamation obligations to BLM related to these leases because there has been no development or surface disturbance on the leases.

AR5359

# Biden-Harris Administration Takes Major Steps to Protect Arctic Lands and Wildlife in Alaska

## Department of the Interior cancels oil and gas leases in the Arctic National Wildlife Refuge; proposes new protections in National Petroleum Reserve in Alaska

9/6/2023

Date: Wednesday, September 6, 2023

Contact: Interior_Press@ios.doi.gov

WASHINGTON — The Biden-Harris administration today announced significant steps to protect the Arctic National Wildlife Refuge (Arctic Refuge) and more than 13 million acres in the National Petroleum Reserve in Alaska (NPR-A). These bold actions to protect the Arctic region build on President Biden's historic conservation and climate agenda, which already includes protecting more than 21 million acres of public lands and waters across the nation, and securing the Inflation Reduction Act, the largest investment in climate action in history.

In the Arctic Refuge, Secretary of the Interior Deb Haaland has authorized the cancellation of the remaining seven oil and gas leases issued by the previous administration in the Coastal Plain. The leases were suspended in June 2021 following the issuance of Secretary's Order (S.O.) 3401, which identified "multiple legal deficiencies in the underlying record supporting the leases."

In addition, the Department today proposed new regulations for the NPR-A that would ensure maximum protection for the more than 13 million acres of Special Areas in the reserve, while supporting subsistence activities for Alaska Native communities. The proposed rule, previewed in March 2023, adds to President Biden's actions to protect millions of acres of lands and waters in the Arctic, including withdrawing approximately 2.8 million acres of the Beaufort Sea, ensuring the entire United States Arctic Ocean is off limits to new oil and gas leasing.

"With climate change warming the Arctic more than twice as fast as the rest of the planet, we must do everything within our control to meet the highest standards of care to protect this fragile ecosystem," said Secretary Haaland. "President Biden is delivering on the most ambitious climate and conservation agenda in history. The steps we are taking today further that commitment, based on the best available science and in recognition of the Indigenous Knowledge of the original stewards of this area, to safeguard our public lands for future generations."

AR5360

Lease Cancellations in the Arctic National Wildlife Refuge

Following passage of the Tax Cuts and Jobs Act of 2017 (Tax Act), the previous Administration held an oil and gas lease sale in the Arctic Refuge's Coastal Plain on January 6, 2021, and issued 10-year leases on nine tracts covering more than 430,000 acres. On January 21, 2021, President Biden issued Executive Order 13990, directing the Department to review oil and gas leasing in the Refuge, "[i]n light of the alleged legal deficiencies underlying the program." S.O. 3401 directed a new, comprehensive analysis of the potential environmental impacts of the Coastal Plain Leasing Program. Since that time, two of the issued leases have been canceled and refunded at the request of the lessees. The remaining seven leases held by the sole lessee covered 365,000 acres in the Coastal Plain.

The Secretary of the Interior has the authority to cancel or suspend oil and gas leases issued in violation of a statute or regulation. The draft supplemental environmental impact statement (SEIS) released today by the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service (FWS) developed information supporting the Department's determination that the 2021 lease sale was seriously flawed and based on a number of fundamental legal deficiencies, including: insufficient analysis under the National Environmental Policy Act, including failure to adequately analyze a reasonable range of alternatives and properly quantify downstream greenhouse gas emissions; and failure to properly interpret the Tax Act. Accordingly, Secretary Haaland has determined that the leases issued by the previous administration in the Arctic Refuge shall be cancelled.

Protections in the National Petroleum Reserve in Alaska

Extending from the northwest slope of the Brooks Range to the Arctic Coast, the NPR-A encompasses roughly 23 million acres of public land managed by the BLM. Tribal Nations have occupied lands now within the NPR-A since time immemorial, and over 40 Indigenous communities continue to rely on subsistence activities in the reserve, harvesting caribou, shore and waterbirds, and many other fish and wildlife species, with many communities subsisting primarily from food harvested from the NPR-A.

Under the Naval Petroleum Reserves Production Act (NPRPA) of 1976, Congress directed the BLM to balance oil and gas development with the management and protection of sensitive landscapes – known as Special Areas – and surface resources across the reserve. The proposed rule is designed to assure maximum protection of Special Areas, as authorized under the NPRPA. The proposed rule would require that protections for Special Areas remain in place for as long as the values and characteristics in those areas are present, ensuring the durability of the protections into the future. The proposed rule also would require the BLM to review and gather public input – at least every five years – on whether existing special areas should be expanded, whether new special areas should be designated, and whether additional resources within special areas should be identified for protection. Upon finalization of the proposed rule, the Administration will follow this proposed process to inform the creation or expansion of additional special areas in the NPR-A.

AR5361

The proposed rule would protect 13 million acres encompassed by the existing Special Areas by limiting future oil and gas leasing and industrial development in the Teshekpuk Lake, Utukok Uplands, Colville River, Kasegaluk Lagoon, and Peard Bay Special Areas – places collectively known for their globally significant intact habitat for wildlife, including grizzly and polar bears, caribou and hundreds of thousands of migratory birds. The rule would establish an outright prohibition on any new leasing in 10.6 million acres, more than 40 percent of the NPR-A.

The proposed rule would raise the bar for development throughout the NPR-A by establishing clear guidelines that are consistent with provisions of the current management plan for the reserve, the NPR-A Integrated Activity Plan (IAP). This current management plan for the reserve was put in place in 2022, and effectively reversed the previous administration's IAP that sought to expand oil and gas leasing and development in the NPR-A and reduce protections for the Special Areas.

The proposed rulemaking would help protect subsistence uses throughout the NPR-A, responding to Alaska Native communities who have relied on the land, water and wildlife to support their way of life for thousands of years. It also advances the Biden-Harris administration's commitment to strengthening the role of Tribal governments in the management of public lands by encouraging the BLM to explore co-stewardship opportunities with Tribes for the Special Areas.

Seeking Public Comment

There will be a 45-day public review and comment period on the draft SEIS for the Coastal Plain. In developing the draft, the BLM and FWS engaged with a wide variety of stakeholders and used the best available data and science, including Indigenous Knowledge. For additional information, go to BLM's eplanning page.

The proposed NPR-A rule and map of the five NPR-A Special Areas as delineated in the 2022 IAP, are available for preview. A forthcoming publication of the proposed rule in the Federal Register will open a 60-day public comment period. During that time, the BLM will host in-person meetings in communities on the North Slope, as well as virtual public meetings to discuss the proposed rule. Details of those opportunities will be made available soon.

###

AR5362



notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS website at *https://www.uscis.gov,* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**SUPPLEMENTARY INFORMATION:**

**Comments**

The information collection notice was previously published in the **Federal Register** on June 29, 2023, at 88 FR 42094, allowing for a 60-day public comment period. USCIS did not receive any comments in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *https://www.regulations.gov* and enter USCIS–2007–0029 in the search box. The comments submitted to USCIS via this method are visible to the Office of Management and Budget and comply with the requirements of 5 CFR 1320.12(c). All submissions will be posted, without change, to the Federal eRulemaking Portal at *https:// www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *https://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other

technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection Request:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* I–864, Affidavit of Support Under Section 213A of the INA; I–864A, Contract Between Sponsor and Household Member; I–864EZ, Affidavit of Support Under Section 213A of the INA; I– 864W, Request for Exemption for Intending Immigrant's Affidavit of Support.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–864; I– 864A; I–864EZ; I–864W; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS uses the data collected on Form I–864 to determine whether the sponsor has the ability to support the sponsored immigrant under section 213A of the Immigration and Nationality Act. This form standardizes evaluation of a sponsor's ability to support the sponsored immigrant and ensures that basic information required to assess eligibility is provided by sponsors.

Form I–864A is a contract between the sponsor and the sponsor's household members. It is only required if the sponsor used income of their household members to reach the required 125 percent of the Federal poverty guidelines. The contract holds these household members jointly and severally liable for the support of the sponsored immigrant. The information collection required on Form I–864A is necessary for public benefit agencies to enforce the Affidavit of Support in the event the sponsor used income of their household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor.

USCIS uses Form I–864EZ in exactly the same way as Form I–864; however, USCIS collects less information from the sponsors as less information is needed from those who qualify in order to make a thorough adjudication.

USCIS uses Form I–864W to determine whether the intending immigrant meets the criteria for exemption from section 213A requirements. This form collects the immigrant's basic information, such as name and address, the reason for the exemption, and accompanying

documentation in support of the immigrant's claim that they are not subject to section 213.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection Form I–864 is 453,345 and the estimated hour burden per response is 6 hours; the estimated total number of respondents for the information collection Form I–864A is 215,800 and the estimated hour burden per response is 1.75 hours; the estimated total number of respondents for the information collection Form I–864EZ is 100,000 and the estimated hour burden per response is 2.5 hours; the estimated total number of respondents for the information collection Form I–864W is 98,119 and the estimated hour burden per response is 1 hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 3,445,839 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $159,608,680.

Dated: September 1, 2023.

**Samantha L. Deshommes,**

*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2023–19375 Filed 9–7–23; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Land Management**

[DOI–BLM–AK–0000–2021–0006–EIS]

**Notice of Availability of the Draft Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of availability.

**SUMMARY:** In compliance with the National Environmental Policy Act of 1969, as amended (NEPA), the Bureau of Land Management (BLM) announces the availability of the Draft Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement (Leasing SEIS).

**DATES:** To afford the joint lead agencies the opportunity to consider comments

in the Final Leasing SEIS, please ensure that the BLM receives your comments within 45 days following the date the Environmental Protection Agency (EPA) publishes its Notice of Availability (NOA) of the Draft Leasing SEIS in the **Federal Register**. The EPA publishes these NOAs on Fridays. The BLM will be holding virtual and in-person public meetings. The dates of the comment period as well as information about public meetings and subsistence hearings will be available on the project website in the **ADDRESSES** section.

**ADDRESSES:** The Draft Leasing SEIS is available for review on the BLM ePlanning project website at *https:// eplanning.blm.gov/eplanning-ui/ project/2015144/510.*

Written comments related to the Draft Leasing SEIS may be submitted via the ePlanning project website at *https:// eplanning.blm.gov/eplanning-ui/ project/2015144/510.*

Documents pertinent to this proposal may be examined at the BLM Alaska State Office, BLM Alaska Arctic District Office, and the United States Fish and Wildlife Service (USFWS) Arctic National Wildlife Refuge Office.

• BLM Alaska State Office Public Room, 222 W 7th Avenue, Anchorage, AK 99513
• BLM Alaska Arctic District Office, 222 University Avenue, Fairbanks, AK 99709
• USFWS Arctic National Wildlife Refuge Office, 101 12th Avenue, Room 235, Fairbanks, AK 99701

**FOR FURTHER INFORMATION CONTACT:** Serena Sweet, BLM Supervisory Planner, telephone (907) 271–4345, or email *ssweet@blm.gov;* Stephanie Kuhns, BLM Planning and Environmental Specialist, telephone (907) 271–4208, email *skuhns@blm.gov;* or Bobbie Jo Skibo, Coastal Plain Oil and Gas Program Coordinator, telephone (907) 441–1539, email *bobbiejo_skibo@ fws.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services for contacting Ms. Sweet, Ms. Kuhns, or Ms. Skibo. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The Draft Leasing SEIS was developed by the BLM and USFWS as joint lead agencies to address deficiencies in the 2019 Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement and the 2020 Record of Decision approving the Arctic National Wildlife Refuge

Coastal Plain Oil and Gas Leasing Program (85 FR 51754).

The joint lead agencies prepared this Draft Leasing SEIS in accordance with NEPA to implement an oil and gas leasing program in the Coastal Plain of the Arctic National Wildlife Refuge (Coastal Plain). This Draft Leasing SEIS serves to inform BLM's implementation of the Public Law 115–97, Section 20001(c)(1) requirement to hold two lease sales. It may also inform management of post-lease activities, including seismic surveys, exploratory drilling, oil and gas development, and transportation of oil and gas in and from the Coastal Plain. Specifically, the Draft Leasing SEIS considers and analyzes the environmental impacts of various leasing alternatives and the indirect impacts that could result from hypothetical development.

This Draft Leasing SEIS does not permit oil and gas extraction activities. It considers three action alternatives for implementation of an oil and gas leasing program in the Coastal Plain. The decisions to be made include which lands to offer for lease and what terms and conditions would apply to leases. The decisions evaluated would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources on the Coastal Plain. Future on-the-ground actions requiring BLM approval, including proposed exploration plans and development proposals, would require further NEPA analysis based on the site-specific proposal.

Although sections 20001(a)(2) and (b)(2)(A) of Public Law 115–97 assign responsibility to the BLM for administering the oil and gas program on the Coastal Plain, it is understood that all activities, including plan development, study development, and consideration of exceptions, modifications, waivers, or any operations conducted on the surface of the Coastal Plain, would include close coordination with the USFWS as the surface management agency. In addition, the BLM would coordinate with other appropriate Federal, State, and North Slope Borough agencies; Tribal Governments; ANCSA corporations; and other Native organizations as appropriate.

All comments received during the comment period will be considered and evaluated, and substantive comments will be addressed in the Final Leasing SEIS to be completed in 2024. The most useful comments are ones that are specific and address one or more of the following:

• Identification of new information that would have a bearing on the analysis.
• Inaccuracies or discrepancies in information or any errors in our portrayal of the resources and uses of the program area.
• Suggestions for improving implementation of an oil and gas leasing program on the Coastal Plain, consistent with the purposes of the Arctic National Wildlife Refuge.
• Identification of new impacts, alternatives, or potential mitigation measures.

When you share your comments with us, please be as specific as possible. Identify the specific concern or correction you are suggesting, where it appears in the Draft Leasing SEIS, and the modification you feel is necessary or appropriate. If you have an idea for a potential mitigation measure, please tell us what it is and the benefits it would provide.

Information about public meetings and subsistence hearings will be available on the project website listed in the **ADDRESSES** section, and will be announced through additional, public notices, news releases, and mailings.

The BLM and USFWS will continue to consult with Indian Tribal Nations and Alaska Native corporations in accordance with Executive Order 13175, BLM MS 1780, and other Departmental policies. Tribal concerns, including impacts on Indian trust assets, impacts to subsistence resources, and potential impacts to cultural resources, will be given due consideration.

Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

(Authority: 40 CFR 1506.6, 40 CFR 1506.10)

**Steven M. Cohn,**
*BLM Alaska State Director.*
[FR Doc. 2023–19427 Filed 9–7–23; 8:45 am]
**BILLING CODE 4331–10–P**

## INTERNATIONAL TRADE COMMISSION

[USITC SE–23–043]

### Sunshine Act Meetings

**AGENCY HOLDING THE MEETING:** United States International Trade Commission.

October 16, 2023

Anchorage Public Meeting on Draft Supplemental EIS

Transcript

Commenter:  Alaska Industrial Development and Export Authority (AIDEA) – Randy Ruaro:

Thank you. Good evening, everyone. My name is Randy Ruaro, last name R-U-A-R-O. I'm the executive director for AIDEA, Alaska Industrial Development & Export Authority. We're the bidder and holder of the leases, and we would urge the federal government to reinstate those leases.
Our statutory mission is to produce economic development and jobs, particularly in rural Alaska.
That would occur here if we were allowed to go forward with our leases.

There are a couple areas that we would also urge the BLM to look at in their EIS, and one of those is the true source of much of the pollution that covers the Arctic, which comes from Asia, not from oil and gas development on the North Slope. And I'm happy to provide some of those records, but that is a -- true source of harm to the -- to the Arctic. Black soot -- it's been traced for quite a while now -- NASA and others.

And so we would urge the BLM to take a close hard look at the language of the 2017 tax act as well. It speaks in terms of "shall." Shall provide in oil and gas and propane. Shall provide for up to 2,000 acres. Shall does not mean may, and we would urge the BLM to follow the law and reinstate our leases.

We do take seriously the opinions of Alaskans and concerns about the environment, and we would only move forward according to the rules of Alaska, which are very strict. I think Alaska may be the only state, probably one of the only places in the world, where waste of oil and gas is not allowed. There is no flaring of gas in Alaska or very little, and that is unlike other places like Umm Al, Russia, other locations where massive amounts of emissions are produced from flaring gas when oil is produced.

So it is protecting the Arctic -- protecting Alaska's Arctic when you're producing oil and gas in Alaska as opposed to other locations with weaker limits.

We'll continue -- we'll continue to follow the process. Will comment -- appreciate the comments of everyone that's spoke tonight. Thank you.

AR5365



**November 7, 2023**

Steve Cohn, State Director
BLM Alaska State Office
222 W 7th Avenue
Anchorage, AK 99513

Shelly Jones, District Manager
BLM Alaska Arctic District Office
222 University Avenue
Fairbanks, AK 99709

Merben Cebrian, Refuge Manager
USFWS Arctic National Wildlife Refuge Office
101 12th Avenue, Room 235
Fairbanks, AK 99701

      Re: Comments of the Alaska Industrial Development and Export Authority on the
      Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing
      Program (NEPA DOI-BLM-AK-0000-2021-0006-EIS)

Mr. Cohn, Ms. Jones, and Mr. Cebrian:

The Alaska Industrial Development and Export Authority submits the following comments
regarding the Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas
Leasing Program, NEPA DOI-BLM-AK-0000-2021-0006-EIS. In addition, AIDEA has attached
as Exhibit A a chart with other specific comments and Exhibits B-E, referenced below; we
incorporate by reference all five Exhibits into AIDEA's comments.

## I.    <u>Introduction and AIDEA's Interest as a State of Alaska-Owned Corporation and Lessee.</u>

The Alaska Industrial Development and Export Authority (AIDEA) is Alaska's economic
development authority, which has as one of its statutory purposes the development of Alaska's
natural resources. Alaska Stat. § 44.88.010(b); § 44.88.070 (2) and (3). Such development can
include the acquisition of a lease. *Id*. § 44.88.080(5). AIDEA is formed and operates by statute as
a public corporation of the State of Alaska, constituting a political subdivision under its laws
"but with separate and independent legal existence." *Id*. § 44.88.020.

The Alaska Legislature created AIDEA "to promote, develop, and advance the general prosperity
and economic welfare of the people of the state, to relieve problems of unemployment, and to
create additional employment." *Id.* § 44.88.070. AIDEA encourages economic growth and

*Investing in Alaskans*    aidea.org

813 West Northern Lights Boulevard, Anchorage, Alaska 99503  T 907.771.3000  Toll Free (Alaska Only) 888.300.8534  F 907.771.3044

Case 3:24-cv-00051-SLG    Document 71-4    Filed 08/13/24    Page 14 of 69

AR5366

diversification in Alaska by providing means of financing and assistance to Alaska businesses, including through its Credit and Development Finance Programs. *Id.* § 44.88.080. Revenue generated by AIDEA investments is allocated towards reinvestment in AIDEA programs, AIDEA projects, and dividends to the State's general fund.

The Coastal Plain Leasing Program was established by Congress through the Tax Cuts and Jobs Act (TCJA), P.L. 115-97, passed in 2017, and the first mandated lease sale under the Program was conducted by the Bureau of Land Management (BLM) in January 2020. Given its directive to use its resources to develop natural resources and encourage economic growth, and particularly given the importance of oil development and oil revenues to both AIDEA and the State of Alaska, AIDEA participated in the lease sale and secured certain oil and gas leases in the Coastal Plain. AIDEA was a successful lease bidder, acquiring 7 leases. AIDEA complied with all of the financial and legal requirements to hold the leases.

The leases that AIDEA bid on and obtained have substantial value both to the Authority and the State of Alaska; by federal law, the State will receive half of the oil royalties from ANWR production. AIDEA paid for the leases to put them into production to create hundreds of jobs and promote significant economic development by producing billions of barrels of domestic oil. AIDEA provides financing for natural resource development and related infrastructure, such as the Delong Mountain Transportation System in Northwestern Alaska.

Depending on market forces, the size and number of fields discovered, and the timing of development, the projected ultimate recovery in the Coastal Plain is estimated to be anywhere from 1.5 BBO to 10 BBO (Attanasi and Freedman 2009). Relevant studies specific to ANWR demonstrate how the amounts of estimated recoverable oil in ANWR have grown over time. The 1987 EIS[1] estimated that there was a 15 percent chance that 2 BBO could be recovered from the 1002 area, a 1998 report[2] increased that likelihood to a 95 percent chance that there were 2 BBO in ANWR, and a 2009 report estimates that there could be from 1.5 BBO to 10 BBO in ANWR.

The U.S. Geological Survey (USGS) further found that oil in the ANWR Coastal Plain was economically and technically recoverable, to a 95 percent degree of certainty, so long as the market price for oil exceeded just $19 per barrel. USGS determined that 3.6 billion barrels of oil (BBO) were economically recoverable from the Coastal Plain if oil prices reached $40 per barrel. USGS Fact Sheet https://.pubs.usgs.gov/fs/fs-0028-01/fs-0028-01.pdf.

For further support of the possible recoverable petroleum from the lease area, the Congressional Research Service in 2018 provided further guidance. The report stated: "The amount that would be economically recoverable depends in part on the price of oil. In its last economic assessment in 2005, USGS estimated that, at $67.65/BBO in 2017 dollars, there is a 95 percent chance that 4.0 billion BBO or more could be economically recovered and a small (5 percent) chance that

---

[1] https://pubs.usgs.gov/fedgov/70039559/report.pdf

[2] https://pubs.usgs.gov/of/1998/ofr-98-0034/

AR5367

10.9 billion BBO or more could be economically recovered on the federal lands on the Coastal Plain; the mean was 7.3 billion BBO."[3]

However, since AIDEA lawfully obtained oil leases on the Coastal Plain, DOI has imposed moratoriums on all oil and gas leasing and directed further NEPA review of programs already addressed by records of decision issued by the prior administration, including the Coastal Plain Program.

Then DOI unlawfully canceled AIDEA's leases in an announcement by the Secretary of Interior and in a written order signed by then DOI Deputy Secretary Beaudreau. A September 6, 2023, Press Release issued by DOI stated that: "In the Arctic Refuge, Secretary of the Interior Deb Haaland has authorized the cancellation of the remaining seven oil and gas leases issued by the previous administration in the Coastal Plain. The leases were suspended in June 2021 following the issuance of Secretary's Order (S.O.) 3401[4], which identified 'multiple legal deficiencies in the underlying record supporting the leases.'". At a press conference on September 6, 2023, Secretary Haaland stated that: "With today's action, no one will have rights to drill in one of the most sensitive landscapes on Earth."[5] On September 6, 2023, Deputy Secretary Tommy Beaudreau sent AIDEA a decision notifying AIDEA that its lease had been cancelled. *See*, Exhibit B.

In AIDEA's view, the cancellation of its ANWR leases it had lawfully acquired was illegal, and AIDEA is pursuing its legal remedies. AIDEA's ability to develop the leases into oil production and provide project financing for that development as a lease owner has been illegally ended. Further, in the Lease Cancellation Decision, DOI stated that it is considering taking acreage that had been included in AIDEA's leases and offering it to bidders in a lease sale in 2024. This subjects AIDEA to the risk that other bidders will obtain the acreage for which AIDEA bid, paid, and was subsequently awarded. Other bidders might outbid AIDEA for the most economically valuable western portionof the Coastal Plain. Further, Defendants are subjecting AIDEA to the risk that they will not offer to any bidder the acreage that AIDEA bid upon and was awarded in the January 2021 lease sale.

On the day, September 6, 2023, DOI cancelled the leases, BLM issued a Supplemental Environmental Impact Statement for the Coastal Plain Oil and Gas Leasing Program (SEIS).[6]

---

[3] 2018 CRS ANWR update, page 12. https://crsreports.congress.gov/product/pdf/RL/RL33872

[4] https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3401-comprehensive-analysis-and-temporary-halt-on-all-activitives-in-the-arctic-national-wildlife-refuge-relating-to-the-coastal-plain-oil-and-gas-leasing-program.pdf

[5] A media report by National Public Radio containing this quotation is available at: https://www.npr.org/2023/09/06/1197945859/anwr-alaska-drilling-oil-gas-leases-environmentenergyclimatechange

[6] https://eplanning.blm.gov/public_projects/2015144/200492847/20085216/250091398/Coastal_Plain_Draft_SEIS_Vol1_508.pdf.

*Investing in Alaskans* aidea.org

Despite the leases' cancellation, AIDEA, in conformity with the ongoing NEPA SEIS process (DOI-BLM-AK-0000-2021-0006-EIS), now submits the following comments on the SEIS for the Coastal Plain Leasing Program, initiated at the Secretary of Interior's direction in 2021 and published in August 2023. By doing so, AIDEA is not agreeing that an SEIS is needed or appropriate under current law. Further, AIDEA again repeats that the cancellation of its leases by BLM and DOI was unlawful.[7]

## II.    The Coastal Plain Leasing Program and Requisite Lease Sales are Not a "Major Federal Action" subject to NEPA.

The National Environmental Policy Act (NEPA) is implemented through regulations promulgated by the Council on Environmental Quality (CEQ) as well as agency-specific regulations and policies. The Fiscal Responsibility Act (FRA), Pub. Law 118-5, made significant and pertinent amendments to NEPA, including thresholds and the definition of "major federal action." The CEQ regulations in place in 2021 when BLM issued its NOI for the SEIS also include this definition. The effective date of the FRA NEPA amendments was June 3, 2023 when the statute was signed into law, as acknowledged by the CEQ's publication in the Federal Register on July 31, 2023. 88 Fed. Reg. 49924.

In the ANWR SEIS, issued on September 6, 2023, BLM failed to apply the appropriate NEPA threshold to the Coastal Plain Leasing Program. BLM failed to apply the CEQ regulations in place at the time the supplemental NEPA process was initiated in 2021. It also failed to apply the FRA amendments to NEPA that went into effect in June 2023, before BLM published the SEIS.

Under the 2020 CEQ Regulations, a "major federal action" requiring environmental review **does not include**, "[a]ctivities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." 40 CFR 1508.1(q)(1)(ii); *see* 42 U.S.C. § 4332 for the agencies' statutory authority. Effective June 2023, the FRA reconfirmed this point by providing that the definition of a major federal action does not include "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority." § 111(10)(B)(vii) (codified at 42 U.S.C. § 4336e(10)(B)(vii)). Further, the FRA states that an agency is not required to prepare an environmental document when the result of the threshold determination is that "the proposed agency action is a nondiscretionary action with respect to which such agency

---

[7] In recently-filed litigation before the U.S. District Court for the District for The District of Columbia (Case BO: 1:23-cv-03126) (filed Oct. 18, 2023), AIDEA challenges the cancellation of its leases prior to the completion of the supplemental NEPA process on several grounds. Specifically, AIDEA asserts: (1) that the leases were unquestionably legal, because Congress directed DOI to issue them; (2) DOI's decision to cancel the leases on the basis of issues collateral to the non-discretionary issuance of the leases was an abuse of discretion; (3) the "legal errors" identified in the initial NEPA process did not require the termination of AIDEA's leases; (4) the termination of AIDEA's leases prior to the completion of the supplemental NEPA process violated AIDEA's due process rights; and (5) the cancellation of the leases violated the Naval Petroleum Reserves Production Act ("NPRPA"), because the leases, believed to contain valuable oil and gas deposits, could not be cancelled absent a court order. A copy of the complaint is attached as Exhibit C and is hereby incorporated by reference into these comments.

*Investing in Alaskans*    aidea.org

does not have authority to take environmental factors into consideration in determining whether to take the proposed action." § 106(a)(4) (codified at 42 U.S.C. § 4336(a)(4)). The regulations that implement NEPA, which were revised in 2020 and 2022, state that in assessing whether NEPA applies, "Federal agencies should determine … whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute." 40 CFR 1501.1.

Congress strengthened this regulatory requirement by amending the NEPA statute to state that "[a]n agency is not required to prepare an environmental document with respect to a proposed agency action if … the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law." FRA § 106(a) (codified at 42 U.S.C. § 4336(a)(3)). This statutory reform was effective in June of 2023, before this SEIS was issued, so the SEIS should have been issued in compliance with these statutory changes. The SEIS clearly appears not to have considered the new reforms.

The 2017 Tax Cuts and Jobs Act (TCJA) required the Secretary of the Interior to offer the initial lease sale not later than December 22, 2021. The DOI has spent six years trying to comply with NEPA since the passage of the TCJA. The end result is that the Department has effectively not leased any of the Coastal Plain. Therefore, BLM, by attempting to comply with NEPA, has created a conflict with the TCJA. The Department was without discretion in creating a leasing program and holding two lease sales, with certain parameters prescribed by Congress. The Secretary's decision to *sua sponte* direct further environmental review violated current regulation in 2021 and now violates the basic parameters of NEPA as amended by the FRA.[8]

### III.   The Decisions to be Made.

The SEIS states that the decisions to be made are a) which tracts to offer for leases, and b) the terms and conditions to be applied to the leases. SEIS p. 1-2. It goes on to state, "The decisions evaluated in this Leasing EIS and its ROD would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources in the Coastal Plain." The TCJA requires BLM to "lease those areas that have the highest potential for the discovery of hydrocarbons." § 20001(c)(1)(B)(i)(II). Consequently, the SEIS should have been focused on and be limited to those areas defined in the act that have the highest potential for the discovery of hydrocarbons. The purpose of the lease program is only to allow for exploration of the ANWR leasing area to determine *if* further development should occur.

Moreover, the terms and conditions should focus on and be limited to activities that do not involve the impacts of production and should address the environmental impacts of exploration. The subsequent site-specific ground disturbing exploration activities fall within the umbrella of this EIS and can be authorized by a lesser follow-up NEPA document such as an EA / FONSI, without having to wait for another full blown EIS. Our comments below include examples of

---

[8] Judge Gleason in her August 7, 2023 decision affirmed DOI's decision to pause the program while DOI undertook further review. AIDEA v. Biden, 2023 WL 502155 (D. Alaska). AIDEA notes that it disagrees with that decision, and the decision remains subject to appeal.

AR5370

impact analyses contained within the SEIS that are currently not relevant to reaching these two decisions, and more importantly that confuse the decision-making process for these decisions by incorporating potential adverse environmental impacts not pertinent to these two decisions. As a result, much of the analysis in the SEIS is surplusage.

The Congressional mandate in the TCJA relies on and is supported by the U.S. Geological Survey's (USGS) conclusion that there is a 95 percent or greater probability of there being at least 4.3 billion barrels of technically recoverable oil in the Coastal Plan, and that 3.4 billion of those barrels (more than 75 percent) are in the western part of the Coastal Plain called the "undeformed part." USGS Arctic National Wildlife Refuge, 1002 Area, Petroleum Assessment, 1998. There are a substantial number of wells that found oil just to the west of the western boundary of the Coastal Plain, near the parts of the Coastal Plain leased by AIDEA in January 2021.

As discussed in greater detail below, by defining a decision that is inappropriately broad and consequently creating an overly broad purpose and need, alternatives that are loaded with constraints on production, and analyses based on activities that are not ripe for decision, BLM has failed to follow the Congressional mandate in the unambiguous TCJA to "lease those areas that have the highest potential for the discovery of hydrocarbons." *Supra.* But ultimately the language in section 321(10)(b)(7) (codified at 42 USC 4336(e)) of the NEPA statutes provides that the term "Major Federal Action" required to trigger NEPA does not include any "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority."

### IV. The NEPA Regulations and Amendments to the NEPA Statute Preclude the Preparation of the SEIS.

The CEQ 2020 and 2022 NEPA regulations state:

> **§ 1501.1 NEPA thresholds.**
> (a)  In assessing whether NEPA applies or is otherwise fulfilled, Federal agencies should determine:
>
> > (1)  Whether the proposed activity or decision is expressly exempt from NEPA under another statute;
> >
> > (2)  Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;(emphasis added)

These CEQ regulations were then followed by the June 2023 FRA Amendments to NEPA. The red font signifies the new statutory language:

> **SEC. 106. PROCEDURE FOR DETERMINATION OF LEVEL OF REVIEW.**
> (a)  THRESHOLD DETERMINATIONS. —*An agency is not required to prepare an document with respect to a proposed agency action if*—
>
> > (1)  the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5, United States Code;

(2) the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with section 109 of this Act, or another provision of law;
*(3) the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law*; or
(4) the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.

42 U.S.C. § 4336 (emphasis added)

With respect to the ANWR leases, the preparation of an SEIS does not excuse BLM from its duty under the 2017 TCJA to hold a lease sale and issue leases by December 2021, TCJA § 20001(c). Particularly now that BLM has cancelled AIDEA's leases, the further delay caused by BLM still continuing to work on an SEIS while the leases required by the TJCA to be in place by December 2021 are not in place as of November 2023 reflects a fundamental conflict between NEPA and "the requirement of another provision of law," the TCJA.

## V.     __What is Ripe for Agency Decision-Making__?

There is no basis for a NEPA environmental document to address any issues other than mitigation, because the TCJA mandates the oil and gas program occur and mandates the issuances of leases and necessary rights-of-way. TJCA § 20001. Legal changes both by statute and by Supreme Court decision obviate any need for a SEIS, especially when the scope of the proposed exploration has not changed since the issuance of the ROD; commercial oil production will be authorized only after separate NEPA analysis devoted to that subject and only after successful exploration; and there is no connected action between the two potential events.

The SEIS repeatedly states that when BLM is presented with proposals for exploration or development, those decisions by BLM for specific authorizations will also be subject to project specific analysis, including compliance with NEPA and other laws. This is a common programmatic approach to NEPA compliance. For example, BOEM does similar programmatic analyses at this stage in determining lease areas for wind farm developments. If an interested party wants to do subsequent exploration, BOEM conducts another NEPA review. 30 CFR 585.

The CEQ regulations state, "Agencies should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, **focus on the actual issues ripe for decision**, and exclude from consideration issues already decided **or not yet ripe** at each level of environmental review." 40 CFR § 1501.11(a) (emphasis added).

By including in the SEIS issues and impacts that are currently not ripe for the two stated decisions, there is the strong possibility that potential adverse impacts not ripe for consideration will affect the decision-making process. In a decision by the U.S. District Court for the District of Alaska, *Chilkat Indian Village of Klukwan, et. al. v. BLM*, 399 F.Supp.3d 888 (2019), Judge

AR5372

Timothy Burgess stated: "…the sole issue of whether NEPA requires consideration of **future** impacts from potential mine development as part of the environmental review for exploration activities." *Id*. at 915 (emphasis added). This is essentially the same issue presented by the standards and analysis applied in the pending ANWR SEIS.

The Court noted that CEQ regulations implementing NEPA require that the agency consider connected actions if "the two actions '[c]annot or will not proceed unless other actions are taken previously or simultaneously.'" *Id* at 916, citing 40 C.F.R. § 1508.25(a)(ii). The Court noted that the Ninth Circuit "appl[ies] an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS." *Id* at 916-7. Such is not the case with the consideration of an ANWR Leasing Program. Leasing simply does not equate to development. And as is explained latter in these comments, the leases actually provide for another layer of environmental review before disturbances of the leasehold interest occur.

The configuration of the action alternatives is also affected by the ripeness question. For example, is there a supportable rationale for including alternative well numbers in order to make the two decisions?

AIDEA considers it the more compelling point that the 2020 regulatory changes were certainly effective before BLM started preparing the SEIS and were not changed on this point by the 2022 Phase 1 regulations. Regarding the amendments, CEQ issued a Q&A after the amendments came out, which states:
a.  What is the effective date of these amendments?
        The amendments to NEPA are effective June 3, 2023.
b.  How do the amendments apply to ongoing NEPA reviews?
        Federal agencies are responsible for determining how the amendments apply to their ongoing NEPA reviews and should consider congressional intent to facilitate more efficient NEPA analysis when making this determination. Many of the provisions of the FRA codify best practices an agency may already include in its NEPA reviews, or ones an agency may integrate into an ongoing review with little or no disruption. Where implementation of a provision could lead to inefficiency in an ongoing NEPA review, agencies should engage in a fact-specific evaluation to determine the appropriate approach that considers the statutory requirements; the level of NEPA review (i.e., environmental impact statement, environmental assessment, or categorical exclusion); the stage at which the environmental review was at the time of the amendment; the expectations of any project proponents; additional resources that would be required to implement the provision; the extent of any disruption it could cause; and other legal considerations.

BLM did not start the SEIS until 2021. Section 1506.13 of the 2020 regulations states: "The effective date of these regulations in this subchapter apply to any NEPA process begun after September 14, 2020." The conclusion by DOI is that an SEIS for the ANWR Leasing Program is

*Investing in Alaskans*  aidea.org

needed is premature, since it failed to follow the changes in the law and implement in the SEIS the requirements of the regulations.

The TCJA mandates that DOI issue the Coastal Plain oil and gas leases, so there was no opportunity for DOI to avoid the alleged greenhouse gas effects through declining to issue leases, and so any asserted shortcoming in NEPA analysis regarding that issue is not an agency error. *Department of Transportation* v. *Public Citizen*, 541 U.S.752, 776-78 (2005); *see* 42 U.S.C. § 4336(a)(4). Like the proposed action at the heart of Public Citizen (opening the Mexican border to long-haul trucks and buses), in this situation, Congress passed legislation that the President signed, directing that there shall be an ANWR Leasing Program. In clear words, an ANWR Leasing Program will determine future mitigation and exploration requirements SHOULD that occur. The SEIS should address the impacts of the leasing program, not exploration or development impacts should they occur. The SEIS on the leasing program should note the leasing program will not produce any greenhouse gases.

ANILCA MANDATES – Exploration. Section 1111(b) mandates the Secretary to grant "temporary access by the State," which AIDEA is, "in order to permit the State … access to its land for purposes of survey, geophysical, exploratory, or other temporary uses … whenever he determines such access will not result in **permanent harm** to the resources of such unit.…" A major exploration program was run in ANWR to meet the report requirements of ANILCA 1002; the report was submitted in 1987. Every mile of ANWR has had 2D seismic analysis run on it. Crews have landed in ANWR for years and performed exploration work without imposing permanent damage.

AIDEA could submit an exploration program and request for access under the existing special use permit program for any Refuge that must be granted here because such a program is a necessary part of the mandate from Congress to administer a program for oil and gas in the Coastal Plain, and unless the Secretary makes an argument of permanent harm. Because of the mandatory direction to the Secretary, NEPA and its study, etc. is not appropriate (NEPA assumes pure discretion to agency to select no-build option, etc.).

## VI. The SEIS' Statement of its Purpose and Need is Flawed

The ANWR SEIS purpose and need is set out on page 1-1:

> Section 20001 of PL 115-97 requires the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic Refuge. The BLM is undertaking this Leasing EIS to implement the leasing program consistent with PL 115-97. The Leasing EIS will serve to inform the BLM's implementation of PL 115-97, Section 20001(c)(1), which is the requirement to hold multiple lease sales.

*Investing in Alaskans*  aidea.org

The first sentence may be factually correct, but as pointed out above, the decision at hand is based on the TCJA calling for the leasing of the areas that have the highest potential for the discovery of hydrocarbons. The purpose and need are incorrect in stating that BLM needs to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas." The purpose and need should be based on the decision at hand, which is to comply with the TCJA.

AIDEA's reading of the original Record of Decision (ROD) is that it did not authorize exploration. The ROD states, "if and when BLM is presented with proposals for exploration or development, those decisions by BLM for specific authorizations will also be subject to project specific analysis, including compliance with NEPA and other laws." For off-shore wind, BOEM simply prepares programmatic EISs at this stage. If a lessee wants to conduct exploration, BOEM conducts another NEPA review (sometimes just an EA). If the lessee wants to develop a wind farm, BOEM conducts an EIS.

## VII. The SEIS Fails to Reference and Incorporate the Terms of the ANWR Leases and Ignores that Areas in ANWR Likely to be Leased are Not "Wetlands" under the Supreme Court's Decision in Sackett v. EPA.

Prior to their unlawful cancellation, AIDEA's leases provided AIDEA with all the exclusive rights to drill, extract, remove and dispose of all oil and gas as well as build and maintain necessary improvements to include off lease access right of way. For the supposedly NEPA-related provision, one should review Lease Term 6. It briefly requires that prior to disturbing the surface of the leased land, lessee must contact lessor regarding "procedures" to be followed and "modifications" that may be necessary. No specific environmental laws or regulations are referenced in Lease Term 6, e.g., no reference to NEPA. See Attachment A (Copy of leases). The terms of the leases should have been considered and evaluated in the SEIS.

Under the requirements of the Endangered Species Act and the National Historic Preservation Act, additional studies may be required of the lessee; at that point, the lessee must, apparently after the studies, stop work and contact the lessor.

It is also important to note that most of the areas subject to the AIDEA ANWR leases are located on permafrost. *See* USGS Permafrost Map of Alaska,[9] As such, under the new definition of "wetlands" mandated by the U.S. Supreme Court decision in *Sackett v. EPA*, 598 U.S. __ (2023), the lease areas would not be subject to U.S. Army Corps of Engineers (COE) jurisdiction under section 404 of the CWA.

## VIII. The Statutory Bases that Result in the Alaskan National Wildlife Refuge Leasing Program Are Ignored in the ANWR SEIS.

A. Section 20001 of the 2017 Tax Cuts and Jobs Act states in full:

---

[9] https://dggs.alaska.gov/webpubs/usgs/i/oversized/i-0445sht01.pdf

AR5375

Section 20001. Oil and Gas Program

a) Definitions. In this section:

(1) Coastal Plain. The term ''Coastal Plain'' means the area identified as the 1002 Area on the plates prepared by the United States Geological Survey entitled ''ANWR Map – Plate 1'' and ''ANWR Map – Plate 2'', dated October 24, 2017, and on file with the United States Geological Survey and the Office of the Solicitor of the Department of the Interior.

(2) Secretary. The term ''Secretary'' means the Secretary of the Interior, acting through the Bureau of Land Management.

(b) Oil and Gas Program.

(1) In General. Section 1003 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3143) shall not apply to the Coastal Plain.

(2) Establishment.

(A) In General. The Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain.

(B) Purposes. Section 303(2)(B) of the Alaska National Interest Lands Conservation Act (Public Law 96– 487; 94 Stat. 2390) is amended:

(i) in clause (iii), by striking ''and'' at the end;

(ii) in clause (iv), by striking the period at the end and inserting ''; and''; and

(iii) by adding at the end the following: ''(v) to provide for an oil and gas program on the Coastal Plain.''.

(3) Management. Except as otherwise provided in this section, the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations).

(4) Royalties. Notwithstanding the Mineral Leasing Act (30 U.S.C. 181 et seq.), the royalty rate for leases issued pursuant to this section shall be 16.67 percent.

(5) Receipts. Notwithstanding the Mineral Leasing Act (30 U.S.C. 181 et seq.), of the amount of adjusted bonus, rental, and royalty receipts derived from the oil and gas program and operations on Federal land authorized under this section:

(A) 50 percent shall be paid to the State of Alaska; and

(B) the balance shall be deposited into the Treasury as miscellaneous receipts.

(c) 2 Lease Sales Within 10 Years.

(1) Requirement.

(A) In General. Subject to subparagraph (B), the Secretary shall conduct not fewer than 2 lease sales area-wide under the oil and gas

program under this section by not later than 10 years after the date of enactment of this Act.

(B) <u>Sale Acreages; Schedule</u>.

(i) <u>Acreages</u>. The Secretary shall offer for lease under the oil and gas program under this section:

(I) not fewer than 400,000 acres area-wide in each lease sale; and

(II) those areas that have the highest potential for the discovery of hydrocarbons.

(ii) <u>Schedule</u>. The Secretary shall offer:

(I) the initial lease sale under the oil and gas program under this section not later than 4 years after the date of enactment of this Act; and

(II) a second lease sale under the oil and gas program under this section not later than 7 years after the date of enactment of this Act.

(2) <u>Rights-Of-Way</u>. The Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section.

(3) <u>Surface Development</u>. In administering this section, the Secretary shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section.

The SEIS ignores each of these statutory provisions in the 2027 Tax Act. AIDEA requested permission from BLM to commence exploratory work on its leases, but was denied access. The SEIS does not acknowledge that the Secretary is required to issue AIDEA an ROW for exploration, for example.

B. The Committee Report provides further explanation about the purpose and mandate for the ANWR Leasing Program. The Supplemental Environmental Impact Statement for the ANWR Leasing Program. H.R. Rep. 115-466 (Dec. 15, 2017) (in Legislative History to P.L. 115-97).[10]

C. Section 20001 directs the Secretary of the Interior to establish and administer all aspects of a competitive oil and gas program in the non-wilderness portion of the Arctic National Wildlife Refuge, known as the "1002 Area" or "Coastal Plain." The legislation defines the term "Coastal Plain" by referencing Plate 1 and Plate 2 of the October 24, 2017 Map prepared by the United States Geological Survey.

---

[10] https://www.congress.gov/115/crpt/hrpt466/CRPT-115hrpt466.pdf

Investing in Alaskans   aidea.org

AR5377

The legislation repeals the prohibition on development from the Coastal Plain contained in section 1003 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3143), and directs the Secretary to manage the oil and gas program on the Coastal Plain in a manner similar to what is required by the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.). The legislation sets a 16.67 percent royalty rate for leases and allocates 50 percent of the revenue derived from the program to the State of Alaska, with the remainder going to the Federal Treasury.

D. Section 20001 further requires the Secretary to conduct at least two area-wide lease sales within the 10-year budget window–the first lease sale within four years of the Act's enactment and the second lease sale within seven years of enactment. Each lease sale must contain not fewer than 400,000 acres and be comprised of those areas that have the highest hydrocarbon potential.

The legislation directs the Secretary to issue any necessary rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation associated with the oil and gas program. Additionally, the section authorizes the development of up to 2,000 surface acres of federal land on the Coastal Plain.

The statute mandates the DOI to issues rights of way for exploration, development, production, or transportation necessary to get oil and gas out of the Coastal Plain in a commercially reasonable way under reasonable conditions. It does the same for the mandatory language on surface development. This is particularly important because DOI in the SEIS asserts it has discretion to limit the amount of area developed to UNDER 2,000 acres, but this is not what the statute provides. The Secretary "**shall** authorize up to 2,000 surface acres of federal land" (emphasis added) to be used for development. There is no discretion granted to authorize a lesser amount than 2,000 acres if 2,000 acres is requested. The SEIS should assume 2,000 acres will be developed. *See* FRA § 2001 (c)(3).

## IX.    Fiscal Responsibility Act of 2023.

In the 2017 TCJA, the Secretary has to offer the leases up for sale, has to administer a program of oil and gas development, has to approve rights-of-way, has to include a minimum of 400,000 acres per sale, and has to authorize up to 2000 acres of surface development at the "production" stage. TCJA § 20001(c). The Secretary lacks discretion to undercut the direction from Congress to have a program, to offer the leases, to include at least 400,000 acres, etc., and therefore, under the FRA § 111(10), codified at 42 U.S.C. § 4332(e)(10), defining "major federal action," the ANWR lease sale is not subject to NEPA. *See* 42 U.S.C. § 4332(2)(C) (requiring EISs be prepared for "major Federal actions"). Also, the analysis of alternatives used in the SEIS with less than 2000 acres "for production and support facilities" is premature. TCJA § 20001(c)(3). Construction of *production* and related support facilities only occurs at the production stage. AIDEA is at the leasing stage, which is not even at the exploration stage yet. Because there will be no surface development for purposes of production or related support facilities at this time,

*Investing in Alaskans*  aidea.org

AR5378

the alternatives used in the SEIS are inapplicable to the facts presented. Further, any surface disturbance limited to exploration will require follow-up NEPA approvals.

## X.    2,000-Acre Issue / Statutory Construction.

One issue of the ANWR SEIS is how to interpret the 2017 TCJA's clause allowing "up to" 2,000 acres of production and support facilities. TCJA § 20001(c)(3). DOI correctly interpreted the 2,000-acre clause in the 2020 ROD. The clause allows the leaseholder(s) to construct production and support facilities covering "up to" 2,000 acres, leaving the leaseholders discretion to utilize less acreage. Thus, the statutory discretion to disturb less than 2,000 surface acres in the phrase "up to" lies with the Lessee(s), not DOI.

However, the SEIS misinterprets the "up to" 2,000 acres provision. SEIS 1.9.1. The "up to" language of the clause cannot be read as allowing DOI the discretion to defeat the Congressionally-mandated oil and gas program through DOI capping the leaseholder(s) at some arbitrary figure substantially less than 2,000 acres. Moreover, no provision in the leases addressed interpretation of the 2,000-acre clause.

Although this comment is redundant to a prior comment above, the statute mandates the DOI to issue rights of way for exploration, development, production, or transportation necessary to get oil and gas out of the Coastal Plain in a commercially reasonable way under reasonable conditions. It does the same for the mandatory language on surface development. This is particularly important because DOI in the SEIS asserts it has discretion to limit the amount of area developed to UNDER 2,000 acres. This is not what the statute provides. The Secretary is mandated to "authorize up to 2,000 surface acres of federal land" to be used for development. There is no discretion granted to authorize a lesser amount than 2,000 acres if 2,000 acres is requested. The EIS should assume 2,000 acres will be developed. *See* FRA § 2001 (c)(3).

## XI.    The Statehood Act is a Compact between the United States and the State of Alaska.

Another flaw in the SEIS is that it does not address and ignores the binding compact that made Alaska a State. Congress offered Alaska statehood on certain terms, including that Alaska would receive not only lands but also the minerals on those lands, the right to develop those resources, *and* the right to regulate that development. Alaskans accepted that offer via a statewide vote. Alaska Division of Elections, Statehood Election Final Results, https://perma.cc/86TW-CHAB. This compact binds all components of the United States—including Congress and federal agencies—and cannot be unilaterally changed by the federal government. The Statehood Act's text, context, and legislative history all confirm that Congress's intent was to give Alaska the prerogative to use and develop natural resources on the lands granted or leased to the State. And Congress reiterated later in the Alaska National Interest Lands Conservation Act (ANILCA) that no more federal withdrawals of land from resource development would occur.

*Investing in Alaskans*    aidea.org

AR5379

The SEIS effectively prevents any development of the ANWR leases held by AIDEA, and the subsequent cancellation of the AIDEA lease, in effect, breaches the compact with the State of Alaska and AIDEA as a wholly owned entity of the State of Alaska.

**XII.** **ANILCA Reinforced the State's Right to Develop its Resources. And This Is Not Addressed in the SEIS.**

A. Beyond granting rights to and agreeing to allow Alaska to develop minerals on state land, Congress later prohibited further federal actions that amount to a "withdrawal" of lands in Alaska from resource development. In 1980, Congress enacted the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, 94 Stat. 2371. Known as "The Great Compromise," the Act created massive areas of federal parks and preserves with limits on resource development in those areas. "[A]t the same time," the Act sought to "provide adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d).

B. ANILCA further reinforces that Congress considered its Alaska statehood land grants to turn over lands and resource development to the State, without future limitation by the federal government or its agencies. ANILCA's promise of no more withdrawals is a dead letter if the United States has complete control over Alaska's lands regardless and can make those lands de facto preserves through a misapplication of NEPA.

C. In this case a Lease authorized by the TCJA that included a provision establishing an oil and gas program for ANWR might be subject to "subsequent misinterpretations of NEPA." On the granted lands, the Statehood Act must be interpreted in light of its own text and context. Nothing in the Act suggests that the rights conveyed to Alaska were conditioned on later federal law—or any conflicting federal law. And beyond the statutory text noted above, the context matters. "Alaska is different—from its 'unrivaled scenic and geological values,' to the 'unique' situation of its 'rural residents dependent on subsistence uses,' to 'the need for development and use of Arctic resources with appropriate recognition and consideration given to the unique nature of the Arctic environment.'" *Sturgeon I*, 577 U.S. at 438–39 (quoting 16 U.S.C. §§ 3101(b), 3111(2), 3147(b)(5)). The "simple truth" is "that Alaska is often the exception, not the rule." The SEIS does not acknowledge any of this Alaska specific law and effectively uses NEPA to withdraw AIDEA's leases from development.

**XIII.** **Connected Action Standard in the 9th Circuit—DOI Went Too Far in the SEIS.**

A. The SEIS also ignores the pertinent 9th Circuit case law. The *Thomas v. Peterson* decision's discussion regarding connected action is still good law. 753 F.2d 754 (9th Cir. 1985). As recently as 2020, the Ninth Circuit has cited *Thomas* for the proposition that an action is "connected" when the record reveals that it is at "an advanced stage of planning." *See Chilkat Indian Village of Klukwan v. Bureau of Land Management,* 825 Fed.Appx. 425, 429 (9th Cir. 2020) (citing *Thomas,* 753 F.2d at 760-61; *Sierra Club v.*

*Investing in Alaskans* aidea.org

*Bureau of Land Mgmt*., 786 F.3d 1219, 1225 (9th Cir. 2015), and observing that "Because Appellants fail to demonstrate that the exploration plans "would [not] have taken place ... without" the future development of a mine, at 1226, BLM did not act arbitrarily by failing to consider those future impacts within a single EA.") Exploration does not necessarily lead to production, albeit that AIDEA anticipates based on the available science that there is a very reasonable likelihood that production will occur. Thus, exploration and production may not be connected actions, meaning NEPA reviews relative to production can be deferred until later. For instance, the impacts of a leasing and exploration program do not warrant an analysis of the impacts of leasing and exploration on greenhouse gases.

B.  *Thomas* has been overruled only to the extent it purported to provide an exception to the traditional test for injunctive relief in the context of procedural violations under the Endangered Species Act. The *Thomas* court had created this "exception" by analogizing the ESA's injunctive relief analysis to the NEPA context, which was later determined to be an unsound analogy. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.,* 789 F.3d 1075 (9th Cir. 2015) includes a lengthy discussion of this change in law at pages 1088-91, and explains that two Supreme Court decisions—*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)—"undermine[d] the theoretical foundation for [the Ninth Circuit's] prior rulings on injunctive relief in *Thomas* and its progeny" to the extent those cases eroded the entitlement of plaintiffs pursuing NEPA claims to injunctions upon a reduced evidentiary showing. *Cottonwood,* 789 F.3d at 1090.

C.  In a decision by the U.S. District Court for the District of Alaska, *Chilkat Indian Village of Klukwan, et. al. v. BLM*, 399 F.Supp.3d 888 (2019), Judge Timothy Burgess stated that the sole issue to be decided in the case was "whether NEPA requires consideration of **future** impacts from potential mine development as part of the environmental review for exploration activities." *Id*. at page 915 (emphasis added). This is essentially the same issue presented by the standards and analysis applied in the pending ANWR SEIS.

In this case, the plaintiff asserted that mining was a "connected action" under 40 C.F.R. sec. 1508.25(a)(ii). The Court noted that CEQ regulations implementing NEPA require that the agency consider connected actions if "the two actions '[c]annot or will not proceed unless other actions are taken previously or simultaneously.'" *Id*. at 916, citing 40 C.F.R. § 1508.25(a)(ii). The Court noted that the Ninth Circuit "appl[ies] an "independent utility" test to determine whether multiple actions are so connected to mandate consideration in a single EIS. *Id*. at 916-7.

D.  In the *Chilkat* case, the court found:

Given this fact, the Court finds it cannot arrive at the conclusion that the Exploration Activities are "inextricably intertwined" with potential future mine development such that NEPA regulations mandate their consideration at the time of the NEPA review for the Exploration Activities.

*Investing in Alaskans*   aidea.org

AR5381

*Id.* at 917.

E. The Court cited the *Thomas* case to contrast that where there was a definitive future action, the project must be considered as a connected action. But, "[h]ere, no such definite plans exist regarding potential future mining." *Id.* at 918. This is also the case with the analysis and consideration of mitigation of the various alternatives for the ANWR leasing program. Leasing does not convey that development will occur.

    1. The court stated:

> Moreover, where the separate actions at issue are phases, or stages, of a single, larger effort, the Ninth Circuit has held that NEPA analysis must encompass all phases only where "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken…. Rather, exploration is a necessary, rational step to determine whether such future activity will occur. "NEPA does not require the government to do the impractical," and where details, planning decisions, and precise information about future phases, or activities, are unavailable, NEPA does not require that an agency consider those activities together. Accordingly, the Court finds that future development activities are not a "connected action" under 40 U.S.C. § 1508.25(a) such that BLM was required to consider these activities as part of the scope of the EAs issued for the Exploration Plan or Road Extension.
> *Id.* at 918-9.

    2. The Court also noted:

> NEPA regulations also separately define "cumulative actions" as "actions, which viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). This regulation—which looks to "the obligation to wrap several cumulative action proposals into one EIS for decision making purposes"—is "separate and distinct" from the cumulative impact analysis required by 40 C.F.R. § 1508.7. *See Dombeck*, 304 F.3d at 896 n. 2. Plaintiffs do not otherwise challenge the adequacy of BLM's cumulative impact analysis, or the impacts identified that would directly result from the Exploration Plan or Road Extension activities. Rather, Plaintiffs challenge only whether additional activities should have been included in the scope of that analysis. (footnotes and citations deleted for brevity's sake).
> *Id.* at n. 200.

F. AIDEA contends in the ANWR SEIS that the agency, in developing the mitigation options and the proposed alternatives, overreaches the issues that need to be addressed to consider the ANWR leasing as required by the Tax Cuts and Jobs Act (P.L. 115-97). The purpose of the lease program is to allow for exploration of the ANWR leasing area to

*Investing in Alaskans*  aidea.org

determine IF further development should occur. The leases by their express terms do not allow for exploration without further NEPA review. The express terms in the AIDEA leases that set out contractual rights between the parties are not referenced or discussed in the SEIS. No ground disturbing activity is allowed without further NEPA review. Should further development be determined to be appropriate, that development will be subject to a new and different Environmental Impact Statement. In effect, there is, as recognized by the Ninth Circuit, an independent utility for just the exploration allowed under the initial leasing program.

G. AIDEA asserts that the ANWR SEIS unnecessarily and perhaps with purpose complicates the purpose and need for the proposed action in conflict with the standards of the Ninth Circuit Court of Appeals.

**XIV.** <u>**Flawed Alternatives that Confuse Decision-Making.**</u>

Again, even though the decisions evaluated in the Leasing Program EIS and its ROD "would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources" and therefore BLM should not have developed alternatives based on exploration and development, it is unclear to us how BLM developed the alternative acres of surface disturbance, a critical factor in differentiating the inappropriately constructed alternatives. It is equally unclear how BLM developed and applied the voluminous number of ROPs, NSO stipulations, CSUs, and TLs that vary by alternative.

**XV.** <u>**Comparison of the Alternatives if One Thought that It Was Appropriate to Even Analyze Production and Failure to Follow Applicable Regulations.**</u>

A. SEIS Chapter 2, Alternatives is seriously deficient due to its failure to comply with CEQ's 40 CFR 1502.14. This section requires that the alternatives section of an EIS present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment and the environmental consequences. The SEIS does not provide this comparison in Chapter 2. As CEQ has frequently stated, the alternatives section is the heart of the EIS. The section needs to include this comparative analysis so that it meets the test of sharply defining the issues for the decision maker and the public and providing a clear basis for the subsequent choice among alternatives.

B. There is a vast amount of information presented within the body of the document; at times the information seems to be extraneous and confusing, especially when considering the analysis is based on a hypothetical impact scenario rather than what is allowed under the express terms of the leases. This ultimately makes it confusing to understand the difference in impacts when comparing alternatives.

AR5383

C. The alternatives are described as having different amounts of direct land impacts. However, when factoring in the various ROPs and stipulations, the direct impacts among the alternatives become more difficult to distinguish.

As a specific example of our above-related comment, throughout various resource impact analyses, particularly biological resources, there is little to no comparison of impacts between the alternatives. Analyses are often loaded with various assumptions and models to attempt to achieve a reasonable analysis of impacts for a hypothetical project which ends up resulting in numerous data outputs (acres available, species numbers, percent of populations, etc.) that are extremely onerous for the reader to comprehend. Once all of this information and data is presented, there is no clear comparison (in one location of the document) that gives the reader (or decisionmaker) an idea of what it all means. For example, the impact methodology and analyses to caribou are extremely complicated and detailed, but there is no conclusory statement for each alternative on what the impacts actually mean and how they compare between alternatives. There is no discussion on the caribou impacts in the context of the overall populations, except one area where a few models indicate the potential percent reduction in population. But again, there is no statement on what that actually means in the context of the ever-changing populations that have been observed over the years. Overall, perhaps the impacts have no notable implications on the species, and the differences between alternatives is not notable, either. But there is no discussion of this (what does it all mean??). In addition, the caribou is not a special status species by any state or federal agency or regulation. It is important for subsistence and that is acknowledged.

## XVI.  <u>Undocumented Elimination of Alternatives.</u>

Without explanation, the Abstract states, "Alternative C and D2 from the FEIS were not carried forward for analysis in the SEIS". § 1502.14(a) of the CEQ regulations states that for alternatives that the agency eliminated from detailed study, it should briefly discuss the reasons for their elimination. This discussion should be added in Chapter 2.4.

## XVII.  <u>Alternatives Considered but Eliminated from Detailed Analysis.</u>

A. Alternative D in the SEIS is a new alternative derived from Alternative D2 in the Final Coastal Plain EIS. (SEIS Executive Summary ES-4 and Section 2.3.4)

B. "The hypothetical development scenario has been revised to address the legal deficiency related to the 2,000-acre interpretation, whereby all alternatives in the Final Coastal Plain EIS were analyzed as having 2,000 acres of surface disturbance. The original assumptions have been revised to be applied proportionally across the new range of Leasing SEIS alternatives to estimate the number of acres that could be developed under each alternative." (SEIS ES-1)

AR5384

### XVIII. <u>Reasonable Alternatives.</u>

In § 1508.1(z) of the CEQ regulations, a reasonable alternative is defined to mean a reasonable range of alternatives that are technically and economically feasible and meet the purpose and need for the proposed action. It is questionable whether the more restricted surface disturbance alternatives (Alternative C and D) are reasonable alternatives from an economic feasibility perspective. SEIS Appendix B, Section B.7.3, *Development*, states that the hypothetical scenario simply assumes that "economically feasible oil accumulations would be discovered in all potential areas that multiple anchor fields would be discovered," but there is no explanation on whether or not this assumption still holds for alternatives with more restricted allowable areas to develop and reduced allowable disturbance footprints (i.e., Alternative C and D), which would likely result in a reduced number of wells and lower production (as stated in SEIS Section 3.2.6, *Petroleum Resources*). Development of Coastal Plain oil and gas is particularly expensive because of its remote location, environmental conditions, and lack of existing pipelines, processing centers, and other infrastructure, and the increased surface disturbance and allowable development area restrictions under Alternative C and D could render the alternative economically infeasible; this is not clearly explained in the alternatives development discussion. Additional explanation of its economic feasibility is needed, or the alternatives should be moved to the category of alternatives considered and dismissed from further analysis.

### XIX. <u>Flawed Impact Analyses if One Thought that It Was Appropriate to Even Analyze Production.</u>

In several resource sections (e.g., birds, terrestrial mammals [caribou]) the analyses are taken to a degree that does not seem reasonable for the BLM's action of issuing of a lease, which in itself does not constitute an irreversible/irretrievable commitment of resources. Analyses in the SEIS are often loaded with various assumptions and models to attempt to achieve a reasonable analysis of impacts for a hypothetical project, which ends up resulting in numerous data outputs (e.g., species numbers) that are extremely onerous for the reader to follow and comprehend. For example, the birds' analysis attempts to estimate impacts all the way out to the number of individual birds (by species) that could be potentially affected, all without a specific project or location to analyze. The caribou analysis is similarly extensive, complicated, and difficult to follow. In the context of a lease issuance and knowing that additional NEPA review would be conducted to address an actual project that would disclose more realistic impacts, it is difficult to understand why the BLM's analyses go to the level they do with so much uncertainty. The analysis of polar bear impacts includes unique and undefined labels for describing the degree of potential impacts to the bears (i.e., "negligible", "minor", "moderate").

*Investing in Alaskans* aidea.org

AR5385

**XX.** **Analysis of Incomplete and Unavailable Information (40 CFR 1502.21).**

The SEIS does not address incomplete and unavailable information as required by CEQ regulations. This topic was addressed in the FEIS (Appendix Q) but is now absent in the SEIS.

**XXI.** **Inappropriate Application of ANILCA 810 Subsistence Analysis.**

The ANILCA 810 Subsistence Analysis requires three steps: 1. Evaluation, 2. Finding, 3. Notice and Hearings. Step 1 consists of evaluating three specific factors. These three factors must be analyzed and separately described for each alternative in an EIS, including the cumulative effects analysis.

A. Factor 1. Evaluate the effect of each of the EIS's proposed action(s) and alternatives on subsistence uses and needs. Factor 2. Evaluate the availability of other lands for the purposes sought to be achieved. Factor 3. Evaluate other alternatives that would reduce or eliminate the proposed action(s) from lands needed for subsistence purposes.

B. Similar to the rest of the SEIS, the ANILCA 810 subsistence analysis in Appendix E indicates that the decision under consideration by BLM does not involve ground-breaking activities.

C. More specifically, the SEIS states:
> The Leasing SEIS uses a hypothetical development scenario (see Appendix B) to inform the impact analysis for each alternative; however, additional NEPA and ANILCA Section 810 analyses would occur with future project-specific proposals. The regulations governing leasing and development provide for multiple decision stages prior to any ground-disturbing activities being authorized and require further compliance with applicable laws, including NEPA, during post-leasing decision stages. Until the BLM receives and evaluates an application for an exploration permit, permit to drill, or other authorization that includes site-specific information about a particular project, impacts of actual exploration and development that might follow lease issuance are unknown as to location, scope, scale, and timing of that exploration and development. At each decision stage, the BLM retains the authority to approve, deny, or reasonably condition any proposed ground-disturbing activity based on compliance with applicable laws and policies, subject to the non-NEPA mandate of the TJCA that the "Secretary shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." TJCA § 20001(c)(2). As discussed above, BLM's duty to comply with this statutory mandate is not subject to NEPA, but to the extent

BLM has any discretion to analyze mitigation issues, that discretion will be exercised later, with additional NEPA analysis, following receipt of future site-specific permit applications that have not yet been filed. Therefore, the analysis of effects of exploration and development in this SEIS, including this ANILCA 810 evaluation, *necessarily reflects a more general, programmatic approach* than could occur at the post-lease project-specific stage. (SEIS page E-2) (emphasis added).

D. However, rather than "a more general programmatic approach," the evaluation of Alternatives B, C, and D, goes into substantial detail on alternatives that are built on an erroneous purpose and need, which was based on a decision that is not ripe. More specifically, it analyzes the number of acres where ROPs for oil production would apply, the number of acres that would be subject to NSO stipulations to protect caribou calving habitat, fish and hydrologic resources, and subsistence activities adjacent to major rivers, the amount of acres subject to CSU, and the number of acres that would be subject to TLs.

## XXII. Failure to Estimate Production Potential Across Alternatives, Considering that the Analyses Were Unwarranted.

In Appendix B the SEIS states,

Production is anticipated to peak at an estimated 100,000 barrels per day from each field (not necessarily concurrently) after 3 years from initial production, though this number may be exceeded for any particular development. From that point onward, production from the field is estimated to decline at a rate of approximately 8 percent per year. New production is expected to come online at various points during the decline but is not expected to bring production back to peak rates. Produced resources would be processed at a CPF to separate water and gas from salable oil and natural gas liquids. Water and gas would be reinjected into the formation to enhance oil recovery; oil and natural gas liquids would be shipped to market, likely via TAPS. Field production can last from 10 to 50 years before abandonment (BLM 2012). In the Coastal Plain, assuming the 100,000 barrel-per-day peak production and the 8-percent decline per year, the assumption was made that it would take an estimated 35 years after reaching peak production to get to the point of abandoning a field. Reinjecting produced gas and water helps maintain oil reservoir energy and improve hydrocarbon recovery efficiency by pushing oil toward the production wells, increasing the ultimate oil recovery. Associated gas and water injection wells are needed where no gas sales line exists and where water disposal is not allowed at the surface (BLM 2012).

Depending on market forces, the size and number of fields discovered, and the timing of development, the projected ultimate recovery in the Coastal Plain is estimated to be anywhere from 1.5 BBO to 10 BBO (Attanasi and Freedman 2009).

AR5387

The alternatives stated in the SEIS vary in size and the number of potential wells, but the SEIS never addresses how a difference in size and number of wells would affect the amount of oil that could be recovered under each alternative. However, in the GHG emissions analysis in Appendix Q, the SEIS states that the assumptions in the model are based on the findings in Appendix B. The model produces different emissions estimates across the alternatives. If the model was based on the production estimates in Appendix B, the results of the emissions analysis should not vary across alternatives, as the analysis in Appendix B does not state that the production of oil would vary across alternatives.

### XXIII. Failure to Show Progression of Oil Production Potential Over Time for the Coastal Plain

In appendix B, the SEIS states:

> It is noted that the projections of oil and gas reserves across the North Slope as cited herein, and predictions of likely future production levels resulting from those reserves, are necessarily highly speculative. For instance, USGS has repeatedly revised their prior assessments of producible oil and gas for the NPR-A and surrounding areas, as new information has become available and additional analysis has been conducted. These assessments have proven to fluctuate significantly over time, as evidenced by the fact that the assessments of technically recoverable reserves for NPR-A and surrounding areas were projected by USGS to be 10.5 billion barrels of oil and 61 trillion cubic feet of gas in 2002, then were revised to be 896 million barrels of oil and 53 trillion cubic feet of gas in 2010, and again were revised to be 8.7 billion barrels of oil and 25 trillion cubic feet of gas in 2017 (USGS 2002, 2010, 2017). Future studies and assessments, whether by the USGS or others, will likely continue to evolve and shift based on advancements in geophysical assessment and drilling technology.

The SEIS uses an example from NPR-A to show how estimates of economically recoverable oil change over time due to improved technology and other factors. The SEIS failed to reference relevant studies specific to ANWR that also demonstrate how the amounts of estimated recoverable oil in ANWR have grown over time. The 1987 Report and Recommendation to Congress and Legislative EIS[11] estimated that there was a 15% chance that 2 BBO could be recovered from the 1002 area, a 1998 report[12] increased that likelihood to a 95% chance that there were 2 BBO in ANWR, and a 2009 report[13] estimates that there could be anywhere from 1.5 BBO to 10 BBO in ANWR. The SEIS only references the 2009 report when estimating the range of potentially recoverable oil in the study area.

---

[11] https://pubs.usgs.gov/fedgov/70039559/report.pdf

[12] https://pubs.usgs.gov/of/1998/ofr-98-0034/

[13] https://pubs.usgs.gov/of/2009/1112/pdf/ofr2009-1112.pdf

Investing in Alaskans    aidea.org

AR5388

## XXIV. Conclusions about Greenhouse Gases Cannot Block ANWR Leasing.

The issue of the downstream effect of greenhouse gasses cannot block the ANWR Coastal Plain oil and gas program from going forward. The case cited in opposition to the project, *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020), concerned leasing on the Outer Continental Shelf, a place in which DOI has substantial discretionary control over whether to let oil and gas projects proceed. *See* 43 U.S.C. § 1344(a)(1).[14] By contrast, the TCJA mandates DOI administer an oil and gas program and issue leases, and does not employ any such balancing language. § 20001(b)(2)(A). Where DOI has discretion to block an activity through declining to issue leases, as under the statute governing the Outer Continental Shelf oil and gas drilling program, there may arguably be a reason to require it to conduct NEPA analysis concerning greenhouse gas effects that could be avoided by declining to issue leases. But the TCJA mandates that DOI issue the Coastal Plain oil and gas leases, so there was no opportunity for DOI to avoid the alleged greenhouse gas effects through declining to issue leases, and so any asserted shortcoming in NEPA analysis regarding that issue is not an agency error. *Public Citizen*, 541 U.S. at 76-78; *see* 42 U.S.C. § 4336(a)(4).

## XXV. Precedent for DOI Failure to Follow Administrative Procedures Act Implementing Executive Order on Greenhouse Gases

In a recent case, The State of Louisiana and several other states joined in litigation against the Biden Administration in *Louisiana v. Biden* 543 F. Supp. 3d 388 (W.D. La. 2021). The States' Motion for Preliminary Injunction centered upon alleged violations of the APA by the Agency Defendants, which includes DOI, BLM, BOEM, the U.S. Bureau of Safety and Environmental Enforcement and named officials.

A. The Plaintiff States allege that in implementing Section 208 of Executive Order 14008, the Agency Defendants violated the following provisions of the APA:
   i. Acted contrary to law in violation of 5 USC 706(2)(A) and (C);
   ii. Acted in an arbitrary and capricious manner in violation of 5 USC 706(2)(A);
   iii. Failed to provide notice and comment required by 5 USC 553(a); and
   iv. Unreasonably withheld and unreasonably delayed agency required activity in violation of 5 USC 706(1).

B. The Federal Government in this case also held energy-producing lands onshore. Congress has likewise made those lands available for development. Under the Mineral Leasing Act (MLA), Pub. L. 66-146, the Secretary of the Interior is required to hold lease sales "for

---

[14] Under that Outer Continental Shelf statute, DOI "considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resources values of the outer Continental Shelf and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1).

each State where eligible lands are available at least quarterly." 30 U.S.C. § 226(b)(1)(A). MLA provides that for oil and natural gas leases on federal lands, in States other than Alaska, 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund, which maintains irrigation systems in several Western States. 30 U.S.C. § 191(a). For leases in Alaska, 90 percent of revenues are granted to the State. *Id.*

Section 20001 of the TCJA requires the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic Refuge. The facts of the *Louisiana v Biden* case are similar. The government is required by the TCJA to lease property in ANWR which, pursuant to the statute, did occur. But subsequently the leases were unilaterally cancelled.

C. The Court stated in the *Louisiana v Biden* case that BLM has the authority to lease public lands with oil and gas reserves to private industry for development under MLA, the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 - 1787, and the BLM's own regulations and plans, see 43 C.F.R. Part 1600 (Planning, Programming, and Budgeting); 43 C.F.R. §§ 3120 (Competitive Leases) and 3160 (Onshore Oil and Gas Operations). BLM's regulations also provide for quarterly lease sales, 43 C.F.R. § 3120.1-2(a) ("Each proper BLM office shall hold sales at least quarterly if lands are available for competitive leasing.").

D. The Plaintiff States maintained that the Pause [ed. note. of two leases on land] itself is a final agency action, as is each cancellation and postponement. The label "pause" is not dispositive of whether the agency action is final. *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1371(W.D. La. 1981), aff'd sub nom. Dep't of Energy v. State of Louisiana, 690 F.2d 180 (Temp. Emer. Ct. App. 1982). As long as an agency has completed its decision-making on a challenged rule—even one interim in nature – the rule satisfies the first prong of the finality test. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79–80 (D.C. Cir. 2020).

The only real question is whether the Pause and/or lease cancellations mark the consummation of the decision-making process.

"This Court has determined that the Pause in new oil and gas leases on federal lands and in federal waters, as well as the cancellation of Lease Sale 257, the stoppage of Lease Sale 258, and the cancellation or postponements of 'eligible lands' under the MLA, are final agency actions that are reviewable under the APA." *Louisiana v. Biden* at 409.

The agencies could cancel or suspend a lease sale due to problems with that specific lease, but not as to eligible lands for no reason other than to do a comprehensive review pursuant to Executive Order 14008. Although there is certainly nothing wrong with performing a comprehensive review, there is a problem in ignoring acts of Congress

*Investing in Alaskans*  aidea.org

while the review is being completed. *Louisiana v. Biden* at 410. Such is the action by the DOI in the case of the ANWR Leasing Program.

As to on-land leases under MLA, the Executive Order, by its own terms, applied the Pause to both new oil and natural gas leases in public land, or in offshore waters. On January 20, 2021, Scott de la Vega, Acting Secretary of the Interior, issued Order No. 3395, which withdrew delegation of authority to Department Bureaus and offices (including the Asst. Secretary of Policy, Management and Budget, Asst. Secretary of Land and Minerals Management, the Secretary and Deputy Secretary of the DOI) to issue any onshore or offshore fossil fuel authorization, including leases. *Louisiana v. Biden* at 411, citing case documents.

Federal administrative agencies are required to engage in reasoned decision-making. *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374, 118 S. Ct. 818, 139 L. Ed. 2d 797 (1998). The States alleged the Pause is arbitrary and capricious under 5 U.S.C. 706(2)(A) both as to MLA and OCSLA claim. The DOI is held to that same standard with the ANWR Leasing Program. The moratorium decision was premised on the Executive Order being temporary, whereas the cancellation of the leases is permanent.

If an administrative agency does not engage in reasoned decision making, a court, under the APA, shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. 706(2)(A). *Louisiana v. Biden* at 414. In the situation with the new SEIS on the ANWR Leasing Program, DOI seeks to ignore the directive of Congress with respect to the leasing program.

The Court granted the States' Motion for Preliminary Injunction. Therefore, DOI was enjoined and restrained from implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in Section 208 of Executive Order 14008, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021), as to all eligible lands, both onshore, and offshore. *Louisiana v. Biden* at 419.

The ANWR SEIS essentially is an exercise in unreasonable decision making. It applies NEPA to a simple leasing program which is not a major federal action. It wrongly ignores the express lease terms that would require NEPA analysis for future activities. It relies on an alternatives analysis that is confusing and contrary to CEQ regulations. It wrongly assumes, contrary to the applicable case law, that exploration and any future production are connected actions and its assumptions about the amount of oil production are not supported by any empirical data. The SEIS's impacts are based on assumed oil production levels that are not based on any referenced data, and that are speculative and capricious.

AR5391

### XXVI. How Does *Chevron* Impact the ANWR Leasing Program?

A. The State of Alaska has joined with the Brief of Amici Curie State of West Virginia and 26 other States in support of the petitioners in *Loper Bright Enterprises v. Raimondo*, a case pending before the U.S. Supreme Court of the United States. *See* Supreme Court Docket 22-451 (December 15, 2022). A significant issue in that case is: Whether the Court should overrule Chevron or at least clarify that statutory silence concerning II controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency. But in the matter of the ANWR SEIS, no ambiguity exists. Section 20001 of the TCJA **requires** the Secretary of the Interior, acting through the BLM, to establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain area within the Arctic Refuge. The BLM is undertaking this Leasing EIS to implement the leasing program consistent with the TCJA. The EIS should only be addressing the initial step in creating the program that is consistent with the Congressional intent. There is no ambiguity in the statute that allows the BLM or the Department of the Interior to implement restrictions or interpret the statute in a manner other than to facilitate a leasing program in ANWR.

B. AIDEA acknowledges that the standard of review is a subject for when and if this matter is brought for judicial review. Here we are at the agency, and the agency is making a decision. No court is reviewing a decision yet. If the FRA is not ambiguous then what is the standard of review for an agency action to reopen a ROD and issue an SEIS? The Administrative Procedure Act is relevant to the SEIS and the DOI in its deliberations. If the TCJA is not ambiguous then what is the standard of review for an agency action to reopen a ROD and issue an SEIS? The APA is relevant.

C. The Amicus Petitioner, West Virginia, to which the State of Alaska joined, stated:
> This problem is not academic. Right or wrong, the lower courts treat Chevron as a heavy thumb on the federal government's side of the scale. The real-world result? Agencies have all the incentives to push expansive constructions of their governing statutes. After all, if agencies—and the administrations most of them answer to—know that lower courts will almost certainly defer to a plausible interpretation, it is hard to hold the line on a more restrained view of agency power. See Kavanaugh, supra, at 2150 (broad deference doctrines "encourage the Executive Branch ... to be extremely aggressive in seeking to squeeze its policy goals into ill-fitting statutory authorizations and restraints"). *See*, Page 11.

Further the petitioner stated: "The Court should make clear that if Chevron applies, it does not allow a court to find ambiguity from silence in a case like this." *See*, Page 17.

D. In the case of the ANWR Leasing Program, Section 2001 of the TCJA is not ambiguous. Rather, it specifically directs the Department of the Interior to conduct a Leasing

*Investing in Alaskans*   aidea.org

Program. However, the SEIS creates ambiguity that will confuse decision makers and the public and leave them unable to make an informed decision.

As the Department of Interior has acknowledged, "[t]he Department has broad responsibilities to manage Federal lands and resources for the public's benefit. The National Environmental Policy Act (NEPA) applies to the execution of many of the Department's responsibilities with the goal of ensuring that information regarding environmental impacts is available to decision makers and the public before decisions are made."[15] This SEIS takes the simple mandates of the TCJA and creates a confusing set of alternatives not needed for a leasing program that is based on non-empirical guesses about future oil production to create a NEPA document that provides no real information on genuine environmental issues and presents speculation to decision makers and the public in a confused misapplication of NEPA.

### XXVII.     Multiple Requests for an Extension of Time

AIDEA on September 28, 2023 sent a letter to the Director of BLM requesting an extension of time for the public comment on the SEIS. A copy is attached as Exhibit D. AIDEA incorporates the AIDEA letter into these AIDEA comments on the SEIS. On September 6, 2023, BLM cancelled the leases it issued to AIDEA in January, 2021 after BLM completed an extensive Final EIS and issued an ROD. On September 8, 2023, BLM published notice of availability of the Draft SEIS in the Federal Register, 88 Fed. Reg. 62,104. That publication started a 45-day public comment period set to expire on October 23, 2023. *See* 88 Fed. Reg. 62,078. AIDEA asked for a very conservative extension of 45 days for the public comment. AIDEA also acknowledges and supports others who requested a longer period of time especially in light of the complexity and length of the SEIS. In response to numerous requests, BLM extended the public comment period a mere two weeks until November 7, 2023.

The Alaska Congressional Delegation on November 1, 2023 sent a letter to Sec. Haaland requesting an extension of at least 80 days and in the letter recited several problems and issues with the solicitation of public comment and consultations with Alaska Natives and Alaska Tribes. A copy of the Delegation letter is attached as Exhibit E and is hereby incorporated into AIDEA's comments. AIDEA must presume the Alaska Congressional Delegation request, if it was considered, was not granted.

The current November 7 deadline is made even more illogical given the schedule just announced for public meetings on the SEIS. The new public meeting schedule goes beyond the current SEIS public comment deadline. Given the complexity of the SEIS, it is hard to envision how the public could be adequately prepared to comment or respond to the SEIS. This violates the Administrative Procedures Act because it is an arbitrary and unfounded agency action contrary to the intent of public involvement with the NEPA process.

---

[15] https://www.doi.gov/oepc/national-environmental-policy-act-nepa.

*Investing in Alaskans* aidea.org

### XXVIII.   Conclusion.

The analysis an agency could perform when they are mandated to act, i.e., administer a leasing program for the exploration, development, production, and transportation of oil and gas from ANWR, falls short of a major federal action triggering NEPA. EISs must always include a "no-action" alternative because NEPA requires and assumes the agency has full discretion whether or not to take an action. It requires this no-action option so that the decisionmaker and the public can understand the difference in impacts between the proposed action and no action. EISs will acknowledge that implementing a no-action alternative would violate a statute but that it is included for comparison.

AIDEA understands that the DOI must comply and perform NEPA reviews to make decisions on the plethora of project details, including environmental mitigation measures. The terms of the ANWR leases are explicit as to this point. Congress mandated that there shall be oil and gas leasing, so the basic question of whether to have an oil and gas program in ANWR is resolved and there is no place for NEPA on that subject. By contrast, Congress did not mandate one way or another precisely how environmental mitigation is done, so NEPA analysis is needed for that part of the agency decision-making. However, that basic yes/no question concerning whether to allow drilling in ANWR is resolved in the statute, leaving the agency no discretion.

The report or analysis the USFWS or BLM could produce here would not under applicable law and regulations (including the substantive amendments to NEPA applicable to this document under the FRA that are totally ignored) require any NEPA process because the agency does not have discretion to decide whether an oil and gas program in ANWR will be administered and developed and allowed. These decisions have already been made for the agency by Congress. The No-Action Alternative cannot be used in these circumstances and NEPA is inapplicable.

The only discretion left to the agency is mitigating conditions of effects of an oil leasing program and exploration as the Secretary is allowed to require under NPRA statute. BLM or USFWS could create a report of the impacts of development, if the lessee proposes it, and recommend mitigating conditions, and the agencies could subsequently analyze development if a lessee proposes it. At this stage, because there are no production activities under consideration, only leasing and initial exploration, no further action is required. That discretion would occur at a subsequent stage of NEPA review. None of these highly pertinent issues are addressed in the SEIS.

The oil and gas program must – "shall" – exist and be administered in accordance with the other "shall" detailed conditions set out in the Tax Act - timing of lease sales, minimum areas to be leased, etc. The agency has no authority to say otherwise when it comes to either the existence of a program for oil and gas in ANWR, the lease sales, the minimum acreage, etc., The agency does have authority to require mitigating conditions of the development that are reasonable and do not destroy the economics of the program which has been mandated by Congress. But this is a different analysis than a NEPA review.

*Investing in Alaskans*  aidea.org

AR5394

The DOI is mandated by "shall" in the Tax Act. It might argue with regards to limits on agency discretion and the exemption from NEPA, but the agency has no discretion as to whether an oil and gas program exists for ANWR, or requires a NEPA review.

Sincerely,

Randy Ruaro
Executive Director
Alaska Industrial Development and Export Authority

Attachments:   Exhibit A – AIDEA Comment Table re: ANWR SEIS
Exhibit B – Lease Cancellation
Exhibit C – Complaint, AIDEA v. Haaland
Exhibit D – AIDEA Letter re: Extension of Time for Public Comments
Exhibit E - Delegation Letter re: Extension of Time for Public Comments

CC:



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska  99513-7504
http://www.blm.gov

In Reply Refer To:
AA095889, AA095890, AA095893
AA095897, AA095898, AA095900
AA095901                                                    December 1, 2023

Memorandum

To:        onrrrefundrequest@onrr.gov

From:      Wayne Svejnoha, Branch Chief Energy and Minerals, BLM Alaska        WAYNE SVEJNOHA   Digitally signed by WAYNE SVEJNOHA Date: 2023.12.01 10:30:15 -09'00'

Subject:   Notice of Alaska Lease Cancellation; Refund Authorized

The Bureau of Land Management (BLM) issued Federal oil and gas leases, listed in the table below, effective January 1, 2021, to Alaska Industrial Development and Export Authority (AIDEA), for 365,755 acres in the Coastal Plain of the Arctic National Wildlife Refuge.

In a decision issued by Deputy Secretary Tommy Beaudreau on September 6, 2023, attached hereto, these leases were cancelled and a refund was authorized.  In accordance with the decision, we hereby request that all money collected for bonus bids and first year rentals be refunded.

Specifically, based on the cancellation of the seven listed leases in their entirety, for the entirety of their time in effect, within 30 days please refund to AIDEA the total amount of $12,801,425.00 from the bonus bids and first year's rentals.

Note that the lessee had continued to pay rental each year for the suspended leases even though they were advised that this was not necessary.  This created an administrative burden on both of our agencies.  If it is possible, we are advising ONRR to reject future annual rental payments from AIDEA for the cancelled leases, in case AIDEA decides to make those payments despite cancellation of its leases.

AR5452

| BLM Serial No. | Tract | Total Bid Amount | 1st Year Rental | | Total Amount Paid |
|---|---|---|---|---|---|
| AA095889 | 2021-CP-016 | $1,437,675.00 | $575,070.00 | | $2,012,745.00 |
| AA095890 | 2021-CP-017 | $1,096,900.00 | $438,760.00 | | $1,535,660.00 |
| AA095893 | 2021-CP-024 | $1,454,400.00 | $581,760.00 | | $2,036,160.00 |
| AA095897 | 2021-CP-026 | $1,335,300.00 | $534,120.00 | | $1,869,420.00 |
| AA095898 | 2021-CP-027 | $1,311,175.00 | $524,470.00 | | $1,835,645.00 |
| AA095900 | 2021-CP-030 | $1,169,775.00 | $467,910.00 | | $1,637,685.00 |
| AA095901 | 2021-CP-031 | $1,338,650.00 | $535,460.00 | | $1,874,110.00 |
| | | | | Total | **$12,801,425.00** |

If you have any questions, please contact Jason Robinson on my staff, at jrobinso@blm.gov.

Attachment (1)
Decision on Leases AA095889, AA095890, AA095893, AA095897, AA095898, AA095900
AA095901, dated September 6, 2023 (7 pages)

cc: Robert Winter,  Program Manager - Financial Management
Office of Natural Resources Revenue

AR5453

state, federal, and private agencies. Except for previous USGS assessments which used similar methods, direct comparison of estimated resources from this assessment with those of most previous assessments is precluded because of different methods and assumptions. With those limitations in mind, the amount of oil estimated for the 1002 area in this assessment is generally larger than that of most previous estimates. The increase results in large part from improved resolution of reprocessed seismic data and geologic information provided by recent nearby wells drilled outside the 1002 area, some of which have discovered producible quantities of oil.

## INTRODUCTION

The USGS is commonly asked to provide the Federal Government with timely scientific input in support of decisions regarding land management, environmental quality, and economic and strategic policies. To do so, the USGS must anticipate issues most likely to be the focus of policy makers in the future. In anticipation of the need for such scientific information and because no recent assessment existed, the USGS has conducted new geologic studies of the Arctic National Wildlife Refuge 1002 area and prepared a new petroleum resource assessment.

The 1002 area, which constitutes about 8-percent (1.5-million acres) of the total area of the Arctic National Wildlife Refuge, is currently off-limits to petroleum exploration and without known petroleum accumulations (Fig. AO1). By all accounts, it is the only part of the Refuge with significant petroleum potential. Situated along the Arctic coast north of the Brooks Range, the 1002 area lies between the major oil fields at Prudhoe Bay that provide nearly one-quarter of daily United States oil production and the Mackenzie delta where nearly 50 petroleum discoveries have been made. The 1002 area is rich in wildlife resources, and because of this the area has been the focus of debate arising from a perceived conflict between oil development and preservation of wildlife and habitat.

In 1980, the Alaska National Interest Lands Conservation Act, Section 1002, provided for a detailed and comprehensive evaluation of the fish and wildlife and petroleum resources in the coastal plain ("1002 area") of the Arctic National Wildlife Refuge. A report to the Congress on those resources was also stipulated. In 1987, the Department of the Interior submitted that report (Clough and others, 1987), an effort jointly authored by the Fish and Wildlife Service, the Bureau of Land Management (BLM), and the USGS. The geologic summary and the in-place petroleum assessment of that report were provided by the USGS and the economic petroleum assessment was

Figure AO6. Summary of Topset Play.



The **Topset Play** includes hydrocarbon potential within Brookian shallow mari ne through non-marine facies (i.e., Sagavanirktok Formation), w hich collectively display topset seismic character.  Modified from Topset play  in previous ANWR assessment.  Related to Topset Play of 1995 USGS National As sessment and the Brookian Unstructured Eastern Topset Play of the 1995 MMS National Assessment.

**Area:** Gross play area totals 735,764 acres of which 555,487 acres  lie within the 1002 area, 30,306 acres lie beneath KIC lands, and 149,971 a cres lie beneath State waters.

**Traps:** Broad, unfaulted anticlines; anticlines related to rotatio nal growth faulting; shelf-edge erosional truncations and growth faults; and lent icular sandstone bodies encased in mudstone.

**Reservoir:** Marine shelf, deltaic, and fluvial sandstones of Paleocene  to Miocene age.

**Source:** Mainly Hue Shale and Canning Formation; potential Shublik F ormation contribution.

**Timing:** Favorable because of syndepositional folding and faulting,  shelf-edge growth faulting, and stratigraphic trap development coupled  with hydrocarbon generation spanning most of Tertiary time.

**Hydrocarbons:** Oil and gas are present in the offshore extension of this p lay in the Hammerhead and Kuvlum accumulations. Oil is present in the p lay interval in Point Thomson-2 well. Oil is present in surface exposures along Marsh Creek anticline and Canning River.

**Analog fields:** Hammerhead, Kuvlum, West Sak, and Ugnu.

AR5496



# Arctic National Wildlife Refuge, 1002 Area, Petroleum Assessment, 1998, Including Economic Analysis

## INTRODUCTION

*T*he Alaska National Interest Lands Conservation Act (1980) established the Arctic National Wildlife Refuge (ANWR) (fig. 1). In section 1002 of that act, Congress deferred a decision regarding future management of the 1.5-million-acre coastal plain ("1002 area") in recognition of the area's potentially enormous oil and gas resources and its importance as wildlife habitat. A report on the resources (including petroleum) of the 1002 area was submitted in 1987 to Congress by the Department of the Interior (DOI). Since completion of that report, numerous wells have been drilled and oil fields discovered near ANWR (fig. 2), new geologic and geophysical data have become available, seismic processing and interpretation capabilities have improved, and the economics of North Slope oil development have changed significantly.

The U.S. Geological Survey (USGS) commonly is asked to provide the Federal Government with timely scientific information in support of decisions regarding land management, environmental quality, and economic and strategic policy. To do so, the USGS must anticipate issues most likely to be the focus of policymakers in the future. Anticipating the need for scientific information and considering the decade-old perspective of the petroleum resource estimates included in the 1987 Report to Congress, the USGS has reexamined the geology of the ANWR 1002 area and has prepared a new petroleum resource assessment.



**Northern Alaska**
36 petroleum discoveries
~15 BBO and 35 TCFG recoverable
commercial production

*Arctic Ocean*

Point Barrow

PRUDHOE BAY   **1002 AREA**

**NPRA**

Mackenzie River delta

Northern margin of Brooks Range

**ANWR**

**Mackenzie River delta**
48 petroleum discoveries
~2 BBO and 12 TCFG recoverable
no commercial production

TAPS

**WILDERNESS AREA**

CANADA
UNITED STATES

Federal lands

Known petroleum accumulations

0          100 MILES

**ANWR = 19 million acres**
1002 area = 1.5 million acres
Wilderness Area = 8 million acres
**NPRA = 23 million acres**

Figure 1.   Map of northern Alaska and nearby parts of Canada showing locations of the Arctic National Wildlife Refuge (ANWR), the 1002 area, and  the National Petroleum Reserve—Alaska (NPRA). Locations of known petroleum accumulations and the Trans-Alaska Pipeline System (TAPS) are shown, as well  as summaries of known petroleum volumes in northern Alaska and the Mackenzie River delta of Canada. BBO, billion barrels of oil (includes cumulative production plus recoverable resources); TCFG, trillion cubic feet of gas recoverable resources.

U.S. Department of the Interior
U.S. Geological Survey

USGS Fact Sheet FS-028-01 *(Supersedes FS-040-98)*
April 2001

AR5576

# Arctic National Wildlife Refuge, 1002 Area, Petroleum Assessment, 1998, Including Economic Analysis



Figure 2. Map of the ANWR 1002 area. Dashed line labeled Marsh Creek anticline marks approximate boundary between undeformed area (where rocks are generally horizontal) and deformed area (where rocks are folded and faulted). Boundary is defined by Marsh Creek anticline along western half of dashed line and by other geologic elements along eastern half of dashed line. Exploration wells are coded to show whether information from them was available for the 1987 USGS assessment of in-place petroleum resources. Dashed red line shows the offshore extent of the entire assessment area.

## ASSESSMENT PROJECT

The new assessment involved 3 years of study by 40 USGS scientists, who coordinated work with colleagues in other Federal agencies, Alaska State agencies, and several universities. New field studies were conducted, new well and sample data were analyzed, and new geophysical data were acquired. Perhaps most importantly, all 1,400 miles of seismic data that had been collected by a petroleum-industry consortium in 1984 and 1985 were reprocessed and reinterpreted. Collection of seismic data within ANWR requires an act of Congress, and these are the only seismic data ever collected within the 1002 area. All this information was integrated as basic input into the petroleum assessment. The term "petroleum" is used herein to include crude oil, natural gas, and natural gas liquids. Although all petroleum commodities were assessed, results reported in this Fact Sheet are for crude oil only because it determines the economic viability of resources on the North Slope. Results for the other commodities are reported in a CD-ROM (USGS Open-File Report 98-34).

## ASSESSMENT METHODOLOGY

The methodology used in this assessment is slightly modified from that used in the 1987 assessment of this area when the USGS estimated in-place petroleum resources for the DOI Report to Congress; the methodology is also slightly modified from that used in the USGS assessment of the National Petroleum Reserve—Alaska (NPRA) (1979–1980). Ten petroleum *plays* were defined as the initial step of the assessment (fig. 3). A play is a volume of rock that contains similar geological parameters (such as petroleum charge, reservoir, and trap) that determine petroleum potential. In keeping with the USGS responsibility for assessing the petroleum potential of all onshore and State water areas of the United States, the total play area considered was extended to the 3-mile boundary between State and Federal jurisdiction. Thus, in addition to the Federal lands of the ANWR 1002 area, this assessment includes resources associated with State waters and Native lands (fig. 2).

AR5577

For each play, distributions of the number and size of potential petroleum accumulations were estimated based on a probabilistic range of values for certain geological attributes, such as reservoir thickness and porosity. These distributions were restricted to potential accumulations larger than 50 million barrels of oil (MMBO) in-place so that the assessment would not be influenced by smaller accumulations that are non-economic in most cases on the North Slope.

The resulting distributions were subjected to a geologic risking procedure designed to weigh the likelihood that petroleum charge, reservoir, and trap conditions were sufficient to generate a 50-MMBO in-place accumulation. In turn, a probabilistic estimate of *in-place* petroleum resources was calculated based on the risked distributions of size and number of potential petroleum accumulations in each play. A recovery factor appropriate to each play was applied to the estimates of in-place petroleum resources to calculate *technically recoverable* petroleum resources (fig. 4).

Estimates for each play were aggregated to calculate total technically recoverable petroleum resources for the entire assessment area, the 1002 area, and the undeformed and deformed parts of the 1002 area (table 1). Costs associated with discovering and recovering petroleum resources, including the costs of constructing pipelines to transport the petroleum, were then applied to estimate *economically recoverable* petroleum resources (fig. 4).

> *The 95-percent probability level refers to 19 in 20 chances; the 5-percent probability level refers to 1 chance in 20 that the amounts shown will be at least that large.*

The assessment methodology yields results that include probabilistic expressions of uncertainty, as illustrated schematically in figure 4. To stress the importance of this uncertainty, results reported here include 95- and 5-percent probabilities, in addition to mean value. The 95- and 5-percent probabilities are considered reasonable minimum and maximum values, and the mean is the average or expected value.





Figure 3. Summary of ages, names, and rock types present in the ANWR 1002 area. The occurrence of recoverable petroleum in these rock formations outside the ANWR 1002 area is indicated by green and red circles. Gray bars at right indicate the 10 petroleum plays assessed in this study and their corresponding rock formations (to the left). Note grouping of plays according to deformed and undeformed areas as shown in figure 2.

**Charge.**—Occurrence of conditions of petroleum generation and migration adequate to cause an accumulation of the minimum size (50 million barrels of oil (MMBO) in-place).

**Reservoir.**—Occurrence of reservoir rocks of sufficient quantity and quality to permit containment of petroleum in volumes sufficient for an accumulation of the minimum size (50 MMBO in-place).

**Trap.**—Occurrence of those structures, pinch-outs, permeability changes, and similar features necessary for the entrapment and sealing of petroleum in an accumulation of the minimum size (50 MMBO in-place).

AR5578

## ASSESSMENT RESULTS

The total quantity of technically recoverable oil within the entire assessment area is estimated to be between 5.7 and 16.0 billion barrels (95-percent and 5-percent probability range), with a mean value of 10.4 billion barrels. Technically recoverable oil within the ANWR 1002 area (excluding State and Native areas) is estimated to be between 4.3 and 11.8 billion barrels (95- and 5-percent probability range), with a mean value of 7.7 billion barrels (table 1).

Quantities of technically recoverable oil are not expected to be uniformly distributed throughout the ANWR 1002 area. The undeformed area (fig. 2) is estimated to contain between 3.4 and 10.2 billion barrels of oil (BBO) (95- and 5-percent probability), with a mean of 6.4 BBO. The deformed area (fig. 2) is estimated to contain between 0 and 3.2 BBO (95- and 5-percent probability), with a mean of 1.2 BBO.

Figure 5 shows the expected numbers of accumulations and volumes of technically recoverable oil grouped by accumulation-size class. It shows that most of the oil is estimated to occur in accumulations that exceed 100 million barrels, the size of recently developed north Alaskan stand-alone accumulations. Moreover, at the mean, nearly 80 percent of the oil is thought to occur in the western part of the ANWR 1002 area, which is closest to existing infrastructure. Volumes of oil are expected to occur as several accumulations rather than a single large accumulation.

Commercial viability of a discovery depends on oil price, accumulation size, recovery technology, and proximity to existing infrastructure (pipelines, etc.). The economic analysis presents the cost of transforming technically recoverable resources into producible proved reserves—it shows the market price that would have to be paid to find, develop, produce, and transport to market (lower 48 West Coast) any particular quantity of assessed oil assuming current technology and existing scientific understanding. Figure 6, which is based on the field-size distributions associated with the mean, 95-, and 5-percent probability oil estimates, summarizes the findings of the economic analysis. The cost functions are calculated in constant 1996 dollars and are based on the expectation that production will repay all operating costs, including taxes and transport to market, all investment expenditures, and provide and an after-tax rate of return of at least 12 percent on the investment.

> **In-place resources.**—The amount of petroleum contained in accumulations of at least 50 MMBO without regard to recoverability.
>
> **Technically recoverable resources.**—Volume of petroleum representing that proportion of assessed in-place resources that may be recoverable using current recovery technology without regard to cost.
>
> **Economically recoverable resources.**—That part of the technically recoverable resource for which the costs of discovery, development, and production, including a return to capital, can be recovered at a given well-head price.

Table 1. Estimates of volumes of technically recoverable oil in various parts of the ANWR assessment study area.

*[ANWR, Arctic National Wildlife Refuge. All reported oil volumes in millions of barrels. Basic statistical principles determine that mean values can be added and subtracted but $F_{95}$ and $F_{05}$ values cannot (e.g., means for the undeformed and deformed parts of the ANWR 1002 area sum to the mean for the total ANWR 1002 area, but $F_{95}$ and $F_{05}$ values do not). $F_{95}$, 95-percent probability level; $F_{05}$, 5-percent probability level]*

| Part of study area | Volume of oil, in millions of barrels | | |
| --- | --- | --- | --- |
| | $F_{95}$ | Mean | $F_{05}$ |
| Entire assessment area[1] | 5,724 | 10,360 | 15,955 |
| ANWR 1002 area (Federal), TOTAL | 4,254 | 7,668 | 11,799 |
| Undeformed part | 3,403 | 6,420 | 10,224 |
| Deformed part | 0 | 1,248 | 3,185 |

[1] Includes 1002 area shown on figure 2, Native lands, and adjacent State water areas within 3-mile boundary (see fig. 2).



Figure 4. Schematic graph illustrating petroleum volumes and probabilities. Curves represent categories of oil in assessment. An example of how one reads this graph is illustrated by the blue and orange lines projected to the curve for economically recoverable oil. There is a 95-percent chance (i.e., probability, $F_{95}$) of at least volume $V_1$ of economically recoverable oil, and there is a 5-percent chance ($F_{05}$) of at least volume $V_2$ of economically recoverable oil.



Typical view of the ANWR 1002 area coastal plain.



**A**

NUMBER OF ACCUMULATIONS

Non-Federal
Federal
Undeformed area (left-hand bar)
Deformed area (right-hand bar)

Figure 5. *A, Histogram showing the expected (mean) number of petroleum accumulations estimated to exist in various size categories of technically recoverable oil resources in this assessment. For each size category, histogram bar on left is for undeformed area and bar on right is for deformed area. Each histogram bar is divided into Federal (1002 area) and non-Federal portions. The histogram is read as follows: It is estimated that the undeformed area contains approximately three accumulations containing between 512 and 1,024 million barrels of technically recoverable oil: two of those accumulations are under Federal jurisdiction and one is non-Federal. Adding the accumulations in the undeformed area to those of the deformed area for each size category gives the total number of those sized accumulations for the entire assessment area (1002 area plus non-1002).*

*B, Histogram showing the expected (mean) volume of oil estimated to exist in each accumulation-size category of technically recoverable oil resources. For each size category, histogram bar on left is for undeformed area and bar on right is for deformed area. Each histogram bar is divided into Federal and non-Federal portions. The histogram is read as follows: It is estimated that the undeformed area contains approximately 1,800 million barrels of technically recoverable oil in accumulations containing between 512 and 1,024 million barrels of technically recoverable oil: approximately 1,300 MMBO is Federal and approximately 500 MMBO is non-Federal. Adding the volume of oil in the undeformed area to that of the deformed area for each size category gives the total volume of those sized accumulations for the entire assessment area (1002 area plus non-1002).*



**B**

VOLUME OF OIL, IN MILLIONS OF BARRELS

TECHNICALLY RECOVERABLE OIL GROUPED BY ACCUMULATION-SIZE CLASS, IN MILLIONS OF BARRELS



*Photograph of oil-stained sandstone near crest of Marsh Creek anticline, 1002 area.*

AR5580

## COMPARISON WITH PREVIOUS ASSESSMENTS

One cannot make a meaningful comparison with previous assessments without knowledge of differences in assessment methodology, assumptions, and data. That information is not always available for the previous assessments of the ANWR 1002 area. Among previous assessments of ANWR 1002 area petroleum resources, only the 1987 USGS assessment of in-place resources is directly comparable. The technically and economically recoverable petroleum resource estimates cannot be compared directly because different methods were used in preparing those parts of the 1987 Report to Congress. The current assessment shows an overall increase in estimated in-place oil resource when compared to the 1987 assessment. Ranges are 11.6 to 31.5 BBO versus 4.8 to 29.4 BBO, (95- and 5-percent probabilities) and mean values are 20.7 BBO versus 13.8 BBO (current assessment compared to 1987 assessment). The increase results in large part from improved resolution of reprocessed seismic data, which allowed the identification of many more potential petroleum accumulations in parts of the area, and analog information provided by recent nearby oil discoveries.

Another significant change is in the geographic distribution of resources. In the 1987 assessment, about 75 percent of the mean estimated in-place oil was in the southeastern or deformed area and only 25 percent was in the north-western or undeformed area (fig. 2). In the current assessment, nearly 85 percent of the in-place oil is in the undeformed area and only about 15 percent is within the deformed area. Again, the reason is largely related to improved resolution of the seismic data, especially in the undeformed area where, in various plays, it allowed the identification of many more potential petroleum accumulations than were previously thought to exist. The southeastern area—with only a single well offshore and complex geology onshore—carries great uncertainty. Further, part of that area considered oil prospective in 1987 is now considered prospective only for gas because of new understanding of the thermal history of the rocks.

## SUMMARY

In anticipation of the need for scientific support for policy decisions and in light of the decade-old perspective of a previous assessment, the USGS has completed a reassessment of the petroleum potential of the ANWR 1002 area. This was a comprehensive study by a team of USGS scientists in collaboration on technical issues (but not the assessment) with colleagues in other agencies and universities. The study incorporated all available public data and included new field and analytic work as well as the reevaluation of all previous work.

Using a methodology similar to that used in previous USGS assessments in the ANWR and the National Petroleum Reserve—Alaska, this study estimates that the total quantity of technically recoverable oil in the 1002 area is 7.7 BBO (mean value), which is distributed among 10 plays. Most of the oil is estimated to occur in the western, undeformed part of the ANWR 1002 area, which is closest to existing infrastructure. Furthermore, the oil is expected to occur in a number of accumulations rather than a single large accumulation. Estimates of economically recoverable oil, expressed by probability curves, show increasing amounts of oil with increasing price. At prices less than $13 per barrel, no commercial oil is estimated, but at a price of $30 per barrel, between 3 and 10.4 billion barrels are estimated. Economic analysis includes the costs of finding, developing, producing, and transporting oil to market based on a 12 percent after-tax return on investment, all calculated in constant 1996 dollars.

The amounts of in-place oil estimated for the ANWR 1002 area are larger than previous USGS estimates. The increase results in large part from improved resolution of reprocessed seismic data and geologic analogs provided by recent nearby oil discoveries.

### *EXPLANATION OF WHY A REVISED FACT SHEET IS BEING ISSUED AND WHAT HAS CHANGED:*

*This revised Fact Sheet is being issued in order to provide a more complete summary of the 1998 USGS oil and gas assessment of the Arctic National Wildlife Refuge 1002 Area. The original Fact Sheet was prepared as a hard-copy executive summary intended for distribution coincident with the May 1998 public announcement of the assessment results. Printing deadlines dictated completion of the Fact Sheet before completion of the final economic analysis. Accordingly, only a general and relatively conservative discussion of economic resources was included. This update replaces that general economic discussion with a summary of the completed economic analysis, one that was released as part of the overall documentation of the assessment provided in USGS Open-File Report 98-34. In addition, two typographical errors in the original Fact Sheet have been corrected: In figure 1, the recoverable northern Alaska gas amount is changed from 45 TCFG to 35 TCFG. In table 1, the mean volume of oil estimated for the entire assessment area is changed from 10,322 million barrels to 10,360 million barrels.*

> *The U.S. Geological Survey is solely responsible for the input and results of this assessment. The USGS acknowledges the cooperation of the U.S. Fish and Wildlife Service, Bureau of Land Management, Minerals Management Service, and the Alaska Department of Natural Resources (Geological and Geophysical Surveys, Division of Oil and Gas, and Oil and Gas Conservation Commission), which provided access to data as well as feedback on geology and methodology.*



RESOURCE COSTS—ANWR 1002 AREA

Figure 6. Summary of the USGS estimates of economically recoverable oil that may occur beneath the Federal part of the Arctic National Wildlife Refuge 1002 Area. The three curves are based on estimates of technically recoverable oil volumes at the mean (expected) value, and at the 95 percent ($F_{95}$) and 5 percent ($F_{05}$) probabilities. Each curve relates market price/cost to the volume of oil estimated to be profitably recoverable. Included are the costs of finding, developing, producing, and transporting oil to lower 48 West Coast market based on a 12 percent after-tax return on investment all calculated in constant 1996 dollars. The chart is read as follows: At a market price of $24 per barrel, there is a 95 percent probability of at least 2.0 BB of economically recoverable oil and a 5-percent probability of at least 9.4 BB. The mean or expected value is at least 5.2 BB of economically recoverable oil at $24 per barrel.

**F**or further information and to request a CD-ROM (USGS Open-File Report 98-34) containing detailed results and supporting scientific documentation, send e-mail to:

**gd-energyprogram@usgs.gov**

or contact:

**Kenneth J. Bird    kbird@usgs.gov (650) 329-4907**
**David W. Houseknecht    dhouse@usgs.gov (703) 648-6470**

# Undiscovered oil resources in the Federal portion of the 1002 Area of the Arctic National Wildlife Refuge: an economic update

E. D. Attanasi

## SUMMARY

This report updates an economic analysis of the U. S. Geological Survey's 1998 petroleum assessment of the Federal 1002 Area of the Arctic National Wildlife Refuge (Attanasi, 1999). Whereas the 1998 geologic assessment evaluated Federal and Native lands in the 1002 Area and adjacent State waters (Bird, 1999), the economic analysis (Attanasi, 1999) published at that time, as well as this update, considered just the Federal part of the 1002 Area. The update includes newer field development practices based on horizontal development wells and alternative area development schemes, as well as an update of the 1996 base costs to a new base year of 2003. However, no changes were made to the 1998 geologic assessment.

In the 1998 assessment, geologists assessed volumes of undiscovered technically recoverable oil and gas in accumulations having at least 50 million barrels of oil or 300 billion cubic feet gas in-place. Estimates of technically recoverable oil in undiscovered accumulations in the Federal 1002 Area range from 4.25 billions of barrels of oil (BBO) to 11.80 BBO with a mean of 7.69 BBO. The ranges in estimated volumes correspond to the 95 percent probability (that is, a 19 in 20 chance of occurrence) and the 5 percent probability level (1 in 20 chance), respectively. Estimates of the technically recoverable non-associated gas in undiscovered gas accumulations range from 0 to 10.02 trillion cubic feet of gas (TCFG) with a mean value of 3.48 TCFG. The economic value of non-associated gas resources was not examined in the 1998 evaluation and in this analysis because those resources are not expected to be a target of exploration in the near-term future.

This economic analysis uses the accumulation size-frequency distributions associated with the mean, 95th, and 5th fractile estimates of undiscovered technically recoverable oil. An after-tax 12 percent rate of return or hurdle rate is assumed. All calculations are in constant 2003 dollars. Transportation costs from the field to the market are included so that prices and incremental costs are at the market rather than well-head. Incremental cost functions include the full costs of finding, developing, producing, and transporting oil to the historical North Slope crude oil markets in the lower 48 west coast and the Far East.

The updated economic analysis focuses on two development option scenarios. In the first (*Scenario 1*), all but the smallest accumulations are developed as stand-alone fields, where each field has its own central processing facility. In *Scenario 2*, all produced fluids are processed at central processing facilities outside of the Federal 1002 Area and the processing facilities operate as independent regulated utilities. *Scenario 2* thus limits industry activity inside the Federal 1002 Area. For scenario 1 at $21 per barrel, 2.7 BBO associated with the mean and 0.8 BBO and 5.9 BBO associated with the 95th and the 5th fractiles can be found, developed, produced and transported to market. At $30 per barrel, the computed economic volumes are 6.1 BBO (associated with the mean), 3 BBO (associated with the 95th factile), and 9.7 BBO (associated with the 5th fractile). The economic volumes for scenario 2 were quite similar. Except when prices were below $25 per barrel, economic volumes for *Scenario 2* were within 10 percent of the *Scenario 1* economic volumes.

The accumulation size-frequency distributions for the mean and 5th fractile estimates have most of the resource contained in large accumulations. The resulting incremental cost functions showed large reserve additions as market prices increase above the threshold prices (between $16 and $18 per barrel) that trigger commercial exploration. At market prices of $30 per barrel about 3.0 BBO or 70 percent of the technically recoverable oil assessed at the 95th fractile is economic. For the mean estimate, 6.1 BBO or 79 percent of the assessed oil is economic, and for the 5th fractile estimate 9.7 BBO or 82 percent of the assessed oil is economic. Sensitivity studies show economic results to be robust (stable) with respect to reasonable changes in economic and technical assumptions. When adjusted to constant dollars, these estimates of economically recoverable oil are generally within 10 percent of the estimates published in the earlier analysis (Attanasi, 1999), suggesting that improvements in productivity, such as those brought about by horizontal drilling, have largely offset increased costs that occurred between the 1996 and 2003 base years.



Figure 1. Location map of the Federal and Native 1002 Area  in relation to the entire
Arctic National Wildlife Refuge and Alaska's North Slope.



Figure  2. Map showing geologic study area (Federal 1002 Area), Native lands and adjacent state waters, recent discoveries, the Arctic National Wildlife Refuge, and the Undeformed and Deformed areas of the 1002 Area.  Petroleum plays occurring principally in the Undeformed area are the Topset, Turbidite, Wedge, Thomson, Kemik, and Undeformed Franklinian.  Plays occurring principally in the Deformed area include the Thin-Skinned Thrust Belt, Ellesmerian Thrust Belt, Deformed Franklinian, and Niguanak/Aurora.

AR5587

# INTRODUCTION

This study is an update of the economic analysis of the undiscovered, technically recoverable conventional oil resources assessed for the Federal 1002 Area (see figures 1 and 2) of the Arctic National Wildlife Refuge (reported in US Geological Survey Open File Report 98-34, 1999). The geologic assessment is described in terms of numbers, sizes, and volumes of undiscovered, but potentially producible, oil and gas accumulations. Estimates of costs and the required product prices for transforming these undiscovered resources into discovered, commercially producible, volumes of oil are presented here. The update includes newer field development practices based on horizontal development wells and alternative area development schemes, as well as an update of the 1996 base costs to a new base year of 2003. The results of the economic analysis are summarized as incremental or resource cost functions.

Incremental cost functions show cost-resource recovery possibilities and are not supply functions as strictly defined by economists. However, the incremental cost functions and the data which underlie the functions are often used in market supply models. *This economic analysis is confined to the resources in the Federal part of the 1002 Area. The analysis does not predict the revenue or bonus payments for leases in the Federal 1002 Area nor does it attempt to estimate regional or national secondary economic benefits.* The economic component of the Federal 1002 Area assessment places the geologic resource analysis in an economic context that is more informative and easily understood by government policymakers and industry decision makers. The geologic assessment and economic analysis is regional in nature rather than prospect specific.

*Undiscovered technically recoverable conventional oil and gas resources* are resources posited to exist in *undiscovered accumulations* outside of known fields on the basis of geologic knowledge and theory. Technically recoverable resources are producible using current recovery practices, but without reference to economic viability. *Conventional oil and gas accumulations* are discrete well-defined accumulations, typically bounded by a downdip water contact, from which oil, gas, and natural gas liquids (NGL) can be extracted using traditional development and production practices. *Accumulations assessed by geologists outside of known fields were considered for the purposes of the economic analysis as separate and discrete new fields. Economically recoverable resources* are that part of the assessed technically recoverable resource for which the costs of finding, development, and production, including a return to capital, can be recovered by production revenues at a given price.

The discussion starts with a brief review of the geologic assessment. It then summarizes characteristics of the assessed technically recoverable resources that are important for understanding the economic analysis. Assumptions about markets, pricing, costs, and the technical relationships used in estimating the incremental costs functions are considered. Results and interpretations of the economic analysis update are discussed in the concluding sections.

## Acknowledgements

The author thanks Ken Bird, Keith Long, James Coleman and Brenda Pierce for their reviews and suggestions that improved the description of the analysis. He also thanks Donna Foulke for her patience in putting the original manuscript in its present form.

# GEOLOGIC ASSESSMENT

## Procedure

The details of the geologic assessment protocol and its statistical foundations are described in Schuenemeyer (1999a). The commercial value of a new discovery depends on its expected size, whether it is oil or gas[1], its depth, location, and reservoir properties. Characteristics of the assessment results, such as the accumulation size-frequency distribution, the depth distribution, and the expected geographical distribution of assessed resources are fundamental for understanding the economic analysis. Numbers of accumulations and accumulation properties were assessed at the level of the geologic play. A play is defined as a set of known or postulated oil and (or) gas accumulations sharing similar geologic, geographic, and temporal properties, such as source rock, migration patterns, timing, trapping mechanism, and hydrocarbon type.

For each geologic play, the assessment geologist assigned probabilities and probability distributions to attributes of undiscovered conventional oil and gas accumulations having at least 50 million barrels of oil (MMBO) or 300 billion cubic feet of gas (BCFG) in-place. These distributions include number of prospects, depth of accumulations, and reservoir attributes that included net pay thickness, area of closure, porosity, and percentage trap fill. Play and prospect probabilities of success were also estimated by the geologists[2].

---

[1] Fields and accumulations are classified as either oil or non-associated gas on the basis of gas-to-oil ratios. Those having at least 20,000 cubic feet of gas per barrel of crude oil are classified as non-associated gas; otherwise, were classified as oil with by-product associated gas.

[2] A play probability is the likelihood that at least one accumulation of the minimum size exists. Prospect probability is the probability that any randomly chosen prospect results in an accumulation at least as large as the minimum size.

AR5588

Table 1. Mean values of undiscovered technically recoverable conventional oil, natural gas, and natural gas liquids (NGL) in the Federal 1002 Area of the Arctic National Wildlife Refuge as of January 1998.[BBO, billions of barrels of oil; TCF, trillions of cubic feet gas, BBL, billions of barrels of NGL (source Schuenemeyer, 1999b).

| Area/Play Name[1] | Oil Fields | | | Gas Fields | |
|---|---|---|---|---|---|
| | Oil (BBO) | Gas (TCF) | NGL (BBL) | Gas (TCF) | NGL (BBL) |
| **Undeformed** | | | | | |
| Topset | 4.325 | 1.193 | 0.010 | 0.000 | 0.000 |
| Turbidite | 1.279 | 1.120 | 0.065 | 0.000 | 0.000 |
| Wedge | 0.438 | 0.226 | 0.005 | 0.000 | 0.000 |
| Thomson | 0.246 | 0.314 | 0.026 | 0.156 | 0.013 |
| Kemik | 0.047 | 0.060 | 0.005 | 0.056 | 0.005 |
| Undeformed Franklinian | 0.085 | 0.150 | 0.015 | 0.150 | 0.014 |
| Subtotal | 6.420 | 3.063 | 0.127 | 0.361 | 0.032 |
| **Deformed** | | | | | |
| Thin-Skinned Thrust Belt | 1.038 | 0.283 | 0.003 | 1.325 | 0.014 |
| Ellesmerian Thrust Belt | 0.000 | 0.000 | 0.000 | 0.876 | 0.018 |
| Deformed Franklinian | 0.046 | 0.044 | 0.003 | 0.816 | 0.043 |
| Niguanak/Aurora | 0.183 | 0.168 | 0.010 | 0.105 | 0.006 |
| Subtotal | 1.267 | 0.496 | 0.016 | 3.121 | 0.080 |
| **Total Federal 1002 Area** | 7.687 | 3.558 | 0.143 | 3.483 | 0.112 |

[1]Geologic characteristics of plays are defined Bird (1999)

Probability distributions describing the sizes[3] of accumulations and numbers of accumulations and volumes of hydrocarbons for individual plays were calculated by the following simulation scheme. For each replication, $i$, $i=1,...,N$, the play risk was evaluated. For each successful play, a value for the risked number of accumulations in the play was computed as the product of the prospect probabilities and a random draw from the distribution of the number of prospects specified by the assessor. For each realization of the play represented by the $n_i$ accumulations, the probability distributions representing the reservoir attributes were sampled $n_i$ times, thus providing a size for each accumulation.

Geologists also specified pairwise dependencies (as high, medium, low) across plays for the occurrence of charge, reservoir, and timely trap formation. The probability distributions for individual plays were combined - conditioned on the play dependencies - with computer simulations. From the resulting aggregate estimates of the distribution of volumes, the associated numbers and sizes of undiscovered accumulations were recovered by play.

Each of the 10 play definitions included a description of the geographic location and geologic characteristics (see Bird, 1999). Most of the plays thought to occur in the 1002 Area are found in adjacent State lands, under State and Federal waters, or elsewhere on the North Slope. Supporting studies were prepared by the assessment geologists and other members of the Assessment Team to assist in the task of characterizing play attributes with probability distributions.

## Results

Estimates of technically recoverable oil in undiscovered accumulations in the Federal lands of the 1002 Area range from 4.25 BBO (95th fractile) to 11.80 BBO (5th fractile) with a mean of 7.69 BBO. Estimates of technically recoverable non-associated gas in undiscovered gas accumulations range from zero (95th fractile) to 10.02 TCFG (5th fractile) with a mean estimate of 3.48 TCFG. Table 1 presents play level and total mean estimates of oil, associated gas, associated gas natural gas liquids (NGL), non-associated gas, and non-associated gas NGL for the 1002 Area. The Topset Play accounts for 56 percent of total oil, and the Topset, Turbidite, and Thin-Skinned Thrust Belt plays together account for more than 86 percent of the total oil assessed. Results suggest that the likelihood is very low of a single large gas field occurring with a NGL to gas ratio sufficiently high for an accumulation to be developed solely for its liquids. Technically recoverable oil accumulation size-frequency distributions, shown in figure 3, convey the economic implications of the oil estimates. Few small

---

[3]For each oil accumulation, for example, the simulated reservoir-attribute values included the following: (1) net reservoir thickness, t, in feet, (2) area of closure, ac, in thousands of acres, (3) porosity, p, as a decimal fraction, (4) trapfill, f, as decimal fraction and (5) hydrocarbon pore space, hps, (as a function of p and Sw where Sw is water saturation as a decimal fraction.) The assessors provided estimates of the oil recovery factor, rf, as a fraction of the in-place resources that are recoverable and the formation volume factor, fvf, was calculated as a function of trap depth and API gravity. Oil accumulation size, szo, in millions of barrels was calculated with the following equation:

szo =7.758(t)(hps)(f)(rf)(ac)/(fvf) where hps = p(1-Sw).

A similar approach was taken for simulating gas accumulation sizes. Schuenemeyer (1999a) provides a more detailed discussion of this approach.

12
10
8
6
4
2
0
NUMBER OF OIL ACCUMULATIONS
8-<16
16-<32
32-<64
64-<128
128-<256
256-<512
512-<1024
1024-<2048
OIL ACCUMULATION SIZE (MMBO)
95TH FRACTILE
MEAN
5TH FRACTILE

Figure 3. Size frequency distribution of undiscovered conventional oil accumulations associated with the 95th fractile estimate, the mean estimate, and the 5th fractile estimate of the assessed distribution of technically recoverable undiscovered oil for the Federal 1002 Area (MMBO, millions of barrels of oil).

accumulations are shown because only accumulations having at least 50 million barrels oil in-place were assessed.

Stand-alone fields of the size of 150 million barrels (recoverable) are considered for development in the coastal areas of the Central North Slope, for example the Liberty Field (Craig, 2002). Based on the accumulation size-frequency distribution associated with the *mean* estimate of undiscovered technically recoverable oil, 3.26 BBO (42 percent) of the assessed oil is assigned to accumulations of at least 500 million barrels of oil (MMBO). Similarly, accumulations of at least 500 MMBO account for 1.12 BBO (26 percent) and 6.43 BBO (54 percent) of the undiscovered volume of oil associated with the 95th and 5th fractile estimates, respectively (see table 2). Table 2 also shows that accumulations larger than 256 MMBO account for 52 percent (2.22 BBO), 65 percent (4.99 BBO) and 72 percent (8.52 BBO) of the oil assessed at the 95th fractile, mean, and 5th fractile estimates, respectively. In short, significant oil volumes were assessed in accumulation sizes of economic interest.

Assessment results (Bird, 1999) show, at the play level, that most of the oil is expected to be concentrated in plays located in the geographically confined Undeformed area (see figure 2: area between Staines River and Marsh Creek Anticline). At their mean estimates, these plays - Topset, Turbidite, Wedge, Thompson, Kemik, and Undeformed Franklinian - account for 6.46 BBO in 31 accumulations (or about 84 percent at the mean oil estimate and 88 percent of the mean number of accumulations). Furthermore, 6 BBO or 78 percent of the total oil estimated at the mean was associated with accumulations with depths shallower than 10,000 feet. Less than 6 percent of the oil was assigned to accumulations at depths greater than 15,000 feet.

The average gravity for the assessed oil was about 30 degrees API; somewhat lighter than oil found near the Prudhoe Bay area. This difference is attributed to measurements from wells drilled at undeveloped discoveries near the 1002 Area. There was also no indication that contaminants in the assessed oil would present production problems or require special treatment (for play assessment data see Schuenemeyer, 1999b).

In summary, the characteristics of the assessed technically recoverable oil important to the economic analysis are the volumes of oil, the oil accumulation-size distribution, and depths. The geographical location of the assessed resources was not specified but is the consequence of the play locations and play endowments. Distributions in figure 3 and supporting data show most of the assessed oil in the 1002 Area assigned to accumulations sufficiently large to be of economic interest. Also, more than three-fourths of the oil assessed is expected to be in accumulations at depths of less than 10,000 feet. Finally, more than 80 percent of the oil was assigned to the western part of the Federal 1002 Area, the area closest to existing infrastructure.

Table 2. Distribution of Assessed Federal 1002 Area Resources of crude oil[1] based on field size distributions associated with estimates of oil at the 95th fractile, the mean, and the 5th fractile.

| USGS Class | Oil Field Size | Cumulative Volume Percentage | | |
|---|---|---|---|---|
| | | 95TH | MEAN | 5TH |
| | (MMBO) | (PERCENT) | (PERCENT) | (PERCENT) |
| 18 | 4096-8192 | 0.00 | 0.56 | 1.36 |
| 17 | 2048-4096 | 1.39 | 5.90 | 12.60 |
| 16 | 1024-2048 | 7.83 | 20.82 | 31.34 |
| 15 | 512-1024 | 26.30 | 42.43 | 54.49 |
| 14 | 256-512 | 52.18 | 64.87 | 72.19 |
| 13 | 128-256 | 77.29 | 83.84 | 87.36 |
| 12 | 64-128 | 93.29 | 94.94 | 96.26 |
| 11 | 32-64 | 98.77 | 99.11 | 99.28 |
| 10 | 16-32 | 99.97 | 99.98 | 99.98 |
| 9 | 8-16 | 100.00 | 100.00 | 100.00 |

[1]The 95th fractile estimate is 4.25 BBO, the mean estimate is 7.69 BBO, and 5th fractile estimate is 11.8 BBO.

Case 3:24-cv-00051-SLG Document 71-4 Filed 08/13/24 Page 58 of 69

AR5590

# ECONOMIC APPROACH

## Data

Data from the assessment simulations include the accumulation size and attributes that determine size. The attributes include area, net pay thickness, depth, porosity, recovery factor; for oil accumulations: the oil formation volume factor. Attributes used to compute accumulation size (see footnote 3) were applied to estimate average production well recovery.

Economic cost data were drawn from earlier economic studies of the Federal 1002 Area and elsewhere on the North Slope (National Petroleum Council 1981a, 1981b, J. Broderick, Bureau of Land Management, 1992, personal communication, Han-Padron Associates, 1985, Young and Hauser, 1986, Thomas and others, 1991, Thomas and others, 1993, Craig, 2002). Additional data on recent cost trends obtained from a variety of sources including Annual Joint Association Survey (American Petroleum Institute. 1997- 2005), Redman, (2002), Erwin, and others (2002), Craig (2002) and Craig (James Craig, Minerals Management Service, written communication, 2005) were used to update configurations and costs of posited production technologies. The empirical relationship presented in Thomas and others (1991) predicted the water cut of produced oil as a function of field depletion.

## General Assumptions and Scope of Analysis

Results of the economic analysis are presented as the costs of transforming undiscovered resources into discovered commercially producible volumes of oil. These include costs of finding, developing, producing, and transporting to market resources in currently undiscovered accumulations. The cost functions are not the same as the economist's market price-supply predictions, because at any given price the oil and gas industry will allocate funds over a number of provinces and sources of supply in order to meet market demand at lowest costs. An observed price-supply relationship represents the culmination of numerous supplier decisions over many projects and regions. Incremental cost functions represent costs that are computed independently of activities in other areas.

Furthermore, the incremental cost functions are assumed to be time independent and should not be confused with the firm supply functions that relate marginal cost to production per unit time period. Because of the time-independent nature of the incremental cost functions and the absence of market demand conditions in the analysis, user costs or the opportunity costs of future resource use are not computed. However, the incremental cost functions and the data which underlie the functions are often used in market supply models.

Undiscovered non-associated gas fields were not evaluated in the original economic analysis because a viable gas market appeared to be at least two decades into the future. A supporting study did consider the option of transporting North Slope gas to the south and selling the gas as LNG to the Far East (Attanasi, 1994). It concluded that at least until 2015, North Slope gas would be at a competitive cost disadvantage to other existing and potential suppliers to that market. In Northern Alaska about 30 TCF of associated gas has already been discovered that can be produced cheaply if a gas market develops. Gas that is currently produced with oil is typically stripped of its liquids and re-injected into the oil accumulation or used as fuel on the lease. For the purposes of this update, the economic value of the undiscovered non-associated gas was not considered.

## Economic Assumptions

Economic models are abstractions that characterize real economic systems and are typically just detailed enough to roughly approximate the outcomes of interactions between economic agents. Only the general direction and the approximate magnitude of the reaction of the system to price or cost change can be modeled. It was assumed that the industry will not invest unless the full operating costs, taxes, capital, and cost of capital could be recovered. Values of physical and economic variables are assumed to be known with certainty by decision makers. It was assumed areas considered in the economic analysis were available to exploration for oil.

## Economic Parameters

Costs used in this analysis represent those prevailing in the calendar year 2003. *Calculations were in terms of constant real dollars*. The discounted cash flow (DCF) analysis was specific to individual discoveries, that is projects, and ignored minimum income taxes and tax preference items that might be important from a corporate accounting stance. A 12 percent after-tax required rate of return was assumed. Federal income tax provisions are as of the year 2003.[4]

Alaska State taxes include the severance, income tax, and ad valorem tax (property tax). The severance tax depends on field and well productivity (see Appendix B for details). Although the nominal State income tax rate is 9 percent, the effective tax rate is set by a complex formula based on the individual company's production and sales. For planning purposes, State agencies use a rate of 1.4 to 3.0 percent of net income. An effective tax rate of 3 percent is used here. The State's ad valorem tax is an annual charge equivalent to 2 percent of the economic value of equipment, facilities, and pipelines. The Federal corporate tax rate used in the project analysis was 35 percent. A one-sixth royalty was assumed to be paid to the Federal government (Young and Hauser, 1986).

---

[4]Based on the 1986 Tax Reform Act, 30 percent of development well drilling cost is classified as tangible cost and therefore capitalized over 7 years. Of the remaining 70 percent of drilling cost (that is, the intangible drilling costs), 30 percent is depreciated over 5 years and the remaining 70 percent is expensed immediately.



Figure 4. Map showing the partitioning of the Federal 1002 Area into the western and eastern sub-areas and the possible regional pipeline transport system (dashed lines from the eastern sub-area of the Federal 1002 Area to Pump Station 1 where double lines show part where east and western sub-area regional pipelines are parallel). The placement of the pipelines shown in this figure is for the purpose of cost analysis in this study and does not imply a suggested route for the actual system.



Figure 5. Map showing the partitioning of the Federal 1002 Area into the western and eastern sub-areas and the possible regional pipeline transport system from sub-areas to production facility area and then to Pump station 1 near Prudhoe Bay. Scenario 2 processing areas are shaded in gray. The placement of the pipelines in this figure if for the purpose of cost analysis in this study and does not imply a suggested route for the actual system.

A charge of $0.25 per barrel produced is also taken to cover abandonment costs.

This report is based on the technology and cost data of the 2003 base year.  It focuses on commercial new discoveries that are in the price range of $15 to $55 per barrel in 2003 dollars.  It has been our standard practice to use as the model price ceiling two times the average price of crude oil in the base year for technology and cost.  Average crude oil prices during 2003 were just over $27 per barrel, so the ceiling price used for this study $55 per barrel in 2003 dollars.  During the summer of 2005, spot oil prices exceeded the high end of the price range; that is, exceeded $60 in 2005 dollars.  If such prices are sustained over the long-term new technologies would emerge that would vitiate the geologic estimate of technically recoverable resources by increasing the play recovery factors assumed by the geologists and also permitting commercial development of smaller accumulations that occur but that were not assessed by the geologists.

The oil price discussed is the landed U. S. lower 48 states' West Coast price rather than the well-head price.  It also represents a price at the market that is sustained, rather than an erratic spot price.  In the absence of gas markets the well-head price of gas was assumed to be zero (non-associated gas was not considered).  The well-head price of natural gas liquids was assumed to be 75 percent of the per barrel price of crude oil.  Though graphs may show additions to reserves for the higher prices, *if prices rise substantially and rapidly, it is unrealistic to assume that constant real costs would hold.*  Historical experience has shown that oil and gas price increases lead to escalation in industry capital and operating costs (Kuuskraa and others, 1987).

## Transportation, Infrastructure, and Location Assumptions

Oil produced in Northern Alaska is shipped via the Trans-Alaska Pipeline System (TAPS) to the Port of Valdez in southern Alaska for ocean tanker transport to market.  In 1988, the TAPS oil flow averaged 2.0 million barrels per day.  For 2004, the TAPS flow rate averaged less than 1 million barrels per day of oil and natural gas liquids.  There currently may be one million barrels per day of unused capacity.

TAPS tariff rate and marine transport rate to market are projected semi-annually by the Alaska Department of Revenue.  The marine transport rate represents transport cost weighted by projected sales volumes from Valdez to a set of destinations which include the US lower 48 West Coast, the Far East, and the US mid-continent region.  These rates are projected on an annual basis to 2020 (Alaska Department of Revenue, 2004).  The average projected TAPS tariff for the period starting in 2014 (assumed to be the earliest time of Federal 1002 Area development) is $3.90 per barrel and similarly, the marine transport rate is $2.23 per barrel.

For this study, the Federal 1002 Area was partitioned into two sub-areas (see figures 4 and 5) from which regional

pipeline costs to transport oil to pump station 1 of TAPS were computed (figure 4).  The assessment geologists allocated resources at the play level to the western and eastern sub-areas.  Overall, approximately 80 percent of the assessed oil was assigned to the western area.  The sub-area allocations of technically recoverable resources by play are presented in Appendix A in tables A-1 though A-3.  Of the 1.526 million acres representing the entire onshore Federal lands of the 1002 Area, there are 0.581 million acres in the western sub-area and 0.945 million acres in the eastern sub-area.

Cost functions were computed based on two very different configurations regarding field development (identified as *Scenarios 1* and *2*).

*Scenario 1.*  It was assumed in the original study (Attanasi, 1999) that a major regional pipeline would be built from TAPS Pump Station 1 to a central location in the western sub-area of the 1002 Area a distance of 85 miles.  Transportation of oil from the eastern sub-area would come with a parallel regional pipeline originating about 50 miles to the east of the terminus of the western sub-area pipeline.   The regional pipeline business entity is assumed to be a regulated common carrier.  Pipeline tariff charges were set to meet all operating costs, taxes, and to assure investors a 12 percent after-tax return on investment.  The assumed pipeline flow capacity from the western sub-area is at least 500,000 barrels per day.  If a larger diameter pipeline is required, then because of scale economies, the unit cost levels and tariffs will be lower than those used in this study.

The distances from the designated central points within the two sub-areas (shown as ends of regional pipelines in figure 4) to Pump Station 1 were used for estimating investment cost.  Pipeline investment cost functions, originally presented in Young and Hauser (1986) and later updated by Broderick (1992), were adjusted to 2003 cost levels.  Annual pipeline operating costs are computed as 2 percent of the initial investment cost.  The pipeline business entity, operated as an independent regulated utility, is assumed to be subject to all Alaska State taxes as well as Federal taxes.

Discovery-specific smaller diameter feeder lines[5] were assumed to be built from the periphery of the discovery to the regional pipeline.  In the western sub-area feeder lines were assumed to be of maximum length of 12 miles.  In the eastern sub-area, the maximum length of the discovery-specific feeder pipeline is 16 miles.  Details of the investment cost functions are presented in Appendix B[6].

*Scenario 2*  An alternative development configuration is to designate the western and eastern sub-areas as two separate

---

[5]The smaller diameter feeder lines were sized according to the field size; see appendix B.

[6]It is also assumed that there are smaller diameter pipelines from the coastal areas outside of the 1002 Area that transport diesel fuel and seawater to the feeder lines. The seawater processing and fuel storage facilities for western sub-area are assumed to be located on coastal State land outside of the Federal 1002 Area.  For the eastern sub-area, fuel and seawater could be transported from that facility or from facilities located in coastal Native lands in to the eastern sub-area. These lines will use the right of way and vertical support members (VSMs) of the regional pipeline and feeder lines.

operating areas and require the produced fluid mixture of oil, gas, and water to be transported and processed outside of the Federal 1002 Area in one or more central processing facilities. Recent technological advances have reduced costs of monitoring and transporting multiphase (mixture of water, oil, and gas) fluids longer distances than in the past (Atkinson and others, 2005). Such advances have allowed commercial development of moderate-size deep water discoveries (50 to 200 million barrels) that may not have been developed if each discovery required construction of a new production platform. The produced fluid mixture of oil, gas, and water is transported to a shared production platform under pressure so the gas is maintained in solution with the oil. On the North Slope, the proposed satellite developments to the Alpine field are examples where multiphase production fluids will be transported over moderate distances. The operating area (field management area) proposed for the main Alpine accumulation and its satellite operations covers 0.890 million acres (Nelson, 2004).

Scenario 2 requires that the mixture of oil, water, and gas produced at the wells be transported to central processing facilities outside the Federal 1002 Area. For accumulations in the western sub-area the produced liquids are transported by the feeder lines to a regional line that terminates in the State land coastal area just outside of the Federal 1002 Area where the mixture is processed. Gas, fuel, and seawater could be returned to the field by return lines utilizing the right of way and vertical support members (VSMs) of the lines to the central processing facilities. For the western sub-area the processed oil is then transported 65 miles west to Pump Station 1 by a regional pipeline (figure 5).

Production from the eastern sub-area is assumed to be transported through the feeder lines to a regional pipeline to its own processing facility located on Native lands near the coast (figure 5). An alternative to processing on Native lands is to add booster pumps to maintain multiphase flow and to transport the mixture west to a location near the western sub-area processing facilities. If the product is processed in the Native lands it then could be transported by regional pipeline 135 miles west to Pump Station 1. Additional details of the analysis are presented in Appendix B.

## Exploration and field development costs

Exploration, field design, and field development methods on the North Slope differ from that of the lower 48 States. Wildcat drilling typically occurs in the winter when temporary ice roads, ice pads, and ice airstrips can be constructed to support drilling activities. After the ice melts there is generally no sign of the previous winter's activity. Seasonal instability of the permafrost requires construction of gravel pads to support production wells and facilities. Typically, production wells are drilled directionally from the pads to target depths and lateral locations. Gravel drilling pads commonly accommodate as

many as 40 well collars[7] spaced at 10 foot intervals along with production equipment. Sidetrack and multilateral drilling of two or more wells using a single well collar enable the maximum utilization of individual drilling pads.

The remoteness of the targets, the climate, and the absence of infrastructure result in high initial exploration and development costs. Following Young and Hauser (1986) and Broderick (1992), costs of wells and facilities are assumed to be at least 30 percent greater in the Federal 1002 Area than the costs that prevail in the Central North Slope Area.

For a stand-alone field, produced oil is processed at the field's central processing facility and the final product is transported from the periphery of the field to TAPS. Because commercial North Slope discoveries are typically very large and provide large payoffs in terms of the volumes of oil that incremental increases in oil recovery can yield, operators typically introduce technological innovations relatively quickly. For example, the application of extended reach drilling has allowed production wells access to distant reaches of the reservoir, sometimes eliminating the need for additional drill pads or allowing satellite pool development from existing drill pads. Because of this technology, it was assumed that any offshore accumulations of the Federal 1002 Area that occur beneath the lagoonal areas between the shoreline and barrier islands can be developed from onshore or with shallow-water drilling pads.

## Exploration costs

Costs of geologic and geophysical studies to site exploration wells after a lease is acquired are computed as part of the costs of wildcat wells. Wildcat well drilling costs were assumed to be twice the cost of drilling production wells in the Federal 1002 Area. Non-drilling exploration expenditures include geologic and geophysical data collection after lease acquisition, scouting costs, and overhead charges associated with land acquisition. Non-drilling exploration expenditures[8], exclusive of lease bonuses, were assumed to amount to 50 percent of the wildcat well drilling costs (Vidas and others, 1993) and were also added to wildcat exploration expenditures[9]. The first twenty wildcat wells drilled in the Federal 1002 Area were assigned a minimum cost of 15 million dollars per well. Exploration was evaluated in increments of 10 wildcat wells. Actual exploration and development costs will depend on site-specific characteristics of the prospects. *Play analysis does not provide specific locations, so generic costs were used.*

---

[7]The well collar is at end of the steel well casing that protrudes at the surface of the drill pad.

[8]For rank wildcat exploration the 3-D seismic expense may range from 750 thousand to 1 million dollars per prospect (D. Houseknecht, US Geological Survey, personal communication, 2005).

[9]*For example*, suppose a development well drilled to a depth of 7500 feet in the Central North Slope costs 3.6 million dollars. Total costs for a comparable wildcat well in the western sub-area of the Federal 1002 Area, including non-drilling costs that amount to 50 percent of drilling cost are about 14 million dollars (that is, the product of 3.6 (base well) x 1.3 (remoteness) x 2 (wildcat fractor) x 1.5 non-drilling factor).

## Field development costs

The two principal field development cost categories are (1) drilling and completion cost of production and injection wells and (2) facilities' costs. During the 1980's and 1990's the reduction in development and operating costs for new discoveries on the North Slope has been substantial and well documented (Harris, 1987a, 1987b Nelson, Thomas and others, 1993). More recently, the use of horizontal wells for all production wells at the Alpine field has, by increasing development well productivity, permitted commercial development of an accumulation with a relatively thin pay interval by the North Slope standards (Gingrich and others, 2001). Greater well productivity reduces the required number of wells for field development and also reduces the size and (or) number of drilling pads. Details for cost estimation procedures are presented in Appendix B.

Field development well investment costs are based on the number of wells required to develop a discovery, the associated number of injection wells, and the cost per well. Per well drilling cost estimates used here should be understood to represent expected costs based on an established industry operating within the capacity of its service industry. Drilling costs were estimated using data from Annual Joint Association Surveys (American Petroleum Institute 1997- 2005), Redman, (2002), National Petroleum Council (National Petroleum Council, 2003) and Craig (2002). Prudhoe Bay area costs for drilling and completing wells became the basis for estimating well costs for the Federal 1002 Area.

The estimated Prudhoe Bay area 2003 base costs for conventional well $2.0 million for wells less than 5,000 feet, $3.6 million for 5,000 feet to10,000 feet, $5.8 million for 10,000 feet to 15,000 feet, and $7.9 million depths greater than 15,000 feet. For the western and eastern sub-areas of the Federal 1002 Area, drilling costs are increased 30 percent over the Prudhoe Bay area costs to compensate for the Federal 1002 Area's lack of infrastructure and special environmental regulations (Young and Hauser, 1986). Horizontal well costs were, in part, based on the conventional well cost to target depth, along with the additional cost of the horizontal lateral section of 3,000 feet and a cost penalty of total drilling length beyond 15,000 feet (James Craig, Minerals Management Service, written communication, 2005) . Extra costs are incurred when fixing down-hole problems when drilling beyond 15,000 feet. Production well drilling-cost levels are assumed to represent long term averages for the industry in constant dollars, rather than the costs associated with first field development.

The number of wells required to develop a discovery depends on well productivity. For each accumulation size and depth category, average oil well recovery was computed with the assumed production well spacing and calculated from the simulated reservoir attribute values for each successful prospect. For each field size class, at a given depth interval, the representative (sub-area) well recovery is a weighted average (weight by volume) of the corresponding play well recovery values estimated from the simulation data (Schuenemeyer,

1999a). Well recovery estimates varied substantially across different depth intervals within the same field size category, reflecting variations in assessed reservoir quality attributes of each play occurring in the depth interval.

Conventional wells were assumed to be drilled on 160 acre spacing (Young and Hauser, 1986). Based on the 160 acre conventional well drainage area and if vertical and horizontal well permeability are roughly equivalent, horizontal production wells having 3000 foot horizontal sections will have drainage areas of at least 365 acres. For each set of 10 conventional production wells, 4 injection wells (water or gas) would also be drilled (National Petroleum Council, 1981a, Young and Hauser, 1986), but for the horizontal wells, each production well is matched by a horizontal injector well in a 'line drive configuration' (Redman, 2002). Appendix B discusses the field design and estimation of the associated drilling costs.

Facilities include drill pads, flow lines from drilling sites, the central processing unit, and infrastructure required for housing workers, including amenities. Facilities design and costs depend on peak fluid flow rates and ultimately on the field size. Appendix B discusses the procedure applied to recalibrate the facilities cost functions used in earlier studies. Table B-4 presents the cost estimates by field size class used in this study.

As of the end of 2004, the eight oil fields developed on a stand-alone basis in Northern Alaska are Prudhoe Bay, Kuparuk, Lisburne, Milne Point, Endicott, Badami, North Star, and Alpine. Other developed fields and pools have produced fluids (oil, gas, and water) transported to the central processing unit of a nearby stand-alone field for separation. Point McIntyre, Niakuk, North Prudhoe Bay, and West Beach all use the central processing facilities of the Lisburne field. Prudhoe Bay production facilities process production from Midnight Sun, Aurora, Polaris, Borealis, and Orion. The Kuparuk River field also processes production from Tabasco, Tarn, Meltwater, and Palm. Thus far, all of the satellite and parent fields have had common ownership.

Development of accumulations as satellites to established fields can reduce substantially capital requirements for field development, as well as the time to first production. Actual savings are site-specific because certain facilities costs, such as drill pads, internal roads, and product transportation, are location dependent. It was assumed that facilities sharing would, on average, result in a 30 percent reduction in facilities investment costs (Thomas and others, 1993).

For *Scenario 1*, as in the earlier analysis (Attanasi, 1999), facilities sharing was limited to discoveries smaller than 130 million barrels in the western sub-area. In the eastern sub-area, the small numbers of assessed fields and possibly greater distances between fields make facilities sharing less likely. For *Scenario 2* cost analyses assumed the produced fluids are transported from the wellhead to common central processing facilities outside of the Federal 1002 area. Details are presented in Appendix B.

AR5595

## Field operating costs

Field operating costs include labor, supervision, overhead and administration, communications, catering, supplies, consumables, well service and workovers, facilities maintenance and insurance, and transportation. Some costs, such as well workover costs have declined because of the introduction of new materials such as coiled tubing (Oil and Gas Journal, 1994). Annual field operating costs were estimated as a function of hydrocarbon and water fluid volumes and number of operating wells (Craig, 2002). The fluid volumes were projected annually using field production forecasts and a water cut function presented in figure B-2, Appendix B, (Thomas and others, 1991). As fields are depleted the water cut increases, thereby increasing the per barrel cost of oil processed. The specific formulation used to estimate operating costs is discussed in Appendix B.

### Economic rationale for computations

Size, depth, regional costs, and co-product ratios determine whether a discovery will be commercially developable. A new discovery is *commercially developable* if the after-tax net present value of its development is greater than zero. The algorithm that calculated incremental costs used the predicted size and depth distribution of undiscovered fields (at the sub-area level) to compute quantities of resources that are commercially developable at various prices. To compute finding costs, the geologic assessment is coupled with a finding rate model (Attanasi and Bird, 1996) to forecast the size and depth distribution of new discoveries from increments of wildcat drilling. These forecasts drive the economic field development and production process model to determine the aggregate value of new discoveries and consequently, how many successive increments of exploration effort should be expended.

Specifically, at a given price the commercial value of developing a representative accumulation from a specific size class and depth category is determined by the results of a discounted cashflow (DCF) analysis. The net after-tax cash flow consists of revenues from the production of oil less the operating costs, capital costs in the year incurred, and all taxes. All new discoveries of a particular size and depth category are assumed to be developed if the representative accumulation is found to be commercially developable, that is, the after-tax DCF is greater than zero, where the discount rate (12 percent) represents the cost of capital and the industry's required return. It is assumed that when operator income declines below the sum of direct operating costs and the operator's production-related taxes, the economic limit rate is reached and production stops. Newly discovered commercially developable accumulations are summed and represent an estimate of the potential reserves attainable from undiscovered accumulations at a given price and required hurdle rate of return. *The results from this procedure do not imply that every accumulation determined to be commercially developable is worth exploring for.*

The basis for the estimates of recoverable undiscovered petroleum as a function of price is that the incremental units of exploration, development, and production effort will not take place unless the revenues expected to be received from the eventual production will cover the incremental costs, including a normal return on the incremental investment. Exploration is assumed to continue until the incremental cost of drilling wildcat wells is equal to or greater than the net present value of the cost of the commercially developed fields discovered by the last increment of wildcat wells. For the last increment of hydrocarbons produced from a field, operating costs (including production related taxes) per barrel of oil equivalent are equal to price.

These two assumptions together imply that for the commercially developable resources discovered by the last economic increment of wildcat wells, that is, for those reserves found, developed, and produced at the economic margin, the sum of finding costs and development and production costs per barrel equals the well head price (price of oil to the field owner). The marginal finding costs as described here are calculated by dividing the cost of the last increment of wildcat wells (which is approximately equal to the sum of the after-tax net present value of all commercially developable fields discovered in that last increment of exploration) by the amount of economic resources discovered by the last increment of exploration. Marginal development and production cost per barrel (for the economic resources discovered in that last increment of exploration) are calculated by subtracting the marginal finding costs from the well head price.

Finding rate functions provide the critical link between the field development costs and exploration costs. The size, depth, and number of undiscovered fields were computed from the *geologic assessment data*. However, *finding rate functions predict the number and sizes of new discoveries as functions of cumulative wildcats drilled within each depth interval.* Because of the relatively small number of discoveries, a consistent set of finding rate coefficients could not be calculated for Northern Alaska. A procedure for obtaining default coefficients is described in Attanasi and Bird (1996). Allocations of wildcat wells by depth interval were made in such a way that for each increment of wildcat wells evaluated, the after-tax net present value of the oil fields discovered was maximized.

## ECONOMIC ANALYSIS

### Incremental costs: finding, development, production and transportation

The full costs include costs of finding, developing, producing and, in the case of northern Alaska, transporting oil to market. Incremental costs are linked to development, production, and transportation cost by finding rate functions that predict the discovery size distributions generated by incre-

AR5596

ments of wildcat wells.  Computations were based on successive increments of 10 wildcat wells.  All computations were prepared for the western sub-area and eastern sub-areas independently.

The results of computations are presented for the two scenarios described earlier.  For Scenario 1, all discoveries in the eastern sub-area and all discoveries except those smaller than 130 million barrels in the western sub-area are developed as stand-alone operations[10].  Alternatively, for Scenario 2, it is assumed that fluids produced from all discoveries would be transported to common processing facilities located outside the Federal 1002 Area (see figure 5).  Sensitivity studies show that it would be less costly to develop fields using horizontal drilling than the standard directional drilling practices assumed in the earlier Federal 1002 Area economic study (Attanasi, 1999), so for both scenarios horizontal drilling was assumed to be implemented.

Figure 6 shows the incremental cost functions for crude oil for the Federal 1002 Area based on the undiscovered field size distributions associated with the 95th fractile, the mean, and 5th fractile estimates under Scenario 1 and Scenario 2, respectively.  Tables 3 and 4 summarize the sub-area and (Federal) study area estimates of incremental costs, expected reserve additions, and finding costs.  Along with crude oil, the tables show the associated gas and associated gas liquids in developable oil discoveries.

Not only is the 95th  fractile estimate smaller in the volume of oil assessed but the oil is distributed in smaller fields that in many cases are not only harder to find but may not even be commercially developable.  For the Scenario 1 development scheme, the threshold prices at which wildcat drilling and development is economic under the assumptions used in this analysis are $19.90 per barrel for the 95th fractile distribution, $17.50 per barrel of the distribution associated with the mean, and $16.40 per barrel for the distribution associated with the 5th fractile estimates.  For Scenario 2 (processing outside the Federal 1002 Area),  the threshold prices at which wildcat drilling and development is economic under the assumptions used here are $19.70 per barrel for the 95th fractile distribution, $17.40 per barrel of the distribution associated with the mean, and $16.50 per barrel for the distribution associated with the 5th fractile estimates.  The two scenario incremental cost curves based on the same mean or fractile size distribution will be almost indistinguishable as the comparison of tables



Figure 6. Incremental costs, in dollars per barrel, of finding, developing, producing, and transporting crude oil from undiscovered accumulations in the Federal 1002 Area of Northern Alaska, where computations were based on discoveries developed (1) predominately as stand-alone fields, each with processing facilities, (Scenario 1, figure 4) and alternatively, (b) where production fluids are transported to two central processing facilities located outside the Federal 1002 area (Senario 2, figure 5). Vertical lines represent the technically recoverable oil at the 95th  fractile, the mean, and the 5th fractile estimates as reported in Bird (1999). The dollar values have a 2003 base year.

3 and 4 show. At per barrel prices of $35 or greater, there is only a few percent difference in the computed economic oil volumes based on development alternatives of Scenario 1 and Scenario 2.[11]

The incremental cost functions associated with the mean and 5th fractile accumulation size-frequency distribution (figure 6) show large additions to reserves as prices initially increase beyond the threshold price at which exploration is initiated because a large part of the total oil associated with the accumulation size-frequency distributions is in large fields (greater than 500 million barrels, see Table 2). Discovery rates decline rather rapidly after the initial increments of wildcat drilling are completed and the large, low cost discoveries are depleted.   Table 3 shows for the accumulation size distribution for mean estimate that at $21 per barrel it is economic to find, develop, and produce 2.7 BBO; at $30,  6.1 BBO;  at $42, 6.9 BBO; and at $51, 7.1 BBO.

Figures 6 highlights the uncertainty attached to the geologic estimates of technically recoverable oil, regardless of the scenario assumptions.  At $21 per barrel economically recoverable oil ranges from 0.75 BBO to 5.95 BBO.  The incremental cost functions are relatively flat to $30 per barrel. For scenario 1, at $30 per barrel, 70 percent of the oil assessed at the 95th fractile is economic, 79 percent of oil assessed at

---

[10]The negotiated sharing costs between the facility operator/owner and the owner of the new discovery followed a scheme presented by Thomas and others (1993). In this scheme the facility owner captures some of the potential savings that would accrue to the small field owner if the facility owner had to price services on a marginal cost basis.

[11]For the case where production fluids are processed outside the Federal 1002 Area (Scenario 2), the eastern sub-area discoveries appear to be somewhat more costly to develop than as stand-alone fields.

AR5597

Table 3.  Incremental cost of finding, developing, producing, and transporting oil and natural gas liquids (NGL) from undiscovered oil fields in the Federal 1002 Area of the Arctic National Wildlife Refuge and associated and finding costs: Scenario 1. [BBO-billions of barrels of oil, TCF-trillions of cubic feet of gas, BBL-billions of barrels of NGL, Asc. gas-Associated gas, boe-barrels of oil equivalent. Find., finding]

| Sub-area $/bbl | 95th FRACTILE ESTIMATE | | | | MEAN ESTIMATE | | | | 5th FRACTILE ESTIMATE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe |
| Western | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 1.40 | 0.37 | 0.00 | 0.38 | 3.14 | 0.92 | 0.01 | 0.34 |
| 21 | 0.75 | 0.20 | 0.00 | 0.63 | 2.66 | 0.76 | 0.01 | 0.64 | 5.10 | 1.58 | 0.02 | 0.69 |
| 24 | 1.51 | 0.46 | 0.01 | 0.83 | 4.01 | 1.42 | 0.03 | 0.84 | 6.72 | 2.50 | 0.06 | 0.76 |
| 27 | 2.23 | 0.98 | 0.03 | 0.79 | 4.54 | 1.81 | 0.05 | 1.09 | 7.31 | 2.92 | 0.08 | 1.13 |
| 30 | 2.64 | 1.35 | 0.06 | 1.27 | 5.06 | 2.26 | 0.08 | 1.49 | 7.95 | 3.53 | 0.12 | 1.34 |
| 33 | 2.83 | 1.51 | 0.07 | 1.68 | 5.32 | 2.48 | 0.10 | 1.97 | 8.16 | 3.67 | 0.13 | 1.85 |
| 36 | 3.00 | 1.64 | 0.08 | 2.39 | 5.42 | 2.55 | 0.10 | 2.77 | 8.26 | 3.74 | 0.14 | 2.64 |
| 39 | 3.05 | 1.68 | 0.08 | 2.78 | 5.55 | 2.65 | 0.11 | 2.91 | 8.45 | 3.92 | 0.15 | 2.82 |
| 42 | 3.15 | 1.77 | 0.09 | 3.61 | 5.66 | 2.75 | 0.12 | 3.71 | 8.54 | 3.98 | 0.15 | 3.61 |
| 45 | 3.18 | 1.79 | 0.09 | 4.16 | 5.69 | 2.77 | 0.12 | 4.20 | 8.57 | 4.00 | 0.15 | 4.16 |
| 48 | 3.20 | 1.81 | 0.09 | 4.71 | 5.71 | 2.79 | 0.12 | 4.86 | 8.63 | 4.04 | 0.15 | 4.68 |
| 51 | 3.24 | 1.84 | 0.09 | 5.42 | 5.75 | 2.82 | 0.12 | 5.37 | 8.65 | 4.06 | 0.15 | 5.25 |
| 54 | 3.26 | 1.85 | 0.09 | 5.99 | 5.78 | 2.85 | 0.12 | 6.07 | 8.67 | 4.07 | 0.16 | 5.86 |
| 55 | 3.26 | 1.85 | 0.09 | 5.99 | 5.78 | 2.85 | 0.12 | 6.07 | 8.70 | 4.09 | 0.16 | 6.54 |
| Eastern | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.85 | 0.20 | 0.00 | 0.63 |
| 24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.70 | 0.18 | 0.00 | 0.98 | 1.34 | 0.36 | 0.00 | 0.88 |
| 27 | 0.10 | 0.02 | 0.00 | 1.41 | 0.90 | 0.23 | 0.00 | 1.38 | 1.67 | 0.48 | 0.01 | 1.53 |
| 30 | 0.34 | 0.08 | 0.00 | 1.97 | 1.01 | 0.27 | 0.00 | 2.00 | 1.74 | 0.51 | 0.01 | 1.79 |
| 33 | 0.39 | 0.10 | 0.00 | 2.33 | 1.05 | 0.28 | 0.00 | 2.40 | 1.85 | 0.54 | 0.01 | 2.53 |
| 36 | 0.47 | 0.12 | 0.00 | 3.09 | 1.19 | 0.35 | 0.01 | 2.18 | 1.89 | 0.56 | 0.01 | 2.97 |
| 39 | 0.50 | 0.13 | 0.00 | 3.64 | 1.23 | 0.37 | 0.01 | 2.81 | 1.92 | 0.57 | 0.01 | 3.50 |
| 42 | 0.53 | 0.14 | 0.00 | 3.62 | 1.26 | 0.39 | 0.01 | 3.37 | 1.96 | 0.59 | 0.01 | 4.06 |
| 45 | 0.56 | 0.17 | 0.00 | 4.15 | 1.29 | 0.41 | 0.01 | 4.12 | 2.00 | 0.61 | 0.01 | 4.62 |
| 48 | 0.59 | 0.19 | 0.00 | 4.19 | 1.32 | 0.42 | 0.01 | 4.21 | 2.03 | 0.62 | 0.01 | 5.34 |
| 51 | 0.62 | 0.20 | 0.00 | 4.74 | 1.34 | 0.44 | 0.01 | 5.01 | 2.03 | 0.62 | 0.01 | 5.34 |
| 54 | 0.64 | 0.21 | 0.00 | 5.77 | 1.34 | 0.44 | 0.01 | 5.01 | 2.04 | 0.63 | 0.01 | 6.24 |
| 55 | 0.64 | 0.21 | 0.00 | 5.77 | 1.36 | 0.45 | 0.01 | 6.04 | 2.04 | 0.63 | 0.01 | 6.24 |
| Total | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 1.40 | 0.37 | 0.00 | 0.38 | 3.14 | 0.92 | 0.01 | 0.34 |
| 21 | 0.75 | 0.20 | 0.00 | 0.63 | 2.66 | 0.76 | 0.01 | 0.64 | 5.95 | 1.78 | 0.02 | 0.68 |
| 24 | 1.51 | 0.46 | 0.01 | 0.83 | 4.72 | 1.60 | 0.03 | 0.86 | 8.06 | 2.85 | 0.06 | 0.78 |
| 27 | 2.33 | 1.00 | 0.03 | 0.82 | 5.43 | 2.04 | 0.06 | 1.14 | 8.98 | 3.40 | 0.09 | 1.20 |
| 30 | 2.98 | 1.44 | 0.06 | 1.35 | 6.07 | 2.53 | 0.09 | 1.57 | 9.69 | 4.03 | 0.13 | 1.42 |
| 33 | 3.22 | 1.60 | 0.07 | 1.76 | 6.37 | 2.76 | 0.10 | 2.04 | 10.01 | 4.21 | 0.14 | 1.97 |
| 36 | 3.47 | 1.77 | 0.08 | 2.48 | 6.60 | 2.90 | 0.11 | 2.67 | 10.15 | 4.30 | 0.14 | 2.70 |
| 39 | 3.55 | 1.81 | 0.08 | 2.89 | 6.77 | 3.03 | 0.11 | 2.89 | 10.38 | 4.49 | 0.15 | 2.94 |
| 42 | 3.67 | 1.91 | 0.09 | 3.61 | 6.92 | 3.14 | 0.12 | 3.65 | 10.50 | 4.56 | 0.16 | 3.69 |
| 45 | 3.74 | 1.96 | 0.09 | 4.16 | 6.97 | 3.18 | 0.12 | 4.19 | 10.58 | 4.61 | 0.16 | 4.24 |
| 48 | 3.80 | 1.99 | 0.09 | 4.63 | 7.03 | 3.21 | 0.13 | 4.74 | 10.65 | 4.66 | 0.16 | 4.80 |
| 51 | 3.86 | 2.04 | 0.09 | 5.32 | 7.09 | 3.26 | 0.13 | 5.30 | 10.68 | 4.68 | 0.16 | 5.27 |
| 54 | 3.90 | 2.06 | 0.10 | 5.96 | 7.12 | 3.29 | 0.13 | 5.88 | 10.71 | 4.70 | 0.17 | 5.93 |
| 55 | 3.90 | 2.06 | 0.10 | 5.96 | 7.14 | 3.30 | 0.13 | 6.06 | 10.74 | 4.72 | 0.17 | 6.48 |

the mean is economic, and 82 percent of the oil assessed at the 5th fractile is economic.[12]

## Sensitivity studies

Several numerical exercises tested the sensitivity of the economic results to specific economic and technical assumptions.  The details are summarized in Appendix C.  The specific parameters examined included drilling costs, facilities costs, required rate of return, and the effect of recognizing

required redundancy in facilities for the Scenario 2.  All tests were based on the undiscovered accumulation size distribution associated with the mean estimate.  Like a comparison of results to the Scenario 1 and Scenario 2  (see Tables 3 and 4), most of the effects on the predicted volumes of economic resources due to cost increases in drilling, facilities, and required rate of return rapidly are dissipated as the market prices increased beyond $30 per barrel.  The robustness of the economic volumes is a consequence of the geologic assessment; that is, the size distributions of undiscovered accumulations.  The differences in the assessed distributions of undiscovered resources remain the primary sources of uncertainty.

[12]The corresponding percentages for Scenario 2 at $30 per barrel were 64 percent (95th fractile), 79 percent (mean), and 81 percent (5th fractile).

Table 4.  Incremental cost of finding, developing, producing, and transporting oil and natural gas liquids (NGL) from undiscovered oil fields in the 1002 Area of the Arctic National Wildlife Refuge and associated finding costs: Scenario 2. [BBO-billions of barrels of oil, TCF-trillions of cubic feet of gas, BBL-billions of barrels of NGL, Asc. gas-Associated gas boe, barrels of oil equivalent. Find., finding]

| Sub-area $/bbl | 95th FRACTILE ESTIMATE | | | | MEAN ESTIMATE | | | | 5th FRACTILE ESTIMATE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe | Oil (BBO) | Asc. Gas (TCFG) | NGL (BBL) | Find. Cost $/boe |
| Western | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 1.45 | 0.39 | 0.00 | 0.37 | 2.93 | 0.86 | 0.01 | 0.36 |
| 21 | 0.96 | 0.27 | 0.00 | 0.67 | 2.95 | 0.87 | 0.01 | 0.66 | 5.28 | 1.64 | 0.02 | 0.62 |
| 24 | 1.59 | 0.51 | 0.01 | 0.92 | 4.05 | 1.48 | 0.04 | 0.62 | 6.89 | 2.67 | 0.07 | 0.86 |
| 27 | 2.24 | 0.98 | 0.03 | 0.86 | 4.61 | 1.92 | 0.06 | 1.02 | 7.45 | 3.09 | 0.09 | 1.16 |
| 30 | 2.62 | 1.30 | 0.05 | 1.44 | 5.11 | 2.28 | 0.08 | 1.55 | 7.96 | 3.52 | 0.12 | 1.37 |
| 33 | 2.82 | 1.49 | 0.07 | 1.81 | 5.30 | 2.47 | 0.10 | 2.00 | 8.13 | 3.65 | 0.13 | 1.92 |
| 36 | 2.99 | 1.64 | 0.08 | 2.44 | 5.49 | 2.62 | 0.11 | 2.50 | 8.35 | 3.82 | 0.14 | 2.53 |
| 39 | 3.11 | 1.74 | 0.08 | 3.08 | 5.62 | 2.72 | 0.11 | 3.24 | 8.49 | 3.94 | 0.15 | 3.11 |
| 42 | 3.14 | 1.77 | 0.09 | 3.56 | 5.65 | 2.74 | 0.12 | 3.69 | 8.53 | 3.97 | 0.15 | 3.60 |
| 45 | 3.17 | 1.79 | 0.09 | 4.13 | 5.68 | 2.77 | 0.12 | 4.18 | 8.59 | 4.02 | 0.15 | 4.14 |
| 48 | 3.24 | 1.84 | 0.09 | 5.29 | 5.73 | 2.80 | 0.12 | 4.77 | 8.64 | 4.05 | 0.15 | 5.24 |
| 51 | 3.26 | 1.85 | 0.09 | 5.94 | 5.76 | 2.83 | 0.12 | 5.35 | 8.67 | 4.08 | 0.16 | 5.81 |
| 54 | 3.27 | 1.87 | 0.09 | 5.94 | 5.78 | 2.85 | 0.12 | 5.99 | 8.69 | 4.09 | 0.16 | 6.53 |
| 55 | 3.29 | 1.88 | 0.09 | 6.56 | 5.80 | 2.86 | 0.12 | 6.74 | 8.69 | 4.09 | 0.16 | 6.53 |
| Eastern | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.05 | 0.00 | 0.75 | 1.01 | 0.25 | 0.00 | 0.70 |
| 27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.78 | 0.20 | 0.00 | 1.20 | 1.44 | 0.40 | 0.00 | 1.08 |
| 30 | 0.10 | 0.02 | 0.00 | 1.47 | 0.93 | 0.24 | 0.00 | 1.72 | 1.64 | 0.47 | 0.01 | 1.58 |
| 33 | 0.34 | 0.08 | 0.00 | 2.01 | 1.00 | 0.27 | 0.00 | 2.02 | 1.78 | 0.52 | 0.01 | 2.13 |
| 36 | 0.43 | 0.11 | 0.00 | 2.63 | 1.12 | 0.32 | 0.00 | 1.78 | 1.84 | 0.54 | 0.01 | 2.52 |
| 39 | 0.47 | 0.12 | 0.00 | 3.09 | 1.17 | 0.35 | 0.01 | 2.30 | 1.91 | 0.57 | 0.01 | 3.52 |
| 42 | 0.50 | 0.13 | 0.00 | 3.64 | 1.25 | 0.39 | 0.01 | 3.39 | 1.94 | 0.58 | 0.01 | 4.11 |
| 45 | 0.55 | 0.16 | 0.00 | 4.22 | 1.26 | 0.39 | 0.01 | 3.39 | 1.96 | 0.59 | 0.01 | 4.11 |
| 48 | 0.59 | 0.18 | 0.00 | 4.23 | 1.29 | 0.40 | 0.01 | 4.02 | 2.00 | 0.61 | 0.01 | 4.58 |
| 51 | 0.59 | 0.18 | 0.00 | 4.23 | 1.31 | 0.42 | 0.01 | 4.21 | 2.02 | 0.62 | 0.01 | 5.35 |
| 54 | 0.62 | 0.20 | 0.00 | 4.62 | 1.34 | 0.44 | 0.01 | 5.04 | 2.04 | 0.63 | 0.01 | 6.22 |
| 55 | 0.62 | 0.20 | 0.00 | 4.62 | 1.34 | 0.44 | 0.01 | 5.04 | 2.04 | 0.63 | 0.01 | 6.22 |
| Total | | | | | | | | | | | | |
| 18 | 0.00 | 0.00 | 0.00 | 0.00 | 1.45 | 0.39 | 0.00 | 0.37 | 2.93 | 0.86 | 0.01 | 0.36 |
| 21 | 0.96 | 0.27 | 0.00 | 0.67 | 2.95 | 0.87 | 0.01 | 0.66 | 5.28 | 1.64 | 0.02 | 0.62 |
| 24 | 1.59 | 0.51 | 0.01 | 0.92 | 4.24 | 1.53 | 0.04 | 0.63 | 7.90 | 2.92 | 0.07 | 0.84 |
| 27 | 2.24 | 0.98 | 0.03 | 0.86 | 5.39 | 2.12 | 0.07 | 1.05 | 8.89 | 3.49 | 0.10 | 1.15 |
| 30 | 2.72 | 1.32 | 0.05 | 1.44 | 6.04 | 2.53 | 0.09 | 1.58 | 9.59 | 3.98 | 0.13 | 1.40 |
| 33 | 3.16 | 1.58 | 0.07 | 1.83 | 6.31 | 2.74 | 0.10 | 2.00 | 9.91 | 4.17 | 0.14 | 1.96 |
| 36 | 3.43 | 1.75 | 0.08 | 2.46 | 6.61 | 2.94 | 0.11 | 2.38 | 10.19 | 4.36 | 0.15 | 2.53 |
| 39 | 3.58 | 1.86 | 0.09 | 3.08 | 6.79 | 3.07 | 0.12 | 3.08 | 10.40 | 4.51 | 0.16 | 3.18 |
| 42 | 3.64 | 1.89 | 0.09 | 3.57 | 6.90 | 3.13 | 0.12 | 3.64 | 10.48 | 4.55 | 0.16 | 3.69 |
| 45 | 3.72 | 1.94 | 0.09 | 4.14 | 6.94 | 3.15 | 0.12 | 4.04 | 10.55 | 4.60 | 0.16 | 4.13 |
| 48 | 3.82 | 2.01 | 0.09 | 5.14 | 7.01 | 3.21 | 0.13 | 4.64 | 10.65 | 4.66 | 0.16 | 5.12 |
| 51 | 3.85 | 2.03 | 0.09 | 5.69 | 7.08 | 3.25 | 0.13 | 5.14 | 10.70 | 4.70 | 0.17 | 5.73 |
| 54 | 3.89 | 2.06 | 0.10 | 5.74 | 7.12 | 3.28 | 0.13 | 5.82 | 10.74 | 4.72 | 0.17 | 6.47 |
| 55 | 3.90 | 2.08 | 0.10 | 6.27 | 7.14 | 3.29 | 0.13 | 6.43 | 10.74 | 4.72 | 0.17 | 6.47 |

To summarize, the assessed field size distributions associated with the mean, 95th, and 5th fractile estimates, respectively, to a large part determine the threshold prices at which the exploration becomes economic to initiate, as well as, the position and shape of the incremental cost functions shown in figure 6.  Estimates representing larger volumes of technically recoverable oil generally have field size distributions with greater proportions of the resources assigned to large fields that typically have lower development costs and are found early in the exploration process.  In an environment such as the North Slope where minimum commercial field size is large compared to the conterminous U.S., such differences in field size distributions magnify differences in estimates of eco-

nomically recoverable oil beyond what would be expected by different volumes.  Although there are a number of sources of economic uncertainty, the sensitivity studies suggest the economic volumes estimated are reasonably robust when predicated on accumulation size distributions that resulted from the geologic assessment.  At this level of reconnaissance analysis, not all of the details of recent technological innovations could be captured.  Moreover, there could be important technological innovations that are also not included that might enhance the value of the oil resources.

AR5599



Figure 7. Incremental costs, in dollars per barrel, of finding, developing, producing, and transporting crude oil from undiscovered accumulations in the Federal 1002 Area of Northern Alaska, where computations are based on stand-alone field development for the costs and technology updated to the 2003 base year compared to the earlier analysis published in Attanasi (1999). Vertical line represents the mean estimate of the technically recoverable oil for the Federal 1002 as reported in Bird (1999). The dollar value uses a 2003 base year.

# CONCLUSIONS AND LIMITATIONS

Technically recoverable resources assessed for the Federal 1002 Area at the 95th and 5th fractiles estimates were 4.25 BBO and 11.80 BBO, respectively. The mean technically recoverable oil amounted to 7.69 BBO (Bird, 1999). Undiscovered size-frequency distributions corresponding to the 95th fractile, the mean, and 5th fractile estimates showed accumulations with at least 260 million barrels accounting for 2.21 BBO, 4.97 BBO, and 8.52 BBO, respectively. Most of the assessed oil is predicted to be in accumulation sizes of economic interest.

Incremental costs include the *full costs of finding, developing, producing, and transporting oil to market*. At incremental costs of $21 per barrel, 2.7 BBO associated with the mean and 0.8 and 5.9 BBO associated with the 95th and the 5th fractiles can be found, developed, produced and transported to market. Because most of the resources assigned to the mean and 5th fractile estimates were in large accumulations, the associated incremental cost functions showed substantial additions to reserves as market prices increase above threshold prices between $16 and $18 per barrel) that trigger commercial exploration. For the 95th fractile estimate, at market prices of $30 per barrel about 3 BBO or 70 percent of the oil assessed is economic. At $30 per barrel, for the mean estimate, 6.1 or 79 percent of the assessed oil is economic and for the 5th fractile estimate 9.7 BBO or 82 percent of the assessed oil is economic. The robustness of the economic results,

which the sensitivity analysis showed, is a consequence of the geologic assessment, that is, the size distributions of the assessed undiscovered accumulations.

When comparing the results of this study to the earlier analysis which also considered only the Federal 1002 area (Attanasi, 1999), the 1996 dollars should be adjusted to 2003 dollars so that economic resources are compared in constant dollars. Based on the general producer price indices, the 1996 dollars would be multiplied by a factor of 1.08[13] to obtain their equivalence in 2003 dollars. Comparing the mean estimates at $21 in 2003 dollars ($19.42 in 1996 dollars), the earlier analysis shows about 2.9 BBO economic, and this analysis shows 2.7 BBO economic, at $30 in 2003 dollars ($27.74 in 1996 dollars) (see figure 7). The earlier analysis shows 6.2 BBO economic, but this analysis shows 6.1 BBO economic and at $42 in 2003 dollars ($38.82 in 1996 dollars), the earlier analysis shows 6.7 BBO economic and this analysis shows 6.9 BBO economic. When adjusted to constant dollars, these estimates of economically recoverable oil are generally within 10 percent of the estimates published in the earlier analysis (Attanasi, 1999), suggesting that improvements in productivity have to a large extent offset increased costs that occurred between the 1996 and 2003 base years.

It is important to keep in mind that until a systematic subsurface evaluation is accomplished, uncertainty about the size and nature of the resource will remain significant. Along with the geologic uncertainty, there are also important sources of uncertainty attached to the economic evaluation of the resources by virtue of the many assumptions that were required. Furthermore, wide variations in world oil prices over time increase the risks of investing in high-cost areas such as the North Slope, a factor that is beyond the scope of this analysis to capture.

This analysis was time independent. At recently prevailing rates of wildcat drilling for the North Slope it could take perhaps a decade to drill the number of well increments that might be economic at an incremental cost of $21 per barrel for either the mean estimate or the 5th fractile estimate. During that time additional improvements in technology could lower costs further. Alternatively, any attempt to rapidly increase drilling rates would undoubtedly drive up drilling rig day rates and cause increasing costs, voiding a central assumption in this analysis of constant real costs. The incremental cost functions do not show what the industry will do, but what is possible assuming the volumes and distribution of resources occur and that the economic assumptions match reality.

---

[13]Producer price index, (where 1982=100) for 1996, is 127.7 and for 2003 the produce price index is 138.1.

## Appendix A. Tables showing allocation of the mean, 95th and 5th fractile estimates of Federal 1002 Area to western and eastern sub-areas - Continued

Table A-2 Volumes of undiscovered technically recoverable conventional oil, natural gas, and natural gas liquids(NGL)in the western and eastern subareas of the Federal 1002 Area of the Arctic National Wildlife Refuge as of January 1998 based on the 95th fractile estimate of the assessed oil in the 1002 Area. [BBO, billions of barrels of oil; TCF, trillions of cubic feet gas, BBL, billions of barrels of NGL]. (Source: simulation data discussed in Schuenemeyer, 1999a)

| Area/Play Name1 | Oil Fields | | | Gas Fields | |
|---|---|---|---|---|---|
| | Oil (BBO) | Gas (TCF) | NGL (BBL) | Gas (TCF) | NGL (BBL) |
| Western sub-area | | | | | |
| Topset | 1.795 | 0.499 | 0.004 | 0.000 | 0.000 |
| Turbidite | 1.026 | 0.892 | 0.051 | 0.000 | 0.000 |
| Wedge | 0.206 | 0.116 | 0.003 | 0.000 | 0.000 |
| Thomson | 0.157 | 0.200 | 0.017 | 0.000 | 0.000 |
| Kemik | 0.016 | 0.023 | 0.002 | 0.051 | 0.004 |
| Undeformed Franklinian | 0.083 | 0.178 | 0.018 | 0.155 | 0.014 |
| Thin-Skinned Thrust Belt | 0.138 | 0.035 | 0.000 | 0.325 | 0.003 |
| Ellesmerian | 0.000 | 0.000 | 0.000 | 0.093 | 0.003 |
| Deformed Franklinian | 0.035 | 0.039 | 0.003 | 1.049 | 0.076 |
| Subtotal | 3.456 | 1.981 | 0.099 | 1.673 | 0.099 |
| Eastern sub-area | | | | | |
| Topset | 0.299 | 0.083 | 0.001 | 0.000 | 0.000 |
| Thin-Skinned Thrust Belt | 0.358 | 0.090 | 0.001 | 0.845 | 0.009 |
| Ellesmerian Thrust Belt | 0.000 | 0.000 | 0.000 | 0.834 | 0.025 |
| Deformed Franklinian | 0.004 | 0.004 | 0.000 | 0.117 | 0.008 |
| Niguanak/Aurora | 0.137 | 0.124 | 0.007 | 0.005 | 0.000 |
| Subtotal | 0.799 | 0.301 | 0.009 | 1.799 | 0.043 |
| Total Federal 1002 Area | 4.254 | 2.282 | 0.107 | 3.472 | 0.142 |

AR5604