James Lister, ABA #1611111
Brian V. Gerd, ABA #1810097
David Karl Gross, ABA #9611065
Zoe A. Eisberg, ABA #1911094
Birch Horton Bittner & Cherot
1150 Connecticut Ave, N.W. Suite 350
Washington, DC 20036
jlister@bhb.com
bgerd@bhb.com
dgross@bhb.com
zeisberg@bhb.com
Telephone 202.659.5800
Facsimile 202.659.1027

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,<br><br>  Plaintiff,<br><br>  vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR, DEB HAALAND, in her capacity as Secretary of the Department of the Interior, BUREAU OF LAND MANAGEMENT, and TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management,<br><br>  Defendants. | Case No.: 3:24-cv-00051-SLG |

**MEMORANDUM IN SUPPORT OF MOTION FOR STAY OF AGENCY ACTION OR PRELIMINARY INJUNCTION IN ORDER TO PRESERVE STATUS QUO**

AIDEA V. HAALAND, ET AL.                   CASE NO. 3:24-CV-00051-SLG
MEMO IN SUPPORT OF STAY OR PRELIM. INJ.              PAGE 1 OF 17

Case 3:24-cv-00051-SLG  Document 85  Filed 11/25/24  Page 1 of 17

Plaintiff Alaska Industrial Development & Export Authority ("AIDEA") respectfully moves for interim relief pursuant to 5 U.S.C. § 705 and Fed.R.Civ.P. 65(a) precluding DOI from offering at auction oil and gas rights to the acres in the Arctic National Wildlife Refuge ("ANWR") the agency previously leased to AIDEA. DOI is proposing to auction off the majority of the 365,775 acres it leased to AIDEA in January 2021, under the leases that DOI unilaterally cancelled on September 6, 2023. This lawsuit challenges the lawfulness of that lease cancellation decision and thus will determine whether AIDEA continues to have exclusive oil and gas rights in the very acres DOI now seeks to reauction. The case has been fully-briefed on cross-motions for summary judgment and is awaiting a ruling.

## Introduction and Procedural Status of Case

In October 2023, AIDEA filed the above-captioned matter seeking to set aside DOI's September 6, 2023 decision to unilaterally cancel seven oil and gas leases that DOI issued to AIDEA in January 2021. In April 2024, the parties negotiated a joint briefing schedule and filed a motion asking for the Court's approval. The joint motion informed the Court that whether the lease cancellation was valid or invalid would impact the second lease sale to be held in December 2024.[1] The parties, therefore, jointly requested that the Court endeavor to decide the case by October 25, 2024, approximately two months before the deadline for holding the lease sale.[2] The target ruling date was aspirational and the Court in no way committed to ruling by the date requested by the parties. AIDEA is familiar with and recognizes the docket congestion the Court is facing due to the shortage of judges.

---

[1] *See* DE 48 at 1-2, 4.

[2] *Id*.; After the parties made this joint request, there was a two-week extension of the briefing schedule, and briefing was completed on September 13, 2024.

On November 6, 2024, DOI issued a Final Supplemental Environmental Impact Statement ("SEIS") in which it declared its intent to re-auction the acres it had leased to AIDEA.[3] This development brought to pass the scenario that was specifically forecast in the summary judgment briefing and scheduling motion. DOI is expected to formalize its adoption of the "Preferred Alternative" in the Final SEIS by issuing a Record of Decision on or about December 6, 2024. The Tax Act mandates that the auction be held by no later than December 22, 2024.[4]

On November 15, 2024, AIDEA requested to meet with DOI to discuss how to preserve the subject matter of this case. On November 18, 2024, DOI replied that, given the Thanksgiving Holiday, it could not meet until 16 days later, on December 4, 2024. As it stands, DOI and AIDEA will meet and confer on December 5, 2024. However, given how close this date is to the December 22, 2024 statutory deadline for completing the second lease sale, AIDEA filed a Notice of Lis Pendens on November 20, 2024, in the applicable Alaska land records office and with this Court.[5] AIDEA now files this motion for interim relief to preserve the status quo. AIDEA will inform the Court if the discussions with DOI to be held on December 5, 2024 are productive and whether there remains a need for the Court to decide this motion for interim relief.

---

[3]  *See* Final Supplemental Environmental Impact Statement, p. ES-5 **("Alternative D2 (Preferred Alternative)** … includes, in part [leasing] the area previously covered by the seven oil and gas leases cancelled by the Deputy Secretary of the Interior on September 6, 2023, and therefore, now potentially available for future lease sale."). The Final SEIS is available at: https://eplanning.blm.gov/eplanning-ui/project/2015144/510 DOI proposes to auction 400,000 acres in the 2024 lease sale. *Id.,* p. 2-2 (Preferred Alternative D-2).

[4]  *See* Pub. Law 115-97, § 20001(c).

[5]  *See* DE 84 and 84-1.

## Applicable Law

The Administrative Procedure Act empowers the reviewing court to issue orders "to preserve status or rights pending conclusion of review proceedings":

> … On such conditions as may be required and to the extent necessary to prevent irreparable injury, **the reviewing court**, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, **may issue all necessary and appropriate process** to postpone the effective date of an agency action or **to preserve status or rights pending conclusion of the review proceedings**..[6]

Here, AIDEA seeks an order pursuant to § 705 that would preserve the Court's ability to enter an order restoring AIDEA's leases to AIDEA, should it find that DOI erred in cancelling AIDEA's leases. Specifically, AIDEA requests an order preliminarily enjoining DOI from auctioning off any oil and gas rights previously leased to AIDEA under the January, 2021 leases, which AIDEA contends DOI unlawfully cancelled.

The Court's ability to grant effective relief, i.e. setting aside the cancellation of AIDEA's leases, will be threatened if DOI conveys the subject matter of the controversy (i.e. the acres it leased to AIDEA) to another party. In other words, if a third party submits a winning bid at the upcoming auction and pays cash for their newly-acquired leases, they may contend that they have equitable rights superior to AIDEA's, because AIDEA's cancelled leases had not yet been restored to full force and effect. The interim relief requested by AIDEA would therefore "preserve status or rights pending conclusion of the review proceedings," and therefore, is the precise relief the APA contemplates.[7]

---

[6] *See* 5 U.S.C. § 705 (emphasis added).

[7] *See* 5 U.S.C. § 705.

The same relief is also available under the more general standard for the award of a preliminary injunction under Fed.R.Civ.P. 65(a). An order preliminarily restraining the conveyance to third parties of the subject matter of the dispute is a type of preliminary injunction commonly granted to preserve the status quo during the litigation, so that the litigation can be decided in an orderly manner.[8] "The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits."[9]

The same four-part test governs a motion for a stay of agency action under 5 U.S.C. § 705 and a motion for preliminary injunction under Fed.R.Civ.P. 65(a).[10] That familiar test asks the following four questions:

1. Has the plaintiff shown a likelihood of success on the merits (or has plaintiff shown "serious questions going to the merits" coupled with showing that the balancing of the hardships "tips sharply" in its favor)?

---

[8] Examples of cases involving public land and properties include: *U.S. v. State of Louisiana,* 229 F.Supp. 14, 18 (W.D. LA, 1964) (preliminarily injunction enjoining Department of Interior from filing a plat subdividing lands while a title dispute was pending); *State v. Weidner*, 684 P.2d 103, 107 (Alaska 1984) (describing preliminary injunction against State conveying lands to winners of Alaska's land lottery, entered to preserve the status quo while a challenge to the lottery's lawfulness was considered); *Monument Realty, LLC v Washington Metropolitan Transit Authority*, 540 F.Supp.2d 66, 83 (DDC 2008) (enjoining transit authority from selling property to bid winner during the litigation of a bid protest).

[9] *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988).

[10] For the standard under 5 U.S.C. § 705 or similar statutes authorizing interim stays of agency orders, see: *Callahan v. U.S. Dep't. of Health and Human Services,* 434 F.Supp.3d 1319, 1336 (N.D. Ga. 2020) (5 U.S.C. § 705); *Prairie Protection Colorado v. USDA APHIS Wildlife Services*, 2019 WL 4751785, *1, (D. Co 2019) (5 U.S.C. § 705); *see also, Nken v. Holder*, 556 U.S. 418, 434 (2009) (analyzing stays under an immigration judicial review statute). *See* n. 11 for the general preliminary injunction standard.

2.   Is the requested interim relief necessary to prevent irreparable harm to the plaintiff that is "likely" to occur if interim relief is withheld?

3.   Does the balancing of the hardship between the parties favor a grant of interim relief?

4.   Does the public interest favor a grant of interim relief?[11]

## Argument

Each of these considerations favors a grant of relief from the Court to preserve the status quo by preventing the acres leased to AIDEA from now being leased to third parties while the judicial review of the lease cancellation is still pending.[12]

### A. Likelihood of Success on the Merits / Serious Questions Going to the Merits.

The merits of whether DOI's cancellation of AIDEA's leases was valid are now fully-briefed on cross-motions for summary judgment.[13]

---

[11]  *Flathead-Loo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180, 1190 (9th Cir. 2024) (analyzing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) and concluding that the "serious questions" variant of the first question on the preliminary injunction standard remains the law).

[12]  While it is permissible to go outside the administrative record in a judicial review case when addressing non-merits injunction elements, it is not necessary to do so here, except to cite DOI's newly-issued Final SEIS, which can be judicially noticed. This is because the irreparable harm and balancing of hardships / public interest issues raised by this motion for interim relief are legal in nature. They center around the uncertainties, delays, and complexities that AIDEA and DOI face if interim relief is denied, DOI then grants leases in overlapping acres to new lessees, and then AIDEA prevails on the merits and its leases are restored. At that point DOI would be in the position of having issued conflicting leases covering overlapping acres, and AIDEA would have to engage in priority contests with the new lessees. *See* the cases cited in notes 17 and 18 to this brief.

[13]  In order to avoid repetitive duplication of its arguments, AIDEA will incorporate the briefing on the merits of the case. *See* Local Rule 7.4(b)(2). AIDEA's briefing is at DE 50, 65, 69-1 and 81. While AIDEA anticipates the Court would prefer to use that completed merits briefing, AIDEA will provide a summary of that briefing if the Court requests.

B. <u>Irreparable Harm.</u>

Unscrambling eggs is always difficult. Rarely can it be accomplished in a complete fashion and often times it is simply impossible. If DOI proceeds with its plan to auction off many of the acres it leased to AIDEA and a third party ends up paying money for the same leases, it will be very difficult and may be impossible to meaningfully implement any future remedy. Although it is difficult to precisely count how many of the 365,775 acres previously leased to AIDEA (AR 5452) are slated for re-auction, it appears that around 265,000 acres "overlap."[14] If a third party obtains a leasehold interest in some of these overlapping acres, AIDEA will need to prevail in a contest with the third-party over whose claim to the acres is superior. Money damages are an unreliable and ineffective remedy because (1) interests in particular parcels of real estate are unique, (2) sovereign immunity bars various kinds of damages claims against the United States, and (3) oil and gas interests that the plaintiff never got to develop are subject to wildly fluctuating opinions as to value.[15]

---

[14] *See* Exs. A1, A2, and A3 to this Motion. Ex. A1 is AR 3316, a DOI map showing in blue the seven tracts previously leased to AIDEA in January 2021, totaling 365,775 acres and in brown the acres previously leased to the two other lessees who voluntarily surrendered their leases (note than two more tracts, Nos. 22 and 23, are also shown in blue, as AIDEA was the high bidder, but were not eased to AIDEA or anyone else). Ex. A2 is Map 2.7 to DOI's November 6, 2024 Final SEIS. It shows in purple the areas that DOI under its Preferred Alternative D2 will withdraw from leasing, and shows in other colors areas that DOI will offer for sale in the December, 2024 auction. Ex. A3 is a map prepared by AIDEA by overlaying those two DOI maps. Non-hatched areas on Exhibit A3 are the 365,775 acres previously leased to AIDEA (the hatched areas were leased in 2021 to the other lessees or were not leased in 2021 to any lessee). To estimate the acreage previously leased to AIDEA that DOI now proposes to re-auction, i.e. the "overlap" areas, subtract the purple area from the 365,775 non-hatched acres on Ex A3 (the non-hatched areas were the areas leased to AIDEA in 2021, see Ex. A1). Using a geospatial tool, AIDEA estimates the overlap at 265,000 acres. The precise amount is not material.

[15] *United Church of the Med. Ctr. v. Med. Ctr. Comm'n,* 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation, however, that a given piece of property is

Through the filing of a lis pendens,[16] AIDEA has done what it can to mitigate the harm it will suffer if the acres it leased are leased to another party in the upcoming sale, but the impacts cannot be fully mitigated and substantial irreparable harm remains. For example, the lis pendens does not stop a transfer that complicates and obscures title to the leasehold interests, which is a finite injury to AIDEA. All the lis pendens does is put potential third party bidders on constructive notice that AIDEA is claiming those acres in a pending litigation. This is a step towards AIDEA prevailing against a third party in a priority contest over who has superior equities, but it is just a step.

Despite the lis pendens, there is no guarantee that AIDEA prevails against a third-party lessee who claims to have invested money in a lease without actual knowledge of AIDEA's claims, or who claims to have expended resources to develop the property after successfully winning a lease. In these instances, it may turn out to be too late to unscramble the eggs. Moreover, introduction of third-party lessee(s) to the mix will cause delay, require extra time and effort, and so hinder AIDEA in in its effort to claw back its ability to develop these acres. Courts granting preliminary injunctions restraining the conveyance of the subject matter of the dispute have noted that a lis pendens can only reduce the injury faced by the plaintiff, and forces the plaintiff to undergo the expense and effort of additional follow-up proceedings against third-party transferees, which is irreparable harm.[17] A preliminary injunction enjoining the sale of acres previously leased

---

considered to be unique, and its loss is always an irreparable injury."); *accord, Bean v. Independent American Sav. Ass'n*, 838 F.2d 739, 743 (5th Cir. 1988).

[16] *See* DE 84-1.

[17] *In re Eisen*, 2006 WL 6810928, *6, n. 11 (9th Cir. B.A.P. 2006) ("recordation of a lis pendens does not necessarily prevent a sale of the Property, which would in turn lead

to AIDEA will prevent such harm to AIDEA and will also prevent harm to third-parties who might overlook the lis pendens.[18]

Further, a third party who wins the auction and is awarded leases for the acres previously leased to AIDEA may proceed to develop the lands in ways that harm AIDEA during the time it takes for AIDEA to (1) prevail over DOI in this litigation and (2) prevail in a follow-up priority contest with the third-party auction winner. Although Tax Act § 20001(c) directed DOI to hold two lease sales with each offering at least 400,000 sub-surface acres, Congress put a very low cap of only 2,000 acres on the maximum amount of ANWR surface acreage (footprint) that can be developed.[19] DOI in its Preferred Alternative appears poised to lower that cap, projecting that it will allow surface development on only 995 acres, out of the 1.5 million acres in the ANWR Coastal Plain.[20]

---

to more litigation and more expense for the estate. Preservation of the status quo by preliminary injunction prevents such harm."); *SFR Investments Pool 1, LLC v. U.S. Bank National Assoc.,* 2020 WL 6685528, *2-3 ((D. Nevada 2020); *see also, State of Louisiana,* 229 F.Supp. at 18 (citing need to avoid "multiplicity of actions and proceedings" in preliminarily enjoining DOI from subdividing land in dispute – no lis pendens discussed).

[18]   *SFR Investments Pool 1, LLC,* 2020 WL 6685528, *2-3 ("Permitting the sale to go forward ... may cause irreparable harm to SFR. Further, it would encumber this litigation with a third-party buyer who is expecting to purchase the property free-and-clear of SFR's interest, which would likely lead to further litigation. … It is also in the public's interest for the Court to enjoin [parties] from selling the property to a third-party buyer, who may not be aware of this litigation and the title dispute—a preliminary injunction will protect an unsuspecting buyer from unknowingly being forced to enter this litigation.")

[19]   *See* Tax Act § 20001(c)(3).

[20]   "Under Alternative D2," which is DOI's Preferred Alternative, there would be "a total allowable development footprint of 995 acres …." Final SEIS p. 31-34. There is some suggestion in other passages that 995 acres is an estimate of the surface development that would occur under Alternative D2, but this passage suggests it is a DOI-imposed cap. What is clear is that the statute imposes a 2,000-acre cap. Tax Act § 20001(c)(3). The Final SEIS is available at: https://eplanning.blm.gov/eplanning-ui/project/2015144/510

The acres DOI leased to AIDEA appear to account for the majority of the 400,000 acres that DOI now proposes to lease to interested bidders in the upcoming auction.[21] Thus, a third party who obtains leases for the large number of acres previously leased to AIDEA may very well proceed to use up a large portion of that small surface acre development allowance. By the time AIDEA prevails on the lease cancellation case, after all appeals are completed, and then prevails in whatever follow-up proceedings are necessary to quiet title against a third-party lessee, there may be little left.[22]

More generally, evicting a third-party lessee who may have already made important decisions regarding permitting is not a good substitute for holding 10-year leases from the start and executing from the outset a thoughtful and environmentally sound permitting and development plan. Decisions must be made regarding how to achieve compliance with a host of restrictive lease stipulations, including ANILCA Title VIII protections for subsistence hunting and fishing; Alaska Native consulting requirements; the Endangered Species Act; the Marine Mammal Protection Act; the National Historic Preservation Act; and many more. If a preliminary injunction is granted and AIDEA prevails in this litigation, AIDEA can get started on all this mountain of permitting. If, on the other hand, the preliminary injunction is denied and DOI proceeds to lease overlapping acres to third parties, and AIDEA later prevails in reversing the lease cancellation decision, AIDEA then will face lengthy further delays while it engages in priority contests with new lessee(s), before any

---

[21] See note 14 above, estimating the overlap area by comparing maps.

[22] Surface development will precede oil and gas extraction. Although perhaps unlikely, if the prior contests were extremely lengthy, one could reach the point in which the new lessees extract the resources, depleting the value of AIDEA's interest.

permitting can start.[23] There was about 9.5 years left on AIDEA's leases when DOI suspended them in June, 2021, before cancelling them.[24] If the cancellation is set aside, the remaining term may erode rapidly, including the time it takes for AIDEA to engage in priority contests with third parties who win overlapping leases in the upcoming auction. With no secure leasehold title during that period, and the various agencies with permitting authority being uncertain as to which lessee they should deal with, it will neither be feasible nor cost effective to engage in permitting work during that period.

Further, while DOI might extend the 10-year term of AIDEA's leases during the time it takes to resolve follow-up priority contests with the new lessees, there is no guaranty that DOI will do so. The details of DOI's lease term extension rules foreshadow trouble, as they condition extensions for "circumstances that are beyond your reasonable control" on the lessee voluntarily seeking a suspension of the lease for the duration of the proposed term extension.[25] During such a voluntary lease suspension, there can be no "beneficial use" of the leasehold interest.[26] Further, suspensions for less-than-all of the acreage covered by a lease are prohibited, meaning work must be halted on an all or nothing basis.

---

[23] See cases cited in notes 17 and above.

[24] *See* AR 3365 (suspension order), 3320 (10-year lease duration), 5353 (lease cancellation). The term of the AIDEA leases was extended for the period in which DOI had suspended the leases (AR 3365) and would presumably also be extended for the period between the lease cancellation and any judicial order reinstating the leases.

[25] *See* 43 CFR 3135.2, 3135.3, and 3135.7. These rules are part of the National Petroleum Reserve Act program rules presumptively borrowed by the Tax Act for ANWR. Tax Act § 20001(b).

[26] *See* 43 CFR 3135.2(c)(3).

This poses additional inefficiencies if a third-party acquires acres overlapping some, but not all, of AIDEA's seven prior leases.[27]

Finally, as discussed fully in "Balancing of Hardships and the Public Interest" below, not enjoining the lease sale of acres previously leased to AIDEA facilitates DOI's strategy of counting approximately 265,000 acres previously leased to AIDEA towards both (1) DOI's obligation to lease at least 400,000 acres in the first mandatory ANWR lease sale, and (2) DOI's separate obligation to lease another 400,000 acres in the second mandatory ANWR lease sale, despite this ongoing litigation challenging the availability of these acres for releasing.[28] Enjoining DOI from putting the same acres it leased to AIDEA in January 2021 up for sale again, will prevent double counting those acres. Enjoining the reauctioning of these lands will open additional acreage for leasing to AIDEA and others by mandating DOI to stop double counting acres leased to AIDEA and to look to other acres to meet its obligation to auction at least 400,000 acres in the second lease sale.[29] Allowing DOI to auction to third parties the acres previously leased to AIDEA results in less total acreage being leased over the two lease sales. Section 20001(c) requires two lease sales of at least 400,000 acres each, by the end of 2024, but under DOI's plans total

---

[27] *See* 43 CFR 3135.3(d).

[28] *See* Tax Act § 20001(c).

[29] Given the timing of DOI's expected December, 2024 lease sale, DOI could proceed with auctioning the approximately 135,000 acres identified in its Preferred Alternative that do not overlap with the acres previously leased to AIDEA. Then, DOI could conduct a supplemental phase to the second lease sale identifying and offering for sale an additional 265,000 additional acres that again do not overlap with those previously leased to AIDEA to meet the Tax Act's requirement that the agency offer at least 400,000 acres for lease.

leasing would only reach 400,000 acres.[30] This would harm AIDEA's interest as an economic development agency in job creation on the North Slope.

### C. Balancing of Hardships and Public Interest

When as here the Defendant is a federal agency, "the balance of equities factor and the public interest factor merge" into one inquiry.[31] When looking at this factor, the hardship to AIDEA in allowing the acres to which it holds a prior claim to be leased to a third-party while this case is still pending is covered in the discussion of irreparable harm above.

By contrast, there is no hardship to DOI. Instead, there is a significant benefit to DOI in deferring the portion of the auction sale that concerns the lands DOI leased to AIDEA or deferring the award of leases to whoever wins those aces at the auction. If DOI erred in cancelling AIDEA's leases, it should not be leasing those acres to someone else. Doing so is contrary to the public interest because it would cause confusion as to who holds the lease and also who has marketable title to any extracted minerals, injuring all involved. This includes those third parties who purchase leases at the upcoming lease auction, and may have monetary or other claims against DOI if their leases are subordinated to AIDEA's prior leases.[32]

---

[30] Final SEIS, p. 2-2, Table 2-1 (Alternative D2), This volume of the Final SEIS is at: https://eplanning.blm.gov/public_projects/2015144/200492847/20122648/251022628/Coastal%20Final%20SEIS_CR_Vol1_20241101_508_updated.pdf

[31] *Sovereign Inupiat for a Living Arctic v. Bureau of Land Management,* 2023 WL 2759864, *5, n. 59 (D. Alaska 2023) (citing *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014)).

[32] *SFR Investments Pool 1, LLC,* 2020 WL 6685528, *2-3 (quoted above)

As noted in the discussion of irreparable harm above, the requested preliminary injunction also effectuates the intent of Congress that DOI hold lease sales for at least 400,000 acres in the first lease sale and another 400,000 acres in the second lease sale.[33] Currently, there are zero acres leased as a result of the first lease sale, because DOI has cancelled all leases from that sale. Through proposing to re-auction in the second lease sale about 265,000 acres won by AIDEA in the now-defunct first lease sale, DOI proposes to count those roughly 265,000 acres towards both (1) DOI's 400,000-acre first sale obligation, and (2) DOI's 400,000-acre second sale obligation. If DOI is preliminarily enjoined from leasing in the upcoming lease sale the acres it previously leased to AIDEA that are under dispute in this case, that double counting will stop, and DOI will then need to select other acres in the 1.5 million acre Coastal Plain to offer for lease. Doing so will allow DOI to meet its obligation under the Tax Act to lease at least 400,000 acres in the second lease sale, while preserving Congress's direction that there be two (not one) lease sales of at least 400,000 acres each.[34] Through cancelling all leases from the first lease sale and double-counting the overlapping areas offered in the 2021 lease sale towards both its 2021 and 2024 lease sale obligations, DOI now proposes to lease only a total of 400,000 acres by the end of 2024, as if Congress had mandated one rather than two such lease sales.

---

[33] *See* Tax Act § 20001(c).

[34] *See* Tax Act § 20001(c)(3). As discussed in note 29 above, while DOI's decision to schedule the second lease sale on the eve of the December 22, 2024 statutory deadline may leave too little time for DOI to select other non-overlapping acres for auction in the fast-upcoming December, 2024 lease sale, DOI can still belatedly comply with the Tax Act by holding a supplemental auction after it selects the additional non-overlapping areas to auction.

Most fundamentally, the public interest requires that agencies follow the law and deal fairly with their lessees. If DOI has violated the law in cancelling AIDEA's leases, it should not be allowed to exacerbate that non-compliance by conveying leasehold interests to third parties, confusing and obscuring the leasehold title.

### D. Specific Stay / Injunction Details

Because AIDEA has shown a likelihood of success on the merits and a likelihood of suffering irreparable harm if interim relief is not granted, and because the balancing of hardships and public interest considerations favor the grant of interim relief, the Court should act under 5 U.S.C. § 705 and Fed.R.Civ.P. 65(c) to preserve the status quo pending final resolution of this litigation. Because this injunction is directed at preserving the status quo in the present litigation, it would not stop DOI from auctioning at the December, 2024 lease sale other acres that do not overlap with the acres previously leased to AIDEA.

Available precedent, albeit limited, holds that no bond is required for the grant of a stay of agency action to preserve the status quo during a judicial review proceeding, 5 U.S.C. § 705.[35] That statute is the appropriate basis for grant of interim relief in this case because this is an APA judicial review case.[36]

---

[35] *Prairie Protection Colorado v. USDA APHIS Wildlife Services*, 2019 WL 4751785, *1, n. 2 (D. Co 2019); *Michigan Citizens for an Independent Press v. U.S. Attorney General*, 1988 WL 90388, *8, n. 12 (DDC 1988).

[36] Should the Court determine to grant relief under the general provisions of Fed.R.Civ.P. 65(a) rather than § 705, then Fed.R.Civ.P. 65(c) requires consideration of the issue of bond. Because an injunction would only be awarded if AIDEA has shown a likelihood of success on the merits, or at least "serious questions going to the merits," and the public interest calls for incentivizing agencies to follow the law and deal fairly with the public, any bond should be set at a low level, to avoid discouraging use of APA remedies for unlawful agency action.

## Conclusion

The Court should grant a stay of agency action under 5 U.S.C. § 705 or a preliminary injunction under Fed.R.Civ.P. 65(a) to preserve the status quo and this Court's ability to conduct a judicial review of DOI's September, 2023 action cancelling AIDEA's leases. It should enjoin DOI from leasing to any third party the acres covered by AIDEA's leases, until entry of a final unappealable order resolving whether DOI's cancellation of AIDEA's leases was lawful.

DATED this 25th day of November, 2024.

                                           BIRCH HORTON BITTNER & CHEROT
                                           Attorneys for Plaintiff

                                       By:  /s/ *James H. Lister*
                                                      James Lister, ABA #1611111
                                                      Brian V. Gerd, ABA #1810097
                                                      David Karl Gross, ABA #9611065
                                                      Zoe A. Eisberg, ABA #1911094

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of November, 2024, a true and correct copy of the foregoing was served on the following via the Court's CM/ECF electronic delivery system:

BIRCH HORTON BITTNER & CHEROT

By:    /s/ *James H. Lister*