## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

ALASKA INDUSTRIAL DEVELOPMENT
AND EXPORT AUTHORITY,

          Plaintiff,

    v.

U.S. DEPARTMENT OF THE
INTERIOR, *et al.*,

          Defendants,

    and

GWICH'IN STEERING COMMITTEE, *et al.*,

          Intervenor-Defendants.

Case No. 3:24-cv-00051-SLG

## DECISION AND ORDER

Before the Court at Docket 50 is Plaintiff Alaska Industrial Development and Export Authority's ("AIDEA") Opening Brief on Counts I, II(A), III, IV, and V. Federal Defendants responded in opposition and cross-moved for summary judgment at Docket 52.[1] Intervenor-Defendants Gwich'in Steering Committee responded in opposition at Docket 53.[2] Intervenor-Defendants the Tribes responded in

---

[1] "Federal Defendants" are collectively the U.S. Department of Interior, Deb Haaland, in her official capacity as the Secretary of the Department of Interior, Bureau of Land Management, and Tracey Stone-Manning, in her official capacity as Director of the Bureau of Land Management.

[2] Intervenor-Defendants "Gwich'in Steering Committee" are collectively Alaska Wilderness League, Alaska Wildlife Alliance, Canadian Parks & Wilderness Society-Yukon, Defenders of

opposition at Docket 59.[3]  AIDEA replied at Docket 65.

Also, at Docket 66 is AIDEA's Opening Brief on Count II(B) and Opposition to Defendants' Motion for Summary Judgment on Count II(B) (the "pretext" claim). Federal Defendants responded in opposition at Docket 74, Gwich'in Steering Committee responded in opposition at Docket 75,[4] and the Tribes responded in opposition at Docket 78.  AIDEA replied at Docket 81.

Additionally, pending at Docket 68 is AIDEA's Motion to Supplement the Administrative Record.  Federal Defendants responded in opposition at Docket 72, Gwich'in Steering Committee responded in opposition at Docket 73, and the Tribes responded in opposition at Docket 78.  AIDEA replied at Docket 76.

Oral argument was not requested on any of the motions and was not necessary to the Court's decision.

## BACKGROUND

This action challenges the Department of Interior's ("DOI") termination of seven lease agreements with AIDEA for the development of oil and gas resources in the Coastal Plain of Alaska within the Arctic National Wildlife Refuge ("Arctic

---

Wildlife, Friends of Alaska National Wildlife Refuges, National Wildlife Federation, National Wildlife Refuge Association, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Wilderness Watch.

[3] Intervenor-Defendants "the Tribes" are Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council. For ease of reference, the Court refers to the two groups of Intervenor-Defendants by the defined names they each use in their briefs.

[4] The Court also reviewed the Errata at Docket 80, which corrects citations in Gwich'in Steering Committee Intervenors' response in opposition to AIDEA's Opening Brief on Count (II)(B).

Refuge" or "ANWR").  It is the latest in a series of cases involving a Congressional program to develop oil and gas resources in the Coastal Plain.[5]  The Court assumes the readers' familiarity with its prior decisions, as well as the factual and procedural background they provide.  The facts and procedural background, as directly relevant to this appeal, are as follows:

## I.    Congress Enacts the Tax Cuts and Jobs Act

In December 2017, as part of the Tax Cuts and Jobs Act (the "Tax Act"), Congress directed that the Secretary of the Interior, acting through the Bureau of Land Management, "shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain" (the "Program").[6]  Congress set statutory parameters for the program, specifying that the Secretary shall conduct at least two lease sales within 10 years, with one to take place by December 22, 2021, and a second to take place within by December 22, 2024, and requiring that each lease sale offers "not fewer than 400,000 acres area-wide" and includes "those areas that have the highest potential for discovery for hydrocarbons."[7]  Congress also directed that the Secretary "shall issue any rights-of-way or easements across the Coastal Plain for

[5] See Gwich'in Steering Comm. v. Bernhardt, Case No. 3:20-cv-00204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021); Alaska Indus. Dev. & Exp. Auth. v. Biden (AIDEA I), 685 F. Supp. 3d 813 (D. Alaska 2023).

[6] Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 20001(b)(2)(A), 131 Stat. 2054 (2017).

[7] Id. § 20001(c)(1)(A)–(B).

Case No. 3:24-cv-00051-SLG, AIDEA v. U.S. Dep't of the Interior, et al.
Decision and Order
Page 3 of 22
Case 3:24-cv-00051-SLG    Document 95    Filed 03/25/25    Page 3 of 22

the exploration, development, production, or transportation necessary . . ." and "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities . . . during the term of the leases under the oil and gas program . . . ."[8]  With respect to management of the Coastal Plain program, Congress directed that "[t]he Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)."[9]  In sum, this Court has previously interpreted the Tax Act to create a statutory mandate "to implement and operate the Program, provided it does so in accordance with all applicable federal laws."[10]

## II.  AIDEA Secures Seven Coastal Plain Leases

To effectuate this Congressional program, the Bureau of Land Management ("BLM") undertook an environmental impact analysis and issued a final Environmental Impact Statement ("FEIS") in September 2019.[11]  Then, in August 2020, DOI published a Record of Decision ("ROD") establishing the Program.[12]  On December 7, 2020, BLM invited bids for Coastal Plain leases.[13]

---

[8] *Id.* § 20001(c)(2)–(3).

[9] *Id.* § 20001(b)(3).

[10] *AIDEA I*, 685 F. Supp. 3d at 833 (citation omitted).

[11] AR 0001–3135.

[12] AR 3138–225.

[13] *See* AR 3227–28.

The first lease sale took place on January 6, 2021, DOI.[14]  At this sale, AIDEA secured leases for seven tracts of land.[15]  One week later, on January 13, 2021, DOI, BLM, and AIDEA executed lease agreements for extendable 10-year terms for these seven tracts, which covered 365,775 acres.[16]

## III.    Defendants Suspend and Ultimately Cancel AIDEA's Leases

One week after DOI issued the leases to AIDEA, on January 20, 2021, President Biden took office and issued Executive Order 13990.  This Order directed DOI to place a temporary moratorium on the federal government's implementation of the Coastal Plain oil and gas leasing program "[i]n light of the alleged legal deficiencies underlying the program, including the inadequacy of the environmental review required by the National Environmental Policy Act . . . ."[17] The Executive Order further instructed the Secretary to "conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program."[18]

"Following the President's directive, on June 1, 2021, Interior Secretary Haaland issued Secretarial Order 3401 . . ., which instructed DOI and BLM officials

---

[14] *AIDEA I*, 685 F. Supp. 3d at 825.

[15] *Id.*

[16] AR 3317–46.

[17] Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis, 86 Fed. Reg. 7037, 7039 (Jan. 20, 2021); AR 3351.

[18] *Id.*

to conduct the supplemental environmental review and instituted a 'temporary halt on all Department activities related to the Program in the Arctic Refuge' while that supplemental review was being conducted."[19]  That same day, DOI issued a Suspension of Operations and Production Letter to AIDEA, which suspended the seven leases while it conducted the supplemental NEPA analysis.[20]  The letter explained that DOI had identified defects in the underlying FEIS and ROD, including legal defects with respect to the FEIS's treatment of greenhouse gas emissions and compliance with § 810 of the Alaska National Interest Lands Conservation Act, and the impact of a then-recent Ninth Circuit decision.[21]  Given these issues, the letter notified AIDEA that

> The BLM will undertake this additional NEPA analysis to determine whether the leases should be reaffirmed, voided or subject to additional mitigation measures. The BLM will publish a notice of intent to begin this process to undertake additional analysis, complete necessary consultation, and correct defects in the EIS and ROD. When complete, the BLM will issue a new decision concerning this suspension of operations and production (SOP) of the above-referenced leases.[22]

Subsequently, on August 19, 2022, DOI issued to AIDEA an addendum to its June 1, 2021 Suspension of Operation and Productions letter.[23]  This letter

---

[19] *AIDEA I*, 685 F. Supp. 3d at 826 (quoting AR 3362).

[20] *Id.*; AR 3364–65.

[21] AR 3364–65.

[22] AR 3365.

[23] AR 3404–05.

explained that DOI had further evaluated the Ninth Circuit's decision in *Center for Biological Diversity v. Bernhardt*, and concluded that this decision, as well as this Court's decision in *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Management*, suggested a legal fault in the Department's analysis of greenhouse gas emissions in its FEIS that supplied an additional basis for the continued suspension of AIDEA's leases.[24]

On November 4, 2021, AIDEA filed suit in this Court and challenged both EO 13990 and DOI's implementation of the Moratorium.[25]  On August 7, 2023, this Court dismissed AIDEA's claims.[26]  The Court emphasized the "temporary duration and limited scope" of the Moratorium and, on that basis, concluded the Moratorium was not unlawful.[27]  In that order, the Court observed that

> the issues of whether Agency Defendants have the authority to cancel any leases and under what circumstances are not before this Court. The purpose of the Moratorium—the agency action that is properly challenged and currently before the Court—is to provide time for Agency Defendants to ensure that the Program is implemented in accordance with applicable laws.  It is well within DOI's authority to issue leases pursuant to the Program and to pause lease implementation to address legal errors that could lead a federal court to reject the Program . . . .[28]

---

[24] AR 3404–05 (first citing 982 F.3d 723 (9th Cir. 2020); and then citing 555 F. Supp. 3d 739 (D. Alaska 2021)).

[25] *AIDEA I*, 685 F. Supp. 3d at 827.

[26] *See generally id.*

[27] *Id.* at 831, 859.

[28] *Id.* at 855.

AIDEA then moved the Court to alter or amend its summary judgment order, which motion the Court denied.[29]  AIDEA appealed to the Ninth Circuit, but has since voluntarily dismissed that appeal.[30]

Soon after this Court entered its order upholding the temporary suspension of the oil and gas leases, on September 6, 2023, DOI issued a decision cancelling AIDEA's leases (the "Lease Cancellation Decision").[31]  In this decision, DOI explained that the Secretary of the Interior, in exercising of her general management authority of public lands, had the inherent authority to cancel AIDEA's leases as "unlawful in the inception" because DOI had identified legal defects in its 2019 FEIS and the 2020 ROD.[32]  Specifically, the letter identified as defects the FEIS's failure to analyze a leasing alternative involving less than 2,000 surface acres, its inadequate analysis of the impact of oil and gas activities on subsistence hunting, and its failure to adequately quantify downstream greenhouse gas emissions.[33]

---

[29] *Alaska Indus. Dev. & Exp. Auth. v. Biden*, Case No. 3:21-cv-00245-SLG, 2024 WL 729530 (D. Alaska Feb. 22, 2024).

[30] *Alaska Indus. Dev. & Exp. Auth. v. Biden*, Case No. 24-2533, Docket 47 (9th Cir. Jan. 24, 2025).

[31] AR 5353–59.

[32] AR 5355–59.

[33] AR 5356–57.

Case No. 3:24-cv-00051-SLG, *AIDEA v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 8 of 22

AIDEA filed the present lawsuit challenging Federal Defendants' cancellation of its leases on October 18, 2023.[34] AIDEA seeks an order vacating DOI's Lease Cancellation Decision.

In November 2024, DOI completed its SEIS for the Coastal Plain Oil and Gas Leasing Program.[35] Then, on December 8, 2024, DOI signed a new Record of Decision, adopting Alternative D2 to guide management of the Coastal Plain of ANWR.[36] This alternative made the minimum 400,000 acres available for a January 10, 2025, lease sale, which included a majority of the 365,775 acreage previously leased to AIDEA.[37] On January 8, 2025, BLM announced that it received no bids for this lease sale and therefore would not hold the sale.[38]

---

[34] Docket 1. AIDEA originally filed this lawsuit in the District Court for the District of Columbia. The case was transferred to the District of Alaska on March 3, 2024. Docket 30; *see also* Docket 27; Docket 28.

[35] U.S. Dep't of the Interior, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement (Nov. 2024).

[36] U.S. Dep't of the Interior, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Record of Decision at 10 (Dec. 2024).

[37] *Id.* at 13; Docket 85 at 2; U.S. Dep't of the Interior, *Arctic Refuge Lease Sale Yields No Interest* (Jan. 8, 2025), https://www.doi.gov/pressreleases/arctic-refuge-lease-sale-yields-no-interest [https://perma.cc/ZWZ9-KHXB].

[38] Docket 90.

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[39]

## LEGAL STANDARD

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[40]

## DISCUSSION

AIDEA asserts the following arguments in this administrative appeal: (1) that DOI deprived it of due process under the Fifth Amendment to the U.S. Constitution when it canceled its Coastal Plain leases; (2) that DOI deprived it of due process required by the APA; (3) that DOI lacks the authority to cancel the leases for the reasons the agency proffered; (4) that the APA required DOI provide to AIDEA an opportunity to cure before cancellation; (5) that DOI was required to obtain a court order to cancel AIDEA's leases; and (6) that there were no errors in the original EIS that justified the cancellation of leases.

---

[39] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[40] 5 U.S.C. § 706(2).

Having reviewed the parties' arguments, the Court concludes that DOI was required to obtain a court order before cancelling AIDEA's leases. Because this conclusion is independently sufficient to decide this case, the Court does not address the other arguments that AIDEA has raised.

AIDEA maintains that a court order is required to cancel its leases by a regulation under the Naval Petroleum Reserves Production Act of 1976 (the "NPRPA"), which AIDEA asserts Congress made applicable to the Coastal Plain program in the Tax Act.[41] In AIDEA's view, DOI mistakenly relied on the U.S. Supreme Court's decision in *Boesche v. Udall* to conclude that it did not need to seek judicial cancellation.[42] Instead, AIDEA maintains that "[t]he NPR-A lease cancellation rule extends to ANWR."[43]

Federal Defendants respond that "the NPR-A regulations only apply to the Refuge in the narrow context prescribed by the Tax Act, which states that "the Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the *administration of lease sales* under the [NPRPA].'"[44] They assert that the cancellation of a lease is not a part of the "administration of lease sales."[45]

---

[41] Docket 50 at 35–47.

[42] Docket 50 at 36–39 (citing 373 U.S. 472 (1963)).

[43] Docket 50 at 39–41.

[44] Docket 52 at 44 (quoting Tax Act, § 20001(b)(3)) (emphasis in original).

[45] Docket 52 at 44–45.

Further, Federal Defendants maintain that these particular NPRPA regulations "exist to address lessee non-compliance, which is not at issue here."[46] And they contend that "[e]ven if these regulations were to apply to cancellation of leases in the Refuge, they do not apply to or diminish the Secretary's inherent authority to cancel improperly issued leases."[47]

Gwich'in Steering Committee likewise asserts that the NPRPA regulation requiring court-ordered lease cancellation does not apply to AIDEA's ANWR leases.[48] It reasons that the regulation does not apply to invalidly issued leases and AIDEA has not challenged the Secretary's inherent authority to correct pre-leasing errors.[49] Moreover, Gwich'in Steering Committee submits that "requiring judicial intervention to cancel an invalidly issued lease is inefficient and contrary to the public interest."[50]

The Tribes raise similar arguments in their brief, contending that the NPRPA lease cancellation rule does not apply here and that, even if it did, its language makes clear that it does not apply to a lease cancellation decision based on pre-

---

[46] Docket 52 at 45.

[47] Docket 52 at 44, 46–48.

[48] Docket 53 at 42–47.

[49] Docket 53 at 42–46.

[50] Docket 53 at 46.

Case No. 3:24-cv-00051-SLG, *AIDEA v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 12 of 22

leasing legal errors.[51]   They maintain that a plain reading of the regulation "indicates it is intended to apply only to situations where the *lessee* is at fault . . ."[52]

At issue is the interpretation of the Tax Act's directive that "[t]he Secretary shall manage the oil and gas program on the Coastal Plain in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. 6501 et seq.) (including regulations)."[53]  "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[54]  Instead, a court must independently employ "the traditional tools of statutory construction" to resolve statutory ambiguities.[55]

The Tax Act instructs the Interior Secretary, "[e]xcept as otherwise provided in this section," to administer the Program in ANWR "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 . . . (including regulations)."[56]  Among the NPRPA's implementing regulations is a regulation that provides that "[p]roducing leases or leases known

---

[51] Docket 59 at 24–25.

[52] Docket 59 at 25–27 (emphasis in original).

[53] Tax Act, § 20001(b)(3).

[54] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 413 (2024).

[55] *Id.* at 401.

[56] Tax Act, § 20001(b)(3).  The regulations governing oil and gas leases under the NPRPA, 42 U.S.C. § 6501 *et seq.*, are set forth at 43 C.F.R. Part 3130.

Case No. 3:24-cv-00051-SLG, *AIDEA v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 13 of 22
Case 3:24-cv-00051-SLG     Document 95     Filed 03/25/25     Page 13 of 22

to contain valuable deposits of oil or gas may be canceled only by court order."[57] At issue is whether this regulation applies to the cancellation of AIDEA's leases. For the following reasons, the Court finds that this regulation applies to AIDEA's ANWR leases.

First, the leases AIDEA secured for the Coastal Plain are "known to contain valuable depositions of oil and gas." Gwich'in Steering Committee "does not concede that the Coastal Plain is 'known to contain valuable deposits of oil and gas,'"[58] but in both the 2019 FEIS and the 2024 SEIS, DOI found that the Coastal Plain contains such deposits.[59] Although these documents indicate that there are no proven plays, or groups of oil fields, due to the lack of oil and gas exploration in the Coastal Plain, they nonetheless confirm that the Coastal Plain contains valuable deposits according to the federal government's best estimates.[60]

---

[57] 43 C.F.R. § 3136.3(b).

[58] Docket 53 at 47 n.191.

[59] *See* AR 122–24 (2019 FEIS); U.S. Dep't of the Interior, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement (Nov. 2024).

[60] *See* AR 608 (2019 FEIS) ("Very little oil and gas exploration has occurred in this area, and there are no proven plays at this point. The United States Geological Survey (USGS) estimated that there is a 95 percent probability that the federal lands in the 1002 Area (as defined by ANILCA) of the Arctic Refuge contain a technically recoverable volume of least 4.25 billion barrels of oil."); *see also* AR 122–23 (2019 FEIS) ("It is estimated that approximately 427,900 acres of the program area are projected to have high potential for petroleum resources, 658,400 acres are projected to have moderate potential, and 477,200 acres are projected to have low potential. . . . Ninety percent of technically recoverable resources were estimated to be economically recoverable at $55/barrel."); U.S. Dep't of the Interior, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Supplemental Environmental Impact Statement at 3-47 (2024 SEIS) ("Mean estimates for the program area suggest it contains approximately 7.687 billion barrels of technically recoverable oil."). Although the APA requires that a reviewing court exercise its independent judgment to decide to decide questions of law, it "*does* mandate that judicial review

Second, this NPRPA regulation applies so as to require judicial cancellation of AIDEA's leases. The Tax Act's instruction to the Interior Secretary to conduct the Coastal Plain program "in a manner similar to the administration of lease sales" under the NPRPA is best interpreted to direct the Secretary to follow the NPRPA and its implementing regulations to administer the Coastal Plain leasing program broadly, and not solely as to the lease sales themselves. The structure of the NPRPA and its implementing regulations support this interpretation. Pursuant to a section titled "Competitive leasing of oil and gas," the NPRPA directs the Secretary to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve . . . ."[61] In order to do so, DOI adopted implementing regulations in 43 C.F.R. Subparts 3130–3138 to "establish the procedures under which the Secretary of the Interior will exercise the authority granted *to administer* a competitive leasing program for oil and gas within the National Petroleum Reserve—Alaska."[62] A regulation included in this section—Subpart 3136, 43 C.F.R. § 3136.3(b)—requires judicial cancellation. Although Federal Defendants maintain that the Tax Act narrowly incorporates the NPRPA regulations related to the "administration of lease sales," the cancellation provision is nested within the

of agency policymaking and factfinding be deferential." *Loper Bright Enterprises*, 603 U.S. at 392 (emphasis in original).

[61] 42 U.S.C. § 6506a(a).

[62] 43 C.F.R. § 3130.0-1 (emphasis added).

regulations that govern the overall administration of the NPRPA's competitive oil and gas leasing program.

Further, Federal Defendants' proposed interpretation of the Tax Act is at odds with how both the Court and DOI have understood how Congress extended the NPRPA regulations to the Coastal Plain program. In its prior decision regarding the suspension of AIDEA's leases, this Court concluded that Congress authorized DOI to suspend the leases by incorporating provisions of the NPRPA.[63] The Court noted that, although activities such as easement applications "take place after the issuance of a lease, they are an essential component of the 'administration of lease sales.'"[64] While the Court's analysis regarding the suspension of leases referred to a suspension provision within the NPRPA itself, that same logic applies here with regard to the NPRPA's implementing regulations. The cancellation of leases for alleged pre-leasing defects is an essential component of the administration of the lease sales that Congress directed to occur in the Tax Act, as it is a measure that ensures that the sales comport with law.

The Court's interpretation that the NPRPA regulation regarding cancellation applies here is also consistent with DOI's stated understanding of the Tax Act. In its 2020 Record of Decision, DOI specified that, pursuant to § 20001(b)(3), "the elements of the Coastal Plain oil and gas leasing program adopted by this Decision

---

[63] *AIDEA I*, 685 F. Supp. 3d at 833–35.

[64] *Id.* at 835.

follow the NPR-A program statutory and regulatory scheme" except where "differences in circumstances between the NPR-A and the Coastal Plain support a departure."[65]  Federal Defendants and Intervenor-Defendants have not identified any relevant difference in circumstance between the NPR-A and the Coastal Plain. Nor can the Court discern any such difference.

Federal Defendants and the Tribes insist that 43 C.F.R. § 3136.3(b) must be read in context with 43 C.F.R. § 3136.3(a), which allows for the administrative cancellation of leases due to for lessee noncompliance.[66]  43 C.F.R. § 3136.3 provides:

> § 3136.3 Cancellation of leases.
>
> (a) Any nonproducing lease may be canceled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in § 3130.0–3 of this title, of the regulations issued thereunder or of the lease, if such failure to comply continues for 30–days after a notice thereof has been delivered by registered or certified mail to the lease owner's record post office address.
>
> (b) Producing leases or leases known to contain valuable deposits of oil or gas may be canceled only by court order.

Subsections (a) and (b) of § 3136.3 address two distinct scenarios—nonproducing leases in which the lessee has failed to comply with the applicable notice are addressed in subsection (a), while leases that are producing or not yet producing,

---

[65] AR 3151–52.

[66] Docket 52 at 45; Docket 59 at 25–27; *see also* 43 C.F.R. § 3136.3(a) ("Any nonproducing lease may be canceled by the authorized officer whenever the lessee fails to comply with any provisions of the Acts cited in § 3130.0–3 of this title, of the regulations issued thereunder or of the lease.").

but known to contain valuable deposits—and therefore warrant greater safeguards against cancellation—are addressed in subsection (b).  While an initial lease with valuable deposits may be non-producing and hence subject to administrative cancellation upon default by the lessee, DOI's own commission of legal errors does not constitute lessee default that would allow for the administrative cancellation of a lease pursuant to subsection (a).  Federal Defendants argue that the language limiting cancellation pursuant to subsection (a) to cases of lessee noncompliance also applies to cancellations of leases known to contain valuable deposits in subsection (b).[67]  But the Court disagrees; subsection (b) does not contain any language limiting its application to only those cases of lessee default.

Lastly, because Congress directed DOI to apply the NPRPA regulation requiring lease cancellation by court order to the Coastal Plain program, it withdrew the Secretary's inherent authority to cancel leases that an agency has subsequently determined were invalid at inception.  In *Boesche v. Udall*, the U.S. Supreme Court held that "the Secretary, under his general powers of management over the public lands, had authority to cancel this lease administratively for invalidity at its inception, unless such authority was withdrawn" by Congress.[68]  As in *Boesche*, "[t]he dispositive question in this case . . . is whether this general

---

[67] Docket 52 at 45.

[68] *Boesche v. Udall*, 373 U.S. 472, 476 (1963).

administrative power of cancellation was withdrawn . . . ."[69]  In the Tax Act, Congress withdrew the Secretary's authority by directing DOI to administer this oil and gas program "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 . . . (including regulations)."[70]  This directive explicitly included the NPRPA's regulations, in which DOI limited the Secretary's authority to cancel certain leases without a court order. And where, as here, Congress adopts a new law incorporating sections of a prior law and its implementing regulations, Congress is presumed to have knowledge of the prior law and regulations.[71]

Federal Defendants note that "AIDEA fails to explain how DOI would institute proceedings to obtain a court order cancelling leases based on DOI's own commission of legal error."[72]  But there is no reason DOI could not file an action seeking declaratory relief in such circumstances.

Accordingly, Federal Defendants' cancellation of AIDEA's leases was not in accordance with law because it failed to seek a court order.

---

[69] *Id.* at 478.

[70] Tax Act, § 20001(b)(3).  The regulations governing oil and gas leases under the NPRPA, 42 U.S.C. § 6501 *et seq.*, are set forth at 43 C.F.R. Part 3130.

[71] *United States v. Gonzalez-Mendez*, 150 F.3d 1058, 1061 (9th Cir. 1998) ("We presume that Congress enacts statutes with full knowledge of the existing law."); *cf. Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

[72] Docket 52 at 48.

Case No. 3:24-cv-00051-SLG, *AIDEA v. U.S. Dep't of the Interior, et al.*
Decision and Order
Page 19 of 22
Case 3:24-cv-00051-SLG     Document 95     Filed 03/25/25     Page 19 of 22

The APA directs that courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[73] "Although not without exception, *vacatur* of an unlawful agency action normally accompanies a remand."[74] However, "[w]hen equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures."[75] "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed."[76]

Federal Defendants and Gwich'in Steering Committee request an opportunity to brief the appropriate remedy.[77] Federal Defendants assert that the circumstances in this case might require consideration of "additional factors outside the record, including the outcome of a 2024 lease sale and whether reinstatement of leases might trigger resumption of the stayed cases challenging

---

[73] 5 U.S.C. § 706(2)(A).

[74] *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis in original) (citation omitted).

[75] *Id.* (citation omitted).

[76] *Alaska Oil & Gas Ass'n v. Jewell*, Case No. 3:11-cv-0025-RRB, 2013 WL 11897792, at *7 (D. Alaska May 15, 2013) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[77] Docket 52 at 49–50; Docket 53 at 47–48.

the 2019 EIS and 2020 ROD."[78]   Similarly, Gwich'in Steering Committee warns that DOI was nearing the completion of a SEIS that could cause changes to the leasing program.[79]

The Court finds that vacatur is appropriate.  DOI's error is serious: DOI cancelled AIDEA's leases without following the congressionally-mandated procedure for doing so.   And vacatur would not result in the disruptive consequences Federal Defendants and Gwich'in Steering Committee suggest. For, as the Court has noted above, although DOI offered leases in a January 10, 2025 sale, BLM received no bids and therefore declined to hold the sale.[80] Therefore, the potentially disruptive consequences of reinstating AIDEA's leases have not materialized.

## CONCLUSION

Based on the foregoing, IT IS ORDERED as follows:

1.      AIDEA's Opening Brief on Counts I, II(A), IV, and V at Docket 50 is GRANTED. DOI's Lease Cancellation Decision of AIDEA's ANWR leases is VACATED.

---

[78] Docket 52 at 49.

[79] Docket 53 at 47–48.

[80] U.S. Dep't of the Interior, *Arctic Refuge Lease Sale Yields No Interest* (Jan. 8, 2025), https://www.doi.gov/pressreleases/arctic-refuge-lease-sale-yields-no-interest [https://perma.cc/ZWZ9-KHXB].

2.      AIDEA's Motion for Partial Summary Judgment on Count II(B) at Docket 66 is DENIED AS MOOT.

3.      AIDEA's Motion to Supplement the Administrative Record at Docket 68 is DENIED AS MOOT.

4.      This matter is remanded to the agency for such further proceedings as may be necessary that are consistent with this Decision and Order.

The Clerk of Court is directed to enter final judgment accordingly.

        DATED this 25th day of March 2025, at Anchorage, Alaska.

                                        _/s/ Sharon L. Gleason_
                                        UNITED STATES DISTRICT JUDGE